

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Joel Menkes, *et al.*,

    *Plaintiffs*,

v.

Stolt-Nielsen S.A., *et al.*,

    *Defendants*.

Civ. Action No. 3:03 CV 409 (DJS)

October 27, 2003

**DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION TO DISMISS
THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

The Complaint in this action rests upon the flawed assumption that the federal securities laws impose upon publicly held companies a duty to disclose violations of federal antitrust laws and other regulations even before any violation has ever been alleged. In fact, no such duty exists. The absence of such duty precludes each of the Plaintiffs' claims for securities fraud. Indeed, were such duty to exist, it would automatically expose every publicly held corporation to securities fraud actions any time any law or regulation were violated by that corporation.

Moreover, the Complaint must be dismissed for the independent reason that it fails to satisfy the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). The PSLRA greatly tightened the pleading standards both for scienter and fraud. The Complaint falls well short of satisfying these heightened pleading standards. For these reasons, the Complaint must be dismissed in its entirety.

**I.    DEFENDANTS HAD NO DUTY TO DISCLOSE ALLEGEDLY UNLAWFUL CONDUCT**

Every one of the Plaintiffs' claims rests on their contention that the securities laws bound the Defendants to disclose potential liability for uncharged crimes, even before governmental

authorities initiated any investigations or enforcement proceedings. *See, e.g.*, Compl. ¶¶ 3, 31-42, 44-46 (antitrust); *id.* at ¶ 5 (embargo violations). It is well established, however, that "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic, Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988). As the Second Circuit made clear in *Data Probe Acquisition Corp. v. Datatab, Inc.*, 722 F.2d 1, 5-6 (2d Cir. 1983), the securities laws are "not a rite of confession."

Because "[s]ilence, absent a duty to disclose" is not actionable under Rule 10b-5, courts have relied on the expertise of the Securities and Exchange Commission ("SEC") to determine the scope of a company's disclosure obligations. Thus, in *United States v. Matthews*, 787 F.2d 38 (2d Cir. 1986), the Second Circuit looked to SEC regulations and reversed the criminal conviction of a defendant charged with violating the securities laws for failing to disclose that he was a bribery co-conspirator. Deferring to the SEC, the Second Circuit explained: "We take cognizance of [the SEC's] 'expert view' as disclosed in the Commission's Rules, knowing that it was arrived at in general compliance with the provisions of the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, and only after every feasible effort has been made to secure the views of the persons affected." 787 F.2d at 47. Although a criminal case, the court relied on the SEC's rules and found — "in the field of federal securities law" — no duty to confess to uncharged criminal wrongdoing:

> The issue with the most far-reaching implications in the field of federal securities law, however, is not what "true" facts Matthews should have disclosed, but whether section 14a of the Exchange Act and the SEC rules enacted pursuant thereto required Matthews to state to all the world that he was guilty of the uncharged crime of conspiracy. This query, we are satisfied, must be answered in the negative.

*Id.* at 46-47.

In *Bolger v. First State Financial Services*, 759 F. Supp. 182 (D.N.J. 1991), the plaintiff tried to enjoin the defendant company from holding its annual meeting until the company amended proxy statements to disclose that a majority block of the shareholders, led by the plaintiff, had been threatening to sue the corporation for alleged breaches of the defendant company's fiduciary duty, and for mismanagement. The court, however, held that the defendant company had no duty under the securities laws to disclose unadjudicated allegations of wrongdoing. Looking to SEC regulations, the court declared that "companies have no duty to disclose legal theories as to how a given transaction violated the law." *Id.* at 194. The court continued: "[E]ven after allegations have become the subject of a lawsuit, ***Regulation S-K requires disclosure only of non-routine pending litigation***." *Id.* (citing 17 C.F.R. § 229.103; *GAF Corp. v. Heyman*, 724 F.2d 727 (2d Cir. 1983)) (emphasis added).

