# Stolt Nielsen SA · 20-F · For 11/30/0, On 5/30/1

## Document 1 of 6 · 20-F · Annual Report of a Foreign Private Issuer

### *This document was filed as EDGAR "Text" and not EDGAR "HTML".*

---

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 20-F

ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934

FOR THE FISCAL YEAR ENDED NOVEMBER 30, 2000

COMMISSION FILE NUMBER 0-16977

STOLT-NIELSEN S.A.

(Exact name of Registrant as specified in its charter)

LUXEMBOURG
(Jurisdiction of incorporation or organization)

C/O STOLT-NIELSEN LIMITED
ALDWYCH HOUSE
71-91 ALDWYCH
LONDON WC2B 4HN, ENGLAND
(Address of principal executive offices)

SECURITIES REGISTERED OR TO BE REGISTERED PURSUANT TO SECTION 12(B) OF THE ACT:
None

SECURITIES REGISTERED OR TO BE REGISTERED PURSUANT TO SECTION 12(G) OF THE ACT:
Common Shares, no par value
Class B Shares, no par value *

SECURITIES FOR WHICH THERE IS A REPORTING OBLIGATION PURSUANT TO SECTION 15(D)
OF THE ACT:

None

Indicate the number of outstanding shares of each of the issuer's classes of
capital or common stock as of the close of the period covered by the annual
report:

Common Shares, no par value................................. 24,194,646**
Class B Shares, no par value *............................. 30,648,690

# TABLE OF CONTENTS

## PART I

Item 1.     Identity of Directors, Senior Management and Advisers.......

Item 2.     Offer Statistics and Expected Timetable....................

Item 3.     Key Information............................................
Selected Financial Data....................................
Risk Factors...............................................

Item 4.     Information on the Company.................................
History and Development of the Company.....................
Business Overview..........................................
Strategy...................................................
Regulation.................................................
Competition................................................
Insurance..................................................
Principal Operating Subsidiaries...........................
Property, Plant, and Equipment.............................

Item 5.     Operating and Financial Review and Prospects...............
Operating Results..........................................
Liquidity and Capital Resources............................
Research and Development; Patents and Licenses.............

Item 6.     Directors, Senior Management, and Employees................
Directors and Senior Management............................
Compensation...............................................
Board Practices............................................
Employees..................................................
Share Ownership............................................

Item 7.     Major Shareholders and Related Party Transactions..........
Major Shareholders.........................................

Item 8.     Financial Information......................................
Consolidated Statements and Other Financial Information.....
Legal Proceedings..........................................
Dividends..................................................
Significant Changes........................................

Item 9.     The Offer and Listing......................................
Stock Trading History......................................
Markets....................................................

i

## INTRODUCTION

Stolt-Nielsen S.A. is a Luxembourg registered company. In this Report, "Stolt-Nielsen", "Stolt", "Group" or the "Company" refer to Stolt-Nielsen S.A. and, unless the context otherwise requires, its consolidated subsidiaries. References in this Report to "SNTG" refer to Stolt-Nielsen Transportation Group Ltd., references to "Stolt Offshore" refer to Stolt Offshore S.A., and references to "SSF" or "Stolt Sea Farm" are references to Stolt Sea Farm Holding plc, each subsidiaries of the Company.

References to Company activities by years refer to the fiscal year ended November 30.

Stolt's Common Shares are listed in Norway on the Oslo Stock Exchange and trade in the form of American Depositary Shares (each ADS representing one Common Share) in the U.S. on the Nasdaq National Market ("Nasdaq").

The Consolidated Financial Statements, including the notes thereto, included or incorporated in this Report (the "Consolidated Financial Statements") have been prepared in accordance with generally accepted accounting principles in the United States.

