has storage facilities, SNTG either maintains a significant presence or occupies a niche in terms of products handled. Corporations such as Vopak that own and operate terminals on a worldwide basis own many of the competing terminals.

## STOLT OFFSHORE

The offshore contracting business is highly competitive. The consolidation in the offshore oil and gas services industry in the last few years has resulted in fewer but more substantial competitors. Although Stolt Offshore believes customers consider, among other things, the availability and technical capabilities of equipment and personnel, efficiency, condition of equipment, safety record, and reputation, price competition is the primary factor in determining which qualified contractor with available equipment will be awarded a contract. Stolt Offshore's ships are specialized and have few alternative uses and, because of their nature and the environment in which they work, have relatively high maintenance costs whether or not operating. Because these costs are essentially fixed, and in order to avoid additional expenses associated with temporarily idling its ships, Stolt Offshore may from time-to-time be required to bid its ships in projects at lower margins depending on the prevailing contractual rates in a given region.

Stolt Offshore believes that it is one of only three companies capable of providing the full range of subsea services on a worldwide basis in the major offshore oil and gas producing regions. Competition across all main product lines is limited to Stolt Offshore and two competitors, Coflexip Stena Offshore and Rockwater, a subsidiary of Brown and Root, itself a division of Halliburton. Stolt Offshore is subject to intense competition from these offshore contractors. In certain geographical regions, and in certain product lines, Stolt Offshore also competes with J. Ray McDermott Inc., Global Industries Limited and DSND. Stolt Offshore also faces substantial competition from smaller regional competitors and less integrated providers of subsea services.

## STOLT SEA FARM

SSF competes with other producers of farmed seafood and with suppliers of wild catch and other species of fish. The North American Atlantic salmon activities compete primarily with North American and Chilean producers in the North American market. Norwegian and Scottish Atlantic salmon activities compete primarily with other Norwegian, U.K., and Irish producers of Atlantic salmon in the European market. For both regions, competition is based on quality, price, and delivery capability. In Asia, SSF competes with importers and producers of farmed and wild fish. The turbot production in Spain competes primarily in the Mediterranean area with other Spanish and French producers of turbot and with suppliers of wild turbot.

## INSURANCE

The Company maintains insurance against physical loss and damage to its assets as well as coverage against liabilities to third parties it may incur in the course of its operations. Assets are insured at replacement cost, market value, or assessed earning power. The owned fleet of SNTG and Stolt Offshore is currently covered by hull and machinery insurance in the aggregate amount of $3.6 billion. Marine liabilities, which may be incurred through the operation of SNTG's and Stolt Offshore's ships, are insured under marine protection and indemnity insurance policies. The policies have a limit of approximately $4.25 billion per incident except for marine oil pollution which is limited to $1 billion per occurrence. Non-marine liabilities are insured up to $125 million. The Company believes its insurance coverage to be in such form, against such risks, for such amounts and subject to such deductibles as are prudent and normal to those industries in which the Company operates.

## PRINCIPAL OPERATING SUBSIDIARIES

As of November 30, 2000, the principal operating subsidiaries of the Company are as follows:

| | COUNTRY OF INCORPORATION | % SHAREHOLD |
|---|---|---|
| Stolt-Nielsen Transportation Group Ltd. | Liberia | 100 |
| Stolt-Nielsen Transportation Group Ltd. | Bermuda | 100 |
| Stolt-Nielsen Transportation Group Inc. | USA | 100 |
| Stolt-Nielsen Transportation Group B.V. | Netherlands | 100 |
| Stolt-Nielsen Transportation Group AG | Switzerland | 100 |
| Stolt Tankers Inc. | Liberia | 100 |
| Stolt General Product Tankers Inc. | Liberia | 100 |
| SBT Services Ltd. | Bermuda | 100 |
| Anthony Radcliffe Steamship Company Limited | England | 100 |
| Stolt-Nielsen Inter Europe Service Inc. | Liberia | 100 |
| Stolt-Nielsen Inter European Service B.V. | Netherlands | 100 |
| Stolt-Nielsen Inter Asia Service Inc. | Liberia | 100 |
| Stolt-Nielsen Inland Tanker Service B.V. | Netherlands | 100 |
| Stolt-Nielsen Indian Ocean and Middle East Service Ltd. | Bermuda | 100 |
| Stolthaven Perth Amboy Inc. | USA | 100 |
| Stolthaven Chicago Inc. | USA | 100 |
| Stolthaven Houston Inc. | USA | 100 |
| Stolthaven (Santos) Ltda. | Brazil | 100 |
| Stolt Tank Containers Leasing Ltd. | Bermuda | 100 |
| Stolt-Nielsen Transportation Group Limited | England | 100 |
| Stolt-Nielsen Transportation Group S.A. | France | 100 |
| Stolt Container Terminal Pte. Ltd. | Singapore | 100 |
| Stolt Container Terminal Co. Ltd. | Taiwan | 90 |
| Stolt Sea Farm A/S | Norway | 100 |
| Stolt Sea Farm Inc. | USA | 100 |
| Stolt Sea Farm Ltd. | Scotland | 100 |
| Stolt Sea Farm S.A. | Spain | 100 |
| Stolt Sea Farm Inc. | Canada | 100 |
| Stolt Offshore S.A. | Luxembourg | 53 (econom 61 (voting |
| Stolt Comex Seaway B.V. | Netherlands | 53 |
| Stolt Comex Seaway S.A. | France | 53 |
| Stolt Offshore Inc. | USA | 53 |
| Stolt Offshore S.A. | Brazil | 53 |
| Stolt Offshore A/S | Norway | 53 |
| Stolt Offshore Ltd. | Scotland | 53 |
| Stolt Offshore S.A. | France | 53 |
| SCS Shipping Ltd. | Isle of Man | 53 |

## PROPERTY, PLANT AND EQUIPMENT

## STOLT-NIELSEN TRANSPORTATION GROUP

The following table describes the parcel tankers that are operated by SNTG, both within and outside STJS. It also includes ships that are leased or time-chartered. (See notes to table below pertaining to ownership and registry.)

31

|  | YEAR BUILT | DWT (METRIC TONS) | OWNERSHIP( |
|---|---|---|---|
| **STOLT AVANCE CLASS** | | | |
| Stolt Avenir......................... | 1978 | 23,275 | Company |
| Stolt Avance......................... | 1977 | 23,648 | Company |
| | | | |
| **STOLT SEA CLASS** | | | |
| Stolt Sea............................ | 1999 | 22,500 | Company |
| Stolt Sun............................ | 2000 | 22,210 | Company |
| Stolt Span........................... | 1999 | 22,460 | NYK Stolt |
| Stolt Surf........................... | 2000 | 23,672 | Company |
| Stolt Stream......................... | 2000 | 22,917 | Company |
| Stolt Spray.......................... | 2000 | 22,460 | Company |
| | | | |
| **SUPERFLEX CLASS** | | | |
| Stolt Guardian....................... | 1983 | 39,726 | Company |
| Sun Sapphire......................... | 1994 | 40,160 | Sunship AB |
| Star Sapphire........................ | 1992 | 40,160 | Sunship AB |
| Blue Sapphire........................ | 1991 | 40,153 | Sunship AB |
| Hyde Park............................ | 1982 | 39,015 | T/C by Company |
| Stolt Protector...................... | 1983 | 39,782 | Company |
| Moon Sapphire........................ | 1983 | 39,742 | T/C by STJS |
| Kenwood Park......................... | 1982 | 39,015 | T/C by Company |
| Red Sapphire......................... | 1982 | 39,702 | T/C by Sunship |
| White Sapphire....................... | 1980 | 39,702 | T/C by Sunship |
| | | | |
| **"V" CLASS** | | | |
| Stolt Victor......................... | 1977 | 30,899 | Company |
| Stolt Viking......................... | 1978 | 30,892 | Company |
| | | | |
| **STOLT ASPIRATION CLASS** | | | |
| Stolt Aspiration..................... | 1987 | 12,219 | NYK Stolt |
| Stolt Alliance....................... | 1985 | 12,674 | NYK Stolt |
| Stolt Taurus......................... | 1985 | 12,749 | Company |
| Stolt Titan.......................... | 1985 | 12,691 | Company |
| Stolt Trader......................... | 1995 | 12,458 | Bibby |
| Stolt Infra.......................... | 1985 | 12,734 | Barton |
| Herefordshire........................ | 1985 | 12,721 | Bibby |
| Stolt Cornwall....................... | 1985 | 12,749 | Bibby |
| Stolt Sakra.......................... | 1984 | 12,775 | Company |
| Stolt Accord......................... | 1982 | 12,467 | NYK Stolt |
| | | | |
| **TROJAN CLASS** | | | |
| Stolt Trojan......................... | 1996 | 15,313 | Barton |
| | | | |
| **TRIUMPH CLASS** | | | |
| Stolt Kent........................... | 1998 | 19,300 | Bibby |
| Botany Triumph....................... | 1997 | 19,299 | Bibby |

