As filed with the Securities and Exchange Commission on May 31, 2002

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 20-F

### ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the Fiscal Year Ended November 30, 2001**

**Commission File Number 0-16977**

# STOLT-NIELSEN S.A.
### (Exact name of Registrant as specified in its charter)

**LUXEMBOURG**
(Jurisdiction of incorporation or organization)

**c/o STOLT-NIELSEN LIMITED**
**Aldwych House**
**71-91 Aldwych**
**London WC2B 4HN, England**
(Address of principal executive offices)

**Securities registered or to be registered pursuant to Section 12(b) of the Act:**
None

**Securities registered or to be registered pursuant to Section 12(g) of the Act:**
Common Shares, no par value

**Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:**
None

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report:

| | |
|---|---|
| Common Shares, no par value | 54,917,749* |
| Founder's Shares, no par value | 13,729,436** |

\*  The number of outstanding Common Shares excludes 7,688,810 Common Shares owned by a subsidiary.

\*\* The number of outstanding Founder's Shares excludes 1,922,203 Founder's Shares held by Stolt-Nielsen S.A.

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes ☒    No ☐

Indicate by check mark which financial statement item the registrant has elected to follow.

Item 17 ☐    Item 18 ☒

# TABLE OF CONTENTS

**Page**

## PART I

| | | |
|---|---|---|
| Item 1. | Identity of Directors, Senior Management and Advisers | 1 |
| Item 2. | Offer Statistics and Expected Timetable | 1 |
| Item 3. | Key Information | 1 |
| | Selected Consolidated Financial Data | 1 |
| | Risk Factors | 1 |
| Item 4. | Information on the Company | 12 |
| | History and Development of Stolt-Nielsen | 12 |
| | Business Overview | 14 |
| | Strategy and Competitive Strengths | 26 |
| | Regulation | 27 |
| | Competition | 31 |
| | Insurance | 32 |
| | Principal Operating Subsidiaries | 33 |
| | Property, Plant, and Equipment | 34 |
| Item 5. | Operating and Financial Review and Prospects | 41 |
| | Operating Results | 41 |
| | Liquidity and Capital Resources | 42 |
| | Research and Development; Patents and Licenses | 42 |
| Item 6. | Directors, Senior Management, and Employees | 43 |
| | Directors and Senior Management | 43 |
| | Compensation | 45 |
| | Board Practices | 45 |
| | Employees | 46 |
| | Share Ownership | 46 |
| Item 7. | Major Shareholders and Related Party Transactions | 48 |
| | Major Shareholders | 48 |
| | Related Party Transactions | 49 |
| Item 8. | Financial Information | 49 |
| | Consolidated Statements and Other Financial Information | 49 |
| | Legal Proceedings | 49 |
| | Dividends | 50 |
| | Significant Changes | 50 |
| Item 9. | The Offer and Listing | 51 |
| | Stock Trading History | 51 |
| | Markets | 52 |
| Item 10. | Additional Information | 52 |
| | Organization and Register | 52 |
| | Articles of Incorporation | 53 |
| | Material Contracts | 56 |
| | Exchange Controls | 56 |
| | Limitations Affecting Shareholders | 57 |
| | Taxation | 57 |
| | Documents on Display | 61 |
| Item 11. | Quantitative and Qualitative Disclosures about Market Risk | 61 |
| Item 12. | Description of Securities Other than Equity Securities | 61 |

Page

**PART II**

Item 13.  Defaults, Dividend Arrearages and Delinquencies .......................... 62
Item 14.  Material Modifications to the Rights of Security Holders and Use of Proceeds ...... 62
          SNSA Share Reclassification ...................................... 62
Item 15.  [Reserved] ...................................................... 62
Item 16.  [Reserved] ...................................................... 62

**PART III**

Item 17.  Financial Statements ............................................. 63
Item 18.  Financial Statements ............................................. 63
          Consolidated Financial Statements ................................ 63
          Supplementary Schedules.......................................... 63
Item 19.  Exhibits ........................................................ 64

## INTRODUCTION

Stolt-Nielsen S.A. is a Luxembourg registered company. In this Report, the terms "we", "us", "our" and "Stolt-Nielsen", refer to Stolt-Nielsen S.A. and, unless the context otherwise requires, its consolidated subsidiaries. References in this Report to "SNTG" refer to Stolt-Nielsen Transportation Group Ltd., references to "SOSA" or "Stolt Offshore" refer to Stolt Offshore S.A., and references to "SSF" or "Stolt Sea Farm" refer to Stolt Sea Farm Holding plc, each subsidiaries of Stolt-Nielsen.

References to our activities by years refer to the fiscal year ended November 30.

Our Common Shares are listed in Norway on the Oslo Stock Exchange under the ticker symbol "SNI" and trade in the form of American Depositary Shares (each ADS representing one Common Share) in the U.S. on the Nasdaq National Market ("Nasdaq") under the ticker symbol "SNSA".

On March 7, 2001, we reclassified our non-voting Class B Shares as Common Shares on a one-for-one basis; on that date, trading in the Class B Shares on Nasdaq and the Olso Stock Exchange ceased. As a result, the Common Shares are our only publicly-traded security. References to Class B Shares means Class B Shares up until March 7, 2001, and thereafter means Common Shares. The reclassification did not change the underlying economic interests of existing shareholders nor the number of shares used for earnings per share purposes.

As of April 30, 2002 we had 54.9 million Common Shares (which excludes 7.7 million Treasury Common Shares) and 13.7 million Founder's Shares (which excludes 1.9 million Treasury Founder's Shares) issued and outstanding.

The Consolidated Financial Statements, including the notes thereto, included or incorporated in this Report (the "Consolidated Financial Statements") have been prepared in accordance with generally accepted accounting principles in the United States.

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

This Report and some of the documents incorporated by reference in this Report include "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. These statements relate to our expectations, beliefs, intentions or strategies regarding the future. These statements may be identified by the use of words like "anticipate", "believe", "estimate", "expect", "intend", "may", "plan", "project", "will", "should", "seek" and similar expressions. Forward-looking statements include, but are not limited to, statements about the following subjects:

- general economic and business conditions
- industry capacity
- industry trends
- competition
- asset operational performance
- raw material costs and availability
- currency fluctuations
- the loss of any significant customers
- availability, terms and deployment of capital

- availability of qualified personnel
- changes in, or the failure or inability to comply with, government regulations
- outcome of legal proceedings
- adverse weather conditions
- disease and other natural causes
- immaturity of aquaculture technology
- changes in business strategy or development plans

The forward-looking statements that we make reflect our current views and assumptions with respect to future events and are subject to risks and uncertainties. Actual and future results and trends could differ materially from those set forth in such statements due to various factors, including those discussed under "Item 3. Key Information—Risk Factors" and "Item 5. Operating and Financial Review and Prospects". Many of these factors are beyond our ability to control or predict. Given these uncertainties, you should not place undue reliance on the forward-looking statements. We undertake no obligation to update publicly or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

(This page has been left blank intentionally.)

# PART I

**Item 1. Identity of Directors, Senior Management, and Advisers.**

Not applicable.

**Item 2. Offer Statistics and Expected Timetable.**

Not applicable.

**Item 3. Key Information.**

**Selected Consolidated Financial Data**

The information under the caption "Selected Consolidated Financial Data" on page 30 of our 2001 Annual Report filed with the Securities and Exchange Commission on Form 6-K on April 9, 2002 is incorporated herein by reference.

**Risk Factors**

You should carefully consider the following factors and the information contained in this Report, including the information incorporated by reference into this Report. The following is a summary of all of the risks applicable to our business operations that we consider to be material. If any of the events described below actually occurs, our business, financial condition or results of operations could be materially adversely affected.

*Stolt-Nielsen Transportation Group*

*SNTG's business can be impacted by the demand for bulk liquid transportation services.*

Demand for Stolt-Nielsen Transportation Group Ltd. services is dependent on the condition and growth of the worldwide economy and trade patterns for the products shipped and stored. Factors impacting this include overall demand, particularly in the chemical, lube oil, acid and food industries, for the products SNTG carries and stores, location of the production of the products carried and stored in relation to location of demand, currency fluctuations, import/export tariffs and other trade restrictions, and current spot and future prices of the products. Any general economic slowdown could also have an adverse effect on the demand for goods to be produced from those products that SNTG ships and stores. Thus, a general economic slowdown could also have a negative impact on SNTG.

*SNTG's business can be impacted by the supply of bulk liquid transportation services.*

The supply of parcel tankers is influenced by the number of new ships delivered into the market, scrappings, and industry regulation of maritime transportation practices. Scrapping rates are also impacted by the pricing achieved in the market, condition of ships, and quality standards set by customers and governmental authorities. For certain shipped products (usually larger commodity type products such as MTBE, methanol, xylene and benzene rather than specialty chemicals), parcel tankers face competition from sophisticated product tankers. Therefore, the supply and utilization of product tankers may also impact the parcel tanker market. The world order book for newbuildings, to be delivered over the next three years, stands today at 8% to 9% of the total competitive fleet. Adjusting for expected scrappings and downgradings, we expect the world net supply of tonnage to grow by approximately 1% to 2% per year over this period. A modest increase in demand, combined with this relatively small order book growth, should result in an improvement in rates over the next several years.

SNTG's tank container operations compete with other tank container operators, shipper-owned tank containers, barrel drums, liquid bags, and, on land, with truck and rail tank cars. The supply of tank containers is influenced by the number of tank containers constructed and industry regulations.

*Inclement weather may adversely impact SNTG's results.*

Inclement weather conditions may impact SNTG's operational performance.

*Trade lane closures may impact SNTG's results.*

Global ocean transportation is dependent upon unrestricted passage through major canals or straits including, but not limited to, the Panama Canal, the Suez Canal, and the Malacca Straits. Interruption or restrictions caused by war, blockage, or government imposed restrictions on the passage of ships through any of these trade lanes can have an impact on SNTG results.

