costs will now be charged to operating expenses rather than netted against net operating revenue. Our financial statements have been reclassified to reflect the increase in net operating revenue and operating expenses of $15.5 million and $15.7 million for the years ended November 30, 2000 and 1999, respectively.

| | For the years ended November 30, | | |
|---|---|---|---|
| | 2001 | 2000 | 1999 |
| | ($ in Millions) | | |
| **Net operating revenue:** | | | |
| **Stolt-Nielsen Transportation Group:** | | | |
| Tankers: | | | |
| United States | $ 245 | $ 278 | $ 272 |
| South America | 74 | 58 | 48 |
| Netherlands | 48 | 47 | 43 |
| Other Europe | 135 | 105 | 100 |
| Malaysia | 68 | 54 | 44 |
| Other Asia | 148 | 118 | 110 |
| Other | 100 | 85 | 54 |
| Less commissions, sublet costs, transshipment and barging expenses | (63) | (53) | (53) |
| | 755 | 692 | 618 |
| Tank Containers: | | | |
| United States | 68 | 80 | 73 |
| South America | 9 | 9 | 7 |
| France | 22 | 23 | 24 |
| Other Europe | 54 | 55 | 46 |
| Japan | 12 | 16 | 25 |
| Other Asia | 38 | 39 | 30 |
| Other | 11 | 2 | 1 |
| | 214 | 224 | 206 |
| Terminals: | | | |
| United States | 71 | 52 | 49 |
| Brazil | 8 | 7 | 6 |
| | 79 | 59 | 55 |
| Total Stolt-Nielsen Transportation Group | 1,048 | 975 | 879 |
| **Stolt Offshore:** | | | |
| Asia Pacific | 39 | 40 | 43 |
| North America | 277 | 122 | 156 |
| Norway | 111 | 199 | 165 |
| SEAME | 520 | 445 | 57 |
| South America | 50 | 53 | 56 |
| United Kingdom | 215 | 124 | 162 |
| Other Corporate | 44 | — | 2 |
| Total Stolt Offshore | 1,256 | 983 | 641 |
| **Stolt Sea Farm:** | | | |
| United States | 99 | 123 | 107 |
| Canada | 18 | 17 | 14 |
| Chile | 7 | 1 | — |
| United Kingdom | 19 | 21 | 22 |
| Norway | 19 | 8 | 22 |
| Spain | 14 | 11 | 12 |
| Japan | 138 | 70 | 48 |
| Others, net | 60 | 75 | 51 |
| Total Stolt Sea Farm | 374 | 326 | 276 |
| Total Stolt-Nielsen | $2,678 | $2,284 | $1,796 |

25

## Strategy and Competitive Strengths

We pursue a strategy of seeking to provide sophisticated industrial services to customers in niche markets which demand complex technology. We aim to operate in global markets where we are, or believe we can become, the market leader. Our investment philosophy is to generate value over the long term.

### Stolt-Nielsen Transportation Group

SNTG's strategy is to build a global network to take care of our customers' every bulk liquid logistic need from door to door throughout the world and to be the low cost provider of such services.

The demand for bulk liquid transportation services varies with patterns of industrial growth and world trade. Historically, such demand has grown at a greater rate than world trade, which itself has grown faster than industrial production.

In 1994, SNTG embarked on a new building program to construct 25 new parcel tankers (of which one ship was cancelled) designed to meet increasing demand for its transportation services and replace the first generation of purpose-built parcel tankers built in the early to mid-1970s. The last ship in this newbuilding program was delivered in December 2001. The ships in the newbuilding program have greater capacity than the units they have replaced and introduce a series of features to increase the operational efficiency, reduce operating costs, and be environmentally safer than previous generations of parcel tankers.

SNTG's tank container operations provide transportation services for many of the same type of bulk liquids that are carried in parcel tankers, although tank containers transport smaller lots. A major trend in the tank container market is the conversion from transportation of liquids in drums to tank containers. As tank containers can be reused, the transportation of liquids in tank containers provides a cleaner, safer, and more economical means of transportation than by drums, which typically must be disposed of after only a few uses. It is SNTG's intention to continue to expand its presence in this market in response to the needs of its customers, and to continue to provide an important link in SNTG's transportation service chain. By using tank containers, SNTG is able to offer door-to-door, just-in-time deliveries. In developing countries in the Asia Pacific region where there is little supporting infrastructure for tank containers, SNTG has also been a pioneer in developing cleaning and maintenance facilities for tank containers.

SNTG's terminal operations support its parcel tanker operations by enabling quicker turnaround of the tankers when in port. They also provide hubs for servicing SNTG's customers by integrating storage with sea and land transportation by parcel tanker, rail, and road. It is SNTG's strategy to take advantage of existing infrastructure and to make selective investments to increase the capacity of its existing terminal facilities, as well as to look for new opportunities on a worldwide basis to expand its network of services and improve operational efficiency through faster parcel tanker turnaround and the integration of transportation services.

### Stolt Offshore

Stolt Offshore's goal is to enhance its position as a full-service offshore contractor providing a full range of global offshore development and construction service to its customers.

Stolt Offshore has historically had a strong position in the North Sea and Brazil since offshore oil exploration started there in the early 1970s. In 1998, Stolt Offshore embarked on a strategy to address changing market dynamics by expanding its service offering and strengthening its market position in the high growth markets of West Africa and the Gulf of Mexico. In 1998, Stolt Offshore acquired Ceanic Corporation which gave it a strong presence in the Gulf of Mexico market and the ability to build relationships with Houston-based oil and gas companies. In 1999, Stolt Offshore purchased ETPM S.A.,


which significantly enhanced its strength in the West African market, and Stolt Offshore acquired a 49% interest in the NKT Flexibles I/S joint venture, which secures its supply of flexible flowlines. In 2001, Stolt Offshore acquired Ingerop Litwin, now called Paragon Litwin, and a controlling interest in Paragon Engineering Services to strengthen its engineering capabilities. Stolt Offshore now has the necessary engineering, construction and technological assets to undertake all aspects of EPIC projects for virtually any new offshore oil and gas field in each of the major offshore markets.

### Stolt Sea Farm

SSF's mission is to position itself as a world leading seafood company; by capitalizing on the potential of aquaculture world wide, through the long term development of new species and new farming technologies; by adding value to its products through further processing into convenient "ready-to-eat" products; and by building its own global sales network, close to its customers, making *Sterling* and *Prodemar* branded seafood products conveniently available to the consumer. In its strategy, Stolt Sea Farm emphasizes scale as well as decentralized farming operations, the importance of being fully integrated along the value chain, and the importance of having both a strong local presence in all the major markets and a production platform in all four major production regions. Stolt Sea Farm focuses on spearheading research and development and taking a position with branded seafood products in several new species.

### Regulation

Our businesses are subject to international conventions and U.S. and other governmental regulations which strictly regulate various aspects of our operations. In addition, we are required by various governmental and other regulatory agencies to obtain certain permits, licenses, and certificates with respect to our equipment and operations. The kinds of permits, licenses and certificates required in our operations depend upon a number of factors. We believe that we have or can readily obtain all permits, licenses, and certificates necessary to conduct our operations. Some countries require that we enter into a joint venture or similar business arrangement with local individuals or businesses in order to conduct business. We have entered into such arrangements where necessary.

### Stolt-Nielsen Transportation Group

SNTG is subject to the international and national conventions and regulations which cover ocean shipping generally and the transport of chemicals and oil in bulk specifically. The major international conventions applicable to SNTG's operations include the International Convention on the Safety of Life at Sea; the International Convention for the Prevention of Pollution from Ships, 1973, as modified by the Protocol of 1978, as amended; the International Convention on the Standards of Training, Certification and Watchkeeping of Seafarers; and the Convention on Civil Liability for Oil Pollution Damage. Applicable national regulations for SNTG's operations in U.S. waters include the Port and Tanker Safety Act, the Hazardous Materials Transportation Act, the Clean Air Act, the Clean Water Act, the U.S. Oil Pollution Act of 1990 ("OPA '90"), and the U.S. Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") (see specific discussion on OPA '90 and CERCLA below).

In addition, specifically to protect the purity of fats and vegetable oils, SNTG complies with the latest cargo rules established by the National Institute of Oilseed Products in the U.S. and the Federation of Oils, Seeds, and Fats Associations in Europe. SNTG's Dedicated Vegetable Oil Service has been developed as a direct result of these rules.

SNTG's river parcel tanker activities are governed by the European Agreement on Regulations for the Carriage of Dangerous Substances on the Rhine and other applicable standards for service on the Rhine River in Europe and by the U.S. Coast Guard safety and pollution prevention regulations.

As a foreign-owned corporation, SNTG is prohibited by U.S. Federal law from owning more than a 25% interest in ships operating in the U.S. coastal market and in the U.S. inland waterway system.

In addition to many of the regulations governing the parcel tanker operations, SNTG's tank container operations are subject to the International Convention for Safe Containers which establishes guidelines for the construction of tank containers; the International Maritime Dangerous Goods Code which regulates the construction and periodic testing of equipment used to transport hazardous packaged liquids; and regulations of other comparable national authorities regarding the use of containers on rail cars and the transport of hazardous materials by rail or road.

Additional regulations specific to SNTG's terminal operations in the U.S. are the Resource Conservation and Recovery Act regarding the reporting, recordkeeping, and handling of hazardous waste and the Occupational Safety and Health Act regulating the working conditions at U.S. terminals as well as other business facilities. Terminals located outside of the U.S. are governed by the comparable national and local governmental agencies.

*U.S. Oil Pollution Act of 1990 and Comprehensive Environmental Response, Compensation and Liability Act*

OPA '90 sets out various requirements applicable to shipowners and ship operators in U.S. waters including, among other things, standards and requirements covering the construction of ships carrying oil and oil products (as defined in the Act), stringent financial responsibility requirements and expanded contingency planning requirements. OPA '90 also increases shipowners' and ship operators' potential liability for damages and cleanup and removal costs for pollution accidents in U.S. waters. Ship and facility owners and operators are "responsible parties" and are jointly, severally and strictly liable (unless the spill results solely from the act or omission of a third party, an act of God or an act of war) for all oil spill containment and cleanup costs and other damages arising from oil spills from their ships or facilities. These other damages are defined broadly to include: (i) natural resources damages and the costs of assessment thereof; (ii) real and personal property damages; (iii) net loss to a government entity of taxes, royalties, rents, fees, and other lost revenues; (iv) lost profits or impairment of earning capacity due to property or natural resources damage; (v) net cost of public services necessitated by a spill response, such as protection from fire, safety, or health hazards; and (vi) loss of subsistence use of natural resources.

With limited exceptions, OPA '90 requires that all new ships ordered after June 30, 1990, or delivered after January 1, 1994, must be built with double hulls to be allowed to call at U.S. ports. There is a timetable for retrofitting existing ships with double hulls or taking them out of service, depending upon the year the ship was built, its gross tonnage, and whether the ship already has a double bottom or double sides. Since January 1, 1995, double bottom ships of greater than 5,000 gross tons and more than 45 years of age have been required to be retrofitted with double hulls. The age requirement is reduced annually so that by 2005, and until 2015, no such ships may exceed 30 years of age without retrofitting. To operate in U.S. waters after 2015, ships must have both a double bottom and double sides.

Double bottom installation has become standard on most parcel tankers and chemical tankers since the IMO regulations for the carriage of hazardous products in bulk became effective. All of SNTG's parcel tankers already have double bottoms. It is SNTG's intention that all tankers ordered in the future will comply with the double hull requirements identified above.

The liability provisions of OPA '90 are applicable to "oil" as defined in the Act. For this purpose, "oil" means oil of any kind or in any form, including, but not limited to, petroleum, fuel oil, sludge, oil refuse, and oil mixed with wastes other than dredged spoil, but does not include any substance which is specifically listed or designated as a "hazardous substance" under CERCLA. Some of the chemicals carried on SNTG's ships are covered by the provisions of CERCLA. SNTG's ships frequently carry some parcel cargoes of lubricating oils and additives and the ships' engines are powered by fuel oil. In

28

addition, cargoes of "clean petroleum products," which are generally covered by the provisions of OPA '90, are occasionally carried on SNTG's ships. Animal fat and vegetable oils as well as other non-petroleum oils are included within the OPA '90 definition of "oil".

