# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| _____ X | |
| JOEL MENKES, Individually and on Behalf Of All Others Similarly Situated, ) | Civil Case No. 3:03cv409 (DJS) |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| STOLT-NIELSEN SA, JACOB STOLT-NIELSEN, ) | |
| NIELS G. STOLT-NIELSEN, SAMUEL ) | |
| COOPERMAN and REGINALD JR. LEE, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |
| X | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT**

**ORAL ARGUMENT REQUESTED**

Lead Plaintiffs Ilene and Gustav Rucker respectfully submit this memorandum of law in opposition to defendants' motion to dismiss the amended complaint.

## PRELIMINARY STATEMENT

This securities-fraud action is extraordinary, both in the crimes that defendants committed and in the global reach of those crimes. What crimes? Antitrust and embargo violations. While some of the decisions to break United States law happened in and around this District, the crimes happened in such far-flung places as Sudan, Iran, Cuba, Dubai, Norway, and Australia. The defendants' rigging bids, fixing prices, and trading with America's enemies did not amount to securities fraud. Nor did their failure to admit culpability for those crimes.

What amounted to securities fraud was defendants' leading the market to believe that business was improving because of "improved demand," when in fact, business "improved" because of cooperation – illegal cooperation – between the defendants and a few chief competitors. What amounted to securities fraud (and what defendants gloss over) is their flouting disclosure requirements under the federal securities laws – disclosure requirements that mandate disclosure of such things as "any risks attendant to foreign operations."[1] What amounted to securities fraud was defendants' misleading investors to believe that business was improving because of "increasing demand," when in fact, systematic violations of United States trade embargos helped drive revenue.

Now, defendants seek to avoid liability by arguing that federal securities laws impose no duty on defendants to admit the culpability of their actions. Defendants' argument fails because it is imprecise. The federal securities laws indeed impose no requirement that an issuer engage in public *mea culpas*. But those laws do require, first, that risks to earnings be disclosed; that those

---

[1]     *See* 17 C.F.R. § 229.101(d)(3) (Item 101(d)(3) of Regulation S-K).

risk disclosures themselves not be false and misleading; and that, having chosen to speak, that defendants speak the whole truth, not just part of it.  The defendants here did none of this.

## FACTUAL BACKGROUND

Few Americans travel to Iran, Sudan, or Cuba.  Few American companies do business in those countries – and for good reason.  All three countries are the subject of United States trade embargos.  Cuba has been on the list the longest.  Iran joined about the time militants seized and held Americans at the U.S. embassy in Tehran twenty-plus years ago and remains on the list today because that country actively supports terrorists and seeks weapons of mass destruction ("WMD's").  Sudan is the newcomer; she joined in 1997 after years of supporting and sheltering terrorists.  But none of this mattered to Stolt-Nielsen, S.A. ("SNSA"), its wholly-owned subsidiary Stolt-Nielsen Transportation Group ("SNTG"), or the individual defendants here.

As early as the summer of 1992 (and perhaps even earlier), SNTG's ship, the Condor, off-loaded diesel fuel in Cienfuegos and Santiago, Cuba.  But the defendants did not do this openly.  They code-named each Cuban port so their ships would not risk detection by openly transmitting the names of Cuban ports.  The defendants also falsified documents to further conceal their law-breaking.[2]  And they went further still when a SNTG official sent the Condor's captain a fax forbidding the captain from contacting SNTG's Greenwich, Connecticut office by telex or fax.[3]

Like Cuba, Sudan opened its arms and ports to SNSA and SNTG ships.  Between 1998 and 2000, the defendants' ships off-loaded cargo in Sudan – everything from a gasoline additive to molasses.  Sudan, however, apparently has a few rules of its own: to off-load cargo in

---

[2]     *See* Consolidated Amended Class Action Complaint ¶ 48 (cited as "Complaint ¶ __").

[3]     Complaint ¶ 49.

Sudan, one must pay Sudanese port officials "incidental port expenses," i.e., bribes. The defendants paid.[4]

Like Sudan, Iran trains, shelters, and supports terrorists bent on harming Americans anywhere they can find us. And like Sudan, Iran likes doing business with SNSA and SNTG. Unlike Cuba and Sudan, however, Iran needed SNSA and SNTG to ship goods out of Iran.[5] As with Cuba and Sudan, the defendants needed to keep their dealings a secret, but code-named ports and faked documents would not be enough hide the deal with Iran. The defendants needed a front company.[6] So, in 2000, SNSA and SNTG went to an Australian company to set up front company – a joint venture called Botany Bay Shipping ("Botany").[7] Botany's sole purpose was to ship oil and chemicals out of Iran for sale around the world.

Despite defendants' best efforts to keep secret their deal with Iran failed. SNTG's General Counsel at the time, Paul O'Brien (O'Brien), warned SNSA and SNTG that the Iran deal threatened to violate U.S. trade laws. Being a lawyer, O'Brien covered his rear; he sent an e-mail to, among others, Alan Windsor ("Windsor").[8] Windsor was, and remains, SNSA's General Counsel. Another recipient of O'Brien's e-mail admitted that O'Brien was dead right and that defendants knew they should not be doing business with Iran.[9] (Ultimately, O'Brien's diligence and conscience would cost him his job.)

---

[4]     Complaint ¶ 5, ¶ 50.

[5]     Complaint ¶ 56.

[6]     Complaint ¶ 58.

[7]     Complaint ¶ 52.

[8]     Complaint ¶ 54.

[9]     Complaint ¶ 55.

