UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
RICHARD WAGNER, on behalf of himself and    :
all others similarly situated,              :
                                            :   03 Civ. 4302 (RMB)
                         Plaintiff,         :
         v.                                 :   <u>ORDER</u>
                                            :
BARRICK GOLD CORP., RANDALL                 :
OLIPHANT, JOHN K. CARRINGTON, and           :
JAMIE C. SOKALSKY,                          :
                                            :
                         Defendants.        :
-----------------------------------------------------------x

I.     Introduction

   This Order resolves the motion filed by Defendants Barrick Gold Corporation ("Barrick"), Randall Oliphant ("Oliphant"), John K. Carrington ("Carngton") and Jamie C. Sokalsky ("Sokalsky") to dismiss five (consolidated) purported class actions alleging violations of federal securities laws pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") and the Private Litigation Securities Reform Act of 1995, 15 U.S.C. §§ 77z, 78u, et seq. ("PSLRA").[1] The complaints in these five actions allege violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) ("Section 10(b)"), Securities and Exchange Commission Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 ("Rule 10b-5") and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) ("Section 20(a)") and were filed between July 8, 2003 and August 8, 2003. Plaintiffs filed a Consolidated and Amended Class Action Complaint ("Amended Complaint" or "Am. Compl.") on November 5, 2003.

---

[1] Oliphant, Carngton and Sokalsky are referred to as the "Individual Defendants." The Individual Defendants, together with Barrick, are referred to as "Defendants."

Defendants moved to dismiss the Amended Complaint on January 12, 2004 ("Def. Mem."). On March 15, 2004, Plaintiffs filed a memorandum of law opposing Defendants' motion ("Pl. Mem.") and Defendants replied on April 2, 2004 ("Def. Reply"). The Court heard oral argument on September 20, 2004.[2] **For the reasons set forth below, Defendants' motion to dismiss the Amended Complaint is granted in part and denied in part**

## II.  Background

The following allegations are set forth in the Amended Complaint and are accepted as true for the purposes of this motion to dismiss. Cooper v. Parsky, 140 F.3d 433, 440 (2d Cir. 1998); Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996).

Defendant Barrick is a Canadian corporation whose common stock trades in the United States over the New York Stock Exchange. (Am. Comp. ¶¶ 17, 27.) "According to Barrick's 2001 Annual Report, 'Barrick . . . is a leading international gold company, with among the largest market capitalizations in the industry.'" (Id. ¶ 3.) Throughout the period February 14, 2002 through September 26, 2002 ("Class Period"), Defendant Oliphant was Barrick's Chief Executive Officer and President; Defendant Carrington was Barrick's Chief Operating Officer and Vice Chairman; and Defendant Sokalsky was Barrick's Chief Financial Officer. fld. ¶¶ 28-30.)

Plaintiffs consist "of all those who purchased securities of Barrick during the [Class Period] and who were damaged thereby." (Am. Compl. ¶ 37.) Plaintiffs allege that as part of a "single, inter-related Fraudulent scheme," Defendants made materially false and misleading

---

[2]  Plaintiffs submitted an (unsolicited) supplemental letter to the Court on September 21, 2004 ("PL Letter") and Defendants submitted an (unsolicited) supplemental letter in response on September 23, 2004 ("Def. Letter").

-2-

statements and omissions with respect to Barrick's operations and finances. Plaintiffs allege that "[a]lthough Barrick has portrayed itself as a gold mining company that explores, mines, and sells gold, in reality, Barrick's core business was short-selling gold through forward sales contracts." (Id. ¶4.)[3] According to Defendants' motion, Plaintiffs' allegations relate to three main categories, as follows: (A) Barrick's costs and earnings projections regarding mining operations ("Costs and Earnings Projections"), (B) Barrick's Premium Gold Sales Program ("Gold Sales Program" or "Program"), and (C) Barrick's exchange of option contracts for variable price sales contracts ("Accounting Change"). (Def. Mem. at 3, 14, 21; Pl. Mem. at 6, 13, 16.)[4]

