mines. (Am. Compl, ¶¶ 3, 11-13, 36, 90-107, 145-49, 155, 159-68, 172, 176, 184-96, 199-200, 205, 208, 211, 215-17, 230-44.) The alleged disparity between Defendants' public statements that production costs were expected to decrease and their knowledge that, due to the high-grading and the absence of remaining high grade ore, these "predictions" would not or were very unlikely to materialize, adequately alleges "defendants' knowledge of facts or access to information contradicting their public statements ... [and that] defendants knew, or more importantly, should have known that they were misrepresenting material facts related to the corporation." Kalnit, 264 F.3d at 142; see also Acito, 47 F.3d at 52; In re Next Level Svs., Inc., Sec. Litig., No. 97 C 7362, 1999 WL 387446, at *7 (N.D. Ill. Mar. 31, 1999).

### 3. Causation

Defendants do not argue that Plaintiffs fail to meet the pleading requirements for "transaction causation" or "loss causation" with respect to the Costs and Earnings Projections. (Def. Mem. at 3-13; Def. Reply at 1-5; 9/20/04 Tr. at 15.) In any event, Plaintiffs have adequately plead these elements. (Id.; Am. Compl. ¶¶ 12, 19-26, 90-104, 139-49, 230-40.)

B.  Gold Sales Program

   1.  **Material Misstatements and Omissions**

Defendants argue that they made no material omissions regarding the Gold Sales Program because they fully disclosed its terms in the 2001 Report, which stated that the "Gold Sales Program is our unique hedging activity that increases revenue from our main asset—our gold reserves," and that under the Program, "[w]e enter into spot deferred contracts to establish prices for future gold production and to hedge against future volatility in gold prices." (Def. Mem. at 18.) Defendants state that "[t]he 2001 Report also gives detailed descriptions of the terms of

-16-

PAGE 18/35 * RCVD AT 9/29/2004 5:16:19 PM [Eastern Daylight Time] * SVR:NYRFAX01/0 * DNIS:1220 * CSID: * DURATION (mm-ss):11-16

[Barrick's] spot deferred contracts, its outstanding commitments and the amount of gold delivered under those contracts, the accounting treatment of those contracts, and the value of its derivative instruments." *(Id.)* In response to Plaintiffs' claims that the Gold Sales Program was "anticompetitive," Defendants claim that "Barrick had no duty to disclose that it potentially violated Federal and state antitrust laws and state common law [because] Courts have consistently refused to require companies to disclose that they engaged in unproven illegal conduct that they deny." (Def. Mem. at 16.)

Plaintiffs argue that Defendants failed to disclose that Barrick's "core business" activity was the Gold Sales Program, a risky derivatives program, rather than gold production, and that Barrick and the Individual Defendants consistently mischaracterized the Program as hedging rather than gold price speculation. (Pl. Mem. at 13; Am. Compl. ¶¶39, 115, 118, 125, 129, 152, 170, 184; see also 9/20/04 Tr. at 9-11.) They also argue that "Defendants were obligated to disclose the underlying improper conduct that became the subject of the Blanchard case, i.e., that Barrick's [Gold Sales] Program was devised and successfully executed to manipulate the gold market downward in order for Barrick to profit from the Program" and to enable Barrick "to force its competitors to sell out to it." (Pl. Mem. at 13.)

"At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." Ganino, 228 F.3d at 161. "The determination of materiality is a mixed question of law and fact that generally should be presented to a jury." Press v. Chem. fay. Servs. Corp., 166 F.3d 529, 538 (2d Cir. 1998). A complaint should not be dismissed "on the ground that the alleged misstatements or omissions are not material unless they are so obviously

-17-

PAGE 19/35 * RCVD AT 9/29/2004 5:16:19 PM [Eastern Daylight Time] * SVR:NYRFAX01/0 * DNIS:1229 * CSID: * DURATION (mm-ss):11-16

09/29/04  16:32 FAX                    JUDGE BERMAN                              ⌐020

unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." Goldman v. Belden. 754 F.2d 1059, 1067 (2d Cir. 1985); see also Ganino. 228 F.3d at 162, "[A]llegations of materiality should not be considered in isolation." Manavazian. 160 F. Supp. 2d at 478.

