### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

JOEL MENKES, Individually and    :
on behalf of all others          :
similarly situated,              :
                                 :
     Plaintiffs,                 :     No. 3:03CV409(DJS)
                                 :
v.                               :
                                 :
STOLT-NIELSEN S.A., JACOB        :
STOLT-NIELSEN, NIELS G. STOLT-   :
NIELSEN, SAMUEL COOPERMAN, and   :
REGINALD JR. LEE,                :
                                 :
     Defendants.                 :

### MEMORANDUM OF DECISION

Lead plaintiffs, Irene Rucker and Gustav Rucker, bring this action on behalf of a putative class of purchasers of defendant Stolt-Nielsen S.A.'s ("SNSA") American Depository Receipts ("ADRs") for the period of May 31, 2000 through February 20, 2003 pursuant to Sections 10(b), 15 U.S.C. § 78j(b), and 20(a), 15 U.S.C. § 78t, of the Securities Exchange Act of 1934 ("the Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78a-78mm, and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, against Stolt-Nielsen S.A., Jacob Stolt-Nielsen, Niels G. Stolt-Nielsen, Samuel Cooperman, and Reginald J.R. Lee.  Defendants have filed a motion to dismiss (dkt. # 29) all counts of the Consolidated Amended Class Action Complaint.  For the reasons set forth herein, defendants' motion (dkt. # 29) is **GRANTED.**

## I. FACTS

The following facts are alleged in the Consolidated Amended Class Action Complaint (hereinafter "complaint" or cited as "Dkt. # 28, ¶ __"), are set forth in documents incorporated by reference into the complaint, or are found in Stolt's public disclosure documents, or in other materials properly considered because plaintiffs have relied upon them in crafting their allegations. See Rothman v. Gregor, 220 F.3d 81, 88-89 (2d Cir. 2000); In re Hunter Environmental Services, Inc. Securities Litigation, 921 F. Supp. 914, 917-18 (D. Conn. 1996).

SNSA is a holding company that, through its subsidiaries, engages in worldwide transportation, storage, and distribution of bulk liquid chemicals and other similar materials. Greenwich, Connecticut based Stolt-Nielsen Transportation Group, Inc. ("SNTG") is a subsidiary wholly owned by Stolt that engages in Stolt's business of liquid chemical transportation on worldwide seaborne trade routes. Jacob Stolt-Nielsen is the founder and current Chairman of SNSA, and Niels G. Stolt-Nielsen is the Chief Executive Officer of SNSA. Samuel Cooperman has been the Chairman of SNTG and Reginald J.R. Lee has been SNTG's Chief Executive Officer during the time period relevant to plaintiffs' claims.

At issue in this case is Stolt's[1] transportation of bulk liquid chemicals.  SNTG is one of the largest parcel tanker operators in the world, and several of SNTG's largest customers are among the world's major chemical companies.  As described by Stolt,

> [t]he parcel tanker industry occupies a market niche in the worldwide tanker trade and represents only about 5% of the [deadweight tons] of the international tanker fleet.  Unlike crude oil tankers which generally load a full cargo at one port for one customer and discharge at one destination, parcel tankers, as the name implies, carry many cargoes (as many as 58 parcels) for many customers on the same voyage and load and discharge cargo at many ports.  A parcel tanker may carry a wide range of bulk liquids shipped in parcels of several hundred to several thousand tons each.

(Dkt. # 33 Ex. B at 4).  SNTG's parcel tankers typically transport lots greater than 150 metric tons in size.  SNTG also transports bulk liquid chemicals by using tank containers, which are smaller (24,000 liter maximum capacity) than the parcels used in SNTG's parcel tankers (100,000 liter minimum capacity) and can be transported by ship, rail car, or truck.

Plaintiffs allege that, for the period of May 31, 2000[2] through February 20, 2003, Stolt engaged in a scheme to fix shipping rates, rig bids, and allocate customers.  According to

---

[1] Where the distinction between SNSA and SNTG serves no purpose, the court will refer to SNSA and SNTG collectively as "Stolt."

[2] Plaintiffs also allege that Stolt may have begun its anti-competitive conduct as early as 1998.

newspaper articles and the affidavit of Special Agent John Sharp
of the Federal Bureau of Investigation submitted in support of a
criminal complaint filed against Richard Wingfield, SNTG's
Managing Director, Tanker Trading Division, certain Stolt
employees made agreements with major competitors of Stolt to
coordinate bidding and divide customer contracts between
themselves.  Stolt employees allegedly met with employees of
Stolt's competitors for this purpose on several different
occasions, exchanged customer lists, and either purposefully did
not bid on contracts to allow its competitors to gain the
business or submitted artificially high bids to drive the
contract price upward for the benefit of other parties to this
anti-competitive arrangement.

