# EXHIBIT B

QuickLinks —– Click here to rapidly navigate through this document

As filed with the Securities and Exchange Commission on June 4, 2003

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM 20–F/A

### Amendment No. 1

☐     **REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR (g) OF THE SECURITIES EXCHANGE ACT OF 1934**

OR

☒     **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended November 30, 2002

OR

☐     **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission File Number 000–16977

# STOLT–NIELSEN S.A.
(Exact name of Registrant as specified in its charter)

**LUXEMBOURG**
(Jurisdiction of incorporation or organization)

**c/o STOLT–NIELSEN LIMITED**
**Aldwych House**
**71–91 Aldwych**
**London WC2B 4HN, England**
(Address of principal executive offices)

**Securities registered or to be registered pursuant to Section 12(b) of the Act:**
None

**Securities registered or to be registered pursuant to Section 12(g) of the Act:**
Common Shares, no par value

**Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:**
None

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report:

| | |
|---|---|
| Common Shares, no par value | 54,949,387* |
| Founder's Shares, no par value | 13,737,346** |

\*

The number of outstanding Common Shares excludes 7,688,810 Common Shares owned by a subsidiary.

\*\*

The number of outstanding Founder's Shares excludes 1,922,203 Founder's Shares held by Stolt–Nielsen S.A.

*Liquidity Line to Stolt Offshore*

Stolt Offshore has obtained a commitment from us to provide a subordinated credit line of $50 million which is currently available until November 28, 2003 and which is excluded in the calculation of covenants for Stolt Offshore's financing arrangements. On February 28, 2003, Stolt Offshore made a drawdown of $48 million against this $50 million liquidity line provided by us. The $48 million drawdown was repaid within seven days.

*Stolt Tankers Joint Service*

SNTG operates its major intercontinental services through the STJS, an arrangement for the coordinated marketing, operation and administration of the fleet of parcel tankers owned or chartered by the Joint Service participants in the deep sea intercontinental market. For further discussion of the STJS, see "Item 4. Information on the Company — Business Overview."

**Item 8. Financial Information.**

**Consolidated Statements and Other Financial Information**

The information included under the captions "Independent Auditors' Report," "Report of Independent Public Accountants," "Consolidated Financial Statements" and "Notes to Consolidated Financial Statements" on pages 32 through 62 of our 2002 Annual Report filed with the Securities and Exchange Commission on Form 6–K on April 18, 2003 and as amended on June 2, 2003 is incorporated herein by reference.

**Legal Proceedings**

*Stolt–Nielsen S.A. and Stolt–Nielsen Transportation Group*

*Antitrust Investigations*

In 2002, we became aware of information that caused us to undertake an internal investigation regarding potential improper collusive behavior in our parcel tanker and intra–Europe inland barge operations. As a consequence of the internal investigation, we determined to voluntarily report certain conduct to the Antitrust Division of the U.S. Department of Justice (the "DOJ") and the Competition Directorate of the European Commission (the "EC"). On February 25, 2003, we announced that SNTG had been conditionally accepted into the DOJ's Corporate Leniency Program in connection with possible collusion in the parcel tanker industry. Pursuant to such program, SNTG and its directors and employees will receive amnesty from criminal antitrust prosecution and fines in the United States for anti–competitive conduct in the parcel tanker business, provided the stated conditions, including continued cooperation, are met. We also announced that the EC had admitted SNTG into its Immunity Program with respect to deep–sea parcel tanker and intra–Europe inland barge operations. Acceptance into the EC program affords SNTG immunity from EC fines with respect to anti–competitive behavior, subject to the SNTG fulfilling the conditions of the program, including continued cooperation. We are committed to cooperating fully with the DOJ and the EC with respect to such programs. In light of SNTG's admission into the government antitrust programs, no provision for any fines related to the DOJ or EC investigations has been made in our consolidated financial statements. However, our ability to enforce the agreements pursuant to which SNTG has been granted conditional amnesty and immunity has not been legally established. Consequently, SNTG's immunity and amnesty depends in large part on the Department of Justice's and European Commission's satisfaction with SNTG's efforts to cooperate and otherwise satisfy the conditions of the immunity and amnesty programs. It is possible that they could determine, because of new information or for other reasons, that SNTG has not fully complied with those conditions. If this were to happen, SNTG could be partly or fully removed from the immunity or amnesty program, subject to criminal prosecution and, if it were found guilty,

63

significant fines and penalties. If any such proceedings were brought by the Department of Justice or European Commission, SNTG could incur significant additional defense costs and significant distraction of senior management from the operation of its business. Consequently, if SNTG cannot continue to avail itself of the immunity and amnesty programs, we could face a material adverse effect on our financial condition, cash flows and results of operations.

