# EXHIBIT C

QuickLinks –– Click here to rapidly navigate through this document

*As filed with the Securities and Exchange Commission on June 16, 2004*

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 20–F

☐    **REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR (g) OF THE SECURITIES EXCHANGE ACT OF 1934**

**OR**

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended November 30, 2003**

**OR**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the transition period from    to**
**Commission File Number 000–16977**

**STOLT–NIELSEN S.A.**

(Exact name of Registrant as specified in its charter)

**LUXEMBOURG**

(Jurisdiction of incorporation or organization)

**c/o STOLT–NIELSEN LIMITED**
**Aldwych House**
**71–91 Aldwych**
**London WC2B 4HN, England**
(Address of principal executive offices)

**Securities registered or to be registered pursuant to Section 12(b) of the Act:**
None

**Securities registered or to be registered pursuant to Section 12(g) of the Act:**
Common Shares, no par value

**Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:**
None

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report:

| | |
|---|---|
| Common Shares, no par value | 54,949,387* |
| Founder's Shares, no par value | 13,737,346** |

\*    The number of outstanding Common Shares excludes 7,688,810 Common Shares owned by a subsidiary, as of November 30, 2003.

\*\*    The number of outstanding Founder's Shares excludes 1,922,203 Founder's Shares held by Stolt–Nielsen S.A., as of November 30, 2003.

Indicate by check mark whether the registrant (1) has filed all Reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such Reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes ☒    No ☐

Indicate by check mark which financial statement item the registrant has elected to follow.

Marlowe's main policies comprise of the following: (i) 20% participation in the comprehensive policy for hull machinery insurance, war insurance, property insurance, equipment insurance, crime insurance, mortgage interest insurance, mortgage additional peril insurance, excess liability insurance, loss of hire for *Seaway Polaris* and professional indemnity insurance ("the Comprehensive Policy"); (ii) retention insurance for SOSA, whereby all of SOSA's deductibles from its various underlying policies are consolidated and insured by Marlowe ("the SOSA Retention Policy"); (iii) employee life insurance for major offices of SNTG, SOSA and SSF ("the Employee Life Policy"); and (iv) SNTG for any potential remediation costs and representations and warrantees made to the buyer in relation to the sale of tank storage terminals in Perth Amboy and Chicago in November 2001 ("the Perth Amboy and Chicago Policy"). Under the terms of the sale agreement for these terminals, we have retained responsibility for certain environmental contingencies, should they arise during the covered period which ended two years after the closing date, in connection with these two sites. The 2003 premiums of these policies, which are eliminated in consolidation are $2.8 million, $6.6 million, $0.8 million and $0.8 million, respectively. In 2004, Marlowe also insures the fish stock of SSF ("the SSF Fish Stock Policy") for a premium of $9.1 million.

Marlowe generally purchases reinsurance policies from third–party reinsurers in order to transfer its risk. For example, Marlowe's 20% interest in the Comprehensive Policy is fully reinsured, with Marlowe retaining no risk with respect to its participation, subject to the terms and conditions of the reinsurance policies and the ability of the reinsurers to make payments. For policies where the risks are more limited, Marlowe either retains full risk or reinsures only a portion of the policy. For example, the SOSA Retention Policy is fully retained by Marlowe. In addition, under the Employee Life Policy, Marlowe does not reinsure employee life insurance for death due to natural causes, but reinsures for all accidental deaths. The risk on the Perth Amboy and Chicago Policy for environmental contingencies is also fully retained by Marlowe. Marlowe does reinsure the fish mortalities for the SSF Fish Stock Policy. Any losses on claims on policies for which there is no reinsurance are expensed as incurred or when the expected losses can be estimated. The expected ultimate cost of claims is estimated based upon analysis of historical data and actuarial assumptions and, therefore, Marlowe's future loss payments are inherently uncertain.

**Item 8.   Financial Information**

**Consolidated Statements and Other Financial Information**

See Item 18 "Financial Statements."

**Legal Proceedings**

***Stolt–Nielsen S.A. and Stolt–Nielsen Transportation Group***

*Investigations by the U.S. Department of Justice and European Commission*

In 2002, we became aware of information that caused us to undertake an internal investigation regarding potential improper collusive behavior in our parcel tanker and intra–Europe inland barge operations. As a consequence of the internal investigation, we voluntarily reported certain conduct to the Antitrust Division of the DOJ and the Competition Directorate of the EC.

