# EXHIBIT D

QuickLinks -- Click here to rapidly navigate through this document

**As filed with the Securities and Exchange Commission on May 31, 2005**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 20-F

☐   **REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR (g) OF THE SECURITIES EXCHANGE ACT OF 1934**
OR
☒   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the fiscal year ended November 30, 2004
OR
☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the transition period from          to
Commission File Number 000-16977

# STOLT-NIELSEN S.A.
(Exact name of Registrant as specified in its charter)

**LUXEMBOURG**
(Jurisdiction of incorporation or organization)

**c/o STOLT-NIELSEN LIMITED**
**Aldwych House**
**71-91 Aldwych**
**London WC2B 4HN, England**
(Address of principal executive offices)

**Securities registered or to be registered pursuant to Section 12(b) of the Act:**
None

**Securities registered or to be registered pursuant to Section 12(g) of the Act:**
Common Shares, no par value

**Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:**
None

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report:

| | |
|---|---|
| Common Shares, no par value | 63,376,760 |
| Founder's Shares, no par value | 15,844,190 |

Indicate by check mark whether the registrant (1) has filed all Reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such Reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes ☒    No ☐

Indicate by check mark which financial statement item the registrant has elected to follow.

Item 17 ☐    Item 18 ☒

$6.6 million, $0.8 million, $0.8 million, and $9.1 million, respectively. SOSA's participation in the LTA Package, Terrorism Policy, and Employee Life Policy is expected to cease effective September 1, 2005.

Marlowe generally purchases reinsurance policies from third−party reinsurers in order to transfer its risks. For example, Marlowe's 10% interest in the LTA Package and the Terrorism Policy are fully reinsured, with Marlowe retaining no risk with respect to its participation, subject to the terms and conditions of the reinsurance policies and the ability of the reinsurers to make payments. For policies where the risks are more limited, Marlowe either retains full risk or reinsures only a portion of the policy. For example, the SOSA Retention Policy is fully retained by Marlowe. In addition, under the Employee Life Policy, Marlowe does not reinsure employee life insurance for death due to natural causes, but reinsures all accidental deaths. The risk on the SHVN Policy for environmental contingencies is also fully retained by Marlowe. The fish mortalities under the Fish Mortality Policy are reinsured on an excess of loss basis. Any losses or claims on policies for which there is no reinsurance are expensed as incurred or when the expected losses can be estimated. The expected ultimate cost of claims is estimated based upon analysis of historical data and actuarial assumptions and, therefore, Marlowe's future loss payments are inherently uncertain.

**Item 8. Financial Information.**

**Consolidated Statements and Other Financial Information**

See Item 18 "Financial Statements."

**Legal Proceedings**

*Stolt−Nielsen S.A. and Stolt−Nielsen Transportation Group*

*Antitrust Governmental Investigations*

*Investigations by U.S. Department of Justice and European Commission*

In 2002, we became aware of information that caused us to undertake an internal investigation regarding potential improper collusive behavior in our parcel tanker and intra−Europe inland barge operations. As a consequence of the internal investigation, we determined to voluntarily report certain conduct to the Antitrust Division of the DOJ and the Competition Directorate of the EC.

As a result of our voluntary report to the DOJ concerning certain conduct in the parcel tanker industry, we entered into an Amnesty Agreement dated January 15, 2003 with the Antitrust Division, which provided that the Antitrust Division agreed "not to bring any criminal prosecution" against us for any act or offense we may have committed prior to January 15, 2003, subject to the terms and conditions of the Amnesty Agreement. As a result of our voluntary report to the DOJ, we entered into an Amnesty Agreement with the Antitrust Division, which provided immunity to us, subject to the terms and conditions of the Amnesty Agreement. On February 25, 2003, we announced that we had been conditionally accepted into the DOJ's Corporate Leniency Program with respect to possible collusion in the parcel tanker industry. Pursuant to such program and provided the program's stated terms and conditions were met, including continued cooperation, we, and our directors and employees, were promised amnesty from criminal antitrust prosecution and fines in the United States for anticompetitive conduct in the parcel tanker business.

