EXHIBIT 1

Westlaw.

Not Reported in F.Supp.2d                                                                                                                     Page 1
Not Reported in F.Supp.2d, 2004 WL 51001 (D.Conn.)
**(Cite as: 2004 WL 51001 (D.Conn.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Connecticut.
B.H., et al., Plaintiffs,
v.
SOUTHINGTON BOARD OF EDUCATION, et al.,
Defendants.
**No. Civ.A. 302CV252SRU.**

Jan. 7, 2004.

*RULING ON PLAINTIFFS' MOTION FOR
RECONSIDERATION*

UNDERHILL, J.

**\*1** B.H., a disabled minor, by and through his parents, Mr. and Mrs. C.H. (collectively, "the plaintiffs"), brought this action pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1415, et seq. ("IDEA"), and 42 U.S.C. § 1983. The plaintiffs allege that the defendants, the Southington Board of Education and its employees, Frances J. Hagg and Anthony D'Angelo [FN1] (collectively, "the Board Defendants"), and the Connecticut Department of Education, through its Commissioner Theordore Sergi (collectively, "the State Defendants"), violated B .H.'s rights under the IDEA in connection with his education in the Southington School District. The plaintiffs seek monetary and equitable relief. Currently pending is the plaintiffs' motion for partial reconsideration (doc. # 82) of the court's July 25, 2003 Ruling (doc. # 75). For the reasons stated herein, the plaintiffs' Motion for Reconsideration is granted, and on reconsideration the requested modifications of the court's Ruling are granted in part and denied in part.

>    FN1. Frances J. Haag and Anthony D'Angelo are, respectively, the Senior Coordinator and Coordinator of Special Education for the Town of Southington.

For purposes of this ruling, the court presumes familiarity with the facts and conclusions of law as stated in the July

25, 2003 Ruling. *See B.H. v. Southington Bd. of Educ., 273 F.Supp.2d 194 (D.Conn.2003).*

I. Discussion

As the plaintiffs note, the standard for granting a motion for reconsideration is "strict." A motion for reconsideration "is not simply a second opportunity for the movant to advance arguments already rejected." *Shrader v. CSX Transportation, Inc., 70 F.3d 255, 257 (2d Cir.1995).* "Such a motion generally will be denied unless the moving party can point to controlling decisions or data that the court overlooked--matters, in other words, that might reasonably be expected to alter the conclusion reached by the court. Thus, the function of a motion for reconsideration is to present the court with an opportunity to correct manifest errors of law or fact or to consider newly discovered evidence." *Channer v. Brooks,* 2001 WL 1094964, \*1 (D.Conn.2001) (citations omitted and internal quotation marks omitted).

The plaintiffs argue first that the court should not have dismissed the claims for permanent injunctive and permanent declaratory relief in Counts One and Two because the Stipulated Agreement did not resolves such claims. The Stipulated Agreement states, in relevant part: "This Agreement resolves all claims for preliminary injunctive and declaratory relief raised by this lawsuit. However, plaintiffs' claims for damages, attorneys' fees and costs are not covered and will be resolved through subsequent proceedings." *See* Stipulated Agreement, dated February 28, 2002 (doc. # 16). The Stipulated Agreement is poorly drafted. In the first quoted sentence, the parties identify the claims they have resolved and, in the second quoted sentence, the parties identify the claims that still must be litigated in this case. In neither sentence is there any mention of permanent equitable relief. Because the only claims the parties listed as still in dispute involve money damages claims, the court reasonably understood that no equitable claims remained unresolved. On reconsideration, the court concludes that the language of the Stipulated Agreement is ambiguous. Accordingly, there may have been no meeting of the minds concerning whether claims for permanent equitable relief were resolved. Under these circumstances, the only reasonable course is to reinstate

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 2
Not Reported in F.Supp.2d, 2004 WL 51001 (D.Conn.)
**(Cite as: 2004 WL 51001 (D.Conn.))**

plaintiffs' claims for permanent equitable relief in Counts One and Two.

**\*2** The plaintiffs next argue that the court mistakenly granted the State Defendants' motion to dismiss Count Three. Count Three alleges that the State Defendants violated plaintiffs' rights under 20 U.S.C § 1413(h) and C.F.R. § 300.360 by failing to implement B.H.'s October 17, 2001 IEP in light of the Board Defendants' failure to implement the IEP. The court dismissed Count Three because the plaintiffs failed to properly notify the State Defendants--prior to bringing suit against them--that the Board Defendants had failed to implement B.H.'s IEP. In so holding, the court determined that the plaintiffs had "never requested a due process hearing to resolve this claim, presented this claim at the due process hearing, or even included the State Defendants at the due process hearing." *B.H.,* 273 F.Supp.2d at 200 (D.Conn.2003). In addition, the court noted that the plaintiffs failed to notify the State Defendants of the Board Defendants' failure to implement B.H.'s IEP via the complaint procedure described in 34 C.F.R. § 300.662. *See id.* at 201-02.

In the present motion, the plaintiffs claim that they are not required to pursue either administrative remedies under the IDEA or file a complaint pursuant to 34 C.F.R. § 300.662 prior to maintaining an action against the State Defendants. Rather, the plaintiffs claim that they are only required to demonstrate that the State Defendants were aware--regardless of the means in which they became aware--that the Board Defendants were not implementing B.H.'s IEP, and that the State Defendants did not "step in" and provide the necessary services themselves. Accordingly, the plaintiffs contend that both their December 17, 2001 letter informing the State Defendants that the Board Defendants were not enforcing Hearing Officer Slez's Interim Order, and their July 23, 2003 disclosure of expert reports indicating that B.H. was not receiving an appropriate IEP, sufficiently notified the State Defendants that B.H. was not receiving his IEP.

Even if the plaintiffs are correct in their contention that they are not required to exhaust either the IDEA's administrative procedures or the Regulations complaint procedure, they still have not provided cause to reinstate the claims against

the State Defendants in this case. For the reasons previously stated in the July 25, 2003 Ruling, the December 17, 2001 letter was insufficient to trigger the State Defendant's responsibilities under the IDEA. *See B.H.,* 273 F.Supp.2d at 200-02. In addition, even if the plaintiffs properly notified the State Defendants via the July 23, 2003 disclosures, they have not supplied the court with any authority for the proposition that the July 23, 2003 disclosures retroactively cured their failure to properly notify the State Defendants of their responsibilities under the IDEA as of the filing of the Amended Complaint. The State Defendants cannot be sued for failing to correct omissions of the Board Defendants about which they received no proper notice until after the filing of the lawsuit. Accordingly, the court adheres to its dismissal of Count Three.

II. Conclusion

**\*3** For the foregoing reasons, Plaintiffs' motion for reconsideration (doc. # 82) is granted. On reconsideration, the claims for permanent equitable relief set forth in Counts One and Two are reinstated, but the claims against the State Defendants are not reinstated.

It is so ordered.

Not Reported in F.Supp.2d, 2004 WL 51001 (D.Conn.)

**Motions, Pleadings and Filings (Back to top)**

• 3:02CV00252 (Docket) (Feb. 11, 2002)

END OF DOCUMENT

# EXHIBIT 2

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1240196 (E.D.N.Y.)

**(Cite as: 2000 WL 1240196 (E.D.N.Y.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. New York.
PAB AVIATION, INC., Treasure Solutions, Inc., and
United States Aviation
Underwriters, Plaintiffs,
v.
UNITED STATES OF AMERICA, Defendant,
v.
THE PORT AUTHORITY OF NEW YORK AND NEW
JERSEY, Third-Party Defendant.
**No. 98-CV-5952 JG.**

Aug. 24, 2000.

Andrew J. Maloney, III, Kreindler & Kreindler, New York,
NY, for Plaintiff PAB Aviation, Inc.

David W. Ogden, Acting Assistant Attorney General, Torts
Branch, Civil Division, U.S. Department of Justice,
Washington, D.C., By: Stephen R. Cerutti, II, Trial
Attorney, for Defendant United States.