Similarly, in *Amalgamated Clothing and Textile Workers Union, AFL-CIO v. J.P. Stevens and Company, Inc.*, 475 F. Supp. 328, 331 (S.D.N.Y 1979), *vacated as moot*, 638 F.2d 7 (2d Cir. 1980), the court dismissed the complaint, finding that the plaintiffs had not properly alleged a violation of Section 10(b) or Rule 10b-5. Guided by the SEC's disclosure requirements under Regulation S-K, the court held:

> [Regulation S-K] does not require disclosure of illegal intentions or ***even of crimes committed which have not been the subject of legal proceedings***. This is not because shareholders would not be interested in such information; rather it is a realistic recognition . . . In my view a requirement that illegal intentions be disclosed would make a silly, unworkable rule. It would not promote increased disclosure, but would serve only to support vexatious litigation and abusive discovery.

*Id.* at 332 (emphasis added); *see also In re Teledyne Def. Contracting Derivative Litig.*, 849 F. Supp. 1369 (C.D. Cal. 1993) (citing *Amalgamated Clothing*, and other cases, and holding that SEC Section 14(b)'s disclosure obligation "requires disclosure of material facts, and the

Defendants' culpability — under the case law and the SEC regulations — does not become a fact that must be disclosed until it is at least charged . . . or proven . . . .").

As in *Bolger* and *Amalgamated Clothing*, Regulation S-K is the relevant SEC regulation to determine the Defendants' disclosure obligations. That regulation only requires companies to periodically disclose "material ***pending*** legal proceedings," as well as "***proceedings known*** to be contemplated by government authorities." Regulation S-K, Item 103, 17 C.F.R. § 229.103 (emphasis added). With respect to directors and high-level corporate management, the regulation only requires the disclosure of pending legal proceedings, but not uncharged violations. Regulation S-K, Item 401(f)(2), 17 C.F.R. § 229.401(f)(2). And as in *Amalgamated Clothing*, Regulation S-K imposed no duty on Stolt-Nielsen S.A. ("SNSA") or Stolt-Nielsen Transportation Group, Ltd. ("SNTG") to disclose alleged wrongdoing before legal proceedings either were pending, or were known to be contemplated by the Government; and no duty on the individual Defendants to disclose alleged wrongdoing until legal proceedings were pending. In this case, the Complaint does not allege — nor could it — that SNSA failed to promptly disclose the initiation of governmental investigations, consistent with Regulation S-K.

Other cases also make clear that Section 10(b) and Rule 10b-5 do not independently impose a duty to self-report legal wrongdoing. One post-PSLRA case — dealing with antitrust claims — is particularly instructive. In *In re Miller Industries, Inc. Securities Litigation*, 12 F. Supp. 2d 1323 (N.D. Ga. 1998), the corporate defendant became the target of an antitrust investigation by the U.S. Department of Justice. *Id.* at 1331. Investor plaintiffs sued the corporate defendant and its directors, alleging among other things, that the defendants omitted to disclose in their pre-antitrust-investigation SEC filings that their activities could expose the company to antitrust liability. The court, however, quickly dismissed those portions of the

complaint stating: "'Silence, absent a duty to disclose, is not misleading under Rule 10b-5.' Materiality alone is not sufficient to place a company under a duty of disclosure. The Federal securities laws do not impose a duty upon parties to admit publicly they may be violating the law." *Id.* at 1331 (internal citations omitted). Consequently, the court ruled: "[T]he Plaintiffs' Rule 10b-5 claim . . . referring to the omission of potential antitrust culpability should be dismissed because ***the Defendants were under no duty to disclose potential but conjectural antitrust liability***." *Id.* (emphasis added).