## FORWARD LOOKING STATEMENTS

This Report contains certain "forward-looking statements" and information relating to Stolt that are based on beliefs of its management as well as assumptions made by and information currently available to Stolt. When used in this Report, the words "anticipate", "believe", "estimate", "expect", "intend", "may", "plan", "project" and "should" and similar expressions are intended to identify forward-looking statements. These forward-looking statements include, but are not limited to, statements included or incorporated by reference herein in "Item 5. Operating and Financial Review and Prospects". In addition, this Report contains forward-looking statements relating to the Company's performance in "Item 4. Information on the Company". These statements reflect the current views and assumptions of Stolt with respect to future events and are subject to risks and uncertainties. Actual and future results and trends could differ materially from those set forth in such statements due to various factors. Such factors include, among others: general economic and business conditions; industry capacity; industry trends; competition; asset operational performance; raw material costs and availability; currency fluctuations; disease and other natural causes; immaturity of aquaculture technology; the loss of any significant customers; changes in business strategy or development plans; availability, terms and deployment of capital; availability of qualified personnel; changes in, or the failure or inability to comply with, government regulations; adverse weather conditions; and other factors referenced in this Report particularly under "Item 3. Key Information--Risk Factors."

2

Case 3:03-cv-00409-DJS   Document 305   Filed 10/27/2008   Page 5 of 289

total estimated costs at completion. Voyage revenues and gross profit may be
adjusted in subsequent reporting periods from those originally reported in prior
periods. To the extent that these adjustments result in a reduction or
elimination of previously

4

developed by Stolt Offshore which may require that Stolt Offshore spend
its own money to remedy the problem;

- changes in the cost of components, materials or labor;

5

markets present risks that are not often encountered in countries that have well established economic and political systems, including:

- economic instability, which could make it difficult for Stolt Offshore to anticipate future business conditions in these markets or cause delays in the placement of orders for projects that Stolt Offshore has been awarded;

6

## COMPETITION

The offshore business is highly competitive, and offshore contractors compete intensely for available projects. Contracts for Stolt Offshore's services are generally awarded on a competitive bid basis, and although customers may consider, among other things, the availability and capability of equipment and the reputation and experience of the contractor, price is a primary factor in determining

7

SEC In Case 0:03-Nielsen08 4 9 - DM - Document 130 - Filed 12/17/05 - Page 9 Page 7 of 114

SEC Info - Stolt Nielsen SA - Form 10-K405 - For 10/30/01 - Document 2 - Page 28 of 114

GENERAL

HAZARDOUS ACTIVITIES

The operation of any ocean-going ship carries an inherent risk of catastrophic marine disasters, property losses and business interruptions caused by adverse weather conditions, mechanical failures, human error, war, terrorism, piracy, labor stoppages, and other circumstances or events. In addition, the transportation of oil, fuel and chemicals is subject to the risk of spills. Any such event may result in loss of revenues or increased costs.

The Company carries insurance to protect against most of the accident-related risks involved in the conduct of its business and it maintains environmental damage and pollution insurance coverage. There can be no assurance, however, that all risks are adequately insured against, that any particular claim will be paid or that the Company will be able to procure adequate insurance coverage at commercially reasonable rates in the future. In particular, more stringent environmental regulations may result in increased costs for, or the lack of availability of, insurance against the risks of environmental damage or pollution.

While the Company currently insures its ships against property loss due to a catastrophic marine disaster, mechanical failure, or collision, the loss of any ship as a result of such an event could result in a substantial loss of revenues, increased costs, and other liabilities in excess of available insurance and could have a material adverse effect on operating performance. Litigation arising from such an occurrence may result in the Company being named as a defendant in lawsuits asserting large claims.

REGULATORY AND ENVIRONMENTAL MATTERS

The Company operates in a number of different jurisdictions and is subject to and affected by various types of governmental regulation related to the protection of the environment, including national laws and regulations and international conventions relating to ship safety and design requirements, disposal of hazardous materials, discharge of oil or hazardous substances, protection of the environment, food safety, and various import and export requirements. These laws and regulations are becoming increasingly complex, stringent, and expensive to comply with, and there can be no assurance that continued compliance with existing or future laws or regulations will not adversely affect the operations of the Company. Significant fines and penalties may be imposed for non-compliance.

In addition, the Company could be held liable for remediation of, and damages arising from, pollution caused by its ships and for releases of oil and hazardous substances and debris from offshore production platforms, pipelines, subsea facilities and other assets owned or operated by its customers, and for releases resulting from activities of, or equipment owned by, its subcontractors. Although the Company generally negotiates contractual provisions requiring customers to indemnify the Company in the event any such liability is imposed, the Company has not obtained such indemnification in all cases. Moreover, such indemnification does not generally cover liability resulting from the gross negligence or willful misconduct of, or violation of law by, employees or subcontractors of the Company.