33

Case 3:03-cu-00409-BdS - Document 30-6 - Filed 10/27/2006 - Page 4 Page 63 of 114

| | YEAR BUILT | DWT (METRIC TONS) | OWNERSHIP(1) |
|---|---|---|---|
| **STOLT BOTANY TANKER SERVICES** | | | |
| Botany Tradewind............ | 1985 | 12,752 | Barton |
| Central Park................ | 1985 | 7,132 | T/C by STJS |
| Botany Treasure............. | 1998 | 8,834 | Barton |
| Botany Triton............... | 1991 | 8,080 | Barton |
| Botany Trust................ | 1998 | 8,823 | Barton |
| Bruce Park.................. | 1992 | 13,940 | T/C by STJS |
| Sun Emerald................. | 1990 | 7,715 | T/C by STJS |
| Hibiya Park................. | 1990 | 13,921 | T/C by STJS |
| **STOLT NYK ASIA PACIFIC SERVICE** | | | |
| Stolt Suisen................ | 1998 | 11,537 | NSSH |
| Stolt Botan................. | 1998 | 11,553 | NSSH |
| Stolt Kikyo................. | 1998 | 11,545 | NSSH |
| Stolt Azami................. | 1997 | 11,564 | NSSH |
| Stolt Ayame................. | 1991 | 9,070 | NSSH |
| Stolt Azalea................ | 1988 | 7,582 | NSSH |
| Stolt Lily.................. | 1988 | 7,593 | NSSH |
| Stolt Magnolia.............. | 1985 | 7,132 | NSSH |
| Stolt Sunrise............... | 1984 | 6,678 | NSSH |
| Southern Knight............. | 1984 | 8,599 | T/C by SNAPS |
| **STOLT NYK AUSTRALIA** | | | |
| Stolt Australia............. | 1986 | 9,940 | SNAPL |
| **STOLT-NIELSEN INLAND TANKER SERVICE** | | | |
| Alliantie................... | 1999 | 1,600 | T/C by Company |
| Pax Montana................. | 1998 | 2,408 | T/C by Company |
| Stolt Emden................. | 1980/1998 | 1,388 | Company |
| Stolt Madrid................ | 1994 | 1,560 | Company |
| Stolt Oslo.................. | 1994 | 1,556 | Company |
| Stolt Prag.................. | 1994 | 1,202 | Company |
| Stolt Waal.................. | 1993 | 2,095 | Company |
| Stolt Somtrans.............. | 1993 | 2,408 | T/C by Company |
| Columbia.................... | 1993 | 1,605 | T/C by Company |
| Stolt Rom................... | 1993 | 2,156 | Company |
| Stolt Wien.................. | 1993 | 2,157 | Company |
| Stolt Mosel................. | 1992 | 2,133 | Company |
| Stolt Main.................. | 1992 | 2,124 | Company |
| Stolt Neckar................ | 1992 | 2,095 | Company |
| Stolt Maas.................. | 1992 | 2,096 | Company |
| Challenger.................. | 1992 | 1,605 | T/C by Company |
| Oranje Nassau............... | 1992 | 2,408 | T/C by Company |
| Stolt Hamburg............... | 1992 | 1,283 | Company |

Case 3:03-cv-00409-DJS   Document 39-6   Filed 10/27/2003   Page 5 of 29

# FLEET OF STOLT OFFSHORE

Stolt Offshore operates one of the world's most advanced fleets of subsea construction support and flowline lay ships from which the majority of Stolt Offshore's subsea activities are performed. The following table describes Stolt Offshore's major assets, as of April 30, 2001:

| NAME | CAPABILITIES | YEAR BUILT/ MAJOR UPGRADE | ROVS | L OV (M |
|------|-------------|---------------------------|------|---------|
| CONSTRUCTION SUPPORT SHIPS | | | | |
| Seaway Harrier............. | Subsea construction | 1985 | 1 | |
| Seaway Hawk............... | Subsea construction | 1978 | -- | |
| Seaway Osprey............. | Flexible flowline and umbilical lay, accepts coiled tubing, straightener for tubing, stern roller | 1984/1992/1996 | 2 | |
| Seaway Eagle.............. | Flexible flowline lay, multi-purpose subsea construction | 1997 | 2 | |
| Seaway Legend............. | ROV and hardsuit diving support, subsea construction | 1985/1998 | 2 | |
| Discovery................. | Flexible flowline lay, subsea construction | 1990 | 1 | |
| Seaway Kingfisher......... | Diverless inspection, repair and maintenance | 1990/1998 | 2 | |
| Stephaniturm.............. | Diving support, light construction | 1978/1994/1995 | 1 | |
| Seaway Explorer........... | Trenching ship | 1984 | -- | |

37

Case 3:03-cv-00409-DJS - Document 30-6 - Filed 10/27/2008 - Page 6 of 29

| NAME | CAPABILITIES | YEAR BUILT/ MAJOR UPGRADE | ROVS | L OV (M |
|------|-------------|---------------------------|------|---------|
| ---- | ------------- | --------------------- | -------- | -- |
| CONSTRUCTION SHIPS | | | | |
| American Pride.............. | Four-point anchor system | 1977/1992 | -- | |
| American Constitution....... | Four-point anchor system, saturation diving, moonpool | 1974 | -- | |
| American Eagle.............. | Four-point anchor system | 1976 | -- | |
| American Independence....... | Four-point anchor system | 1970 | -- | |
| American Recovery........... | Tug, diving support | 1965/1995 | -- | |
| American Star............... | Four-point anchor system, saturation diving | 1967/1998 | -- | |
| American Triumph............ | Four-point anchor system | 1965/1997 | -- | |
| American Victory............ | Four-point anchor system | 1976/1997 | -- | |
| American Liberty............ | Four-point anchor system | 1974 | -- | |
| American Scout.............. | Diving support | 1978 | -- | |
| Pipeline Surveyor........... | Diving support | 1965/1996 | -- | |
| American Diver.............. | Diving support | 1964 | -- | |

OTHER PROPERTIES

In addition to owned or leased office space, the Company owns or holds under long-term leases the following real property in connection with SNTG:

|  | OWNED | LEASED | DEBT (AS O |
|---|---|---|---|
|  | -------- | -------- | ----- |
|  | (ACRES) | | |
| Perth Amboy bulk liquid storage terminal.............. | 155 | -- | $ |
| Chicago bulk liquid storage terminal................. | -- | 178 | |
| Houston bulk liquid storage terminal................. | 249 | -- | |
| New Orleans bulk liquid storage terminal............. | 118 | -- | |
| Santos bulk liquid storage terminal.................. | 14 | -- | |
| Singapore tank container depot....................... | -- | 4 | |
| Rotterdam pier....................................... | -- | 3 | |