*Changes in contract and spot market rates may impact SNTG's results.*

In 2001 approximately 54% of SNTG's parcel tanker business was done under a long-term contract basis with customers and approximately 46% was for spot or short-term contracts, usually single voyage contracts. SNTG's ability to renew long-term contracts at favorable rates is dependent on the current, and customers' outlook on future, spot contract prices.

*SNTG's results may be negatively impacted by the loss of major customers.*

While SNTG has a large number of customers and its largest customers may vary from year to year, the loss of a major customer can impact results. Parcel tanker and tank container assets are typically utilized in servicing a wide variety of customers.

*The price of ship fuel may impact SNTG's results.*

Ship fuel constitutes one of the major operating costs of SNTG's parcel tanker fleet. Fluctuations in the price of fuel can have a material impact on SNTG's results. Since 1987, the average annual cost of bunker fuel purchased by SNTG has varied between approximately $76 and $139 per ton. In 2001, with an average cost of approximately $139 per ton, ship fuel constituted approximately 19% of total fleet operating costs.

Although SNTG is able to pass a substantial portion of these fuel price fluctuations through to its customers, a significant portion are incurred solely by SNTG and a rise in ship fuel costs can negatively impact SNTG's results. Approximately 54% of SNTG's total parcel tanker volume in 2001 was carried under long-term contracts; with the majority of this revenue covered by contract provisions intended to pass through fuel price fluctuations. The remaining cargo volume is carried under spot contracts at freight rates that are affected by prevailing fuel prices.

*SNTG's method of accounting for parcel tanker voyages may result in the reduction or elimination of previously reported profit.*

In SNTG's parcel tanker operations, most revenue is recognized on a percentage-of-completion basis, based on the ratio of costs incurred to the total estimated costs at completion. Voyage revenues and gross profit may be adjusted in subsequent reporting periods from those originally reported in prior periods. To the extent that these adjustments result in a reduction or elimination of previously reported profits, SNTG would recognize a charge against current earnings that may be significant depending on the size of the voyage or the adjustment.

2

*We are exposed to substantial hazards and risks that are inherent to the shipping industry which may result in the loss of revenues, increased expenses, or for which the liabilities may potentially exceed our insurance coverage and contractual indemnity provisions.*

The operation of any ocean-going ship carries an inherent risk of catastrophic marine disasters, property losses and business interruptions caused by adverse weather conditions, mechanical failures, human error, war, terrorism, piracy, labor stoppages, and other circumstances or events. In addition, the transportation of oil, fuel and chemicals is subject to the risk of spills. Any such event may result in loss of revenues or increased costs.

We carry insurance to protect against most of the accident-related risks involved in the conduct of our business and we maintain environmental damage and pollution insurance coverage. There can be no assurance, however, that all risks are adequately insured against, that any particular claim will be paid or that we will be able to procure adequate insurance coverage at commercially reasonable rates in the future. In particular, more stringent environmental regulations may result in increased costs for, or the lack of availability of, insurance against the risks of environmental damage or pollution.

While we currently insure our ships against property loss due to a catastrophic marine disaster, mechanical failure, or collision, the loss of any ship as a result of such an event could result in a substantial loss of revenues, increased costs, and other liabilities in excess of available insurance and could have a material adverse effect on our operating performance. Litigation arising from such an occurrence may result in our being named as a defendant in lawsuits asserting large claims.

The U.S. Oil Pollution Act of 1990 ("OPA '90"), by imposing virtually unlimited liability upon ship owners, operators, and certain charterers for certain oil pollution accidents in the U.S., has made liability insurance more expensive and has also prompted insurers to consider reducing available liability coverage. While we maintain insurance, there can be no assurance that all risks are adequately insured against particularly in light of the virtually unlimited liability imposed by OPA '90, that any particular claim will be paid, or that we will be able to procure adequate insurance coverage at commercially reasonable rates in the future. Because we maintain mutual insurance, we are subject to funding requirements and coverage shortfalls in the event claims exceed available funds and reinsurance and to premium increases based on prior loss experience. Any such shortfalls could have a material adverse impact on us.

### Stolt Offshore

*Stolt Offshore's business is affected by expenditures by participants in the oil and gas industry.*

Demand for Stolt Offshore's offshore services depends on expenditures by participants in the oil and gas industry and particularly on capital expenditure budgets of the companies engaged in the exploration, development and production of offshore oil and gas. In particular, the oil and gas industry has been consolidating. There are fewer and larger oil and gas companies that control expenditures for the types of services and products that Stolt Offshore and its competitors provide. Offshore oil and gas field capital expenditures are also influenced by many other factors beyond Stolt Offshore's control, including:

- prices of oil and gas and anticipated growth in world oil and gas demand;
- the discovery rate of new offshore oil and gas reserves;
- the economic feasibility of developing particular offshore oil and gas fields;
- the production from existing producing oil and gas fields;
- political and economic conditions in areas where offshore oil and gas exploration and development may occur;

3

- policies of governments regarding the exploration for, pricing and production and development of their oil and gas reserves; and
- the ability of oil and gas companies to access or generate capital and the cost of such capital.

*Unexpected costs may adversely affect the amount Stolt Offshore realizes from fixed-price contracts.*

A significant proportion of Stolt Offshore's business is performed on a fixed-price or turnkey basis. In 2001, 2000 and 1999, approximately 72%, 74% and 47%, respectively, of Stolt Offshore's revenue was derived from fixed-price contracts. Long-term fixed-price contracts are inherently risky because of the possibility that Stolt Offshore may incur costs that it did not expect at the time of bidding, including the cost of satisfying post-completion warranty obligations. The cost and gross profit realized on such contracts can vary from those expected because of changes beyond Stolt Offshore's control, including but not limited to:

- unanticipated technical problems with the equipment Stolt Offshore is supplying or developing which may require that Stolt Offshore spend its own money to remedy the problem;
- unanticipated changes in the costs of components, materials or labor;
- unanticipated difficulties in obtaining required governmental permits or approvals;
- project modifications creating unanticipated costs;
- delays caused by local weather and soil conditions; and
- suppliers' or subcontractors' failure to perform.

These risks are exacerbated if the duration of the project is long-term, because there is more time for and, therefore, an increased risk that the circumstances upon which Stolt Offshore originally bid and developed a price will change in a manner that increases Stolt Offshore's costs. Stolt Offshore's long-term projects often subject it to penalties if it cannot complete portions of the project in accordance with agreed-upon time limits.

*Stolt Offshore may be liable to third parties for the failure of its joint venture partners to fulfill their obligations.*

Under some of Stolt Offshore's joint venture agreements, Stolt Offshore and its partners are jointly and severally liable to the customer for the performance of the contract. If Stolt Offshore's joint venture partner in such arrangement fails to fulfill its obligations, Stolt Offshore could have to carry the resultant liability toward the customer and would have to rely on its ability to obtain reimbursement from its joint venture partner. If Stolt Offshore's joint venture partner became insolvent or ceased operations, this might not be possible.

*Stolt Offshore's method of accounting for projects could result in a reduction or elimination of previously reported profits.*

Substantially all of Stolt Offshore's projects are accounted for on the percentage-of-completion method, which is standard for its industry and in compliance with U.S. generally accepting accounting principles. Under the percentage-of-completion method, estimated contract revenues are accrued based on the ratio of costs incurred to date to the total estimated costs, taking into account the level of physical completion. Estimated contract losses are recognized in full when determined. Contract revenues and total cost estimates are reviewed and revised periodically as work progresses and as change orders are approved, and adjustments based on the percentage of completion are reflected in contract revenues in the reporting period when these estimates are revised. To the extent that these adjustments result in a reduction or elimination of previously reported contract revenues, Stolt

4

Offshore would recognize a charge against current earnings that may be significant depending on the size of the project or the adjustment.

*Stolt Offshore's business could suffer as a result of current or future litigation.*

Stolt Offshore is subject to legal claims by customers, sub-contractors, employees, joint venture partners, government agencies and competitors. In particular, its competitor, Coflexip S.A., has commenced legal proceedings through the United Kingdom High Court against three of Stolt Offshore's subsidiaries claiming infringement of a certain patent held by Coflexip relating to flexible flowline laying technology in the United Kingdom. Judgment was rendered on January 22, 1999 and January 29, 1999. The disputed patent was held valid. Stolt Offshore appealed and the Appeal Court maintained the validity of the patent and broadened its application compared to the High Court decision. Stolt Offshore has applied for leave to appeal the Appeal Court decision to the House of Lords, which has now been denied. The result of these court decisions is that the flexible lay system tower on *Seaway Falcon*, and the process by which this system lays flexible conduits, has been held to infringe Coflexip's patent in the United Kingdom. During 2001, Coflexip submitted an amended claim for damages claiming lost profits on a total of 15 projects. In addition, there is a claim for alleged price depreciation on certain other projects. The claim is for approximately $89.0 million, up from approximately $14.0 million claimed previously, plus interest, legal costs and a royalty for each time that the flexible lay system tower on the *Seaway Falcon* was brought into United Kingdom waters. Stolt Offshore estimates that the total claim will amount to approximately $115.0 million. In the alternative, Coflexip claims a reasonable royalty for each act of infringement, interest and legal costs. Coflexip has not quantified this claim, but it will be considerably less than the claim to lost profits. Stolt Offshore, in consultation with its advisers, has assessed that the range of possible outcomes for the resolution of damages is $1.5 million to $115.0 million and has determined that there is no amount within the range that is a better estimate than any other amount. Consequently, in accordance with Statement of Financial Accounting Standards ("SFAS") No. 5, *Accounting for Contingencies,* Stolt Offshore has reserved $1.5 million in the financial statements, being the lower amount of the range. The amount of damages is nevertheless uncertain, and no assurance can be given that the provided amount is sufficient. If the amount Stolt Offshore is ultimately determined to owe, if any, is substantially more than it has currently reserved or if Stolt Offshore increases the amount of the reserve for this claim, it could have a material adverse effect on its results of operations.

Furthermore, there can be no assurance that the results of the litigation described above or other legal proceedings will not materially harm Stolt Offshore's business or reputation.