In compliance with OPA '90 requirements, SNTG has obtained Certificates of Financial Responsibility for all of its ships which call on U.S. ports.

The effect of the liability provisions of OPA '90 and CERCLA on the shipping industry has not yet been fully determined. OPA '90 increased the limit on shipowners' and ship operators' liability for tankers over 3,000 gross tons to the greater of $1,200 per gross ton or $10 million for damages, cleanup, and removal costs. Owners and operators of onshore facilities, including oil terminals, are liable for removal costs and damages up to a limit of $62 million. However, OPA '90 provides for unlimited liability if the spill was proximately caused by: (i) gross negligence or willful misconduct; (ii) violation of an applicable federal safety, construction or operating regulation by the responsible party, its agents or employees or any person acting pursuant to a contractual relationship with it; or (iii) if the owner or operator fails to report the spill, provide reasonable cooperation in connection with a removal order or, without sufficient cause, to obey an order issued by an authority under a removal regulation. For owners and operators of ships carrying hazardous substances as cargo, the liability provisions under CERCLA are $300 per gross ton or $5 million, whichever is greater. Facility owners and operators are liable for the total of all response costs plus $50 million for damages as defined under CERCLA. The CERCLA damages provisions are broadly similar to those of OPA '90. CERCLA also contains provisions similar to OPA '90 for breaking liability limits. CERCLA contains various reporting provisions, some of which are more detailed than OPA '90. Furthermore, both OPA '90 and CERCLA provide that individual U.S. states may issue their own pollution prevention laws and regulations, which laws and regulations may impose greater liabilities than set out in, and which may differ significantly from, OPA '90 or CERCLA. Many states have, in fact, enacted such provisions which provide for virtually unlimited liability for pollution accidents occurring in their waters.

OPA '90 also sets out contingency plan requirements with respect to cleanup and removal of the substances covered by its provisions. OPA '90 also requires expenditure to meet specific response standards for equipment to be kept on board ships. The contingency plan requirements also apply to marine transportation-related facilities, including Coast Guard-regulated onshore oil terminals, tank trucks, and railroad tank cars.

OPA '90 has made liability insurance more expensive for shipowners and ship operators and has also caused insurers to consider reducing available liability coverage, although this has not yet occurred. See "Insurance" in this Item 4.

### Stolt Offshore

Stolt Offshore's business is subject to international conventions and governmental regulations that strictly regulate various aspects of its operations. The maritime laws and the diving, health and safety regulations of the jurisdictions in which Stolt Offshore operates govern its operations in these areas. In the North Sea, these regulations include established working hours and a specified working environment for divers, as well as standards for diving procedures, equipment and diver health. The North Sea standards are among the most stringent in the world. In the absence of any specific regulation in other geographic regions, Stolt Offshore closely follows the standards set by the International Marine Contractor Association.

Stolt Offshore's operations in the United Kingdom are subject to a variety of worker and European community safety laws. The Health and Safety at Work Act of 1974, and regulations made thereunder, mandate general requirements for safe workplaces for all employees. Similar regulations apply in Norway, France and other European countries in which it operates.

In the United States, Stolt Offshore is subject to the jurisdiction of the U.S. Coast Guard, the National Transportation Safety Board and the U.S. Customs Service, as well as private industry organizations such as the American Bureau of Shipping. The Coast Guard and the National Transportation Safety Board set safety standards and are authorized to investigate vessel accidents and recommend improved safety standards. The Customs Service is authorized to inspect vessels at will. The exploration and development of oil and gas properties located on the Outer Continental Shelf of the United States is regulated by the Minerals Management Serivce. Stolt Offshore's U.S. operations are also affected by numerous federal, state, and local laws and regulations relating to safety and health of employees, protection of the environment including the Occupational Safety & Health Act of 1970, the Resource Conservation & Recovery Act of 1976, the Outer Continental Shelf Lands Act of 1953, the Federal Water Pollution Control Act of 1972, and the Oil Pollution Act of 1990.

The International Maritime Organization recently made the regulations of the International Safety Managment (ISM) Code mandatory. The ISM Code provides an international standard for the safe management and operation of ships, pollution prevention and certain crew and vessel certifications which is effective, unless extended by governmental authorities, on July 1, 2002. Stolt Offshore believes that it is currently in compliance with these standards or will be in compliance in all relevant jurisdictions by the effective date.

Compliance with current environmental, safety and other laws and regulations is an ordinary part of Stolt Offshore's business. These laws change frequently and, as an ordinary part of our business, we incur costs to maintain compliance with such laws. Although these costs have not had a material impact on Stolt Offshore's financial condition or results of operations in recent years, there can be no assurance that it will not have such an impact in the future. Moreover, although it is Stolt Offshore's objective to maintain compliance with all such laws and regulations applicable to it, there can be no assurance that Stolt Offshore will avoid material costs, liabilities and penalties imposed as a result of governmental regulation in the future.

In addition, Stolt Offshore is required by various governmental and other regulatory agencies to obtain certain permits, licenses and certificates with respect to its equipment and operations. The kind of permits, licenses and certificates required in Stolt Offshore's operations depend upon a number of factors but are normally of a type required of all operators in a given jurisdiction. We believe that Stolt Offshore has or can readily obtain all permits, licenses and certificates necessary to conduct its operations. Some countries require that Stolt Offshore enter into a joint venture or similar business arrangements with local individuals or businesses in order to conduct business in such countries.

Stolt Offshore's operations are affected from time to time and to varying degrees by political developments and federal and local laws and regulations. In particular, oil and gas production, operations and economics are affected by price control, tax and other laws relating to the petroleum industry, by changes in such laws and by constantly changing administrative regulations. Such developments directly or indirectly may affect Stolt Offshore's operations and those of its customers.

*Stolt Sea Farm*

SSF is subject to the laws and regulations of the individual countries, including Norway, the U.K., Canada, the U.S., Chile, Spain, Portugal, France, Belgium and Australia, in which its operations are situated which strictly regulate various aspects of its operations. The hatcheries, the ongrowing sites, and the slaughteries are regulated by state environmental laws and laws regarding treatment of, and protection from, fish diseases and pollution. International conventions and treaties regulate the importation of SSF's products in various markets around the world.

In 1996, the Norwegian government imposed feed quotas and production regulations on Norwegian fish farmers, in an attempt to reduce the supply of Norwegian farmed salmon, and hence the amount of Norwegian farmed salmon available for sale in the EU market. In order to avoid further

threats of duties against Norwegian salmon, the Norwegian government, in July 1997, reached an agreement with the EU for a five year period to regulate supplies of Norwegian salmon into the EU market. This agreement, among other things, restricts the increase in supply of Norwegian salmon into the EU market to 10% per year; requires the average sales price to be at or above an agreed minimum price and increases the export levy payable by Norwegian producers. The Norwegian government still maintains the feed quota and production regulations that it introduced in 1996. The quotas and regulations have had an adverse effect on the cost structure of the Norwegian operation, as they have limited the capacity utilization of farmed concessions. However, the Norwegian government has permitted annual increases of varying amounts (ranging from 2% to 10%) in the feed quotas, which progressively reduce the negative impact of the feed quota regime. The agreement expires in 2002 and at this time it is not known what, if anything, will take its place.

In July 1998, the U.S. Department of Commerce imposed duties on imports of fresh Atlantic salmon from Chile into the U.S. Eicosal, a 12.5% owned joint-venture partner at that time, suffered the highest duty rate of 10.69%. On the first administrative review for the period July 1998 to June 1999, Eicosal's duty was reduced to *de minimis* and subsequently they now enjoy a zero duty. The second review period, July 1999 to June 2000, also found zero duty for Eicosal. The third period, July 2000 to June 2001, review has not yet been completed. If the third administrative review also determines *de minimis* duties for Eicosal they may apply to be revocated from the duty and if accepted, their duty rate will remain permanently at zero. In July 2001, SSF purchased the remaining 87.5% of Eicosal, which is now fully owned by SSF. Ocean Horizons, a 100% owned Chilean salmon farming subsidiary, was too small in size to be selected by the U.S. Department of Commerce for review, and is subject to an average duty rate of 4.57%. The petitioners for the duty have requested that Ocean Horizons and Eicosal be "collapsed" for purposes of duty review.

All species of sturgeon have now been added to Appendix II of the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"). As a result, all international trade of sturgeon and caviar is now regulated, and all exports require proper documentation. While this does not affect the sale of SSF California's products within the U.S., it does mean that exports from the U.S. require proper license documentation. We have been working with the U.S. government to obtain the necessary documents and now have the procedures in place to allow export.

**Competition**

*Stolt-Nielsen Transportation Group*

The market for the integrated transportation and logistics services provided by SNTG is in its infancy. In providing such services, SNTG competes primarily with a few other large terminal and transport companies who are developing such services. SNTG is able to offer parcel tanker and tank container services on a worldwide basis. SNTG's tanker operations compete with operators based primarily in Europe and the Asia Pacific region. The parcel tanker market can be divided into two segments, deep-sea and regional, which depend on the routes and ships employed. SNTG's tank container operations compete primarily with European-based tank container operators. The competition in the tank container market is fragmented, although the relative size of the competition is increasing on a worldwide basis. SNTG also competes, to a lesser extent, with tank container leasing companies and with container shipping lines which operate tank containers. SNTG's terminal operations compete primarily with other independent terminal companies. In the ports where SNTG has storage facilities, SNTG either maintains a significant presence or occupies a niche in terms of products handled. Corporations such as Vopak that own and operate terminals on a worldwide basis own many of the competing terminals.

*Stolt Offshore*

The offshore contracting business is highly competitive. The consolidation in the offshore oil and gas services industry in the last few years has resulted in fewer but more substantial competitors. Although Stolt Offshore believes customers consider, among other things, the availability and technical capabilities of equipment and personnel, efficiency, condition of equipment, safety record, and reputation, price competition is the primary factor in determining which qualified contractor with available equipment will be awarded a contract. Stolt Offshore's ships are specialized and have few alternative uses and, because of their nature and the environment in which they work, have relatively high maintenance costs whether or not operating. Because these costs are essentially fixed, and in order to avoid additional expenses associated with temporarily idling its ships, Stolt Offshore may from time-to-time be required to bid its ships in projects at lower margins depending on the prevailing contractual rates in a given region.

Stolt Offshore believes that it is one of only four companies capable of providing a wide range of offshore services on a worldwide basis in the major offshore oil and gas producing regions. Competition in most of the range of services that Stolt Offshore offers to its customers is limited to three main competitors, Technip-Coflexip, the Halliburton DSND joint venture now known as "Subsea7," and Saipem S.p.A., occasionally working as Saibos, the joint venture between Saipem S.p.A. and Bouygues Offshore S.A. Stolt Offshore is subject to intense competition from these offshore contractors. In North America, J. Ray McDermott Inc., Global Industries Inc., Cal Dive International and Horizon Offshore Contractors Inc. also provide similar services to those that Stolt Offshore provides. Additionally, these services are provided by J. Ray McDermott Inc. in Asia Pacific and the Middle East and by Global Industries Inc. in Asia Pacific and West Africa. However, Stolt Offshore believes that these companies are not capable of operating in all the major oil and gas producing regions worldwide. Stolt Offshore also competes with Allseas Marine Contractors and Heerema who operate in the worldwide market, providing trunkline and rigid pipelay services and heavy lifting services, respectively. Stolt Offshore also faces substantial competition from smaller regional competitors and less integrated providers of offshore services.