Neither O'Brien's warning nor the defendants' own knowledge deterred defendants. Rather than pulling the plug on their Iranian deals, the defendants sought more deals with Iran. They pursued setting up a joint venture with the Iranians themselves. It was big – 660,000 tons of chemicals a year.[10] SNSA or SNTG would supply the ships; the Iranians would supply the cargo (oil or chemicals); and the Stolt-Iran joint venture would split the profits evenly between SNSA and Iran.[11] Defendants did this with no thought towards the inescapable fact that putting money into Iran's pockets might well pay for the next terrorist attack or help fund Iran's quest for WMD's. Not even the horrific terrorist attacks of September 11, 2001, which killed more Americans than did the attack on Pearl Harbor sixty years ago, moved the defendants away from their planned joint venture with Iran.[12]

Only Treasury Department inquiries and Justice Department criminal probes ended defendants' trading with rogue states. In late 2002 when SNSA and SNTG revealed that the Treasury Department was investigating SNSA's and SNTG's activities in Sudan. That investigating led to defendants' paying a $95,000 civil penalty for the bribes paid to Sudanese port officials.[13] Now, the Justice Department has launched criminal probes into the defendants' activities in Cuba, Sudan, and Iran.[14]

How does any of this relate to the federal securities laws? Easy. For years, the defendants' illegal activities had added significantly to SNSA's revenues, which were reported in

---

[10]     Complaint ¶ 58.

[11]     Complaint ¶ 57.

[12]     Complaint ¶ 58.

[13]     Complaint ¶ 4.

[14]     Complaint ¶ 47.

financial statements filed with the United States Securities & Exchange Commission ("SEC"). Before the November 2002 announcement, never did defendants tell their shareholders or the market at large about the deliveries to Cuba and Sudan, the "incidental port expenses" paid to Sudanese port officials, or the deals with Iran.[15]  Instead, the defendant misled the market to believe that profits came from legitimate business.  Nor did the defendants disclose risks attendant to such foreign operations.  What risks?  Risks that the revenue would end when the embargo violations came to light and the federal government started calling defendants to account for their law-breaking – risks now realized in the wake of the federal government's investigations and criminal probes.

Unfortunately, the defendants did not limit their law-breaking to flouting U.S. embargos against rogue states.  Defendants also flouted U.S. antitrust laws by conspiring with their largest competitors – Norwegian shipping giant Odfjell and Japanese shipping giant Tokyo Marine. Defendants, Odfell, and Tokyo Marine conspired to "carve up the world" by rigging bids and fixing prices on shipping contacts in a scheme exposed along with the embargo violations.[16]  Defendants' antitrust violations had the same buoying effect on SNSA's publicly-reported financials as did defendants' embargo violations.  And  again, defendants attributed improving earnings and performance to legitimate business [17] and misled the market about SNSA's and SNTG's cooperation with competitors.[18]

And SNTG's shipping business, particularly its parcel tanker business, provides SNSA its life's blood.  For example, in 2001, SNTG accounted for almost forty percent of SNSA's

---

[15]     Complaint ¶ 19, ¶ 59.

[16]     Complaint ¶ 32, ¶ 37.

[17]     Complaint ¶ 68.

[18]     Complaint ¶ 70.

operating revenue and about ninety-four percent of income from operations.[19]  According to SNSA's filings with the SEC, SNTG's parcel tanker division, with its seventy-four tankers, will only take on increasing importance in the company's future; in 1994, SNSA started building twenty-five new parcel tankers.[20]

SNTG's parcel tanker operations "remain SNTG's single largest activity" and a huge contributor to SNSA's reported profits.[21]  But the parcel tanker division does not stand alone.  According to SNSA's filings with the SEC, the parcel tanker division is "fully integrated" with the rest of SNSA's tanker business.[22]  Thus, any anti-competitive conduct involving the parcel tanker division would not only be crucial to SNSA's publicly-reported profits but implicates other parts of SNSA's "fully integrated" tank container business and terminal operations.[23]

SNTG's growing fleet of parcel tankers came under direct threat from two independent sources in that late 1990's and early 2000: (1) Asia's stagnating economy, and (2) an announced merger between SNTG's and Odfjell's two biggest customers, Dow and Union Carbide.[24]  Desperate to ensure its 70-plus parcel tanker fleet bucked these trends and had full cargo holds for top-dollar rates, SNTG executive Wingfield worked tirelessly.[25]

---

[19]    Complaint ¶ 12.

[20]    Exhibit B at 17.

[21]    Exhibit B at 6.

[22]    Exhibit B at 6.

[23]    Exhibit B at 17 ("SNTG's terminal operations support its parcel tanker operations[.]"); *see also* Exhibit B at 22 (discussing interchangeably SNTG's parcel tanker and tank container operations).

[24]    Complaint ¶ 34, ¶ 36.

[25]    Complaint ¶ 40 (Wingfield boasting that the Dow contracts were "all but locked up" and that SNTG had a lot of help from their "friends in the mountains," i.e., Odjfell.); Complaint ¶ 39(b) (Wingfield spent much of the afternoon on March 30, 2001 "reviewing the status of contracts around the world, trade lane by trade

Unfortunately, Wingfield worked tirelessly not to market SNTG's services to customers. Instead, Wingfield worked to fix prices and rig bids starting in about 1998.[26] At a meeting in SNTG's Greenwich offices in 1998, Andrew Pickering ("Pickering"), then-head of tanker trading for SNTG, said that Norwegian shipping giant Odfjell and Stolt had reached an agreement that certain customers belonged to Stolt and others to Odfjell – that they had "carved up the world."[27] Pickering's announcement alarmed many at SNSA and SNTG, including Kenneth Bloom ("Bloom"), vice-president of logistics for SNSA or SNTG.