**A.     Costs and Earnings Projections**

Defendants allegedly issued false information "assuring the market that it was improving its operations by keeping its production costs in check, [and] reducing its hedging activities to take advantage of rising gold prices, and that the Company expected to earn $0.42-$0.47 per share in 2002___" (Am. Compl. ¶11-) Plaintiffs refer to the following public statements made by Defendants, among others:

---

[3]    "Forward contracts are promises to buy or to sell a particular commodity on a specified date at a predetermined price." David L. Threlkeld & Co. v. Metallgesellschaft. Ltd.. 923 F.2d 245, 246 (2d Cir. 1991).

[4]    At oral argument on September 20, 2004, Defendants described the three "areas of inquiry" somewhat differently, stating:
> [T]he first [claim] . . . is Barrick as a gold speculator as opposed to a gold producer. Then there are misstatements from February 2002 until September 2002 projecting year-end cost of production and earnings. That is the second claim. And the third claim is an effort to bring into the case an antitrust claim that is pending in the Eastern District of Louisiana . . . contending that the unlawful alleged conduct in that antitrust case somehow impacted on the shareholders here."

(9/20/04 Tr. at 2-3.)

-3-

- Barrick's 2001 Annual Report, dated February 14, 2002 ("2001 Report") stating that "Barrick enters 2002 with the strongest balance sheet in the gold mining industry, high quality assets, a cash and short-term investment position of US $733 million and virtually no debt," and "the Company expects administration and exploration expenses to decline——" (Am. Compl. ¶ 105.)

- A press release dated May 1, 2002 reporting on Barrick's results for the first quarter of 2002 ("1Q Report"), stating that "we're on track to meet our production and cost targets for the year. We've . . . continued to implement the improvements to production and costs that we have identified." (Id. ¶ 145.)

- A press release issued on July 25, 2002, announcing results for the second quarter of 2002 ("2Q Report"), entitled "Pipeline Enhanced; Expects Higher Production and Lower Costs in Second Half," and which quotes Defendant Carrington as stating: "We expect a better second half, with higher production and lower costs, as we believe we've resolved most of the operating challenges we had in the first half." (Id. ¶ 160.)

- Barrick's "Form 6-K for the month ending June 30, 2002, which was signed by [D]efendant Sokalsky [and which] reiterated the statements made in the [2Q Report]." (Id. ¶ 168.)

- A conference call with industry analysts on July 25, 2002 discussing second quarter results, during which Defendant Oliphant explained that "changes we made to mine sequences at Hemlo, Meikle and Plutonic in the first half of the year led to the deferral of higher rate material in the second half. We can expect higher production and lower costs from these operations." (Id. ¶ 165.)

"On February 14, 2002, the beginning of the Class Period and the date of a positive Barrick announcement . . . Barrick's stock closed at $18.77 per share." (Am. Compl. ¶ 2.) On September 26, 2002, the last day of the Class Period, "the Company announced that it expected to earn materially less in 2002 than previously announced, and that it would materially miss its previously forecasted results for the Third Quarter 2002, due to increased costs stemming from production issues at several mines." (Id. ¶ 12.) "In reaction to the announcement, which came

-4-

only days after the Company announced a $2 billion expansion plan and reiterated its 2002 projections, Barrick's stock fell by 10.5% in one day, from S17.77 per share on September 25, 2002 to S15.90 per share on September 26, 2002." (Id.)