Plaintiffs' allegations that speculation rather than hedging was the central activity of the Gold Sales Program adequately plead materiality. "[H]edging, like insurance, is a method of risk aversion, not risk assumption." In re Ashanti. 184 F. Supp, 2d at 254 (citing BP N. Am. Petroleum v. Solar ST. 250 F.3d 311 n.3 (5th Cir. 2001)). Mischaracterizing speculation as hedging creates the impression that the activity is "protective ... rather than risky." In re Ashanti. 184 F, Supp. 2d at 251-52. If, as the Amended Complaint alleges, the Program was highly speculative, misstatements or omissions that failed adequately to disclose such information would be material to the reasonable investor. Id. at 256 ("it is clear that 'hedging' and 'speculation' describe different futures market strategies.——Accordingly, Ashanti's use of the terms "hedging" and "speculation" can form the basis of a securities fraud complaint.").

The Amended Complaint also alleges that the Gold Sales Program was Barrick's "main profit center." (Am. Compl. ¶¶ 4, 118 (quoting Oliphant as stating that the Program "has meant $2 billion in additional revenue for our company"); see also id. ¶¶ 115, 129, 152; 9/20/04 Tr. at 9 (Gold Sales Program "was 71 percent of this company's earnings").) When a large portion of a company's profits are a product of hedging operations, "it contributes to the perception that [a defendant has] become more dependent for its profits on the futures market than a producer that was merely hedging would be," In re Ashanti. 184 F. Supp. 2d at 257. If the Gold Sales Program were in fact speculative, and reflected more risk than was disclosed, then Defendants

-18-

PAGE 20/35 * RCVD AT 9/29/2004 5:18:19 PM [Eastern Daylight Time] * SVR:NYRFAX01/0 * DNIS:1229 * CSID: * DURATION (mm-ss):11-16

may have misrepresented the nature of the Program, and concealed potential financial exposure when gold prices fluctuated. In re Ashanti, 184 F. Supp. 2d at 257. Such an omission cannot be considered "obviously unimportant to a reasonable investor." Goldman, 754 F.2d at 1067; fare Ashanti, 184 F. Supp. 2d at 257.

The Amended Complaint also alleges that the Gold Sales Program involved "anticompetitive conduct" that should have been disclosed, i.e., as reflected in the Blanchard case." (Am. Compl. ¶¶ 43, 50, 110.) Whether or not the conduct alleged by Plaintiffs is illegal, Defendants are under a "duty to disclose . . . whenever secret information renders prior public statements materially misleading." In re Sotheby's Holdings, Inc. Sec. Litig., No. 00 Civ. 1041, 2000 WL 1234601, at *4 (Aug. 31, 2000). The conduct alleged here, i.e., that Defendants improperly manipulated the price of gold, includes, as the Amended Complaint alleges, the potential for "enormous and ruinous civil and criminal liability." (Am. Compl. ¶ 110.) See also, In re Sotheby's, 2000 WL 1234601, at *4 ("[W]hen a corporation does make a disclosure—whether it be voluntary or required—there is a duty to make it complete and accurate. This duty to disclose exists even where the omitted information relates to allegedly illegal conduct.") (citation omitted); In re Par Pharms., Inc. Sec. Litig., 733 F. Supp. 668, 675 (S.D.N.Y. 1990) ("The illegality of corporate behavior is not a justification for withholding information that the corporation is otherwise obligated to disclose."); Ballan v. Wilfred Am. Ed. Corp., 720 F. Supp. 241, 249 (E.D.N.Y. 1989) ("The fact that a defendant's act may be a crime does not justify its concealment.").