Plaintiffs also allege that, for the period of May 31, 2000
through February 20, 2003, Stolt illegally shipped goods to and
from countries such as Iran, Sudan, and Cuba that are subject to
a U.S. trade embargo.  Plaintiffs allege that Stolt, through
U.S.-based SNTG employees, was actively involved in trade to
these countries in violation of U.S. embargoes.

The value of Stolt's ADRs[3] was adversely effected after news

_____

[3] An ADR is a "financial instrument[] that allow[s]
investors in the United States to purchase and sell stock in
foreign corporations in a simpler and more secure manner than
trading in the underlying security in a foreign market." Pinker
v. Roche Holdings Ltd., 292 F.3d 361, 365 (3rd Cir. 2002).  "ADRs
are tradeable in the same manner as any other registered American
security, may be listed on any of the major exchanges in the

-4-

of these allegations became public.  On November 22, 2002, published reports stated that the U.S. Department of the Treasury had been investigating SNTG to determine if SNTG had engaged in trade with certain nations in violation of U.S. trade embargoes. Stolt's ADRs dropped from the price of $7.62 per share to $6.50 per share after the publication of these reports.  On February 20, 2003, published reports recounted the allegations of price-fixing and anti-competitive conduct, and the price of Stolt's ADRs dropped from $7.10 per share to $5.94 per share.

Plaintiffs claim that a number of statements made by defendants during the class period were false or misleading because of these undisclosed illegal activities.  Specifically, plaintiffs claim that the following statements were false or misleading in light of Stolt's clandestine illegal conduct:

- "[t]he Company's businesses are subject to international conventions and U.S. and other governmental regulations which strictly regulate various aspects of the Company's operations," (dkt. # 28, ¶ 61 (May 31, 2000, May 31, 2001, and May 31, 2002); see also id., ¶ 67 (October 26, 2001));

- "[s]hipments in the year 2000 increased from the downturn encountered in 1999.  Increases were primarily the result of improved demand in three main operating regions of Asia Pacific, Europe and the United States. Shipment levels in 2001 continue to reflect improved demand particularly from the United States and Asia," (id., ¶¶ 63 & 65 (October 26, 2001));

- "[g]rowth of 5% is anticipated in 2002 as a result of

United States or traded over the counter, and are subject to the Securities Act and the Exchange Act."  Id. at 367.

increased marketing and sales efforts in all regions," (id., ¶¶ 64 & 72 (May 31, 2002));

• "[t]he market for the integrated transportation and logistics services provided by SNTG is in its infancy. In providing such services, SNTG competes primarily with a few other terminal and transport companies who are developing such services. . . . SNTG's tanker operations compete with operators based primarily in Europe and the Asia Pacific region. . . . The competition in the tank container market is fragmented, although the relative size of the competition is increasing on a worldwide basis. SNTG also competes, to a lesser extent, with tank container leasing companies," (id., ¶ 66 (October 26, 2001));

• "[e]xcluding the restructuring charges, the Stolt-Nielsen Transportation Group reported results on par with the first quarter of last year. Income from operations for SNTG's parcel tanker division was $20.5 million in the first quarter of 2002 compared to $20.3 million in the first quarter of 2001. . . . Contracts of affreightment continue to be renewed at higher levels and SNTG recently renewed a multi-year contract for one of its largest customers. We are anticipating a pickup in rates in the second half of the year and throughout 2003 as the world economies continue their recovery[.] . . . SNTG's tank container operations income improved to $4.7 million in the first quarter of 2002 compared to $2.7 million in the first quarter of last year. While shipments in the first quarter were similar to the comparable quarter last year, utilization rose to 71.1% compared to 67.7% last year. For the remainder of the year we anticipate seeing continued pressure on pricing while utilization should be similar to what we saw in the first quarter. We still see shipments for the year growing 5% compared to 2001," (id., ¶ 68 (March 27, 2002));

• "[d]uring 2000, SNTG entered into co-service agreements with two Parcel tanker companies, Tokyo Marine and Seatrans, to improve the scheduling of SNTG's fleets, and increase operational efficiency and customer service. In January 2002, SNTG announced an additional co-service agreement with Jo Tankers.***SNTG personnel coordinate most of the marketing and sales efforts directly with SNTG's parcel tanker customers," (id., ¶ 70 (May 31, 2002));

-6-

- "SNTG's strategy is to build a global network to take care of our customers' every bulk liquid logistic need from door to door throughout the world and to be the low cost provider of such services," (<u>id.</u>, ¶ 73 (May 31, 2002));