*Potential Investigation by the U.S. Attorney's Office in Connecticut*

We are aware that an article in the May 20, 2003 edition of *The Wall Street Journal* reported a probe of SNTG by the U.S. Attorney's Office in Connecticut. We have contacted the U.S. Attorney's Office and we are committed to cooperating fully in any probe. We understand that the probe is in the most preliminary of phases. If an investigation proceeds, SNTG could be subject to criminal prosecution and, if it were found guilty, significant fines and penalties. In connection with an investigation and any potential criminal proceedings we could incur significant additional defense costs and significant distraction of senior management from the operation of its business. Consequently, we could face a material adverse effect on our financial condition, cash flows and results of operations.

*Office of Foreign Assets Control Investigations*

OFAC has initiated investigations of certain payments by SNTG of incidental port expenses to entities in Iran and Sudan as possible violations of the International Emergency Economic Powers Act, the Iranian Transactions Regulations and the Sudanese Sanctions Regulations. We are cooperating fully with OFAC in these investigations, have implemented internal Company policies and procedures, which are designed to ensure full compliance with U.S. sanctions regulations, and have ceased all tanker trade with all OFAC–restricted countries. With respect to OFAC's Iran investigation, on April 3, 2002 OFAC issued a Cease and Desist Order to SNTG covering payments by SNTG for incidental port expenses involving unlicensed shipments to, from or involving Iran. SNTG has fully complied with that Order. OFAC's investigation with respect to Iran is currently pending and OFAC has not made any determination of whether a violation has occurred as a result of SNTG's payments of incidental port expenses to entities in Iran. If OFAC determines that an apparent violation has occurred, SNTG could seek to settle the matter with OFAC or OFAC could impose a civil monetary or other penalties on SNTG. OFAC also could refer the matter to other federal law enforcement agencies for criminal investigation. At this time, we do not know whether the subject of OFAC's investigation of SNTG is included as part of the U.S. Attorney's probe in Connecticut. Even if OFAC has referred this matter to the Department of Justice for criminal investigation, OFAC might also continue to pursue the matter as a civil penalty matter. With respect to OFAC's Sudan investigation, on March 20, 2003 SNTG settled the matter with OFAC for a payment of US $95,000 and without any determination by OFAC that SNTG's payments of incidental port expenses to entities in the Sudan violated U.S. sanctions regulations.

*Paul E. O'Brien*

In June 2002 a former general counsel of SNTG, Paul E. O'Brien, filed an action in Superior Court in Connecticut alleging that he had been constructively discharged. Mr. O'Brien had resigned in March 2002 and his complaint seeks, among other things, compensatory damages for lost future income as well as punitive damages in unspecified amounts. Mr. O'Brien seeks to make public privileged and confidential attorney–client information regarding legal advice on compliance with U.S. and international laws and regulations and to disclose ethically protected client confidences. We have formally moved to strike each count of the complaint. We intend to vigorously defend ourselves against this lawsuit and have not made any provision for any liability related to the action in the consolidated financial statements.

*Civil Antitrust Actions*

In March 2003 a former customer of SNTG, JLM Industries, Inc. ("JLM"), filed a putative civil class action against SNTG and several other parcel tanker companies in the U.S. District Court for the District of Connecticut. The suit alleges violations of the Sherman Antitrust Act and state antitrust and unfair trade practices acts and seeks treble damages in an unspecified amount. We have formally moved to seek dismissal of the action based on SNTG's agreement with JLM to arbitrate disputes. Another defendant has similarly moved to compel arbitration. We intend to vigorously defend ourselves against the JLM action and have not made any provision for any liability related to the JLM action in the consolidated financial statements.