As a result of our voluntary report to the DOJ, we entered into an Amnesty Agreement with the Antitrust Division, which provided immunity to us subject to the terms and conditions of the Amnesty Agreement. On February 25, 2003, we announced that we had been conditionally accepted into the DOJ's Corporate Leniency Program with respect to possible collusion in the parcel tanker industry. Pursuant to such program and provided the program's stated terms and conditions were met, including continued cooperation, our directors, officers and employees were promised amnesty from criminal antitrust prosecution and fines in the U.S. for anticompetitive conduct in the parcel tanker business.

126

At the same time, we also announced that the EC had admitted us into its Immunity Program with respect to deep–sea parcel tanker and intra–Europe inland barge operations. Acceptance into the EC program affords us immunity from EC fines with respect to anticompetitive behavior, subject to our fulfillment the conditions of the program, including continued cooperation. There can be no assurance that in the future national authorities in Europe or elsewhere will not assert jurisdiction over the alleged conduct and/or seek to take action against us.

Subsequently, the Antitrust Division's staff informed us that it was suspending our obligation to cooperate because the Antitrust Division was considering whether or not to remove us from the DOJ's Corporate Leniency Program. Thereafter, in March 2004, the Antitrust Division voided the Amnesty Agreement and revoked our conditional acceptance into the DOJ Corporate Leniency Program. We intend to vigorously challenge the Antitrust Division's decision. If our challenge to the Antitrust Division's decision is not successful, it is possible that we or our directors officers or employees could be subject to criminal prosecution and, if found guilty, substantial fines and penalties. Even if our challenge were successful, our continuing immunity and amnesty under the Antitrust Division's Corporate Leniency Program would depend on the DOJ's satisfaction that going forward we and our directors, officers and employees were meeting their obligations to cooperate and otherwise comply with the conditions of the Corporate Leniency Program. It is possible that the Antitrust Division could, once again, determine that we or such directors, officers or employees did not or have not fully complied with those terms and conditions. If this were to happen, SNTG or such directors or employees could, once again, be partly or fully removed from the Corporate Leniency Program, subject to criminal prosecution and, if found guilty, substantial fines and penalties.

We remain in the EC's Immunity Program. Our directors, officers, and employees continuing immunity and amnesty under the EC's Immunity Program depends on the EC's satisfaction that going forward we and our directors and employees are meeting our obligations to cooperate and otherwise comply with the conditions of the Immunity Program. It is possible that the EC could determine that we or such directors or employees did not or have not fully complied with those terms and conditions. If this were to happen, we or such directors or employees could be partly or fully removed from the Immunity Program, subject to criminal prosecution and, if found guilty, substantial fines and penalties.

The DOJ has taken the position that the Executive Vice President and Managing Director of SNTG Tanker Trading, Richard Wingfield, who we have suspended from his employment with SNTG, has not complied with the cooperation requirements of the conditional immunity. In June 2003, the DOJ arrested Mr. Wingfield and filed a criminal complaint against him. To date, Mr. Wingfield has not been indicted.

We are challenging the DOJ's withdrawal of conditional immunity and remain in the EC's Immunity Program. Because of this and the inherent difficulty of predicting the outcome of an investigation and the challenge to the DOJ's determination, we have made no provision for any fines or other penalties related to the DOJ or EC investigations in our Consolidated Financial Statements.

*Investigations by Korea Fair Trade Commission and Canada Competition Bureau*

The KFTC and the CCB have each notified SNTG that they are conducting investigations of the parcel tanker shipping industry and SNTG. SNTG has informed the KFTC and the CCB that it is committed to cooperating fully with the investigations.

Because of the early stages of these investigations and the inherent unpredictability of the outcome of such proceedings, we are unable to determine whether or not an unfavorable outcome is probable and have made no provision for any fines or other penalties related to the KFTC or CCB investigations in our Consolidated Financial Statements.

*Employment Litigation*

In an action filed in the Superior Court in Connecticut, SNTG and its former chairman have been sued by a former in house legal counsel, Paul E. O'Brien, who resigned in early 2002.

In the Paul E. O'Brien action, the plaintiff seeks damages for constructive discharge and alleges that SNTG was engaging in ongoing "illegal antitrust activities that violated U.S. and international law against price fixing and other illegal collusive conduct." The O'Brien action also seeks an order allowing the plaintiff to disclose client confidences regarding these allegations and protecting the plaintiff from civil or disciplinary proceedings after such revelation. The complaint, as amended, does not specify the range of damages sought other than to state they are in excess of the $15,000 jurisdictional minimum. We have moved for summary judgment on the entire complaint. The motion is fully briefed and under consideration by the Court.

We intend to vigorously defend ourselves against this lawsuit and, in accordance with SFAS No. 5, "Accounting for Contingencies," we have not made any provision for any liability related to the action in the accompanying Consolidated Financial Statements.