At the same time, we also announced that the EC had admitted us into its Immunity Program with respect to deep−sea parcel tanker and intra−Europe inland barge operations. Acceptance into the EC program affords us immunity from EC fines with respect to anticompetitive behavior, subject to our fulfilling the conditions of the program, including continued cooperation. It is possible that in the future national authorities in Europe, or elsewhere will assert jurisdiction over the alleged industries. In August 2004, the EC informed us that it had closed its investigation into possible collusive behavior in

the intra–Europe inland barge industry. The EC investigation into the parcel tanker industry has continued.

Subsequent to our announcement of our acceptance in the DOJ's Corporate Leniency Program, the Antitrust Division's Philadelphia field office staff informed us that it was suspending our obligation to cooperate because the Antitrust Division was considering whether or not to remove us from the DOJ's Corporate Leniency Program. The stated basis for this reconsideration was that the Antitrust Division had received evidence that we had not met the condition that SNTG "took prompt and effective action to terminate its part in the anticompetitive activity being reported upon discovery of the activity."

In February 2004, we filed a civil action in the United States District Court for the Eastern District of Pennsylvania against the DOJ to enforce the Amnesty Agreement and to seek specific performance and/or a permanent injunction to enforce the Agreement's bar on criminal prosecution for certain activity having occurred prior to January 15, 2003. On March 2, 2004, the DOJ notified us that it was unilaterally voiding the Amnesty Agreement and revoking our amnesty. On January 14, 2005, the District Court entered a judgment in our favor and permanently enjoined the DOJ from indicting or prosecuting SNSA or SNTG for any violation of the Sherman Antitrust Act prior to January 15, 2003, in the parcel tanker industry involving transportation to and from the United States. Through this order, the District Court enforced the Amnesty Agreement. On February 14, 2005 the DOJ filed a notice of appeal from the January 14, 2005 order. That appeal is pending before the United States Court of Appeals for the Third Circuit. If the District Court's ruling is not upheld, it is possible that we, or our directors or employees, could be subject to criminal prosecution and, if found guilty, to substantial fines and penalties. Even if the DOJ's appeal is unsuccessful, our continuing immunity and amnesty under the DOJ's Corporate Leniency Program requires that we and our directors, officers and employees continue to meet our obligations to cooperate and otherwise comply with the conditions of the Corporate Leniency Program. If we are not able to comply with those obligations, it is possible that we or such directors, officers or employees could be partly or fully removed from the Corporate Leniency Program, subject to criminal prosecution and, if found guilty, substantial fines and penalties.

We remain in the EC's Immunity Program with respect to the parcel tanker industry. Our continuing immunity and amnesty, and the continuing immunity of our directors and employees depends on the EC's satisfaction that going forward we and our directors and employees are meeting any obligations we or they may have to cooperate and otherwise comply with the conditions of the immunity and amnesty programs. It is possible that the EC could assert that we or our directors, officers or employees have not complied or are not fully complying with the terms and conditions of the Immunity Program. If this were to happen, we or such directors or employees could be partly or fully removed from the Immunity Program, subject to criminal prosecution and, if found guilty, substantial fines and penalties.

Because of the ongoing litigation with respect our Amnesty Agreement, including our success at the District Court level, the unsettled nature of the law involved, the fact–intensive nature of the issues involved, and the inherent difficulty of predicting the outcome of antitrust investigations, we have made no provisions for any fines related to the DOJ or EC investigations in our Consolidated Financial Statements.