*MEMORANDUM AND ORDER*
GLEESON, J.

*1 PAB Aviation has moved for reconsideration of my
memorandum and order, dated August 3, 2000, dismissing
its claim against the United States.

Eastern District Local Civil Rule 6.3 authorizes motions for
reconsideration when accompanied by "a memorandum
setting forth concisely the matters or controlling decisions
which counsel believes the court has overlooked." The
requirements of Local Rule 6.3, which applies in both the
Southern and Eastern Districts, are strictly construed in
order to keep the court's docket free of unnecessary
relitigation. *See Bell Sports, Inc. v. System Software Assocs.,
Inc., 71 F.Supp.2d 121, 125-26 (E.D.N.Y.1999)* (noting that
a party seeking reconsideration bears a "difficult burden ...
'in order to dissuade repetitive arguments'" (quoting *Ruiz v.
Commissioner of the Dep't of Transp., 687 F.Supp. 888, 890
(S.D.N.Y.1988)*)); *see also Quartararo v. Catterson, 73*

*F.Supp.2d 270, 273 (E.D.N.Y.1999)* (noting *Rule 6.3*'s
"design to prevent re-litigation").

A party may not advance a new argument in a motion to
reconsider; that argument is waived. *See Eisemann v.
Greene, 204 F.3d 393, 395 n. 2 (2d Cir.2000)* ("To be
entitled to reargument, a party 'must demonstrate that the
Court overlooked controlling decisions or factual matters
*that were put before it on the underlying motion.*" (quoting
*Shamis v. Ambassador Factors Corp., 187 F.R.D. 148, 151
(S.D.N.Y.1999)* (emphasis added)); *cf. Brown v. J.F.H. Mak
Trucking, 95-CV-2118, 1999 WL 1057274, at *1 (E.D.N
.Y. Nov. 8, 1999)* ("[S]uch motions cannot be used as a
vehicle to introduce new evidence that should have been set
forth during the pendency of the prior motion or could have
been discovered in the exercise of due diligence."). Nor may
the party merely reiterate or repackage an argument
previously rejected by the court; that argument is for appeal.
*See Brown, 1999 WL 1057274, at *1* (noting that a motion
to reconsider "may not be used as a substitute for an
appeal"); *see also Resource N.E. of Long Island v. Town of
Babylon, 80 F.Supp.2d 52, 64 (E.D.N.Y.2000)* ("[A motion
to reconsider] is not a vehicle to reargue those issues already
considered when a party does not like the way the original
motion was resolved."). The purpose of the motion to
reconsider is to allow the district court to correct its own
mistake, by calling its attention to a factual matter or a
controlling precedent previously put forward by the party
but "overlooked" by the court. *Bell Sports, 71 F.Supp.2d at
126.*

Because PAB's motion involves only reformulations of
arguments already considered and rejected, reconsideration
is not warranted. [FN1] The motion is therefore denied.

FN1. PAB notes that I relied on the *Restatement
(Second) of Torts* § 766C, but contends that I
overlooked comment (b) to that section. That
comment, however, does not apply to this case.
The comment addresses "physical harm to the ...
chattels of the plaintiff," and there was no physical
harm to any property owned by PAB. Treasure
Solutions owned the aircraft; PAB had only a
contractual right to use it. The case is therefore
indistinguishable from Illustration 1 to comment

Westlaw.

Not Reported in F.Supp.2d                                              Page 2
Not Reported in F.Supp.2d, 2000 WL 1240196 (E.D.N.Y.)
**(Cite as: 2000 WL 1240196 (E.D.N.Y.))**

(a) to § 766C:

A has contracted to tow a barge owned by B
between two ports. Before the contract can be
performed, C negligently sinks the barge, and A is
prevented from towing it and so deprived of the
profit to be made out of the towage fees. C is not
liable to A.

Not Reported in F.Supp.2d, 2000 WL 1240196 (E.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 1:98cv05952 (Docket) (Sep. 24, 1998)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 3

Westlaw.

Not Reported in F.Supp.2d                                                     Page 1
Not Reported in F.Supp.2d, 2005 WL 1272271 (N.D.Ill.)
**(Cite as: 2005 WL 1272271 (N.D.Ill.))**

H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois, Eastern Division.
Dennis HIGGINBOTHAM, individually and on behalf of
all others similarly
situated, Plaintiffs,
v.
BAXTER INTERNATIONAL, INC., Harry M. Jansen
Kraemer, Jr., Brian P. Anderson and
John Greisch, Defendants.
Todd KATZ, as Vice President of Bloomfield, Inc., on
behalf of all others
similarly situated, Plaintiff,
v.
BAXTER INTERNATIONAL, INC., Defendant.
**No. 04 C 4909, 04 C 7096.**

May 25, 2005.

Marvin Alan Miller, Jennifer Winter Sprengel, Christopher
B. Sanchez, Miller Faucher and Cafferty, LLP, Chicago, IL,
Marc A Topaz, Schiffrin, Craig and Barroway, Richard A.
Maniskas, Schiffrin & Barroway, LLP, Bala Cynwyd, PA,
for Plaintiffs.

Donna L. McDevitt, Matthew Robert Kipp, Lanelle Kay
Meidan, Dhananjai Shivakumar, Skadden Arps Slate
Meagher & Flom, LLP, Chicago, IL, for Defendants.

Jonathan M. Plasse, Goodkind, Labaton, Rudoff &
Sucharow, New York, NY, Leigh R. Lasky, Norman
Rifkind, Amelia Susan Newton, Lasky & Rifkind, Ltd.,
Chicago, IL, for plaintiff Todd Katz.

*MEMORANDUM OPINION AND ORDER*
HART, J.

**\*1** This is a securities fraud putative class action which is
subject to the Private Securities Litigation Reform Act of
1995 ("PSLRA"), 15 U.S.C. § 78u-4 *et seq.* Three cases
have been consolidated, lead plaintiffs have been appointed,
and a Consolidated Class Action Complaint ("CAC") has

been filed. [FN1] One other case has been reassigned, but
has not yet been consolidated into the CAC because the
named plaintiff in that case has moved for a remand to state
court. *See Katz v. Baxter International, Inc.,* No. 04 C 7096
(N.D.Ill.) (*"Katz"* ).

> FN1. No motion for class certification has been
> filed. Class certification will be denied without
> prejudice.

In the CAC, plaintiffs name as defendants: Baxter
International, Inc. ("Baxter"); Harry Kraemer, Baxter
Chairman and Chief Executive Officer from 1999 until
April 2004; [FN2] Brian Anderson, [FN3] Baxter's Senior
Vice President and Chief Financial Officer from February
1998 until June 21, 2004; and John Greisch, a Baxter
Corporate Vice President and President of its BioScience
business beginning in 2002, and Baxter's Chief Financial
Officer since June 21, 2004. For the first quarter of 2001
through the first quarter of 2004, Baxter overstated its
revenues and net income. This resulted from the
overstatement of net sales and net income from Baxter's
Brazil operations and inadequate recognition of bad debt
from Baxter's Brazil operations. On July 22, 2004, Baxter
publicly announced that it would be restating its financial
results for 2001 through 2003 and the first quarter of 2004.
It is alleged that, throughout this time period, defendants
knowingly or recklessly allowed the inaccurate financial
results to be released. Immediately after the initial
announcement, sales of Baxter's shares fell $1.48 per share,
which was 4.59% of their prior value. Plaintiffs allege that
all defendants violated § 10(b) of the Securities Exchange
Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. §
240.10b-5. The individual defendants are also alleged to
have control person liability under § 20(a) of the Securities
Exchange Act, 15 U.S.C. § 78t(a).

> FN2. It is alleged that Robert Parkinson has been
> Baxter's Chairman and Chief Executive Officer
> since April 2004. He is not named as a defendant.