*Roeder v. Alpha Industries, Inc.*, 814 F.2d 22 (1st Cir. 1987) — a pre-PSLRA case — is also instructive. There, the plaintiffs alleged that executives of the defendant company illegally bribed a defense contractor. *Id.* at 23-24. The plaintiffs also alleged that the defendant company knew about the bribe, as well as a federal investigation, months before they publicly disclosed the alleged wrongdoing. *Id.* at 24. Like the Plaintiffs in this case, the plaintiff in *Roeder* filed a class action complaint under a "fraud on the market" theory, alleging that the defendant company's failure to disclose its wrongdoing when it occurred artificially inflated the defendant company's stock value. *Id.* The First Circuit, however, found that the corporate defendant had no duty under the securities laws to disclose its illegal conduct. The court held: "What is important for our purposes is that the fraud on the market theory does not dispense with the requirement that there must be a duty to disclose before there can be liability." *Id.* at 27. The plaintiff's complaint was dismissed as it did "not allege facts that, if proved would establish [defendant] had a duty to disclose the alleged illegal payments." *Id.* at 28.

Both *Miller Industries* and *Roeder* are applicable here. As in *Miller Industries*, the Plaintiffs are alleging — without support — that the Defendants had a duty to report allegedly illegal antitrust and other conduct ***before*** the authorities commenced an investigation of SNSA or

-5-

SNTG. But as *Miller Industries* makes clear, "the Defendants were under no duty to disclose **potential** but **conjectural** antitrust liability." 12 F. Supp. 2d at 1331. And like the plaintiffs in *Roeder*, the Plaintiffs here do "not allege facts that, if proved would establish [Defendants] had a duty to disclose the allegedly illegal [conduct.]" 814 F.2d at 28.

As this Court knows, SNSA entered the Antitrust Amnesty Program of the U.S. Department of Justice ("DOJ") earlier this year by reporting certain conduct in SNTG's parcel tanker operations. SNSA's entry into the program resulted in extensive media reporting in February 2003. The Plaintiffs' novel theory would revolutionize the duties of corporations under the federal securities laws and other laws and regulations. Today, there is no duty under federal antitrust laws, or under most federal regulatory statutes, to self-report violations. "A corporation and its directors generally have no affirmative duty to report or disclose evidence of criminal conduct or the results of internal investigations to law enforcement authorities." Dan K. Webb *et al.*, *Corporate Internal Investigations*, § 3.02[3][a] (2003); *see also Internal Corporate Investigations* 281 (Brad D. Brian & Barry F. McNeil, eds., 2d ed. 2003) ("The general rule is that a company is not required to report knowledge of criminal conduct to authorities or to disclose evidence of that conduct voluntarily") (citations omitted); Stuart J. Baskin, *Corporate Governance, Compliance and Accountability: Performing the Investigation, Caremark and Year 2000 Issues*, 1070 PLI/Corp 261, 269, Sept.-Oct. 1998 ("Absent a mandatory disclosure obligation, neither corporations or individuals have a general affirmative duty to acknowledge improprieties or wrongdoing").

Precisely because there is no duty to self-report an antitrust crime, DOJ created a voluntary amnesty program for reports of antitrust violations. *See* James M. Griffin, Deputy Assistant Attorney General, Antitrust Division, United States Department of Justice, Speech: *An*

*Inside Look At A Cartel: Common Characteristics Of International Cartels* (Apr. 5, 2000) ("In August 1993, the Antitrust Division expanded its Amnesty Program to increase the opportunities and raise the incentives for companies to self-report and cooperate with the Division;" "No other U.S. governmental voluntary disclosure program offers as great an opportunity or incentive for companies to self-report and cooperate"). Not all corporations avail themselves of this program. There can be instances where the potential violations are sufficiently borderline, the facts murky, or when other sound business judgment leads management to conclude that it is prudent to let the statute of limitations run, rather than to expose the corporation to certain treble damage private actions (and failing the granting of this motion, a separate violation of federal securities laws). In fact, permitting this case to move forward would create a further disincentive to report potential antitrust violations to the Antitrust Division.