CERTAIN FINANCIAL REQUIREMENTS

The Company is party to material bank credit and other financing agreements which impose certain financial requirements such as limitations on debt and the types of businesses the Company may engage in. At the end of 2000, the Company

## FLOATING INTEREST RATES

Approximately 40% of the Company's long-term indebtedness at March 31, 2001 is accrued at rates that fluctuate with the prevailing interest rates and, accordingly, increases in such rates will increase the Company's interest cost if the Company cannot hedge the impact of such interest rate movements.

## CAPITAL REQUIREMENTS

The acquisition of new assets and properties, both for growth as well as replacement, is capital intensive. The availability of new capital to finance these expenditures depends on the prevailing market conditions and the acceptability of financing terms offered to the Company. Management believes that capital expected to be available under the various lines of credit, financing agreements, and other sources and from disposition of existing assets and properties as well as cash generated from operations, should be sufficient to meet its capital requirements for the foreseeable future. No assurance, however, can be given that financing will continue to be available on attractive terms.

## FOREIGN CURRENCY FLUCTUATIONS

Substantial portions of the Company's revenue and expenses are denominated in currencies other than U.S. dollars. Fluctuations in these currencies can have a significant impact on the Company's financial results. The Company engages in hedging programs intended to reduce part of the Company's short-term exposure to currency fluctuations. However, there can be no assurances that such efforts will be successful. Hedging is limited to known and foreseeable exposures that develop through normal business operations and to long-term business investments. The Company does not attempt to hedge foreign earnings that are translated into dollars for reporting purposes. Foreign currency fluctuations have had and will continue to have an impact on reported financial results.

## TAXES

Pursuant to the Internal Revenue Code of the U.S. (the "Code"), effective for the Company's fiscal year beginning on or after December 1, 1987, U.S. source income from the international operation of ships is generally exempt from U.S. tax if the company operating the ship meets certain requirements. Among other things, in order to qualify for this exemption, the company operating the ship must be incorporated in a country which grants an equivalent exemption to U.S. citizens and corporations that meet certain residency requirements. The Internal Revenue Service has agreed that the Company qualifies for this exemption for the years up to and including fiscal 1992, but may review the Company's qualifications for subsequent years. The Company believes that substantially all of SNTG's ship owning and ship operating subsidiaries meet the requirements to qualify for this exemption from U.S. taxation. For these reasons, no provision for U.S. income taxes has been made with respect to the Company's U.S. source shipping income.

In February 2000, the Internal Revenue Service published proposed regulations which, if published in final form, might adversely effect the Company's ability to qualify for this exemption. Based upon information available at this time, the Company believes that it will still qualify for the exemption. However, there can be no certainty until the Internal Revenue Service publishes the final regulations. If an equivalent exemption were not available, or if the Company did not qualify for a treaty exemption, the Company would be taxable on its U.S. source income from shipping activities in one of two ways. Generally, income subject to U.S. taxation would include 50% of the revenues derived from shipments between the U.S. and foreign ports. This would include

would be further subject to the 30% branch profits tax to the extent not
reinvested in the U.S. Under the second method, any such income which is not
effectively connected with a U.S. trade or business would be subject to taxation
on a gross basis (without allowance for deductions) at a fixed 4% rate. The
branch profits tax would not apply to income subject to the 4% tax.

LABOR RELATIONS

The Company employs many unionized employees and considers its relations
with its employees and their unions to be good and has not experienced any
significant work stoppages. There can be no assurances however that disruption
of the Company's services or production caused by strikes or work slowdowns, or
larger labor disputes involving the industries the Company operates in, will not
adversely affect the Company's results.

ACQUISITION AND EXPANSION STRATEGY

One element of the Company's strategy is to continue to grow through
selected acquisitions. Likewise the Company plans on expanding its operations at
existing or new locations. There can be no assurance that any currently planned
acquisitions or expansions will be completed or that any completed, currently
planned or additional acquisitions or expansions will be successful in enhancing
the operations or profitability of the Company; that the Company will be able to
identify suitable additional acquisition candidates or areas for expansion; that
it will have the financial ability to consummate additional acquisitions or
expansions; or that it will be able to consummate such additional acquisitions
or expansions on terms favorable to the Company. Inability to successfully
implement our acquisition and expansion strategy would negatively impact the
Company's plans for profitable growth.