STOLT OFFSHORE

Stolt Offshore owns or holds under long-term leases real estate property as described below:

|  | OFFICE SPACE (SQUARE METERS) | WORK OR STORAGE SPACE OR LAND (SQUARE METERS) | S |
|---|---|---|---|
|  | --------------- | --------------- | ---- |
| Aberdeen, Scotland....................... | 12,276 | 102,095 | Owne |
| Baku, Azerbaijan......................... | 66 | -- | L |
| Buenos Aires, Argentina.................. | 100 | -- | L |
| Columbus, Ohio........................... | 279 | 8,614 | L |
| Dhahran, Saudi Arabia.................... | 330 | 750 | L |
| Dundee, Scotland......................... | -- | 8,234 | L |
| East Kalimantan, Indonesia............... | -- | 190,267 | L |
| Houston, Texas........................... | 4,208 | 15,489 | Owne |
| Jakarta, Indonesia....................... | 915 | 601 | L |
| Killingoy, Norway........................ | 60 | 11,150 | L |
| Kristiansund, Norway..................... | 120 | 800 | L |
| Lagos, Nigeria........................... | 200 | -- | L |
| Lobito, Angola........................... | 5,945 | 554,431 | L |
| Luanda, Angola........................... | 53 | 690 | L |
| Macae City, Brazil....................... | 1,286 | 10,658 | Owne |
| Marseille, France........................ | 1,005 | 416 | L |
| Nanterre, France......................... | 13,200 | -- | L |
| New Orleans, Louisiana................... | 305 | 56,658 | L |
| Oxnard, California....................... | 929 | 6,643 | L |
| Perth, Australia......................... | 1,456 | 3,818 | L |
| Porth Gentil, Gabon...................... | 305 | 5,070 | L |
| Port Harcourt, Nigeria................... | 400 | 300 | L |
| Port of Fourchon, Louisiana.............. | 650 | 74,240 | L |
| Port of Iberia, Louisiana............... | 1,796 | 95,688 | L |
| Rio de Janeiro, Brazil................... | 295 | -- | L |

41

Case 3:03-cv-00409-DJS - Document 30-6 - Filed 10/27/2003 - Document 4 of 6 - 20419 - Page 8 of 29 - Page 71 of 114

the fabrication and inspection of steel catenary risers.

42

ITEM 6. DIRECTORS, SENIOR MANAGEMENT AND EMPLOYEES

DIRECTORS AND SENIOR MANAGEMENT

Stolt is a Luxembourg holding company and does not have officers as such. The following is a list of the Directors of Stolt and persons employed by its subsidiaries who perform the indicated executive and administrative functions for the combined business of the Company's subsidiaries:

| NAME | AGE* | POSITION |
| ---- | -------- | ------------------------------ |
| Jacob Stolt-Nielsen.................... | 69 | Chairman of the Board |
| Niels G. Stolt-Nielsen................. | 36 | Director and Chief Executive Of S.A. and Stolt Sea Farm |
| Jacob B. Stolt-Nielsen................ | 38 | Director and Chief Executive Of |
| Christer Olsson........................ | 55 | Director |
| Erling C. Hjort........................ | 64 | Director |
| Kinichi Hirayama....................... | 58 | Director |
| Carroll N. Bjornson.................... | 71 | Director |
| Christopher J. Wright.................. | 66 | President and Chief Operating O |
| Jan Chr. Engelhardtsen................. | 49 | Chief Financial Officer |
| Reginald J. R. Lee..................... | 57 | Chief Executive Officer, Stolt-Transportation Group |
| Bernard Vossier........................ | 56 | Chief Executive Officer, Stolt |
| Samuel Cooperman....................... | 56 | Chief Executive Officer, Optimu |

------------------------------

* As of April 30, 2001.

Under the terms of Stolt's Articles of Incorporation, its Directors may be elected for terms of up to six years, and serve until their successors are elected. It has been Stolt's practice to elect Directors for one-year terms. Under the Articles of Incorporation, the Board may consist of not fewer than three nor more than nine Directors at any one time. Stolt's Board of Directors currently consists of seven members.

Jacob Stolt-Nielsen has served as Chairman of the Company since he founded it in 1959. Mr. Stolt-Nielsen also serves as Chairman of the Board of Directors of Stolt Offshore. He held the position of Chief Executive Officer of Stolt-Nielsen S.A. from 1959 until November 2000.

Niels G. Stolt-Nielsen has served as a Director of the Company and President of Stolt Sea Farm, since 1996. In November of 2000 he was appointed to the position of Chief Executive Officer of Stolt-Nielsen S.A. Mr. Stolt-Nielsen joined the Company in 1990 in Greenwich, working first as a shipbroker and then as round voyage manager. In 1994 he opened and organized the Company's representative office in Shanghai. He is also a director of Stolt Offshore.

Mr. Hjort has served as a Director of the Company since May 1995. He joined the Norwegian law firm of Wikborg, Rein & Co. in Oslo in 1964, where he was admitted to the bar in the same year. In 1970 he was admitted to the bar of the Supreme Court in Norway, and in 1993 he became the Senior Partner in Wikborg, Rein & Co.

Mr. Hirayama was appointed a Director of the Company in June of 2000. Mr. Hirayama is currently Chairman and Chief Executive Officer of NYK Line (North America) Inc. and Managing Director of NYK Tokyo. He joined NYK Line ("NYK") in 1965.

Mr. Bjornson has served as a Director of the Company since 1974. He was employed by the Company in a variety of executive capacities from 1963 to 1985. He resigned in 1985 and became Chairman and Chief Executive Officer of Maryland Marine Inc. until its sale in November 1997.

Mr. Wright has served as President and Chief Operating Officer of the Company since July 1986. Mr. Wright also serves as Deputy Chairman of the Board of Stolt Offshore.

Mr. Engelhardtsen has served as Chief Financial Officer since 1991. He served as President and General Manager of Stolt-Nielsen Singapore Pte. Ltd. from 1988 through 1991. He has been associated with the Company since 1974.

Mr. Lee has served as Chief Executive Officer, Stolt-Nielsen Transportation Group since 2000. Previously, he served as Managing Director of Stolt Tank Containers. He joined the Company in 1981.

Mr. Vossier was appointed Chief Executive Officer, Stolt Offshore in May 1995. Previously he served as Chief Operating Officer of that business from December 1994 to May 1995. He joined Comex in 1974.

Mr. Cooperman has served as Chief Executive Officer, Optimum Logistics since 2000. Previously, he served as Chief Executive Officer, Stolt-Nielsen Transportation Group and Chief Executive Officer of Stolt Parcel Tankers Inc. He joined the Company in 1974.

Jacob B. Stolt-Nielsen and Niels G. Stolt-Nielsen are the sons of Jacob Stolt- Nielsen.

Under a Shareholders' Agreement between NYK and an entity controlled by the Stolt-Nielsen family, during the term of such agreement and for so long as NYK shall own at least 5,500,000 Common Shares, (or the equivalent thereof after any stock split or recapitalization), such entity shall support NYK's nomination of one person to the Board of Directors of Stolt.