*Stolt Offshore faces competition which could have an adverse effect upon its operating results and financial condition.*

The offshore oil and gas services business is highly competitive, and offshore contractors compete intensely for available projects. Contracts for Stolt Offshore's services are generally awarded on a competitive bid basis, and although customers may consider, among other things, the availability and capability of equipment and the reputation and experience of the contractor, price is a primary factor in determining which contractor is awarded a contract. Several of Stolt Offshore's competitors and potential competitors are larger than Stolt Offshore and have greater financial and other resources. This intense competition could result in pricing pressures, lower sales and reduced margins which would have an adverse effect upon Stolt Offshore's operating results and financial condition.

*Stolt Offshore depends on certain significant customers and long-term contracts and the loss of one or more significant customers or the failure to replace or enter into new long-term contracts could adversely affect its operating results.*

In 2001, TotalFinaElf accounted for 24% of Stolt Offshore's net operating revenue and Williams Gas accounted for 11% of Stolt Offshore's net operating revenue. In 2000, TotalFinaElf accounted for 24%, and Shell accounted for 10%, of Stolt Offshore's net operating revenue. During 2001 and 2000, our ten largest customers accounted for 76% and 67%, respectively, of Stolt Offshore's net operating revenue, and over that period seven customers, including BP, ChevronTexaco, Petrobras, Shell, Statoil, TotalFinaElf and Triton Energy (acquired in 2001 by Amerada Hess) consistently numbered among Stolt Offshore's ten largest customers. Revenues from Stolt Offshore's largest customers are often related to specific long-term contracts that upon completion may not be replaced by contracts of equivalent size. Stolt Offshore's inability to replace significant long-term projects on similar terms or the loss of any one or more of its significant customers or a substantial decrease in demand by its significant customers could result in a substantial loss of revenues which could have a material adverse effect on it.

*Stolt Offshore could be adversely affected if it fails to keep pace with technological changes, and changes in technology could result in write-downs of assets.*

Stolt Offshore's customers are constantly seeking to develop oil and gas fields in deeper waters. To meet its customers' needs, it must continuously develop new, and update existing, technology for the installation, repair and maintenance of offshore structures. In addition, rapid and frequent technology and market demand changes can often render existing technologies obsolete requiring substantial new capital expenditures and/or write-downs of assets. Stolt Offshore's failure to anticipate or to respond adequately and timely to changing technology, market demands and/or customer requirements could adversely affect its business and financial results.

*Stolt Offshore is exposed to substantial hazards and risks that are inherent in the offshore services business for which liabilities may potentially exceed its insurance coverage and contractual indemnity provisions.*

Stolt Offshore's operations are subject to all the risks normally associated with offshore development and production and could result in damage to or loss of property, suspension of operations or injury or death to personnel or third parties. Stolt Offshore insures its assets at levels which its management believes reflect their current market value. Such assets include all capital items such as ships, major equipment and land-based property. The only assets not insured are those where the cost of such insurance would be disproportionate to their value.

Stolt Offshore's operations are conducted in hazardous environments where accidents involving catastrophic damage or loss of life could result, and litigation arising from such an event may result in it being named a defendant in lawsuits asserting large claims. Stolt Offshore insures for liability arising from its operations, both onshore and offshore, including loss of or damage to third-party property, death or injury to employees or third parties, statutory workers compensation protection and pollution. Although there can be no assurance that the amount of insurance Stolt Offshore carries is sufficient to protect it fully in all events, all such insurance is carried at levels of coverage and deductibles that Stolt Offshore considers financially prudent. A successful liability claim for which Stolt Offshore is underinsured or uninsured could have a material adverse effect on Stolt Offshore.

Stolt Offshore generally seeks to obtain indemnity agreements whenever possible from its customers requiring those customers to hold Stolt Offshore harmless in the event of structural damage, loss of production or liability for pollution that originates below the water surface. Such contractual indemnification, however, does not generally cover liability resulting from the gross negligence or willful misconduct of, or violation of law by Stolt Offshore's employees or subcontractors. Additionally, if Stolt

6

Offshore suffers a loss for which it is entitled to indemnity, Stolt Offshore is dependent on its customer's ability to satisfy its indemnity obligation. If the customer cannot satisfy its obligation, Stolt Offshore could suffer losses.

*Stolt Sea Farm*

*SSF may encounter severe price fluctuations caused by imbalances in supply and demand.*

Demand for salmon and salmon trout products in the main markets in Europe, the U.S. and Asia Pacific is met by supplies from the main salmon farming regions in Northern Europe, North America and Chile. Although demand in each market tends to increase steadily, supply to the markets can vary more sharply. Growing conditions in the different regions can vary, there may be disease epidemics in different regions, and there are differing restrictions on farming capacity increases in the different growing regions. For a large part of 2000, prices in Europe and the U.S. rose exceptionally due to lower supply from Scotland and Chile, mainly attributable to diseases suffered in those regions. In the latter part of 2000 and through 2001, prices in the U.S. and Europe fell significantly as supplies from Chile and Scotland recovered to earlier levels and higher, as well as supplies from the Faeroe Islands and Ireland increasing at the same time. Sudden imbalances between supply and demand can result in significant fluctuations in selling prices and hence material variations in the results of the salmon and salmon trout farming operations.

*SSF operates in an industry that is heavily affected by natural conditions.*

SSF's fish farming operations may be adversely affected from time to time by climactic conditions, such as severe storms, flooding, dry spells and changes in water temperature or salinity, and may be adversely affected by natural calamities. Because the growth rates of fish are dependent on weather conditions, unexpectedly hot or cold temperatures may adversely impact growth rates, harm the fish and lead to losses of fish. Bad weather may also delay harvest or result in the loss of equipment or fish. Storms and floods can also cause damage to facilities involving an interruption in the water supply or seaweed blockages, which may lead to a loss of fish.

SSF's operations also may be adversely affected by other natural conditions such as algae blooms (intensive and sudden blooms of algae that occur naturally in the marine environment as a result of weather changes), pollution, disease, parasites and natural predators, such as sea lions, seals and predatory birds. Although SSF uses antibiotics and other chemical substances to control diseases and parasites and uses farm management to control the impact of natural predators, if these precautions are not successful SSF could suffer losses to its fish stock, thereby reducing its revenues and resulting in possible losses. In certain instances, healthy fish may need to be culled under mandate from government authorities as part of an effort to control disease outbreak in the local farming area. Additionally, new diseases or parasites could emerge in a farming environment for which SSF does not currently have adequate countermeasures.

*Accidents or intentional acts that affect the condition of the water used in SSF's operations could adversely affect its results.*

Farmed fish require water conditions to be carefully maintained to ensure their good health. Unintentional accidents causing pollution or loss of water may result in the death of fish or the need to harvest fish before they reach optimal market size.

Farmed fish are also susceptible to deliberate acts of vandalism or sabotage, which can result in the death or early harvesting of the fish.

*The limitations of aquaculture technology may adversely affect SSF's results.*

Although most areas of technology involved in aquaculture are well-known and proven, there are certain aspects of the life cycle of certain species of fish, such as halibut and sturgeon, that are less well understood, particularly those concerning the juvenile phase of production. Unexpected events in the life cycle of farmed fish can result in either a higher production cost for fish (related to higher mortality rates or slower growth rates) or in lower grade fish (related to sub-optimal genetic qualities), either of which may adversely affect profitability.

*Escaping fish could harm native species and could otherwise adversely affect SSF's results.*

Fish escaping from cages not only entails considerable risk of loss for SSF, but also may impact native species of fish. There is insufficient knowledge in the aquaculture industry about the negative effects, if any, caused by escaping fish and SSF may be exposed to lawsuits from governmental and environmental organizations. If fish escape, their chances of survival are extremely low.

*Fluctuations in feed cost may adversely affect SSF's profitability.*

Feed for fish accounts for an important part of the total production cost of SSF's products. The availability of raw material is critical to feed production, and feed producers are to a great extent dependent on the price development and availability of fish meal and fish oil. Natural limitations in the resources of the sea may lead to a shortage of fish meal and fish oil. Prices for fish feed can vary substantially because feed producers depend on the price and availability of raw materials such as fish meal and fish oil, which are scarce resources. Fluctuations in the price of fish feed may adversely affect SSF's profitability.

*SSF must comply with government laws and regulations around the world.*

The production, import, sale and marketing of SSF's products are subject to governmental laws and regulations around the world. The regulatory standards administered by government agencies and by the rules of industry associations pertain to overall product quality, plant sanitation and the use of feeds, drugs and other chemical substances in aquaculture operations. In the United States, the import and marketing of SSF's products are regulated primarily by the U.S. Food and Drug Administration, or FDA, which has broad authority to prohibit entry of imported foods on various grounds.

Government laws and regulations are used as instruments of environmental, ecological and trade policy. Governments have implemented laws and regulations to control such factors as the area where aquaculture is permitted and the number of concessions to be operated in an area, the density of fish permitted in a concession and the amount of feed that can be fed to the fish. They are also used to erect tariff barriers against the import of farmed fish and fish products. SSF is required to obtain permits and licenses in various jurisdictions, and it may not be able to renew them as they fall due. Changes in government regulation of the aquaculture industry can have a significant impact on SSF's production costs and on its ability to compete effectively in the regulated markets.

*SSF's products are subject to shifting consumer preferences.*

Public perception of the health benefits or detriments of eating fish, including concerns regarding cholesterol or contamination due to pollution or disease, may affect consumer preferences and, therefore, the overall demand for these foods. SSF's business may be affected by published reports on the relative health benefits of its products or of competing seafood, meat and poultry products in the future. The relative pricing of SSF's fish products versus these other products can also impact the demand for SSF's products.

*Optimum Logistics and SeaSupplier*

*The unproven business models of Optimum Logistics Ltd. and SeaSupplier Ltd. may fail to generate sufficient revenue or any profits.*

Both Optimum Logistics Ltd. ("OLL") and SeaSupplier Ltd. ("SSL") have limited operating histories, new and unproven business models, and face substantial competition. Their prospects for success must be considered in the light of the risks, including market acceptance and expenses and difficulties frequently encountered by companies in their early stage of development, particularly companies in new and rapidly evolving markets. To address these risks, OLL and SSL must respond to competitive developments, continue to upgrade their products and continue to attract, retain and motivate qualified personnel. There can be no certainty that OLL and SSL will be able to address these risks, their business models will be successful, or that these businesses will generate sufficient revenue or any profits.