*Stolt Sea Farm*

SSF competes with other producers of farmed seafood and with suppliers of wild catch and other species of fish. The North American Atlantic salmon activities compete primarily with North American and Chilean producers in the North American market. Norwegian and Scottish Atlantic salmon activities compete primarily with other Norwegian, U.K., Irish and Faeroese producers of Atlantic salmon in the European market. For both regions, competition is based on quality, price, and delivery capability. In Asia, SSF competes with importers and producers of farmed and wild fish. The turbot production in Spain, Portugal and France competes primarily in the Mediterranean area with other Spanish and French producers of turbot and with suppliers of wild turbot.

**Insurance**

We maintain insurance against physical loss and damage to our assets as well as coverage against liabilities to third parties we may incur in the course of our operations. Assets are insured at replacement cost, market value, or assessed earning power. The owned fleet of SNTG and Stolt Offshore is currently covered by hull and machinery insurance in the aggregate amount of $3.8 billion. Marine liabilities, which may be incurred through the operation of SNTG's and Stolt Offshore's ships, are insured under marine protection and indemnity insurance policies. The policies have a limit of approximately $4.25 billion per incident except for marine oil pollution which is limited to $1 billion per occurrence. Non-marine liabilities are insured up to $200 million. We believe our insurance coverage to be in such form, against such risks, for such amounts and subject to such deductibles as are prudent and normal to those industries in which we operate.

**Principal Operating Subsidiaries**

As of April 30, 2002, our principal operating subsidiaries are as follows:

| | Country of Incorporation | % Shareholding |
|---|---|---|
| Stolt-Nielsen Transportation Group Ltd. . . . . . . . | Liberia | 100 |
| Stolt-Nielsen Transportation Group Ltd. . . . . . . . | Bermuda | 100 |
| Stolt-Nielsen Transportation Group Inc. . . . . . . . | USA | 100 |
| Stolt-Nielsen Transportation Group B.V. . . . . . . . | Netherlands | 100 |
| Stolt-Nielsen Transportation Group AG . . . . . . . | Switzerland | 100 |
| Stolt-Nielsen Transportation Group Pte. Ltd. . . . | Singapore | 100 |
| Stolt Tankers Inc. . . . . . . . . . . . . . . . . . . . . . . | Liberia | 100 |
| Stolt General Product Tankers Inc. . . . . . . . . . . . | Liberia | 100 |
| Anthony Radcliffe Steamship Company Limited . | England | 100 |
| Stolt-Nielsen Inter European Service B.V. . . . . . . | Netherlands | 100 |
| Stolt-Nielsen Inter Asia Service Inc. . . . . . . . . . . | Liberia | 100 |
| Stolt-Nielsen Inland Tanker Service B.V. . . . . . . . | Netherlands | 100 |
| Stolt-Nielsen Indian Ocean and Middle East Service Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . | Bermuda | 100 |
| Stolthaven New Orleans L.L.C. . . . . . . . . . . . . . | USA | 100 |
| Stolthaven Houston Inc. . . . . . . . . . . . . . . . . . . | USA | 100 |
| Stolthaven (Santos) Ltda. . . . . . . . . . . . . . . . . . | Brazil | 100 |
| Stolt Tank Containers Leasing Ltd. . . . . . . . . . . . | Bermuda | 100 |
| Stolt-Nielsen Transportation Group Limited . . . . | England | 100 |
| Stolt-Nielsen Transportation Group SAS . . . . . . . | France | 100 |
| Stolt Container Terminal Pte. Ltd. . . . . . . . . . . . | Singapore | 100 |
| Stolt Container Terminal Co. Ltd. . . . . . . . . . . . | Taiwan | 90 |
| Stolt Sea Farm Holdings plc . . . . . . . . . . . . . . . | England | 100 |
| Stolt Sea Farm A/S . . . . . . . . . . . . . . . . . . . . . . | Norway | 100 |
| Stolt Sea Farm Inc. . . . . . . . . . . . . . . . . . . . . . . | USA | 100 |
| Stolt Sea Farm Ltd. . . . . . . . . . . . . . . . . . . . . . . | Scotland | 100 |
| Stolt Sea Farm S.A. . . . . . . . . . . . . . . . . . . . . . . | Spain | 100 |
| Stolt Sea Farm Inc. . . . . . . . . . . . . . . . . . . . . . . | Canada | 100 |
| Stolt Offshore S.A. . . . . . . . . . . . . . . . . . . . . . . | Luxembourg | 53 (economic) |
| | | 61 (voting) |
| Stolt Offshore B.V. . . . . . . . . . . . . . . . . . . . . . . | Netherlands | 53 |
| Stolt Offshore S.A. . . . . . . . . . . . . . . . . . . . . . . | France | 53 |
| Stolt Offshore Inc. . . . . . . . . . . . . . . . . . . . . . . | USA | 53 |
| Stolt Offshore S.A. . . . . . . . . . . . . . . . . . . . . . . | Brazil | 53 |
| Stolt Offshore A/S . . . . . . . . . . . . . . . . . . . . . . | Norway | 53 |
| Stolt Offshore Limited . . . . . . . . . . . . . . . . . . . | United Kingdom | 53 |
| Stolt Offshore Services S.A. . . . . . . . . . . . . . . . . | France | 53 |
| Class 3 Shipping Ltd. . . . . . . . . . . . . . . . . . . . . | Bermuda | 53 |
| SCS Shipping Limited . . . . . . . . . . . . . . . . . . . . | Isle of Man | 53 |
| Optimum Logistics Ltd. . . . . . . . . . . . . . . . . . . | Bermuda | 80 |
| SeaSupplier Ltd. . . . . . . . . . . . . . . . . . . . . . . . . | Bermuda | 97 |

**Property, Plant and Equipment**

*Stolt-Nielsen Transportation Group*

The following table describes the parcel tankers that are operated by SNTG, both within and outside STJS. It also includes ships that are leased or time-chartered. (See notes to table below pertaining to ownership and registry.)

## Parcel Tankers Operated by Stolt Tankers Joint Service
## as of March 31, 2002

| | Year Built | DWT (Metric Tons) | Ownership(1) | Registry |
|---|---|---|---|---|
| **STOLT INNOVATION CLASS** | | | | |
| Stolt Capability | 1998 | 37,000 | NYK Stolt | Liberian |
| Stolt Efficiency | 1998 | 37,000 | Stolt-Nielsen | Cayman |
| Stolt Inspiration | 1997 | 37,000 | Stolt-Nielsen | Cayman |
| Stolt Creativity | 1997 | 37,000 | Stolt-Nielsen | Cayman |
| Stolt Invention | 1997 | 37,000 | NYK Stolt | Liberian |
| Stolt Confidence | 1996 | 37,000 | Stolt-Nielsen | Cayman |
| Stolt Innovation | 1996 | 37,000 | Stolt-Nielsen | Cayman |
| Stolt Concept | 1999 | 37,000 | Stolt-Nielsen | Cayman |
| Stolt Effort | 1999 | 37,000 | Stolt-Nielsen | Cayman |
| Stolt Perseverance | 2001 | 37,000 | Stolt-Nielsen | Cayman |
| **STOLT ACHIEVEMENT CLASS** | | | | |
| Stolt Achievement | 1999 | 37,000 | Stolt-Nielsen | Cayman |
| **STOLT HELLULAND CLASS** | | | | |
| Stolt Vinland | 1992 | 29,999 | Stolt-Nielsen | Liberian |
| Stolt Vestland | 1992 | 29,999 | Stolt-Nielsen | Liberian |
| Stolt Helluland | 1991 | 29,999 | Stolt-Nielsen | Liberian |
| Stolt Markland | 1991 | 29,999 | Stolt-Nielsen | Liberian |
| **STOLT SAPPHIRE CLASS** | | | | |
| Stolt Jade | 1986 | 38,746 | Stolt-Nielsen | Cayman |
| Stolt Aquamarine | 1986 | 38,746 | Stolt-Nielsen | Cayman |
| Stolt Topaz | 1986 | 38,720 | Stolt-Nielsen | Cayman |
| Stolt Emerald | 1986 | 38,720 | Stolt-Nielsen | Cayman |
| Stolt Sapphire | 1986 | 38,746 | NYK Stolt | Liberian |
| **STOLT FALCON CLASS** | | | | |
| Stolt Eagle | 1980 | 37,082 | Stolt-Nielsen | Liberian |
| Stolt Condor | 1979 | 37,200 | Stolt-Nielsen | Liberian |
| Stolt Heron | 1979 | 37,075 | Stolt-Nielsen | Liberian |
| Stolt Hawk | 1978 | 37,080 | Stolt-Nielsen | Liberian |
| Stolt Osprey | 1978 | 37,080 | Stolt-Nielsen | Liberian |
| Stolt Falcon | 1978 | 37,200 | Stolt-Nielsen | Liberian |
| **STOLT PRIDE CLASS** | | | | |
| Stolt Excellence | 1979 | 32,093 | Stolt-Nielsen | Liberian |
| Stolt Loyalty | 1978 | 32,091 | Stolt-Nielsen | Liberian |
| Stolt Tenacity | 1978 | 32,093 | Stolt-Nielsen | Liberian |
| Stolt Integrity | 1977 | 32,057 | Stolt-Nielsen | Liberian |
| Stolt Sincerity | 1976 | 31,942 | Stolt-Nielsen | Liberian |
| Stolt Pride | 1976 | 31,942 | Stolt-Nielsen | Liberian |

**STOLT AVANCE CLASS**

| | | | | |
|---|---|---|---|---|
| Stolt Avenir | 1978 | 23,275 | Stolt-Nielsen | Liberian |
| Stolt Avance | 1977 | 23,648 | Stolt-Nielsen | Liberian |

**STOLT SEA CLASS**

| | | | | |
|---|---|---|---|---|
| Stolt Sea | 1999 | 22,500 | Stolt-Nielsen | Cayman |
| Stolt Sun | 2000 | 22,210 | Stolt-Nielsen | Cayman |
| Stolt Span | 1999 | 22,460 | NYK Stolt | Liberian |
| Stolt Surf | 2000 | 22,460 | Stolt-Nielsen | Cayman |
| Stolt Stream | 2000 | 22,917 | Stolt-Nielsen | Cayman |
| Stolt Spray | 2000 | 22,460 | Stolt-Nielsen | Cayman |

**SUPERFLEX CLASS**

| | | | | |
|---|---|---|---|---|
| Stolt Guardian | 1983 | 39,726 | Stolt-Nielsen | Liberian |
| Hyde Park | 1982 | 39,015 | T/C by Stolt-Nielsen | Liberian |
| Stolt Protector | 1983 | 39,782 | Stolt-Nielsen | Liberian |
| Kenwood Park | 1982 | 39,015 | T/C by Stolt-Nielsen | Liberian |

**"V" CLASS**

| | | | | |
|---|---|---|---|---|
| Stolt Victor | 1977 | 30,899 | Stolt-Nielsen | Liberian |
| Stolt Viking | 1978 | 30,892 | Stolt-Nielsen | Liberian |

**STOLT ASPIRATION CLASS**

| | | | | |
|---|---|---|---|---|
| Stolt Aspiration | 1987 | 12,219 | NYK Stolt | Panamanian |
| Stolt Alliance | 1985 | 12,674 | NYK Stolt | Panamanian |
| Stolt Taurus | 1985 | 12,749 | Stolt-Nielsen | Liberian |
| Stolt Titan | 1985 | 12,691 | Stolt-Nielsen | Liberian |
| Stolt Durham | 1995 | 12,458 | Bibby | Panamanian |
| Stolt Devon | 1985 | 12,721 | Bibby | Panamanian |
| Stolt Cornwall | 1985 | 12,749 | Bibby | Panamanian |
| Stolt Sakra | 1984 | 12,775 | Stolt-Nielsen | Liberian |
| Stolt Accord | 1982 | 12,467 | NYK Stolt | Liberian |

**TROJAN CLASS**

| | | | | |
|---|---|---|---|---|
| Stolt Trojan | 1996 | 15,313 | Barton | Panamanian |