Bloom immediately reached out to SNTG's then-chairman, defendant Cooperman and told Cooperman that "carv[ing] up the world" with Odfjell raised serious antitrust concerns. But Cooperman did nothing to undo SNTG's illegal deal with Odfjell. Nor did he disclose in any SNSA filing with the SEC that Odfjell and SNTG were cooperating. Cooperman's inaction would ultimately lead to Cooperman's being replaced and retired early shortly after the scandal broke.[28]

In addition to Odfjell, SNTG conspired with an Asian competitor, Tokyo Marine. Again, Wingfield was driving SNTG's efforts, and amazingly, he kept a journal of his exploits.[29] Wingfield's exploits included many meetings between SNTG and Odfjell and an analysis that conspiring with competitors would keep shipping rates on key contracts five to twenty-five percent higher than the rates would otherwise be in a slow economy.[30] Apparently, Wingfield loved

---

lane" and that both SNTG and Odfjell would "talk to Dow and compare notes.").

[26]    Complaint ¶ 33.

[27]    Complaint ¶ 33.

[28]    Complaint ¶ 35.

[29]    Complaint ¶ 38.

[30]    Complaint ¶ 39.

detailing his exploits because, in addition to keeping a journal that will now be evidence in his federal criminal trial, Wingfield announced on January 24, 2002, that the Dow contracts were "all but locked up."[31]    Like his announcement three years earlier had alarmed Pickering, this announcement by Wingfield unsettled SNTG's General Counsel O'Brien.

Like Pickering before him, O'Brien went to SNTG's chairman, defendant Cooperman.  O'Brien implored Cooperman to suspend Wingfield; launch an investigation; and stop SNTG's illegal activities.  Cooperman rebuffed O'Brien, and instead, allowed Wingfield to give an antitrust seminar.[32]  Again, Cooperman did nothing vis-a-vis SNSA's SEC filings.  He continued to let investors believe that SNTG's performance was improving because of legitimate demand when, in fact, the performance was due, in part, to SNTG's collusive deals with Odjfell and Tokyo Marine.[33]  Disgusted, O'Brien quit because he could no longer look the other way.[34]

Eventually, all of the chickens came home to roost when word finally got out about the defendants' illegal practices.  And when that happened, SNSA's stock price hit the skids.  In late 2002 and early 2003, Irene and Gustav Rucker (the "Ruckers" or "Lead Plaintiffs") and thousands like them watched helplessly as the value of their investments in SNSA securities collapsed.[35]  The first drop happened on November 22, 2002, when SNSA admitted that the U.S. Treasury Department suspected SNTG of trading with Iran, in violation of long-standing U.S. trade embargos against that

---

[31]    Complaint ¶ 40.

[32]    Complaint ¶ 42, ¶ 44.

[33]    Complaint ¶ 68.

[34]    Complaint ¶ 42.

[35]    Complaint ¶¶ 80-86.

country.[36]  More bad news befell SNSA's investors, when the *Wall Street Journal* ("*Journal*") reported that the defendants' conspiracy to rig bids and fix prices on major shipping contracts had inflated revenues on those contracts by as much as twenty-five percent.[37]  By June 2003, the United States filed a criminal complaint against SNTG executive Richard B. Wingfield, who posted $500,000 bail and now awaits trial on federal antitrust violations.[38]

Now, in addition to this securities-fraud class action, defendants are swamped with litigation – litigation brought on by defendants' antitrust and embargo violations and by their efforts to hide those crimes.  One fired Stolt-Nielsen Transportation Group ("SNTG") executive faces federal criminal charges.  Dow Chemical and Union Carbide, angry about being gouged by over-priced shipping contracts, are now suing the defendants.  SNTG's former general counsel is also suing because, he says, the defendants forced him out when he blew the whistle on their illegal conduct.  The defendants' misconduct also caught the eye of the Department of Justice, which is investigating the antitrust violations has launched a criminal investigation of the embargo violations. All of these risks were obvious to the defendants, yet they said nothing to investors.

## LEGAL ARGUMENT

I.    **THE FEDERAL SECURITIES LAWS REQUIRED DISCLOSURE OF MATERIAL FACTS ABOUT DEFENDANTS' OPERATIONS OVERSEAS, INCLUDING FACTS THAT MIGHT INDICATE WRONGDOING.**

Contrary to what defendants argue, the federal securities laws indeed require that defendants disclose such matters as risks attendant to their foreign operations[39] and to describe

---

[36]    Complaint ¶ 80.

[37]    Complaint ¶ 83.

[38]    *See* Complaint ¶ 4.

[39]    See 17 C.F.R. § 229.101(d)(3).

material contracts.[40]  But defendants did not; instead, they omitted to disclose material facts about

SNTG's foreign operations in countries such as Iran, Sudan, and Cuba.[41]  They omitted to disclose

the cooperation between SNTG and its competitors like Tokyo Marine and Odfjell – cooperation

that kept shipping rates high on contracts with such important customers as Dow Chemical and

Union Carbide[42] and they made affirmative statements concerning improving revenues without

disclosing the true reasons for those improving results.

      Nor do the misleading and boilerplate nature of defendants' purported risk disclosures

shield defendants from liability under the federal securities laws especially where, as here, the

defendants issued purported risk disclosures – heralded in defendants' Opening Brief – that federal

courts characterize as "deceit."[43]

> ### A.    Defendants' Own Statements Mandated That Defendants Disclose Facts Concerning Bid-Rigging, Price-Fixing, And Embargo-Violating.