B.   Gold Sales Program

According to Plaintiffs, Barrck's Gold Sales Program's primary purpose was not "hedging" designed to mitigate the risks associated with fluctuating gold prices as Defendants represented to investors, but rather, risky speculation that remained undisclosed to investors. (Am. Compl.¶¶f43.) Barrick was allegedly not in a position to benefit from a rise in the price of gold because "[u]nbeknownst to investors .. Barrick used the combination of its gold production and [the Gold Sales Program] to depress the gold market prior to the Class Period so that Barrick could short-sell gold at an enormous profit, acquire gold companies that were harmed as a result of the artificially depressed market at [depressed] prices, and use the gold reserves from the acquired companies to further increase its forward sales positions." (Id. ¶ 4.) Eventually, Barrick "was forced to scale back the [Gold Sales] Program during and following the Class Period, because (1) the Company was unable to continue its depression of the gold market as gold prices sky-rocketed due to a myriad of unrelated factors, e.g.. impending war in Iraq, depressed economy, and falling interest rates; (2) stock market analysts began to question the propriety of the Program ... and (3) on December 18, 2002, the largest retail dealer of gold in the United States, Blanchard & Co. ('Blanchard') commenced an antitrust action against Barrick ... alleging, inter alia. that Barrick's efforts to manipulate the gold market by flooding it with gold and taking advantage of the resulting drop in price are anticompetitive conduct under the United States antitrust laws." (Id. ¶¶ 4, 9.) Plaintiffs allege that Barrick engaged in monopolistic

-5-

conduct by manipulating "the price of gold downward . . . by causing the lease of excessive amounts of gold from the central bank and the subsequent sales of leased gold into the spot market." (Id. ¶ 49.)

Important disclosures concerning both the speculative and anticompetitive nature of the Gold Sales Program were allegedly omitted from the following communications:

- A February 15, 2002 conference call with industry analysts held by [the Individual Defendants] to discuss Fourth Quarter 2001 results and projections for 2002. "[Under the] Gold Sales Program . . . Barrick began hedging about 14 years ago [and it] allowed producers to lock in higher prices and lower risk.... If [the] gold price rises, that shows on bottom line [and positively impacts] gold price." (Id. ¶ 115.)

- On February 21, 2002, "[D]efendant Sokalsky stated that the Company had 'no plans to increase its forward sales position.'" (Id. ¶ 122.)

- The 2001 Report which states that Barrick "also use[s] derivative instruments in a risk management program that seeks to mitigate the effects of volatility in commodity prices, interest rates and foreign exchange rates on our business." (Id. ¶ 125.)

- A "personal message" from Defendant Oliphant stating that: "The Premium Gold Sales Program is our unique hedging activity that increases revenue from our main asset—our gold reserves. . . . While maximizing returns, it also minimizes downside exposure to volatile gold prices," (Id, ¶ 129.)

- A September 17, 2002 press release, in which Defendant Oliphant states: "As the industry faces declining production and rising costs, we stand to benefit the most from rising gold prices. . . . Barrick's growth plan makes us uniquely positioned to benefit from strengthening gold prices." (Id ¶ 186.)

C.   **Accounting** Change

"When gold prices rose in the First Quarter of 2002, the[] derivative positions which had been on the balance sheet and income statement at the end of 2001, would have resulted in

-6-

Barrick reporting a large loss." (Am. Compl. ¶ 10.) "Sometime in the First Quarter of 2002, Barrick arranged to change these contracts in name only and reclassified them from 'derivatives' to 'normal sales contracts,' enabling Barrick to exclude them from its balance sheet and income statement." (Id.) "What should have been recorded as a balance sheet loss (estimated in the $50 million to $90 million range in the First Quarter 2002) was moved off of the balance sheet and income statement and co-mingled with other non-book income." (Id.) According to Plaintiffs, the "co-mingling permitted this huge loss to be hidden from clear public view." (Id.)