-19-

2.  **Scienter**

Defendants claim that their conduct cannot be considered "reckless" because, among other things, "the Blanchard plaintiffs had to amend their complaint three times; ... the judge [in Blanchard] wrote a lengthy opinion denying Barrick's motion to dismiss; and ... Barrick has vigorously defended the case, [which] undercuts any suggestion that the purported antitrust violations were 'obvious,'" and "because each of the [I]ndividual [D]efendants is a Canadian national and none of them possesses a law degree, [P]laintiffs cannot show that they 'recklessly disregarded' potential violations of U.S. antitrust law," (Def. Mem. at 19.)

Plaintiffs allege that, through the Gold Sales Program, Defendants purposefully engaged in conduct designed illegally to affect the gold spot market and, that the Gold Sales Program was Barrick's "main profit center." (Am. Compl. ¶43.) Plaintiffs also allege that Defendants "carefully managed the Program and, thus, knew (and indeed intended) the manipulative effect that the Program had on the gold market." (Pl. Mem. at 20.) Plaintiffs argue that Defendants also "cannot credibly feign ignorance to the anti-competitive nature of the Program as it was the Company's core business for many years and from which it realized almost all of its profits— Here, it is without question that the Program was the cornerstone of Barrick's business model and, thus, Defendants' [] knowledge of its adverse effect on the gold market and competing gold producers, must be imputed to them." (Pl. Mem. at 21-22.) Finally, "[n]otwithstanding Defendants' contention that they are Canadians and therefore, cannot be held responsible for failing to disclose the Company's antitrust violations, no such ignorance of the law defense exists, because it is the knowledge of the conduct, not its illegality that matters." (Pl. Mem. at 21 n.27.)

Under Novak v. Kasaks, 216 F.3d 300 (2d Cir. 2000), a strong inference that defendants acted with the required state of mind can be drawn, as alleged here, if they "knew facts or had access to information suggesting that their public statements were not accurate." Id. at 311. Plaintiffs sufficiently allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. See Acito, 47 F.3d at 52. Defendants may be said to have had knowledge of Barrick's speculative activities as well as the anticompetitive nature of the Gold Sales Program. For example, Barrick's Form 40-F, dated April 29, 2002, states that:

> The Company's derivatives activities are subject to the management, direction, and control of its Financial Committee as part of that Committees's oversight of the Company's investment activities and treasury function. The Finance Committee, which is comprised of five members of the Company's Board of Directors, including the Company's Chief Operating Officer, reports to the Board of Directors on the scope of the Company's risk-management strategy and on its derivatives activities.

(Form 40-F, dated April 29, 2002, at 170-71 ("40-F Form"), attached to Altaian Decl. at Exh. 7.) In addition, each of the Individual Defendants made statements during the Class Period concerning the hedging aspect of the Gold Sales Program. (Am. Compl. ¶¶ 122, 125, 129, 186.) As for the anticompetitive aspect of the Program, Plaintiffs allege that, in addition to having actual knowledge of the activities of the Program through the oversight role described in the 40-F Form, the Program was so "enormous" that its effects on the gold market price simply could not be unknown to Defendants. (Am. Compl. ¶ 48, 51-61.) For example, "Barrick's short position as of the end of 2001 was 24.1 million ounces, as compared to global mine production of 65.2 million ounces," and was "more than double the annual production of South Africa, the largest gold producer in the world." (Am. Compl. ¶¶ 49, 58.) Moreover, the Program generated the vast majority ($2 billion) of Barrick's profits over the last fourteen years. (Id. ¶ 118.) Thus,

-21-

Defendants were sufficiently aware of both the speculative and anticompetitive nature of the Program and they therefore "knew, or . . . should have known that they were misrepresenting material facts related to the corporation." Kalnit, 264 F.3d at 142; Novak, 216 F.3d at 311; see also In re Ashanti, 184 F. Supp. 2d at 257.