- "[w]hile the results in the second quarter for the Stolt-Nielsen Transportation Group were down compared to last year, our core contract business, particularly for specialty chemicals, remains healthy. We continue to see improvements in Stolt Offshore's results," (<u>id.</u>, ¶ 74 (June 26, 2002));

- "SNTG's tank container division's income from operations improved significantly to $6.3 million in the second quarter of 2002 compared to $4.0 million in the same quarter of 2001. Utilization in the second quarter compared to the same period last year rose 7.0% to 74.4%. Shipments are up some 6% although pricing continues to be tight," (<u>id.</u> (June 26, 2002)); and

- "[t]he Stolt-Nielsen Transportation Group posted a solid quarter[.] . . . SNTG's tank container division delivered another strong result with income from operations rising to $6.2 million from $5.6 million in the comparable quarter of 2001. Year-to-date shipments are up some 10% compared to last year and utilization in the third quarter hit a record level of 77.7% although the business continues to see a tight pricing environment," (<u>id.</u>, ¶ 76 (October 8, 2002)).

Plaintiffs claim that defendants' failure to disclose Stolt's alleged anti-competitive conduct or its alleged actions taken in violation of U.S. trade embargoes rendered these statements misleading.

## II. DISCUSSION

Plaintiffs set forth two counts in their complaint: (1) violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5 promulgated thereunder against Stolt and the individual

defendants; and (2) violation of 15 U.S.C. § 78t against the
individual defendants.  Defendants seek dismissal of each count
pursuant to Rule 12(b)(6) of the Federal Rules of Civil
Procedure.

A. STANDARD

When considering a Rule 12(b)(6) motion to dismiss, the
court accepts as true all factual allegations in the complaint
and draws inferences from these allegations in the light most
favorable to the plaintiff.  See Scheur v. Rhodes, 416 U.S. 232,
236 (1974); Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996).
Dismissal is warranted only if, under any set of facts that the
plaintiff can prove consistent with the allegations, it is clear
that no relief can be granted.  See Hishon v. King & Spaulding,
467 U.S. 69, 73 (1984); Cooper v. Parsky, 140 F.3d 433, 440 (2d
Cir. 1998).  "The issue on a motion to dismiss is not whether the
plaintiff will prevail, but whether the plaintiff is entitled to
offer evidence to support his or her claims."  United States v.
Yale New Haven Hosp., 727 F. Supp. 784, 786 (D. Conn. 1990)
(citing Scheuer, 416 U.S. at 232).  In its review of a motion to
dismiss, the court may consider "only the facts alleged in the
pleadings, documents attached as exhibits or incorporated by
reference in the pleadings and matters of which judicial notice
may be taken."  Samuels v. Air Transport Local 504, 992 F.2d 12,
15 (2d Cir. 1993).

B. SECTION 10(b) CLAIM

Plaintiffs allege that defendants engaged in fraudulent conduct that affected the purchase or sale of Stolt's ADRs. Specifically, plaintiffs claim that defendants had a duty to disclose to the investing public the nature and scope of their anti-competitive agreements with other parcel tanker companies and the extent of its operations in nations subject to U.S. trade embargo, such as Cuba, Iran, and Sudan.  Defendants argue that they had no such duty to disclose this information, and that, even if a duty did arise, plaintiffs have not alleged that defendants acted with the requisite state of mind.

Section 10 of the Securities Exchange Act of 1934 provides, in pertinent part, that

> It shall be unlawful for any person, directly or
> indirectly, by the use of any means or instrumentality
> of interstate commerce or of the mails, or of any
> facility of any national securities exchange—
>
> * * *
>
> (b) To use or employ, in connection with the purchase
> or sale of any security registered on a national
> securities exchange or any security not so registered,
> or any securities-based swap agreement (as defined in
> section 206B of the Gramm-Leach-Bliley Act), any
> manipulative or deceptive device or contrivance in
> contravention of such rules and regulations as the
> Commission may prescribe as necessary or appropriate in
> the public interest or for the protection of investors.

15 U.S.C. § 78j.  Rule 10b-5, which was promulgated under the authority of Section 10, provides the following:

> It shall be unlawful for any person, directly or

-9-

indirectly, by the use of any means or instrumentality
of interstate commerce, or of the mails or of any
facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to
defraud,

(b) To make any untrue statement of a material fact or
to omit to state a material fact necessary in order to
make the statements made, in the light of the
circumstances under which they were made, not
misleading, or

(c) To engage in any act, practice, or course of
business which operates or would operate as a fraud or
deceit upon any person, in connection with the purchase
or sale of any security.