In April 2003 a former customer of SNTG, Nizhnekamskneftekhim USA, Inc. ("Nizh"), filed a putative civil class action against SNTG and several other parcel tanker companies in the U.S. District Court for the Southern District of Texas. The suit alleges violations of Section 1 of the Sherman Antitrust Act and Section 4 of the Clayton Antitrust Act and seeks treble damages in an unspecified amount. As in the JLM action described above, SNTG has agreements with Nizh to arbitrate disputes. We intend to vigorously defend ourselves against the Nizh action and have not made any provision for any liability related to the Nizh action or such unasserted possible claims in the consolidated financial statements.

*Securities Action*

In March 2003 an individual claiming to have purchased Stolt–Nielsen S.A. American Depositary Shares, Joel Menkes, filed a putative civil securities class action in the U.S. District Court for the District of Connecticut against us and certain of our directors and officers. The complaint claims that our failure to disclose such alleged collusive behavior, coupled with allegedly "false and misleading" statements, caused plaintiff to pay inflated prices for our securities. We intend to vigorously defend itself against this lawsuit and have not made any provision for any liability related to the action in the consolidated financial statements.

**Stolt Offshore**

CSO commenced legal proceedings through the U.K. High Court against three subsidiaries of SOSA claiming infringement of a certain patent held by CSO relating to flexible flowline laying technology in the U.K. Judgement was given on January 22, 1999 and January 29, 1999. The disputed patent was held valid. SOSA appealed and the Appeal Court maintained in July 2000 the validity of the patent and potentially broadened its application compared to the High Court decision. SOSA applied for leave to appeal the Appeal Court decision to the House of Lords, which was denied.

During 2001 after the Appeal Court decision became final, CSO submitted an amended claim to damages claiming lost profit on a total of 15 projects. In addition, there is a claim for alleged price depreciation on certain other projects. The total claim for lost profits was for approximately $89 million, up from approximately $14.0 million claimed after the High Court decision confirming the patent's validity, plus interest, legal costs and a royalty for each time that the flexible lay system tower on the *Seaway Falcon* was brought into U.K. waters. The increase came because several more projects potentially became relevant. The amount of the claim has not yet been considered by the Court and has thus so far not been upheld. SOSA estimates that the total claim as submitted is in the order of $130 million at November 30, 2002, increasing at 8% simple interest per annum.

In the alternative, CSO claims a reasonable royalty for each act of infringement, interest and legal costs. CSO has not quantified this claim, but it will be considerably less than the claim to lost profits.

SOSA, in consultation with its advisers, has assessed that the range of possible outcomes for the resolution of damages is $1.5 million to $130 million and has determined that there is no amount

65

within the range that is a better estimate than any other amount. Consequently, in accordance with SFAS No. 5, "Accounting for Contingencies," as interpreted by FASB Interpretation No. 14, "Reasonable Estimation of the Amount of a Loss", SOSA has provided $1.5 million in the financial statements, being the lower amount of the range. The amount of damages is nevertheless uncertain and no assurance can be given that the provided amount is sufficient.

On April 15, 2003, the U.K. High Court, in an action between Rockwater Ltd. (part of the Halliburton Group) and CSO, held that the same patent, the subject of the proceedings against SOSA, was invalid. SOSA is considering its position in the light of this recent judgement.

On December 6, 2002, SOSA settled a long–standing dispute with the owners of the *Toisa Puma* vessel for $7.3 million, including interest of $1.0 million. The nature of the dispute was the cancellation of a charter of the vessel in 1999. SOSA had expected that the settlement would be made in the range of $2 million to $8 million. The cost of the final settlement was included in SOSA's 2002 results.

### Stolt Sea Farm

SSF has not received any notice of violation from any federal, state or local permitting agency. However, USPIRG and two individual plaintiffs, represented by the National Environmental Law Center, have brought a civil action under the citizen suit provisions of the federal Clean Water Act, against SSF alleging that SSF is operating without a required Maine Pollutant Discharge Elimination System ("MPDES") permit. USPIRG also sued two other major Maine aquaculture companies on identical grounds. USPIRG claims that SSF is required to have a MPDES permit in order to authorize the routine conduct of fish farming operations, and was required to obtain the MPDES permit prior to commencing sea farm operations. USPIRG seeks an injunction ordering SSF to cease operations at its Maine salmon farms in violation of the Clean Water Act, to remediate any harm caused by the alleged violations, and to pay civil penalties for each violation occurring from April 25, 1995 to the present, and to pay plaintiffs' reasonable attorneys fees and costs.