*Antitrust Civil Class Action Litigations*

To date we are aware of twelve putative private class actions filed against SNSA and SNTG for alleged violations of antitrust laws. The actions set forth almost identical claims of collusion and bid rigging that track information in media reports regarding the DOJ and EC investigations. The suits seek treble damages in unspecified amounts and allege violations of the Sherman Antitrust Act and various state antitrust and unfair trade practices acts. The actions typically name as defendants SNSA and SNTG, along with several of SNTG's competitors, Odfjell, Jo Tankers and Tokyo Marine. The actions are as follows:

1.
JLM Industries, Inc., JLM International, Inc., JLM Industries (Europe) BV, JLM Europe BV, and Tolson Holland, individually and on behalf of all other similarly situated v. Stolt–Nielsen SA, Stolt–Nielsen Transportation Group Ltd., Odfjell ASA, Odfjell USA Inc., Jo Tankers BV, Jo Tankers, Inc., and Tokyo Marine Co. LTD., 3:03 CV 348 (DJS) (D. Conn.) ("JLM");

2.
Nizhnekamskneftekhim USA, Inc., on behalf of itself and all others similarly situated v. Stolt–Nielsen S.A., Stolt–Nielsen Transportation Group Ltd., Odfjell ASA, Odfjell USA Inc. (Houston,) Jo Tankers BV, Jo Tankers USA Inc., and Tokyo Marine Co., H–03–1202 (S.D. Tex.)("Nizh");

3.
Fleurchem, Inc., on behalf of itself and all others similarly situated v. Stolt–Nielsen S.A., Stolt–Nielsen Transportation Group Ltd., Odfjell ASA, Odfjell USA Inc., Jo Tankers BV, Jo Tankers USA, Inc., and Tokyo Marine Co., H–03–3385 (S.D. Tex.) ("Fleurchem");

4.
AnimalFeeds International Corp., Inversiones Pesqueras S.A., Central Pacific Protein Corp, and Atlantic Shippers of Texas, Inc., individually and on behalf of all other similarly situated v. Stolt–Nielsen S.A.; Stolt–Nielsen Transportation Group Ltd.; Odfjell ASA; Odfjell USA Inc.; Jo Tankers BV; Jo Tankers USA, Inc.; and Tokyo Marine Co., 2:03–CV–5002 (E.D. Pa.);

5.
Allchem Industries Industrial Chemicals Group, Inc., individually and on behalf of all others similarly situated, v. Stolt–Nielsen S.A.; Stolt–Nielsen Transportation Group Ltd.; Odfjell ASA; Odfjell USA Inc.; Jo Tankers BV; Jo Tankers USA, Inc.; and Tokyo Marine Co., 2:03–CV–3476 (E.D. Pa.) ("Allchem");

6.
Basic Chemical Solutions LLC, individually and on behalf of all others similarly situated, v. Stolt–Nielsen S.A.; Stolt–Nielsen Transportation Group Ltd.; Odfjell ASA; Odfjell USA Inc.; Jo Tankers BV; Jo Tankers USA, Inc.; and Tokyo Marine Co., 2:03–CV–4080 (E.D. Pa.);

7.
GFI Chemicals, LP; and GFI Sweden AB, individually and on behalf of all others similarly situated, v. Stolt–Nielsen S.A.; Stolt–Nielsen Transportation Group Ltd.; Odfjell ASA; Odfjell USA Inc.; Jo Tankers BV; Jo Tankers USA, Inc.; and Tokyo Marine Co., 2:03–CV–4079 (E.D. Pa.);

8.

  Illovo Sugar Limited, individually and on behalf of all others similarly situated, individually and on behalf of all others similarly situated, v. Stolt–Nielsen S.A.; Stolt–Nielsen Transportation Group Ltd.; Odfjell ASA; Odfjell USA Inc.; Jo Tankers BV; Jo Tankers USA, Inc.; and Tokyo Marine Co., 3:03–CV–1200 (D. Conn.) ("Illovo");

9.

  Scott Sutton, on behalf of himself and all others similarly situated in the State of Tennessee v. Stolt–Nielsen S.A., Stolt–Nielsen Transportation Group Ltd., Odfjell ASA, and Odfjell Seachem AS, Odfjell USA Inc., Jo Tankers BV, Jo Tankers USA Inc.; and Tokyo Marine Co. Ltd, No. 28,713–II (Cir. Ct. Cocke County, Tenn.) ("Sutton");

10.