*Investigations by Korea Fair Trade Commission and Canada Competition Bureau*

In February 2004, the KFTC and the CCB, notified us that they had launched antitrust investigations of the parcel tanker shipping industry and SNTG. We informed the KFTC and CCB that we are committed to cooperating fully with the investigations. We do not have amnesty in either of these investigations but have continued to cooperate with both authorities. We have participated in two hearings before the KFTC. At the close of the hearings, the KFTC staff recommended that the KFTC

impose a monetary sanction of Korean Won 470,000,000 (approximately US $470,000 based on prevailing exchange rates). We expect that the KFTC will make a determination about whether or not to assess any fine within the next several months.

Because of the continuing nature of these investigations and proceedings, the unsettled nature of the law involved, the fact–intensive nature of the issues involved, and the inherent unpredictability of the outcome of such proceedings, we have made no provisions for any fines related to the Korean or Canadian antitrust investigations in our Consolidated Financial Statements. We have participated in two hearings before the Korean Fair Trade Commission, and we expect that the KFTC will make a determination about whether or not to assess any fine within the next several months. At the close of the hearings, the KFTC staff recommended a monetary sanction of Korean Won 470,000,000 (approximately US $470,000 based on prevailing exchange rates) for the Commission to deliberate about.

*Investigation into the Stolt–Nielsen Tank Container Business*

On June 28, 2004, we received a grand jury subpoena from the DOJ Antitrust Division calling for the production of documents relating to our tank container business which is organized as a separate line of business from our parcel tanker business. We have informed the DOJ that we are committed to cooperating in this matter. Because of the early stage of this investigation and the inherent unpredictability of the outcome of such proceedings, we have made no provisions for any fines related to the DOJ investigation in our Consolidated Financial Statements.

The foregoing are the government antitrust investigations for which we have received formal notification. Because of the trend towards global coordination of competition agencies and the inherent confidentiality of the investigations they conduct, it is possible that there may be additional investigations of the parcel tanker industry or other business in which we participate by other national authorities for which we have not received formal notification or which may be opened in the future. It is also possible that the consequences of such proceedings, if brought, could have a material adverse effect on our financial condition, cash flows or results of operations.

*Antitrust Civil Class Action Litigations*

To date, we are aware of twelve purported private antitrust class actions that have been filed against SNSA and SNTG for alleged violations of antitrust laws, four of which are no longer pending and have been dropped. Generally speaking, the actions set forth almost identical claims of collusion and bid rigging that track information in media reports regarding the DOJ and EC investigations. The suits typically seek treble damages in unspecified amounts and allege violations of the Sherman Antitrust Act and various state antitrust and unfair trade practices acts. The actions typically name as defendants SNSA and SNTG, along with several of our competitors, including Odfjell, Jo Tankers and Tokyo Marine.

Three of these twelve actions have been dismissed and another action was settled with no material adverse financial impact. All but two were filed in federal courts. The eight actions that remain pending are as follows:

*1.*
JLM Industries, Inc., JLM International, Inc., JLM Industries (Europe) BV, JLM Europe BV, and Tolson Holland, individually and on behalf of all other similarly situated v. Stolt–Nielsen SA, Stolt–Nielsen Transportation Group Ltd., Odfjell ASA, Odfjell USA Inc., Jo Tankers BV, Jo Tankers, Inc., and Tokyo Marine Co. LTD., 3:03 CV 348 (DJS) (D. Conn.) ("JLM");

*2.*
Nizhnekamskneftekhim USA, Inc., on behalf of itself and all others similarly situated v. Stolt–Nielsen S.A., Stolt–Nielsen Transportation Group Ltd., Odfjell ASA, Odfjell USA Inc.