> FN3. The pleadings are inconsistent as to whether
> this defendant's name is Anderso n or Anderse n.
> Anderson appears to be the correct spelling.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                      Page 2
Not Reported in F.Supp.2d, 2005 WL 1272271 (N.D.Ill.)
**(Cite as: 2005 WL 1272271 (N.D.Ill.))**

The *Katz* case was originally filed in the Circuit Court of Cook County, Illinois. Defendant Baxter removed the *Katz* case. The *Katz* case is also a putative class action. The *Katz* Complaint contains allegations similar to the CAC, but the only named defendant in the *Katz* Complaint is Baxter and the allegations regarding misstated earnings and income are limited to the misstatement of 2001 and 2002 earnings and income. The *Katz* Complaint focuses on alleged misstatements in Baxter's registration statements and the only claim is one for violation of § 11 of the Securities Act of 1933, 15 U.S.C. § 77k. The *Katz* Complaint does not contain any state law claims or Exchange Act claims.

Presently pending is defendants' motion to dismiss all counts of the CAC. Also pending is Katz's motion to remand the *Katz* case. The remand motion will be considered first.

Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), provides that jurisdiction over Securities Act claims may be in either state or federal court. Prior to 1998, § 22(a) provided in part that "No case arising under this subchapter and brought in any State court of competent jurisdiction shall be removed to any court of the United States." Prior to 1998, § 16 of the Securities Act, 15 U.S.C. § 77p, provided that "rights and remedies provided by this subchapter shall be in addition to any or and all other rights and remedies that may exist at law or in equity."

*2 In 1998, Congress amended § 16 of the Securities Act to preempt certain state law claims. With exceptions set forth in § 16(d), § 16(b) now provides:
 No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging--
 (1) an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security; or
 (2) that the defendant used or employed any manipulative or deceptive device or
 contrivance in connection with the purchase or sale of a covered security.
15 U.S.C. § 77p(b).

Congress also added § 16(c) of the Securities Act which provides:
 Any covered class action brought in any State court involving a covered security, as set forth in subsection (b), shall be removable to the Federal district court for the district in which the action is pending, and shall be subject to subsection (b).
15 U.S.C. § 77p(c).

Consistent with the amendment of § 16, § 22(a) was amended to provide:
 *Except as provided in section 77p(c) of this title,* no case arising under this subchapter and brought in any State court of competent jurisdiction shall be removed to any court of the United States.
15 U.S.C. § 77v(a) (emphasis added).

Katz contends § 22(a) prohibits the removal of his case. He contends that his case does not fall into the § 16(c) exception because it contains no state law claims. Baxter contends that the pertinent statutory provisions should be construed in light of the purposes and legislative history of the 1998 amendments and, therefore, § 16(c) should be read as permitting removal of cases containing § 11 claims, but no state law claims.

The language of the statutes are clear and unambiguous. No case containing a § 11 claim is removable from state court unless it meets the exception set forth in § 16(c). Section 16(c) provides that it only applies to covered class actions "as set forth in subsection [16](b)." To be a class action set forth in § 16(b), the case must be *inter alia* a "covered class action based upon the statutory or common law of any State or subdivision thereof." The language of these statutes plainly and unambiguously limit removal to certain class actions containing state law claims. *California Public Employees' Retirement System v. WorldCom, Inc.,* 368 F.3d 86, 98 (2d Cir.2004), *cert. denied,* --- U.S. ----, 125 S.Ct. 862, 160 L.Ed.2d 824 (2005); *In re Tyco International, Ltd.,* 322 F.Supp.2d 116, 119-21 (D.N.H.2004); *Hawaii Structural Ironworkers Pension Trust Fund v. Calpine Corp.,* 2003 WL 23509312 * 2 (S.D.Cal. Aug.27, 2003); *Nauheim v. Interpublic Group of Cos.,* 2003 WL 1888843 *3-4 (N.D.Ill. April 16, 2003); *In re Waste Management, Inc. Securities Litigation,* 194 F.Supp.2d 590, 593

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                      Page 3
Not Reported in F.Supp.2d, 2005 WL 1272271 (N.D.Ill.)
**(Cite as: 2005 WL 1272271 (N.D.Ill.))**

(S.D.Tex.2002). Where the statutory language is plain and unambiguous and does not produce an absurd result, that language should be applied and legislative history need not be considered. _Whitfield v. United States,_ --- U.S. ----, ----, 125 S.Ct. 687, 692, 160 L.Ed.2d 611 (2005); _National Organization for Women, Inc. v. Scheidler,_ 396 F.3d 807, 816 (7th Cir.2005); _City of Chicago v. United States Department of Treasury,_ 384 F.3d 429, 435 (7th Cir.2004); _Kramer v. Banc of America Securities, LLC,_ 355 F.3d 961, 966 (7th Cir.), _cert. denied,_ --- U.S. ----, 124 S.Ct. 2876, 159 L.Ed.2d 798 (2004); _Nauheim,_ 2003 WL 188843 at *3. The plain language of the statute will be followed. _Nauheim,_ 2003 WL 188843 at *3-5.

**\*3** Because the only claim in the _Katz_ case is a § 11 federal securities law claim, the _Katz_ case was not removable. The _Katz_ case will be remanded to state court.

Still to be considered is the motion to dismiss the CAC. The basic elements of a § 10(b) claim are: (1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. _Dura Pharmaceuticals, Inc. v. Broudo,_ --- U.S. ----, ----, 125 S.Ct. 1627, 1631, --- L.Ed.2d ----, ---- (2005). Defendants contend plaintiff has failed to adequately allege the second element, scienter. The PSLRA provides that, "with respect to each act or omission alleged to violate" § 10(b), plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required" scienter. 15 U.S.C. § 78u-4(b)(2); _DH2, Inc. v. Athanassiades,_ 359 F.Supp.2d 708, 717 (N.D.Ill.2005); _Stephenson v. Hartford Life & Annuity Insurance Co.,_ 2004 WL 2260616 *7 (N.D.Ill. Oct.1, 2004). The required scienter for a § 10(b) claim is "a mental state embracing intent to deceive, manipulate, or defraud," _Ernst & Ernst v. Hochfelder,_ 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); _Hallberg v. American Agencies General Agencies, Inc.,_ 2005 WL 563211 *3 (N.D.Ill. March 8, 2005), and also includes "reckless disregard of the truth." _S.E.C. v. Jakubowski,_ 150 F.3d 675, 681 (7th Cir.1998), _cert. denied,_ 525 U.S. 1103, 119 S.Ct. 868, 142 L.Ed.2d 770 (1999); _Sundstrand Corp. v. Sun Chemical Corp.,_ 553 F.2d 1033, 1044-45 (7th Cir.), _cert. denied,_ 434 U.S. 875 (1977); _Hallberg,_ 2005 WL

563211 at *3; _Marwil v. Ent & Imler CPA Group, PC,_ 2004 WL 2750255 *5 (S.D.Ind. Nov.24, 2004). "Reckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." _Sundstrand,_ 553 F.2d at 1045; _Marwil,_ 2004 WL 2750255 at * 5.

A number of district court cases in the Seventh Circuit have adopted the Second Circuit standard that scienter may be adequately alleged by either (a) facts showing that the particular defendant had both motive and opportunity to commit fraud or (b) facts constituting strong circumstantial evidence of conscious misbehavior or recklessness. See _Ong v. Sears, Roebuck & Co.,_ 2004 WL 2534615 *27 (N.D.Ill. Sept.27, 2004); _In re Spiegel, Inc. Securities Litigation,_ 2004 WL 1535844 *24-25 (N.D.Ill. July 8, 2004). Other cases have criticized this approach as too narrowly focusing on particular factors instead of viewing the allegations as a whole in order to determine whether a strong inference of scienter may be drawn. See, e.g., _Johnson v. Tellabs, Inc.,_ 303 F.Supp.2d 941, 961 (N.D.Ill.2004) (quoting _Ottmann v. Hanger Orthopedic Group, Inc.,_ 353 F.3d 338, 345 (4th Cir.2003)). See also _Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1301.1 (3d ed.2004)._

**\*4** According to Baxter's August 6, 2004 Restatement of financial results for 2001 through the first quarter of 2004, the "restatement is primarily the result of the inappropriate application of accounting principles for revenue recognition and inadequate provisions for bad debts in Brazil during the period." CAC ¶ 34. An investigation by the Audit Committee of Baxter's Board of Directors had revealed:

(i) "an ineffective control environment maintained by senior management in Brazil, including intentional overrides by senior management in Brazil of internal controls;" (ii) "inadequate revenue recognition controls in Brazil;" (iii) "inadequate controls in Brazil to ensure adherence to generally accepted accounting principles for loss contingencies, including bad debts;" and (iv)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1272271 (N.D.Ill.)
(Cite as: 2005 WL 1272271 (N.D.Ill.))