The breathtaking scope of new liability that the Plaintiffs seek to create here is not limited to violations of federal antitrust laws, but extends to all violations of federal statutes and regulations of various embargo statutes and regulations. *See* Compl. ¶¶ 5, 43, 47-60 (describing alleged trading with nations subject to various embargo statutes and regulations). In short, were this Complaint to be sustained, any violation of federal statutes or regulations by a corporation would create not only the express liability for that statute or regulation envisioned by Congress, but also a new, corresponding, overarching securities law liability.

The Plaintiffs seek to create a new duty that any significant violation of any federal law gives rise automatically to a duty by the corporation to speak. This novel securities law liability would transform a company's financial statements into a warranty that no federal statute has been violated during the reporting period. Such a breathtaking extension of the Exchange Act certainly requires Congressional debate and enactment.

Because the Plaintiffs have failed to allege an SEC rule affirmatively requiring the Defendants to disclose their alleged legal wrongdoing before governmental investigations were initiated, and because Section 10(b) and Rule 10b-5 do not independently require such disclosures, the Complaint must be dismissed.

## II. THE COMPLAINT MUST BE DISMISSED BECAUSE IT FAILS TO ALLEGE A VIOLATION OF THE EXCHANGE ACT

Even if the Defendants had a legal duty to disclose to shareholder antitrust violations and other conduct, the Complaint still would have to be dismissed for failing to properly allege the "strong inference" of fraudulent intent, or "scienter" required by the PSLRA's heightened pleading standards. *See* 15 U.S.C. § 78u-4(b)(2). A plaintiff can establish such "strong inference" either: "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) (the PSLRA later essentially codified this Second Circuit standard). As in the pleading context generally, securities-fraud "[p]laintiffs do not, however, enjoy a license to base claims of fraud on speculation and conclusory allegations." *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 813-14 (2d Cir. 1996) (quotation omitted).

Contrary to *San Leandro*'s admonition, however, the Complaint offers nothing but conclusory allegations regarding scienter. Indeed, Paragraphs 87-90 of the Complaint merely mimic the PSLRA's language and generically lump all the Defendants together. Although these conclusory allegations are contained in a section of the Complaint entitled "***Additional*** Scienter Allegations," the Complaint's other averments put no flesh on these bare-boned scienter

allegations. In short, the Complaint merely restates the legal standard for scienter, but alleges no facts supporting scienter beyond formulaic recitations.

### A. The Complaint Does Not Properly Allege Scienter As To Stolt-Nielsen S.A. Or Its Officers

The Plaintiffs allege that SNSA and its officials had the requisite scienter, but only for acts and schemes allegedly planned and conducted by officers of SNSA's subsidiary, SNTG. The Complaint, however, alleges no fact to establish that SNSA, or any SNSA officer (Defendants Jacob Stolt-Nielsen and Niels G. Stolt-Nielsen), either knew or became aware of the allegedly illegal conduct at SNTG, while such conduct was occurring. While the series of *Wall Street Journal* articles referenced in the Complaint discuss "Stolt" liberally, the "Stolt" to which the articles refer is not SNSA, but SNTG. The Government affidavit quoted in the Complaint also relates to SNTG. Compl. ¶ 45. Moreover, of the two SNSA Defendants, only Defendant Niels G. Stolt-Nielsen is substantively mentioned in the Complaint — and then only to recite the allegedly fraudulent statements he made in SNSA press releases. But the Complaint alleges no fact tying him to the alleged wrongdoing at SNTG, establishing that he was aware of the alleged wrongdoing at SNTG when it was occurring, or establishing that he made the statements attributed to him knowing of SNTG's alleged misconduct. Even more astonishing, the Complaint never mentions Defendant Jacob Stolt-Nielsen, except in the caption, and to identify him as a defendant.[1]

The Second Circuit is clear that in circumstances such as these, the separate legal identities of related corporate defendants should be preserved. In *Chill v. General Electric Corp.*, 101 F.3d 263 (2d Cir. 1996), the Second Circuit affirmed the dismissal of a complaint, and declined to impute scienter to a corporate parent notwithstanding extensive allegations

---

[1] As noted below, the allegations regarding SNTG officers Cooperman and Lee are also fatally deficient.

regarding the relationship between the parent and its subsidiary, which had engaged in fraudulent conduct. *See id.* at 268. In *Chill*, the plaintiff had alleged several "specific" facts regarding the parent's culpability, including memoranda between the parent and its subsidiary detailing "unprecedented and dramatically increasing profitability" at the subsidiary. *See id.* at 269. But these allegations were not sufficient as a matter of law.