RISK OF LOSS AND INSURANCE

The business of the Company is affected by a number of risks, including the
mechanical failure of its ships, collisions, ship loss or damage, cargo loss or
damage, hostilities, and labor strikes. In addition, the operation of any ship
is subject to the inherent possibility of a catastrophic marine disaster,
including oil, fuel, or chemical spills and other environmental mishaps, as well
as other liabilities arising from owning and operating ships. Any such event may
result in loss of revenues and increased costs and other liabilities. Although
the Company's losses from such hazards have not historically exceeded its
insurance coverage, there can be no assurance that this will continue to be the
case.

The U.S. Oil Pollution Act of 1990 ("OPA '90"), by imposing virtually
unlimited liability upon ship owners, operators, and certain charterers for
certain oil pollution accidents in the U.S., has made liability insurance more
expensive and has also prompted insurers to consider reducing available
liability coverage. While the Company maintains insurance, there can be no
assurance that all risks are adequately insured against particularly in light of
the virtually unlimited liability imposed by OPA '90, that any particular claim
will be paid, or that the Company will be able to procure adequate insurance
coverage at commercially reasonable rates in the future. Because it maintains
mutual insurance, the Company is subject to funding requirements and coverage
shortfalls in the event claims exceed available funds and reinsurance and to
premium increases based on prior loss experience. Any such shortfalls could have
a material adverse impact on the Company.

In September 2000, SSF purchased Rokerji La Couronne NV, a smoker and processor of salmon and other seafood products.

Also, in September 2000, SSF purchased the remaining 49% of Pacific Aqua Salmon Farmers Ltd. ("PASFL") that it did not own. PASFL is a producer of Atlantic salmon in British Columbia.

13

$265 million in 2000 and $9 million in 1999.

ASSET DISPOSITIONS

    In 2000, proceeds from the sale of assets were $72 million including
$50 million for tank containers that were leased back and $19 million for Stolt
Offshore. In 1999, proceeds from the sale of assets

14

carry many cargoes (as many as 58 parcels) for many customers on the same voyage and load and discharge cargo at many ports. A parcel tanker may carry a wide range of bulk liquids shipped in parcels of several hundred to several thousand tons each.

15

("ISMA") Quality Assurance System certification, which includes International Standards Organization ("ISO") 9002 and International Safety Management ("ISM") certifications. SNTG has also secured ISO 9002 certification for its chartering and operations activities worldwide.

SNTG personnel coordinate most of the marketing and sales efforts directly with SNTG's parcel tanker customers. In some markets third-party brokers support this effort. SNTG's top ten tanker

SNTG's tank container operations requires its own infrastructure for tank cleaning and repair. In Europe and the U.S., third-party contractors primarily perform this work. In Rotterdam, Houston, and

=========

   SNTG obtained ISO 9002 certification for its terminal business systems in Houston, Chicago, Perth Amboy, and Santos. SNTG implemented a Terminal Automation System for tracking customer contracts and tank inventory, as well as for producing customer bills and reports.

Services tend to be local business projects which can be supported by Regional departments. They can include engineering studies; drill support; or inspection, repair and maintenance operations, shallow water pipelay, for example.

In addition to its main product lines, Stolt Offshore offers heavy lift services through a joint venture company, Seaway Heavy Lifting Limited ("SHL"), which operates the heavy lift ship, STANISLAV

19

costs. The transaction has been accounted for under the purchase method of accounting. The purchase price generated goodwill of approximately $114.8 million at November 30, 1998. This was adjusted during 1999 to $122.1 million. The adjustment reflects a reassessment of the value of certain intangible assets within Ceanic and their related deferred tax liabilities. The goodwill is being amortized on a straight-line basis over 25 years.