COMPENSATION

As described above, Stolt does not have officers, but certain persons employed by its subsidiaries perform executive and administrative functions for the combined business of the Company's subsidiaries. The aggregate annual compensation paid to the seven officers, excluding non-executive directors, performing such executive functions for the Company for the fiscal year ended November 30, 2000 (including profit sharing awards and certain benefits) was $3,590,000. In addition, $69,100 was contributed on behalf of such officers to defined contribution pension plans maintained by the Company and its subsidiaries. During 2000, Stolt executive directors received no compensation for their services as such, but received reimbursement of their out-of-pocket expenses. The non-executive directors, with the exception of NYK's nominated director, received an aggregate fee of $87,500 plus expenses.

individual award is based on performance, salary, and overall contribution to the business. SNTG's and SSF's Profit Sharing Plans are administered by a Compensation Committee appointed by the Stolt Board of Directors. The Stolt Offshore Profit Sharing Plan is administered by a Compensation Committee appointed by Stolt Offshore's Board of Directors. For the fiscal year ended November 30, 2000, no monies were paid by the SNTG and Stolt Offshore Profit Sharing Plans to its officers and employees, while the SSF Profit Sharing program paid $1.2 million of which $160,000 was paid to those officers performing executive and administrative functions.

## BOARD PRACTICES

The standing committees of the Board of Directors consist of an Audit Committee and a Compensation Committee.

## AUDIT COMMITTEE

The Audit Committee, formed in 1988, meets regularly to review the Company's audit practices and procedures, scope and adequacy of internal controls and related matters, the Company's financial statements and to advise the Board on such matters. The Audit Committee recommends to the Board of Directors the annual appointment of auditors, the scope of audit and other assignments to be performed by the auditors and the fees relating thereto. The Audit Committee also meets periodically with representatives of the Company's auditors, Arthur Andersen LLP ("AALLP"), to review the scope of AALLP's engagement with respect to its audit of the Company's financial statements and to review the recommendations of AALLP arising therefrom. The current members of the Audit Committee are Messrs. Hjort (Chairman), Bjornson and Olsson.

## COMPENSATION COMMITTEE

The Compensation Committee, formed in 1988, reviews and approves salaries for the Company's executive officers, salary parameters for all other staff, profit sharing awards (if any, pursuant to the Company's Profit Sharing Plan) and stock option awards under the Company's Stock Option Plan. The current members of the Compensation Committee are Messrs. Jacob Stolt-Nielsen (Chairman), Bjornson and Olsson. Mr. Wright is an EX-OFFICIO member of this Committee.

## EMPLOYEES

The average number of persons employed during the three years ended November 30, 2000 are as follows:

|  | AVERAGE NUMBER OF EMPLOYE | |
| --- | --- | --- |
|  | YEARS ENDED NOVEMBER 30 | |
|  | 2000 | 1999 |
| Transportation* | 4,305 | 4,080 |
| Subsea | 4,770 | 4,202 |
| Seafood | 1,149 | 916 |
| All Other** | 44 | -- |
|  | 10,268 | 9,198 |

----------------------

## UNIONS

SNTG employs primarily European senior officers, European and Filipino junior officers and Filipino crew members on its parcel tankers. Twelve SNTG-owned ships are manned by Filipino officers and crew, eleven by Latvian officers and crew and four by Russian officers and crew. SNTG maintains its own crewing office and training center in Manila to provide Filipino officers and crew members for its fleet, all of whom belong to the Associated Marine Officers' and Seamen's Union of the Philippines. SNTG owns 49% of its crewing agent in Latvia to provide Latvian officers and crew members who belong to the Latvian Seafarers' Union of Merchant Fleet Riga, and those from Russia belong to the Seafarers' Union of Russia. All such unions are affiliated with the International Transport Workers Federation in London. The collective bargaining agreements currently in effect expire on December 31, 2001. Hourly employees at certain of SNTG's terminals are also covered by union contracts. A significant number of the Stolt Offshore's employees are represented by labor unions. As part of normal business, a number of union agreements come up for annual renegotiation in 2001. The Company has not experienced any significant work stoppages and considers its relations with its unionized employees and their unions to be good.

## SHARE OWNERSHIP

Each of the Company's Directors and executive officers, on an individual basis, and all Directors and executive officers as a group beneficially owns less than one percent of the Common Shares outstanding as of April 30, 2001. After consideration of Common Shares receivable upon exercise of employee stock options exercisable within 60 days after April 30, 2001, that are deemed to be beneficially owned at said date, none of the Company's directors and executive officers would own more than one percent of common shares on an individual basis. All Directors and executive officers as a group (12 persons) would own 1.6% of Stolt's Common Shares.

Reference is made to Item 7.A. "Major Shareholders" for a discussion of Common Shares owned by Fiducia Ltd., which is owned by trusts of which members of the Stolt-Nielsen family are beneficiaries. Total shares owned by Fiducia Ltd. and the three members of the Stolt-Nielsen family listed in the above table represent 49.7% of the Common Shares outstanding as of April 30, 2001.

Stolt has a 1987 Stock Option Plan (the "1987 Plan") covering 2,660,000 Common Shares and a 1997 Stock Option Plan (the "1997 Plan") covering 5,180,000 Common Shares. No further grants will be issued under the 1987 Plan. Options granted under the 1987 Plan, and those which may be granted under the 1997 Plan are exercisable for periods of up to ten years. The options granted under the 1987 Plan and the 1997 Plan are or will be at an exercise price not less than the fair market value per share at the time the option was or is granted. The 1987 Plan and the 1997 Plan are administered by a Compensation Committee appointed by Stolt Board of Directors. The Compensation Committee awards options based on the grantee's position in the Company, degree of responsibility, seniority, contribution to the Company and such other factors as it deems relevant under the circumstances.

On March 6, 2001, at an extraordinary general meeting of shareholders, the Company's share reclassification was approved, effective as of the beginning of the trading day, March 7, 2001. Under the reclassification, the outstanding non-voting Class B Shares were reclassified as Common Shares on a one-for-one basis. All Class B Shares issued in connection with the exercise of options will immediately convert to Common Shares upon issuance.

to Directors and executive officers of Stolt. The options are exercisable at the respective prices set out below and expire on the dates indicated:

| EXERCISE PRICE | NUMBER OF COMMON SHARES FOR WHICH OUTSTANDING | EXPIRATION DATE |
|---|---|---|
| $Nil | 304,280 | June 2000-December 2005 |
| 12.750 | 66,425 | December 2002 |
| 17.500 | 4,000 | August 2003 |
| 15.750 | 129,375 | December 2003 |
| 19.750 | 170,000 | December 2004 |
| 25.375 | 3,000 | June 2005 |
| 28.625 | 235,750 | December 2005 |
| 17.750 | 10,000 | July 2006 |
| 16.875 | 4,250 | September 2006 |
| 17.125 | 156,963 | December 2006 |
| 17,500 | 156,026 | December 2006 |
| 22.500 | 2,500 | August 2007 |
| 22.125 | 2,500 | August 2007 |
| 20.125 | 373,650 | December 2007 |
| 9.875 | 383,300 | December 2008 |
| 11.938 | 2,100 | April 2009 |
| 14.625 | 440,950 | December 2009 |
| 20.500 | 2,600 | October 2010 |
| 17.730 | 5,000 | December 2010 |
| 14.750 | 508,600 | December 2010 |
| | ---------- | |
| | 2,961,269 | |
| | ========== | |

Case 3:09-cv-00400-DJS - Document 39-6/30/Filed 10/27/2008 - Document 2006 - 2009 ... Page 14 of 29

Transportation Group Ltd., it is estimated that the free float of ADSs on Nasdaq is 4,186,495.

49

Case 3:03-cv-00409-DJS - Document 30-6 - Filed 10/27/2003 - Page 15 of 33

The Company is a party to various other legal proceedings arising in the ordinary course of business. The Company believes that none of the matters covered by such legal proceedings will have a material adverse effect on the Company's business or financial condition.