*General*

*Our failure to comply with environmental and other regulations may result in significant fines, penalties, or the loss of revenue.*

We operate in a number of different jurisdictions and are subject to and affected by various types of governmental regulation related to the protection of the environment, including national laws and regulations and international conventions relating to ship safety and design requirements, disposal of hazardous materials, discharge of oil or hazardous substances, protection of the environment, food safety, and various import and export requirements. These laws and regulations are becoming increasingly complex, stringent, and expensive to comply with, and there can be no assurance that continued compliance with existing or future laws or regulations will not adversely affect our operations. Significant fines and penalties may be imposed for non-compliance.

*Our floating interest rate debt exposes us to the risk of fluctuations in interest rates.*

Approximately 46% of our long-term indebtedness at March 31, 2002 incurs interest at rates that fluctuate with the prevailing interest rates and, accordingly, increases in such rates will increase our interest cost if we do not hedge the impact of such interest rate movements.

*Our international operations expose us to changes in foreign regulations and other risks inherent to international business, any of which could affect our operating results.*

Operations in international markets present risks including:

- economic instability, which could make it difficult for us to anticipate future business conditions in these markets;
- political instability, which could discourage investment and complicate our dealings with governments;
- boycotts and embargoes that may be imposed by the international community on countries in which we operate;
- labor unrest;
- disruptions due to civil war, election outcomes, shortages of commodities, power interruptions or inflation;
- the imposition of unexpected taxes or other payments on revenues; and
- the introduction of exchange controls and other restrictions by foreign governments.

9

*Our international operations expose us to the risk of fluctuations in currency exchange rates.*

Substantial portions of our revenue and expenses are denominated in currencies other than U.S. dollars. Consequently, exchange rate movements between the U.S. dollar and the Euro, the Norwegian kroner, the Canadian dollar, the Singapore dollar, the Japanese yen and other currencies can have a significant impact on our financial results. We engage in hedging programs intended to reduce part of our short-term exposure to currency fluctuations. However, there can be no assurance that such efforts will be successful. Hedging is limited to known and foreseeable exposures that develop through normal business operations and to long-term business investments. We do not attempt to hedge foreign earnings that are translated into dollars for reporting purposes. Foreign currency fluctuations have had and will continue to have an impact on reported financial results.

*The U.S. Internal Revenue Service may rule that our shipping operations do not qualify for exemption from U.S. income taxes.*

Pursuant to the Internal Revenue Code of the U.S. (the "Code"), effective for our fiscal years beginning on or after December 1, 1987, U.S. source income from the international operation of ships is generally exempt from U.S. tax if the company operating the ships meets certain requirements. Among other things, in order to qualify for this exemption, the company operating the ship must be incorporated in a country which grants an equivalent exemption to U.S. citizens and corporations and whose shareholders meet certain residency requirements. The Internal Revenue Service has agreed that we qualify for this exemption for years up to and including fiscal 1992, but may review our qualifications for subsequent years. We believe that substantially all of SNTG's ship owning and ship operating subsidiaries meet the requirements to qualify for this exemption from U.S. taxation. For these reasons, no provision for U.S. income taxes has been made with respect to SNTG's U.S. source shipping income.

In February 2000, the Internal Revenue Service published proposed regulations which, if published in final form, might adversely effect our ability to qualify for this exemption. Based upon information available at this time, we believe that we will still qualify for the exemption and, in addition, may qualify for a treaty exemption. However, there can be no certainty until the Internal Revenue Service publishes the final regulations. If an equivalent exemption were not available, or if we did not qualify for a treaty exemption, we would be taxable on our U.S. source income from shipping activities in one of two ways. Generally, income subject to U.S. taxation would include 50% of the revenues derived from shipments between the U.S. and foreign ports. This would include our share of all such income from the Stolt Tankers Joint Service ("STJS"). Under the first method, if the company operating the ship has any such income which is effectively connected with a U.S. trade or business, such income would be subject to U.S. taxation on a net basis at graduated rates of up to 35%. This income, with adjustments, would be further subject to the 30% branch profits tax to the extent not reinvested in the U.S. Under the second method, any such income which is not effectively connected with a U.S. trade or business would be subject to taxation on a gross basis (without allowance for deductions) at a fixed 4% rate. The branch profits tax would not apply to income subject to the 4% tax.

*Our level of debt and bank credit and financing agreements may constrain our operations.*

As of April 30, 2002, we had an aggregate of $1,553 million of debt outstanding. In addition, we are party to material bank credit and other financing agreements which impose certain financial requirements such as limitations on debt and the types of businesses we may engage in. The degree to which we are leveraged may affect our ability to obtain additional financing in the future for working capital, capital expenditures, product and service development and general corporate purposes, to utilize cash flow from operations for purposes other than debt service, and to overcome seasonal or other cyclical variations in our business. Our ability to satisfy our obligations, to reduce our debt, and remain in compliance with all of these credit/financing agreements depends on our future performance.

*The Stolt-Nielsen Family exercises a controlling influence over matters requiring shareholder approval, which could prevent a change of control.*

As of April 30, 2002, the Stolt-Nielsen family, directly and indirectly through Fiducia Ltd., controlled approximately 60% of the outstanding shares of Stolt-Nielsen entitled to vote generally on matters brought to a vote of shareholders of Stolt-Nielsen.

The Stolt-Nielsen family currently exercises a controlling influence over our operations and has sufficient voting power to control the outcome of matters requiring shareholder approval including: the composition of our Board of Directors which has the authority to direct our business and to appoint and remove our officers; approving or rejecting a merger, consolidation or other business combination; raising future capital; and amending our Articles of Incorporation which govern the rights attached to our Common Shares. This control may also make it difficult to take control of Stolt-Nielsen without the approval of the Stolt-Nielsen family. Additionally, the interests of the Stolt-Nielsen family may conflict with those of other shareholders.

*Our Articles of Incorporation impose restrictions on the ownership of our securities.*

Our Articles of Incorporation state that no one U.S. person (defined to include any person who is a citizen or resident of the United States, a corporation organized under the laws of the United States and certain other entities and their affiliates and associates) may own, directly or indirectly, more than 9.9% of our total outstanding shares at any time. In addition, the Articles provide that all shareholders of any single country may not own, directly or indirectly, more than 49.9% of our outstanding shares, and no person may own, directly or indirectly, more than 20% of our outstanding shares unless a majority of our Board of Directors shall have authorized such shareholding in advance. The Board of Directors may take remedial action if it determines that we are threatened with "imminent and grave damage" (as defined in the Articles). We have been advised by our Luxembourg counsel, Elvinger, Hoss & Prussen, that there are no Luxembourg judicial interpretations of such phrase, but that situations involving hostile takeovers, adverse tax consequences to us or governmental sanctions are likely to be among the situations covered by that phrase. These defensive measures may have the effect of making more difficult a merger involving us, or a tender offer, open-market purchase program or other purchase of our shares, in circumstances that could give shareholders the opportunity to realize a premium over the then prevailing market price for their shares.

*It may be difficult to enforce a U.S. judgment against us, our officers and our directors or to assert U.S. securities laws claims in Luxembourg or serve process on our officers or directors.*

We are a corporation organized under the laws of Luxembourg. Several of our directors and officers reside and maintain most of their assets outside the United States and it may not be possible to effect service of process within the United States on us or on such persons, or to enforce against us or them in U.S. courts judgments obtained in such courts based on the civil liability provisions of the U.S. federal securities laws. We have been advised by Elvinger, Hoss & Prussen, our Luxembourg counsel, that there is substantial doubt as to whether the courts of Luxembourg would (1) enforce judgments of U.S. courts obtained in actions against us or such directors and officers based on the civil liability provisions of the U.S. federal securities laws or (2) entertain original actions brought in Luxembourg against us or such directors and officers predicated solely upon the civil liability provisions of the U.S. federal securities laws. There is no treaty in effect between the United States and Luxembourg providing for such enforcement, and there are grounds upon which Luxembourg courts may choose not to enforce judgments of U.S. courts. Certain remedies available under the U.S. federal securities laws would not be enforced by Luxembourg courts as contrary to that nation's public policy.

11

## Item 4. Information on the Company.

### History and Development of Stolt-Nielsen

Stolt-Nielsen S.A. was incorporated in Luxembourg in 1974 as the holding company for all of the group's activities. Our registered office is located at 23, avenue Monterey, L-2086 Luxembourg and we are registered at the Companies' Register of the Luxembourg District Court under the designation "R.C. Luxembourg B.12.179". Our principal executive offices are c/o Stolt-Nielsen Limited, Aldwych House, 71-91 Aldwych, London WC2B 4HN, England; telephone number 44-207-611-8960; internet address www.stolt-nielsen.com. Our agent for U.S. federal securities law purposes is Stolt-Nielsen Inc., 8 Sound Shore Drive, P.O. Box 2300, Greenwich, Connecticut, U.S. 06836.

We have 89 offices and facilities, and employ approximately 13,300 persons worldwide as of November 30, 2001.

### *Recent Significant Developments*

#### *Stolt-Nielsen Transportation Group*

In 2001, SNTG completed the first phase of construction of a tank storage terminal in the U.S., located in Braithwaite, Louisiana, containing 38 tanks with storage capacity of 850,000 barrels of liquid storage and associated ship, rail and trucking facilities, at a total cost to date of approximately $54 million. The Braithwaite terminal became operational in mid 2001 and was completed during the first quarter of 2002. In 2000, SNTG purchased the land and made progress payments on the terminal in Braithwaite, Louisiana.

Our latest newbuilding program, which we started in 1994, was completed with the delivery of *Stolt Perseverance* in December 2001. During 2000, SNTG also made progress payments on newbuildings of parcel tankers under construction, and final payments on the delivery of six new parcel tankers.