**TRIUMPH CLASS**

| | | | | |
|---|---|---|---|---|
| Stolt Kent | 1998 | 19,300 | Bibby | Isle of Man |
| Botany Triumph | 1997 | 19,299 | Bibby | Panamanian |

**NTOMBI CLASS**

| | | | | |
|---|---|---|---|---|
| Stolt Ntaba | 1991 | 13,946 | Unicorn | Panamanian |
| Ntombi | 1990 | 13,947 | Unicorn | Panamanian |

**OTHER PARCEL TANKERS**

| | | | | |
|---|---|---|---|---|
| Stolt Hikawa | 1992 | 8,080 | Stolt-Nielsen | Liberian |
| Stolt Egret | 1992 | 5,758 | Stolt-Nielsen | Cayman |
| Bruce Park | 1992 | 13,940 | T/C by Stolt-Nielsen | Panamanian |
| Antignano | 2002 | 35,000 | T/C by Stolt-Nielsen | Italian |
| Stolt Infra | 1985 | 12,734 | T/C by Stolt-Nielsen | Panamanian |
| Blue Sapphire | 1991 | 40,153 | T/C by Stolt-Nielsen | Liberian |
| Montana Star | 1992 | 40,160 | T/C by Stolt-Nielsen | Liberian |
| Montana Sun | 1994 | 40,160 | T/C by Stolt-Nielsen | Liberian |

Total in STJS
(68 ships) ........................ 1,928,161

Parcel Tankers Outside the Stolt Tankers Joint Service
Operated and/or Controlled by Stolt Affiliates
as of March 31, 2002

|  | Year Built | DWT (Metric Tons) | Ownership(1) | Registry |
|---|---|---|---|---|
| **STOLT-NIELSEN INTER-EUROPE SERVICE** | | | | |
| Stolt Shearwater . . . . . . . . . . . . . | 1998 | 5,498 | Stolt-Nielsen | Cayman Islands |
| Stolt Kittiwake . . . . . . . . . . . . . | 1993 | 4,729 | Stolt-Nielsen | Cayman Islands |
| Stolt Guillemott . . . . . . . . . . . . | 1993 | 4,709 | Stolt-Nielsen | Cayman Islands |
| Stolt Cormorant . . . . . . . . . . . . | 1999 | 5,498 | Stolt-Nielsen | Cayman Islands |
| Stolt Kestrel . . . . . . . . . . . . . . . | 1992 | 5,758 | Stolt-Nielsen | Cayman Islands |
| Stolt Petrel . . . . . . . . . . . . . | 1992 | 4,794 | Stolt-Nielsen | Cayman Islands |
| Stolt Tern . . . . . . . . . . . . . . | 1991 | 4,794 | Stolt-Nielsen | Cayman Islands |
| Stolt Dipper . . . . . . . . . . . . . . | 1992 | 4,794 | Stolt-Nielsen | Cayman Islands |
| Stolt Kite . . . . . . . . . . . . . . . . | 1992 | 4,794 | Stolt-Nielsen | Cayman Islands |
| Stolt Puffin . . . . . . . . . . . . . . | 1993 | 5,758 | Stolt-Nielsen | Cayman Islands |
| Stolt Fulmar . . . . . . . . . . . . . . | 2000 | 5,498 | Stolt-Nielsen | Cayman Islands |
| **STOLT NIELSEN INTER-ASIA SERVICE** | | | | |
| Stolt Avocet . . . . . . . . . . . . . . | 1992 | 5,758 | Stolt-Nielsen | Cayman Islands |
| **STOLT BOTANY TANKER SERVICES** | | | | |
| Botany Tradewind . . . . . . . . . . | 1985 | 12,752 | Barton | Panamanian |
| Central Park . . . . . . . . . . . . . . | 1985 | 12,681 | T/C by Stolt-Nielsen | Panamanian |
| Botany Treasure . . . . . . . . . . . . | 1998 | 8,834 | Barton | Panamanian |
| Botany Triton . . . . . . . . . . . . . | 1991 | 8,080 | Barton | Liberian |
| Botany Trust . . . . . . . . . . . . . | 1998 | 8,823 | Barton | Panamanian |
| Hibiya Park . . . . . . . . . . . . . . | 1990 | 13,921 | T/C by Stolt-Nielsen | Panamanian |
| **STOLT NYK ASIA PACIFIC SERVICE** | | | | |
| Stolt Suisen . . . . . . . . . . . . . . | 1998 | 11,537 | NSSH | Liberian |
| Stolt Botan . . . . . . . . . . . . . . | 1998 | 11,553 | NSSH | Liberian |
| Stolt Kikyo . . . . . . . . . . . . . | 1998 | 11,545 | NSSH | Liberian |
| Stolt Azami . . . . . . . . . . . . . . | 1997 | 11,564 | NSSH | Liberian |
| Stolt Ayame . . . . . . . . . . . . . . | 1991 | 9,070 | NSSH | Liberian |
| Stolt Azalea . . . . . . . . . . . . . . | 1988 | 7,582 | NSSH | Liberian |
| Stolt Lily . . . . . . . . . . . . . . . | 1988 | 7,593 | NSSH | Liberian |
| Stolt Magnolia . . . . . . . . . . . . . | 1985 | 7,132 | NSSH | Panamanian |
| Stolt Sunrise . . . . . . . . . . . . . | 1984 | 6,678 | NSSH | Liberian |
| Southern Knight . . . . . . . . . . . . | 1984 | 8,599 | T/C by SNAPS | Panamanian |
| Sun Emerald . . . . . . . . . . . . . . | 1990 | 7,715 | T/C by SNAPS | Malaysian |
| **STOLT NYK AUSTRALIA** | | | | |
| Stolt Australia . . . . . . . . . . . . . | 1986 | 9,940 | SNAPL | Australian |
| **STOLT-NIELSEN INLAND TANKER SERVICE** | | | | |
| Alliantie . . . . . . . . . . . . . . . | 1999 | 1,600 | T/C by Stolt-Nielsen | Dutch |
| Pax Montana . . . . . . . . . . . . . | 1998 | 2,408 | T/C by Stolt-Nielsen | Dutch |
| Stolt Emden . . . . . . . . . . . . . | 1980/1998 | 1,388 | Stolt-Nielsen | German |
| Stolt Madrid . . . . . . . . . . . . . | 1994 | 1,560 | Stolt-Nielsen | Swiss |
| Stolt Oslo . . . . . . . . . . . . . . . | 1994 | 1,556 | Stolt-Nielsen | Swiss |

| | | | | |
|---|---|---|---|---|
| Stolt Prag | 1994 | 1,202 | Stolt-Nielsen | Dutch |
| Stolt Waal | 1993 | 2,095 | Stolt-Nielsen | Dutch |
| Stolt Somtrans | 1993 | 2,408 | T/C by Stolt-Nielsen | Dutch |
| Columbia | 1993 | 1,605 | T/C by Stolt-Nielsen | Dutch |
| Stolt Rom | 1993 | 2,156 | Stolt-Nielsen | Swiss |
| Stolt Wien | 1993 | 2,157 | Stolt-Nielsen | Swiss |
| Stolt Mosel | 1992 | 2,133 | Stolt-Nielsen | Dutch |
| Stolt Main | 1992 | 2,124 | Stolt-Nielsen | Dutch |
| Stolt Neckar | 1992 | 2,095 | Stolt-Nielsen | Dutch |
| Stolt Maas | 1992 | 2,096 | Stolt-Nielsen | Dutch |
| Challenger | 1992 | 1,605 | T/C by Stolt-Nielsen | Dutch |
| Oranje Nassau | 1992 | 2,408 | T/C by Stolt-Nielsen | Dutch |
| Stolt Hamburg | 1992 | 1,283 | Stolt-Nielsen | Dutch |
| Stolt Basel | 1992 | 2,404 | Stolt-Nielsen | Dutch |
| Stolt Lausanne | 1992 | 2,359 | Stolt-Nielsen | Swiss |
| Diersbuettel | 1992 | 2,103 | T/C by Stolt-Nielsen | Swiss |
| Stolt Tolerantie | 1999 | 1,500 | T/C by Stolt-Nielsen | Dutch |
| Stolt Paris | 1991 | 2,103 | Stolt-Nielsen | Swiss |
| Enterprise | 1991 | 1,608 | T/C by Stolt-Nielsen | Dutch |
| Turbulentie | 1986/1990 | 1,777 | Stolt-Nielsen | Dutch |
| Stolt Koeln | 1989 | 1,701 | Stolt-Nielsen | German |
| Stolt Berlin | 1987 | 3,199 | Stolt-Nielsen | Swiss |
| Reesenbuettel | 1987 | 3,153 | T/C by Stolt-Nielsen | Swiss |
| Stolt London | 1985 | 1,335 | Stolt-Nielsen | Dutch |
| Brunsbuettel | 1985 | 3,000 | T/C by Stolt-Nielsen | Dutch |
| Stolt Antwerpen | 1984 | 1,600 | Stolt-Nielsen | Dutch |
| Stolt Hoechst | 1980 | 1,366 | Stolt-Nielsen | Swiss |
| Thysstad | 2000 | 2,500 | T/C by Stolt-Nielsen | Belgian |
| Tim | 2000 | 2,452 | Stolt-Nielsen | Dutch |
| Pegasus | 1999 | 2,494 | T/C by Stolt-Nielsen | Belgian |

Total Outside STJS
(65 ships) .................    308,514

GRAND TOTAL
(133 ships) .................    2,236,675

Notes:

"NYK Stolt" means NYK Stolt Tankers, S.A., which is 50%-owned by us.

"T/C" means Time-Chartered.

"Barton" means Barton Shipping.

"Bibby" means Bibby Line.

"Unicorn" means Unicorn Tankers.

"NSSH" means NYK Stolt Shipholding Inc., which is 50%-owned by us.

"SNAPS" means Stolt NYK Asia Pacific Services Inc., which is 50%-owned by us.

"SNAPL" means Stolt NYK Australia Pty. Ltd., which is 50%-owned by us.

(1) Certain of our parcel tankers are subject to ship mortgages. See Note 13 to our 2001 Consolidated Financial Statements.

*Stolt Offshore*

Stolt Offshore operates one of the world's most advanced fleets of subsea construction support and flowline lay ships from which the majority of Stolt Offshore's subsea activities are performed. Stolt Offshore owns or charters a fleet consisting of nine construction support ships, four flowline lay ships, nine survey/inspection, repair and maintenance ships, 11 anchored construction and maintenance ships, one heavy lift ship, seven pipelay barges, four tugs and other ships, 95 ROVs (five of which are owned by a joint venture) and 11 hardsuits.