      SNSA's bottom line started looking up during the first quarter of 2002, or at least that

is what SNSA and defendant Niels G. Stolt-Nielsen to misled investors to believe.  On March 27,

---

[40]      *See* SEC Form 20-F (Item 10(c)) (Form 20-F is attached hereto as Exhibit A for the Court's convenience); *see also* Exhibit A at 24.

[41]      Complaint ¶ 59 ("Defendants concealed from investors the above facts about the Companies' involvement with Sudan, Iran, and Cuba.").

[42]      Complaint ¶¶ 33-34 (Stolt and Odfjell "carved up the world;" SNTG's Chairman, defendant Cooperman found out but did nothing to correct any of SNSA's or SNTG's public disclosures.); Complaint ¶ 39 (a) (SNTG official admits in an e-mail that Tokyo Marine realized that cooperation between competitors on rates was the only way to move the market).

[43]      *See, e.g.*, *Rubinstein v. Collins*, 20 F.3d 160, 171 (5th Cir. 1994) ("'To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.'") (quoting *Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir. 1981), *aff'd in relevant part and rev'd in part on other grounds*, 459 U.S. 375 (1983)); *Berger v. Compaq Computer Corp.*, 1999 WL 33620108, at *13 (S.D. Tex. Dec. 22, 1999) (Statements misled investors because statements did not "allud[e] to the methods through which those results were obtained or the risks associated with the use of those methods. * * * The inclusion of general cautionary language regarding a prediction does not excuse the alleged failure to reveal known material facts.").

2002, SNSA and Niels G. Stolt-Nielsen extolled improving financial results in SNSA's and SNTG's key division – the parcel tanker division.[44]  They attributed these purportedly improved results to continued renewal of "affreightment contracts" and the "multi-year renewal" of a contract with one of its "largest customers."[45]  Defendants said nothing about agreements with Odjfell and Tokyo Marine or about their ships' visits to Cuba, Sudan, or Iran.

Not long ago, esteemed auction houses Sotheby's and Christie's ensnared themselves with the same kind of anti-competitive behavior, i.e., price-fixing, that now besets SNSA, SNTG, and the other defendants here.[46]  Here, as in *Sotheby's*, business began to falter; revenues started to suffer.  Sotheby's and its chief competitor, Christie's, "agreed to fix prices" for their services – just like SNTG, Tokyo Marine, and Odfjell did here.[47]  Here, as in *Sotheby's*, the complaint alleges that the defendants "publicly touted the positive impact" of the conduct and improved revenues "when the real cause of the increased profits was the illegal collusion."[48]  Here, as in *Sotheby's*, the Court should reject defendants' misplaced arguments about the absence of disclosure obligations and deny the motion to dismiss.

In *Sotheby's*, the Court ruled that Sotheby's breached its duty to disclose under the federal securities laws.  The Court so ruled because, like SNSA and SNTG here, Sotheby's public

---

[44]     Complaint ¶ 68.

[45]     Complaint ¶ 68.

[46]     *See id.*

[47]     *Compare Sotheby's*, 2000 WL 1234601, at *2 (Sotheby's business starts to suffer) *with* Complaint ¶ 32 (Stolt's business starts to suffer).  *Compare Sotheby's*, 2000 WL 1234601, at *2 (Sotheby's agrees with chief competitor to fix prices) *with* Complaint ¶¶ 37-40 (SNTG agrees with chief competitors to fix prices).

[48]     *Compare Sotheby's*, 2000 WL 1234601, at **3-4 (complaint's allegations in *Sotheby's*) *with* Complaint ¶ 68 (noting increased revenues for parcel tanker division in first quarter of 2001), Complaint ¶ 70 (heralding "co-service" agreements with Tokyo Marine), Complaint ¶ 73 (SNTG's "strategy").

statements attributed improved revenues to legitimate causes when, in fact, the complaint alleged that the improved revenues flowed from "illegal collusion." The "illegal conclusion" amounted to "secret information" that rendered Sotheby's public statements materially misleading.

The Court also cited statements from Sotheby's SEC filings that indicated Sotheby's was competing when, in fact, Sotheby's was colluding to fix prices. SNSA made similar statements in its SEC filings – something that the Court can judicially notice.[49]  SNSA said that its "tanker operations *compete* with operators based primarily in Europe and the Asia Pacific region."[50]  SNSA said so in an SEC filing on October 26, 2001. Clearly, that was materially untrue because, as the Complaint alleges, as early as 1998 (or by February 28, 2001 at the latest), SNTG was busy "caving up the world" with its competitors.[51]   It was not competing with them; SNTG was, instead, conspiring to fix prices and rig bids, as detailed in an affidavit filed in Wingfield's criminal case.[52]

Consequently, the federal securities laws required that Sotheby's update or correct those public statements so that those statements would reflect the true state of Sotheby's business and not mislead investors about the level of competition and the reasons for Sotheby's improved financial results. But Sotheby's neither updated nor corrected the prior statements. Rejecting the very arguments and caselaw that defendants cite here, the Court held that "[t]his duty to disclose

---

[49]    *See Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2nd Cir. 1991).

[50]    Exhibit B at 22 (Emphasis added).

[51]    Complaint ¶¶ 33-34, ¶¶ 38-39.

[52]    Complaint ¶ 45.

exists even where the omitted information relates to allegedly illegal conduct."[53]  For that reason, the Court denied, in part, defendants' motion to dismiss.[54]  This Court should do likewise.

> ### B. Line-Item Disclosure Requirements Mandated That Defendants Disclose Facts Concerning Their Trading With Rogue States And Facts Concerning Bid-Rigging And Price-Fixing.