III.   Legal Standard

In resolving a motion to dismiss, the Court "must accept the factual allegations of the complaint as true and must draw all reasonable inferences in favor of the plaintiff." Bernheim. 79 F.3d at 321. "The issue is not whether a plaintiff is likely to prevail ultimately, 'but whether the claimant is entitled to offer evidence to support the claims.' Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test." Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir. 1995) (quoting Weisman v. LeLandais. 532 F.2d 308, 311 (2d Cir. 1976)). "A complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of a claim that would entitle him to relief." Del Principe v. Am. Fed. of Musicians of the U.S. fo Canada, No. 84 Civ. 8164, 1986 WL 6007, at *1 (S.D.N.Y. May 20, 1986). It has even been said that "[t]he motion to dismiss for failure to state a claim is disfavored and is seldom granted." Stein Jewelry Co. v. United Parcel Serv., Inc., 228 F. Supp. 2d 304, 306 (S.D.N.Y. 2002) (citing Bower v. Weisman. 639 F. Supp. 532, 539 (S.D.N.Y. 1986)).

-7-

PAGE 9/35 * RCVD AT 9/29/2004 5:16:19 PM [Eastern Daylight Time] * SVR:NYRFAX01/0 * DNIS:1229 * CSID: * DURATION (mm-ss):11-16

In considering a motion to dismiss under Fed. R. Civ, P. 12(b)(6), a district court limits its consideration "to the factual allegations in plaintiffs' [complaint], . . . to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." Brass v. Am. Film Techs., Inc.. 987 F.2d 142, 150 (2d Cir. 1993); see also Cortec Indus.. Inc. v. Sum Holding L.P.. 949 F.2d 42, 48 (2d Cir. 1991). The district court may also consider "public disclosure documents required by law to be, and that have been, filed with the SEC." Rothman v. Gregor. 220 F.3d 81, 88 (2d Cir. 2000).

Where plaintiffs allege fraud, "the circumstances constituting fraud . . . shall be stated with particularity," Fed. R. Civ. P. 9(b); see Stern v. Gen. Elec. Co.. 924 F.2d 472, 476 (2d Cir. 1991). Defendants must be afforded "a reasonable opportunity to answer the complaint and . . . to frame a response." Ryan v. Hunton & Williams. No. 99 Civ. 5938, 2000 WL 1375265, at *6 (E.D.N.Y. Sept. 20, 2000) (quoting Ross v. A.H. Robins Co.. 607 F.2d 545, 557-58 (2d Cir. 1979)). Plaintiffs alleging securities fraud must also comply with the PSLRA, which requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

To state a claim under Section 10(b), a plaintiff "must plead that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." Ganino v. Citizens Utils. Co.. 228 F.3d 154, 161 (2d Cir. 2000).

PAGE 10/35 * RCVD AT 9/29/2004 5:16:19 PM [Eastern Daylight Time] * SVR:NYRFAX01/0 * DNIS:1229 * CSID: * DURATION (mm-ss):11-16

In considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a district court limits its consideration "to the factual allegations in plaintiffs' [complaint], . . . to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." Brass v. Am. Film Techs., Inc.. 987 F.2d 142, 150 (2d Cir. 1993); see also Cortec Indus., Inc. v. Sum Holding L.P.. 949 F.2d 42, 48 (2d Cir. 1991). The district court may also consider "public disclosure documents required by law to be, and that have been, filed with the SEC." Rothman v. flrepor. 220 F.3d 81, 88 (2d Cir. 2000).

Where plaintiffs allege fraud, "the circumstances constituting fraud . . . shall be stated with particularity." Fed. R. Civ. P. 9(b); see Stern v. Gen. Elec. Co.. 924 F.2d 472, 476 (2d Cir. 1991). Defendants must be afforded "a reasonable opportunity to answer the complaint and . . . to frame a response." Ryan v. Hunton & Williams. No. 99 Civ. 5938, 2000 WL 1375265, at *6 (E.D.N.Y. Sept. 20, 2000) (quoting Ross v. A.H. Robins Co.. 607 F.2d 545, 557-58 (2d Cir. 1979)). Plaintiffs alleging securities fraud must also comply with the PSLRA, which requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief *is* formed." 15 U.S.C. § 78u-4(b)(1).

To state a claim under Section 10(b), a plaintiff "must plead that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." Ganino v. Citizens Utils. Co.. 228 F.3d 154, 161 (2d Cir. 2000).