3.  **Causation**

Defendants argue that Plaintiffs have failed to allege loss causation because "[a]lthough [P]laintiffs' losses allegedly resulted from the drop in Barrick's stock price on September 26, 2002, the announcement that purportedly caused that drop made no mention of the [Gold Sales Program]." (Def. Mem. at 20.) Defendants contend that "Barrick's 'anticompetitive conduct' was not 'revealed' until December 18, 2002 - three months after the end of the putative class period - when the Blanchard case was filed," and because of this fact, "Plaintiffs' losses . . . cannot be attributed to the alleged disclosure of the 'anticompetitive conduct.'" (Id. (emphasis in original).) Plaintiffs respond that they have adequately alleged loss causation because a "partial disclosure" of the "single, inter-related fraudulent scheme" occurred on September 26, 2002, when the Company announced that "it expected to earn materially less in 2002" and that "it would materially miss its previously forecasted results for the Third Quarter 2002" due to "increased costs stemming from production issues at several mines." (Pl. Mem, at 25.) Plaintiffs argue that this "partial disclosure" on September 26, 2002, coupled with the subsequent drop in stock price that day "more than satisfies the loss causation pleading requirement." (Pl. Mem. at 25; Pl. Letter at 1.) Plaintiffs further argue that "there need not be a mirror image between the alleged misrepresentations and the eventual corrective disclosure because the principle of loss

-22-

causation 'embodies notions of the common law tort concept of proximate causation.'" (Id. (citing AUSA Life Ins. Co. v. Ernst & Young. 206 F.3d 202, 216 (2d Cir. 2000).)

Causation under federal securities laws embraces "transaction causation" and "loss causation." See Suez Equity Investors. L.P. v. Toronto-Dominion Bank. 250 F.3d 87, 95 (2d Cir. 2001); see also AUSA Life. 206 F.3d at 209.[6] "Loss causation ... is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." Emergent Capital Inv. Mgmt.. LLC v. Stonepath Group. Inc.. 343 F.3d 189, 197 (2d Cir. 2003) (citing Suez Equity. 250 F.3d at 96). Plaintiffs must "adequately allege a causal connection between defendants' non-disclosures and the subsequent decline in the value of [the security]." Emergent Capital, 343 F.3d at 197. "We have often compared loss causation to the tort law concept of proximate cause, 'meaning that the damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation or material omissions.'" Emergent Capital. 343 F.3d at 197 (citing Castellano v. Young & Rubicam. Inc.. 257 F.3d 171, 186 (2d Cir. 2001)); see also Citibank. N.A. v. K-H Corp.. 968 F.2d 1489, 1495 (2d Cir. 1992) (comparing loss causation to proximate cause); In re Atlas Air Worldwide Holdings. Inc. Sec. Litig.. 324 F. Supp. 2d 474, 498 (S.D.N.Y. 2004). A plaintiff can satisfy the loss causation requirement by alleging that (1) the misrepresentation artificially inflated the value of the security, or otherwise misrepresented its investment quality, and (2) the subject of the misrepresentation caused the decline in the value of the security." Fogarazzo v. Lehman Bros.. Inc.. No. 03 Civ. 5194, 2004 WL 1151542, at *10 (S.D.N.Y. May 21, 2004) (emphasis in original).

---

[6] Defendants do not argue that the Amended Complaint fails to allege transaction causation with respect to the Gold Sales Program. (Def. Mem. at 19-21; see also 9/20/04 Tr. at 15.)

-23-

Plaintiffs have alleged, inter alia, that Defendants failed to disclose the following material information about the Gold Sales Program: "[the Gold Sales Program], not mining, was [Barrick's] central business;" Barrick "manipulated the price of gold" through the Program; Barrick engaged in anticompetitive activity by "forc[ing] smaller players from the market;" Barrick "exposed the Company to liability . . . for its anticompetitive conduct;" through the Program, Barrick "improperly received and relied upon an unearned, unsustainable, and high risk revenue stream;" and "Barrick should have disclosed that J.P. Morgan possessed a financial interest in Barrick." (Am. Compl. ¶ 79.) Plaintiffs contend that "[a]s a result of these materially false and misleading statements and failures to disclose, Barrick securities traded at artificially inflated prices during the Class Period." (Id. ¶ 206.) Plaintiffs also allege that "when the truth emerged about Barrick's misrepresentations and omissions . . . the price of Barrick common stock fell 10.5% in one day." (Id ¶ 2.) According to Plaintiffs, the "truth emerged" on September 26, 2002, when "the Company announced that it expected to earn materially less in 2002 than previously announced, and that it would materially miss its previously forecasted results for the Third Quarter 2002, due to increased costs stemming from production issues at several mines." (Id. ¶ 12.) The Amended Complaint states that "the disclosures at the end of the Class Period that caused the decline of Barrick's stock price centered around higher than expected production costs and lower than expected gold production due to low grade ore mining at several mines." (Id. ¶ 90.)