17 C.F.R. § 240.10b-5.  "For a plaintiff to state a viable cause

of action for securities fraud under § 10(b), 15 U.S.C. § 78j(b),

and Rule 10b-5, 17 C.F.R. § 240.10b-5(b), the complaint must

allege that in connection with the purchase or sale of

securities, defendant, acting with scienter, either made a false

material representation or omitted to disclose material

information so that plaintiff--acting in reliance either on

defendant's false representation or its failure to disclose

material information--suffered injury and damages." In re

Scholastic Corp. Sec. Litig., 252 F.3d 63, 69 (2d Cir. 2001).

    In order to adequately establish the substantive elements of

a violation of Rule 10b-5, plaintiffs must meet the pleading

standard set forth in Rule 9(b) of the Federal Rules of Civil

Procedure, the PSLRA, and precedent from the Court of Appeals for

the Second Circuit.  With respect to the existence of false or

misleading statements, in order to meet Rule 9(b)'s requirement
that "[i]n all averments of fraud or mistake, the circumstances
of fraud or mistake shall be stated with particularity," Fed. R.
Civ. P. 9(b), "[t]he complaint must identify the statements
plaintiff asserts were fraudulent and why, in plaintiff's view,
they were fraudulent, specifying who made them, and where and
when they were made." In re Scholastic Corp. Sec. Litig., 252
F.3d at 69-70.[4]

With respect to scienter, under the PSLRA, and prior Second
Circuit precedent, a plaintiff must "state facts with
particularity that give rise to a strong inference of the
required state of mind." Novak v. Kasaks, 216 F.3d 300, 312 (2d
Cir. 2000); see 15 U.S.C. § 78u-4(b)(2) ("In any private action
arising under this chapter in which the plaintiff may recover
money damages only on proof that the defendant acted with a
particular state of mind, the complaint shall, with respect to
each act or omission alleged to violate this chapter, state with
particularity facts giving rise to a strong inference that the
defendant acted with the required state of mind."). The Court of
Appeals for the Second Circuit has "recognized two distinct ways

_____

[4] The court finds that, at this stage of the proceedings,
plaintiffs have complied with Rule 9 of the Federal Rules of
Civil Procedure even though certain actionable statements
reference SNTG's tank container operations rather than its parcel
tanker operations. Defendants' argument draws a nice distinction
more properly reserved for the time when presentation of evidence
is appropriate.

in which a plaintiff may plead scienter without direct knowledge of the defendant's state of mind.  The first approach is to allege facts establishing a motive to commit fraud and an opportunity to do so.  The second approach is to allege facts constituting circumstantial evidence of either reckless or conscious behavior."  In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 268-69 (2d Cir. 1993).

### i. Material Omissions

In order for an omission to be actionable, the omission must be material.  "A statement is material only if there is a 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'"  In re Int'l Bus. Machines Corporate Sec. Litig., 163 F.3d 102, 106-7 (2d Cir. 1998) (quoting Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988)).  "Material facts include those that 'affect the probable future of the company and [that] may affect the desire of investors to buy, sell, or hold the company's securities.'"  Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 180 (2d Cir. 2001) (quoting SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 849 (2d Cir. 1968)).  "At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment

decisions." Ganino v. Citizens Utilities Co., 228 F.3d 154, 161 (2d Cir. 2000). Because materiality is a mixed question of law and fact, judgment as a matter of law "may not be granted on the ground that alleged omissions are immaterial 'unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" Castellano, 257 F.3d at 180 (quoting Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985)); see Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 357 (2d Cir. 2002) ("Recognizing that the materiality of an omission is a mixed question of law and fact, courts often will not dismiss a securities fraud complaint at the pleading stage of the proceedings, unless reasonable minds could not differ on the importance of the omission."); Ganino, 228 F.3d at 162.

The trier of fact could find that the omissions alleged by plaintiffs were material. The allegations of Stolt's agreement to rig bids and fix prices are, as set forth in the complaint, sweeping in their scope, and the potential sanctions therefor could significantly impact Stolt's future operations and earnings. There is a "substantial likelihood that a reasonable shareholder" would consider this information important in deciding whether to conduct a transaction involving Stolt's ADRs. TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976).

ii. Duty to Disclose

Although the omissions alleged by plaintiffs could be material, defendants must have had a duty to disclose this information in order to be liable under Rule 10b-5.  <u>See Chiarella v. U.S.</u>, 445 U.S. 222, 228 (1980) ("[O]ne who fails to disclose material information prior to the consummation of a transaction commits fraud only when he is under a duty to do so."); <u>In re Time Warner Sec. Litig.</u>, 9 F.3d at 267 ("[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact. Rather, an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts.").  Although Rule 10b-5 generally does not "require management to accuse itself of antisocial or illegal policies," <u>Amalgamated Clothing and Textile Workers Union, AFL-CIO v. J.P. Stevens & Co., Inc.</u>, 475 F. Supp. 328, 331 (S.D.N.Y. 1979), <u>judgment vacated as moot</u> 638 F.2d 7 (2d Cir. 1980), management may be compelled to disclose uncharged[5] illegal conduct when there is insider trading, when a statute or regulation requires disclosure, or when disclosure is necessary to prevent another statement from misleading the public.  <u>See Roeder v. Alpha</u>

---

[5] Regulation S-K, which is discussed at a later point in this memorandum, mandates the disclosure of "any material pending legal proceedings" and "any such proceedings known to be contemplated by governmental authorities."  17 C.F.R. § 229.103.