On June 16, 2002, the United States District Court of the District of Maine issued a decision on the parties' cross motions for summary judgment. The Court found that SSF had violated the Clean Water Act by operating sea farms in Maine waters without obtaining MPDES permits, and entered Summary Judgment for the plaintiffs on liability issues, rejecting SSF's legal and equitable defenses on the liability issues. A hearing on civil penalties and injunctive relief was concluded in October 2002 and on May 28, 2003, the Court issued its ruling. The Court ordered SSF to pay $50,000 in damages: to fallow its sites for 24 months following the completion of the normal grow–out and to harvest the fish currently on the sites; not to restock any sites until an MPDES permit is issued; only to stock one year class of fish on any site; not to use any non–North American strains of fish; and to pay reasonable plaintiff attorney's fees.

The Maine Department of Environmental Protection recently announced that the Maine Board of Environmental Protection will consider a draft general Maine NPDES permit for salmon sea farm operations for approval on June 19, 2003.

66

In April 2001 two lawsuits were filed against SSF pertaining to our operations in the Broughton Archipelago, British Columbia. Both are brought in the name of aboriginal organizations. The one filed in the Federal Court of Canada seeks to set aside the decision of the Minister of Fisheries and Oceans to permit the relocation of an aquaculture site from Eden Island to Humphrey Rock. The other, filed in the Supreme Court of British Columbia, seeks damages, and other relief arising from the stocking of aquaculture facilities in territory claim to be subject to aboriginal title of the plaintiffs. In this action the Plaintiffs have given notice of an intention to apply for an interlocutory injunction to restrain the continuance of aquaculture operations pending resolution of the dispute. The federal and provincial governments and Heritage Salmon Ltd. are co–defendants in the suit along with SSF. Both actions are being vigorously defended by all named defendants, and we have not made any provision for any liability related to these actions in our Consolidated Financial Statements.

*General*

We are a party to various other legal proceedings arising in the ordinary course of business. We believe that none of the matters covered by such legal proceedings will have a material adverse effect on our business or financial condition.

The ultimate outcome of governmental and third party legal proceedings are inherently difficult to predict. It is reasonably possible that actual expenses and liabilities could be incurred in connection with both asserted and unasserted claims in a range of amounts that cannot reasonably be estimated. It is possible that such expenses and liabilities could have a material adverse affect on our financial condition, cash flows or results of operations in a particular reporting period.

## Dividends

Cash dividends are normally paid twice per year in U.S. dollars.

The following table shows the total dividend payments per Common Share, Class B Share, and Founder's Share made during the fiscal years indicated.

| Class of Stock | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| Common | $ 0.500 | $ 0.375 | $ 0.250 | $ 0.250 | $ 0.250 |
| Class B* | $ 0.500 | $ 0.375 | $ 0.250 | $ 0.125 | $ — |
| Founder's | $ 0.005 | $ 0.005 | $ 0.005 | $ 0.005 | $ 0.005 |

\*

In March 2001 all Class B Shares were reclassified as Common Shares on a one–for–one basis.

The 2002 figures represent the interim and final dividend for 2001. An interim dividend for 2002 of $0.125 per Common Share and $0.005 per Founder's Share was declared on November 14, 2002 and paid on December 18, 2002. The shareholders at our Annual General Meeting, held on May 8, 2003, approved a final dividend for 2002 of $0.125 per Common Share which was paid on May 28, 2003 to shareholders of record as of May 14, 2003.

## Significant Changes

Except as described in Note 26 to the Consolidated Financial Statements, in "Item 4. Information on the Company—Recent Significant Developments", "Item 5. Recent Developments" and "Item 8. Financial Information—Legal Proceedings" of this Report, there have been no significant changes since November 30, 2002.