  KP Chemical Corporation, on behalf of itself and all others similarly situated, v. Jo Tankers AS, Jo Tankers NV, Jo Tankers Asia Pte, Ltd., Jo Tankers Japan, Stolt–Nielsen Transportation Group Ltd., Stolt Parcel Tankers, Inc., Stolt–Nielsen Netherlands BV, Stolthaven Terminals, Inc., Anthony Radcliffe Steamship Company, Ltd., Copenhagen Tankers, Inc., Parcel Tankers de Columbian y Cia Ltda., Tokyo Marine Co., Ltd. and IIno Kaiun Kaisha, Ltd., 3:04–cv–00249–RNC (D. Conn.) ("KP Chemical");

11.

  Tulstar Products, Inc. individually and on behalf of all others similarly situated, v. Stolt–Nielsen SA, Stolt–Nielsen Transportation Group Ltd., Odfjell ASA, Odfjell USA, Inc., Jo Tankers BV, Jo Tankers USA, Inc. and Tokyo Marine Co., Ltd., 3:04–cv–00318–AWT (D. Conn.) ("Tulstar"); and

12.

  Karen Brock, on behalf of herself and all others similarly situated, v. Stolt–Nielsen SA, Stolt–Nielsen Transportation Group Ltd., Odfjell ASA, Odfjell USA, Inc., Jo Tankers BV, Jo Tankers USA, Inc., Tokyo Marine Co., Ltd and Does 1 through 100 inclusive, No. CGC 04429758 (Superior Court of California, County of San Francisco) ("Brock").

  In nine of these actions, the customers claim they paid higher prices under the contracts they had with the defendants as a result of defendants' alleged collusive conduct. The remaining three actions, Fleurchem, Sutton and Brock, are on behalf of indirect purchasers who claim that such alleged collusion resulted in higher prices being passed on to them. We have removed the Brock California state court action to federal court to consolidate it with the other federal actions. We have not been served in the KP Chemical or Tulstar actions.

  In the Allchem action listed above, the plaintiff recently filed a notice of voluntary dismissal. Additionally, we have settled with one of the named plaintiffs, Illovo Sugar, without material financial impact.

  In July 2003, we moved for the Judicial Panel on Multidistrict Litigation ("JPML") to consolidate all of the then–pending litigation into a single multidistrict litigation ("MDL") court for pretrial proceedings. None of the plaintiffs opposed this motion and the JPML consolidated the earliest filed cases into a single MDL proceeding before Judge Covello in the U.S. District Court for the District of Connecticut. Motions to consolidate the remainder of the cases (except for the recently filed KP Chemical and Tulstar actions and Sutton State Court action) as "tag–a–long" actions in that same Connecticut MDL court have been filed without opposition. Other than a case management conference, no proceedings have begun in the MDL action as yet due to the stay described below.

  SNTG's contracts with its customers contain arbitration clauses. Accordingly, prior to the JPML consolidation, in two of the earliest filed class actions (Nizh and JLM) we filed motions to compel arbitration. In the JLM action SNTG's motion to compel arbitration was denied by the U.S. District Court for the District of Connecticut. All proceedings in the district court were stayed pending the appeal to the United States Court of Appeals for the Second Circuit. In the meanwhile, the JLM action has been consolidated before the MDL court, which has continued the stay and applied it to all the actions before the MDL Court. The Second Circuit heard oral argument on February 3, 2004 and the parties await the Court's ruling on the arbitration issues. In the Nizh action in the U.S. District Court for the Southern District of Texas, the motion to compel arbitration was granted. Subsequently, in December 2003, Nizh served on the named defendants a demand for arbitration in New York. The

129

MDL court has stayed the Nizh arbitration along with the other actions pending a ruling by the Second Circuit in the JLM matter regarding the arbitration issues.

The proceedings described above are at an early stage. The claims made appear to track media reports regarding the DOJ and EC investigations and are not based on any factual discovery. Consequently, and because of the inherent uncertainty involved in evaluating potential litigation outcomes, we are not able to determine whether or not a negative outcome in any of these actions is probable or a reasonable range for any such outcome and we have not made any provision for any of these claims in our Consolidated Financial Statements.

*Private Civil Actions By Direct Opt–Out Plaintiffs*

On November 7, 2003, The Dow Chemical Company filed antitrust claims against us in the Federal District Court for the District of Connecticut. The claims track the allegations in the putative class actions described above. The claims are presented in two complaints, which reflect that for part of the period at issue Dow had not then merged with Union Carbide Corporation. The actions are captioned as follows:

*1.*

      The Dow Chemical Company v. Stolt–Nielsen Transportation Group Ltd., Stolt–Nielsen, S.A., Odfjell ASA, Odfjell Seachem AS, Odfjell USA, Inc., Jo Tankers BV, Jo Tankers, Inc., and Tokyo Marine Co., LTD., 3:03 CV 01920 (GLG) (D. Conn);

*2.*

      Union Carbide Corporation v. Stolt–Nielsen Transportation Group Ltd., Stolt–Nielsen, S.A., Odfjell ASA, Odfjell Seachem AS, Odfjell USA, Inc., Jo Tankers BV, Jo Tankers, Inc., and Tokyo Marine Co., LTD., 3:03 CV 01919 (SRU) (D. Conn.)