110

(Houston), Jo Tankers BV, Jo Tankers USA Inc., and Tokyo Marine Co., H–03–1202 (S.D. Tex.) ("Nizh");

3.   Fleurchem, Inc., on behalf of itself and all others similarly situated v. Stolt–Nielsen S.A., Stolt–Nielsen Transportation Group Ltd., Odfjell ASA, Odfjell USA Inc., Jo Tankers BV, Jo Tankers USA, Inc., and Tokyo Marine Co., H–03–3385 (S.D. Tex.) ("Fleurchem");

4.   AnimalFeeds International Corp., Inversiones Pesqueras S.A., Central Pacific Protein Corp, and Atlantic Shippers of Texas, Inc., individually and on behalf of all other similarly situated v. Stolt–Nielsen S.A.; Stolt–Nielsen Transportation Group Ltd.; Odfjell ASA; Odfjell USA Inc.; Jo Tankers BV; Jo Tankers USA, Inc.; and Tokyo Marine Co., 2:03–CV–5002 (E.D. Pa.) ("AnimalFeeds");

5.   *Scott Sutton, on behalf of himself and all others similarly situated in the State of* Tennessee v. Stolt–Nielsen S.A., Stolt–Nielsen Transportation Group Ltd., Odfjell ASA, and Odfjell Seachem AS, Odfjell USA Inc., Jo Tankers BV, Jo Tankers USA Inc.; and Tokyo Marine Co. Ltd, No. 28,713–II (Cir. Ct. Cocke County, Tenn.) ("Sutton");

6.   KP Chemical Corporation, on behalf of itself and all others similarly situated, v. Jo Tankers AS, Jo Tankers NV, Jo Tankers Asia Pte, Ltd., Jo Tankers Japan, Stolt–Nielsen Transportation Group Ltd., Stolt Parcel Tankers, Inc., Stolt–Nielsen Netherlands BV, Stolthaven Terminals, Inc., Anthony Radcliffe Steamship Company, Ltd., Copenhagen Tankers, Inc., Parcel Tankers de Columbian y Cia Ltda., Tokyo Marine Co., Ltd. and IIno Kaiun Kaisha, Ltd., 3:04–cv–00249 (D. Conn.) ("KP Chemical");

7.   Tulstar Products, Inc. individually and on behalf of all others similarly situated, v. Stolt–Nielsen SA, Stolt–Nielsen Transportation Group Ltd., Odfjell ASA, Odfjell USA, Inc., Jo Tankers BV, Jo Tankers USA, Inc. and Tokyo Marine Co., Ltd., 3:04–cv–00318–AWT (D. Conn.) ("Tulstar"); and

8.   Karen Brock, on behalf of herself and all others similarly situated, v. Stolt–Nielsen SA, Stolt–Nielsen Transportation Group Ltd., Odfjell ASA, Odfjell USA, Inc., Jo Tankers BV, Jo Tankers USA, Inc., Tokyo Marine Co., Ltd and Does 1 through 100 inclusive, No. CGC 04429758 (Superior Court of California, County of San Francisco) ("Brock").

In five of these actions, customers claim they paid higher prices under the contracts they had with the defendants as a result of defendants' alleged collusive conduct. The remaining three actions—*Fleurchem*, *Sutton*, and *Brock*—are allegedly brought on behalf of indirect purchasers who claim that such alleged collusion resulted in higher prices being passed on to them. All but two of the actions (*Sutton* and *Brock*) were filed in federal courts. We had removed *Brock*, one of the state actions, to federal court, but the matter was remanded back to state court in August 2004. We have not been served in the KP Chemical or Tulstar actions.

On our motion, all of the federal civil antitrust cases have been consolidated into a single multidistrict litigation ("MDL") proceeding in the U.S. District Court for the District of Connecticut captioned "In re Parcel Tanker Shipping Services Antitrust Litigation." Although there has been motion practice regarding discovery, other than case management conferences, no proceedings have gone forward in the MDL action as yet due to the stay related to the JLM appeal described below.