"ineffective financial review by management responsible for the Intercontinental region, which includes Latin America." *Id.* ¶ 35. The Audit Committee is also quoted as stating that these issues collectively "constitute a material weakness in the company's internal controls over financial reporting." *Id.* ¶ 36. A substantial portion of the improperly recognized revenue resulted "from sales to fictitious customers, fictitious sales to actual customers, and the illegal rigging of bids for the sale of blood byproducts to the Brazilian government. Certain of the inadequate provisions for bad debts were the result of Baxter's Brazilian management's involvement in a kickback scheme with product vendors." *Id.* ¶ 37.

Beginning in April 2004, investigations and accusations were publicly disclosed in Brazil regarding a Brazilian blood products price-fixing cartel. Baxter was an alleged participant in the scheme. On April 20, 2004, there was a Brazilian newspaper item regarding these accusations. On April 29, 2004, the Brazilian Ministry of Justice initiated an administrative proceeding in which Baxter was accused of being involved in the cartel's price-fixing practices. On May 19, 2004, Brazilian Federal Police conducting a related investigation launched several search and seizure operations in the blood products industry. A number of people were arrested, including a former employee of Baxter's Brazilian operation. On May 21, 2004, a Brazilian newspaper published a report that the Brazilian General Accounting Office had conducted an investigation and found that the blood products cartel existed. On the same day, another newspaper reported that Baxter was one of the participants in the cartel. On May 26, 2004, the Secretary of Economic Rights ordered an investigation of several companies, including Baxter. *See* CAC ¶¶ 45-51. These allegations do not specifically refer to the kickback scheme, only the price-fixing scheme. Also, there is no specific allegation that, prior to July 2004, any of the individual defendants were aware of these investigations and accusations.

The CAC also contains allegations regarding kickbacks. *See* CAC ¶¶ 52-56. These include allegations that the President, Human Resources Director, Finance Director, and Sales Manager for Baxter's Brazilian operations were involved.

These paragraphs do not include any allegation that the individual defendants were aware of this conduct.

*5 For the three years ending December 31, 2003, Baxter's Restatement of financial results decreased net sales by a total of $37,000,000 and net income decreased by a total of $33,000,000. For the first quarter of 2004, net sales were unchanged and net income decreased $2,000,000. During the three-year period, net sales as corrected were $24,345,000,000. The $37,000,000 overstatement represented 0.15% of Baxter's corrected net sales. For the three-year period, the corrected net income total was $2,238,000,000. The $33,000,000 overstatement represented 1.47% of corrected net income.

Throughout the pertinent time period, Anderson signed quarterly Forms 10-Q in which it was represented that the "financial statements reflect all adjustments necessary for a fair representation." Beginning with the Form 10-Q for the second quarter of 2002, as required by the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7241, Anderson and Kraemer signed certifications as to the accuracy of each Form 10-Q. [FN4] Anderson and Kraemer signed the annual Forms 10-K for 2002 and 2003, which also contained statements required by Sarbanes-Oxley. The statements included that these two defendants "concluded that the Company's disclosure controls and procedures are effective in alerting them in a timely fashion to material information relating to Baxter required to be included in reports that the Company files under the Exchange Act." CAC ¶ 78. There is no allegation as to any statement made by Greisch. The aforementioned statements are claimed to be misrepresentative because the financial statements included misstated Brazilian sales/income and the statements of defendants failed to acknowledge the allegedly inadequate controls regarding Brazilian operations.

> FN4. Kraemer did not sign the Form 10-Q for the first quarter of 2004. *See* CAC ¶ 94. He was no longer employed by Baxter when that report was filed.

As to scienter, plaintiffs particularly point to the following allegations. Plaintiffs point to the conclusory statements in the August 2004 Restatement that (a) management

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                          Page 5
Not Reported in F.Supp.2d, 2005 WL 1272271 (N.D.Ill.)
**(Cite as: 2005 WL 1272271 (N.D.Ill.))**

responsible for the region engaged in "ineffective financial review" and (b) Baxter internal controls over financial reporting was weak. *See* CAC ¶¶ 35-36. [FN5] Plaintiffs contrast these statements with Anderson's and Kraemer's statements that "the Company's disclosure controls and procedures are effective." CAC ¶ 78. *See also* CAC ¶ 91. Plaintiffs, however, provide no specific allegations as to what the deficiencies in the controls were, nor are there any specific allegations as to Anderson's or Kraemer's awareness of those deficiencies. These are not particularized allegations. *Cf. Abrams v. Baker Hughes Inc.,* 292 F.3d 424, 432 (5th Cir.2002); *In re Silicon Graphics Inc. Securities Litigation,* 183 F.3d 970, 985 (9th Cir.1999); *In re Foundry Networks, Inc.,* 2003 WL 23211577 *6 (N.D.Cal. Feb.14, 2003). These allegations do not provide a basis for drawing a strong inference that Anderson and Kraemer made intentional or reckless misrepresentations.

> FN5. Other allegations contained in ¶ 35 are limited to employees in Baxter's Brazilian operations.

Plaintiffs allege that Greisch received monthly reports of the financial results of Baxter's Brazilian operations. *See* CAC ¶ 39. It is also alleged that, as Senior Vice President of Finance in the Renal Division, Greisch had oversight of the Brazilian operations. *Id.* ¶ 109. The monthly reports alleged in ¶ 39, however, are reports that already contained the inaccurate financial information. There are no specific allegations that would support that Greisch could discern from these reports that they contained false information. The mere fact of Greisch's supervision and receipt of reports are not a sufficient basis for inferring that Greisch knew the reports were inaccurate. *See PR Diamonds, Inc. v. Chandler,* 364 F.3d 671, 687-88 (6th Cir.2004); *Abrams,* 292 F.3d at 432; *Silicon Graphics,* 183 F.3d at 985; *Tellabs,* 303 F.Supp.2d at 963; *Foundry Networks,* 2003 WL 23211577 at *6; *Chu v. Sabratek Corp.,* 100 F.Supp.2d 827, 837 (N.D.Ill.2000).

**6** Plaintiffs also point to their allegation that the "fictitious contracts were brought to the attention of defendant Greisch on a regular basis, and to defendant Anderson at least as early as May 2004." CAC ¶ 43. Although open to interpretation, it will be assumed that this allegation does

not merely mean that the contracts themselves were brought to defendants' attention, but also that they were made aware that the contracts were fictitious and included in financial reports. Even so interpreted, this allegation is conclusory and therefore insufficient to infer scienter. In order to draw a strong inference, plaintiffs must provide some details as to the contents of the reports, as well as when and how reported. *Abrams,* 292 F.3d at 432; *Silicon Graphics,* 183 F.3d at 985; *Tellabs,* 303 F.Supp.2d at 963; *Foundry Networks,* 2003 WL 23211577 at *6.

Additionally, even if it were adequately alleged that Greisch had knowledge of, or reckless disregard, of the inaccurately reported sales/income, there is no sufficient basis for holding him liable because there are no allegations that he was responsible for or made any inaccurate representation. The claims against Greisch cannot be sustained unless it is specifically alleged that he was responsible for the misrepresentations that have been specifically alleged. *Southland Securities Corp. v. Inspire Insurance Solutions Inc.,* 365 F.3d 353, 365 (5th Cir.2004); *Tellabs,* 303 F.Supp.2d at 965; *Friedman v. Rayovac Corp.,* 295 F.Supp.2d 957, 993 (W.D.Wis.2003). Since Greisch is not alleged to be responsible for any misrepresentation, all claims against him will be dismissed.