The Complaint's allegations against SNSA blur the juridical distinction between SNSA and SNTG. The Complaint in this case is even weaker than the one in *Chill* because in *Chill*, unlike here, the plaintiff at least alleged "specific" facts and attempted to establish a direct factual link (inter-company memoranda) between the parent and its subsidiary. Here, the Plaintiffs allege no factual link beyond their insufficient allegation that the officers of SNSA must have known (by virtue of their positions) of SNTG's misconduct. As the Second Circuit has made clear, however, this is insufficient to sustain an action against a parent and its officers.

**B.     The Complaint Does Not Properly Allege Motive And Opportunity**

In addition, the Complaint must be dismissed as to all the Defendants because the Complaint offers no factual predicate establishing any Defendant's "motive and opportunity" to commit fraud. *See, e.g., Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) ("motive would entail ***concrete benefits***") (emphasis added). Second Circuit law is pellucidly clear that "generalized" motives shared by "every" company or executive do not suffice to plead motive. *See, e.g., San Leandro*, 75 F.3d at 813-14 (rejecting allegations of motive by way of a purported desire to maintain the company's credit rating); *In re Crystal Brands Sec. Litig.*, 862 F. Supp. 745, 749 (D. Conn. 1994) (rejecting generalized motive allegations).

Contrary to the admonitions of the Second Circuit and this Court, the Complaint's only mention of motive alleges that "defendants had the motivation to misrepresent and conceal the facts about [SNTG's] anti-trust and embargo violations to keep the Companies' earnings high

enough to not breach key debt covenants." Compl. ¶ 88. But *San Leandro* makes clear that such motive allegation is insufficient to establish scienter. Simply put, the Complaint abjectly fails to establish any Defendant's motive and opportunity to commit fraud.

### C. The Complaint Does Not Properly Allege Circumstantial Evidence of Recklessness

To allege scienter through recklessness, a defendant's conduct must "approximate an actual intent to aid in the fraud being perpetrated." *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 121 (2d Cir. 1982). This standard, and the PSLRA's admonition that plaintiffs plead with particularity facts giving rise to a "strong inference" of fraudulent intent, have sown numerous opinions regarding the factual showing of recklessness that a plaintiff must plead under the PSLRA. *See, e.g., Kalnit v. Eichler*, 264 F.3d 131, 143-44 (2d Cir. 2001) (holding that plaintiff had not alleged facts demonstrating circumstantial evidence of conscious misbehavior or recklessness); *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir. 1999) (holding that defendant was not reckless, and that plaintiff's arguments "appear to amount to allegations of fraud by hindsight"); *Chill*, 101 F.3d at 270-71 (holding that allegations against defendant parent company were insufficient to constitute recklessness); *San Leandro*, 75 F.3d at 813 (holding that "the Complaint obviously fails to allege facts constituting circumstantial evidence of reckless or conscious misbehavior on the part of defendants in making the statements").

In this case, the Plaintiffs state repeatedly that SNSA and SNTG officials were "reckless," but they allege no *facts* to support this conclusion — thereby failing to meet the *Shields* test. As noted above, the factual allegations against Jacob Stolt-Nielsen and Niels G. Stolt-Nielsen are so bare as to be meaningless.