20

In August 1999, SSF acquired International Aqua Foods Ltd. ("IAF"), a publicly listed company, for approximately $11.0 million and the assumption of $9.2 million in debt. IAF was involved in salmon and tilapia hatchery operations in Canada and the U.S., and salmon and trout farming in Chile. In June 2000, SSF purchased the remaining 49% of Ocean Horizons SA that it did not own. Ocean

Case 3:03-cv-00409-DJS   Document 60-6   Filed 01/27/2006   Page 22 of 28

their respective businesses. The Company will hold a controlling interest in PSL, which will be renamed SeaSupplier Ltd., and which will have offices in London, Oslo, Houston, Singapore, Piraeus, and Bermuda.

|                          | FOR THE YEARS |
|--------------------------|--------------:|
|                          | 2000          |
|                          | ($ IN         |
| **Tank Containers:**     |               |
| United States............................................ | 80 |
| South America............................................ | 9 |
| France................................................... | 23 |
| Other Europe............................................. | 55 |
| Japan.................................................... | 16 |
| Other Asia............................................... | 39 |
| Other.................................................... | 2 |
|                          | ------ |
|                          | 224 |
|                          | ------ |
| **Terminals:**           |               |
| United States............................................ | 52 |
| Brazil................................................... | 7 |
|                          | ------ |
|                          | 59 |
|                          | ------ |
| Total SNTG............................................... | 975 |
|                          | ------ |
| **STOLT OFFSHORE:**      |               |
| Asia Pacific............................................. | 40 |
| North America............................................ | 122 |
| Norway................................................... | 199 |
| SEAME.................................................... | 445 |
| South America............................................ | 53 |
| United Kingdom........................................... | 124 |
| Other Corporate.......................................... | -- |
|                          | ------ |
| Total Stolt Offshore..................................... | 983 |
|                          | ------ |
| **STOLT SEA FARM:**      |               |
| United States............................................ | 118 |
| Canada................................................... | 16 |
| United Kingdom........................................... | 13 |
| Norway................................................... | 52 |
| Spain.................................................... | 10 |
| Japan.................................................... | 70 |
| Others, net.............................................. | 32 |
|                          | ------ |
| Total Stolt Sea Farm..................................... | 311 |
|                          | ------ |
| Total.................................................... | $2,269 |
|                          | ====== |

## STRATEGY

The Company pursues a strategy of seeking to provide sophisticated industrial services to customers in niche markets which demand complex technology. The Company aims to operate in global markets where it is, or believes it can become, the market leader. The Company's investment philosophy is to generate value over the long term.

STOLT-NIELSEN TRANSPORTATION GROUP

Case 3:03-cv-00409-DJS - Document 90-5/30/1 - Document 206-2 - Page 24 of 28

transportation and inventory, electronic communications of transactions, and supply chain management. SNTG is developing or expanding its capabilities in all of these areas.

The demand for chemical transportation services varies with patterns of industrial growth and world trade. Historically, such demand has grown at a greater rate than world trade, which itself has grown faster than industrial production.

In 1994, SNTG embarked on a new building program to construct 25 new parcel tankers (of which one ship was cancelled) designed to meet increasing demand for its transportation services and to replace the first generation of purpose-built parcel tankers built in the early to mid-1970s. The ships in the newbuilding program have greater capacity than the units they have replaced and introduce a series of features to increase operational efficiency, reduce operating costs, and be environmentally safer than previous generations of parcel tankers.

SNTG's tank container operations provide transportation services for many of the same type of bulk liquids that are carried in parcel tankers, although tank containers transport smaller lots. Generally, parcel tankers are more economical for lots greater than 150 metric tons, whereas tank containers are more economical for smaller lots. A major trend in the tank container market is the conversion from transportation of liquids in drums to tank containers. The transportation of liquids in tank containers provides a cleaner, safer, and more economical means of transportation than by drums. It is SNTG's intention to continue to expand its presence in this market in response to the needs of its customers, and to continue to provide an important link in SNTG's transportation service chain. By using tank containers, SNTG is able to offer door-to-door, just-in-time deliveries. In developing countries in the Asia Pacific region where there is little supporting infrastructure for tank containers, SNTG has been a pioneer in developing cleaning and maintenance facilities.

SNTG's terminal operations support its parcel tanker operations by enabling quicker turnaround of the tankers when in port. They also provide hubs for servicing SNTG's customers by integrating storage with sea and land transportation by parcel tanker, rail, and road. It is SNTG's strategy to take advantage of existing infrastructure and to make selective investments to increase the capacity of its existing terminal facilities, as well as to look for new opportunities on a worldwide basis which will support the strategic objectives of expanding its network of services and improving operational efficiency through faster parcel tanker turnaround and the integration of transportation services.