50

CLASS B SHARES (NASDAQ) (ADSS)

QUARTERLY FOR THE TWO YEARS ENDED NOVEMBER 30, 2000 AND FOR THE QUARTER ENDED
FEMBRUARY 28, 2001

| | QTR |
|---|---|
| | ---- |
| 2001 | |
|   High.................................................... | $17. |
|   Low | $14. |
| 2000 | |
|   High.................................................... | $19. |
|   Low- | $14. |
| 1999 | |
|   High.................................................... | $12. |
|   Low.................................................... | $ 9. |

ANNUALLY FOR THE FIVE YEARS ENDED NOVEMBER 30,

| | 2000 | 1999 | 1998 | |
|---|---|---|---|---|
| | -------- | -------- | -------- | - |
| High....................................... | $25.000 | $19.250 | $23.500 | $ |
| Low....................................... | $14.625 | $ 9.875 | $ 9.500 | $ |

CLASS B SHARES (OSLO STOCK EXCHANGE) (NORWEGIAN KRONER)

QUARTERLY FOR THE TWO YEARS ENDED NOVEMBER 30, 2000 AND FOR THE QUARTER ENDED
FEBRUARY 28, 2001

| | QTR |
|---|---|
| | ---- |
| 2001 | |
|   High.................................................... | 167 |
|   Low | 130 |
| 2000 | |
|   High.................................................... | 160 |
|   Low.................................................... | 120 |
| 1999 | |
|   High.................................................... | 95 |
|   Low.................................................... | 73 |

ANNUALLY FOR THE FIVE YEARS ENDED NOVEMBER 30,

| | 2000 | 1999 | 1998 |
|---|---|---|---|
| | -------- | -------- | ------- |
| High....................................... | 225.00 | 148.00 | 170.00 |
| Low....................................... | 120.00 | 73.00 | 75.00 |

MARKETS

Stolt's Common Shares are currently listed in Norway on the Oslo Stock Exchange (under the ticker symbol SNI) and trade as ADSs, each of which represents one Common Share, in the United States on the Nasdaq National Market (under the ticker symbol SNSA). On March 7, 2001, the Company completed a share reclassification. The objective of the reclassification was to create a simplified and more transparent share capital structure that gives all shareholders a vote on all matters, and results in only one class of publicly traded shares. The reclassification reclassified the outstanding non-voting Stolt-Nielsen Class B (previously listed on the Oslo Stock Exchange under the ticker symbol SNIB and traded as ADSs on Nasdaq under ticker symbol STLBY) as voting Common Shares on a one-for-one basis. Prior to the share reclassification, the Company's Common Shares were only listed on Nasdaq (under the ticker symbol STLTF).

ITEM 10. ADDITIONAL INFORMATION

ORGANIZATION AND REGISTER

Stolt-Nielsen S.A. is a "Societe Anonyme Holding" organized in the Grand Duchy of Luxembourg under the Company Law of 1915, as amended. The Company was incorporated in Luxembourg in 1974 as the holding company for all of the Group's activities.

The Company's registered office is located at 23, avenue Monterey, L-2086 Luxembourg and it is registered in the Companies' Register of the Luxembourg District Court under the designation "R.C. Luxembourg B.12.179".

ARTICLES OF INCORPORATION

SET FORTH BELOW IS A SUMMARY OF CERTAIN PROVISIONS OF THE COMPANY'S ARTICLES OF INCORPORATION AND THE LUXEMBOURG COMPANY LAW. THE FOLLOWING SUMMARY DOES NOT PURPORT TO BE A COMPLETE STATEMENT OF THE RELEVANT PROVISIONS AND IS QUALIFIED BY REFERENCE TO THE ARTICLES OF INCORPORATION AND APPLICABLE LUXEMBOURG LAW. THE FULL TEXT OF THE ARTICLES OF INCORPORATION IS AVAILABLE AT THE REGISTERED OFFICE OF THE COMPANY.

OBJECTS AND PURPOSES

Article Three of the Company's Articles of Incorporation sets forth its object as a holding company, namely participation in any manner in all commercial, industrial, financial and other enterprises of Luxembourg or foreign nationality through the acquisition by participation, subscription, purchase, option or by any other means of all shares, stocks, debentures, bonds or securities; the acquisition of patents and licenses which it will administer and exploit; it may lend or borrow with or without security, provided that any money so borrowed may only be used for the purposes of the Company, or companies which are subsidiaries of or associated with or affiliated to the Company; and in general to undertake any operations directly or indirectly connected with such objects as permitted by the Luxembourg Holding Company Law of 1929.

DIRECTORS

The Board of Directors is comprised of at least three and not more than nine members, elected by a simple majority of the outstanding shares of the Company represented at a general meeting of shareholders, for a period not exceeding six years and until their successors are elected. It is the customary practice of the Company that Directors are elected for terms of one year at the Annual General Meeting of Shareholders held each year in Luxembourg.

The Company's Articles of Incorporation do not require Board members to be shareholders in the Company.

Under Luxembourg law and the Company's Articles of Incorporation, the members of the Board of Directors owe a duty of loyalty and care to the Company. They must exercise the standard of care of a prudent and diligent business person and bear the burden of proving they did so if their actions are contested.

The Company's Articles of Incorporation provide that no transaction between the Company and another party in which a Director serves as a director, officer or employee, will be invalidated solely for that reason. The Articles also provide that any Director who has a personal interest in a transaction must disclose such interest, must abstain from voting on such transaction and may not be counted for purposes of determining whether a quorum is present at the meeting. Such Director's interest in any such transaction shall be reported at the next meeting of shareholders.

AUTHORIZED SHARES

The Company's authorized share capital consists of:

- 120,000,000 Common Shares, no par value

- 30,000,000 Founder's Shares, no par value

Under the Luxembourg Company Law, Founder's Shares are not considered as representing capital of the Company.

Pursuant to the Company's Articles of Incorporation, and as required by Luxembourg law as presently in effect, authorized capital will automatically be reduced to the amount represented by outstanding shares on the fifth anniversary date of the publication of the most recent amendment of the Articles revising the Company's authorized capital. Amendments increasing and amending the Company's authorized capital were approved at an Extraordinary General Meeting held on March 6, 2001, and publication of such amendment in the OFFICIAL GAZETTE is expected to take place in July 2001. The Company takes from time to time such steps as are required to continue the authorized capital in effect.

The Board of Directors is authorized to issue additional Common Shares and Founder's Shares, from time to time, up to the maximum authorized number. The Articles of Incorporation require all shares to be issued in registered form. All shares, when issued, are fully paid and non-assessable. All shares are freely transferable by the holder thereof.

As a general rule, shareholders are entitled to preemptive rights under Luxembourg law in respect of the issuance of shares of the same class of shares for cash, unless the Articles of Incorporation provide otherwise. The Company's Articles authorize the Board of Directors to deny shareholders' preemptive rights for a period of five years, and the Company's Board of Directors has done so, with respect to all authorized but unissued Common Shares. Upon the expiration of authorized but unissued shares as described above, the suppression of preemptive rights will also terminate and shareholders will be entitled to preemptive rights once again unless the Board recommends denying further such rights and such recommendation is approved by the shareholders. As a result, assuming publication of the amendment to the Company's Articles of Incorporation in July 2001 as aforesaid, Common Shares will not be entitled to preemptive rights for a period of at least five years ending July 2006.

The Company's Articles of Incorporation contain an anti-dilution provision

In addition to the authorized Common Shares and Founder's Shares of the Company set forth above, an additional 1,500,000 Class B Shares, no par value, have been authorized for the sole purpose of options granted under the Company's existing stock option plans, and may not be used for any other purpose. The rights, preferences and priorities of such Class B Shares are set forth in the Articles of Incorporation. All such Class B Shares convert to Common Shares immediately upon issuance. Such authorized Class B Shares and all of the rights relating thereto shall expire, without further action, on December 31, 2009.