#### *Stolt Offshore*

On December 7, 1999, Stolt Offshore acquired a 49% interest in the NKT Flexibles I/S joint venture. As partial consideration for the acquisition of its interest, Stolt Offshore issued to NKT Holdings 1,758,242 of its Class A Shares, which were reclassified as Common Shares in March 2001. In accordance with the terms of the purchase agreement for its joint venture interest, in February 2002 one of Stolt Offshore's group companies purchased 249,621 of its Common Shares from NKT Holdings at a guaranteed price of $13.65 per share for an aggregate price of $3,407,327. On December 16, 1999, Stolt Offshore acquired ETPM S.A. from Groupe GTM S.A., the predecessor of Groupe Vinci S.A. The total consideration for this acquisition, including debt assumed, was approximately $350.0 million, funded partly by cash and partly by the issuance of 6,142,857 of Stolt Offshore's Class A Shares. The Class A Shares were reclassified as Common Shares in March 2001. The purchase agreement relating to the acquisition of ETPM effectively provided that in the event of a sale of Vinci's Stolt Offshore shares, Vinci would receive a minimum of $18.50 per share. In accordance with the terms of that purchase agreement, in May 2002, Stolt Offshore's indirect wholly owned subsidiary purchased 6,142,857 Common Shares from Vinci for $54.7 million, based on the then current market value per share, and Stolt Offshore paid to Vinci the difference between that aggregate amount and the guaranteed aggregate price of $113.6 million.

In April 2002, Stolt Offshore filed a registration statement with the Securities and Exchange Commission for an offering of 8.0 million of its Common Shares. The Common Shares offered by Stolt Offshore include 1,607,522 newly issued shares and 6,392,478 shares held by one of Stolt Offshore's indirect wholly owned subsidiaries following the repurchase of those shares from Vinci and NKT Holdings as described above.

12

Stolt Offshore intends to use the net proceeds from the sale of its Common Shares pursuant to the offering (including those received by its indirect, wholly owned subsidiary) to repay debt incurred to purchase Common Shares from Vinci that Stolt Offshore issued in the ETPM acquisition and to settle the associated share price guarantees. Stolt Offshore incurred $110.0 million of debt for these purposes in May 2002, including $65.0 million borrowed from us and $45.0 million borrowed from banks under its exising credit facilities. Stolt Offshore intends to apply the net proceeds of the offering first, to the repayment of debt owing to us and then, if there are any remaining proceeds, to the repayment of its bank debt.

Under Stolt Offshore's $440 million Secured Multi-Currency Revolving Facility, Stolt Offshore is required to maintain compliance with financial covenants including covenants relating to tangible net worth. Stolt Offshore's compliance with these covenants will be measured on May 31, 2002, before the proceeds of the offering of its Common Shares are received. If Stolt Offshore were to prepare these financial covenant calculations on an actual basis, Stolt Offshore expects that it would be out of compliance in respect of covenants relating to tangible net worth as it would be required to reduce its tangible net worth by $113.6 million for the purchase of its Common Shares from Vinci, but it is not able to increase tangible net worth by the proceeds from the sale of the Common Shares pursuant to the offering unless and until they are received. Stolt Offshore has obtained consent from the banks participating in the facility to calculate the financial covenants on a pro forma basis so as to account for the sale of its Common Shares pursuant to the offering completed after May 31, 2002 as if the sale had taken place by May 31, 2002. When the covenant calculations are prepared on this basis, and assuming at least $20.0 million of net proceeds to Stolt Offshore, it will be in compliance with the covenants under the facility. The bank consent is applicable through June 30, 2002. If Stolt Offshore does not complete the Common Share offering by that date, it expects that it will no longer be in compliance with the tangible net worth covenants. At that time, Stolt Offshore will have to either seek an extension of the time to complete its offering or it will have to seek an alternative source of funds. We have assured Stolt Offshore that, if necessary, we will exchange the $65.0 million of debt that Stolt Offshore owes to us for additional Common Shares of Stolt Offshore based on the market price of such Common Shares. If this exchange is undertaken, Stolt Offshore expects that it would be in compliance with the tangible net worth covenants at that time.

*Stolt Sea Farm*

In February 2001, SSF purchased Harlosh Salmon Limited, a company that is involved in the farming of Salmon in Scotland. In July 2001, SSF purchased the 87.5% of Sociedad Pesquera Eicosal SA ("Eicosal") that it did not own. Eicosal is a producer of Atlantic salmon, salmon trout and coho in Chile. In July 2001, SSF purchased the 50% of Ferme Marine de l'Adour ("FMA") that it did not already own. FMA is a producer of turbot in France. The total consideration for the aforementioned SSF acquisitions in December 2000 and 2001 was approximately $80 million.

*Optimum Logistics and SeaSupplier*

On February 28, 2001, we sold a minority stake in OLL to Aspen Technology Inc., a global provider of intelligent decision support and e-business solutions for process industries. This marks a significant milestone in the plan to bring strategic partners into Optimum Logistics.

In May 2001, PSL entered into an agreement with OneSea.com Inc. to merge their respective businesses. We maintain a controlling interest in PSL, which was renamed SeaSupplier Ltd., and which has offices in London, Oslo, Houston, Singapore, Piraeus, and Bermuda.

*Capital Expenditures*

Capital asset expenditures by business over the last three years is summarized below. There were no significant divestitures during the three year period.

| | 2001 | 2000 | 1999 |
|---|---|---|---|
| | (In millions) | | |
| Stolt-Nielsen Transportation Group: | | | |
| Tankers | $ 43 | $150 | $175 |
| Tank Containers | 9 | 27 | 9 |
| Terminals | 58 | 29 | 7 |
| Total Stolt-Nielsen Transportation Group | 110 | 206 | 191 |
| Stolt Offshore | 63 | 62 | 91 |
| Stolt Sea Farm | 41 | 12 | 21 |
| Corporate and Other | 5 | 6 | — |
| Total Stolt-Nielsen | $219 | $286 | $303 |

In addition, the cash costs of acquisition of subsidiaries, net of cash acquired, amounted to $81 million (primarily for Stolt Sea Farm), $120 million (primarily for Stolt Offshore) and $22 million in 2001, 2000, and 1999, respectively. These amounts exclude non-cash costs for acquisitions of $9 million, $265 million and $9 million in 2001, 2000 and 1999, respectively.

Projected capital asset expenditures for 2002 amount to approximately $150 million comprised of $50 million for SNTG, $40 million for Stolt Sea Farm and $60 million for Stolt Offshore.

*Asset Dispositions*

In 2001, proceeds from the sale of assets were $77 million, including $70 million for the sale of tank storage terminals in Perth Amboy, NJ and Chicago, IL and $6 million for Stolt Offshore. In 2000, proceeds from the sale of assets were $72 million including $50 million for tank containers that were leased back and $19 million for Stolt Offshore. In 1999, proceeds from the sale of assets were $119 million including $56 million for sale of ships and $52 million for tank container sales.

**Business Overview**

*General*

We are a holding company which, through our subsidiaries, is engaged in: the worldwide transportation, storage, and distribution of bulk liquid chemicals, edible oils, acids, and other specialty liquids; offshore construction services including design, procurement, building, installation and servicing of a range of offshore surface and subsurface infrastructure for the global oil and gas industry; and aquaculture; the production, marketing, and distribution of farmed fish. We have two Internet-based businesses, one focused on bulk logistics and the other on procurement for ship owners and operators.

*Description of Business Segments*

*Stolt-Nielsen Transportation Group*

The transportation business is carried out through Stolt-Nielsen Transportation Group Ltd., which represented approximately 39% of our 2001 net operating revenue, approximately 94% of 2001 income from operations, and approximately 50% of total assets as of November 30, 2001.

14

SNTG is engaged in the worldwide transportation, storage, and distribution of bulk liquid chemicals, edible oils, acids, and other specialty liquids. These products are carried on worldwide seaborne trade routes for the producers, refiners, and distributors of such products, as well as for trading, end-manufacturing, and industrial companies. Several of SNTG's largest customers are among the world's major chemical companies. Parcel tankers and tank containers carry similar products with parcel tankers typically used to transport cargo lots greater than 150 metric tons, while tank containers are typically more economical for the transportation of smaller cargo lots. SNTG's terminal operations facilitate the turnaround of its parcel tankers. The different operations of SNTG share many of the same customers and employ many of the same chemical handling and cleaning technologies. While the parcel tanker operations remain SNTG's single largest activity, the expansion of its tank container operations and storage and distribution services has increasingly enabled SNTG to provide integrated logistics solutions for its customers' transportation requirements. SNTG offers fully integrated transport and logistic services including intercontinental parcel tanker, coastal parcel tanker, river parcel tanker, tank container, rail, and storage.

*Parcel Tanker Operations*

SNTG has been a pioneer in the parcel tanker industry, an industry which derives its name from our first operating company, Parcel Tankers Inc. ("PTI"), which was incorporated in 1959. PTI subsequently changed its name to Stolt-Nielsen Transportation Group Ltd. SNTG is one of the largest operators of parcel tankers in the world. As of March 31, 2002, SNTG marketed a fleet of 133 parcel tankers, product tankers, and river tankers ranging in size from approximately 1,200 to 40,000 deadweight tons ("dwt") (of which 73 were over 10,000 dwt), and totaling approximately 2.2 million dwt. Of the 133 tankers, 68 ships provide intercontinental service, 30 ships provide regional service and 35 ships provide inland or river service.

The parcel tanker industry occupies a market niche in the worldwide tanker trade and represents only about 5% of the dwt of the international tanker fleet. Unlike crude oil tankers which generally load a full cargo at one port for one customer and discharge at one destination, parcel tankers, as the name implies, carry many cargoes (as many as 58 parcels) for many customers on the same voyage and load and discharge cargo at many ports. A parcel tanker may carry a wide range of bulk liquids shipped in parcels of several hundred to several thousand tons each.