The following table describes Stolt Offshore's major assets, as of April 30, 2002:

| Name | Capabilities | Year Built/ Major Upgrade | ROVs | Length overall (meters) | Owned/ Chartered |
|------|--------------|---------------------------|------|-------------------------|------------------|
| **Construction Support Ships** | | | | | |
| Seaway Harrier . . . . . . . . . | Subsea construction | 1985 | 1 | 84 | Owned(1) |
| Seaway Hawk . . . . . . . . . . | Subsea construction | 1978 | — | 93 | Owned |
| Seaway Osprey . . . . . . . . . | Flexible flowline and umbilical lay, accepts coiled tubing, straightener for tubing, stern roller | 1984/1992/1996 | 2 | 102 | Owned(1) |
| Seaway Eagle . . . . . . . . . . | Flexible flowline lay, multi-purpose subsea construction | 1997 | 2 | 140 | Owned(1) |
| Seaway Legend . . . . . . . . . | ROV and hardsuit diving support, subsea construction | 1985/1998 | 2 | 73 | Owned |
| Discovery . . . . . . . . . . . . . | Flexible flowline lay, subsea construction | 1990 | 1 | 120 | Chartered(2) |
| Seaway Kingfisher . . . . . . . | Diverless inspection, repair and maintenance | 1990/1998 | 2 | 90 | Chartered(3) |
| Stephaniturm . . . . . . . . . . | Diving support, light construction | 1978/1994/1995 | 1 | 73 | Chartered(4) |
| Seaway Explorer . . . . . . . . | Trenching ship | 1984 | — | 80 | Owned(1) |
| **Flowline Lay Ships** | | | | | |
| Seaway Condor . . . . . . . . | Flexible flowline and umbilical lay, module handling system, trenching | 1982/1994/1999 | 2 | 141 | Owned(1) |
| Seaway Falcon . . . . . . . . . | Rigid and flexible flowline and umbilical lay | 1976/1995/1997 | 2 | 162 | Owned(1) |
| Seaway Polaris . . . . . . . . . | Deepwater derrick/pipelay barge | 1979/1991/1996 /1999 | — | 137 | Owned |
| Seaway Kestrel . . . . . . . . . | Rigid reel lay ship | 1976/1991/1995 | — | 99 | Owned(1) |
| **Survey/IRM Ships** | | | | | |
| Seaway Commander . . . . . . | Survey | 1967/1982/1988 | 2 | 75 | Chartered(5) |
| Seaway Defender . . . . . . . . | ROV and hardsuit diving support, subsea construction | 1976 | 1 | 67 | Owned |

| Name | Capabilities | Year Built/ Major Upgrade | ROVs | Length overall (meters) | Owned/ Chartered |
|------|-------------|--------------------------|------|------------------------|------------------|
| Seaway Pioneer .......... | ROV and hardsuit diving support, subsea construction | 1966/1996 | 1 | 64 | Owned |
| Seaway Invincible ........ | ROV support, subsea construction | 1971 | — | 71 | Owned |
| Seaway Rover........... | ROV support, subsea construction | 1966/1972/1983 /1991 | — | 71 | Owned |
| Elang Laut............. | Multi-role shallow seismic/ multibeam survey and geotechnical service ship | 1978 | — | 35 | Owned |
| Far Saga .............. | ROV support, subsea construction | 2001 | 2 | 89 | Chartered(6) |
| Polar Bjorn ........... | ROV support, subsea construction | 2001 | 2 | 90 | Chartered(7) |
| Ernest Shackleton........ | ROV support, subsea construction | 1999 | 2 | 80 | Chartered(8) |
| **Anchored Construction & Maintenance Ships** | | | | | |
| American Pride ......... | Four-point anchor system | 1977/1992 | — | 59 | Owned |
| American Constitution .... | Four-point anchor system, saturation diving, moonpool | 1974 | — | 64 | Owned |
| American Eagle ......... | Four-point anchor system | 1976 | — | 50 | Owned |
| American Independence ... | Four-point anchor system | 1970 | — | 52 | Owned |
| American Recovery ...... | Tug, diving support | 1965/1995 | — | 43 | Owned |
| American Star .......... | Four-point anchor system, saturation diving | 1967/1998 | — | 53 | Owned |
| American Triumph ....... | Four-point anchor system | 1965/1997 | — | 53 | Owned |
| American Victory ........ | Four-point anchor system | 1976/1997 | — | 50 | Owned |
| American Liberty ........ | Four-point anchor system | 1974 | — | 33 | Owned |
| Pipeline Surveyor ........ | Diving support | 1965/1996 | — | 33 | Owned |
| American Diver ......... | Diving support | 1964 | — | 33 | Owned |
| **Heavy Lift Ships and Barges** | | | | | |
| Stanislav Yudin ......... | Heavy lift, 2,500-ton crane | 1985 | — | 183 | Chartered(9) |
| Annette .............. | Pipelay barge, marine construction | 1972/1989/1997 | — | 61 | Owned |
| Arwana .............. | Pipelay barge | 1998 | — | 70 | Owned |

| Name | Capabilities | Year Built/ Major Upgrade | ROVs | Length overall (meters) | Owned/ Chartered |
|---|---|---|---|---|---|
| Jasamarine V (ex Sin Thai Hin IV) . . . . . . . . . . . . | Flat top barge fitted out for inshore diving/construction | 1978 | — | 55 | Owned |
| Seaway Orion . . . . . . . . . . | Pipelay barge | 1977/1984/1997 | — | 85 | Owned |
| DLB 801 . . . . . . . . . . . . . | Derrick lay barge | 1978/1980/1989 | — | 107 | Owned |
| LB 200  . . . . . . . . . . . . . . | Pipelay barge | 1975/1996 | — | 168 | Owned(1) |
| **Tugs and Other** | | | | | |
| DLB 1 . . . . . . . . . . . . . . . | Barge | 1956 | — | 91 | Owned |
| Golek  . . . . . . . . . . . . . . | Transport barge | 1983/1992 | — | 46 | Owned |
| Polka . . . . . . . . . . . . . . . | River tug and anchor handler | 1971 | — | 12 | Owned |
| Seaway Sabia . . . . . . . . . . | Anchor Mooring support | 2002 | — | 37 | Owned |

(1)  Subject to mortgage under Stolt Offshore's current credit facilities.

(2)  Chartered from Friary Ocean Surveyor NV through September 2002 with options to extend through 2011 and with options to purchase.

(3)  Chartered from Kingfisher DA in which Stolt Offshore has a 50% ownership, for five years starting in 1998, with 10-one year options to extend through December 2013 and with options to purchase.

(4)  Chartered from Horizon Offshore from March 1, 2000 through February 2003 with 2 one-year options to extend.

(5)  Chartered from DSND Shipping A/S through December 2002.

(6)  Chartered from Farstad Supply AS for five years beginning in 2002 with three one-year options to extend.

(7)  Chartered from Polar Ship Investment AS for three years beginning 2002.

(8)  Chartered from Silverseas Shipping Limited for one year beginning in 2001 with four one-year options to extend.

(9)  Chartered to SHL by a subsidiary of the ship's owner, Lukoil, through October 2004.

### Other Properties

In addition to owned or leased office space, we own or hold under long-term leases the following real property in connection with SNTG:

|  | Owned | Leased | Debt Outstanding (as of 3/31/02) |
|---|---|---|---|
|  | (acres) | | (in thousands) |
| Houston bulk liquid storage terminal | 249 | — | $77,835 |
| New Orleans bulk liquid storage terminal | 118 | — | — |
| Santos bulk liquid storage terminal | 28 | — | 620 |
| Singapore tank container depot | — | 4 | — |
| Rotterdam pier | — | 3 | — |

### Stolt Offshore

Stolt Offshore owns or holds under long-term leases, as of April 30, 2002, real estate property as described below:

| | Office Space | Work or Storage Space or Land | Status |
|---|---|---|---|
| | (square meters) | (square meters) | |
| Aberdeen, Scotland | 6,028 | 102,793 | Owned/Leased |
| Baku, Azerbaijan | 66 | — | Leased |
| Bergen, Norway | 100 | — | Leased |
| Cairo, Egypt | 250 | — | Leased |
| Dhahran, Saudi Arabia | 330 | 750 | Leased |
| East Kalimantan, Indonesia | — | 190,267 | Leased |
| Houston, Texas | 5,156 | 2,971 | Leased |
| Houston, Texas | 10,105 | 15,663 | Leased |
| Jakarta, Indonesia | 915 | 601 | Leased |
| Kristiansund, Norway | 120 | 800 | Leased |
| Lagos, Nigeria | 200 | — | Leased |
| Lobito, Angola | 5,945 | 554,431 | Leased |
| Luanda, Angola | 53 | 690 | Leased |
| Macae City, Brazil | 1,286 | 20,300 | Owned/Leased |
| Nanterre, France | 22,364 | — | Leased |
| New Orleans, Louisiana | 305 | 56,658 | Leased |
| Perth, Australia | 1,456 | 3,818 | Leased |
| Port Gentil, Gabon | 305 | 5,070 | Owned |
| Port of Fourchon, Louisiana | 650 | 74,240 | Leased |
| Port of Iberia, Louisiana | 1,796 | 95,688 | Leased |
| Rio de Janeiro, Brazil | 295 | — | Leased |
| Rotterdam, The Netherlands | — | 4,200 | Leased |
| Rueil, France | 5,235 | — | Leased |
| Sharjah, United Arab Emirates | 1,570 | 5,147 | Leased |
| Singapore | 928 | 4,606 | Leased |
| Stavanger, Norway | 7,721 | 562 | Leased |
| Sunbury, England | 616 | — | Leased |
| Tananger, Norway | 250 | 18,200 | Leased |
| Tchengue, Gabon | 1,486 | 60,000 | Leased |
| Teeside, England | — | 19,667 | Leased |
| Tehran, Iran | 600 | — | Leased |
| Warri, Nigeria | 1,765 | 222,582 | Leased |

### Item 5. Operating and Financial Review and Prospects.

### Operating Results

The information included under the caption "Management's Discussion and Analysis" on pages 19 through 29 of our 2001 Annual Report filed with the Securities and Exchange Commission on Form 6-K on April 9, 2002 is incorporated herein by reference.

**Liquidity and Capital Resources**

The information included under the caption "Management's Discussion and Analysis" on pages 19 through 29 of our 2001 Annual Report filed with the Securities and Exchange Commission on Form 6-K on April 9, 2002 is incorporated herein by reference.

**Research and Development; Patents and Licenses**

*Stolt-Nielsen Transportation Group*

SNTG does not have significant expenditures for research and development.

*Stolt Offshore*

Stolt Offshore has a long history of innovation and the development of new technologies that have contributed significantly to the evolution of the offshore oil and gas industry. Particular strengths include its construction techniques, which include but are not limited to: deepwater pipeline laying and umbilicals, remote intervention technologies and automated welding systems.

Two of Stolt Offshore's notable developments are currently being used extensively in water depth of 1,400 meters. These developments are the J-Lay tower on the *Seaway Polaris* used to lay pipeline, which enables rigid pipe to be laid from the barge at a steep angle allowing for efficient pipelay, and MATIS™, an automatic bolted flange connection system for deepwater pipeline spools. A deepwater pipeline spool is a length of pipe, typically between 20 and 100 meters in length that connects a subsea pipeline to a structure on the seabed. Stolt Offshore's MATIS™ trademark is registered in the United Kingdom and Norway and is currently in the process of U.S. federal trademark registration.

Serimer Dasa, Stolt Offshore's welding technology company, continues to improve welding procedures and equipment to meet the technical demands of both new steels and riser installation techniques. Among the research and development programs currently in progress are the development of high speed welding techniques for large diameter pipelines, the welding of high strength steels, the development of laser welding techniques and a number of studies relating to the fabrication and inspection of steel catenary risers.

A major problem facing the offshore oil and gas industry is the repair of damaged pipelines in water depths that are too deep for divers. Such repairs must be made by robotic means, which is both time consuming and costly. Stolt Offshore is developing a number of solutions to this problem based on the MATIS™ tie-in equipment and the friction stitch welding process. The development of this process will offer significant advantages to subsea pipeline operators who will no longer be required to hold inventories of expensive repair connectors. If these technologies are developed successfully, Stolt Offshore will be able to provide repair services to subsea pipeline customers quickly by using off-the-shelf flange connectors or friction stitch welding.

Stolt Offshore's current research and development program also includes elements of architecture of a field development, which includes, but is not limited to, different type of risers or flowline systems including insulation, coating, buoyancy and conditions monitoring to be offered to customers as part of their infrastructure to produce and transport hydrocarbons in deepwater.

Stolt Offshore's research and development activities are primarily customer and project specific development efforts that it undertakes to tailor equipment and systems to the needs of a customer in connection with specific orders or projects. Order-related development amounts are paid by customers as part of the contract price.

*Stolt Sea Farm*

SSF aims to be at the forefront of the development of new species and technology in the aquaculture industry. Expenditures in research and development include: farming methods, disease control, new equipment, breeding programs, and new species such as halibut and sole.