Defendants open their brief by stating a most unremarkable proposition, i.e., that absent a duty to speak, silence is not fraud under the federal securities laws.  They do so trying (and failing) to rebut the Complaint's allegation that SNSA's public filings during the Class Period misled investors because those public filings said nothing about the facts surrounding defendants' embargo and antitrust violations.  While defendants quite correctly state a proposition of federal securities law,  that proposition does not here apply. This is so because, indeed, Regulation S-K[55] and SEC Form 20-F mandate disclosure of facts that defendants omitted to disclose.

> ### 1. Regulation S-K sets SNSA's disclosure obligations; even defendants concede that.

Defendants correctly note that Regulation S-K "is the relevant SEC regulation to determine [d]efendants' disclosure obligations." (Defs.' Opening Br. at 4).  They also correctly cite provisions from Regulation S-K concerning an issuer's obligation to disclose threatened or pending litigation.  (Defs.' Opening Br. at 3-4).  But in setting up their strawman argument about Regulation

---

[53]     *Sotheby's*, 2000 WL 1234601, at *4 (on facts identical to those alleged here, distinguishing *United States v. Matthews* and *Roeder v. Alpha Industries*  – defendants' principal authorities here).

[54]     *Sotheby's*, 2000 WL 1234601, at **3-4.

[55]     17 C.F.R. § 229.010 - § 229.1016 (2003).

S-K, defendants overlook another Regulation S-K requirement: Item 101(d)(3), which requires issuers to disclose "any risks attendant to the foreign operations[.]"[56]

Here, defendants failed to disclose the risks they took in trading (and planning to trade) with Iran, Sudan, or Cuba. In fact, defendants said nothing at all about their trading with those rogue states. Defendants never disclosed the risk that trading with those rogue states might pose to earnings, i.e., that once the trading came to light, it would have to stop, as would the revenue stream from such activity.

But according to defendants, they indeed warned investors when they said "[o]ur failure to comply with environmental and other regulations may result in significant fines, penalties, or the loss of revenues." (Defs.' Opening Br. at 14) (quoting SNSA's SEC Form 20-F/A, filed with the SEC on October 26, 2001). Not only was this purported disclosure inadequate, it too misled investors because in October 2001, the SNSA and SNTG were actively trading with Iran and Sudan, in violation of U.S. trade embargos against those countries.[57] That was deceit, and as such, actionable under the federal securities laws.[58]

## 2. SEC Form 20-F also sets SNSA's disclosure obligations

SNSA is a foreign issuer, and as such, must file its registration statements and annual reports under SEC Form 20-F ("Form 20-F").[59] Form 20-F describes in detail what SNSA should

---

[56]     *See* 17 C.F.R. § 229.101(d)(3) (2003); *see also In re Craftmatic Sec. Litig.*, 890 F.2d 628, 641 n.17 (3rd Cir. 1990) ("disclosures mandated by Regulation S-K are presumptively material").

[57]     Complaint ¶ 50 (SNSA trading with Sudan from 1998 to 2000); Complaint ¶ 55 (SNTG ships visiting Iranian ports); Complaint ¶¶ 57-58 (SNTG working to develop business with Iran during reporting period covered by Form 20-F/A).

[58]     *See* n.14, *supra.*

[59]     Exhibit A at 2 (General instructions describing "Who May Use Form 20-F And When It Must Be Filed").

have (but did not) disclose in the SEC filings quoted in the Complaint.  According to Form 20-F,

foreign issuers' disclosures must discuss:

> ● Material effects of government regulations;[60]
>
> ● Significant factors, including unusual . . . or new developments materially affecting the company's income from operations . . . any other significant component of revenue necessary to understand the company's results of operations . . . [p]rovide information about any governmental . . . political policies . . . that . . . could materially affect directly or indirectly the company's operations or investments by host country shareholders;[61] and
>
> ● Summarize each material contract.[62]

SNSA's Form 20-F's filed during the Class Period did not mention the effect that

United States trade embargos might have on their foreign operations.  Nor did SNSA's Form 20-F's

discuss how United States and European antitrust laws might impact efforts to coordinate marketing

and sales efforts with competitors.  SNSA's Class Period Form 20-F's said nothing about

"significant factors" such as the cooperation between SNTG, Tokyo Marine, and Odfjell – a new

development that added between five percent and twenty-five percent to important shipping

contracts. Finally, SNSA's Class Period Form 20-F's failed to described the material contracts or

agreements between SNTG, Tokyo Marine, and Odfjell to move the market through cooperation.

Plainly, then, despite defendants' strawman arguments about the absence of

disclosure requirements under the federal securities laws, those disclosure requirements indeed

---

[60]     Exhibit A at 9 (Item 2(B)(8) Business Overview).

[61]     Exhibit A at 11 (Item 5 (A) Operations of Results).

[62]     Exhibit A at 24 (issuers must describe material contracts).

required the defendants to disclose facts surrounding their antitrust and embargo violations.[63]  Their

omitting to disclose this information broke the federal securities laws.

### C.    Defendants' Caselaw Offers Defendants No Shelter From Liability.

Defendants cite a panoply of caselaw to say that issuers bear no duty under the

federal securities laws to confess liability for illegal conduct.  (Defs.' Br. at 4-8).  The rule that

defendants press into service here, i.e., that they need not have admitted liability for antitrust and

embargo violations, "does not limit a party's duty to disclose all material facts relating to a party's

actions, including those that might relate to misconduct."[64]  "The fact that a defendant's act may be

a crime does not justify its concealment."[65]

Defendants cite *United States v. Matthews*,[66] *Roeder v. Alpha Industries*,[67] and

*Amalgamated Clothing & Textile Workers*[68] as their chief authorities.  (Defs.' Opening Br. at 2 &

5).  But, as *Sotheby's* and *Greenfield v. Professional Care* explain neither *Matthews* nor *Roeder*

apply here.   And this is so for two reasons.