-8-

PAGE 10/35 * RCVD AT 9/29/2004 5:16:19 PM [Eastern Daylight Time] * SVR:NYRFAX01/0 * DNIS:1229 * CSID: * DURATION (mm-ss):11-16

## IV.   Analysis

Generally, Defendants argue that "[c]ourts have routinely parsed complex securities fraud complaints into individual statements, or groups of similar statements, to determine whether the requirements of the PSLRA were satisfied with respect to each statement," Def. Letter at 2, and, as noted, suggest that Plaintiffs' claims fall into three categories. (Def. Mem. at 3-25; Def. Reply at 1-10; Def. Letter at 2-3) (citing 15 U.S.C. § 78u-4(b)(1); Rombach v. Chang, 355 F.3d 164, 172 (2d Cir. 2004); In re Int'l Bus. Machs. Corp. Sec. Litig., 163 F.3d 102, 106-10 (2d Cir. 1998); In re Indep. Energy Holdings PLC Sec. Litig., 154 F. Supp. 2d 741, 755-60 (S.D.N.Y. 2001)). While Plaintiffs organize their briefs along similar lines, see Pl. Mem. at 6-13, 13-16, 16-18; Am. Compl. ¶¶43-84, 85-89, 90-104, they also argue that the Amended Complaint's allegations are "all part of a single, inter-related fraudulent scheme," and that, under the PSLRA, misstatements and omissions should be "assessed collectively." (Pl. Letter at 1; Pl. Mem. at 18, 25; see also 9/20/04 Tr. at 7) (citing In re Initial Public Offering Sec. Litig., 241 F. Supp. 2d 281, 380 (S.D.N.Y. 2003); In re Complete Mgmt. Sec. Litig., 153 F. Supp. 2d 314 (S.D.N.Y. 2001); Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1230 (9th Cir. 2004)).

Courts in this district have, after conducting individualized analyses of allegedly fraudulent misstatements and omissions, grouped similar categories of statements together for the purpose of discussion. See 15 U.S.C. § 78u-4(b); Rombach, 355 F.3d at 172; In re Int'l Bus. Machs., 163 F.3d at 106-10; In re Indep. Energy, 154 F. Supp, 2d at 755-60 (S.D.N.Y. 2001). In In re Bausch & Lomb, Inc. Sec. Litig., No. 01-CV-6190, 2003 WL 23101782 (W.D.N.Y, Mar. 28, 2003), the court noted that the "action revolves around [Defendant's] three business segments;" it analyzed the alleged misstatements and omissions in an annual report, a conference

-9-

call, a Form 10-Q, etc.; and organized its findings and conclusions under the three headings corresponding to the defendant's three business segments after analyzing all of the allegedly fraudulent statements. Id. at *18. Similarly, here the Court has analyzed the Amended Complaint "statement-by-statement and look[ed] at whether each fraud allegation meets the initial pleading standard of the PSLRA," Rombach. 355 F.3d 172, and also organized this Order, for purposes of convenience, under the three headings used by the parties in their briefs. See id.; In re Bausch & Lomb. 2003 WL 23101782, at *18.

**A.** Costs and Earnings Projections

    **1.** **Material Misstatements and Omissions**

Defendants argue that Barrick's Costs and Earnings Projections are "not actionable" because they "are inherently forward-looking statements—i.e., opinions and predictions as to future events," and that, as a matter of law, Defendants' use of "terms such as 'expectations,' 'forecasts,' 'projections,' and the like … fall squarely within the PSLRA's definition of forward-looking statements." (Def. Mem. at 4-5, 7; Def. Reply at 1-2; 9/20/04 Tr. at 15.) Defendants also argue that the Costs and Earnings Projections adequately warned of "the risk that unexpected increases in gold production costs might adversely impact earnings." (Def. Mem. at 7; Def. Reply at 2.) Plaintiffs counter that Defendants' "statements fall well outside the [PSLRA] safe harbor because they are not, in fact, forward-looking at all, but misrepresentations of present facts." (Pl. Mem. at 8-9.)