Even accepting all factual allegations in the Amended Complaint as true, Plaintiffs have failed adequately to allege "a causal connection between defendants' non-disclosures and the subsequent decline in the value of the security" on September 26, 2002. Emergent Capital. 343

-24-

F.3d 197; Suez Equity, 250 F.3d at 97; In re Merrill Lynch Tyco Research Sec. Litig., No. 03 Civ. 4080, 2004 WL 305809, at *3 (S.D.N.Y. Feb. 18, 2004). Plaintiffs' principal theory is that Defendants concealed certain facts about the "true nature" of the Gold Sales Program, see Am. Compl. ¶ 206, and that revelation of these facts on September 26, 2002 caused the stock price to decline, resulting in Plaintiffs' losses, see Am. Compl. ¶¶ 197, 206, 208. At the same time, the revelation that Plaintiffs allege to have occurred on September 26, 2002 was Barrick's restatement of previous forecasts "due to increased costs stemming from production issues at several mines." (Id. ¶ 12; see also id. ¶ 193 (Barrick "shocked the market" by issuing press release revising earnings expectations and "blaming the negative revision on high costs and lower production due to problems at certain mines"); ¶¶ 196-97 (in "reaction to . . . disclosure" that "costs at Hemlo were higher because of poor grades of ore," "Barrick common stock fell 10.5% in one day"); ¶ 90 ("disclosures . . . that caused the decline of Barrick's stock price centered around higher than expected production costs and lower than expected gold production"); ¶ 12 (inference of fraud likely because "it is inconceivable that Barrick simultaneously learned of production problems and increased costs at several mines a mere nine days after a positive announcement"). The September 26, 2002 "revelations" did not address the Gold Sales Program, nor any alleged speculation, anticompetitive activity, price manipulation, improper relationship with J.P. Morgan, or high risk revenue. Plaintiffs have, therefore, failed to "assert any causal relationship between the 'fraud' alleged and the decline in . . . trading price" on September 26, 2002. Merrill Lynch, 2004 WL 305809, at *3 ("Because the June 6 research report did not discuss the subject matter of the alleged fraud, as a matter of law, the decline in Tyco's trading price on that date cannot be considered a reaction to the disclosure of the alleged

-25-

"fraud.'"); Fogarazzo. 2004 WL 1151542, at *10 (noting that in both Emergent Capital and Suez Equity, it was "critical" that "the ultimate decline in the companies' stock price was attributable to the very thing that the defendants allegedly lied about"); DeMarco v. Robertson Stephens Inc.. 318 F. Supp. 2d 110, 125 (S.D.N.Y. 2004) (loss causation established in part because "revelation of the misrepresentations . . . lead[s] inexorably to a price correction"); see also Suez Equity, 250 F.3d at 96 ("The loss causation inquiry typically examines how directly the subject of the fraudulent statement caused the loss, and whether the resulting loss was a foreseeable outcome of the fraudulent statement.").

Plaintiffs acknowledge that Barrick's anticompetitive conduct was not "revealed" to the market until December 18, 2002 when the Blanchard case was filed. (Am. Compl. ¶201 ("On December 18, 2002, Blanchard filed its action against Barrick and J.P. Morgan revealing Barrick's anti-competitive conduct under the Program.").) Blanchard was filed almost three months after the alleged stock price decline and Plaintiffs alleged injuries "could not have been the foreseeable result of the alleged fraud." Arduini/Messina P'ship v. Nat'l Med. Fin. Serv. Corp., 74 F. Supp. 2d 352, 361 (S.D.N.Y. 1999) (plaintiffs "unable to link their losses to the alleged misrepresentations and omissions" where "any drop in . . . stock price as a result of the fraud about which plaintiffs complain would not have been felt until . . . seven to eleven months after" end of class period "when the alleged fraudulent scheme" was "finally announced"); see also AUSA Life. 206 F.3d at 215 (where alleged fraud did not manifest itself during class period, no loss causation); Merrill Lynch. 2004 WL 305809, at *3.[7]

---

[7] Plaintiffs' argument that they need not satisfy the requirement for loss causation with regard to the Gold Sales Program because "the misrepresentations concerning the Program,
(continued...)