-14-

<u>Indus., Inc.</u>, 814 F.2d 22, 27 (1st Cir. 1987) ("Roeder claims that a corporation has an affirmative duty to disclose all material information even if there is no insider trading, no statute or regulation requiring disclosure, and no inaccurate, incomplete, or misleading prior disclosures. The prevailing view, however, is that there is no such affirmative duty of disclosure."); <u>see also</u> <u>Glazer v. Formica Corp.</u>, 964 F.2d 149, 156-57 (2d Cir. 1992) (adopting the Court of Appeals for the First Circuit's analysis of the duty to disclose set forth in <u>Roeder</u>).

In other words, the fact that a corporation's employees engaged in illegal conduct may well be material to the reasonable investor for several obvious reasons, but the obligation to disclose uncharged illegal conduct does not arise from the materiality of this information alone. Rather, in the present context, a duty to disclose uncharged illegal conduct arises when it is necessary to disclose this conduct under the terms of a statute or regulation, or when it is necessary to disclose this conduct in order to prevent statements the corporation does make from misleading the public. Courts that have determined that corporations had a duty to disclose uncharged illegal conduct in order to prevent other statements from misleading the public have required a connection between the illegal conduct and the statements beyond the simple fact that a criminal conviction

would have an adverse impact upon the corporation's operations in general or bottom line.  See, e.g., In re Sotheby's Holdings, Inc., No. 00Civ.1041(DLC); 2000 WL 1234601, at *4 (S.D.N.Y. Aug. 31, 2000) (denying motion to dismiss securities fraud claims based upon an anti-competitive agreement and finding that defendants had a duty to disclose the anti-competitive conduct because the corporation stated that competition was "intense" with its "primary auction competitor," which was a party to the anti-competitive agreement); In re Par Pharma., Inc. Sec. Litig., 733 F. Supp. 668, 677-78 (S.D.N.Y. 1990) (denying motion to dismiss securities fraud claims based upon failure to disclose a scheme to bribe Food and Drug Administration officials for the purpose of obtaining expedited approval of new drug applications because defendants compared the corporation's success to other corporations, projected similar results in the future, and conveyed the impression that defendants's success was due to a particular expertise); Ballan v. Wilfred Am. Educ. Corp., 720 F. Supp. 241, 249-50 (E.D.N.Y. 1989) (denying motion to dismiss securities fraud claims based upon a school's failure to disclose the extent of the school's abuse of the federal higher education loan system and finding that a duty to disclose the extent of the misconduct existed because the school minimized the potential consequences of the pending investigation in its public statements); but see Greenfield v. Prof'l Care, Inc., 677 F.

-16-

Supp. 110, 113 (E.D.N.Y. 1987) (denying motion to dismiss
securities fraud claims based upon falsification of patient
eligibility for Medicaid reimbursement and finding that a duty to
disclose the illegal conduct existed because "[i]nformation going
directly to the financial condition of the company" is material).
In other words, a corporation has a duty to disclose uncharged
criminal conduct to prevent conveying, through its own public
statements, a false impression to an investor and not for the
sake of merely improving an investor's perspective.

Certain statements set forth in the complaint obligate Stolt
to disclose its alleged uncharged anti-competitive activity
because disclosure of this conduct was necessary to prevent
misleading the investing public.  "A duty to disclose arises
whenever secret information renders prior public statements
materially misleading. . . ."  In re Time Warner Sec. Litig., 9
F.3d at 268.  Here, Stolt's public statements set forth in
paragraphs 66, 68, 74, and 76 do not disclose Stolt's alleged
anti-competitive behavior and therefore could have misled a
reasonable investor.  Each of these statements directly
references the uncharged anti-competitive conduct alleged in the
complaint by stating that "SNTG's tanker operations compete with
operators based primarily in Europe and the Asia Pacific region,"
(dkt. # 28 ¶ 66), touting the fact that SNTG "recently renewed a
multi-year contract for one of its largest customers," which

-17-

plaintiffs allege was the direct result of a conspiracy with Odfjell (id. ¶ 68), and describing the pricing environment in the market as "tight" (id. ¶ 74) and subject to continued "pressure" (id. ¶ 68).