On June 7, 2004, Huntsman Petrochemical Corporation filed antitrust claims against SNSA and SNTG in the Federal District Court for the District of Connecticut. The claims generally track the allegations in the putative class actions described above. This action is captioned as follows:

*1.*

      Huntsman Petrochemical Corporation, Huntsman International Trading Corporation, Huntsman Chemical Company Australia Pty Limited and Huntsman Petrochemicals (UK) Ltd. v. Stolt–Nielsen S.A., Stolt–Nielsen Transportation Group Ltd., and Tokyo Marine Co., Ltd.

The Dow and Union Carbide actions have been consolidated into the JPML proceedings. All pretrial proceedings in these actions would be handled by the same court that addresses the pretrial proceedings in the consolidated putative class actions. The Huntsman action has not yet been consolidated into the JPML proceedings although we have been informed by the plaintiff that it intends to consolidate this action. SNTG's contracts with Dow, Union Carbide and Huntsman Petrochemical Corporation contained arbitration clauses. Like the other actions before the MDL court, these actions are stayed pending a ruling by the Second Circuit on the arbitration issues.

These actions name the same defendants as the putative class actions, make similar allegations, and seek the same type of damages under the Sherman Act as sought by the putative class actions. In effect, Dow has asserted claims in its own name that were already included within the purported scope of the putative class actions.

The proceedings described above are at an early stage. The claims made appear to track media reports regarding the DOJ and EC investigations and are not based on any factual discovery. Consequently, and because of the inherent uncertainty involved in evaluating potential litigation outcomes, we are not able to determine whether or not a negative outcome in any of these actions is probable or a reasonable range for any such outcome and we have not made any provision for any of these claims in our Consolidated Financial Statements.

*Securities Litigation*

In March 2003 an individual claiming to have purchased SNSA American depositary receipts, Joel Menkes, filed a putative civil securities class action in the U.S. District Court for the District of Connecticut against the SNSA Group and certain officers. The action is captioned as follows: Joel Menkes, individually and on behalf of all others similarly situated v. Stolt–Nielsen SA, Jacob Stolt–Nielsen, Niels G. Stolt–Nielsen, Samuel Cooperman, and Reginald J.R. Lee, 3:03 CV 409 (AWT) (D. Conn.) The complaint appears to be based significantly on media reports about the O'Brien action and the DOJ and EC investigations described above. Pursuant to the Private Securities Litigation Reform Act ("PSLRA") the Court allowed for the consolidation of any other class actions with this one. No other class actions were brought during the time allowed, but on June 27, 2003, at plaintiffs' request, the Court appointed Irene and Gustav Rucker as lead plaintiffs in the action.

On September 8, 2003, the plaintiffs filed their Consolidated Amended Class Action Complaint against the same defendants. The consolidated complaint is brought on behalf of "all purchasers of SNSA's ADR's from May 31, 2000 through February 20, 2003 … and all U.S. located purchasers of SNSA's securities traded on the Oslo Børs to recover damages caused by defendants' violations of the U.S. Securities Exchange Act of 1934." The complaint asserts that our failure to disclose alleged corrupt or illegal behavior, coupled with allegedly "false and misleading" statements, caused plaintiff to pay inflated prices for the our securities by making it appear that we were "immune to an economic downturn that was afflicting the rest of the shipping industry" and "misleading them to believe that the Companies' earnings came from legitimate transactions."

On October 27, 2003 the SNSA Group filed a motion to dismiss the consolidated complaint in its entirety. Briefing of the motion was completed in January 2004 and the parties await a ruling from the Court.

We intend to vigorously defend ourselves against this lawsuit and, in accordance with SFAS No. 5, we have not made any provision for any liability related to the action in our Consolidated Financial Statements.