Prior to consolidation in the MDL proceeding, we moved to compel arbitration in the purported class actions brought by JLM Industries, Inc. and Nizhnekamskneftekhim USA, Inc. ("Nizh") in accordance with the arbitration provisions in their respective contracts with us. The U.S. District Court for the Southern District of Texas in the Nizh action ordered arbitration while the U.S. District Court for the District of Connecticut in the JLM action denied the motion to compel arbitration. Following consolidation, all proceedings in the MDL court were stayed pending our appeal of the district court's

111

decision in the JLM action. In October 2004, the United States Court of Appeals for the Second Circuit issued a ruling on our appeal in the JLM action requiring JLM to arbitrate all of its federal antitrust claims and related state law claims against us. The Second Circuit's broad ruling appears to require all similarly situated plaintiffs to proceed in arbitration rather than in federal court. JLM filed a request for *en banc* consideration with the Second Circuit and the MDL actions remained stayed. On February 2, 2005, the Second Circuit denied JLM's motion for rehearing *en banc*. The MDL district court has not yet lifted the stay.

During the pendency of the stay, we entered negotiations with the purported class plaintiffs regarding the procedures for arbitration of their claims. The law regarding the ability of plaintiffs to bring arbitration as class action arbitration is unsettled. We have agreed to procedures with purported class plaintiffs under which they will pursue their claims in a consolidated arbitration in which the arbitrators will determine in the first instance whether the actions may proceed as a class action. The parties are in the process of constituting the arbitration panel.

No discovery has commenced in any of these civil antitrust proceedings against us. In light of the early stages of these proceedings, the unsettled nature of the law involved, the fact−intensive nature of the issues involved, and the inherent uncertainty of litigation and arbitration, we are not able to determine whether or not a negative outcome in any of these actions is probable, or a reasonable range for any such outcome, and we have not made any provision for any of these claims in our Consolidated Financial Statements.

*Antitrust Civil Actions By Direct Opt−Out Plaintiffs*

To date we are aware of four actions brought by individual plaintiffs who have elected to opt out of the purported class actions. The principal plaintiffs in these actions are The Dow Chemical Co., Union Carbide Corp. (now a Dow subsidiary), Huntsman Petrochemical Corp., and Sasol Ltd. The cases are as follows:

1. The Dow Chemical Company v. Stolt−Nielsen Transportation Group Ltd., Stolt−Nielsen, S.A., Odfjell ASA, Odfjell Seachem AS, Odfjell USA, Inc., Jo Tankers BV, Jo Tankers, Inc., and Tokyo Marine Co., LTD., 3:03−CV−01920 (D. Conn);

2. Union Carbide Corporation v. Stolt−Nielsen Transportation Group Ltd., Stolt−Nielsen, S.A., Odfjell ASA, Odfjell Seachem AS, Odfjell USA, Inc., Jo Tankers BV, Jo Tankers, Inc., and Tokyo Marine Co., LTD., 3:03−CV−01919 (SRU) (D. Conn.)

3. Huntsman Petrochemical Corporation, Huntsman International Trading Corporation, Huntsman Chemical Company Australia Pty Limited and Huntsman Petrochemicals (UK) Ltd. v. Stolt−Nielsen S.A., Stolt−Nielsen Transportation Group Ltd., and Tokyo Marine Co., Ltd. 3:04−CV−923 (D. Conn.)

4. Sasol Ltd, Sasol Chemical Indus Ltd Sasol Technology (Pty.) Ltd., Sasol Chemie Gmbh & Co Kg, Sasol Olefins & Surfactants Gmbh, Sasol Germany Gmbh, Merisol Antioxidants LLC, Sasol Italy Spa, Sasol North America Inc., Merisol Ltd., Merisol UK Ltd., Merisol Hong Kong Ltd., Merisol LP, Merisol USA LLC, Merisol RSA (Pty.) Ltd, Merisol GP LLC v. Stolt−Nielsen SA, Stolt−Nielsen Transportation Group Ltd, Stolt−Nielsen Transportation Group BV, Stolt−Nielsen Nederland BV, Stolt Tankers Inc, Richard B. Wingfield, Odfjell ASA, Odfjell Seachem AS, Odfjell Tankers AS, Odfjell USA Inc, Bjorn Sjaastad, Erik Nilsen, Jo Tankers BV, Jo Tankers Inc, Hendrikus Van Westenbrugge Tokyo Marine Co Ltd,, Satoshi Kuwano, 3:04−CV−2017 (D. Conn.)