Plaintiffs also contend that scienter can be inferred from the allegations that an overstatement of sales/income occurred, Baxter's use of stock for stock acquisitions and offerings, and officers' sales of stock in April 2004. Plaintiffs further contend that these allegations should be considered along with the "direct evidence of intentional fraud." Pl. Answer Brief at 15. Any direct allegations of fraud, however, essentially are limited to allegations regarding Baxter managers in Brazil. There are no direct allegations regarding Kraemer's knowledge of the improper reporting from Brazil. As previously discussed, any allegations regarding Greisch's knowledge are irrelevant because he was not involved in making the alleged misrepresentations. In any event, as previously discussed, the conclusory allegations as to his knowledge are insufficient to draw the necessary inferences. That leaves only the conclusory allegation in ¶ 43 of the CAC that "fictitious contacts" were brought to Anderson's attention "at least as early as May 2004." As previously

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 6
Not Reported in F.Supp.2d, 2005 WL 1272271 (N.D.Ill.)
**(Cite as: 2005 WL 1272271 (N.D.Ill.))**

discussed, that is a conclusory allegation that is insufficient to support that Anderson had knowledge of the fiction at the time. Moreover, the last alleged misrepresenta-tion is the first quarter of 2004 Form 10-Q that was filed on May 10, 2004. CAC ¶ 94. Thus, even if it were not ignored as conclusory, the allegation that Anderson had knowledge "as early as May 2004" is not specific enough to establish that he had knowledge prior to any of the alleged misrepresentations. The circumstantial evidence must be considered on its own. There is no adequate "direct evidence" to consider along with it.

*7 Overstatements of income or revenues are not by themselves sufficient to draw an inference of scienter. There must also be other allegations, direct or circumstantial, that together will support a strong inference of scienter. *PR Diamonds*, 364 F.3d at 695; *In re Navarre Corp. Securities Litigation*, 299 F.3d 735, 745 (8th Cir.2002); *In re Anicom Inc.*, 2001 WL 536066 *5 (N.D.Ill. May 18, 2001); *Chu*, 100 F.Supp.2d at 824. Additionally, if the misstated income or revenues is small in magnitude, stronger allegations will be needed to sufficiently support the inference of scienter. See *In re priceline.com Inc. Securities Litigation*, 342 F.Supp.2d 33, 57 (D.Conn.2004); *In re Allied Products Corp., Inc. Securities Litigation*, 2000 WL 1721042 *3- 4 (N.D.Ill. Nov.15, 2000); *In re MicroStrategy, Inc. Securities Litigation*, 115 F.Supp.2d 620, 635 & n. 30 (E.D.Va.2000); *In re Baan Co. Securities Litigation*, 103 F.Supp.2d 1, 21 (D.D.C.2000). In the present case, net income was overstated by approximately 1.5%, which is not a particularly substantial number. Cf. *Stavros v. Exelon Corp.*, 266 F.Supp.2d 833, 851 (N.D.Ill.2003); *In re SCB Computer Technology, Inc., Securities Litigation*, 149 F.Supp.2d 334, 351 (W.D.Tenn.2001).

The allegations as to motive are insufficient, when considered along with the overstatements, to support a strong inference of scienter. Plaintiffs allege the following transactions by Baxter: (a) in May 2001, Baxter issued $800,000,000 of convertible debentures; (b) in August 2001, Baxter acquired Cook Pharmaceutical Solutions for cash and 2,111,047 shares of common stock; (c) in April 2002, Baxter issued $500,000,000 of term debt; (d) in May 2002, Baxter acquired Fusion Medical Technologies, Inc. for

2,806,660 shares of common stock; (e) in December 2002, Baxter issued $1,250,000,000 in senior notes; (f) in March 2003, Baxter issued $600,000,000 in term debt; (g) in 2002 Baxter issued 14,950,000 shares of common stock for $414,000,000 in net proceeds; and (h) in 2003 Baxter issued 22,000,000 shares of common stock for $644,000,000 in net proceeds. CAC ¶¶ 112-118. It is not reasonable to infer that Anderson and Kraemer were motivated to overstate net income by a mere 1.5% ($33,000,000 over three years) in order to obtain more favorable rates or returns for the listed transactions valued at more than $4,000,000,000. Even if the 1.5% overstatement were to be considered significant enough to affect the alleged transactions, plaintiffs fail to allege facts connecting the overstatements to the transactions nor any facts supporting that the individual defendants would directly benefit from these transactions. Apparently, plaintiffs simply listed all significant transactions that Baxter engaged in during the time period. That can never be sufficient. See *PR Diamonds*, 364 F.3d at 690; *Bombach v. Chang*, 355 F.3d 164, 177 (2d Cir.2004); *Ottmann*, 353 F.3d at 352; *City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1269 (10th Cir.2001); *In re Cross Media Marketing Corp. Securities Litigation*, 314 F.Supp.2d 256, 264-65 (S.D.N.Y.2004); *In re Allscripts, Inc. Securities Litigation*, 2001 WL 743411 *11 (N.D.Ill. June 29, 2001).

*8 The other alleged fact concerning motivation is Anderson's April 26, 2004 sale of 44,902 shares of stock for $1,458,865.98. CAC ¶ 120. [FN6] Defendants contend attributing a fraudulent motive to this transaction is inconsistent with the allegation that Anderson did not learn of fictitious contracts until May 2004. That allegation, however, is that Anderson learned about the fictitious contracts "at least as early as May 2004," CAC ¶ 43, leaving open the possibility that he had learned earlier. Plaintiffs apparently contend that the circumstantial evidence of the stock sale would support that Anderson had knowledge of wrongdoing prior to May 2004.

> FN6. Allegations that a Senior Vice President sold 140,000 shares of stock on April 29, 2004 need not be considered. There are no allegations that this officer had any knowledge of the overstated income or was in any way involved in the alleged

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1272271 (N.D.Ill.)
(Cite as: 2005 WL 1272271 (N.D.Ill.))

Page 7

fraudulent misconduct.

The allegations as to Anderson's stock sale are insufficient to draw a strong inference of scienter. More must be alleged than simply a sale within the pertinent time period. *In re AMDOCS Ltd. Securities Litigation*, 390 F.3d 542, 550 (8th Cir.2004); *Navarre*, 299 F.3d at 747; *Silicon Graphics*, 183 F.3d at 986; *In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1424 (3d Cir.1997); *Gaines v. Guidant Corp.*, 2004 WL 2538374 *17 n. 39 (S.D.Ind. Nov.8, 2004); *Tellabs*, 303 F.Supp.2d at 962. Here there are no allegations regarding Anderson's trading history that would support that the April 2004 sale was unusual or otherwise suspicious. There are also no allegations connecting the April 2004 sale with any particular event or Anderson acquiring any particular information. Anderson's April 2004 stock sale is no basis for drawing a strong inference of scienter.

There are no allegations in the CAC adequately supporting that the individual defendants acted with the necessary scienter. Therefore, the direct claims against the individual defendants must be dismissed.