The allegations against the other individual Defendants are also deficient. For example, while the Complaint asserts that Defendant Cooperman did nothing after learning that SNTG

employees might be engaged in antitrust violations, the Complaint acknowledges that "Cooperman held an antitrust-law seminar" for the alleged violators — hardly supportive of "actual intent to aid in the fraud being perpetrated." *Decker*, 681 F.2d at 121. And the *only* time Defendant Lee's name is mentioned in the Complaint — other than in the caption or to identify him as a defendant — is to allege that SNTG's U.S. operation's insulation from the Iran trade "ended when Stolt appointed Defendant Lee, a Briton, to run SNTG" — nothing more. Compl. ¶ 52. These conclusory allegations are not pleadings of *fact*, and are simply insufficient to allege recklessness.

### III. THE COMPLAINT MUST BE DISMISSED BECAUSE IT FAILS TO ALLEGE MATERIAL MISSTATEMENTS WITH SUFFICIENT PARTICULARITY

Even if the Complaint presented an actionable case under Section 10(b) and Rule 10b-5, the Complaint would still have to be dismissed for failure to satisfy heightened pleading standards for securities fraud claims. Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b); *see also Leventhal v. Tow*, 48 F. Supp. 2d 104, 111-12 (D. Conn. 1999). In addition, the PSLRA also imposes a heightened pleading standard, requiring Plaintiffs who allege violation of Section 10(b) to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading" and to the extent a claim is based on information and belief, "to state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). To adequately plead a securities law violation, plaintiffs have no "license to base claims of fraud on speculation and conclusory allegations." *Chill*, 101 F.3d at 267. Here, the Plaintiffs claim that the Defendants "issued materially false and misleading statements about the Companies' revenues, earnings and business practices," not through the affirmative misstatements of any Defendant, but because the Defendants failed to

confess that SNTG was engaging in legal wrongdoing. Compl. ¶ 3. The Plaintiffs, however, have failed to plead any violation of U.S. embargo laws, and "fail to specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading" because the alleged fraudulent statements relate to the wrong operational unit.

One of the Complaint's most fatal flaws goes to the core of Plaintiffs' claim — the allegedly fraudulent statements by SNSA and Niels G. Stolt-Nielsen. Most of the allegedly fraudulent statements identified in the Complaint relate to SNTG's tank container operations, rather than the parcel tanker operations. Indeed, the Complaint's reliance on statements unrelated to parcel tankers is so pervasive that the Complaint fails to state fraud with any particularity required either by Rule 9(b) or the PSLRA.

In the section of their Complaint relating to embargo violations, the Plaintiffs allege that in annual reports filed May 31, 2000 (Exh. 1), May 31, 2001 (Exh. 2), and May 31, 2002 (Exh. 3), SNSA represented:

> The Company's businesses are *subject to* international conventions and U.S. and other governmental regulations which *strictly regulate* various aspects of the Company's operations.

Compl. ¶ 61 (emphasis added). Citing to SNSA's 2000 Form 20-F/A (Exh. 4), the Plaintiffs make the same allegation in the section of the Complaint relating to antitrust violations. Compl. ¶ 67.[2] These statements were misleading, according to the Plaintiffs, because they somehow "led investors to believe" that SNTG was "in compliance" with those "international conventions" and "governmental regulations." Compl. ¶¶ 62, 67. These statements, however, plainly represent that SNSA and its subsidiaries are *subject to* different "international conventions" and

---

[2] The Plaintiffs incorrectly attribute the statement here to SNSA's 2000 Form 20-F/A. Compl. ¶ 67. The language they quote, however, is actually from SNSA's 2001 Form 20-F. The language from SNSA's 2000 Form 20-F/A is similar, but not identical, to the language quoted in the Complaint.

"governmental regulations." The statements, however, do not represent that SNSA or SNTG are fully "in compliance" with those "international conventions" and "governmental regulations" — the words "in compliance" do not appear in the financial filings. Indeed, it would be foolhardy for SNSA or SNTG — or any company — to render such warranty. The statements actually put investors on notice that SNSA and SNTG risk violating such "international conventions" and "governmental regulations" precisely because of their pervasiveness and because they "*strictly regulate*."