STOLT OFFSHORE

Stolt Offshore's strategy is to enhance its position as a full-service offshore contractor providing technologically advanced and cost effective life-of-field offshore services to its customers. With the recent merger activities among the major oil companies it is clear that they are now looking for contractors with a greater range of assets and technologies and who are able to offer them a worldwide service for both new construction and field maintenance services.

Stolt Offshore's December 1999 acquisition of ETPM enables Stolt Offshore to offer a much wider range of engineering and pipelay services and also to provide fixed or floating production platforms. Stolt Offshore is therefore able to supply a complete field development solution for the first time. This increased capability and capacity has given Stolt Offshore a much stronger presence in West Africa as it can now undertake larger pipelay and EPIC projects.

## STOLT SEA FARM

SSF's mission is to position itself as a world leading seafood company; by capitalizing on the potential of aquaculture world-wide, through the long term development of new species and new farming technologies; by adding value to its products through further processing into convenient "ready-to-eat" products; and by building its own global sales network, close to its customers, making STERLING and PRODEMAR branded seafood products conveniently available to the consumer. In its strategy, Stolt Sea Farm emphasizes scale as well as decentralized farming operations, the importance of being fully integrated along the value chain, and the importance of having both a strong local presence in all the major markets and a production platform in all the four major production regions. Stolt Sea Farm focuses on spearheading research and development and taking a position with branded seafood products in several new species.

## REGULATION

The Company's businesses are subject to international conventions and U.S. and other governmental regulations which strictly regulate various aspects of the Company's operations. In addition, the Company is required by various governmental and other regulatory agencies to obtain certain permits, licenses, and certificates with respect to its equipment and operations. The kinds of permits, licenses and certificates required in the operations of the Company depend upon a number of factors. The Company believes that it has or can readily obtain all permits, licenses, and certificates necessary to conduct its operations. Some countries require that the Company enter into a joint venture or similar business arrangement with local individuals or businesses in order to conduct business. The Company has entered into such arrangements where necessary.

## STOLT-NIELSEN TRANSPORTATION GROUP

SNTG is subject to the international and national conventions and regulations which cover ocean shipping generally and the transport of chemicals and oil in bulk specifically. The major international conventions applicable to SNTG's operations include the International Convention on the Safety of Life at Sea; the International Convention for the Prevention of Pollution from Ships, 1973, as modified by the Protocol of 1978, as amended; the International Convention on the Standards of Training, Certification and Watchkeeping of Seafarers; and the Convention on Civil Liability for Oil Pollution Damage. Applicable national regulations for SNTG's operations in U.S. waters include the Port and Tanker Safety Act, the Hazardous Materials Transportation Act, the Clean Air Act, the Clean Water Act, the U.S. Oil Pollution Act of 1990 ("OPA '90"), and the U.S. Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") (see specific discussion on OPA '90 and CERCLA below).

In addition, specifically to protect the purity of fats and vegetable oils, SNTG complies with the latest cargo rules established by the National Institute of Oilseed Products in the U.S. and the Federation of Oils, Seeds, and Fats Associations in Europe. SNTG's Dedicated Vegetable Oil Service has been developed as a direct result of these rules.

SNTG's river parcel tanker activities are governed by the European Agreement on Regulations for the Carriage of Dangerous Substances on the Rhine and other applicable standards for service on the Rhine River in Europe and by the U.S. Coast Guard safety and pollution prevention regulations.

As a foreign-owned corporation, SNTG is prohibited by U.S. Federal law from owning more than a 25% interest in ships operating in the U.S. coastal market and in the U.S. inland waterway system.

which regulates the construction and periodic testing of equipment used to transport hazardous packaged liquids; and regulations of other comparable national authorities regarding the use of containers on rail cars and the transport of hazardous materials by rail or road.

Additional regulations specific to SNTG's terminal operations in the U.S. are the Resource Conservation and Recovery Act regarding the reporting, recordkeeping, and handling of hazardous waste and the Occupational Safety and Health Act regulating the working conditions at U.S. terminals as well as other business facilities. Terminals located outside of the U.S. are governed by the comparable national and local governmental agencies.