VOTING RIGHTS

Except for matters where applicable law requires the approval of both classes of shares voting as separate classes, Common Shares and Founder's Shares vote as a single class on all matters submitted to a vote of the shareholders, with each share entitled to one vote. Under Luxembourg law, shareholder action can generally be taken by a simple majority of Common Shares and Founder's Shares present or represented at a meeting, without regard to any minimum quorum requirements. Three exceptions to the law are (i) to amend the Articles which requires (x) a two-thirds vote of those Common Shares and Founder's Shares present or represented, and (y) when the meeting is first convened, a quorum of 50% of the outstanding shares entitled to vote, (ii) to change the country of incorporation of the Company to a country other than Luxembourg or to increase the contribution of the shareholders, which require the affirmative vote of 100% of the Common Shares and Founder's Shares, and (iii) any action for which the Articles require more than a majority vote or a quorum. Luxembourg law further provides that a two-thirds majority vote of those shares present or represented and when the meeting is first convened, a quorum of 50% of such shares, of the outstanding Common Shares and Founder's Shares, each voting and counted for quorum purposes as a separate class, is required to authorize any amendment to the Articles in respect of a recapitalization, reclassification and similar transactions affecting the relative rights, preferences and priorities of the Common Shares and Founder's Shares if such class of shares is adversely affected thereby.

SHAREHOLDER MEETINGS AND NOTICE THEREOF

Under the Articles, the Company is required to hold a general meeting of shareholders each year in Luxembourg. The meeting is normally convened in April. In addition, the Board may call any number of extraordinary general meetings, which may be held in Luxembourg or elsewhere, although any extraordinary general meeting convened to amend the Articles will be held in Luxembourg. The Board of Directors is further obliged to call a general meeting of shareholders to be held within thirty days after receipt of a written demand therefor by shareholders representing at least one-fifth of the outstanding shares entitled to vote thereat.

The Articles require notice of any general meeting to be sent by first class mail, postage prepaid, to all shareholders at least twenty days prior to such meeting. Shareholders may be represented by written proxy, provided the written proxy is deposited with the Company at its registered office in Luxembourg, or with any Director of the Company, at least five days before the meeting.

DIVIDENDS

Under the Articles, holders of Common Shares and Founder's Shares participate in annual dividends, if any are declared by the Company, in the following order of priority:

- $0.005 per share to Founder's Shares and Common Shares equally;

by the shareholders at a general meeting, and any such interim dividend must be approved by the Company's independent auditors. Final dividends are declared once a year at the annual general meeting of the shareholders. Interim and final dividends on Common Shares and Founder's Shares can be paid out of earnings, retained and current, as well as paid in surplus.

Luxembourg law authorizes the payment of stock dividends if sufficient surplus exists to provide for the related increase in stated capital or the par value of the shares issued in connection with any stock dividend. Luxembourg law requires that 5% of the Company's unconsolidated net profits each year be allocated to a legal reserve before declaration of dividends. This requirement continues until the reserve is 10% of the stated capital of the Company, as represented by the Common Shares, after which no further allocations are required until further issuance of shares.

The legal reserve may also be satisfied by allocation of the required amount at the time of issuance of shares or by a transfer from paid-in surplus. The legal reserve is not available for dividends. The legal reserve for all existing Common Shares of the Company has heretofore been satisfied and appropriate allocations will be made to the legal reserve account at the time of each new issuance of Common Shares.

LIQUIDATION PREFERENCE

Under the Articles, in the event of a liquidation, all debts and obligations of the Company must first be paid, and thereafter all remaining assets of the Company are paid to the holders of Common Shares and Founder's Shares in the following order of priority:

- Common Shares ratably to the extent of the stated value thereof (e.g. $1.00 per share);

- Common Shares and Founder's Shares participate equally up to $0.05 per share; and

- thereafter, Common Shares are entitled to all remaining assets.

EQUAL TREATMENT PROVISION

If the Company merges, consolidates or enters into any similar transaction with another entity or such other entity will remain the survivor, the Common Shares held by holders other than holder(s) of Founder's Shares shall be entitled to receive consideration which is no less per share than the consideration per share received by the holder(s) of Founder's Shares, the latter per share amount to be determined by dividing the aggregate of all consideration received by such holder(s) for all shares owned by them, including Founder's Shares, by the total number of Common Shares which they own.

RESTRICTIONS ON SHAREHOLDERS

The Company's Articles of Incorporation provide that in recognition of the fact that certain shareholdings may threaten the Company with "imminent and grave damage", which term includes adverse tax consequences, a hostile takeover attempt or adverse governmental sanctions,

(i) no U.S. Person (as defined in the Articles) shall own, directly or indirectly, more than 9.9% of the Company's outstanding shares,

(ii) all shareholders who are U.S. Persons may not own, directly or indirectly, more than 49.9% of the Company's outstanding shares,

The Articles provide that the foregoing restrictions shall not apply to any person who was a shareholder as of August 31, 1987, or certain Affiliates or Associates (as such terms are defined in the Articles) of such person.

CHANGE IN CONTROL

Except as described above, there are no provisions in the Company's Articles of Incorporation that would have the effect of delaying, deferring or preventing a change in control of the Company and that would only operate with respect to a merger, acquisition or corporate restructure involving the Company or any of its subsidiaries.

NON-LUXEMBOURG SHAREHOLDERS

There are no limitations under Luxembourg law on the rights of non-residents to hold or vote shares of the Company.

MATERIAL CONTRACTS

The Company has not entered into a material contract, other than contracts entered into in the ordinary course of business, since May 30, 1999.

EXCHANGE CONTROLS

The Company has been advised by Messrs. Elvinger, Hoss & Prussen, Luxembourg counsel to the Company, that at the present time there are no exchange controls in existence in Luxembourg which would restrict the export or import of capital, including but not limited to, foreign exchange controls, or affect Stolt's ability to make payments of dividends, interest or other amounts to non-resident holders of Common Shares.

LIMITATIONS AFFECTING SHAREHOLDERS

Stolt's Articles of Incorporation (the "Articles") provide restrictions on the shareholdings of certain persons. In particular, the Articles provide that the following restrictions shall apply to Persons (defined to include any individual, firm, corporation, or other entity, and certain associates and affiliates thereof) who became shareholders on or after September 1, 1987: (i) no one U.S. Person (including any person who is a citizen or resident of the U.S., a corporation organized under the laws of the U.S., or any State thereof, a corporation organized under the laws of any other jurisdiction whose shares are owned by U.S. Persons, a partnership organized under the laws of any State of the U.S. and certain trusts and estates) may own, directly or indirectly, more than 9.9% of Stolt's outstanding shares; (ii) all shareholders who are U.S. Persons may not own, directly or indirectly, more than 49.9% (including for these purposes shares held by Persons who were shareholders prior to September 1, 1987) of Stolt's outstanding shares in the aggregate; (iii) no more than 49.9% (including for these purposes shares held by Persons who were shareholders prior to September 1, 1987) of Stolt's shares shall, in the aggregate, be owned by all shareholders of any particular country (including any person who is a citizen or resident of any such country, a corporation, partnership, association, or other entity organized or created under the laws of any such country and certain trusts and estates); and (iv) no Person may own, directly or indirectly, more than 20% of Stolt's outstanding shares unless a majority of the Board shall have approved such shareholding in advance.

In addition, the Board is authorized to restrict, reduce or prevent the ownership of Stolt's shares if it appears to the Board that such ownership may threaten the Company with "imminent and grave damage". Luxembourg Company Law does not provide a specific definition of imminent and grave damage, but instead

Case 3:03-cv-00409-DJS   Document 30-6   Filed 10/27/2003   Page 22 of 39

judicial interpretations of the phrase, but that situations involving hostile takeovers, adverse tax consequences to the Company or governmental sanctions are likely to be among the situations covered by such phrase.