To facilitate handling of the diverse range of products carried by parcel tankers, the fleet is comprised of highly specialized ships. SNTG's sophisticated intercontinental parcel tankers typically have 45 to 58 separate cargo tanks of varying sizes to permit the carriage of up to that number of fully segregated cargoes. The tanks are made of stainless steel or specially coated or lined steel to maintain the integrity of the variety of chemicals and other products carried and to facilitate cleaning. In addition, many tanks have independent heating and cooling systems to provide temperature control for each cargo. The level of sophistication of parcel tankers is reflected in newbuilding costs that are substantially higher than for equivalently-sized product tankers.

SNTG's parcel tanker fleet covers nearly all of the major international trade routes served by the industry. SNTG operates its ships on round-trip voyages with cargo carried on both outbound and inbound legs. These patterns result in high load factors, with ships seldom sailing without cargo.

SNTG operates its major intercontinental services through the Stolt Tankers Joint Service ("STJS" or "Joint Service"), an arrangement for the coordinated marketing, operation, and administration of the fleet of parcel tankers owned or chartered by the Joint Service participants in the deep sea intercontinental market. The Joint Service participants include affiliates and non-affiliates of Stolt-Nielsen. This fleet currently is comprised of 67 parcel tankers totaling approximately 1.9 million dwt. Of these, SNTG owns 44 ships and time-charters two ships for participation in the STJS.

15

The Joint Service operates seven ships owned by NYK Stolt Tankers, S.A. ("NYK Stolt", 50%-owned by Stolt-Nielsen), one ship owned by Barton Partner Limited, five ships owned by Bibby Pool Partner Limited and two ships owned by Unicorn Lines (Pty) Limited. The STJS currently has six additional tankers on time-charter.

Each ship in the STJS is assigned an earnings factor based upon its cargo carrying capacity and technical capabilities. The profitability of each ship is determined by its share of the STJS results, and not by the specific voyages performed. This enables the management of the STJS to schedule the fleet to seek to optimize its total results.

Stolt Tankers Inc., a Liberian corporation wholly owned by us, acting as agent for the STJS, enters into contracts with third parties on behalf of the STJS. The STJS ships are marketed by SNTG's professional chartering personnel worldwide using proprietary marketing and cargo tracking information systems as part of SNTG's worldwide network of chemical transportation and distribution services. Management believes that SNTG's ships operating in the STJS derive higher utilization, revenues, and profitability than competitors operating outside a similar pooling arrangement.

SNTG also operates tankers in six regional markets, three of which are in conjunction with joint venture partners. The Stolt NYK Asia Pacific Services Inc. ("SNAPS") joint venture operates between East Asia, Southeast Asia, and Australia. The Stolt NYK Australia Pty. Ltd. ("SNAPL") joint venture operates within the Australian coastal and trans-Tasman markets. Both the SNAPS and SNAPL tankers are marketed by SNTG's offices in these areas. The Stolt-Nielsen Inter-Europe Service ("SNIES") operates small tankers in European coastal waters. The Stolt-Nielsen Inland Tanker Service ("SNITS") currently operates 35 inland tankers on the River Rhine and the adjacent Rotterdam Antwerp waterways.

During 2000, SNTG entered into co-service agreements with two parcel tanker companies, Tokyo Marine and Seatrans, to improve the scheduling of SNTG's fleets, and increase operational efficiency and customer service. In January 2002, SNTG announced an additional co-service agreement with Jo Tankers.

SNTG manages all of its owned ships and employs its own seafarers except for one bareboat chartered vessel which is managed externally. For its shipowning activities SNTG has secured International Ship Management Association ("ISMA") Quality Assurance System certification, which includes International Standards Organization ("ISO") 9002 and International Safety Management ("ISM") certifications.

SNTG personnel coordinate most of the marketing and sales efforts directly with SNTG's parcel tanker customers. In some markets third-party brokers support this effort. SNTG's top ten tanker customers and top ten products accounted for 29% and 30%, respectively, of the total SNTG deep sea tanker revenue in 2001.

SNTG's tanker operations make extensive use of information systems for estimating voyages, scheduling cargo, stowing cargo, billing customers, tracking product handling and cleaning requirements, and managing ships. These systems not only control and track the status of each cargo movement but also keep the customer informed through system-generated estimated time of arrival notices. SNTG's Cargo STOW system has won a Windows World Open award for best Microsoft Windows system for distribution companies.

*Tank Container Operations*

The emergence of liquid tank containers as a means of transporting bulk liquids such as chemicals and oils dates back to the early 1970s. Tank containers are stainless steel cylindrical tanks enclosed in rectangular steel frames, with the same outside dimensions as 20 foot dry box containers. They carry 17,000 to 24,000 liters of bulk liquids (16 to 20 tons, depending upon the specific gravity of the

16

product). This compares to the smallest compartment in a parcel tanker which carries approximately 100,000 liters of bulk liquid. Tank containers are fully intermodal and are transported on container ships, rail cars, and trucks owned by others.

SNTG is the largest door-to-door operator in the tank container market. SNTG's tank container operations specialize in smaller lot shipments of bulk liquid products. These are primarily operated for door-to-door shipments. SNTG entered the tank container business in 1982 when it acquired United Tank Containers, which at the time operated about 400 tank containers. As the market grew, SNTG steadily expanded its tank container fleet through the purchase or lease of newly- manufactured tank containers and through acquisitions. SNTG specializes in offering door-to-door tank container transportation services, making all transportation arrangements from origin to destination on behalf of the shipper. SNTG is one of the largest operators in the door-to-door business, deploying approximately 11,950 tank containers in all major worldwide markets. In addition, approximately 1,800 tank containers are managed on behalf of customers.

There was a slight improvement in volume of container shipments in 2001. The increase from 1999 to 2000 was attributable to increased demand and a larger fleet for tank containers. Tank container shipments in 2001 totaled 59,762, a 2% increase from shipments of 58,624 in 2000. Shipments in 2000 reflected an increase of 11% from shipments of 52,922 in 1999. Total shipments increased in 2001 over 2000 but declines were experienced in Europe and Japan. Growth of 5% is anticipated in 2002 as a result of increased marketing and sales efforts in all regions. Shipments increased in 2000 against 1999 in all major regions. Shipments from Europe, North America, and intra-Asia were particularly strong during 2000, continuing the trend established in late 1999. As of March 31, 2002, SNTG controls a fleet of approximately 13,750 tank containers of which approximately 4,400 are owned and 9,350 are tank containers that are leased in or managed for customers.

All of SNTG's tank containers are built and maintained to the standards of the International Maritime Organization ("IMO"), the ISO, the U.S. Department of Transportation and other governmental and private organizations. SNTG requires that all of its tank containers be constructed according to, and have valid certificates in accordance with, the International Convention for Safe Containers ("CSC"). SNTG conducts periodic inspections in conformity with CSC and IMO testing requirements.

SNTG's tank container operations requires its own infrastructure for tank cleaning and repair. In Europe and the U.S., third-party contractors primarily perform this work. In Rotterdam, Houston, and the Asia Pacific region, SNTG has established its own facilities to ensure high standards of quality, reduce costs, and speed market penetration. The facilities in Japan, China, Taiwan, and Korea are operated through joint ventures.

The business systems of SNTG's tank container operations have received ISO 9002 Certification. SNTG's Move/Quote System is used by the tank container personnel on a worldwide basis to schedule, track and bill for all tank container movements.

*Terminal Operations*

SNTG has interests in, investments in or alliances with ten bulk liquid storage terminals. SNTG's terminals offer storage services and consolidate inland waterway and land transportation for more efficient operation and better customer service. SNTG currently owns and operates two tank storage terminals in the U.S. and one in Brazil, with a combined capacity of approximately 3.4 million barrels of liquid storage. In 2001, SNTG completed the first phase of the construction of a tank storage terminal located in Braithwaite, Louisiana with a storage capacity of approximately 0.8 million barrels of liquid storage and associated ship, rail and trucking facilities at a total cost to date of approximately $54 million. The Braithwaite terminal became operational in mid-2001. The terminal was 48% completed with a total of 405,000 barrels operational at year end, with the balance of 445,000 barrels

completed during the first quarter of 2002. Each of these terminals serves as a hub for the regional storage and distribution of liquid chemicals, vegetable oils, and other products, providing storage and handling services to SNTG's parcel tankers and for third parties.

SNTG's terminal operations also have interests in three ventures, with a combined storage capacity of 4.5 million barrels: (i) a 40% interest in Stolthaven Westport, a joint venture with the Bolton Group in Malaysia; (ii) a 37% interest in Dovechem Terminal Holdings Ltd., a publicly-traded company listed on the Singapore Stock Exchange, with terminals and drum manufacturing interests in China, Singapore, Indonesia and Malaysia; and (iii) a 50% interest in Jeong Stolthaven IL Tank Terminal which has a terminal facility in Ulsan, South Korea. SNTG also has an arrangement with subsidiaries of Vopak pursuant to which it has preferential berthing rights to two terminals located in Rotterdam, which is SNTG's parcel tanker operations' most frequently called port.

The following table contains information on SNTG's terminals as of March 31, 2002:

| Storage Location | % Holding | Year Acquired | Capacity (barrels) |
|---|---|---|---|
| Houston, Texas ..................... | 100% | 1982 | 2,050,200 |
| Braithwaite, Louisiana .............. | 100% | 2001 | 850,000 |
| Santos, Brazil ..................... | 100% | 1982 | 454,700 |
| Sub Total ..................... | | | 3,354,900 |
| Joint Ventures | | | |
| Westport, Malaysia ............... | 40% | 1998 | 417,000 |
| Kuantan, Malaysia ............... | 10% | 1999 | 305,000 |
| Shenzen, China ................. | 26% | 1998-2000 | 640,100 |
| Shanghai, China ................. | 26% | 1998-2000 | 416,300 |
| Ulsan, South Korea .............. | 50% | 1999 | 2,682,700 |
| Sub Total ..................... | | | 4,461,100 |
| Total ..................... | | | 7,816,000 |

SNTG currently holds the ISO 9002 certification, obtained in 1994, for its terminal business systems in Houston and Santos. SNTG implemented a Terminal Automation System for tracking customer contracts and tank inventory, as well as for producing customer bills and reports.