42

## Item 6. Directors, Senior Management and Employees.

### Directors and Senior Management

We are a Luxembourg holding company and do not have officers as such. The following is a list of our Directors and persons employed by our subsidiaries who perform the indicated executive and administrative functions for the combined business of our subsidiaries:

| Name | Age* | Position |
| --- | --- | --- |
| Jacob Stolt-Nielsen | 70 | Chairman of the Board |
| Niels G. Stolt-Nielsen | 37 | Director and Chief Executive Officer |
| Richard Fisher | 52 | Director |
| Kinichi Hirayama | 59 | Director |
| Erling Hjort | 65 | Director |
| Christer Olsson | 56 | Director |
| Jacob B. Stolt-Nielsen | 39 | Director and Chief Executive Officer, SeaSupplier |
| Christen Sveaas | 45 | Director |
| Christopher J. Wright | 67 | Director |
| Jan Chr. Engelhardtsen | 50 | Chief Financial Officer |
| John Wakely | 54 | Executive Vice President |
| Reginald J.R. Lee | 58 | Chief Executive Officer, Stolt-Nielsen Transportation Group |
| Bernard Vossier | 57 | Chief Executive Officer, Stolt Offshore |
| James S. Lorentzen | 45 | Chief Executive Officer, Stolt Sea Farm |
| Samuel Cooperman | 57 | Chief Executive Officer, Optimum Logistics |

\*    As of March 31, 2002.

Under the terms of our Articles of Incorporation, our Directors may be elected for terms of up to six years, and serve until their successors are elected. It has been our practice to elect Directors for one-year terms. Under the Articles of Incorporation, the Board may consist of not fewer than three nor more than nine Directors at any one time. Our Board of Directors currently consists of nine members.

Mr. Jacob Stolt-Nielsen has served as Chairman of Stolt-Nielsen since he founded it in 1959. Mr. Stolt-Nielsen also serves as Chairman of the Board of Directors of Stolt Offshore. He held the position of Chief Executive Officer of Stolt-Nielsen from 1959 until 2000.

Mr. Niels G. Stolt-Nielsen has served as a Director of Stolt-Nielsen since 1996. From 1996 until September 2001 he held the position of Chief Executive Officer of Stolt-Nielsen. In 2000 he was appointed to the position of Chief Executive Officer of Stolt-Nielsen. Mr. Stolt-Nielsen joined Stolt-Nielsen in 1990 in Greenwich, working first as a shipbroker and then as round voyage manager. In 1994 he opened and organized Stolt-Nielsen's representative office in Shanghai. He is also a director of Stolt Offshore.

Mr. Fisher was elected a Director of Stolt-Nielsen in May 2002. He served as Deputy United States Trade Representative with the rank of Ambassador from 1997 to 2001, with primary responsibility for U.S. trade policy in Asia, Latin America, Mexico and Canada. He began his career with Brown Brothers Harriman & Co., rising to become Senior Manager of the firm, before creating Fisher Capital Management, where he was Managing Partner from 1987 until he joined the U.S. government in 1997. He is currently the Managing Partner of the Fisher Fund, L.P. and a member of the strategy board of Hicks, Muse, Tate, and Furst Inc.

Mr. Hirayama has been a Director of Stolt-Nielsen since 2000. He joined NYK Line ("NYK") in 1965 and has worked in both Japan and the U.S. in various positions within NYK. Mr. Hirayama is

presently Chairman and Chief Executive Officer of NYK Line (North America) Inc. and Senior Managing Director of NYK Line.

Mr. Hjort has served as a Director of Stolt-Nielsen since May 1995. He joined the Norwegian law firm of Wikborg, Rein & Co. in Oslo in 1964, where he was admitted to the bar in the same year. In 1970 he was admitted to the bar of the Supreme Court in Norway, and in 1993 he became the Senior Partner in Wikborg, Rein & Co.

Mr. Olsson has served as a Director of Stolt-Nielsen since 1993. He is Chairman of WalleniusWilhelmsen Lines A/S and Vice Chairman of Wallenius Lines AB. He also serves as Chairman of UECC and the Swedish Club, Vice Chairman of Gorthon Lines AB and a Director of B&N ABGC, Atlantic Container Line AB, B&N AB, and the Swedish Shipowners Association.

Mr. Jacob B. Stolt-Nielsen has served as a Director of Stolt-Nielsen since 1995. In 2000 he founded and currently serves as Chief Executive Officer of SeaSupplier Ltd. From October 1992 to March 2000, he was President, Stolthaven Terminals, with responsibility for SNTG's storage business. He joined Stolt-Nielsen in 1987 and has served in various positions in Oslo, Singapore, Greenwich, and Houston.

Mr. Sveaas was elected a Director of Stolt-Nielsen in May 2002. He is a private investor and chairs his own investment company, Kistefos AS, which has investments in shipping, offshore services, real estate and venture capital. He is a director of Orkla ASA and HemoCue AB, and is a senior advisor to the international investment firm EQT Scandinavia and EQT Northern Europe Limited.

Mr. Wright was elected a Director of Stolt-Nielsen in May 2002. He served as President and Chief Operating Officer of Stolt-Nielsen from 1986 to December 2001. He was employed by British Petroleum plc ("BP") from 1958 until the time he joined Stolt-Nielsen. He held a variety of positions at BP working in Scandinavia, Asia, the U.S. and London.

Mr. Engelhardtsen has served as Chief Financial Officer since 1991. He served as President and General Manager of Stolt-Nielsen Singapore Pte. Ltd. from 1988 through 1991. He has been associated with Stolt-Nielsen since 1974.

Mr. Wakely was appointed Executive Vice President, in January 2002 with responsibility for tax planning, internal audits and legal. He joined Stolt-Nielsen in 1988 and held various positions in the controllership, internal auditing and tax planning areas. He was employed by BP prior to his employment with Stolt-Nielsen.

Mr. Lee has served as Chief Executive Officer, Stolt-Nielsen Transportation Group since 2000. Previously, he served as Managing Director of Stolt Tank Containers. He joined Stolt-Nielsen in 1981.

Mr. Vossier was appointed Chief Executive Officer, Stolt Offshore in May 1995. Previously he served as Chief Operating Officer of that business from December 1994 to May 1995. He joined Comex in 1974.

Mr. Lorentzen has served as Chief Executive Officer, Stolt Sea Farm since September 2001. He has previously worked for Stolt-Nielsen in a number of marketing and management posts in the tanker and terminal divisions of the Stolt-Nielsen Transportation Group. Most recently he has held senior management positions with Belships in both Oslo and Singapore.

Mr. Cooperman has served as Chief Executive Officer, Optimum Logistics since 2000. He also serves as Chairman of Optimum Logistics Ltd., SeaSupplier Ltd. and Stolt-Nielsen Transportation Group Ltd. Previously, he served as Chief Executive Officer, Stolt-Nielsen Transportation Group and Chief Executive Officer of Stolt Parcel Tankers Inc. He joined Stolt-Nielsen in 1974.

Jacob B. Stolt-Nielsen and Niels G. Stolt-Nielsen are the sons of Jacob Stolt-Nielsen.

Under a Shareholders' Agreement between NYK and an entity controlled by the Stolt-Nielsen family, during the term of such agreement and for so long as NYK shall own at least 5,500,000 Common Shares, (or the equivalent thereof after any stock split or recapitalization), such entity shall support NYK's nomination of one person to our Board of Directors.

## Compensation

As described above, we do not have officers, but certain persons employed by our subsidiaries perform executive and administrative functions for the combined business of our subsidiaries. The aggregate annual compensation paid to the eight officers, excluding non-executive directors, performing such executive functions for us for the fiscal year ended November 30, 2001 (including profit sharing awards and certain benefits) was $3,172,000. In addition, $72,500 was contributed on behalf of such officers to defined contribution pension plans maintained by us and our subsidiaries. The Directors and executive officers also received stock option awards in 2001 for 135,000 Common Shares. During 2001, our executive directors received no compensation for their services as such, but received reimbursement of their out-of-pocket expenses. The non-executive directors, with the exception of NYK's nominated director, received an aggregate fee of $75,000 plus expenses.

### Profit Sharing Plan

We have Profit Sharing Plans which pays 10% of the net profits of each of our individual businesses (after specified adjustments) to the majority of the employees other than those covered by collective bargaining agreements. Under each such plan, the determination of an employee's individual award is based on performance, salary, and overall contribution to the business. SNTG's and SSF's Profit Sharing Plans are administered by a Compensation Committee appointed by our Board of Directors. The Stolt Offshore Profit Sharing Plan is administered by a Compensation Committee appointed by Stolt Offshore's Board of Directors. For the fiscal year ended November 30, 2001, no monies were paid by the Stolt Offshore Profit Sharing Plan to its officers and employees, while the SNTG and SSF Profit Sharing programs paid $4.5 million and $0.5 million, respectively, of which $180,000 was paid to those officers performing executive and administrative functions.

## Board Practices

The standing committees of the Board of Directors consist of an Audit Committee and a Compensation Committee.

### Audit Committee

The Audit Committee, formed in 1988, meets regularly to review our audit practices and procedures, scope and adequacy of internal controls and related matters, our financial statements and to advise the Board on such matters. The Audit Committee recommends to the Board of Directors the annual appointment of auditors, the scope of audit and other assignments to be performed by the auditors and the fees relating thereto. The Audit Committee also meets periodically with representatives of our auditors, to review the scope of our auditors' engagement with respect to the audit of our financial statements and to review the recommendations arising therefrom. The current members of the Audit Committee are Messrs. Hjort (Chairman) and Olsson. Mr. Carroll N. Bjornson, a former Director of Stolt-Nielsen who retired from the Board in 2002, was also a member of the Audit Committee in 2001 and early 2002.

### Compensation Committee

The Compensation Committee, formed in 1988, reviews and approves salaries for our executive officers, salary parameters for all other staff, profit sharing awards (if any, pursuant to our Profit

Sharing Plan) and stock option awards under our Stock Option Plan. The current members of the Compensation Committee are Messrs. Jacob Stolt-Nielsen (Chairman), Niels G. Stolt-Nielsen, Olsson and Wright. Mr. Carroll N. Bjornson, a former Director of Stolt-Nielsen who retired from the Board in 2002, was also a member of the Compensation Committee in 2001 and early 2002.

*Service Contracts*

No Director has a service contract that provides for benefits upon termination.

**Employees**

The average number of persons employed during the three years ended November 30, 2001 are as follows:

| | Average number of employees Years ended November 30, | | |
| --- | --- | --- | --- |
| | 2001 | 2000 | 1999 |
| Transportation[a] | 4,298 | 4,305 | 4,080 |
| Offshore Construction[b] | 5,370 | 4,770 | 4,202 |
| Seafood | 1,736 | 1,149 | 916 |
| All Other[c] | 67 | 44 | — |
| | 11,471 | 10,268 | 9,198 |

[a]   Corporate service employees are included within Transportation and related costs are allocated to the other business units based on services provided.

[b]   As of the year ended November 30, 2001 the total number of employees was approximately 6,500 comprised of 3,900 permanent employee and 2,600 temporary employees.

[c]   All Other includes the employees of Optimum Logistics Ltd. and SeaSupplier Ltd.

*Unions*

Twelve SNTG-owned ships are manned by Filipino officers and crew, eleven by Latvian officers and crew and four by Russian officers and crew. SNTG maintains its own crewing office and training center in Manila to provide Filipino officers and crew members for its fleet, all of whom belong to the Associated Marine Officers' and Seamen's Union of the Philippines. SNTG owns 49% of its crewing agent in Latvia to provide Latvian officers and crew members who belong to the Latvian Seafarers' Union of Merchant Fleet Riga, and those from Russia belong to the Seafarers' Union of Russia. All such unions are affiliated with the International Transport Workers Federation in London. The collective bargaining agreements currently in effect expire on December 31, 2002. Hourly employees at certain of SNTG's terminals are also covered by union contracts. A significant number of the Stolt Offshore's employees are represented by labor unions. As part of normal business, a number of union agreements come up for annual renegotiation in 2002. We have not experienced any significant work stoppages and consider our relations with our unionized employees and their unions to be good.