---

[63]        *See In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 675 (S.D.N.Y. 1990) ("The illegality of corporate behavior is not a justification for withholding information that a corporation is otherwise required to disclose."); *see also Pinker v. Roche Holdings*, 292 F.3d 361, 374 (3rd Cir. 2002) (reversing dismissal of securities-fraud suit where defendants failed to disclose facts surrounding antitrust violations); *Craftmatic.*, 890 F.2d at 640 & n.16 (reversing dismissal where defendants failed to disclose illegal practices after touting success of advertising that was based upon those undisclosed and illegal practices).

[64]        *See Warner Communications v. Murdoch*, 581 F. Supp. 1482, 1490 (D. Del. 1984).

[65]        *Ballan v. Wilfred Am. Educational Corp.*, 720 F. Supp. 241, 249 (E.D.N.Y. 1989) (distinguishing many of the authorities cited in defendants' Opening Brief); *Greenfield v. Professional Care, Inc.*, 677 F. Supp. 110, 113 (E.D.N.Y. 1987).

[66]        787 F.2d 38 (2nd Cir. 1986).

[67]        814 F.2d 22 (1st Cir. 1987).

[68]        475 F. Supp. 328 (S.D.N.Y. 1979), *vacated as moot*, 638 F.2d 7 (2nd Cir. 1980).

*First*, as in both *Sotheby's* and *Greenfield*, the Complaint alleges that the defendants did more than omit information. The Complaint alleges that the defendants made material misstatements that "related directly" to SNSA's "earnings."[69]   And the misstatements concerned "[i]nformation going directly to the financial condition of the company[.]"[70]

*Second*, even absent *Sotheby's* and *Greenfield*, the defendants cannot use their authorities to escape liability here because, here, unlike the circumstances in defendants' authorities, Item 101(d)(3) of Regulation S-K affirmatively required that the omitted information be disclosed. Moreover, the very form that SNSA files with the SEC, Form 20-F, also affirmatively requires that the omitted information be disclosed. So, even absent an affirmative misstatement, the defendants face liability because they omitted to make disclosures that Regulation S-K and Form 20-F require.

---

[69]     *Greenfield*, 677 F. Supp. at 113.  *See* Complaint ¶ 68,  ¶ 74, ¶ 76

[70]     *Greenfield*, 677 F. Supp. at 113.  *See* Complaint ¶ 68,  ¶ 70, ¶ 73; *see also re Sotheby's Holdings, Inc.*, 2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000) (rejecting the same arguments that defendants offer here) (collecting authorities).

## II.     THE COMPLAINT PLEADS A STRONG INFERENCE THAT THE DEFENDANTS ACTED WITH SCIENTER.

Defendants fire a blunderbuss at the Complaint's scienter allegations.  But they do not (and they cannot) challenge the notion that SNTG acted with scienter with respect to both the antitrust and embargo violations.[71]  Nor do they say much at all about SNSA's scienter with respect to embargo violations  – nor could they.  Their main fusillade aims at the Complaint's scienter allegations with respect to the individual defendants.  But their fusillade misses the mark.

### A.    Complaint Pleads Strong Inference of Scienter As To SNSA.

A securities-fraud plaintiff may adequately plead scienter by alleging deliberate illegal conduct.[72]   Here, the Complaint alleges that both SNSA and SNTG engaged in deliberate illegal conduct, i.e., trading with rogue states like Sudan and Iran in violation of U.S. embargos against those countries.[73]  And lest there be any doubt at all about SNSA's knowledge of (and complicity in) embargo violations, the Complaint makes clear that SNSA's general counsel, i.e., SNSA's agent, was informed about SNTG's trading with Iran,[74] which put SNSA on notice of the conduct and imputed scienter to SNSA.[75]

---

[71]     Complaint ¶ 45 (SNTG's extensive antitrust violations); Complaint ¶¶ 50-58 (SNTG's extensive embargo violations).

[72]     *See Novak v. Kasaks*, 216 F.3d 300, 308 (2nd Cir. 2000).

[73]     Complaint ¶ 50 (SNSA and SNTG trade with Sudan); Complaint ¶ 52 (At first, SNSA's dealings with Iran did not implicate SNTG).

[74]     Complaint ¶ 54, ¶ 62 (Alan Windsor, SNSA's general counsel, received e-mail from SNTG's former general counsel warning about SNTG's trading with Iran).

[75]     *See In re Atlantic Fin. Mgmt, Inc.*, 784 F.2d 29 (1st Cir. 1986); *Cromer Fin. Ltd. v. Berger*, 2002 WL 826847, at **3-8 (S.D.N.Y. May 2, 2002).

### B. Strong Inference of Scienter By Individual Defendants Exists, Given The Great Importance of SNTG's Parcel Tanker Business To SNSA.