"[I]t is well recognized that even when an allegedly false statement 'has both a forward-looking aspect and an aspect that encompasses a representation of present fact,' the safe harbor provision of the PSLRA does not apply." In re APAC Teleservice. Inc. Sec. Litig No. 97

-10-

Civ. 9145, 1999 WL 1052004, at *7 (S.D.N.Y. Nov. 19, 1999) (quoting Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1213 (1st Cir. 1996)). "[N]o degree of cautionary language will protect material misrepresentations or omissions where defendants knew their statements were false when made." Milman v. Box Hill Svs. Corp.. 72 F. Supp. 2d 220, 231 (S.D.N.Y. 1999); see also 15 U.S.C. § 78u-5(c); In re Indep. Energy. 154 F. Supp. 2d at 755. "Under the bespeaks caution doctrine, a [forward-looking] misstatement or omission will be considered immaterial if cautionary language is sufficiently specific to render reliance on the false or omitted statement unreasonable." In re Indep. Energy. 154 F. Supp, 2d at 755 ( citing Steinberg v. PRT Group. Inc.. 88 F. Supp. 2d 294, 301 (S.D.N.Y. 2000)). "The doctrine does not apply to misstatements or omissions concerning historical or current facts." *In* re Indep. Energy. 154 F. Supp. 2d at 755 (citing In re APAC Teleservices. 1999 WL 1052004, at *8).

The Amended Complaint clearly alleges that Defendants* statements concerning Barrick's Costs and Earnings Projections concerned "problems [mat] had already arisen" and that the statements were "made with actual knowledge that [they] were false and misleading." (Am. Compl. ¶¶ 3, 11-13, 35, 100-07, 145-49, 155, 159-68, 172, 176, 184-96, 199-200, 205, 208, 211, 215-17, 230-44; PL Mem at 6, 8, 12.) For example, paragraph 100 of the Amended Complaint alleges that Barrick was "clearly under a lot of pressure to produce ounces at lower cost . . . and [they] were shamelessly high-grading that ore body with the idea that they would go back and recover the lower grade material that they left behind——" (Id. f 100; see also id. ¶¶ 105-07, 146, 211); paragraph 101 states that "[m]iners at the Meikle Mine also noted that Barrick was taking early profits out of the mine but not disclosing that they were compromising the future of the mine." (Id. ¶ 101; see also id. ffl 105-07, 211); paragraph 160 alleges that although the 2Q

-11-

PAGE 13/35 * RCVD AT 9/29/2004 5:16:19 PM [Eastern Daylight Time] * SVR:NYRFAX01/0 * DNIS:1229 * CSID: * DURATION (mm-ss):11-16

Report "noted that, during the Second Quarter, Barrick experienced 'declining production from a group of mines being phased out this year,' [D]efendant Carrington assured the markets that the Company had put these problems behind it, stating that '[w]e expect a better second half, with higher production and lower costs, as we believe we've resolved most of the operating challenges we had in the first half.'" (Id. f 160); paragraphs 98 and 161 state that, with respect to one of the most important of all the Barrick mines, the Meikle mine, Barrick reported in the 2Q Report that "[p]roduction in the second half of 2002 is expected to rise... with cash costs declining . . . due to higher mining grades and lower ground support costs." (Id. ¶¶ 98, 161); paragraph 165 states that during a conference call with industry analysts on July 25, 2002, Defendant Oliphant stated that "changes we made to mine sequences at Hemlo, Meikle and Plutonic [mines] in the first half of the year led to the deferral of higher rate material in the second half." (Id. ¶ 165); paragraph 172 states that, on the same day, an industry analyst from BMO Nesbitt Burns Research reported that, based on the July 25, 2002 conference call, "Barrick expects to improve its operating performance in the second half, as higher-grade reserves will be processed . . . Lower grades are a recurring theme at [Barrick's mining] operations, where mine sequencing changes have deferred higher grades to the second half. . . ." (Id. ¶ 172.)