-26-

C.      Accounting Change

    1.      Material **Misstatements** and Omissions

Defendants claim that **Barrick's** decision not to treat the variable price sales contracts as derivative positions was entirely consistent with generally accepted accounting principles ("GAAP") and "did not render its financial statements, or its representations that those statements conformed to GAAP, inaccurate or misleading." (Def. Mem. at 22.) "Moreover, **Barrick** fully **disclosed** the exchange of options, and the corresponding accounting change." (Id.) **Plaintiffs claim** that the allegations **concerning** the Accounting Change are material because they reflect the purpose of concealing "**the** Company's fundamental 'bet against the gold market' trading strategy," i.e., the Program. (Pl. Mem. at 16.) "Defendants concealed the financial impact of this change, misleading investors into believing that first quarter 2002 reported revenues and profits **compared** favorable to prior periods [when in] fact they did not" (Id.)

Plaintiffs allege materiality. The Amended Complaint alleges that "[w]hen gold prices rose in the First Quarter of 2002, the short call positions and the **min-max positions**, . . . which were recorded positively on the balance sheet and in the income statement as of December 31, 2001, resulted in a **loss** ranging from $50 million to $90 **million**. To mask this loss during the First Quarter of 2002, Barrick changed the name of these positions and accounted for them as 'normal sales contracts' instead of 'derivatives,' thereby eliminating the recognition of this loss

---

[7](...continued)
variable **sales** contracts, and **Barrick's** high-grading were all part of a single, inter-related fraudulent scheme" **does** not satisfy me pleading standard under the **PSLRA**. (PL Mem. at 25.) See also 15 U.S.C. § 78u-4(b); In re QLT Inc. Sec. Litig., 312 F. Supp. 2d 526, 537 (S.D.N.Y. 2004).

-27-

PAGE 29/35 * RCVD AT 9/29/2004 5:16:19 PM [Eastern Daylight Time] * SVR:NYRFAX01/0 * DNIS:1229 * CSID: * DURATION (mm-ss):11-16

from *its* First Quarter 2002 balance sheet and income statement." (Am. Compl ¶ 86.) "In short, when these derivative positions were advantageous to **Barrick**, they were recognized as derivatives and recorded on **Barrick's** balance sheet and income statement Once they adversely impacted earnings, **Barrick** renamed them to avoid the negative impact on its bottom line, which permitted Defendants to continue to deceptively portray Barrick as a company with positive earnings." (Id. ¶ 89.) Also, "**Defendants** failed to explain that the reason for the **reclassification** was to avoid a negative impact to earnings had this deceptive change in accounting not occurred." (Id. 1 88.)

If, as the Amended Complaint alleges, Barrick "**never** fully or adequately disclosed the potential negative impact of rising gold prices on this derivative position to the public," (Am. Compl. ¶ 86), and through the Accounting Change Barrick was able to "**bury**" a multi-million dollar loss, making it appear as a profit, then such information cannot be considered "obviously unimportant to a reasonable investor." **Goldman**, 754 F.2d at 1067.