The case before the court is indistinguishable from the other cases in which district courts within the Second Circuit have found a duty to disclose uncharged illegal conduct arising from the corporation's own misleading statements.  In In re Sotheby's Holdings, Inc., Sotheby's explicitly referenced its anti-competitive agreement with Christie's when it characterized competition between the two firms as "intense."  Sotheby's statements could have misled the investing public because it fostered an inaccurate view of the relationship between Sotheby's and Christie's: competition was not "intense" with respect to commissions.  Here, Stolt describes the pricing environment as "tight" and subject to continued "pressure," which is no different than stating that there is "intense" competition between its business rivals in that the statement conveys the false impression to investors that Stolt achieved success in a competitive pricing environment.  Similarly, touting the renewal of a major contract that could have been the result of an illegal agreement conveys the false impression that this particular contract was procured through sound business practices.

In contrast, a trier of fact could not find Stolt's

-18-

statements cited in paragraphs 61, 63, 64, 65, 67, 70, 72, and 73 materially misleading because the "subject matter of [each] statement is so attenuated from [the uncharged illegal conduct] that it could not reasonably be found to have created a false impression in a reasonable investor."  In re Par Pharm. Sec. Litig., 733 F. Supp. at 678; cf. In re Time Warner Sec. Litig., 9 F.3d at 268 ("[W]e hold that when a corporation is pursuing a specific business goal and announces that goal as well as an intended approach for reaching it, it may come under an obligation to disclose other approaches to reaching the goal when those approaches are under active and serious consideration."). In these public statements, Stolt did not discuss competition between other companies such that the failure to disclose Stolt's illegal circumvention of competition rendered Stolt's statements misleading.  Unlike other cases decided by district courts within the Second Circuit, Stolt did not flout its ability to expedite regulatory approval of new drugs when in fact a bribery scheme was the direct cause of this ability to expedite, see In re Par Pharm. Sec. Litig., 733 F. Supp. at 677-78, nor did Stolt describe competition as "intense" and list "the amount of commission" as a factor in competition when in fact there was an illegal agreement to fix commissions with its only major competitor, see In re Sotheby's Holdings, Inc., 2000 WL 1234601, at *4 & n.2.  Not one of these statements has any direct

-19-

connection to agreements to allocate customers, agreements to refrain from bidding, agreements to submit inflated bids, or actions taken in violation of U.S. trade embargoes; instead, each statement is a generic description of the state of the market as a whole, a recitation of historical facts about Stolt's operations, or vague forecasts of future success, which are too remote from Stolt's alleged illegal conduct to compel disclosure of this conduct.

Plaintiffs also contend that disclosure of Stolt's alleged criminal conduct was required under Regulation S-K and the SEC's instructions to Form 20-K.  Regulation S-K "states the requirements applicable to the content of the non-financial statement portions" of registration statements and annual reports that must be filed pursuant to federal securities law.  17 C.F.R. § 229.10(a).  Item 101 of Regulation S-K provides that "[a] registrant shall describe any risks attendant to the foreign operations and any dependence on one or more of the registrant's segments upon such foreign operations."  17 C.F.R. § 229.101(d)(3).  The SEC's instructions for completing Form 20-F, which Stolt must follow when filing its annual report, state that Stolt must provide the following three items: (1) "[a] description of the material effect of government regulations on the company's business, identifying the regulatory body," (dkt. # 33, Ex. A at 9); (2)

-20-

information regarding significant factors, including
unusual or infrequent events or new developments,
materially affecting the company's income from
operations, indicating the extent to which income was
so affected.  Describe any other significant component
of revenue or expenses necessary to understand the
company's results of operations. . . .  Provide
information regarding any governmental economic,
fiscal, monetary or political policies or factors that
have materially affected, or could materially affect,
directly or indirectly, the company's operations or
investments by host country shareholders.

(id. at 11); and (3) "a summary of each material contract, other

than contracts entered into in the ordinary course of business,

to which the company or any member of the group is a party for

the two years immediately preceding publication of the document.

. . .," (id. at 24).

Neither Regulation S-K nor the SEC's instructions for

completing Form 20-F mandates the disclosure of the conduct at

issue in this case.  To construe the disclosure requirements

cited by plaintiffs to compel disclosure of Stolt's alleged

criminal actions in this case would eviscerate the well-

established principle that Rule 10b-5 generally does not "require

management to accuse itself of antisocial or illegal policies."

Amalgamated Clothing and Textile Workers Union, AFL-CIO, 475 F.

Supp. at 331; see U.S. v. Matthews, 787 F.2d 38, 49 (2d Cir.