*Customer Relations Issues*

We have actively engaged in discussion with a number of customers regarding the subject matter of the DOJ and EC antitrust investigations. A number of companies have indicated their support and some have expressed concerns. We have participated in business discussions and formal mediation with some customers seeking to address any concerns and avoid additional litigation. We have reached commercial agreements with several customers pursuant to which the customers have relinquished any claims arising out of the matters that are the subject of the antitrust investigations. Although the impact of these agreements is difficult to assess until they are fully performed over time, we expect that they will not have a material negative impact on SNTG's earnings or cash flows. If favorable market conditions continue in the future, these agreements may have a more positive financial impact over time than the commercial arrangements that they replaced. Based on our interaction with our other significant customers, we expect to continue doing business with those customers on terms that reflect the market for our services.

*Investigations by the U.S. Department of the Treasury's Office of Foreign Assets Control*

The U.S. Department of the Treasury's OFAC currently is investigating certain payments by SNTG of incidental port expenses to entities in Iran as possible violations of the IEEPA and the Iranian Transactions Regulations. OFAC concluded an investigation of similar payments by SNTG to entities in the Sudan as possible violations of IEEPA and the Sudanese Sanctions Regulations. SNTG is cooperating fully with OFAC, and has implemented policies and procedures to comply with U.S. sanctions regulations.

131

With respect to OFAC's Sudan investigation, on March 20, 2003 SNTG settled the matter with OFAC for a payment of $95,000 by SNTG and without any determination by OFAC that SNTG's payments of incidental port expenses to entities in the Sudan violated U.S. sanctions regulations.

With respect to OFAC's Iran investigation, on April 3, 2002 OFAC issued a Cease and Desist Order to SNTG covering payments by SNTG of incidental port expenses involving unlicensed shipments to, from or involving Iran. OFAC's Iran investigation is currently pending and OFAC has not made any formal determination of whether a violation has occurred as a result of SNTG's payments of incidental port expenses to entities in Iran. OFAC has referred this matter to the U.S. Attorney's Office in Connecticut for investigation.

Because of the stages of the Iran investigation and the inherent unpredictability of the outcome of such proceedings, we are unable to determine whether or not an unfavorable outcome is probable and we have made no provision for any fines or other penalties related to OFAC's Iran investigation in the accompanying Consolidated Financial Statements.

*Investigation by U.S. Attorney's Office in Connecticut*

The U.S. Attorney's Office in Connecticut has opened an investigation regarding whether SNTG's "trade with embargoed countries violated U.S. laws." We are cooperating fully with the U.S. Attorney's Office.

Because of the early stage of this investigation and the inherent unpredictability of the outcome of such proceedings, we are unable to determine whether or not an unfavorable outcome is probable and we have made no provision for any fines or other penalties related to the U.S. Attorney's investigation in our Consolidated Financial Statements.

*Compliance with Existing Debt Documents*

At fiscal year end 2003, we were in compliance with the financial covenants under various creditor agreements. Such compliance was a result of certain waiver agreements which were in effect until December 15, 2003. On December 29, 2003, new waiver agreements became effective extending the waiver period until May 21, 2004, except as discussed below. For additional information on compliance with terms of our former $240 million credit facility, see Item 13. "Defaults, Dividends, Arrearages and Delinquencies."

On February 20, 2004, the waiver agreement with respect to our Senior Notes was terminated. Representatives of the holders of our Senior Notes informed us that the Senior Note holders believed that upon termination of the waiver agreement and the deconsolidation of SOSA, we were in breach of each of: (i) our leverage covenant; (ii) our limitations on dividends and stock purchases; (iii) our limitations on consolidations and mergers and sales of assets; and (iv) guaranties under the Senior Note agreements. The representatives did not provide specific details in support of such allegations. We have informed the representatives of the Senior Note holders that we disagree with these assertions. On June 16, 2004, we resolved the dispute with our Senior Note holders regarding the asserted defaults under the Senior Notes and entered into the Amendment Agreement to amend the Senior Notes. Pursuant to the Amendment Agreement, a permanent waiver was granted by the Senior Note holders in respect of the defaults they asserted. For additional information, see Item 5. "Operating and Financial Review and Prospects—Liquidity and Capital Resources—Indebtedness—The Senior Notes."

As a result of the termination of the waiver with the note holders, waivers in respect of certain other financings also expired on February 20, 2004. Waivers that did not automatically terminate on February 20, 2004, terminated on May 21, 2004, in accordance with their terms. At that time, we were in compliance with the financial covenants in the original agreements for those financings, therefore no default resulted from those waiver terminations.