These four actions make similar allegations as the purported antitrust class actions and generally seek the same type of damages under the Sherman Antitrust Act as sought by the purported class actions. Generally, the direct opt−out plaintiffs have asserted claims in their own names that would have

been otherwise included within the purported scope of the damages sought by the purported class actions. *We have not been served in the Sasol action.*

These four private opt−out actions have been consolidated into the MDL proceedings pending in the U.S. District Court for the District of Connecticut. Like the other actions before the MDL court, these actions were stayed. During the pendency of the stay, we entered negotiations with the direct opt−out plaintiffs regarding the procedures for arbitration of their claims. Additional customers, who have not yet filed a suit or served an arbitration demand, have also come forward seeking to be included in arbitration and the negotiations of the procedures.

As with the purported class actions, no discovery has commenced. Although the Plaintiffs concede that most of their claims are subject to arbitration under the Second Circuit's *JLM* decision, three of the plaintiffs, Dow, UCC, and Huntsman, have filed motions in the MDL proceedings to keep parts of their claims in federal court. We have opposed those motions and filed cross−motions to compel arbitration of all of the claims.

In light of the early stage of these proceedings, the fact−intensive nature of the claims involved, the unsettled nature of the law involved, and the inherent uncertainty of litigation and arbitration, we are not able to determine whether or not a negative outcome in any of these actions is probable or a reasonable range for any such outcome, and have made no provision for any of these claims in our Consolidated Financial Statements.

*Antitrust Civil Action by Competitor*

On June 23, 2004, the bankruptcy trustee for O.N.E. Shipping, Inc., a former competitor of ours, filed antitrust claims against us in the Federal District Court for the Eastern District of Louisiana. The claim generally tracks the factual allegations in the purported class actions and direct opt−out actions described above, except that the complaint alleges that we conspired with other parcel tanker firms to charge predatory prices, that is, prices that were below a competitive level, thereby driving O.N.E. out of business.

This action seeks treble damages related to alleged suppression and elimination of competition. It has been consolidated in the MDL proceeding with the purported class and direct opt−out plaintiff actions and has been subject to the stay in that proceeding. As with the purported class actions, no discovery has commenced in this litigation.

In light of the early stage of these proceedings and the inherent uncertainty of litigation and arbitration, we are not able to determine whether or not a negative outcome in this action is probable or a reasonable range for any such outcome, and we have made no provision for any of these claims in our Consolidated Financial Statements.

*Securities Litigation*

In March 2003 an individual claiming to have purchased SNSA American depositary receipts, Joel Menkes, filed a purported civil securities class action in the U.S. District Court for the District of Connecticut against us and certain of our officers. The action was initially captioned as follows: *Joel Menkes, individually and on behalf of all others similarly situated v. Stolt−Nielsen SA, Jacob Stolt−Nielsen, Niels G. Stolt−Nielsen, Samuel Cooperman, and Reginald J.R. Lee*, 3:03 CV 409 (D. Conn.). Plaintiffs' counsel have since replaced Mr. Menkes with Irene and Gustav Rucker, who also claim to have purchased SNSA American Depositary Receipts. The current complaint appears to be based significantly on media reports about the O'Brien action discussed below and the DOJ and EC investigations described above. Pursuant to the Private Securities Litigation Reform Act ("PSLRA") the Court allowed for the consolidation of any other class actions with this one. No other class actions were brought during the time allowed.

113

On September 8, 2003, the Plaintiffs filed their Consolidated Amended Class Action Complaint against the same defendants. The consolidated complaint is brought on behalf of "all purchasers of Stolt's American Depositary Receipts ("ADR's") from May 31, 2000 through February 20, 2003... and all United States ("U.S.")—located purchasers of Stolt securities traded on the Oslo Exchange to recover damages caused by defendants' violations of the Securities Exchange Act of 1934."