Plaintiffs argue that the § 10(b) claim against Baxter is sufficient because scienter on the corporation's part can be satisfied based on the collective knowledge and intent of the organization, including the knowledge of managers of its Brazilian operations regarding the overstated sales and income. Plaintiffs contend Baxter's scienter can be adequately alleged even if scienter is not adequately alleged as to any of the individual defendants. Plaintiffs' contention is contrary to holdings of at least two Circuit Courts, *Southland*, 365 F.3d at 366-67 (5th Cir.); *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1435-36 (9th Cir.1995), and the Seventh Circuit has expressed agreement with such holdings, *see Caterpillar, Inc. v. Great American Insurance Co.*, 62 F.3d 955, 963 (7th Cir.1995) (discussing *Nordstrom*). *See also Kinsey v. Cendant Corp.*, 2004 WL 2591946 *13 (S.D.N.Y. Nov.16, 2004); *In re Tyson Foods, Inc.*, 2004 WL 1396269 *12 (D.Del. June 17, 2004); *In re Cable & Wireless, PLC*, 321 F.Supp.2d 749, 772 (E.D.Va.2004); *Piper Jaffray Cos. v. National Union Fire Insurance Co. of Pittsburgh*, 38 F.Supp.2d 771, 779-80 (D.Minn.1999). These cases hold that the requisite scienter must be held by

the corporate employee responsible for issuing the alleged misrepresentations or at least that a senior officer or director of the corporation must have the pertinent scienter. Here, the alleged misrepresentations were made by Anderson and Kraemer. As previously discussed, plaintiffs have not adequately alleged that these defendants had the requisite scienter. Neither have plaintiffs adequately alleged that any other senior officer of Baxter itself had the requisite scienter.

*9 Plaintiffs cite two cases in support of their contention that they have adequately alleged Baxter's collective scienter. One case is readily distinguishable. In *In re NUI Securities Litigation*, 314 F.Supp.2d 388, 410-13 (D.N.J.2004), the court found that there were two bases for finding scienter on the part of the corporation itself even though allegations as to the individual defendants were deficient. *See id.* at 413-14 & n. 18. First, there were adequate allegations linking the alleged misrepresentations to an NUI stock offering that was intended to reduce short term debt. That is unlike the situation in the present case where, as previously discussed, plaintiffs have failed to provide adequate allegations linking alleged Baxter transactions with the alleged misrepresentations. Second, there were allegations that NUI's assistant general counsel received letters informing her of the improper bad debt practices that were being followed. Although the assistant general counsel was not named as an individual defendant, she was deemed to be a senior management official whose knowledge could be attributed to NUI. That is unlike the present case where the only Baxter employees adequately alleged to have knowledge of the improper practices were managers of Baxter's Brazilian operations, not upper level management officials of Baxter itself.

Plaintiffs also cite *In re WorldCom, Inc. Securities Litigation*, 352 F.Supp.2d 472, 497 (S.D.N.Y.2005). That holding concerns the § 10(b) liability of an accounting firm for recklessly issuing audit opinions in support of WorldCom's false disclosures. In part, the holding relies on the nature of an accounting firm and it having collective responsibility for the results of an audit that was conducted by numerous employees. *See id.* at 497 ("case law abounds with discussions of securities fraud by accounting firms that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 8
Not Reported in F.Supp.2d, 2005 WL 1272271 (N.D.Ill.)
**(Cite as: 2005 WL 1272271 (N.D.Ill.))**

concentrate on the firm's collective state of mind, not that of individual partners or employees"). The case, however, also states that it is generally appropriate to look to the collective knowledge and intent of a corporate securities fraud defendant.

> To carry their burden of showing that a corporate defendant acted with scienter, plaintiffs in securities fraud cases need not prove that any one individual employee of a corporate defendant also acted with scienter. Proof of a corporation's collective knowledge and intent is sufficient .... "[c]orporations compartmentalize knowledge, subdividing the elements of specific duties and operations into smaller components. The aggregate of those components constitutes the corporation's knowledge of a particular operation."

*WorldCom,* 352 F.Supp.2d at 497 (quoting *United States v. Bank of New England, N.A.,* 821 F.2d 844, 856 (1st Cir.), *cert. denied,* 484 U.S. 943, 108 S.Ct. 328, 98 L.Ed.2d 356 (1987) [FN7]).

> FN7. *Bank of New England* is not a securities fraud case. It concerns the Bank's criminal liability for violations of the Currency Transaction Reporting Act, 31 U.S.C. §§ 5311-22. *New England,* 821 F.3d at 847.

To the extent this holding of *WorldCom* is not limited to accounting firms, this court declines to follow *WorldCom* and instead will follow the majority rule previously discussed. Plaintiffs have not adequately alleged scienter on the part of Anderson and Kraemer, who issued the alleged misrepresentations. Neither have plaintiffs adequately alleged scienter on the part of any other Baxter senior management official. The § 10(b) claim against Baxter will be dismissed.

**\*10** Since the allegations do not adequately support that Baxter violated § 10(b), the control person claims against the individual defendants must also be dismissed. *Southland,* 365 F.3d at 383-84; *Taubenfeld v. Career Education Corp.,* 2005 WL 350339 *13 (N.D.Ill. Feb.11, 2005).

It has been found that the CAC fails to adequately allege a basis for relief. In that circumstance, plaintiffs request that the CAC be dismissed without prejudice and that they be provided the opportunity to amend. Defendants oppose that request. The case will be dismissed and a judgment will be entered. That does not necessarily deprive plaintiffs of the opportunity to amend. However, to the extent they desire to amend, they must move within the time provided under Fed.R.Civ.P. 59(e). Any such motion must include the proposed amended complaint. *See Crestview Village Apartments v. United States Department of Housing & Urban Development,* 383 F.3d 552, 557-58 (7th Cir.2004).

IT IS THEREFORE ORDERED that:

(a) In No. 04 C 7096, the motion to remand (misfiled in No. 04 C 4909 as Motion [21] ) is granted. The Clerk of the Court is directed to remand No. 04 C 7096 to the Circuit Court of Cook County, Illinois.

(b) In No. 04 C 4909, defendants' motion to dismiss [26] is granted. Class certification is denied without prejudice. The Clerk of the Court is directed to enter judgment in favor of defendants and against plaintiffs dismissing plaintiffs' cause of action with prejudice.

Not Reported in F.Supp.2d, 2005 WL 1272271 (N.D.Ill.)

**Motions, Pleadings and Filings (Back to top)**

• 2005 WL 2241183 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum of Law in Opposition to Plaintiff's Rule 59(e) Motion to Alter the Judgment (Jul. 06, 2005)

• 1:04cv07096 (Docket) (Nov. 03, 2004)

• 2004 WL 2815408 (Trial Motion, Memorandum and Affidavit) Memorandum of Points and Authorities in Support of Motion of the Michigan Funds for Consolidation of Related Actions, for Appointment as Lead Plaintiffs and for Approval of Lead Plaintiffs' Selection of Co-Lead Counsel (Sep. 27, 2004)

• 2004 WL 2815396 (Trial Pleading) Class Action Complaint (Jul. 27, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 4

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 1267465 (S.D.N.Y.)
**(Cite as: 1999 WL 1267465 (S.D.N.Y.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
William A. SHIELDS, Plaintiff,
v.
ROBINSON-VAN VUREN ASSOCIATES, INC.,
Defendant.
**No. 98 Civ. 8785(DLC).**

Dec. 29, 1999.

Robert P. O'Brien, O'Brien McLaughlin & Kenny,
Lynbrook, NY, for Plaintiff.

Mary E. Flynn, Morrison Cohen Singer & Weinstein, LLP,
New York, NY, for Defendant.

*MEMORANDUM OPINION & ORDER*
COTE, J.

**\*1** This dispute arises out of defendant's termination of plaintiff's employment. Near the end of the discovery period, plaintiff has moved to amend the complaint to assert a cause of action for breach of contract. For the reasons stated below, the motion is denied.

Procedural History

This action was filed on December 11, 1998. Plaintiff alleged that defendant Robinson-Van Vuren Associates ("RVA") violated various state and federal discrimination statutes in terminating his employment on March 5, 1997, based on his disability or perceived disability. In an answer filed on March 4, 1999, RVA asserted that plaintiff's employment was terminated approximately three weeks earlier than alleged by plaintiff, that is, on February 19, 1997. On October 12, 1999, plaintiff received a copy of the Statement of Facts and Position that the defendant had submitted to the EEOC, and in which the defendant also stated that the plaintiff's employment was terminated on February 19, 1997.