Notably, the Plaintiffs ignore SNSA's straightforward warnings explaining the perils that exposure to multiple laws and regulations may create. For example, in the 2000 Form 20-F/A that the Plaintiffs quote in paragraph 67 of the Complaint, SNSA pointedly warned investors that "Our failure to comply with environmental and other regulations may result in significant fines, penalties, or the loss of revenue." Moreover, each of SNSA's annual filings made clear that "[a]ctual and future results and trends could differ materially from those set forth in such statements due to various factors," including "changes in, or the failure or inability to comply with, government regulations." 1999 Form 20-F (Exh. 1) at 29; 2000 Form 20-F (Exh. 2) at 21; 2001 Form 20-F (Exh. 3) at iii. The Plaintiffs' contention — that SNSA and SNTG "led investors to believe that, in fact, SNTG was in compliance with governmental regulations when, in fact, STNG was violating" U.S. embargo regulations and antitrust laws (Compl. ¶¶ 62, 67) — is undermined by the very same filings the Plaintiffs claim warranted full compliance. SNSA was very clear about the risks, and nothing in its statements could have "led" investors to believe that SNSA and its subsidiaries were warranting full compliance with all laws and regulations.

The Complaint also alleges that the Defendants misled investors by claiming that "[s]hipments in the year 2000 increased from the downturn encountered in 1999. Increases were

primarily the result of improved demand in three main operating regions of Asia Pacific, Europe and the United States. Shipment levels in 2001 continue to reflect improved demand particularly from the United States and Asia." Compl. ¶ 63 (quoting statement from SNSA's 2000 Form 20-F/A); ¶ 65 (same). The Plaintiffs claim that this statement was "materially false and misleading" because the increases were caused by the Defendants' embargo and antitrust violations. Compl. ¶¶ 63, 65. This allegation is nonsensical. As explained above, the Plaintiffs' allegations of legal wrongdoing relate to SNTG's *parcel tanker operations*. This statement, however, relates to SNTG's *tank container operations*, as to which there are no allegations of wrongdoing. As reflected in the filing upon which the Plaintiffs rely, the quoted statement comes from the third paragraph of a section entitled: "Tank Container Operations." *See* 2000 Form 20-F/A at 7. (Exh. 4.) Alleging legal wrongdoing in one operational unit, and then asserting material misstatements in an unrelated operational unit does not explain "why the statement is misleading," (Rule 9(b)), and provides no "reason or reasons why the statement is misleading" (15 U.S.C. § 78 v-4(b)(1)).

The Complaint is replete with allegedly fraudulent statements relating to SNTG's *tank container* operations, rather than parcel tanker operations. Thus, the Plaintiffs claim that SNSA made another "material [sic] false and misleading statement" when it stated in its May 31, 2002 annual report: "Growth of 5% is *anticipated* in 2002 as a result of increased marketing and sales efforts in all regions." Compl. ¶¶ 64, 72 (quoting 2001 Form 20-F) (emphasis added). But the quote relates to growth in SNTG's tank container operations — not parcel tanker operations. In fact, the quote comes from the third paragraph of a section entitled "Tank Container Operations" contained in SNSA's 2001 Form 20-F. *See* 2001 Form 20-F at 16-17.[3]

---

[3] Even if the statement did relate to the correct operational unit, the statement — as well as those in paragraphs 68, 72 and 73 — is a non-actionable forward-looking statement. First, the statement is not

Many other alleged misstatements arise from the Plaintiffs' misreading of SNSA's filings and their misunderstanding of the industry. *See, e.g.*, Compl. ¶ 66 (quoting SNSA 2001 annual report: "competition in the ***tank container*** market is fragmented") (emphasis added). Statements attributed to Defendant Niels G. Stolt-Nielsen from SNSA press releases also relate to tank container operations, not parcel tanker operations. *See* Compl. ¶ 68 ( "SNTG's ***tank container*** operations income improved . . . .") (emphasis added); *id* at ¶ 74 ( "SNTG's ***tank container*** division's income from operations improved significantly . . . .") (emphasis added); *id.* at ¶ 76 ("SNTG's ***tank container*** division delivered another strong result . . . .") (emphasis added). Because nearly all the allegedly fraudulent statements relate to tank container operations, not parcel tanker operations, the Complaint fails to satisfy the heightened pleading standards of Rule 9(b) or the PSLRA.