## U.S. OIL POLLUTION ACT OF 1990 AND COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION AND LIABILITY ACT

OPA '90 sets out various requirements applicable to shipowners and ship operators in U.S. waters including, among other things, standards and requirements covering the construction of ships carrying oil and oil products (as defined in the Act), stringent financial responsibility requirements and expanded contingency planning requirements. OPA '90 also increases shipowners' and ship operators' potential liability for damages and cleanup and removal costs for pollution accidents in U.S. waters. Ship and facility owners and operators are "responsible parties" and are jointly, severally and strictly liable (unless the spill results solely from the act or omission of a third party, an act of God or an act of war) for all oil spill containment and cleanup costs and other damages arising from oil spills from their ships or facilities. These other damages are defined broadly to include: (i) natural resources damages and the costs of assessment thereof; (ii) real and personal property damages; (iii) net loss to a government entity of taxes, royalties, rents, fees, and other lost revenues; (iv) lost profits or impairment of earning capacity due to property or natural resources damage; (v) net cost of public services necessitated by a spill response, such as protection from fire, safety, or health hazards; and (vi) loss of subsistence use of natural resources.

With limited exceptions, OPA '90 requires that all new ships ordered after June 30, 1990, or delivered after January 1, 1994, must be built with double hulls to be allowed to call at U.S. ports. There is a timetable for retrofitting existing ships with double hulls or taking them out of service, depending upon the year the ship was built, its gross tonnage, and whether the ship already has a double bottom or double sides. Since January 1, 1995, double bottom ships of greater than 5,000 gross tons and more than 45 years of age have been required to be retrofitted with double hulls. The age requirement is reduced annually so that by 2005, and until 2015, no such ships may exceed 30 years of age without retrofitting. To operate in U.S. waters after 2015, ships must have both a double bottom and double sides.

Double bottom installation has become standard on most parcel tankers and chemical tankers since the IMO regulations for the carriage of hazardous products in bulk became effective. All of SNTG's parcel tankers already have double bottoms. It is SNTG's intention that all tankers ordered in the future will comply with the double hull requirements identified above.

The liability provisions of OPA '90 are applicable to "oil" as defined in the Act. For this purpose, "oil" means oil of any kind or in any form, including, but not limited to, petroleum, fuel oil, sludge, oil refuse, and oil mixed with wastes other than dredged spoil, but does not include any substance which is specifically listed or designated as a "hazardous substance" under CERCLA. Some of the chemicals carried on SNTG's ships are covered by the provisions of CERCLA. SNTG's ships frequently carry some parcel cargoes of lubricating oils and additives and the ships' engines are powered by fuel oil.

In compliance with OPA '90 requirements, the Company has obtained Certificates of Financial Responsibility for all of its ships which call on U.S. ports.

The effect of the liability provisions of OPA '90 and CERCLA on the shipping industry has not yet been fully determined. OPA '90 increased the limit on shipowners' and ship operators' liability for tankers over 3,000 gross tons to the greater of $1,200 per gross ton or $10 million for damages, cleanup, and removal costs. Owners and operators of onshore facilities, including oil terminals, are liable for removal costs and damages up to a limit of $62 million. However, OPA '90 provides for unlimited liability if the spill was proximately caused by: (i) gross negligence or willful misconduct; (ii) violation of an applicable federal safety, construction or operating regulation by the responsible party, its agents or employees or any person acting pursuant to a contractual relationship with it; or (iii) if the owner or operator fails to report the spill, provide reasonable cooperation in connection with a removal order or, without sufficient cause, to obey an order issued by an authority under a removal regulation. For owners and operators of ships carrying hazardous substances as cargo, the liability provisions under CERCLA are $300 per gross ton or $5 million, whichever is greater. Facility owners and operators are liable for the total of all response costs plus $50 million for damages as defined under CERCLA. The CERCLA damages provisions are broadly similar to those of OPA '90. CERCLA also contains provisions similar to OPA '90 for breaking liability limits. CERCLA contains various reporting provisions, some of which are more detailed than OPA '90. Furthermore, both OPA '90 and CERCLA provide that individual U.S. states may issue their own pollution prevention laws and regulations, which laws and regulations may impose greater liabilities than set out in, and which may differ significantly from, OPA '90 or CERCLA. Many states have, in fact, enacted such provisions which provide for virtually unlimited liability for pollution accidents occurring in their waters.