In order to enforce the foregoing restrictions, the Articles empower the Board to take certain remedial action including causing Stolt: (i) to decline to register any prohibited transfer; (ii) to decline to recognize any vote of a shareholder precluded from holding shares; (iii) to require any shareholder on Stolt's Register of Shareholders or any prospective shareholder to provide information to determine whether such person is precluded from holding shares; and (iv) upon the issuance of a notice, to require the sale of shares to Stolt at the lesser of (A) the amount paid for the shares if acquired within the twelve months immediately preceding the date of the notice, and (B) the last quoted price for the shares on the day immediately preceding the day on which the notice is served (provided that the Board may in its discretion pay the amount calculated under (B) in situations where (A) would otherwise apply and result in a lower purchase price, if the Board determines it equitable after taking into account specified factors) and to remove the name of any shareholder from the Register of Shareholders immediately after the close of business on the day the notice is issued and payment is made available.

Stolt's form of share certificate requires a certification to be made upon the transfer of ownership regarding the citizenship of the transferee. The certification is intended to assist Stolt in enforcing the restrictions described above.

There are no limitations imposed by Luxembourg law on the rights of non-resident Stolt shareholders to hold or vote their shares.

TAXATION

U.S. FEDERAL INCOME TAXATION

The following is a summary of the principal U.S. federal income tax consequences that may be relevant with respect to the acquisition, ownership and disposition of Common Shares or ADSs. This summary addresses only the U.S. federal income tax considerations of holders that will hold Common Shares or ADSs as capital assets. This summary does not address tax considerations applicable to holders that may be subject to special tax rules, such as financial institutions, insurance companies, real estate investment trusts, regulated investment companies, grantor trusts, dealers or traders in securities or currencies, tax-exempt entities, persons that received Common Shares or ADSs as compensation for the performance of services, persons that will hold Common Shares or ADSs as part of a "hedging" or "conversion" transaction or as a position in a "straddle" for U.S. federal income tax purposes, persons that have a "functional currency" other than the U.S. dollar or holders that own (or are deemed to own) 10% or more (by voting power or value) of the stock of the Company. Moreover, this summary does not address the U.S. federal estate and gift or alternative minimum tax consequences of the acquisition, ownership and disposition of Common Shares or ADSs. This summary (i) is based on the Internal Revenue Code of 1986, as amended (the "Code"), U.S. Treasury Regulations and judicial and administrative interpretations thereof, in each case as in effect and available on the date of this Report. All of the foregoing are subject to change, which change could apply retroactively and could affect the tax consequences described below.

The U.S. Treasury Department has expressed concern that depositaries for American depositary receipts, or other intermediaries between the holders of shares of an issuer and the issuer, may be taking actions that are inconsistent with the claiming of U.S. foreign tax credits by U.S. holders of such receipts

For purposes of this summary, a "U.S. Holder" is a beneficial owner of Common Shares or ADSs that, for U.S. federal income tax purposes, is: (i) a citizen or resident of the U.S., (ii) a partnership or corporation created or organized in or under the laws of the U.S. or any state thereof (including the District of Columbia), (iii) an estate the income of which is subject to U.S. federal income taxation regardless of its source or (iv) a trust if such trust validly elects to be treated as a U.S. person for U.S. federal income tax purposes or if (x) a court within the U.S. is able to exercise primary supervision over its administration and (y) one or more U.S. persons have the authority to control all of the substantial decisions of such trust. A "Non-U.S. Holder" is a beneficial owner (or, in the case of a partnership, a holder) of Common Shares or ADSs that is not a U.S. Holder.

Each holder should consult its own tax advisor with respect to the U.S. federal, state, local and foreign tax consequences of acquiring, owning or disposing of Common Shares.

OWNERSHIP OF ADSS IN GENERAL

For U.S. federal income tax purposes, a holder of ADSs generally will be treated as the owner of the Common Shares represented by such ADSs.

FOREIGN PERSONAL HOLDING COMPANY STATUS

The Company is a "foreign personal holding company" for U.S. federal income tax purposes. As a result, U.S. Holders would be subject to U.S. federal income tax on their share of any undistributed foreign personal holding company income (generally, taxable income calculated as if the Company were a U.S. corporation, subject to adjustments for any dividends paid and certain other items) received by the Company but not actually distributed to shareholders. To the extent that a U.S. Holder were required to include amounts in income under this rule, such amounts would be added to the tax basis of the Common Shares or ADSs held by such U.S. Holder. The Company has made distributions in an amount sufficient to eliminate undistributed foreign personal holding company income in the past and, subject to compliance with certain financing covenants limiting its ability to pay dividends, the Company intends to distribute all such income it may receive in the future.

DISTRIBUTIONS

Subject to the discussion above under "Foreign Personal Holding Company Status", the gross amount of any distribution by the Company of cash or property (other than certain distributions, if any, of Common Shares distributed pro rata to all shareholders of the Company, including holders of ADSs) with respect to Common Shares or ADSs will be includible in income by a U.S. Holder as dividend income to the extent such distributions are paid out of the current or accumulated earnings and profits of the Company as determined under U.S. federal income tax principles. Such dividends will not be eligible for the dividends received deduction generally allowed to corporate U.S. Holders. Subject to the discussion above under "Foreign Personal Holding Company Status", to the extent, if any, that the amount of any distribution by the Company exceeds the Company's current and accumulated earnings and profits as determined under U.S. federal income tax principles, it will be treated first as a tax-free return of the U.S. Holder's adjusted tax basis in the Common Shares or ADSs and thereafter as capital gain.

Dividends received by a U.S. Holder with respect to Common Shares or ADSs will be treated as foreign source income, which may be relevant in calculating such holder's foreign tax credit limitation. The limitation on foreign taxes eligible for credit is calculated separately with respect to specific classes of

federal income or withholding tax on dividends received on Common Shares or ADSs, unless such income is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the U.S..

SALE OR EXCHANGE OF COMMON SHARES OR ADSS

A U.S. Holder generally will recognize gain or loss on the sale or exchange of Common Shares or ADSs equal to the difference between the amount realized on such sale or exchange and the U.S. Holder's adjusted tax basis in the Common Shares or ADSs. Such gain or loss will be capital gain or loss. In the case of a noncorporate U.S. Holder, the maximum marginal U.S. federal income tax rate applicable to such gain will be lower than the maximum marginal U.S. federal income tax rate applicable to ordinary income if such U.S. Holder's holding period for such Common Shares or ADSs exceeds one year and will be further reduced if such holding period exceeds five years. Gain or loss, if any, recognized by a U.S. Holder generally will be treated as U.S. source income or loss for U.S. foreign tax credit purposes. The deductibility of capital losses is subject to limitations.

Subject to the discussion below under "Backup Withholding Tax and Information Reporting Requirements," a Non-U.S. Holder of Common Shares or ADSs generally will not be subject to U.S. federal income or withholding tax on any gain realized on the sale or exchange of such Common Shares or ADSs unless (i) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the U.S. or (ii) in the case of any gain realized by an individual Non-U.S. Holder, such holder is present in the U.S. for 183 days or more in the taxable year of such sale or exchange and certain other conditions are met.

BACKUP WITHHOLDING TAX AND INFORMATION REPORTING REQUIREMENTS

U.S. backup withholding tax and information reporting requirements generally apply to certain payments to certain noncorporate holders of stock. Information reporting generally will apply to payments of dividends on, and to proceeds from the sale or redemption of, Common Shares or ADSs made within the U.S. to a holder of Common Shares or ADSs (other than an "exempt recipient", including a corporation, a payee that is not a U.S. person that provides an appropriate certification and certain other persons). A payor will be required to withhold 31% of any payments of dividends on, or the proceeds from the sale or redemption of, Common Shares or ADSs within the U.S. to a holder (other than an "exempt recipient") if such holder fails to furnish its correct taxpayer identification number or otherwise fails to comply with, or establish an exemption from, such backup withholding tax requirements.