SNTG also operates a fleet of 355 leased railroad tank cars consisting of general-purpose low-pressure and specialized high-pressure tank cars.

*Stolt Offshore*

The offshore contracting business is carried out through Stolt Offshore S.A. (Stolt Offshore or SOSA), (formerly named Stolt Comex Seaway S.A.) a subsidiary in which, as of May 15, 2002 we hold a 57% economic interest and a 65% voting interest.

A publicly traded company since May 1993, we established Stolt Offshore through the acquisitions of two leading diving support services companies, Comex Services S.A. ("Comex") and Stolt-Nielsen Seaway A/S in separate transactions in 1992. At the time of acquisition, Comex was a leading worldwide subsea services contractor, which pioneered deepwater saturation diving and subsea construction using both manned and unmanned techniques. Stolt-Nielsen Seaway A/S operated principally in the North Sea and pioneered the development and use of specially designed, technologically sophisticated diving support ships and ROVs to support operations in hostile deepwater environments.

18

In August 1998, Stolt Offshore acquired the Houston-based Ceanic Corporation, a publicly traded subsea contractor, for approximately $218.9 million. Ceanic provided a range of subsea services and products to the offshore oil and gas industry in the Gulf of Mexico and inland underwater services to domestic and governmental customers. With this acquisition Stolt Offshore acquired a substantial fleet of ships mostly designed for shallow water work, ROVs and other related technologies. Stolt Offshore's acquisition of Ceanic was strategically important in that it provided significant operations in the Gulf of Mexico. These operations, combined with its deepwater technology and know-how, allow Stolt Offshore to participate in the growing deepwater construction market in the Gulf of Mexico and gives it the ability to build relationships with Houston-based oil and gas companies who conduct much of their worldwide business from Houston.

In December 1998, Stolt Offshore acquired the ROV business of Dolphin A/S for approximately $16.9 million. This acquisition, which included 21 ROVs mostly on long-term contracts to Norwegian oil companies, strengthened its position in the ROV drill support market in Norway.

On December 7, 1999, Stolt Offshore completed a transaction to form a joint venture entity, NKT Flexibles I/S ("NKT"), a manufacturer of flexible flowlines and risers for the offshore oil and gas industry. Stolt Offshore owns 49% of NKT and the remaining 51% is owned by NKT Holdings A/S. The total consideration for Stolt Offshore's share in the joint venture was $36.0 million funded partly by cash and partly by Class A Shares. The Class A shares were subsequently converted to Common Shares on a one-for-one basis. This investment secures Stolt Offshore's supply of flexible products.

On December 16, 1999, Stolt Offshore acquired the French offshore construction and engineering company ETPM S.A., a wholly owned subsidiary of Groupe GTM S.A. Groupe GTM was subsequently acquired by Groupe Vinci S.A. The total consideration for this acquisition, including debt assumed, was approximately $350.0 million, funded partly by cash and partly by the issuance of 6.1 million Class A Shares. The Class A Shares were subsequently converted to Common Shares on a one-for-one basis. The acquisition of ETPM provided Stolt Offshore with a strong market position in West Africa, which is one of the fastest growing markets for its services. Stolt Offshore also gained significant engineering skills particularly in conceptual engineering and offshore design of both subsea structures and of fixed and floating production platforms, in addition to a fleet of pipelay barges, which broaden its range of pipelay capabilities.

On July 18, 2001, Stolt Offshore acquired the Paris-based engineering company Ingerop Litwin from Vinci. On September 4, 2001, Stolt Offshore acquired a controlling interest in the Houston-based engineering company, Paragon Engineering Services, Inc. Stolt Offshore paid a total of $16.7 million of cash for these two companies, $4.3 million of which in relation to the Paragon acquisition has been deferred until March 2005. These acquisitions, by adding conceptual design and detailed engineering skills, will enable Stolt Offshore to better undertake all of the engineering required on many of the large engineering, procurement, installation and commission type contracts that it expects to come into the market in the next few years.

Stolt Offshore provides services and products that add value for its customers at all phases of offshore oil and gas field exploration, development and production. Stolt Offshore surveys the seabed and provides other support services for drilling test holes during the exploration phase. When a field is being developed, Stolt Offshore applies its technical expertise and knowledge of regional conditions to offer conceptual and engineering designs for the field. Stolt Offshore also procures or fabricates and installs equipment used in field development. This equipment includes the above-water topsides and platforms used for processing recovered oil and gas, wellheads, pipelines and electrical and hydraulic cables, known as umbilicals, that are used to control subsea wells. The pipelines are used to transport oil and gas underwater and to the production and processing facilities at the surface. They may be steel pipe, referred to as rigid pipe, or of a bonded structure, referred to as flexible pipe, depending on technical requirements, and may be narrow (flowlines) or wide (trunklines) depending on production

19

volumes and pressure. Stolt Offshore also combines its design and fabrication expertise to manage the building of floating facilities (known as FPSOs) that process, store and offload oil and which are used in very deep water where a platform or topside would be impractical. During the time that the field is producing oil or gas, Stolt Offshore inspects, maintains and repairs this equipment. Once the field has been depleted and is to be abandoned, Stolt Offshore provides field decommissioning services which include the removal of offshore structures and equipment.

Stolt Offshore is one of only a few companies that can offer a full range of offshore development and construction services on a global basis. Stolt Offshore's worldwide operations are managed through six regional offices which are in Aberdeen, Scotland for the United Kingdom and Southern North Sea; Stavanger, Norway for the Norway Region; Singapore for Asia Pacific; Nanterre, France for operations in southern Europe, Africa and the Middle East; Houston, Texas for the Gulf of Mexico and Macae City in Brazil for South America. Stolt Offshore has operated in more than 60 countries and currently operates in over 34 countries.

Stolt Offshore provides its conceptual design and engineering services for all regional operations through its offices in Houston, Texas and Nanterre, France. Stolt Offshore employs approximately 500 engineers worldwide. Stolt Offshore assembles and constructs offshore infrastructure equipment at its fabrication yards in Nigeria and Angola. Stolt Offshore's principal executive offices are located in Sunbury, near London, England. Stolt Offshore has a world class fleet of highly specialized ships, barges and unmanned underwater remotely operated vehicles, or ROVs, deployed in the world's major offshore oil and gas exploration regions, including:

- 9 construction support ships;

- 4 flowline lay ships;

- 9 survey/inspection, repair and maintenance ships;

- 11 anchored construction and maintenance ships;

- 1 heavy lift ship;

- 7 pipelay barges;

- 4 tugs and other ships;

- 95 ROVs (5 of which are owned by a joint venture); and

- 11 hardsuits for manned dives.

Projects relating to the engineering and construction of new offshore oil and gas fields, which typically lasts more than one year, accounts for approximately 95% of Stolt Offshore's revenues while work related to the inspection, repair and maintenance of oil and gas fields throughout their time in production accounts for the remaining 5% of revenues.

Stolt Offshore's services cover all phases of offshore oil and gas operations, from exploration to decommissioning. Stolt Offshore offers its products and services through the following lines of business:

- The Pipelay and Engineering, Procurement Installation and Commissioning (EPIC) business line involves offshore fields where platforms are part of the infrastructure or where there is a large diameter pipeline or a major offshore element of pipeline work. These activities may include platform design and fabrication or tieback projects, which involve pipelaying or pipeline procurement to connect a new production well to an existing structure.

- The Subsea Construction business line involves projects where there may be one or more of the following elements: well control umbilical laying; burying rigid or flexible pipelines in the seabed to protect and insulate them (trenching); laying flexible pipelines; installing short pipes that

20

connect other pipelines (jumpers); and/or hyperbaric welding (which is welding performed in a dry atmosphere in an underwater chamber).

- The Deepwater Development business line involves large or complex offshore projects where Stolt Offshore has some influence over the architecture of the oil or gas infrastructure and could include the design, manufacturing and installation of flowlines, production risers and other subsea structures.

- The Floating Production business line involves the design and management of the building of FPSOs for use in very deep water.

- The Regional Services business line handles local business projects including seabed survey and positioning for drill rig location or defining pipeline routes engineering studies, drilling support, shallow water pipelay or inspection, repair and maintenance operations.

Stolt Offshore also provides field decommissioning services at the end of the working life of an offshore oilfield.

Stolt Offshore offers heavy lift floating crane services through a joint venture company, SHL. SHL charters the heavy lift barge *Stanislav Yudin* from a subsidiary of Lukoil, our joint venture partner in SHL. Stolt Offshore also manufactures flexible flowlines and dynamic flexible risers (which are flexible pipelines from the sea floor to the surface) through the joint venture company NKT, in which it has a 49% interest. The remainder of the joint ventures in which Stolt Offshore has interests have been formed either with a national oil company, such as Sonangol in Angola or Socar in Azerbaijan, or on a project-specific basis to enhance the range of services provided to the customer. Stolt Offshore typically has interests ranging from 25% to 55% in these joint ventures.

*Stolt Sea Farm*

Our wholly-owned subsidiary, Stolt Sea Farm Holdings plc. produces, processes, and markets a variety of high quality seafood products, including Atlantic salmon, salmon trout, turbot, halibut, sturgeon (primarily for caviar), caviar, tilapia and tuna. The predecessor of SSF was founded by Jacob Stolt-Nielsen in 1972 and acquired by us in late 1991.

SSF produces, processes, and markets a variety of high quality seafood with salmon production sites in Norway, North America, Chile and Scotland; salmon trout production sites in Norway and Chile; tilapia production sites in Canada; turbot production sites in Spain, Portugal, Norway, and France; halibut production sites in Norway; a tuna production site in Australia; and sturgeon and caviar production sites in the U.S. SSF has worldwide marketing operations with sales organizations covering North America, Europe, and Asia Pacific.