**Share Ownership**

Each of our Directors and executive officers, on an individual basis, and all Directors and executive officers as a group beneficially owns less than one percent of the Common Shares outstanding as of March 31, 2002. After consideration of Common Shares receivable upon exercise of employee stock options exercisable within 60 days after March 31, 2002, that are deemed to be beneficially owned at said date, none of our directors and executive officers would own more than one

percent of Common Shares on an individual basis. All Directors and executive officers as a group (15 persons) would own 1.6% of our Common Shares.

Reference is made to Item 7.—"Major Shareholders and Related Party Transactions" for a discussion of Common Shares owned by Fiducia Ltd., which is owned by trusts of which members of the Stolt-Nielsen family are beneficiaries. Total shares owned by Fiducia Ltd. and Jacob Stolt-Nielsen, Jacob B. Stolt-Nielsen and Niels G. Stolt-Nielsen represent 49.6% of the Common Shares outstanding as of March 22, 2002.

Our 1987 Stock Option Plan (the "1987 Plan") covers 2,660,000 Common Shares and our 1997 Stock Option Plan (the "1997 Plan") covers 5,180,000 Common Shares. No further grants will be issued under the 1987 Plan. Options granted under the 1987 Plan, and those which have been or may be granted under the 1997 Plan are exercisable for periods of up to ten years. The options granted under the 1987 Plan and the 1997 Plan are or will be at an exercise price not less than the fair market value per share at the time the option was or is granted. The 1987 Plan and the 1997 Plan are administered by a Compensation Committee appointed by our Board of Directors. The Compensation Committee awards options based on the grantee's position in Stolt-Nielsen, degree of responsibility, seniority, contribution to Stolt-Nielsen and such other factors as it deems relevant under the circumstances.

In March 2001, we completed a share reclassification whereby our outstanding non-voting Class B Shares were reclassified as Common Shares on a one-for-one basis. All Class B Shares issued in connection with the exercise of options will immediately convert to Common Shares upon issuance.

As of March 31, 2002, options for 3,466,780 Common Shares were outstanding under the 1987 and 1997 Plans. Of this total, options for 920,225 Common Shares were outstanding in accordance with their stated terms to our Directors and executive officers. None of our Directors or executive officers hold options exercisable for shares representing more than 1% of our outstanding Common Shares. The options are exercisable at the respective prices set out below and expire on the dates indicated:

| Exercise Price | Number of Common Shares For which Outstanding | Expiration Date |
|---|---|---|
| $ 0.00 | 295,616 | December 2002-December 2005 |
| 12.750 | 61,425 | December 2002 |
| 17.500 | 4,000 | August 2003 |
| 15.750 | 125,250 | December 2003 |
| 19.750 | 165,800 | December 2004 |
| 25.375 | 3,000 | June 2005 |
| 28.625 | 231,750 | December 2005 |
| 16.875 | 4,250 | September 2006 |
| 17.125 | 152,163 | December 2006 |
| 17.500 | 151,226 | December 2006 |
| 22.500 | 2,500 | August 2007 |
| 22.125 | 2,500 | August 2007 |
| 20.125 | 365,650 | December 2007 |
| 9.875 | 364,975 | December 2008 |
| 11.938 | 2,100 | April 2009 |
| 14.625 | 425,175 | December 2009 |
| 20.500 | 2,600 | October 2010 |
| 17.730 | 5,000 | December 2010 |
| 14.750 | 499,200 | December 2010 |
| 13.10 | 602,600 | December 2011 |
| | 3,466,780 | |

47

## Item 7. Major Shareholders and Related Party Transactions.

### Major Shareholders

We are not, directly or indirectly, owned by another corporation or by any government. There are no arrangements known to us, the operation of which may at a subsequent date result in a change in control of Stolt-Nielsen.

Set out below is information concerning the share ownership of all persons who owned beneficially 5% or more of our Common Shares and Founder's Shares as of March 22, 2002:

| Name of Beneficial Owner or Identity of Group | Number of Common Shares Owned | Percentage of Class | Number of Founder's Shares Owned | Percentage of Class |
|---|---|---|---|---|
| Fiducia Ltd., which is owned by Trusts of which the Stolt-Nielsen Family (including Niels G. Stolt-Nielsen and Jacob B. Stolt-Nielsen) are Beneficiaries . . . . . . . . . . . . . . . | 27,253,129(a) | 49.6% | — | — |
| Jacob Stolt-Nielsen . . . . . . . . . . . . . | — | — | 13,731,108 | 100% |
| Nippon Yusen Kaisha Ltd. ("NYK") . | 5,500,000 | 10.0% | — | — |
| Odin Forvaltning AS . . . . . . . . . . . . | 3,173,730 | 5.8% | — | — |

(a) Includes aggregate of 247,974 Common Shares owned by Jacob Stolt-Nielsen and members of his immediate family, including Jacob B. Stolt-Nielsen and Niels G. Stolt-Nielsen.

As of March 22, 2002, there were 15,653,311 Founder's Shares issued of which 13,731,108 were owned by Mr. Stolt-Nielsen and 1,922,203 were held by us as Treasury Shares. As a result of the ownership of the Founder's Shares, and his beneficial ownership of Common Shares noted above, Mr. Stolt-Nielsen and his family control 59.7% of our outstanding voting securities.

As of March 22, 2002, Stolt-Nielsen Transportation Group Ltd. owned 7,688,810 Common Shares. Under applicable provisions of the Luxembourg Company Law, these shares remain issued but are not entitled to vote. In computing earnings per Common Share, these shares are not considered part of outstanding shares. The cost of these shares is being accounted for similar to treasury stock, as a deduction from shareholders' equity.

There has been no significant change in the percentage ownership held by the major shareholders listed in the above table during the past three years. Fiducia Ltd.'s percentage ownership has ranged from 49.6% to 49.9% and NYK's percentage ownership has ranged from 10.0% to 10.1% over the past three years.

As of March 22, 2002, all of our 62,613,247 Common Shares were registered in the Verdipapirsentralen ("VPS") in the names of 958 shareholders. Excluding Treasury Common Shares held by Stolt-Nielsen Transportation Group Ltd., outstanding Common Shares registered in the name of Fiducia Ltd. and NYK and outstanding Common Shares registered in the name of Citibank N.A. as depositary for the ADSs, it is estimated that the free float of Common Shares on the Oslo Stock Exchange is 13,500,708. As of March 22, 2002, there was a total of 40,496,667 ADSs registered in the names of 236 shareholders. Of the ADSs, 10,810,973 ADSs were registered in the names of 120 shareholders having U.S. addresses (although some of such ADSs may be held on behalf of non-U.S. persons). Based on communications with banks and securities dealers who hold our ADSs in street name for individuals, we estimate the number of beneficial owners of ADSs is approximately 2,500. Excluding outstanding ADSs registered in the name of Fiducia Ltd. and NYK and Treasury ADSs registered in the name of the Stolt-Nielsen Transportation Group Ltd., it is estimated that the free float of ADSs on Nasdaq is 8,670,600.

**Related Party Transactions**

We have provided Stolt Offshore with a $65.0 million unsecured bridge loan to enable it to partially fund the purchase of 6,142,847 shares from Vinci. The loan is subordinated to Stolt Offshore's principal credit facility and bears interest at a rate of 4.75% per annum as well as an upfront fee of $65,000. Under the terms of the loan, repayment is to be made on the earlier of either the date of the receipt of the proceeds from the sale of Stolt Offshore's Common Shares as described in Item 4. Information on the Company—History and Development of Stolt-Nielsen, or August 2, 2002.

**Item 8. Financial Information.**

**Consolidated Statements and Other Financial Information**

The information included under the captions "Report of Independent Public Accountants," "Consolidated Financial Statements" and "Notes to Consolidated Financial Statements" filed with the Securities and Exchange Commission as an exhibit to Form 6-K/A on May 31, 2002 is incorporated herein by reference.

**Legal Proceedings**

We are involved in legal proceedings from time to time incidental to the ordinary conduct of our business.

Coflexip S.A. ("CSO") has commenced legal proceedings through the U.K. High Court against three subsidiaries of Stolt Offshore claiming infringement of a certain patent held by CSO relating to flexible flowline laying technology in the U.K. Judgement was given on January 22, 1999 and January 29, 1999. The disputed patent was held valid. Stolt Offshore appealed and the Appeal Court maintained the validity of the patent and broadened its application compared to the High Court decision. Stolt Offshore has applied for leave to appeal the Appeal Court decision to the House of Lords, which has now been denied. The result of these court decisions is that the flexible lay system tower on *Seaway Falcon*, and the process by which the system lays flexible conduits, has been held to infringe CSO's patent in the United Kingdom. During 2001, CSO submitted an amended claim to damages claiming lost profits on a total of 15 projects. In addition, there is a claim for alleged price depreciation on certain other projects. The total claim is for approximately $89.0 million, up from approximately $14.0 million claimed previously, plus interest, legal costs and a royalty for each time that the flexible-lay system tower on the *Seaway Falcon* was brought into U.K. waters. Stolt Offshore estimates that the total claim will amount to approximately $115.0 million. In the alternative, CSO claims a reasonable royalty for each act of infringement, interest and legal costs. CSO has not quantified this claim, but it will be considerably less than the claim to lost profits. Stolt Offshore, in consultation with its advisers, has assessed that the range of possible outcomes for the resolution of damages is $1.5 million to $115.0 million and has determined that there is no amount within the range that is a better estimate than any other amount. Consequently, in accordance with SFAS No. 5, *Accounting for Contingencies,* Stolt Offshore has reserved $1.5 million in its financial statements, being the lower amount of the range. The amount of damages is nevertheless uncertain and no assurances can be given that the amount provided is sufficient.

In September 1999, Stolt Offshore terminated its charter of the ship, *Toisa Puma*, for default. Stolt Offshore is currently in arbitration with the owners, who are contesting that the termination was wrongful. The arbitration has held that the ship was in breakdown, but that the termination was nevertheless wrongful. Stolt Offshore applied for leave to appeal the decision to the High Court, which has been denied. During 2001, the owner has quantified their claim to approximately $8.0 million. Stolt Offshore has disputed the magnitude of the claim in relation to lack of instigation, lack of cost savings and lack of actual loss for parts of the claim. In addition, Stolt Offshore has a counterclaim related to the breakdown of the ship. Stolt Offshore, in consultation with its advisers, has assessed the range of

possible outcomes for the resolution of damages with the upper amount being $8 million. Stolt Offshore has determined that there is no amount within the range that is a better estimate than any other amount. Consequently, in accordance with SFAS No. 5, Stolt Offshore has provided in the financial statements an amount to cover the liability for damages which is at the lower amount of the range. The amount of such liability is nevertheless uncertain and no assurance can be given that the amount provided is sufficient.

Legal costs are expensed as incurred.

Litigation is subject to many uncertainties, and the outcome of individual matters is not predictable with assurance. It is reasonably possible that the final resolution of any litigation could require us to make additional expenditures in excess of reserves that we may establish. In the ordinary course of business, various claims, suits and complaints have been filed against us in addition to those specifically referred to above. Although the final resolution of any such other matters could have a material effect on our operating results for a particular reporting period, we believe that they should not materially affect our consolidated financial position.

## Dividends

The following table shows the total dividend payments per Common Share, Class B Share, and Founder's Share made during the fiscal years indicated.

| Class of Stock | 1997 | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|
| Common . . . . . . . . . . . . . . . . . . . . . . . | $0.500 | $0.500 | $0.375 | $0.250 | $0.250 |
| Class B* . . . . . . . . . . . . . . . . . . . . . | $0.500 | $0.500 | $0.375 | $0.250 | $0.125 |
| Founder's . . . . . . . . . . . . . . . . . . . . . | $0.005 | $0.005 | $0.005 | $0.005 | $0.005 |

\*    In March 2001 all Class B Shares were reclassified as Common Shares on a one-for-one basis.

The 2001 figures represent the interim and final dividend for 2000. An interim dividend for 2001 of $0.125 per Common Share and $0.005 per Founder's Share was declared on November 13, 2001 and paid on December 19, 2001. The shareholders at our Annual General Meeting, held on May 2, 2002, approved a final dividend for 2001 of $0.125 per Common Share which was paid on May 29, 2002 to shareholders of record as of May 13, 2002.