SNSA's Form 20-F's highlight the importance SNTG's operations to SNSA's bottom line. SNTG's business "represented approximately 43% of [SNSA's] net operating revenue [and] about 87% of 2000 income from operations."[76] Moreover, parcel tanker operations "remain SNTG's single largest activity."[77] Thus, despite the fact that parcel tanker operations form a key component of SNSA's business, the individual defendants disclaim any knowledge about what kept revenues afloat in this key division. Courts reject such disclaimers and hold that where improprieties are alleged on key contracts, the inference of scienter is strong.[78]

This seems especially so for defendant Cooperman, SNTG's former chairman who was summarily removed from his post when the antitrust scandal broke at SNTG. How Cooperman can claim ignorance defies common sense and alleged fact.[79] Cooperman ran SNTG and SNTG's parcel-tanker operations – operations key to SNTG's earnings and to SNSA's bottom line and to the company's future. He was told not only of the antitrust violations, but he was also warned about the embargo violations. Subordinates confronted him about both. Thus, for two reasons, he cannot claim ignorance.

---

[76] SNSA's SEC Form 20-F/A at 5 (filed with the SEC on October 26, 2001) (attached hereto as Exhibit B).

[77] Exhibit B at 5.

[78] *See In re Raytheon Sec. Litig.*, 157 F. Supp.2d 131, 148 (D. Mass. 2001) (allegations of improprieties on company's key contracts warranted denying the motion to dismiss); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 634 (E.D. Va. 2000) (same).

[79] Complaint ¶ 34 (Cooperman informed about SNTG's "carving up the world" with Odfjell); Complaint ¶ 35 (Soon after antitrust scandal broke, SNSA moved Cooperman out as SNTG's chairman and announced that Cooperman would soon retire.).

First, SNTG's parcel-tanker operations were simply too important to the company for Cooperman to credibly disclaim knowledge of the antitrust violations.[80]  Second, subordinates confronted him about both the antitrust violations and the embargo violations.[81]   And yet, Cooperman did nothing vis-a-vis SNSA's filings with the SEC.

## III.   THE COMPLAINT MEETS THE REFORM ACT'S PARTICULARITY REQUIREMENTS.

Defendants purport to challenge the Complaint's particularity because, defendants say, many (but not all) of the alleged false and misleading statements relate to the "wrong operational unit" at SNTG.  Defendants say that any alleged false statement affecting SNTG's tank container operations lacks particularity because, defendants say, the wrongdoing happened in the parcel tanker operations. (Defs.' Opening Br. at 13).

Defendants' purported challenge fails for three reasons: (1)  even assuming defendants are right (and they are not), defendants cannot assert their particularity challenge against *any* embargo allegation because those allegations sweep in SNSA as well as SNTG; nor can they assert their particularity challenge against several alleged misstatements concerning antitrust activity because those misstatements indisputably concern SNTG's parcel tanker unit, (2) not even the Reform Act requires the level of detail that defendants demand;[82] and (3) the purported challenges

---

[80]        *See In re Raytheon Sec. Litig.*, 157 F. Supp.2d 131, 148 (D. Mass. 2001) (allegations of improprieties on company's key contracts warranted denying the motion to dismiss); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 634 (E.D. Va. 2000) (same).

[81]        *See, e.g.*, *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1338 (S.D. Fla. 1999) (rejecting former directors' and officers' scienter challenges because plaintiffs, as here, alleged that the individual defendants were "confronted" by subordinates with evidence of corporate wrongdoing and the individual defendants did not act to correct the wrongdoing).

[82]        *See Greebel v. FTP Software*, 194 F.3d 185, 204 (1st Cir. 1999) ("We do not say that each of these particulars must appear in the complaint[.]"); *PSS World Med., Inc. Sec. Litig.*, 250 F. Supp. 2d 1335, 1349 (M.D. Fla. 2002) (concluding that complaint passed muster under the Reform Act).

do not (and cannot) address the heart of this case: defendants' affirmative misstatements about the company's financial condition and the defendants' omitting to disclose material facts that Regulation S-K and Form 20-F say must be disclosed.

### A.    Defendants Do Not (And Cannot) Challenge At Least Two Statements.

Complaint paragraphs sixty-eight and seventy identify two Class Period statements that concern parcel-tanker operations – the unit to which defendants would confine the misconduct, something that is fact-based and inappropriate on a motion to dismiss. Defendants gloss over these two statements that were misleading in the light of defendants' many omissions, which are detailed in Part I, supra.

Complaint paragraph sixty-nine explains, as it must, why the statement in complaint paragraph sixty-eight was materially false and misleading when made. Complaint paragraph sixty-eight shows that defendant Niels G. Stolt-Nielsen touting results from parcel tanker operations and contract renewals. But, just as in *Sotheby's*, that statement was misleading when made because "the real cause of [improved financial performance] was the illegal collusion."[83] Defendants do not challenge the particularity of paragraph sixty-nine. They just hope that the Court will overlook it.

Complaint paragraph seventy provides an even more sobering example of defendants' contempt for the federal securities laws. There, the Complaint quotes a public statement from defendants Form 20-F that purported to announce that "[d]uring 2000, SNTG entered 'co-service agreements' with Tokyo Marine." That statement was more than misleading; that statement was an outright lie, as Complaint paragraphs seventy-one and thirty-nine show. Those paragraphs allege

---

[83]        *Sotheby's*, 1234601, at *3.

and show that, during 2000, SNTG was hard at work securing an agreement with Tokyo Marine to fix prices and rig bids.

Thus, these paragraphs meet  the Reform Act, which requires that plaintiffs identify the misstatement and explain why the misstatement was false and misleading when made and if the allegation rests on information and belief, plaintiffs must allege the facts upon which they base their information and belief.[84]  When the Court applies Rule 9(b), the Court should easily conclude that the Complaint meets Rule 9(b) because the Complaint alleges the "first paragraph of any newspaper story"[85] concerning the fraud.[86]

### B.    Defendants Demand More Detail Than Does The Reform Act.

Defendants argue that many of the Complaint's allegations lack enough particularity because, defendants say, those allegations refer to the wrong operational unit.  This argument by defendants suffers at least two infirmities.  *First*, nowhere does the Complaint purport to limit its allegations of antitrust and embargo violations to just the parcel tanker operations of SNTG.  Nor must it.  At this embryonic stage of the case, defendants simply cannot assume that misconduct at SNTG was confined to the parcel tanker operations.  That is for summary judgment.