      The Amended Complaint (adequately) pleads securities fraud by alleging, inter alia, that Defendants engaged in a process known as high-grading which they knew was increasing production costs at the same time that they were issuing statements to the public that costs were expected to decrease. (Am. Compl. ¶¶ 90-104, 105-07, 160-65, 211.) According to Plaintiffs, Defendants had no basis for the statements made to the public that production costs "are expected to decline from a First Quarter high as the year progresses, owing to higher grades at

-12-

some operations." (Am. Compl. ¶ 146: see also id. ¶211.) Plaintiffs assert that the risks of higher production costs presented by Defendants as a "possibility" had in fact already materialized (because the higher grade ore had already been removed from the ground and the remaining ore would necessarily cost more to extract) but were not disclosed. (Id. ¶¶90-104, 106-07, 113, 149, 165, 211.)

There is no protection afforded Defendants under either the safe harbor provision of the PSLRA or the so-called bespeaks caution doctrine for knowing misstatement or omission of an existing fact, such as concealing that an ongoing production process actually increases costs while advising the public that costs will decline or stating that high grade ore remains in the ground when it is known that it has already been removed. See Rombach v. Chang. 355 F.3d 164, 173 (2d Cir. 2004) ("The bespeaks caution doctrine does not serve if it is abused or gamed. Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."); In re Prudential Sec. Ltd. P'shps. Litig.. 930 F, Supp, 68, 72 (S.D.N.Y. 1996) ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away."); Manavazian v. ATEC Group. Inc.. 160 F. Supp. 2d 468, 481 (S.D.N.Y. 2001) (neither safe harbor nor bespeaks caution doctrine apply "to allegations of misrepresentations of existing facts"); fa re Ashanti Goldfields Sec. Litig., 184 F. Supp. 2d 247, 267 (E.D.N.Y. 2002) ("statements about the then-existing state of affairs are not protected by the [PSLRA's] safe harbor provision").

-13-

2. **Scienter**

Defendants also argue that Plaintiffs "fail to allege particular facts giving rise to a strong inference of either actual knowledge or recklessness," and that "Plaintiffs failed to meet their burden because they do not allege that any of the [I]ndividual [D]efendants . . . had direct knowledge of any alleged fraud." (Def. Mem. at 8-9.) Plaintiffs assert that "when Defendants assured investors that Barrick had deferred high-grade reserves and, thus, Class Period mining costs would fall, Defendants had access to, possessed, and concealed information to the contrary," and, similarly, knew of the high-grading process. (Pl. Mem. at 19; Am. Compl. ¶¶ 90-104, 105-07, 160-65, 211.)

To prevail in an action brought under Section 10(b) or Rule 10b-5, a plaintiff must allege that the defendants acted with "an intent to deceive, manipulate or defraud." Ganino, 228 F.3d at 168 (Quoting Ernst & Ernst v. Hochfelder. 425 U.S. 185, 193 n.12 (1976)). Under the PSLRA, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). This requirement is satisfied by alleging either (a) "facts to show that defendants had both motive and opportunity to commit fraud," or (b) "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Acito v. IMCERA Group. Inc.. 47 F.3d 47, 52 (2d Cir. 1995); Kalnit v. Eichler, 264 F.3d 131, 138-39 (2d Cir. 2001); Novak v. Kasaks 216 F.3d 300, 310 (2d Cir. 2000).[5] A plaintiff may establish "strong circumstantial evidence of conscious misbehavior

---

[5] Where "the Complaint successfully pleaded that the defendant engaged in conscious or reckless misbehavior, it need not also consider the motive and opportunity prong of scienter." Ganino, 228 F.3d at 170. As set forth below under each of Plaintiffs' claims, the Court concludes that Plaintiffs have successfully plead "facts that constitute strong circumstantial
(continued...)

-14-