2.   **Scienter**

Defendants claim that "Plaintiffs do not adequately **allege** scienter with respect to Barrick's Exchange of Option Contracts" because "accounting decisions tolerate a range of '**reasonable**' treatments, leaving the choice among alternatives to management" and "[t]he existence of a reasonable basis for an accounting decision therefore necessarily precludes a showing of intentional fraud." (Def. Mem. at 24.) They state that "[e]ven if plaintiffs had alleged GAAP violations, such **violations**, by **themselves**, do not establish scienter." (Id.) "Finally, the purported motive '**to** avoid a negative impact to **earnings**' . . . for the alleged fraud is universally-held by all corporations and cannot demonstrate scienter." (Id.) Plaintiffs argue that

-28-

"Defendants concede that the decision to change the accounting treatment of their derivatives was a conscious decision by admitting it was **Barrick's** decision not to treat the variable sales price contracts as **derivative positions**. . . . Thus, Defendants concede **scienter** with respect to reversing **tens-of-millions** of **dollars** in losses into $46 million in profits by one stroke of a pen." (Pl. Mem. at 23.)

The Amended Complaint alleges that the Accounting Change was a conscious decision made by Defendants "to avoid the negative impact [of the derivative positions] on its bottom line, which permitted Defendants to continue to deceptively portray **Barrick** as a company with positive earnings." (Am. **Compl.** ¶ 89.) Through the Accounting Change, "**the** Company avoided having to recognize a negative impact on their First Quarter earnings in the range of $50 million to $90 million, and buried the $50 million to S90 million mark-to-market loss adjustment with its unrealized off-balance sheet Program holdings [**permitting**] the loss to be masked." (Id. ¶ 88.) Additionally, "Barrick reiterated that the changes to the Variable Price Options . . . were simply changes in name **only**" when Defendant **Sokalsky** stated:

> We have called these sales contracts. **We've** rewritten the contracts. And by doing that, those contracts qualify as normal sales, and we do not have to put the mark to market on those formally call options or **minmax** contracts through the income **statement**. . . . [T]he substance of these contracts is essentially the same as the **call** options and **minmax** contracts that we have ___ As I mentioned earlier, the substance of these transactions is the same. All we've **done — is** formalized and rewritten **the** contracts with the counter parties that we deal with to provide the we can deliver this gold as a sales contractor **physically — So** there was no cost to essentially just clarify and formalize **that**.

(Am. Compl. ¶ 167.)

As The Amended Complaint alleges that the Accounting Change was not "essentially the same" as claimed by Barrick's Chief Financial **Officer** (Sokalsky) because it "masked" millions

-29-

of dollars of losses in derivatives, Am. Compl. ¶ 88, Plaintiffs adequately have alleged that Defendants "knew or . . . should have known that they were misrepresenting material facts related to the corporation." Kalnit, 264 F.3d at 142.

3. **Causation**

Defendants claim that "Plaintiffs fail to plead loss causation because there is no allegation that any disclosure regarding the change in accounting treatment caused any decline in Barrick's stock price." (Def. Reply at 10; see also Def. Mem. at 21-25, 9/20/04 Tr. at 15.)[*] Plaintiffs respond that the "partial disclosure of that fraud and the subsequent drop in stock price more than satisfies the loss causation pleading requirement." (Pl. Mem. at 25; see also 9/20/04 Tr. at 11 ("We believe it's a unified fraud and one act has to do with the other.").)

Under the PSLRA, each statement alleging fraud must "adequately allege a causal connection between defendants' non-disclosures and the subsequent decline in the value of [the security.]" Emergent Capital, 343 F.3d at 197. Plaintiffs' claim is that Barrick had derivative positions which it classified as "short calls" and "min-max options" on its balance sheet at the end of 2001, and that these were later reclassified as "normal sales contracts" to "mask" Bairick's losses arising from rising gold prices, in violation of the Securities and Exchange Commission's rules and generally accepted accounting principles ("GAAP"). (Am. Compl. ¶¶ 10, 85-89, 166-70.) But there is no causal link alleged between the Accounting Change and the harm suffered by Plaintiffs. (Id.) The Amended Complaint identifies no "causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." See In re

---

[*] Defendants do not argue that the Amended Complaint fails to allege transaction causation with respect to the Accounting Change. (Def. Mem. at 24-25; see also 9/20/04 Tr. at 15.)

-30-

OLT Inc. Sec. Litig., 312 F. Supp. 2d 526, 536 (S.D.N.Y. 2004); see also Emergent Capital, 343 F.3d at 197 (citing Suez Equity, 250 F.3d at 96); In re Bausch & Lomb, 2003 WL 23101782, at *18.