1986) ("[A]t least so long as uncharged criminal conduct is not

required to be disclosed by any rule lawfully promulgated by the

SEC, nondisclosure of such conduct cannot be the basis of a

criminal prosecution.").  For example, the "risk attendant to

-21-

[Stolt's] foreign operation" referenced in Regulation S-K is no different than the risk inherent in any of the corporation's activities: the possibility that an employee will break the law while conducting the business of the corporation.  Likewise, the "material contract[s]" referenced in the instructions for completing Form 20-F are in this case an agreement, or conspiracy, to perform a criminal act, which is conceptually no different than any other criminal act.  If the regulation and instructions were read as plaintiffs advocate, a corporation would have to warn the investing public of the "risk" that an employee would break the law, or disclose the existence of a "material contract" that is actually an uncharged criminal conspiracy.  There is simply no authority supporting plaintiffs' broad reading of Regulation S-K; a much more specific and decisive statement from the SEC is necessary to overcome the proposition, emphatically stated by the Court of Appeals for the Second Circuit in <u>Matthews</u>, that Rule 10b-5 does not mandate the disclosure of uncharged criminal conduct.

Defendants' motion must therefore be denied with respect to the statements set forth in paragraphs 66, 68, 74, and 76, because Stolt had a duty to disclose its alleged anti-competitive conduct arising from these statements.  Defendants' motion is granted with respect to the statements set forth in paragraphs 61, 63, 64, 65, 67, 70, 72, and 73, as plaintiffs cannot prove

that any defendant had a duty to disclose the uncharged criminal
conduct alleged in the complaint arising from these statements.
The court finds that defendants did not have a duty to disclose
alleged uncharged violations of U.S. trade embargoes.  Because
the court concludes that plaintiffs have failed to state a claim
for relief under the Exchange Act based upon its holding that
defendants did not have a duty to disclose the information
plaintiffs claim should not have been omitted, the court renders
no opinion regarding plaintiffs' allegations of scienter with
respect to any defendant as to paragraphs 61, 63, 64, 65, 67, 70,
72, and 73 of the complaint.

### iii. Scienter

Having determined that certain statements made by defendants
could be found to be false or misleading because defendants
omitted information regarding SNTG's anti-competitive conduct,
the court must determine whether plaintiffs have adequately
alleged that the speaker of each false or misleading statement
acted with the required scienter.  Here, each statement was
spoken by SNSA or by SNSA's agent on behalf of SNSA, while SNTG
employees actually engaged in the anti-competitive activity.
Plaintiffs must therefore allege that SNSA offered these
potentially false of misleading statements with scienter.

In order to successfully plead scienter, plaintiffs must
"allege facts that give rise to a strong inference of fraudulent

intent." Shields v. Citytrust Bancorp., Inc., 25 F.3d 1124, 1128
(2d Cir. 1994). "The requisite 'strong inference' of fraud may
be established either (a) by alleging facts to show that
defendants had both motive and opportunity to commit fraud, or
(b) by alleging facts that constitute strong circumstantial
evidence of conscious misbehavior or recklessness." Id.

Plaintiffs attempt to meet their pleading burden by way of
the latter method.[6] "[S]ecurities fraud claims typically have
sufficed to state a claim based on recklessness when they have
specifically alleged defendants' knowledge of facts or access to
information contradicting their public statements. Under such
circumstances, defendants knew or, more importantly, should have
known that they were misrepresenting material facts related to
the corporation." Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir.
2000). Mindful of the admonition that "there are limits to the
scope of liability for failure to adequately monitor the
allegedly fraudulent behavior of others," id. at 309, plaintiffs
attempt to establish the sufficiency of their allegations against
SNSA as follows.

First, plaintiffs contend that, because SNTG's operations
were so critical to SNSA's financial health, the trier of fact

_____

[6] To the extent plaintiffs have alleged motive and
opportunity to commit fraud, their attempt fails because they
allege only "a generalized motive, one which could be imputed to
any publicly-owned, for-profit endeavor. . . ." Chill v. General
Electric Co., 101 F.3d 263, 268 (2d Cir. 1996).

-24-

could infer that SNSA management must have known of SNTG's anti-competitive conduct. Plaintiffs point out that SNTG's business "represented approximately 43% of [SNSA's] net operating revenue [and] about 87% of 2000 income from operations," (dkt. # 33 at 19 (quoting dkt. # 33, Ex. B at 5) (alterations in original, internal quotation marks omitted)), and that "parcel tanker operations 'remain SNTG's single largest activity,'" (id. (quoting dkt. # 33, Ex. B at 5)). Plaintiffs also contend that Cooperman, who served as SNTG's chairman, must have been aware of SNTG's anti-competitive conduct and was in a position to relay this knowledge to SNSA.