*Stolt Offshore*

*Technip*

In 1996, Coflexip SA and Coflexip Stena Offshore Limited (now known as Technip S.A. and Technip Offshore Limited) ("Technip"), commenced legal proceedings in the UK High Court against three subsidiaries of SOSA for infringement of a certain patent held by Technip on flexible flowline laying technology. The claim related to SOSA's use of the flexible lay system on the *Seaway Falcon*. The claim was heard by the UK High Court in 1998 and on January 27, 1999 the disputed patent was held valid in favor of Technip. Following this judgment, Technip claimed damages relating to lost profit for five projects, plus legal costs and interest. However, the damages claim was stayed pending the appeal by both parties against the January 1999 decision. The Court of Appeal dismissed the defendant's appeal and maintained the validity of the patent. SOSA applied for leave to appeal the Court of Appeal decision to the House of Lords, which was denied. As a result, the equipment part as well as the process part of the patent were held valid.

During 2001, Technip submitted an amended claim for damages claiming the lost profits on a total of 15 projects. In addition there was a claim for alleged price depreciation on certain other projects. The total claim was for UK pounds 63 million (approximately $118 million), plus interest, legal fees and a royalty for each time that the flexible lay system tower on the *Seaway Falcon* was brought into UK waters. SOSA estimated that the total claim would be approximately UK pound 88 million (approximately $165 million). In the alternative, Technip claimed a reasonable royalty for each act of infringement, interest and legal costs. Technip did not quantify the claim.

During 2003, the UK High Court held that the same patent, the subject of the proceedings against SOSA, was invalid in a separate and unrelated litigation between a company of the Halliburton Group and Technip. That decision has been appealed by Technip.

In light of the decision in the Halliburton case, SOSA applied to the UK High Court to stay the damages inquiry in the Stolt Offshore case, pending the resolution of the Halliburton case. The UK High Court denied the request. SOSA appealed this decision to the UK Court of Appeal and the UK Court of Appeal, subsequent to a hearing in January 2004, decided that SOSA could not benefit from the patent being revoked in the Halliburton case. However, the UK Court of Appeal did not decide on whether or not to stay the damages inquiry, nor on whether or not to recommend that leave to appeal to the House of Lords be given. These two issues were expected to be considered by the UK Court of Appeal after the decision in the Halliburton case was known. The damages inquiry in the infringement case with Technip was scheduled to be heard beginning in late April 2004.

As of November 30, 2002, SOSA, in consultation with its advisers, had assessed that the range of possible outcomes for the resolution of damages was $1.5 million to $130.0 million and determined that no amount within the range was a better estimate than any other amount. Consequently, in accordance with SFAS No. 5, as interpreted by the FASB Interpretation No.14 "Reasonable Estimation of the Amounts of a Loss," SOSA provided $1.5 million in the financial statements, being the lower amount of the range.

As of November 30, 2003, SOSA, in consultation with its advisers, provided for an increased contingency reserve of $9.3 million related to this litigation, reflecting SOSA's best estimate of the then expected settlement.

On March 18, 2004, SOSA announced that it and Technip had reached a settlement of this matter. The settlement involves (i) a cash payment by SOSA of an amount within its contingency reserve described above, (ii) Technip's grant of a license to SOSA for the use of the allegedly infringing technology covering the North Sea area for future periods for an immaterial annual fee, (iii) the termination of arbitration proceedings in the U.S. with respect to an unrelated matter, with neither party making payment to the other, and (iv) a transfer to Technip of a portion of SOSA's minority equity interest in a project joint venture involving Technip and SOSA. SOSA estimates the fair value of

this interest to be approximately $6.0 million. Technip has not granted to SOSA a license to use the allegedly infringing technology or process in any other jurisdiction.

*Duke Hubline*

In October 2003, SOSA commenced arbitration proceedings against Algonquin Gas Transmission Company, claiming approximately $57.8 million in unpaid invoices for work performed while laying an offshore gas pipeline off the coast of Massachusetts for the Duke Hubline project (a conventional project in the U. S., executed in 2002 and 2003). Algonquin Gas Transmission, the owner of the pipeline, challenged its obligation to pay any of the invoice amounts and asserted counterclaims totaling an additional $39 million for alleged mismanagement and inadequate performance by SOSA. Due to Algonquin Gas Transmission's non–payment of invoiced amounts, SOSA was unable to pay certain of its subcontractors employed to work on the pipeline, two of which, Bisso Marine Company and Torch Offshore Inc., filed lawsuits against SOSA in Louisiana state courts for non–payment of amounts invoiced. These same subcontractors claimed liens over the pipeline, which liens are the subject of proceedings commenced by them against SOSA and Algonquin Gas Transmission in Massachusetts state court.