The complaint claims that we "concealed that a material portion of [SNSA's] and SNTG's revenues and earnings from 2001 through February 2003 came from an illegal pact between SNTG and Odfjell ASA… to rig bids for international shipping contracts…" The consolidated complaint further alleges that we failed to disclose "the Companies' long history of trading with rogue states like Cuba, Iran, and Sudan." The consolidated complaint asserts that our failure to disclose such alleged behavior, coupled with our allegedly "false and misleading" statements, caused plaintiff to pay inflated prices for our securities by making it appear that we were "immune to an economic downturn that was afflicting the rest of the shipping industry" and "misleading them to believe that the Companies' earnings came from legitimate transactions."

On October 27, 2003, we filed a motion to dismiss the consolidated complaint in its entirety. Briefing of the motion was completed in January 2004. There has been no discovery.

We intend to vigorously defend ourselves against this lawsuit and we are not able to determine whether or not a negative outcome in this action is probable, or a reasonable range for any such outcome, and we have not made any provisions for any liability related to the action in our Consolidated Financial Statements.

*Employment Litigation*

In an action filed in the Superior Court in Connecticut, we and a former chairman of SNTG have been sued by a former employee, Paul E. O'Brien, who resigned in early 2002.

The plaintiff in the O'Brien action, a former in–house counsel, seeks damages for constructive discharge and alleges that we were engaging in ongoing "illegal antitrust activities that violated United States and international law against price fixing and other illegal collusive conduct." The O'Brien action also seeks an order allowing the plaintiff to disclose client confidences and secrets regarding these allegations and protecting the plaintiff from civil or disciplinary proceedings after such revelation. The complaint, as amended, does not specify the damages sought other than to state they are in excess of the $15,000 jurisdictional minimum.

We filed motions for summary judgment on the entire complaint based, among other things, on the grounds that: 1) a New York lawyer cannot maintain an action against his client where it will necessarily require disclosure of privileged information or client confidences; and 2) O'Brien failed pursuant to New York (and Connecticut) law to report his concerns "up the corporate ladder" in March 2002. By agreement of the parties, in September 2004 the Superior Court heard arguments on only the first ground for summary judgment. In October 2004 the Superior Court denied that branch of the summary judgment motion. We immediately took an interlocutory appeal, and our petition for review by the state Supreme Court was denied in April 2005. Although there was limited discovery prior to our appeal, full discovery on the merits of the case has yet to commence in earnest. We intend to continue to vigorously defend ourselves against this lawsuit and, we are not able to determine whether or not a negative outcome in this action is probable, or a reasonable range for any such outcome, and we have not made any provision for any liability related to the action in our Consolidated Financial Statements.

We have actively engaged in discussion with a number of customers regarding the subject matter of the DOJ and EC antitrust investigations. A number of companies have indicated their support for us, and some have expressed concerns. We have participated in business discussions and formal mediation with some customers to address any business concerns and avoid litigation. We have reached commercial agreements with several customers pursuant to which the customers have relinquished any claims arising out of the matters that are the subject of the antitrust investigations, typically in connection with contracts for transportation to be performed in the future. Although the impact of these agreements is difficult to assess until they are fully performed over time, and given the inherent uncertainty of the volume of future shipping business, we expect at present that these agreements will not have a material negative impact on our earnings or cash flows. Based on our interaction with other significant customers, we expect to continue doing business with those customers on terms that reflect the market for our services.

*Investigations by the U.S. Department of the Treasury's Office of Foreign Assets Control and by the U.S. Attorney's Office for the District of Connecticut*

In or about August 2001, the OFAC opened an investigation of certain payments by SNTG of incidental port expenses to entities in Iran as possible violations of the IEEPA and the Iranian Transactions Regulations. In connection with this investigation, on April 3, 2002 OFAC issued a Cease and Desist Order to SNTG covering payments by SNTG of incidental port expenses involving unlicensed shipments to, from or involving Iran. This matter is currently pending before OFAC's Civil Penalties Division. OFAC has not made any final determination of whether a violation has occurred as a result of SNTG's payments of incidental port expenses to entities in Iran. We have cooperated fully with OFAC, and have implemented policies and procedures to comply with U.S. sanctions regulations.