Pursuant to the Court's Pretrial Scheduling Order of May 4, 1999, all fact discovery was to be completed by September 17, 1999, and any amendment to the pleadings was to be made by June 11, 1999. At the plaintiff's request, fact discovery was extended until October 29, 1999, on August 30, 1999, and until November 24, 1999, on November 8, 1999. In granting the second extension, the Court stated "there shall be no further extension." The plaintiff filed this motion to amend on November 15, 1999. Pursuant to the May 4, 1999 Scheduling Order, any summary judgment motion is due to be served on January 21, 2000, the same date that the pretrial order is due in the absence of a motion. The case has been placed on the February 2000 trial ready calendar in the event there is no summary judgment motion.

DISCUSSION

Under Rule 15(a), Fed.R.Civ.P., once a responsive pleading has been served, a party may amend its pleadings "only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." The Supreme Court has emphasized that amendment should normally be permitted and that a refusal to grant leave must be justified by grounds such as undue delay, bad faith, or futility. *Foman v. Davis,* 371 U.S. 178, 182 (1962). *See also Dluhos v. The Floating and Abandoned Vessel, Known as "New York,"* 162 F.3d 63, 69 (2d Cir.1998). Prejudice to the opposing party is an additional reason to deny leave to amend. *See Foman,* 371 U.S. at 182; *Dluhos,* 162 F.3d at 69. A district court therefore has discretion to deny leave to amend "where the motion is made after an inordinate delay, no satisfactory explanation is made for the delay, and the amendment would prejudice the defendant." *MacDraw, Inc. v. CIT Group Equip. Fin., Inc.,* 157 F.3d 956, 962 (2d Cir.1998) (quoting *Cresswell v. Sullivan & Cromwell,* 922 F.2d 60, 72 (2d Cir.1990)). The burden to explain a delay is on the party that seeks leave to amend. *MacDraw,* 157 F.3d at 962.

**\*2** In this case, the defendant opposes the amendment on the grounds of delay, prejudice, and futility. If an amendment does not state a claim upon which relief can be granted, a court may deny leave to amend because amendment would be futile. *See Ricciuti v. N.Y.C. Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991). The proposed amended complaint "is to be judged by the same standards as those governing the adequacy of a filed pleading." *Id.* Thus, the Court should

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                                    Page 2
Not Reported in F.Supp.2d, 1999 WL 1267465 (S.D.N.Y.)
(Cite as: 1999 WL 1267465 (S.D.N.Y.))

only deny leave to amend for failure to state a claim if the complaint as amended would be subject to dismissal under Rule 12(b)(6), Fed.R.Civ.P. *See id.*

In the proposed cause of action, the plaintiff asserts that by not allowing him a full thirty days from his date of hire to satisfy a medical certification requirement, the defendant breached an employment agreement between the parties. The facts relevant to the proposed cause of action are not in dispute. Plaintiff began working as an air traffic controller and entered into an Employment Agreement ("Agreement") with the defendant on February 3, 1997. Under the Agreement, the plaintiff's preliminary period of employment, termed "Conditional Employment," ended when and if the plaintiff failed to "submit to and pass ... [a] Pre-employment Class II Physical Examination by a licensed physician (the "Physical Exam")." On February 19, 1997, both the plaintiff and RVA learned that the plaintiff had not passed his Class II Physical Examination. RVA contends that it terminated plaintiff's employment on that same day. The plaintiff believed that his employment was terminated at the end of the thirty day period of Conditional Employment. Well after the thirty day period had expired, in May of 1997, he passed a Physical Examination.

The defendant argues that it was entitled under the unambiguous terms of the Agreement and based on the uncontested facts to fire the plaintiff. It argues, therefore, that any cause of action for breach of the Agreement is futile. This Court agrees. Based on the undisputed facts, the defendant was entitled to terminate the plaintiff's employment under the Agreement on February 19, 1997. Plaintiff admits that he failed to satisfy the condition that he "pass" the Physical Examination. Nothing in the Agreement suggests that plaintiff was entitled to a full thirty days in which to satisfy that condition. The Agreement states that the conditional period of employment ends in thirty days or upon the employee's failure to satisfy any one of the listed conditions. The Agreement's description of the medical examination as a "Pre-employment" physical examination further underscores the defendant's interpretation of its rights under the Agreement. Based on the undisputed facts and the unambiguous language of the Agreement, plaintiff's amended complaint fails to state a claim for breach of the Agreement. Even if the plaintiff believed that he had thirty days to pass the examination, it is undisputed that he did not accomplish this task until months later. Nor can the plaintiff attribute his delay to the defendant's firing him before the end of the thirty day conditional employment period. As of the filing of this lawsuit, the plaintiff still believed he had not been fired until the thirty day period had elapsed.

**\*3** Moreover, the plaintiff has unduly delayed in seeking to amend the complaint. The addition of the proposed cause of action will require that discovery be reopened, at prejudice and expense to the defendant. Additional discovery would likely result in delay, as the pretrial order or a summary judgment motion is now due on January 21, 2000, and the case is already on the February trial ready calender if there is no summary judgment motion.

Nor can the plaintiff justify the delay. On March 4, 1999, the plaintiff became aware through the defendant's answer of the defendant's contention that it terminated the plaintiff's employment on February 19, 1997. If the plaintiff believed that contention supported a cause of action for breach of the Agreement, then he could have sought leave to amend immediately, or if he believed more information was necessary, immediately conducted appropriate discovery. Plaintiff has not provided sufficient justification for the eight month delay in seeking to amend the complaint. Because the amendment would be futile, comes after undue delay, and would prejudice the defendant, plaintiff's motion to amend is denied.

CONCLUSION

For the reasons stated, plaintiff's motion to amend the complaint is denied.

SO ORDERED:

Not Reported in F.Supp.2d, 1999 WL 1267465 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 1:98cv08785 (Docket) (Dec. 11, 1998)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 5

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 263026 (S.D.N.Y.)
**(Cite as: 1996 WL 263026 (S.D.N.Y.))**

---

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
JOHN J. KIRLIN, INC., Plaintiff,
v.
CONOPCO, INC., t/a Lever Brothers Company, Defendant.
**No. 94 C IV. 2675 (AGS).**

May 16, 1996.

*MEMORANDUM DECISION*
SCHWARTZ, District Judge:

*1 This diversity action arises out of a dispute relating to the construction of certain improvements performed by plaintiff for defendant during the year 1992. Plaintiff John J. Kirlin, Inc. ("Kirlin") moves for leave to file a Second Amended Complaint in order to assert five additional causes of action sounding in fraud and misrepresentation. Defendant Conopco, Inc. t/a Lever Brothers Company ("Lever") opposes Kirlin's motion. For the reasons set forth below, Kirlin's motion is denied.

*BACKGROUND*
This Court previously denied a motion by Lever to dismiss Kirlin's complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Familiarity with the Court's Opinion and Order dated January 13, 1995 is assumed.

The complaint alleges that Lever and Kirlin entered into a contract dated May 11, 1992 (the "Contract") for certain mechanical construction to be performed by Kirlin in 1992 in connection with a project located in Maryland. The nub of the complaint is that Lever failed to disclose to Kirlin, prior to Kirlin's having bid on the construction project, that: (1) the project's design was incomplete; (2) the project's plans and specifications were inadequate; and (3) the project was on a "fast track". Additionally, the complaint alleges that Lever failed to timely respond to Kirlin's numerous "Requests for Information" and that Lever refused to issue, in a timely manner, extensions of time to accommodate design changes. As a result, Kirlin claims, its performance

was "radically different from that contemplated by the parties at the time of the [[[C]ontract" and, consequently, "Kirlin's base contract labor was severely impacted resulting in a tremendous loss of labor productivity."