## IV. THE COMPLAINT FAILS TO PROPERLY ALLEGE CONTROLLING PERSON LIABILITY

Finally, the Complaint alleges that the "Individual Defendants" — Defendants Jacob Stolt-Nielsen, Niels G. Stolt-Nielsen, Cooperman and Lee— should face both primary liability for direct violations of Section 10(b) and Rule 10b-5, and secondary liability as "controlling persons" for violations of Section 20(a) of the Exchange Act. Compl. ¶¶ 13-17, 19, 94-106. But

---

actionable because it is "accompanied by meaningful cautionary statements." 15 U.S.C. § 78u-5(c)(1)(A)(i). In fact, in the 2001 Form 20-F referenced in paragraph 64 of the Complaint, those cautionary statements are found on the third page of the report, and clearly state that the report contains statements relating to SNSA's "expectations, beliefs, intentions or strategies regarding that future." 2001 Form 20-F at iii. Moreover, the cautionary language also makes clear that forward-looking statements "may be identified by the use of words like '*anticipate*,' . . . ." *Id.*; *see In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1091 (9th Cir. 2002) (noting that financial forecasts are "unquestionably forward-looking statements"). Second, the statement is not actionable because the Plaintiffs have not alleged — nor can they — that the statement was made by a corporate officer "with actual knowledge . . . that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(B). Here, the Plaintiffs have alleged no facts establishing that any Defendant had such "actual knowledge." *See, e.g.*, *Fellman v. Electro Optical Sys. Corp.*, 2000 WL 489713, at *4 (S.D.N.Y. 2000) (concluding that "[a]lthough Plaintiffs allege in a general manner that [defendant] had actual knowledge of the falsity . . . they allege no specific facts from which such actual knowledge can be inferred").

because the Plaintiffs have failed to establish any liability under Section 10(b), and the Plaintiffs' Section 20(a) claims derive from the Section 10(b) claims, the Complaint must be dismissed as to the Section 20(a) claims as well. *See, e.g., Kalnit v. Eichler*, 85 F. Supp. 2d 232, 246 (S.D.N.Y. 1999), *aff'd* 264 F.3d 131 (2d Cir. 2001) (dismissing Section 20(a) claims because complaint failed to adequately plead a primary violation under Section 10(b) or Rule 10b-5); *Friedman v. Wheat First Sec. Inc.*, 64 F. Supp. 2d 338, 347 (S.D.N.Y. 1999) (same).

## CONCLUSION

For the foregoing reasons, the Court should grant the Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint, and dismiss the Complaint in its entirety as to all Defendants.

> DEFENDANTS STOLT-NIELSEN S.A.,
> STOLT-NIELSEN TRANSPORTATION
> GROUP LTD., JACOB STOLT-NIELSEN,
> NIELS G. STOLT-NIELSEN, SAMUEL
> COOPERMAN AND REGINALD J.R. LEE
>
> By: [signature]
> Donna Nelson Heller (ct06854)
> Patrick J. McHugh (ct14072)
> Finn Dixon & Herling LLP
> One Landmark Square
> Suite 1400
> Stamford, CT 06901-2689
> Tel: (203) 325-5000
> Fax: (203) 348-5777
> Email: dheller@fdh.com
> Email: pmchugh@fdh.com

*Of Counsel*
J. Mark Gidley
Christopher M. Curran
Jaime M. Crowe
Peter J. Carney
**WHITE & CASE LLP**
601 Thirteenth Street, N.W.
Washington, DC 20005
Tel: (202) 626-3600
Fax: (202) 639-9355