OPA '90 also sets out contingency plan requirements with respect to cleanup and removal of the substances covered by its provisions. OPA '90 also requires expenditure to meet specific response standards for equipment to be kept on board ships. The contingency plan requirements also apply to marine transportation-related facilities, including Coast Guard-regulated onshore oil terminals, tank trucks, and railroad tank cars.

OPA '90 has made liability insurance more expensive for shipowners and ship operators and has also caused insurers to consider reducing available liability coverage, although this has not yet occurred. See "Other Matters--Insurance" in this Item 4.

STOLT OFFSHORE

Stolt Offshore's businesses are subject to international conventions and governmental regulations, which strictly regulate various aspects of its operations. In addition, Stolt Offshore is required by various governmental and other regulatory agencies to obtain certain permits, licenses, and certificates with respect to its equipment and operations. The kinds of permits, licenses, and certificates required in the operations of Stolt Offshore depend upon a number of factors. Stolt Offshore believes that it has or can readily obtain all permits, licenses, and certificates necessary to conduct its operations. Some countries require that Stolt Offshore enter into a joint venture or similar business arrangement with local individuals or businesses in order to conduct business in such countries.

Stolt Offshore's operations are affected from time-to-time and to varying degrees by political developments and federal and local laws and regulations. In particular, oil and gas production, operations, and economics are affected by

STOLT SEA FARM

SSF is subject to the laws and regulations of the individual countries, including Norway, Canada, the U.S., Chile and Australia, in which its operations are situated which strictly regulate various aspects of its operations. The hatcheries, the ongrowing sites, and the slaughteries are regulated by state environmental laws and laws regarding treatment of, and protection from, fish diseases and pollution. International conventions and treaties regulate the importation of SSF's products in various markets around the world.

In 1996, the Norwegian government imposed feed quotas and production regulations on Norwegian fish farmers, in an attempt to reduce the supply of Norwegian farmed salmon, and hence the amount of Norwegian farmed salmon available for sale in the EU market. In order to avoid further threats of duties against Norwegian salmon, the Norwegian government in July 1997 reached an agreement with the EU for a five year period to regulate supplies of Norwegian salmon into the EU market. This agreement, among other things, restricts the increase in supply of Norwegian salmon into the EU market to 10% per year; requires the average sales price to be at or above an agreed minimum price and increases the export levy payable by Norwegian producers. The Norwegian government still maintains the feed quota and production regulations that it introduced in 1996. The quotas and regulations have had an adverse effect on the cost structure of the Norwegian operation, as they have limited the capacity utilization of farmed concessions. However, the Norwegian government has permitted annual increases of varying amounts (ranging from 2% to 10%) in the feed quotas, which progressively reduce the negative impact of the feed quota regime.

In July 1998, the U.S. Department of Commerce imposed duties on imports of fresh Atlantic salmon from Chile into the U.S. Eicosal, a 12.5% owned joint-venture partner, suffered the highest duty rate of 10.69%. On the first administrative review for the period July 1998 to June 1999, Eicosal's duty was reduced to DE MINIMIS and subsequently they now enjoy a zero duty. If the administrative reviews for 1999-2000 and 2000-2001 also find DE MINIMIS for Eicosal, their duty rate will remain permanently at zero. Ocean Horizons, a 100% owned Chilean salmon farming subsidiary, was too small in size to be selected by the U.S. Department of Commerce for review, and is subject to an average duty rate of 4.57%.

All species of sturgeon have now been added to Appendix II of the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"). As a result, all international trade of sturgeon and caviar is now regulated, and all imports require proper documentation. While this does not affect the sale of SSF California's products within the U.S., it does mean that exports from the U.S. require proper license documentation. We have been working with the U.S. government to obtain the necessary documents and now have the procedures in place to allow export.

COMPETITION

STOLT-NIELSEN TRANSPORTATION GROUP

The market for the integrated transportation and logistics services provided by SNTG is in its infancy. In providing such services, SNTG competes primarily with a few other large terminal and transport companies who are developing such services. SNTG is able to offer parcel tanker and tank container services on a worldwide basis. SNTG's tanker operations compete with operators based primarily in Europe and the Asia Pacific region. The parcel tanker market is divided into two segments, deep-sea and intra-regional coastal, which depend on the routes and ships employed. SNTG's tank container operations compete primarily with