THE ABOVE SUMMARY IS NOT INTENDED TO CONSTITUTE A COMPLETE ANALYSIS OF ALL TAX CONSEQUENCES RELATING TO ACQUISITION, OWNERSHIP AND DISPOSITION OF SHARES OR ADSs. PROSPECTIVE PURCHASERS AND HOLDERS OF SHARES OR ADSs SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE TAX CONSEQUENCES OF THEIR PARTICULAR SITUATIONS.

LUXEMBOURG TAXATION

Other than certain former Luxembourg residents, current Luxembourg residents and those non-residents who maintain a permanent establishment in Luxembourg with which the holding of Stolt shares is connected, Stolt shareholders are not subject to taxation in Luxembourg.

DOCUMENTS ON DISPLAY

The Company is subject to the informational reporting requirements of the Securities Exchange Act of 1934 and files reports and other information with the

reference facilities maintained by the SEC at Room 1024, 450 Fifth Street, N.W., Washington, D.C., 20549, and at the SEC's regional offices located at Suite 1400, Northwest Atrium Center, 500 West Madison Street, Chicago, Illinois, 60661-2551 and Room 1300, Seven World Trade Center, New York, New York, 10048. Copies of these materials may also be received by mail from the SEC's Public Reference Branch at 450 Fifth Street, N.W., Washington, D.C., 20549. For more information on the public reference rooms, call the SEC at 1-800 SEC-0330. The Company's reports and other information filed with the SEC are also available to the public from commercial document retrieval services and the website maintained by the SEC at http://www.sec.gov.

ITEM 11. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

The Company is exposed to market risk, including changes in interest rates and currency exchange rates. To manage the volatility relating to these exposures on a consolidated basis, the Company enters into derivative transactions for currency exposures in accordance with the Company's policies. The financial impact of these instruments is offset by corresponding changes in the underlying exposures being hedged. The Company does not hold or issue derivative instruments for trading purposes.

CURRENCY RATE EXPOSURE

The primary purpose of the Company's foreign currency hedging activities is to protect against the volatility associated with foreign currency liabilities arising in the normal course of business. The Company's policy prescribes the range of allowable hedging activity. The Company primarily utilizes forward exchange contracts negotiated with major banks.

INTEREST RATE EXPOSURE

Based on the Company's overall interest rate exposure as of November 30, 2000, a near-term change in interest rates would not materially affect the Company's consolidated financial position, results of operations or cash flows. As of November 30, 2000, the large majority of the consolidated debt, after consideration of interest rate swap agreements, was fixed-rate debt (approximately 60%).

The Company uses a value-at-risk ("VAR") model to assess the market risk of its derivative financial instruments. The model utilizes a variance/covariance modeling technique. VAR models are intended to measure the maximum potential loss for an instrument or portfolio assuming adverse changes in market conditions, for a specific time period and confidence level. As of November 30, 2000 the Company's estimated maximum potential one day loss in fair value of foreign exchange rate instruments, calculated using the VAR model given a 95% confidence level, would approximate $1.3 million and $2.6 million from adverse changes in foreign exchange rates and interest rates, respectively. As of November 30, 1999 the Company's estimated maximum potential one day loss in fair value of foreign exchange rate instruments, calculated using the VAR model given a 95% confidence level, would approximate $0.6 million and $2.1 million from adverse changes in foreign exchange rates and interest rates, respectively. Actual experience has shown that gains and losses tend to offset each other over time, and it is highly unlikely that the Company could experience losses such as these over an extended period of time. These amounts should not be considered projections of future losses, since actual results may differ significantly depending upon activity in the global financial markets.

ITEM 12. DESCRIPTION OF SECURITIES OTHER THAN EQUITY SECURITIES.

Not applicable.

Case 3:03-cv-00409-DJS    Document 30-6    Filed 10/27/2003    Page 26 of 29

PART II

ITEM 13. DEFAULTS, DIVIDEND ARREARAGES AND DELINQUENCIES.

None.

ITEM 14. MATERIAL MODIFICATIONS TO THE RIGHTS OF SECURITY HOLDERS AND USE OF PROCEEDS.

SNSA SHARE RECLASSIFICATION

The Company's share reclassification was approved at an extraordinary general meeting of shareholders on March 6, 2001 and became effective on March 7, 2001. The objective of the reclassification was to create a simplified and more transparent share capital structure that gives all shareholders a vote on all matters, and results in only one class of publicly traded shares. The reclassification converted the Company's outstanding non-voting Class B shares to Common shares on a one-for-one basis. The existing classes of Founder's shares remain outstanding and continue to constitute 20% of the issued voting shares (Common and Founder's shares) of the Company. The holders of the Founder's shares agreed to abandon certain special voting rights formerly enjoyed by the Founder's shares including, for example, a separate class vote for merger transactions. The Founder's shares have only nominal economic rights and are not considered part of the share capital of the Company. The reclassified Common shares are listed in Norway on the Oslo Stock Exchange and trade as ADSs in the U.S. on Nasdaq.

Stolt-Nielsen has 54.8 million outstanding Common shares (which exclude 7.7 million Treasury Common shares) and 15.6 million Founder's shares. The share reclassification does not change the underlying economic interests of existing shareholders.

ITEM 15. [RESERVED]

ITEM 16. [RESERVED]

PART III

ITEM 17. FINANCIAL STATEMENTS.

The Company has elected to provide financial statements for the fiscal year ended November 30, 2000 and the related information pursuant to Item 18.

ITEM 18. FINANCIAL STATEMENTS.

A. CONSOLIDATED FINANCIAL STATEMENTS

Report of Independent Public Accountants

Consolidated Statements of Income for the years ended November 30 2000, 1999, and 1998

Consolidated Balance Sheets as of November 30, 2000 and 1999

Consolidated Statements of Shareholders' Equity for the years ended November 30, 2000, 1999 and 1998

Consolidated Statement of Cash Flows for the years ended November 30, 2000, 1999 and 1998

Notes to Consolidated Financial Statements

The Company's consolidated financial statements and related notes referred to above and the report of Arthur Andersen LLP, the Company's independent public accountants, appearing on pages 22 through 43 of the Company's 2000 Annual Report filed on April 12, 2001 with the Securities and Exchange Commission on Form 6-K and attached as an exhibit to this report are incorporated herein by reference.

B. SUPPLEMENTARY SCHEDULES

Report of Independent Public Accountants on Schedules

Schedule II--Valuation and Qualifying Accounts

64

## SIGNATURES

The registrant hereby certifies that it meets all of the requirements for
filing on Form 20-F and that it has duly caused and authorized the undersigned
to sign this annual report on its behalf.

STOLT-NIELSEN S.A.

By:             /s/ NIELS G. ST
                ------------------------
                    Niels G. Stol
                 TITLE: CHIEF EXEC

By:             /s/ JAN CHR. EN
                ------------------------
                    Jan Chr. Enge
                 TITLE: CHIEF FINA

Date: May 30, 2001

REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS

To STOLT-NIELSEN S.A.

We have audited in accordance with auditing standards generally accepted in the United States, the consolidated financial statements included in Stolt-Nielsen S.A.'s Annual Report to Shareholders incorporated by reference in this Form 20-F, and have issued our report thereon dated January 31, 2001. Our audits were made for the purpose of forming an opinion on those statements taken as a whole. The schedule listed in the Index on page F-1 is the responsibility of the Company's management and is presented for purposes of complying with the Securities and Exchange Commission's rules and is not part of the basic consolidated financial statements. This schedule has been subjected to the auditing procedures applied in the audits of the basic consolidated financial statements and, in our opinion, fairly states in all material respects the financial data required to be set forth therein in relation to the basic consolidated financial statements taken as a whole.

/s/ ARTHUR ANDERSEN LLP

New York, New York
January 31, 2001