Aquaculture is the controlled breeding, growing and harvesting of seafood in a captive environment. The aquaculture industry is one of the fastest growing segments of the food industry with an average annual growth rate of 12% between 1984 and 2000. Global aquaculture now represents approximately 20% of the total world supply of fish and aquatic products. As the world population grows and individuals increasingly seek healthier products such as fish, and the supply of wild catch seems to have reached its peak level, the demand for farmed fish is expected to increase. From being primarily a salmon farming and sales company, SSF has diversified over the years into farming and selling other species, and has built a substantial seafood trading business in the Asia Pacific region.

In SSF, the growth and harvesting of different fish species, and generations within those species, follow set patterns over the life cycle of the species. The cycle starts with the build-up of inventory of the species, and ends as the inventory is harvested over a certain period. These patterns are different for each species, and they do not all coincide. It is not always possible to discern seasonality overall, although there may be occasions when the coincidence of several cycles may result in a noticeable

21

fluctuation. In northern hemisphere markets for salmon, demand tends to rise in holiday seasons, typically at the end of the year and during spring.

The world's main seafood markets are Asia, North America and Europe. Traditionally, there have been several middle-men between producers and consumers of fresh seafood. The majority of fish farmers do not have their own world wide sales and marketing organizations, and these companies will typically sell their fish to an exporter or a domestic wholesaler, which in turn will sell to importers, wholesalers and distributors, which in turn will sell to food service operators and retailers (restaurants and supermarkets). The overall trend in Europe, North America and Asia seems, with a varying degree of speed and concentration, to be moving toward a consolidation into fewer and larger vertically integrated fish farming companies selling their products more directly to food service operators, restaurant chains and supermarket chains. These customers in turn, to an increasing degree, are demanding a higher degree of value added and consumer convenient products.

Of the main competitors in the industry, SSF is one of three currently with a presence in all the four major farming regions—Norway, Chile, Canada/U.S. and the U.K allowing SSF to supply customers in all major markets at competitive prices year round. Two other major competitors farm in three of the big four regions. SSF is the only producer with an in-market sales organization in all main markets. SSF's position in the industry is strengthened by the fact that SSF has further diversified into farming various new species which offer product cross selling advantages and further earnings opportunities. SSF has also been developing a concept of sales of higher value added products deeper in the market, through processing and sales units situated in the U.S. market and known as seafood centers. The first of these was opened in 1997 in Los Angeles, CA and a second was opened in Stratford, CT in 2001.

In August 1999, SSF acquired International Aqua Foods Ltd. ("IAF"), a publicly listed company, for approximately $11.0 million and the assumption of $9.2 million in debt. IAF was involved in salmon and tilapia hatchery operations in Canada and the U.S., and salmon and trout farming in Chile.

In September 2000, SSF purchased Rokerij La Couronne NV, a smoker and processor of salmon and other seafood products.

In September 2000, SSF purchased the remaining 49% of Pacific Aqua Salmon Farmers Ltd. ("PASFL") that it did not own. PASFL is a producer of Atlantic salmon in British Columbia, and SSF acquired its initial 51% interest in the company when it acquired IAF in 1999. The seller of the 49% interest in PASFL was EWOS Canada Ltd., a subsidiary of Cermaq ASA. The agreement involved SSF acquiring the remaining 49% of the company, while Cermaq ASA acquired the assets and inventory owned by SSF at the Tofino, British Columbia sites.

The total consideration for the aforementioned SSF acquisitions in 2000 was approximately $9 million.

In December 2000, SSF purchased Australian Bluefin Pty Ltd., a company involved in the ranching of Southern Bluefin tuna.

In December 2000, SSF purchased the remaining 49% of Ocean Horizons SA ("OHSA") that it did not own. OHSA is a producer of Atlantic salmon in Chile, and SSF acquired its initial 51% interest in the company when it acquired IAF in 1999.

In February 2001, SSF purchased Harlosh Salmon Limited, a company that is involved in the farming of salmon in Scotland.

In July 2001, SSF purchased the 87.5% of Sociedad Pesquera Eicosal SA ("Eicosal") that it did not own. Eicosal is a producer of Atlantic salmon, salmon trout, and coho in Chile.

22

In July 2001, SSF purchased the 50% of Ferme Marine de l'Adour ("FMA") that it did not already own. FMA is a producer of turbot in France.

The total consideration for the aforementioned SSF acquisitions in December 2000 and in 2001 was approximately $80 million.

In December 2001, SSF purchased F&B Sales Ltd., a company based in Hong Kong and involved in the trading of seafood, for a total consideration, including debt assumed, of approximately $2 million.

### Optimum Logistics

Optimum Logistics Ltd. ("OLL") was established in Bermuda on December 30, 1999. OLL offers an internet-based logistics system for global supply chain management for companies engaged in the bulk materials industries. OLL connects all participants in a producer's supply chain, such as carriers, terminal operators, receivers, surveyors, and freight forwarders. This system, TransLink™ ("TransLink"), enables OLL's customers to improve the efficiency of their entire supply chains.

OLL has focused its initial technological development and marketing efforts on the bulk marine segment of the chemicals industry. During 2000, efforts were directed toward the development of logistics products and pilot testing of these products with various chemical producers. In 2001, OLL focused on commercializing the existing technology by developing commercial relationships with a number of multinational chemical companies. Additionally, OLL undertook a significant development effort to enhance the functionality of TransLink and to develop additional products, including TransBid™ ("TransBid"), a freight procurement application and TransBridge™ ("TransBridge") a middleware allowing for integration across OLL's products and to client's Enterprise Resource Planning Systems. TransBridge was completed at the end of December 2001 and TransBid was completed at the end of May 2002.

During 2000, OLL did not generate revenues and incurred operating losses and negative operating cash flow. OLL relied on equity and debt financing from us to fund its operations. During 2001, OLL generated revenues of $969,542. The external revenue sources totaled $418,235 based primarily on subscription and transaction fees paid by customers. Internal revenue sources, defined as those accounts with fees generated through subscription and transaction, but paid by SNTG as part of an overall logistics solution provided by SNTG, and fees paid directly by SNTG for the use of the TransLink-based Stolt Storefront software, totaled $551,307. All revenues are recognized as earned based on monthly subscriptions and/or transaction fees. All revenues were generated from U.S.-based customers, although the software may have been deployed globally.

On February 28, 2001, we sold a 19 percent minority interest in OLL to Aspen Technology, Inc. ("Aspen"), a global provider of intelligent decision-support and e-business solutions for process industries.

During 2001, OLL incurred operating losses and negative operating cash flow. OLL relied on equity and debt financing from Stolt-Nielsen and Aspen to fund its operations. Operating costs in 2001 were largely associated with software development and depreciation, employee salaries and benefits and other general and administrative costs to run the business. External software development costs are either capitalized or expensed as incurred, and will largely be eliminated in 2002 as OLL hired a team of experienced software developers in June of 2001.

### SeaSupplier

In early 2000, we established Prime Supplier Ltd., now renamed SeaSupplier Ltd. ("SSL"), which offers an Internet-based total marine procurement system, which makes available products and services needed for marine operations. The system enables ship operators to electronically select, purchase and

arrange delivery for all the ship's needs for consumables, spare parts and other services. SSL employs a proprietary supplier and price database to intelligently manage the procurement process, including transportation.

During 2000, SSL did not generate revenues and incurred operating losses and negative operating cash flow. SSL relied on equity and debt financing from Stolt-Nielsen to fund its operations.

In May 2001, SSL acquired the assets and liabilities of OneSea.com Inc., through the sale of a minority interest in SSL to the shareholders of OneSea.com Inc. resulting in the name change to SSL. We maintain a controlling interest in SSL, which has offices in London, Oslo, Houston, Singapore, Piraeus, and Bermuda.

During 2001 SSL incurred operating losses and negative operating cash flow. SSL began to generate internal revenue during the second half of the year. SSL relied on equity financing from us to fund its operations. The operating expenses were largely associated with software development and employee salaries and benefits.

In October 2001, SSL signed a contract with Seabulk International, and this was followed by contracts with Royal Caribbean Cruise Lines and Teekay Shipping Ltd., both in January 2002. In May 2002, SSL signed a global e-procurement contract with Tokyo based Nippon Yusen Kabushiki Kaisha (NYK Line). SSL started generating external revenue in the first quarter of 2002 and is currently negotiating several new contracts.

### Financial Summary of Businesses

The following table sets out the net operating revenue, income from operations and identifiable assets for each of our businesses for the year ended November 30, 2001:

| | Net Operating Revenue | | Income From Operations | | Identifiable Assets | |
|---|---|---|---|---|---|---|
| | | | ($ in Millions) | | | |
| Stolt-Nielsen Transportation Group: | | | | | | |
| Tankers | $ 755 | 28% | $ 97 | 66% | $1,574 | 40% |
| Tank Containers | 214 | 8 | 17 | 12 | 151 | 4 |
| Terminals | 79 | 3 | 24 | 16 | 264 | 6 |
| Subtotal | 1,048 | 39 | 138 | 94 | 1,989 | 50 |
| Stolt Offshore | 1,256 | 47 | 34 | 23 | 1,560 | 39 |
| Stolt Sea Farm | 374 | 14 | (1) | (1) | 414 | 11 |
| Corporate and Other | — | — | (24) | (16) | 9 | — |
| Total | $2,678 | 100% | $147 | 100% | $3,972 | 100% |

### Geographic Distribution

The following table sets out net operating revenue by country for our reportable segments. SNTG net operating revenue is allocated on the basis of the country in which the cargo is loaded. Tankers and Tank Containers operate in a significant number of countries. Revenues from specific foreign countries which contribute over 10% of total net operating revenue are disclosed separately. Stolt Offshore net operating revenue is primarily allocated based on the geographic distribution of its activities. SEAME represents Southern Europe, Africa and the Middle East. SSF net operating revenue is primarily allocated on the basis of the country in which the sale is generated.

Certain prior year amounts in the consolidated financial statements have been reclassified to conform with the current year presentation. Effective September 1, 2001, we changed our method of reporting freight revenue and costs for the SSF business segment in compliance with Emerging Issues Task Force (EITF) Issue No.: 00-10, *"Accounting for Shipping and Handling Fees and Costs."* Freight