## Significant Changes

Except as described in Note 21 to the Consolidated Financial Statements, there have been no significant changes since November 30, 2001.

## Item 9. The Offer and Listing.

### Stock Trading History

The following table sets out the range of high and low closing prices for our publicly traded shares for the periods indicated.

### Common Shares (Nasdaq)

| Quarterly for the two years ended November 30, 2001 and for the quarter ended February 28, 2002 | Qtr. 1 | Qtr. 2 | Qtr. 3 | Qtr. 4 |
|---|---|---|---|---|
| **2002** | | | | |
| High | $15.74 | — | — | — |
| Low | $12.28 | — | — | — |
| **2001** | | | | |
| High | $18.00 | $20.27 | $20.45 | $14.55 |
| Low | $15.75 | $14.94 | $14.45 | $10.50 |
| **2000** | | | | |
| High | $18.75 | $22.00 | $22.00 | $21.00 |
| Low | $11.75 | $15.25 | $16.06 | $17.00 |

| Annually for the five years ended November 30, | 2001 | 2000 | 1999 | 1998 | 1997 |
|---|---|---|---|---|---|
| High | $20.45 | $22.00 | $16.75 | $22.38 | $28.50 |
| Low | $10.50 | $11.75 | $ 9.00 | 10.38 | $16.38 |

### Common Shares (Oslo Stock Exchange) (Norwegian Kroner)

| Quarterly for the year ended November 30, 2001 and for the quarter ended February 28, 2002 | Qtr. 1 | Qtr. 2 | Qtr. 3 | Qtr. 4 |
|---|---|---|---|---|
| **2002** | | | | |
| High | 145.00 | — | — | — |
| Low | 112.00 | — | — | — |
| **2001** | | | | |
| High | — | 185.50 | 189.00 | 130.00 |
| Low | — | 136.00 | 128.00 | 93.00 |

### Class B Shares (Nasdaq) (ADSs)*

| Quarterly for the year ended November 30, 2000 and for the quarter ended February 28, 2001 | Qtr. 1 | Qtr. 2 | Qtr. 3 | Qtr. 4 |
|---|---|---|---|---|
| **2001** | | | | |
| High | $17.73 | — | — | — |
| Low | $14.75 | — | — | — |
| **2000** | | | | |
| High | $19.13 | $20.50 | $25.00 | $22.75 |
| Low | $14.63 | $16.25 | $16.88 | $17.13 |

| Annually for the five years ended November 30, | 2001* | 2000 | 1999 | 1998 | 1997 |
|---|---|---|---|---|---|
| High | $17.73 | $25.00 | $19.25 | $23.50 | $31.38 |
| Low | $14.75 | $14.63 | $ 9.88 | $ 9.50 | $16.75 |

### Class B Shares (Oslo Stock Exchange) (Norwegian Kroner)*

| Quarterly for the year ended November 30, 2000 and for the quarter ended February 28, 2001 | Qtr. 1 | Qtr. 2 | Qtr. 3 | Qtr. 4 |
|---|---|---|---|---|
| **2001** | | | | |
| High | 167.00 | — | — | — |
| Low | 130.00 | — | — | — |
| **2000** | | | | |
| High | 160.00 | 180.00 | 225.00 | 215.00 |
| Low | 120.00 | 145.00 | 150.00 | 165.00 |

51

| Annually for the five years ended November 30, | 2001* | 2000 | 1999 | 1998 | 1997 |
|---|---|---|---|---|---|
| High | 189.00 | 225.00 | 148.00 | 170.00 | 220.00 |
| Low | 93.00 | 120.00 | 73.00 | 75.00 | 113.50 |

The following table sets out the range of high and low closing prices for our Common Shares for the most recent six months ended April 30, 2002.

| | Nasdaq—ADS (U.S. Dollars) | | Oslo Stock Exchange (Norwegian Kroner) | |
|---|---|---|---|---|
| | High | Low | High | Low |
| **2001** | | | | |
| November | $13.99 | $13.20 | 124.00 | 115.00 |
| December | $15.63 | $13.10 | 141.00 | 120.00 |
| **2002** | | | | |
| January | $15.74 | $13.66 | 142.00 | 120.00 |
| February | $13.65 | $12.28 | 126.00 | 112.00 |
| March | $16.97 | $14.26 | 145.00 | 126.00 |
| April | $17.52 | $16.45 | 152.00 | 142.00 |

---

\*   On March 7, 2001 we completed a share reclassification in which the then outstanding Class B Shares were converted to Common Shares on a one-for-one basis; on that date, trading in the Class B Shares on Nasdaq and the Oslo Stock Exchange ceased. Our Common Shares are currently listed in Norway on the Oslo Stock Exchange (under the ticker symbol SNI) and trade as American Depositary Shares ("ADSs"), each of which represents one Common Share, in the United States on Nasdaq (under the ticker symbol SNSA).

### Markets

Our Common Shares are currently listed in Norway on the Oslo Stock Exchange (under the ticker symbol SNI) and trade as ADSs, each of which represents one Common Share, in the United States on the Nasdaq National Market (under the ticker symbol SNSA). On March 7, 2001, we completed a share reclassification. The objective of the reclassification was to create a simplified and more transparent share capital structure that gives all shareholders a vote on all matters, and results in only one class of publicly traded shares. The reclassification reclassified our outstanding non-voting Class B (previously listed on the Oslo Stock Exchange under the ticker symbol SNIB and traded as ADSs on Nasdaq under ticker symbol STLBY) as voting Common Shares on a one-for-one basis. Prior to the share reclassification, our Common Shares were only listed on Nasdaq (under the ticker symbol STLTF).

### Item 10. Additional Information

### Organization and Register

We are a "Société Anonyme Holding" organized in the Grand Duchy of Luxembourg under the Company Law of 1915, as amended. We were incorporated in Luxembourg in 1974 as the holding company for all of the group's activities.

Our registered office is located at 23, avenue Monterey, L-2086 Luxembourg and we are registered in the Companies' Register of the Luxembourg District Court under the designation "R.C. Luxembourg B.12.179".

## Articles of Incorporation

*Set forth below is a description of the material provisions of our Articles of Incorporation and the Luxembourg Company Law. The following summary is qualified by reference to the Articles of Incorporation and applicable Luxembourg law. The full text of the Articles of Incorporation is available at our registered office.*

### Objects and Purposes

Article Three of our Articles of Incorporation sets forth our object as a holding company, namely participation in any manner in all commercial, industrial, financial and other enterprises of Luxembourg or foreign nationality through the acquisition by participation, subscription, purchase, option or by any other means of all shares, stocks, debentures, bonds or securities; the acquisition of patents and licenses which we will administer and exploit; we may lend or borrow with or without security, provided that any money so borrowed may only be used for the purposes of Stolt-Nielsen, or companies which are subsidiaries of or associated with or affiliated with Stolt-Nielsen; and in general to undertake any operations directly or indirectly connected with such objects as permitted by the Luxembourg Holding Company Law of 1929.

### Directors

The Board of Directors is comprised of at least three and not more than nine members, elected by a simple majority of our outstanding shares represented at a general meeting of shareholders, for a period not exceeding six years and until their successors are elected. It is our customary practice that Directors are elected for terms of one year at the Annual General Meeting of Shareholders held each year in Luxembourg.

Our Articles of Incorporation do not mandate the retirement of Directors under an age limit requirement.

Our Articles of Incorporation do not require Directors to be shareholders in Stolt-Nielsen.

Under Luxembourg law and our Articles of Incorporation, the members of the Board of Directors owe a duty of loyalty and care to Stolt-Nielsen. They must exercise the standard of care of a prudent and diligent business person and bear the burden of proving they did so if their actions are contested.

Our Articles of Incorporation provide that no transaction between Stolt-Nielsen and another party in which a Director serves as a director, officer or employee, will be invalidated solely for that reason. The Articles also provide that any Director who has a personal interest in a transaction must disclose such interest, must abstain from voting on such transaction and may not be counted for purposes of determining whether a quorum is present at the meeting. Such Director's interest in any such transaction shall be reported at the next meeting of shareholders.

### Authorized Shares

Our authorized share capital consists of:

- 120,000,000 Common Shares, no par value

- 30,000,000 Founder's Shares, no par value

Under the Luxembourg Company Law, Founder's Shares are not considered as representing capital of our company.

Pursuant to our Articles of Incorporation, and as required by Luxembourg law as presently in effect, authorized capital will automatically be reduced to the amount represented by outstanding shares on the fifth anniversary date of the publication of the most recent amendment of the Articles

53

revising our authorized capital. Amendments increasing and amending our authorized capital were approved at an Extraordinary General Meeting held on March 6, 2001, and publication of such amendment in the *Official Gazette* took place on October 29, 2001. From time to time we take such steps as are required to continue the authorized capital in effect.

The Board of Directors is authorized to issue additional Common Shares and Founder's Shares, from time to time, up to the maximum authorized number. The Articles of Incorporation require all shares to be issued in registered form. All shares, when issued, are fully paid and non-assessable. All shares are freely transferable by the holder thereof.

As a general rule, shareholders are entitled to preemptive rights under Luxembourg law in respect of the issuance of shares of the same class of shares for cash, unless the Articles of Incorporation provide otherwise. Our Articles authorize the Board of Directors to deny shareholders' preemptive rights for a period of five years, and our Board of Directors has done so, with respect to all authorized but unissued Common Shares. Upon the expiration of authorized but unissued shares as described above, the suppression of preemptive rights will also terminate and shareholders will be entitled to preemptive rights once again unless the Board recommends denying further such rights and such recommendation is approved by the shareholders. As a result, based on publication of the amendment to our Articles of Incorporation in October 2001, Common Shares will not be entitled to preemptive rights for a period of at least five years ending October 2006.

Our Articles of Incorporation contain an anti-dilution provision which maintains the level of Founder's Shares at 20% of all outstanding voting shares (Common Shares and Founder's Shares). In the event of a stock dividend, recapitalization or other issuance of our Common Shares, additional Founder's Shares are distributed to the then holder(s) of such Founder's Shares on a proportionate basis so as to maintain the 20% level at all times.

In addition to our authorized Common Shares and Founder's Shares set forth above, an additional 1,500,000 Class B Shares, no par value, have been authorized for the sole purpose of options granted under our existing stock option plans, and may not be used for any other purpose. The rights, preferences and priorities of such Class B Shares are set forth in the Articles of Incorporation. All such Class B Shares convert to Common Shares immediately upon issuance. Such authorized Class B Shares and all of the rights relating thereto shall expire, without further action, on December 31, 2010.

*Voting Rights*

Except for matters where applicable law requires the approval of both classes of shares voting as separate classes, Common Shares and Founder's Shares vote as a single class on all matters submitted to a vote of the shareholders, with each share entitled to one vote. Under Luxembourg law, shareholder action can generally be taken by a simple majority of Common Shares and Founder's Shares present or represented at a meeting, without regard to any minimum quorum requirements. Three exceptions to the law are (i) to amend the Articles which requires (x) a two-thirds vote of those Common Shares and Founder's Shares present or represented, and (y) when the meeting is first convened, a quorum of 50% of the outstanding shares entitled to vote, (ii) to change the country of incorporation of Stolt-Nielsen to a country other than Luxembourg or to increase the contribution of the shareholders, which require the affirmative vote of 100% of the Common Shares and Founder's Shares, and (iii) any action for which the Articles require more than a majority vote or a quorum. Luxembourg law further provides that a two-thirds majority vote of those shares present or represented and when the meeting is first convened, a quorum of 50% of such shares, of the outstanding Common Shares and Founder's Shares, each voting and counted for quorum purposes as a separate class, is required to authorize any amendment to the Articles in respect of a recapitalization, reclassification and similar transactions affecting the relative rights, preferences and priorities of the Common Shares and Founder's Shares if such class of shares is adversely affected thereby.