*Second*, a careful reading of SNSA's Form 20-F's shows that the parcel tanker operations are "fully integrated" with the tank container operations.[87]  Given that defendants say the two operations are "fully integrated," separating them out at this stage seems premature.  For

---

[84]       *See* 15 U.S.C. § 78u-4(b)(1)(A) (2003); *Sotheby's*, 1234601, at *4 (finding sufficient particularity on similar allegations as those made in the Complaint here).

[85]       *See In re Initial Public Offering Sec. Litig.*, 241 F. Supp.2d 281, 327 (S.D.N.Y. 2003).

[86]       *See id.* at 333-336 (explaining how both the Reform Act and Rule 9(b) apply to the various elements of a securities-fraud claim).

[87]       Exhibit B at 12.

example, defendants complain that the Complaint identifies as misleading a statement about 5% growth in the tank container operations.  (Defs.' Opening Br. at 15).  But since even they concede that parcel tanker and tank container operations are "fully integrated," and apparently, marketed together,[88] they cannot say that the 5% prediction was not knowingly false and misleading when made.

For these reasons, the Court should reject defendants' particularity challenge as demanding more than is required under the Reform Act.

## IV. DEFENDANTS' PURPORTEDLY FORWARD-LOOKING STATEMENTS FIND NO SAFE HARBOR IN THE REFORM ACT BECAUSE THE PURPORTEDLY MEANINGFUL CAUTIONARY LANGUAGE IS NEITHER MEANINGFUL NOR CAUTIONARY.

In a footnote, defendants point to the now-unremarkable proposition that the Reform Act's safe harbor shields forward-looking statements.  (Defs.' Opening Br. at 16).  What defendants do not mention is the proverbial elephant in the living room: that the allegedly cautionary language was itself false and misleading and far too generalized to be meaningful.  The Reform Act itself denies defendants the safe harbor on such facts.[89]

In short, all of SNSA's purportedly cautionary statements fail because none were meaningful.  None were meaningful because all were false and misleading.  All were false and misleading because all omitted to disclose the matters called for by Regulation S-K and Form 20-F.

---

[88]     Exhibit B at 22.

[89]     *See* 15 U.S.C. § 78u-5(c)(1)(B); *In re Seebeyond Tech. Corp.*, 266 F. Supp. 2d 1150, 1163-67 (C.D. Cal. 2003) (explaining how the safe harbor works and denying defendants the safe harbor for two reasons: (1) complaint alleged that defendants knowingly made false forward-looking statements, and (2) cautionary language was not "meaningful" because it too was false and misleading); *Sherleigh Assocs. v. Windmere-Durable Holdings* ("*Windmere*"), 178 F. Supp. 2d 1255, 1273-74 (S.D. Fla. 2000) (rejecting defendants' safe harbor argument because complaint alleged that defendants knew when they made the forward-looking statements that those statements were false when made and rejecting the defendants' safe harbor argument also because the complaint alleged that the cautionary language was itself false and misleading).

None of SNSA's purportedly cautionary language warned that the risks warned of were already unfolding on SNTG – risks brought on by SNSA's and SNTG's illegal conduct, and that omission was deceit.[90]  For these reasons, the Court should reject defendants' safe-harbor arguments.

### CONCLUSION

For these reasons explained in this brief, Lead Plaintiffs have stated a cause of action for primary liability against all defendants and control-person liability against the individual defendants.

DATED: December 11, 2003                     Respectfully submitted,

**SCOTT + SCOTT, LLC**

_/s/_ _____
David R. Scott (Federal Bar No. CT16080)
Erin Green Comite (Federal Bar No. CT24886)
108 Norwich Avenue
P. O. Box 192
Colchester, CT 06415
Telephone: (860) 537-3818
Facsimile: (860) 537-4432
Emails:        drscott@scott-scott.com
                    ecomite@scott-scott.com
**Liaison Counsel**

---

[90]      _See Windmere_, 178 F. Supp. 2d at 1274 (quoting _Huddleston v. Herman & McLean_, 640 F.2d 534, 544 (5th Cir. 1981), _aff'd in part, rev'd in part on other grounds_, 459 U.S. 375 (1983)).

**CAULEY, GELLER, BOWMAN
    & RUDMAN, LLP**
Samuel H. Rudman
200 Broadhollow Road - Suite 406
Melville, NY 11747
Telephone: 631-367-7100
Facsimile: 631-367-1173

**Lead Counsel**

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that on this 11th day of December, 2003, I caused a true copy of this

document to be sent via U.S. mail to the following parties:

**Attorneys for Defendants**

Donna Nelson Heller
Patrick J. McHugh
Finn Dixon & Herling
One Landmark Sq.
Ste. 1400
Stamford, CT 06901
203-325-5000

Christopher M. Curran
J. Mark Gidley
Peter J. Carney
Jaime Crowe
White & Case
601 Thirteenth St., NW
Suite 600 So.
Washington, DC 20005

**Lead Counsel for Plaintiffs**

Sam Rudman
David Rosenfeld
Cauley Geller Bowman Coates & Rudman, LLP
200 Broadhollow Rd., Suite 406
Melville, NY  11747

/s/
David R. Scott