D.   Section 20(a) Claims

Defendants argue that "[i]n the absence of an underlying violation of § 10(b), the 'controlling persons' claim against the individual defendants under § 20(a) must also fail." (Def. Mem. at 25.) Plaintiffs claim that because they "have pled a Section 10(b) violation . . . Defendants' contention that Plaintiffs have not pled a Section 20(a) claim must be denied." (Pl. Mem. at 25.)

"Section 20(a) of the Exchange Act provides that 'every person who . . . controls any person liable [for a Section 10(b) violation] . . . shall also be liable jointly and severally with and to the same extent as such controlled person.'" Ellison v. Am. Image Motor Co., 36 F. Supp. 2d 628, 637 (S.D.N.Y. 1999) (citation omitted). "'Controlling person liability' is a separate inquiry from that of primary liability and provides an alternate basis of culpability." In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 77-78 (2d Cir. 2001). Defendants have offered no independent basis for dismissing the Section 20(a) claims beyond their arguments for dismissal of the primary Section 10(b) claims. The Court does not (here) dismiss Plaintiffs' Section 10(b) claim with regard to the Costs and Earnings Projections, therefore Plaintiffs' Section 20(a) claim also survives. See, e.g., In re Sterling Foster & Co. Sec. Litig., 222 F. Supp. 2d 216, 277, 282-23 (E.D.N.Y. 2002) (denying motion to dismiss Section 20(a) claim where Section 10(b) claim survives); see also In re Scholastic Corp., 252 F.3d at 78; Buxbaum v. Deutsche Bank, A.G., No.

-31-

PAGE 33/35 * RCVD AT 9/29/2004 5:16:19 PM [Eastern Daylight Time] * SVR:NYRFAX01/0 * DNIS:1229 * CSID: * DURATION (mm-ss):11-16

98 Civ. 8460, 2000 WL 33912712, at *19 (S.D.N.Y. Mar. 7, 2000); In re Credit Suisse First Boston Corp. Sec. Litig., No. 97 Civ. 4760, 1998 WL 734365, at *12 (S.D.N.Y. Oct. 20, 1998).

E.   Leave to Amend

Plaintiffs request that if the Court determines that there are any deficiencies in the Amended Complaint, they be given leave to amend pursuant to Fed. R. Civ. P. 15(a). (Pl. Mem. at 25 n.31.) Defendants argue that the Amended Complaint should be dismissed in its entirety "with prejudice." (Def. Mem. at 25.)

Fed. R. Civ. P. 15(a) provides that leave to amend the complaint "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a); Panio v. Beverly Enters., Inc., No. 86 Civ. 6422, 1990 WL 41767, at *2 (S.D.N.Y. Apr. 4, 1990). Leave to amend should especially be granted "[i]n the absence of undue .. delay, bad faith or dilatory motive on the part of the movant," or "undue prejudice to the opposing party," Foman v. Davis. 371 U.S. 178, 182 (1962), and "where dismissal of the complaint was based on Rule 9(b)." Acito. 47 F.3d at 55; see also Dovitz v. Rare Medium Group. Inc., No. 01 Civ. 10196, 2002 WL 1225540, at *5 (S.D.N.Y. June 4, 2002). Plaintiffs are granted leave to file a Second Amended Complaint on or before October 20, 2004.

V.   Conclusion and Order

For the reasons set forth below, Defendants' motion to dismiss [22] is granted in part and denied in part. Plaintiffs may file a Second Amended Complaint in accordance with this Order by October 20, 2004.

Counsel are requested to appear at a status/settlement conference with the Court on Thursday, November 4, 2004 at 2:00 p.m. in Courtroom 706 of the Thurgood Marshall

-32-

Courthouse, 40 Centre Street, New York, New York. The parties are directed to engage in good faith settlement negotiations prior to the conference with the Court.

Dated: September 29, 2004
       New York, New York



RICHARD M. BERMAN, U.S.D.J.

-33-