Plaintiffs also allege that SNSA employees were or should have been aware of SNTG's anti-competitive conduct. Plaintiffs allege that the primary perpetrator of the alleged anti-competitive conduct was Richard Wingfield, SNTG's Managing Director of its Tanker Trading Division. They allege that, during late 2000 through 2001, Wingfield met with Odfjell, which was one of SNTG's primary competitors in the parcel tanker business, to agree on pricing and allocate contracts and routes. Plaintiffs also allege that Wingfield discussed agreement about shipping rates with Tokyo Marine. Plaintiffs contend that Wingfield shared information about his anti-competitive activity as follows: an e-mail to "colleagues in Greenwich," (dkt. # 28 ¶ 39(a)), a fax to Wingfield consisting of "a cost-benefit analysis

-25-

prepared by Stolt regarding the profitability of conspiring with Odfjell versus 'going to war' with Odfjell," (id. ¶ 39(c)), and an announcement to "the SNTG management board," (id. ¶ 40). Plaintiffs allege that Paul O'Brien, SNTG's general counsel, was aware of Wingfield's activities, that O'Brien asked Cooperman to suspend Wingfield and investigate his anti-competitive activities in February of 2002, that Cooperman declined to do so, and that O'Brien resigned on March 1, 2002.

Plaintiffs also allege that SNTG's "vice-president for SNTG's tanker trading," identified as Pickering, stated, in a meeting between SNSA and SNTG employees, that "Odfjell and Stolt had reached an agreement that certain customers belonged to Stolt and others to Odfjell. They had 'carved up the world.'" (Dkt. # 28 ¶ 33). They further allege that Kenneth Bloom, a SNSA "vice-president for logistics," "expressed his concerns [about Pickering's statement] to Cooperman, then SNTG's Chairman." (Id. ¶ 34).

As currently constituted, the complaint does not establish a clear link between those who were involved in the anti-competitive arrangements at SNTG and SNSA management. Although they do allege that word of anti-competitive activities reached the highest level of SNTG management in Cooperman, plaintiffs do not allege any facts supporting the conclusion that Cooperman relayed this information to SNSA management. See In re Alpharma

-26-

Inc. Sec. Litig., 372 F.3d 137, 150 (3rd Cir. 2004) (holding that allegations that an executive's subordinate knew of corporate misconduct was "an insufficient basis upon which to impute knowledge" to the executive); Kushner v. Beverly Enterprises, Inc., 317 F.3d 820, 828 (8th Cir. 2003) (same).  Further, the relative importance of SNTG's operations to SNSA's overall well-being, which should not be minimized, does not fill this factual void.  Even though SNTG is far more critical to SNSA than Kidder Peabody & Co. was to General Electric Company in Chill because Kidder Peabody & Co. was one of twenty-four subsidiaries of GE Capital Services, Inc., which was one of twelve subsidiaries of General Electric Company, the court cannot, without any information in the complaint as to the manner by which information flowed from SNTG to SNSA and how involved SNSA was in monitoring SNTG's activities from which the anti-competitive conduct originated complete the link from those with knowledge of the anti-competitive conduct to SNSA's management.  Without facts such as these, the court can only assume, and not infer, that SNSA's management knew about the illegal activity.  Because plaintiffs have not alleged scienter on the part of SNSA and Niels G. Stolt-Nielsen, defendants' motion must be granted with respect to plaintiff's Section 10(b) claims.

## III. CONCLUSION

For the reasons set forth herein, defendants' motion to dismiss (dkt. # 29) is **GRANTED.** To summarize, the court finds as follows. First, defendants did not have a duty to disclose alleged uncharged illegal conduct with respect to the statements set forth in paragraphs 61, 63, 64, 65, 67, 70, 72, and 73 of the complaint. Second, defendants did have a duty to disclose the alleged uncharged anti-competitive conduct with respect to the statements set forth in paragraphs 66, 68, 74, and 76 of the complaint due to the nature of the statements themselves. Third, plaintiffs did not sufficiently allege that defendants made the statements set forth in paragraphs 66, 68, 74, and 76 of the complaint with the required scienter. Fourth, because plaintiffs' Section 20(a) claims are derived from their Section 10(b) claims, which fail as a matter of law, these claims also fail as a matter of law. Each count of the Consolidated Amended Class Action Complaint is **DISMISSED with prejudice.** The Clerk of the Court shall close this file.

So ordered this 10th day of November, 2005.


                                        **/s/DJS**
                        _____
                            **DOMINIC J. SQUATRITO**
                        **UNITED STATES DISTRICT JUDGE**