SOSA's dispute with Algonquin Gas Transmission was referred to mediation in late January 2004, at which the parties reached a "settlement in principle" whereby (i) Algonquin Gas Transmission agreed to pay SOSA $37 million in full and final settlement of SOSA's claims and (ii) SOSA agreed to withdraw the arbitration proceedings and use its best efforts to secure the release of the above–mentioned subcontractor liens in full and final settlement of Algonquin Gas Transmission's counterclaims. A definitive settlement agreement was executed on February 26, 2004 reflecting the terms of the "settlement in principle" and Algonquin Gas Transmission paid the settlement amount to SOSA. The value of the settlement is consistent with the receivable of $37 million recorded as of November 30, 2003. SOSA has also reached agreements in principle with Bisso Marine Company and Torch Offshore Inc. to settle the related subcontractor litigation.

*West African Contract*

In connection with a major West African contract, SOSA received a letter dated December 12, 2003 from the customer notifying SOSA of a potential claim for an unspecified amount of liquidated damages. The claim relates to delays in completion of certain milestones. SOSA believes that the customer does not have a valid case for liquidated damages, and on that basis has not recorded a provision.

**Stolt Sea Farm**

Several SSF companies and almost 45 companies in the aquaculture industry, as well as processing companies, seafood distributors and grocery retailers, were served with a Notice of Violation, by the Attorney General, State of California, on January 30, 2004. The alleged violation is for sale of salmon without warning labels regarding PCB content. This is a so–called "Proposition 65" proceeding under Californian Law.

The outcome of this action is uncertain, and this could end with decree by the court that salmon as merchandise has to carry certain labels indicating the PCB content. It is also possible that the companies subject to this proceeding become liable for a monetary fine.

In April 2003, two lawsuits were filed against SSF pertaining to its operations in the Broughton Archipelago, British Columbia. Both actions were brought in the name of aboriginal organizations. The lawsuit filed in the Federal Court of Canada seeks to set aside the decision of the Minister of Fisheries and Oceans to permit the relocation of an aquaculture site from Eden Island to Humphrey Rock. The other, filed in the Supreme Court of British Columbia, seeks damages and other relief arising from the stocking of aquaculture facilities in territory claimed to be subject to aboriginal title of the plaintiffs. In this action, the plaintiffs have given notice of an intention to apply for an interlocutory injunction to restrain the continuance of aquaculture operations pending resolution of the dispute. The federal and provincial governments and Heritage Salmon Ltd. are co–defendants in the suit along with SSF. Both actions are being vigorously defended by all named defendants, and we have not made any provision for any liability related to these actions in our Consolidated Financial Statements.

134

We are a party to various other legal proceedings arising in the ordinary course of business. We believe that none of the matters covered by such legal proceedings will have a material adverse effect on our business or financial condition.

The ultimate outcome of governmental and third party legal proceedings are inherently difficult to predict. It is reasonably possible that actual expenses and liabilities could be incurred in connection with both asserted and unasserted claims in a range of amounts that cannot reasonably be estimated. It is possible that such expenses and liabilities could have a material adverse affect on our financial condition, cash flows or results of operations in a particular reporting period.

## Dividends

Cash dividends are normally paid twice per year in U.S. dollars.

The following table shows the total dividend payments per Common Share, Class B Share, and Founder's Share made during the fiscal years indicated.

| Class of Stock | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|
| Common | $ 0.375 | $ 0.250 | $ 0.250 | $ 0.250 | $ 0.250 |
| Class B* | $ 0.375 | $ 0.250 | $ 0.125 | $ — | $ — |
| Founder's | $ 0.005 | $ 0.005 | $ 0.005 | $ 0.005 | $ 0.005 |

\*

     In March 2001 all Class B Shares were reclassified as Common Shares on a one–for–one basis.

The 2003 figures represent the interim and final dividend for 2002. An interim dividend for 2002 of $0.125 per Common Share and $0.005 per Founder's Share was declared on November 15, 2002 and paid on December 18, 2002. The shareholders at our Annual General Meeting, held on May 8, 2003, approved a final dividend for 2002 of $0.125 per Common Share which was paid on May 28, 2003 to shareholders of record as of May 14, 2003. The SNSA Board of Directors decided not to pay a dividend for the fiscal year ending November 30, 2003. We are currently prohibited by the terms of our financing arrangements from paying dividends to our shareholders.

## Significant Changes

Except as described in Note 28 to the Consolidated Financial Statements, included in Item 18 of this Report, Item 4. "Information on the Company—Recent Significant Developments," Item 5. "Operating and Financial Review and Prospects" and Item 8."Financial Information—Legal Proceedings" of this Report, there have been no significant changes since November 30, 2003.

## Item 9. The Offer and Listing.

## Stock Trading History

The following table sets out the range of high and low closing prices for our publicly traded shares for the periods indicated.

135