We understand that, based on a referral from OFAC, a criminal investigation was opened under the auspices of the U.S. Attorney's Office in Connecticut in or about May 2003 regarding whether our "trade with embargoed countries violated U.S. laws." We cooperated fully with that investigation. The U.S. Attorney's office has informed us that it has declined to pursue this matter.

In early 2005 OFAC informed us that it had transferred the Iran matter internally from OFAC's Enforcement Division to its Civil Penalties Division. We are unable to determine whether or not an unfavorable outcome is probable and have made no provisions for any fines or other penalties related to this matter in our Consolidated Financial Statements.

*Stolt Sea Farm*

Several SSF companies and almost 45 companies in the aquaculture industry, as well as processing companies, seafood distributors and grocery retailers, were served with a Notice of Violation, by the Attorney General of the State of California, on January 30, 2004. The alleged violation is for sale of salmon without warning labels regarding PCB content. This is a so–called "Proposition 65" proceeding under California law.

The outcome of this action is uncertain, and a requirement could be imposed that salmon as merchandise has to carry certain labels indicating the PCB content. It is also possible that the companies subject to this proceeding may become liable for a monetary fine.

In April 2003, two lawsuits were filed against SSF pertaining to its operations in the Broughton Archipelago, British Columbia. Both actions were brought in the name of aboriginal organizations. One of the lawsuits tried to set aside the decision of the Minister of Fisheries and Oceans to permit the relocation of an aquaculture site. The other lawsuit was for damages and other relief arising from the

stocking of aquaculture facilities in territory claimed to be subject to aboriginal title. Both actions are now discontinued.

*General*

We are a party to various other legal proceedings arising in the ordinary course of business. We believe that none of the matters covered by such legal proceedings will have a material adverse effect on our business or financial condition.

The ultimate outcome of governmental and third party legal proceedings are inherently difficult to predict. It is reasonably possible that actual expenses and liabilities could be incurred in connection with both asserted and unasserted claims in a range of amounts that cannot reasonably be estimated. It is possible that such expenses and liabilities could have a material adverse affect on our financial condition, cash flows or results of operations in a particular reporting period.

**Dividends**

It is our policy to pay a semi−annual cash dividend to our shareholders. The amount to be paid is determined each year by the Board of Directors according to the financial situation of the Company and its investment plans.

The following table shows the total dividend payments per Common Share, Class B Share, and Founder's Share made during the fiscal years indicated.

| Class of Stock | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|
| Common | $ 0.250 | $ 0.250 | $ 0.250 | $ 0.250 | $ — |
| Class B* | $ 0.250 | $ 0.125 | $ — | $ — | $ — |
| Founder's | $ 0.005 | $ 0.005 | $ 0.005 | $ 0.005 | $ — |

\* In March 2001 all Class B Shares were reclassified as Common Shares on a one−for−one basis.

We were prohibited by the terms of our financing arrangements from paying final dividends to our shareholders for the fiscal year ending November 30, 2003. The SNSA Board of Directors has recommended a special dividend payment of $2.00 per share for the fiscal year ending November 30, 2004, pending shareholder approval at our annual meeting on June 9, 2005.

**Significant Changes**

Except as described in Note 29 to the Consolidated Financial Statements, included in Item 18 of this Report, Item 4. "Information on the Company—Recent Significant Developments," and Item 5. "Operating and Financial Review and Prospects" and Item 8. "Financial Information—Legal Proceedings" of this Report, there have been no significant changes since November 30, 2004.

**Item 9. The Offer and Listing.**

**Stock Trading History**

The following table sets out the range of high and low closing prices for our publicly traded shares for the periods indicated.