Kirlin's original complaint in this action asserted two causes of action based on the above allegations: breach of contract and quantum meruit. [FN1] In May 1995, Lever consented to Kirlin's filing and serving a First Amended Complaint, which increased the demand for damages pursuant to the breach of contract claim from $549,512 to $965,722. In all other respects, the First Amended Complaint is identical to Kirlin's original complaint. Following filing and service of the First Amended Complaint, extensive discovery ensued during the summer of 1995. Lever produced eight to ten file boxes of documents. Nine depositions of various witnesses -- including current and former employees of Kirlin, Lever and at least one non-party -- were conducted during the months of June and July 1995.

In October 1995 Kirlin moved for leave to file a Second Amended Complaint adding claims for fraud, negligent misrepresentation, fraudulent concealment, constructive fraud, and fraud in the inducement. Kirlin contends that it seeks to add these five claims based on its review of documents received in late July 1995 as part of Lever's document production. In particular, Kirlin relies on a document entitled "Management Project Review Meeting #6" dated April 22, 1992 (the "Management Memo"). According to Kirlin, the Management Memo was prepared during the same time period in which Lever and Kirlin were negotiating the Contract. The Management Memo states that Lever "issued the piping and equipment arrangement drawings for construction" and that "[m]odel work [is] in progress [and] estimated 85% complete." Memorandum of Points and Authorities in Support of Kirlin's Motion for Leave to File its Second Amended Complaint, Exhibit C. The Management Memo also states: "Continue [to] work on model targeting the end of April for completion." The last page, under the heading "Area of Concern", states: "Ability to hold schedule and maintain quality engineering without a firm design basis." According to Kirlin, the Management Memo and other Lever documents produced during discovery demonstrate that the designs for the construction

---

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.

Not Reported in F.Supp., 1996 WL 263026 (S.D.N.Y.)

(Cite as: 1996 WL 263026 (S.D.N.Y.))

Page 2

project were incomplete, contrary to Lever's representations during the parties' negotiations. Accordingly, Kirlin seeks to add the five claims sounding in fraud and misrepresentation asserted in the proposed Second Amended Complaint. These claims, in substance, allege that (1) Lever knew or should have known that its project design was incomplete at the time of award of the Contract to Kirlin; and (2) Lever intentionally, recklessly, or negligently mislead Kirlin regarding the status of Lever's construction designs and other matters. Such new claims, according to Kirlin, support an award of $995,112 in actual damages and $2 million in punitive damages.

*DISCUSSION*

**\*2** Rule 15(a) of the Federal Rules of Civil Procedure declares that leave to amend "shall be freely given when justice so requires." In *Foman v. Davis*, 371 U.S. 178, 182 (1962), the Supreme Court provided additional guidance:

> In the absence of any apparent or declared reason -- such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. -- the leave sought should, as the rules require, be "freely given."

The Court concludes that leave to amend is unwarranted here because of undue delay by Kirlin in seeking this amendment and undue prejudice to Lever which would result if Kirlin's motion were granted.

The Court finds that there has been undue delay on the part of Kirlin in seeking to allege fraud in that (1) more than two years have passed since Kirlin filed its initial complaint in Maryland (*see* footnote 1, *supra*); (2) the complaint already has been amended in this Court, by leave, to increase the alleged contract damages; and (3) the underlying facts have been known to Kirlin since 1992 and the "new" document relied upon for this motion is cumulative to information previously known to Kirlin. Moreover, amendment at this time would unfairly prejudice Lever in that (1) the proposed amendment, after discovery is nearly complete, would expand the scope of discovery to include issues such as state of mind, knowledge, reasonable reliance and industry practice, requiring defendant to re-conduct depositions and

to take additional party and non-party discovery; (2) the amendment would substantially increase the damages claimed by adding a substantial punitive damages claim after defendant has proceeded based on contract and quantum meruit claims; and (3) at least one witness which Kirlin now identifies as central to the fraud claim may not be available.

Although Kirlin purports to base its motion to amend on the discovery of alleged new evidence, it appears that Kirlin seeks to amend based on a nucleus of facts that has been in its possession since the beginning of the parties' dispute. The crux of Kirlin's breach of contract and quantum meruit claims has been, and continues to be, that Lever failed to disclose certain facts prior to Kirlin's bidding on the construction project. Kirlin argues that, prior to its receipt of certain documents in July 1995, it was unable to allege fraud with sufficient particularity to satisfy Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b) states in relevant part that "the circumstances constituting fraud ... shall be stated with particularity. Malice, intent, knowledge, and other condition of mind may be averred generally."

Kirlin's explanation for its substantial delay in asserting the proposed fraud and misrepresentation claims is not convincing. There is no requirement under Rule 9(b) that fraud allegations be supported by "hard" evidence such as documents or exhibits. Rule 9(b) simply requires specificity as to the "circumstances" of fraud, which include matters such as the time, place, and contents of the false representation, as well as the identity of the person making the misrepresentation. 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1297 (1990). A review of Kirlin's original and First Amended Complaint demonstrates that knowledge as to the "circumstances" of Lever's alleged fraudulent conduct has been within Kirlin's possession since this action was first filed. Kirlin's original complaint and its First Amended Complaint -- although asserting claims for breach of contract and quantum meruit -- focused on alleged misrepresentations and omissions made by Lever during the Contract negotiations.

**\*3** This delay on Kirlin's part in seeking to allege fraud is coupled with substantial prejudice to Lever if amendment were to be granted. As set forth above, discovery in this

Westlaw.

Not Reported in F.Supp.                                                                                     Page 3
Not Reported in F.Supp., 1996 WL 263026 (S.D.N.Y.)
**(Cite as: 1996 WL 263026 (S.D.N.Y.))**

action is either completed or substantially completed. The new claims would significantly expand the scope of discovery to include issues such as state of mind, knowledge, and reasonable reliance, thus requiring Lever to re-depose several persons who were already deposed and to take additional party and non-party discovery. [FN2] The Court, therefore, concludes that additional discovery would be unduly prejudicial to Lever at this stage in the proceedings. _Smith v. City of New York, 611 F.Supp. 1080, 1093 (S.D.N.Y. 1985)_ (citing _Mende v. Dun & Bradstreet, Inc., 670 F.2d 129, 131 (9th Cir. 1982)_) ("[a]dditional discovery or preparation required by the belated addition of new claims is a recognized source of prejudice justifying denial of a motion to amend"); _see also Richardson Greenshields Sec., Inc. v. Mui-Hin Lau, 113 F.R.D. 608, 611-12 (S.D.N.Y. 1986)_ ("[u]nexcused delay, coupled with the probability that the addition of new claims would lead to a new wave of discovery is also an adequate basis for denying leave to amend") (citations omitted).

_CONCLUSION_

For the reasons set forth above, Kirlin's motion for leave to amend its complaint is denied. The parties shall appear for a pre-trial conference on May 31, 1996 at 4:30 p.m., in Courtroom 1350 of the Courthouse at 500 Pearl Street.

SO ORDERED.

FN1. Kirlin instituted an action in Maryland state court based on substantially similar allegations in August 1993. _See_ Affidavit of Robert F. D'Emelia dated October 26, 1995, ¶¶ 3-4 and Exhibit A. The Maryland court dismissed Kirlin's complaint in October 1993, holding that a forum selection clause in the parties' contract required litigation in New York State courts or in the Southern District of New York. _Id._ Kirlin instituted its action in this Court on or about April 13, 1994.

FN2. Kirlin argues that it notified Lever and the Court in June 1995 -- before the parties had conducted any depositions -- that it intended to seek leave of the Court to assert claims for fraud if Kirlin received certain information from Lever's files through discovery. However, the Court does not agree that the fact that Kirlin gave conditional notice of its possible intent to amend excuses Kirlin's significant delay or mitigates the prejudice to Lever, in light of the fact that Kirlin's amendment is based on a nucleus of facts that has been in Kirlin's possession since the commencement of this action. If Kirlin desired to bring fraud claims, it could have sought to do so long before the parties conducted depositions.

Not Reported in F.Supp., 1996 WL 263026 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 1:94cv02675 (Docket) (Apr. 13, 1994)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.