UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| IRENE RUCKER and GUSTAV RUCKER, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | Civil Action No. 3:03-cv-00409-DJS |
| | ) | CLASS ACTION |
| Plaintiffs, | ) ) | SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT |
| vs. | ) ) | JURY TRIAL DEMANDED |
| STOLT-NIELSEN S.A., JACOB STOLT-NIELSEN, NIELS G. STOLT-NIELSEN, SAMUEL COOPERMAN and REGINALD J.R. LEE, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

Lead Plaintiffs Irene Rucker and Gustav Rucker (the "Plaintiffs" or "Lead Plaintiffs") have alleged the following based upon the investigation of Plaintiffs' counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Stolt-Nielsen S.A. ("SNSA") or SNSA's wholly-owned subsidiary, Stolt-Nielsen Transportation Group, Inc. ("SNTG," collectively, the "Companies"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Companies, press releases and other public statements issued by the Companies, media reports about the Companies, review of the pleadings in *O'Brien, Paul v. Stolt-Nielsen, et al.*, Docket No. FST-CV-02-0190051-S, Connecticut Superior Court and *Stolt Nielsen, et al. v. USA*, Docket No. 05-1480, 3rd Circuit Court of Appeals (on appeal from Docket No. 0313-2:04-cv-00537, Eastern District of Pennsylvania), interviews with former employees of SNSA and SNTG and Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action brought on behalf of all purchasers of SNSA's American Depository Receipts ("ADRs") from February 1, 2001 through February 20, 2003 (the "Class Period"), and all United States ("U.S.") located purchasers of SNSA ordinary shares (together with ADRs referred to herein as "SNSA securities") traded on the Oslo Stock Exchange to recover damages caused by Defendants' violations of the Securities Exchange Act of 1934 ("Exchange Act").

2.      Defendant SNSA is a holding company that engages in worldwide transportation, storage, and distribution of bulk liquid chemicals, among other things, through its subsidiaries. Defendant SNTG, SNSA's wholly-owned subsidiary, transports, stores, and distributes bulk liquid chemicals, edible oils, acids, and other specialty liquids.  SNTG carries these products on worldwide seaborne trade routes for these products' producers, refiners, and distributors.

3.     During the Class Period, Defendants issued materially false and misleading statements about the Companies' revenues, earnings, and business practices. These statements were materially false and misleading because they misrepresented and failed to disclose that a material portion of SNSA's and SNTG's revenues and earnings during the Class Period was derived from an illegal pact between SNTG and Odfjell ASA ("Odfjell"), SNTG's main competitor. SNTG and Odfjell plotted and conspired to rig bids for international shipping contracts, among other things. By concealing the anti-competitive behavior, SNSA and SNTG were able to make it appear that they were immune to an economic downturn that was afflicting the rest of the shipping industry, when, in fact, their illegal activity was the true reason for their financial success.

4.     When the market learned about SNTG's anti-competitive behavior, the price of SNSA securities declined substantially, thereby causing damage to Plaintiffs and the Class who had purchased SNSA securities at artificially inflated prices during the Class Period.

## JURISDICTION AND VENUE

5.     The claims asserted herein arise under §10(b) and §20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5.

6.     This Court possesses subject-matter jurisdiction under §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1331 (federal-question jurisdiction).

7.     Venue is proper in this District under §27 of the Exchange Act and under 28 U.S.C. §1391(b). SNTG is headquartered in this District and the underlying anti-competitive conduct emanated from SNTG's offices in this District. SNSA also maintains executive offices in this District (in the same building as SNTG). Finally, Defendants' materially false and misleading statements and omissions reached this District.

8.    Defendants directly and indirectly used the instruments of interstate commerce, including the U.S. mails, interstate telephone communications, the facilities of the national securities exchanges, SEC filings, and the internet to defraud Plaintiffs and all Class members.

## THE PARTIES

9.    Plaintiffs purchased SNSA ADRs during the Class Period and have been damaged thereby.  By order of this Court, dated June 27, 2003, they were appointed Lead Plaintiffs and their certification has been previously filed with the Court and is incorporated herein by reference.

10.    Defendant SNSA is a holding company that engages in worldwide transportation, storage, and distribution of bulk liquid chemicals, edible oils, acids and other specialty liquids; offshore construction services including design, procurement, building, installation, and servicing of a range of offshore surface and subsurface infrastructure for the global oil and gas industry; and aquaculture, through its subsidiaries.  SNSA coordinates its international shipping business through its wholly-owned subsidiary, Defendant SNTG.  SNSA maintains offices in Connecticut, located at 800 Connecticut Avenue, Fourth Floor East, Norwalk, CT 06854.

11.    Defendant SNTG, SNSA's wholly-owned subsidiary, transports, stores, and distributes bulk liquid chemicals, edible oils, acids, and other specialty liquids.  SNTG carries these products on worldwide seaborne trade routes for these products' producers, refiners, and distributors. Several of SNTG's largest customers are among the world's major chemical companies.  In 2001, SNTG represented 39% of SNSA's net operating revenue, 94% of income from operations, and 50% of SNSA's total assets.  By 2004, SNTG represented about 62% of SNSA's net operating revenue and 73% of SNSA's total assets.  SNTG's executive offices are located in Connecticut, at 800 Connecticut Avenue, Fourth Floor East, Norwalk, CT 06854 – the same address as SNSA.

12.     Defendant Jacob Stolt-Nielsen has served as Chairman of SNSA since he founded the Company in 1959.  During the Class Period, Jacob Stolt-Nielsen served on the Board of Directors for both SNSA and SNTG.

13.     Defendant Niels G. Stolt-Nielsen has served as Chief Executive Officer ("CEO") of SNSA at all relevant times.  During the Class Period, Niels G. Stolt-Nielsen served on the Board of Directors for both SNSA and SNTG.

14.     Defendant Samuel Cooperman ("Cooperman") served as Chairman of SNTG at all relevant times.

15.     Defendant Reginald J.R. Lee served as SNTG's CEO at all relevant times.

16.     The defendants named ¶¶12-15 are referred to herein as the "Individual Defendants."

17.     The Individual Defendants' positions with SNSA and SNTG gave them access to SNSA's and SNTG's internal documents, reports, and other information, including the adverse non-public information about the Companies' financial condition, business, operations, operational trends, finances, markets, present and future prospects, operating plans, budgets and forecasts, reports of actual operations, and conversations and connections with other corporate officers and employees.

18.     The Individual Defendants, as SNSA's and SNTG's officers and/or directors and controlling persons, each bore their legal duty to disseminate truthful and accurate information about SNTG's antitrust conspiracy with the Companies' competitors and that conspiracy's effect on the Companies' financial condition, performance, growth, operations, business, markets, management, and earnings.  In contravention of their duty, the Individual Defendants failed to do so.

19.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to (and did) control the content of various SEC filings, press releases, and other public statements about the Companies.  Defendants are primarily

and/or jointly and severally liable, as direct participants in (and co-conspirators of) the wrongs alleged in this complaint.

20.     Each defendant is liable as a participant in a fraudulent scheme and course of business that defrauded or deceived all purchasers of the Companies' securities. The scheme: (i) deceived Lead Plaintiffs and the investing public about the intrinsic value of SNSA's ADRs and SNSA's ordinary shares; and (ii) caused Lead Plaintiffs and other members of the putative Class to purchase SNSA securities at artificially high prices.

## CLASS ACTION ALLEGATIONS

21.     Lead Plaintiffs bring this action as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure for a class (the "Class") of all persons: (i) who purchased SNSA ADRs between February 1, 2001 through and including February 20, 2003, inclusive, and who were damaged thereby; and (ii) all U.S.-located persons who purchased SNSA securities traded on the Oslo Exchange between May 24, 2000 through and including February 20, 2003, inclusive, and who were damaged thereby.

22.     Excluded from the Class are the Defendants, members of their immediate family, any parent, subsidiary, affiliate, officer, director or employee of either SNSA or SNTG, any entity in which any excluded person has a controlling interest, or is a parent or subsidiary of or is controlled by either SNSA or SNTG, and the officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns of the defendants, and the legal representatives, heirs, successors and assigns of any excluded person.

23.     The members of the Class are so numerous that joinder of all members is impracticable. Although the Lead Plaintiffs do not now know the exact number of Class members, they believe that thousands of members exist as SNSA securities were actively traded during the Class Period.

24.     Lead Plaintiffs will fairly and adequately represent and protect the Class members'
interests.  Lead Plaintiffs retained competent counsel experienced in class actions and securities
litigation.  Lead Plaintiffs will vigorously prosecute this class action and possess no interests
antagonistic to, or in conflict with, the other Class members.

25.     Lead Plaintiffs' claims are typical, as Lead Plaintiffs and all other members of the
Class each sustained damages from the same course of illegal conduct.

26.     Common questions of law and fact exist as to all Class members and predominate
over any questions affecting only individual members.  Among the common questions of law and
fact common are:

(a)     Whether Defendants' acts and omissions alleged violated §10(b), §20(a), and
Rule 10b-5 of the Exchange Act;

(b)     Whether Defendants participated in and pursued the common course of
conduct and fraudulent scheme complained of herein;

(c)     Whether the documents, reports, filings, releases and statements that
Defendants issued to the investing public omitted and/or misrepresented material facts about the
Companies' business dealings, including the Companies' antitrust conspiracy with SNSA
competitors;

(d)     Whether officers and/or directors of SNTG and SNSA had knowledge or were
aware of the antitrust activities performed by SNTG at the time Defendants omitted and/or
misrepresented material facts about the Companies' business dealings; and

(e)     Whether Lead Plaintiffs and other Class members have suffered damages as a
result thereof.

27.     A class action is superior to other available methods for the fair and efficient
adjudication of this controversy since, among other things, joinder of all Class members is

impracticable.  Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to sue individually.  Lead Plaintiffs do not foresee or anticipate any difficulties in managing this litigation that would preclude maintaining this case as a class action.

28.     Notice can be given *via* published notice, first-class mail, and other techniques and forms of notice similar to those customarily used in class actions under the federal securities laws.

## SUBSTANTIVE ALLEGATIONS

### SNTG Engages In Anticompetitive
### Conduct In Violation of the Antitrust Laws

29.     Before and during the Class Period, SNTG and its competitors schemed to fix shipping rates, rig bids, and allocate customers in violation of applicable antitrust and competition laws.  The scheme enabled SNSA, through SNTG, and its competitors to dominate international shipping trade and stay profitable despite market events that, absent the scheme and its positive effect on profits, would have negatively impacted their respective revenues and earnings.

30.     On February 20, 2003, *The Wall Street Journal* ran a cover story entitled "How Seagoing Chemical Haulers May Have Tried To Divide Market."  That cover story detailed the scheme between SNSA and at least one SNSA competitor, Odfjell, which began when Asia's economy slowed in the late 1990s.  The Asian slowdown cut chemical production and, in turn, cut the amount of chemicals being shipped abroad from Asia.  This turn of events was especially troubling given the glut of new ships that both SNSA and Odfjell had built to service Asia's economy.

31.     The February 20, 2003 cover story revealed that SNSA's antitrust conspiracy with Odfjell may date back as far as 1998, when SNSA and SNTG held a meeting in Connecticut.  At that meeting, Pickering, then vice-president for SNTG's tanker trading, said:

> Odfjell and [SNSA] had reached an agreement that certain customers belonged to [SNSA] and others to Odfjell.  They had "carved up the world."

- 7 -

32.     Pickering's statement worried many at SNSA and SNTG, including Kenneth Bloom ("Bloom"), a SNSA vice-president for logistics.  Bloom expressed his concerns to Cooperman, then SNTG's Chairman.  Cooperman held an antitrust-law seminar for Pickering and others.  He did nothing, however, to stop the Companies' antitrust conspiracy.  He likewise did nothing to ensure the accuracy of SNSA's SEC disclosures or corporate governance.  Instead, Cooperman aimed to perpetuate the concealment of the Companies' illegal activities.

33.     In July 2003, in the wake of SNSA's "global price-fixing and bid-rigging conspiracy," SNSA announced that Cooperman "was taking an unspecified management position within the parent company until he retires soon."

34.     After the Asian crisis eased, the Companies and Odfjell faced a new challenge: the merger between Dow Chemical ("Dow") and Union Carbide.  The merged company projected that it would spend about $350 million per year on marine transport.  Both SNSA and Odfjell, at the time, shipped significant quantities of product for Dow and Union Carbide.  SNSA and Odfjell immediately recognized that the merged company would seek deep discounts in its shipments of chemicals, the result of which would obviously be detrimental to SNSA's and Odfjell's profits.

35.     According to the February 20, 2003, *The Wall Street Journal* cover story, beginning in late 2000 through 2001, Wingfield began brokering a conspiracy with Odfjell to coordinate bidding on shipping contracts in an effort to maintain their profit-levels despite Dow's and Union Carbide's efforts to pare down shipping costs.

36.     Specifically, Wingfield's journal notes describe a February 28, 2001 meeting between the Companies and Odfjell, where executives from both companies "went through in detail which COA [*i.e.*, contract of affreightment] belonged to who."

37.     The February 20, 2003, *The Wall Street Journal* cover story revealed other anti-competitive and illegal conduct by Defendants:

(a)    A May 24, 2000, e-mail from Wingfield to colleagues in Greenwich that yet another competitor, Tokyo Marine, realized "the only way to move the market is through cooperation." Another e-mail from Wingfield that same day reported that Tokyo Marine wanted "cooperation on rates" but opined that "[t]he problem is to get everyone to cooperate.";

(b)    An entry about a March 30, 2001, meeting between SNSA and Odfjell at the South Shore Harbour Resort in League City, Texas, where executives spent "much of the afternoon reviewing the status of contracts around the world, trade lane by trade lane," including a notation that the companies would "both talk to Dow and compare notes";

(c)    An April 10, 2001, fax to Wingfield of a cost-benefit analysis prepared by SNSA regarding the profitability of conspiring with Odfjell versus "going to war" with Odfjell. The analysis predicted that freight rates on key accounts would increase 5-25% as a result of the conspiracy;[1] and

(d)    Many other instances of collusion between SNSA and Odfjell over international shipping routes and rates.

38.    On January 24, 2002, Wingfield announced to the SNTG management board that the Dow contracts were all but locked up. According to the February 20, 2003, cover story, Wingfield praised Odfjell's conspiring with SNSA to secure Dow's business. He boasted that "[w]e had a lot of help from our friends from the mountains."

39.    That same month SNSA officials discussed with SNSA's attorneys in London the Companies' European shipping efforts. Those attorneys worried that the Companies were breaking Europe's antitrust laws.

---

[1]    As set forth herein, this fax was prepared at the request of Defendant Jacob Stolt-Nielsen.

40.    Only eleven days after Wingfield's January 24, 2002, announcement, O'Brien asked Cooperman to suspend Wingfield, to investigate SNSA's illegal practices, and to act to stop the Companies' antitrust violations.  Cooperman refused, and on March 1, 2002, O'Brien resigned as SNTG's general counsel and later sued his former employer and Cooperman in Connecticut Superior Court in Stamford, Connecticut.  O'Brien's civil complaint alleged that O'Brien had to resign to avoid participating in illegal or criminal activities.  The lawsuit is described in further detail below.

41.    Remarkably, on March 12, 2002, SNSA held a business meeting for its directors and scheduled Wingfield to present an antitrust update.  Fifteen months later, when the U.S. charged and arrested Wingfield for antitrust violations, the investing public learned that Wingfield was violating U.S. antitrust laws for at least a year before SNSA scheduled Wingfield to give that antitrust seminar.

42.    On June 24, 2003, the U.S. filed a criminal complaint against Wingfield.  Attached to the U.S.'s complaint against Wingfield is an affidavit from Federal Bureau of Investigation ("FBI") Special Agent John W. Sharp ("Special Agent Sharp").  Special Agent Sharp attested as follows:

(a)    Beginning at least as early as March 2001 and continuing at least until October 2002, . . . the defendant, Richard B. Wingfield, Managing Director, Tanker Trading Division, Stolt-Nielsen Transportation Group, Ltd. [SNTG], and co-conspirators engaged in a conspiracy to suppress and eliminate competition by allocating customers, fixing prices[,] and rigging bids for parcel tanker shipping of products to and from the United States and elsewhere, in unreasonable restraint of interstate and foreign trade and commerce, in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

(b)    The conspiracy consisted of a continuing agreement, understanding, and concert of action among the defendant and co-conspirators, the substantial terms of which were to agree to allocate customers, rig bids, and fix and maintain prices for parcel tanker shipping of products to and from the United States and elsewhere.

(c)    For purposes of forming and carrying out the conspiracy, the defendant and co-conspirators did the following:

(i)    attended meetings and engaged in discussions in the United States and elsewhere to discuss customers and prices of parcel tanker shipping of products to and from the United States and elsewhere;

      (ii)     agreed, during those meetings and discussions, not to compete for one another's customers either by not submitting prices or bids or by submitting intentional high prices or bids to such customers; and

      (iii)    discussed and exchanged prices submitted to certain customers so as not to undercut one another's prices.

(d)     Beginning at least as early as March 2001 and continuing until at least October 2002, products shipped by co-conspirator companies, and parcel tanker shipping vessels, equipment and supplies necessary to providing such parcel tanker shipping, as well as payments for such parcel tanker shipping, traveled in interstate and foreign commerce.

(e)     Beginning at least as early as March 2001 and continuing until at least October 2002, the activities of the defendant and co-conspirators in connection with parcel tanker shipping services affected by this conspiracy were within the flow of, and substantially affected interstate and foreign trade and commerce.

(f)     Pursuant to an agreement with the Government, Cooperating Witness "A," a subordinate of the defendant, has provided sworn testimony under penalty of perjury that beginning in March 2001, he and the defendant met and engaged in discussions with representatives of a competitor company and agreed not to compete for one another's customers. Pursuant to the agreement, customer lists were prepared and exchanged. Witness "A" testified that the agreement existed until at least October 2002. During this period, representatives of the two companies implemented the agreement by, among other things, having meetings and discussions in which they agreed not to submit bids for one another's customers, to submit intentionally high bids to one another's customers, and to discuss and exchange prices submitted to certain customers so as not to undercut one another's prices.

(g)     Pursuant to an agreement with the Government, Cooperating Witness "B," a high-ranking executive of a competitor company, has provided sworn testimony under the penalty of perjury that during the charged period, he and others at this company had discussions with representatives of SNTG and another competitor company in which they agreed not to compete for one another's customers, to submit intentionally high bids to one another's customers, and to discuss and exchange prices submitted to certain customers so as not to undercut one another's prices. One such discussion took place in or about October 2002, when, at the defendant's request, a representative of Cooperating Witness "B's" company gave the defendant prices to bid on a contract being awarded by a customer of Cooperating Witness "B."

(h)     I have reviewed documents of the co-conspirator companies, including documents prepared by the defendant, and they corroborate the existence of a conspiracy and the defendant's participation in it. Specifically, among other things, I have reviewed copies of the defendant's business diaries for portions of the charged period. The diaries show frequent contact with co-

conspirators.  I have also reviewed certain customer lists obtained by co-conspirators pursuant to the charged conspiracy.  I have also reviewed a document addressed to the defendant which evaluates the financial benefits to SNTG of continuing the charged agreement.  I have also reviewed the hand-written notes made by a co-conspirator during discussions at the outset of the conspiracy.

43.     On June 25, 2003, *The Wall Street Journal* reported that Wingfield had been arrested by federal authorities for antitrust violations.  The article further reported that the federal complaint charged Wingfield with misconduct going back at least to March 2001 – misconduct like "conspiracy to suppress and eliminate competition," and to "allocat[e] customers, fix[] prices, and rig[] bids."

44.     In October 2003, in connection with the same Justice Department investigation, Odfjell Seachem AS of Norway, its chairman, Bjorn Sjaastad, and a vice president, Erik Nilsen, pleaded guilty to charges of participating in the shipping cartel.  Odfjell was sentenced to pay a $42.5 million fine.

45.     On October 6, 2004, *The Wall Street Journal* reported that "even after shipping concern Stolt-Nielsen SA received an internal warning that the company was illegally cooperating with competitors to keep prices high, a high-ranking Stolt [SNSA] executive met twice with rival Odfjell ASA and promised that the arrangement would continue."  Upon learning this information, the U.S. Justice Department sought to revoke their amnesty agreement with agreement with SNSA, which was denied by the court (as reported by *The Wall Street Journal*, January 17, 2005).  The Justice Department is appealing the decision and the Third Circuit has not yet ruled.

## SNSA and the Individual Defendants Knew of SNTG's Anti-Competitive Conduct During the Class Period

46.     During the Class Period, Defendants knew of, or at a minimum, recklessly disregarded, SNTG's anticompetitive activities.

47.     Defendants SNTG, Cooperman and Lee were aware of and actively involved in SNTG's anticompetitive conduct, as detailed herein.

48.     Defendants Jacob Stolt-Nielsen and Niels G. Stolt-Nielsen were aware of SNTG's anticompetitive behavior during the Class Period.  Defendants Jacob Stolt-Nielsen and Niels G. Stolt-Nielsen had complete access to all of SNTG's operational and financial information as they served on the Board of Directors of SNSA and SNTG.  Furthermore, SNTG and SNSA maintained offices in the same office space in Connecticut and the Companies utilized the same computer server during the Class Period, according to a former Quality Assurance Manager at SNTG who was employed at SNTG during the Class Period.

49.     Moreover, in or around April 2001, Defendant Jacob Stolt-Nielsen requested that SNTG prepare an analysis of the pros and cons of continued pricing collusion with Odfjell.  On May 27, 2005, *Tradewinds* reported that in relation to the United States' investigation into SNSA, "Prosecutors cited an April 2001 internal memo written by SNTG's Bjorn Jansen to his superior, Richard Wingfield, detailing the pros and cons of continued pricing collusion with supposed competitor Odfjell.  The analysis 'had been ***requested by Stolt SA Chairman Jacob Stolt-Nielsen***,' the DOJ said in a footnote to its appeal."  [Emphasis added.]  Based on the foregoing, it is reasonable to infer that Defendant Jacob Stolt-Nielsen knew of SNTG's anticompetitive activities prior to requesting that an analysis of that activity be prepared.

50.     In addition, SNSA has publicly admitted that it learned of SNTG's anticompetitive behavior in 2002, although it is clear that Defendants knew of the anticompetitive conduct at all times during the Class Period.  SNSA's June 4, 2003, June 16, 2004 and May 31, 2005 20-F filings, each include the following statement:

> **In 2002, we became aware of information that caused us to undertake an internal investigation regarding potential improper collusive behavior in our parcel tanker and intra-Europe inland barge operations**.  Consequently, we decided to voluntarily report conduct to the Antitrust Division of the U.S. Department of Justice (the "DOJ" or "Antitrust Division") and the Competition Directorate of the European Commission ("EC").  [Emphasis added.]

SNSA has publicly stated that it became aware of the anticompetitive behavior in 2002 in order to avail itself of U.S. Dept. of Justice leniency and amnesty programs even though it knew of the behavior for some time. In the amnesty proceedings, the Dept. of Justice contended that SNSA learned of the anticompetitive behavior by at least March 2002 and likely much earlier citing the April 2001 analysis prepared at the direction of Defendant Jacob Stolt-Nielsen.

51.     In and around February and March 2002, O'Brien informed members of the SNTG Board, as well as high level executives and officers of SNSA, of SNTG's anticompetitive conduct. Based on a review of the pleadings from O'Brien's wrongful termination lawsuit it is reasonable to strongly infer that O'Brien told both Defendants Jacob Stolt-Nielsen and Niels G. Stolt-Nielsen of his concerns regarding SNTG's anticompetitive behavior in or around February 2002 – aside from telling Defendant Cooperman, Lee and others.

52.     O'Brien has stated that spoke with high-level executives and officers at SNSA. A statement in one of O'Brien's pleadings reads: "Defendants' contention that that Mr. O'Brien did not bring the corporate illegality to the attention of the highest authorities in both SNTG and SNSA is – as defendants are well aware – factually false."

53.     Notably, Defendants submitted affidavits of outside board members (Kinichi Hirayama, Erling C. Hjort, Christer Olsson, and Carroll Bjornson) to support the notion that O'Brien did not convey his concerns regarding SNTG's anticompetitive behavior to SNSA or its directors and officers. In response, the following statement was submitted by O'Brien in the course of motion practice: "Defendants do not actually argue that Mr. O'Brien failed to speak with anyone over defendant Cooperman on the corporate ladder, but rather contend only that Mr. O'Brien did not speak directly or individually with the *outside* directors on SNTG's Board of Directors. Missing from defendants' factual submissions to this Court is so much as a single affidavit or declaration by any of the management directors on the Board of Directors or the Chief Executive Officer of the

parent company.  Equally absent from every single one of the declarations submitted in support of defendants' Motion is a statement by the affiant that he had not been made aware of the antitrust concerns raised by Mr. O'Brien as of February-March 2002."  Neither Defendant Jacob Stolt-Nielsen or Niels G. Stolt-Nielsen submitted affidavits denying that O'Brien informed them of SNTG's anticompetitive activities.

54.    O'Brien has further represented that he personally informed Alan Winsor, general counsel of SNSA, of SNTG's anticompetitive activities in February 2002.

55.    A substantial portion of the affidavits submitted by O'Brien in support of his claims against his former employer have been redacted at the request of the Companies.  The unredacted portions of his affidavits, however, indicate that O'Brien held meetings with directors and officers of both SNTG and SNSA, including Defendants Jacob and Niels G. Stolt-Nielson, at the Connecticut offices of SNTG and SNSA.

56.    O'Brien, in his court papers, remarked: "It is reprehensible that, even as defendants were seeking amnesty under the government's corporate leniency program, they were issuing public statements denying any illegal conduct."

### Materially False and Misleading
### Statements Issued During the Class Period

57.    On February 1, 2001, SNSA issued a press release announcing its fourth quarter financial results for 2000.  Commenting on the results, Defendant Niels G. Stolt-Nielsen stated in pertinent part as follows:

> Income from operations for SNTG's tank container division increased to $19.9 million for the full year of 2000 from $17.8 million in 1999.  **While pricing remains competitive in most markets**, shipments in 2000 were up 11% from 1999 with similar growth anticipated in 2001.  [Emphasis added.]

58.    The statement referenced above in ¶57 that "pricing remains competitive in most markets" was materially false and misleading because SNTG was at that time engaging in

- 15 -

anticompetitive conduct and not competing on price with its competitors. Accordingly, "pricing" was not "competitive" – it was being rigged and fixed by collusion.

59.    On March 28, 2001, SNSA issued a press release announcing its first quarter financial results for 2001. Commenting on the results, Defendant Niels G. Stolt-Nielsen stated in pertinent part as follows:

> For SNTG's tank container operations, income from operations fell to $2.7 million in the first quarter of 2001, down from $4.9 million in the first quarter of last year. While shipments were up 10% from the comparable quarter, **pricing competition, weak utilization, and empty repositioning costs negatively impacted the results.** For the remainder of the year, we anticipate overall growth in the business to continue to be about 10% over last year and **while we expect to continue to see strong price competition**, margins should improve and by the latter half of the year be similar to the comparable quarters of last year. [Emphasis added.]

60.    The statement referenced above in ¶59 that "pricing competition . . . negatively impacted results" was materially false and misleading because it failed to disclose that SNTG was at that time engaging in anticompetitive conduct and not competing on price with its competitors. In addition, the statement that "we expect to see strong price competition" was materially false and misleading because it failed to disclose that SNTG was at that time engaging in anticompetitive conduct and not competing on price with its competitors.

61.    On October 26, 2001, SNSA filed its Annual Report, Form 20-F/A. That Form 20-F/A made the following material false and misleading statement:

> Shipments in the year 2000 increased from the downturn encountered in 1999. Increases were primarily the result of improved demand in three main operating regions of Asia Pacific, Europe[,] and the United States. Shipment levels in 2001 continue to reflect improved demand particularly from the United States and Asia.

62.    The statement referenced above in ¶61 was materially false and misleading when made because "increases" in shipments were not primarily the result of "improved demand" but rather a material portion of the "increases" were the result of Defendants' anti-competitive behavior as detailed herein. Similarly, it was materially false and misleading to state that "shipment levels in 2001 continue to reflect improved demand particularly from the United States and Asia" when

- 16 -

Defendants knew that the increased shipment levels were due, in material part, to Defendants' anticompetitive behavior.

63.     On October 26, 2001, SNSA filed its Annual Report, Form 20-F/A. That Form 20-F/A made the following material false and misleading statement:

> COMPETITION
>
> [SNTG]
>
> The market for the integrated transportation and logistics services provided by SNTG is in its infancy. In providing such services, SNTG competes primarily with a few other large terminal and transport companies who are developing such services . . . . SNTG's tanker operations compete with operators based primarily in Europe and the Asia Pacific region . . . . The competition in the tank container market is fragmented, although the relative size of the competition is increasing on a worldwide basis. SNTG also competes, to a lesser extent, with tank container leasing companies[.]

SNSA repeated this false and misleading statement in its SEC Form 20-F, filed on May 31, 2002. Both statements were materially false and misleading because they falsely represented that SNTG's tanker operations "compete" with "operators based primarily in Europe and the Asia Pacific region" when in truth, and in fact, SNTG was engaging in anti-competitive conduct with its so-called competitors, as detailed herein.

64.     On March 27, 2002, SNSA announced its first quarter results for 2002. Specifically, SNSA reported a net loss for the latest quarter of $3.7 million, or $0.07 per share, on net operating revenue of $611.2 million, compared to a net loss of $8.2 million, or $0.15 per share, on net operation revenue of $542 million for the first quarter of 2001. Commenting on the results, Niels G. Stolt-Nielsen said

> Excluding the restructuring charges, the Stolt-Nielsen Transportation Group reported results on par with the first quarter of last year . . . Income from operations for SNTG's parcel tanker division was $20.5 million in the first quarter of 2002 compared to $20.3 million in the first quarter of 2001.

More specifically, regarding SNTG's shipping contracts, Niels G. Stolt-Nielsen stated:

> **Contracts of affreightment continue to be renewed at higher levels and SNTG recently renewed a multi-year contract for one of its largest customers.** We are

anticipating a pickup in rates in the second half of the year and throughout 2003 as the world economies continue their recovery . . . SNTG's tank container operations income from operations improved to $4.7 million in the first quarter of 2002 compared from $2.7 million in the first quarter of last year. While shipments in the first quarter were similar to the comparable quarter last year, utilization rose to 71.1% compared to 67.7% last year. **For the remainder of the year we anticipate seeing continued pressure on pricing while utilization should be similar to what we saw in the first quarter.** We still see shipments for the year growing 5% compared to 2001. [Emphasis added.]

65.     The statement referenced in ¶64 that "Contracts of affreightment continue to be renewed at higher levels" was materially false and misleading when made because it failed to disclose that SNTG was successful in getting higher renewals because of Defendants' anticompetitive conduct. In addition, the statements that "SNTG recently renewed a multi-year contract for one of its largest customers" was materially false and misleading because it failed to disclose that the customer was Dow and that SNTG had illegally colluded with Odfjell in order to secure the renewal. Finally, the statement that "we anticipate seeing continued pricing pressure" was materially false and misleading because it failed to disclose that Defendants had engaged in anticompetitive conduct designed to artificially inflate SNTG's pricing structure.

66.     On June 26, 2002, SNSA issued a press release announcing its financial results for the second quarter and the six-month period ended May 31, 2002. SNSA's net loss for the latest quarter was $0.6 million, or $0.01 per share, on net operating revenue of $697.7 million, compared with a net profit of $4.8 million, or $0.09 per share, on net operating revenue of $644.3 million for the second quarter in 2001. The weighted basic average number of shares outstanding for the second quarter of 2002 was 54.9 million, which was the same as the second quarter of 2001. Commenting on these results, Niels G. Stolt-Nielsen stated in pertinent part as follows:

> While the results in the second quarter for the Stolt-Nielsen Transportation Group were down compared to last year, our core contract business, particularly for specialty chemicals, remains healthy. We continue to see improvements in Stolt Offshore's results.

About SNTG's highly lucrative shipping contracts, Niels G. Stolt-Nielsen stated in pertinent part as follows:

> SNTG's tank container division's income from operations improved significantly to $6.3 million in the second quarter of 2002 compared to $4.0 million in the same quarter of 2001. Utilization in the second quarter compared to the same period last year rose 7.0% to 74.4%. Shipments are up some 6% **although pricing continues to be tight**. [Emphasis added.]

67.     The statement referenced above in ¶66 that "pricing continues to be tight" was materially false and misleading because SNTG was at that time engaging in anticompetitive conduct and not competing on price with its competitors.

68.     On October 8, 2002, SNSA issued a press release announcing its earnings for the third quarter of Fiscal Year 2002. Specifically, SNSA reported that net income for the quarter was $1.8 million, or $0.03 per share, on net operating revenue of $753.2 million, compared with a net income of $29.7 million, or $0.54 share, on net operating revenue of $739.5 million for the third quarter in 2001. SNSA's net loss for the nine-month period ended August 31, 2002 was $1.7 million, or $0.03 per share, on net operating revenue of $2.0 billion, compared with the net income of $26.3 million, or $0.48 per share, on net operating revenue of $1.9 billion for the same period of 2001. Commenting on the results, Defendant Niels G. Stolt-Nielsen stated in pertinent part as follows:

> The Stolt-Nielsen Transportation Group posted a solid quarter . . . SNTG's tank container division delivered another strong result with income from operations rising to $6.2 million from $5.6 million in the comparable quarter of 2001. Year-to-date shipments are up some 10% compared to last year and utilization in the third quarter hit a record level of 77.7% **although the business continues to see a tight pricing environment**. [Emphasis added.]

69.     The statement referenced above in ¶68 that "the business continues to see a tight pricing environment" was materially false and misleading because SNTG was at that time engaging in anticompetitive conduct and not competing on price with its competitors. Accordingly, the "pricing environment" was not "tight" as it was being rigged and fixed by collusion..

- 19 -

70.     On February 4, 2003, SNSA announced that it would delay the announcement of its fourth quarter and year-end financial results.

71.     On February 19, 2003, SNSA announced that the European Commission Investigation was investigating SNSA on "antitrust matters."  SNSA gave no further details.

### The Truth Begins to Emerge

72.     On November 22, 2002, *The Wall Street Journal* reported, among other things, that SNTG was accused, by a former employee, of conducting anti-competitive activities.  The former employee, O'Brien, sought permission from a court to report SNTG improper activities to the appropriate authorities.  On that news, SNSA's ADRs dropped from $7.62 per share with 9,919 shares traded on November 21, 2002 (the day before *The Wall Street Journal* report) to close at $6.50 per share with 242,230 shares traded on November 22, 2002 (the day of *The Wall Street Journal* report).

73.     On February 20, 2003, *The Wall Street Journal's* cover story detailed the scheme and how that scheme (as opposed to legitimate business efforts) enabled SNSA to reap enormous profits and that the scheme appeared to have gone on "for years."  On this news, SNSA's ADRs dropped from $7.10 per share with 7,400 shares traded on February 19, 2003 (the day before *The Wall Street Journal* report) to close at $5.94 per share with 100,950 shares traded on February 20, 2003 (the day of *The Wall Street Journal* report).

74.     On February 21, 2003, the online version of *The Wall Street Journal* reported that the U.S. Justice Department launched a criminal probe into allegations of price fixing by ocean shipper SNSA and Odfjell.  The article further stated: "Stolt's [SNSA] outside lawyers in Britain told the company early last year [early 2002] that they believed there was evidence of a cartel in the European inland-barge chemicals-shipping market, in which Stolt [SNSA] also operates.  The attorneys reportedly said that Stolt [SNSA] could be violating European antitrust rules in that

market. Stolt [SNSA] and the law firm, London-based Linklaters, declined to comment on the matter." (The February 21, 2003 article further evinces that the Companies were informed and had knowledge of the anti-competitive actions performed by SNTG.)

75.    The February 21, 2003, *The Wall Street Journal* article added:

A person close to the board said that Richard Fisher, formerly Stolt's only American director, resigned from the board in December amid deep concerns about the way the company was handling Mr. O'Brien's allegations and the Treasury probe. Mr. Fisher, a former deputy U.S. trade representative, demanded an independent investigation after first learning about the Treasury Department probe in The Wall Street Journal last year, according to a person close to the board. ***The probe was more than a year old before the article appeared***. [Emphasis added.]

76.    On February 25, 2003, the Companies issued a press release announcing that SNTG was granted conditional amnesty from prosecution and fines for violation of U.S. antitrust laws. The press release acknowledged that the Companies, in the course of internal investigation of SNTG, became aware of possible collusive behavior committed in the course of SNTG's business affairs. The declaration regarding the internal investigation comports with the statements made in SNSA's June 4, 2003, June 16, 2004 and May 31, 2005 20-F filings, which each include the following statement:

**In 2002, we became aware of information that caused us to undertake an internal investigation regarding potential improper collusive behavior in our parcel tanker and intra-Europe inland barge operations**. Consequently, we decided to voluntarily report conduct to the Antitrust Division of the U.S. Department of Justice (the "DOJ" or "Antitrust Division") and the Competition Directorate of the European Commission ("EC"). [Emphasis added.]

SNSA and its officer and directors, by their admission, had knowledge of the anti-competitive activities undertaken by the subsidiary company, SNTG.

77.    On February 28, 2003, *The Wall Street Journal* reported that due to a "chemical-trading concern," JLM Industries sued SNSA and Odfjell for acting to "illegally fix prices." The suit was filed in this Court.

78.     On March 4, 2003, *The Wall Street Journal* reported that "[i]n one internal document, SNSA executives estimated that the company's cooperative relationship with Odjfell . . . kept freight rates on some major accounts as much as 25% higher than they would have otherwise been." That is a clear indication that the conspiracy grossly inflated SNSA's revenues and that the Defendants knew their public statements made materially false and misleading affirmative misstatements and omissions.

79.     On June 24, 2003, the U.S. filed a criminal complaint against Wingfield. Attached to that complaint was an affidavit from Special Agent Sharp. Agent Sharp's allegations of Wingfield's antitrust violations, as well as the corresponding sequence of events, for the Companies are detailed in ¶¶42-45, *supra*.

80.     On May 27, 2005, *Tradewinds* reported that in relation to the United States' investigation into SNSA, "Prosecutors cited an April 2001 internal memo written by SNTG's Bjorn Jansen to his superior, Richard Wingfield, detailing the pros and cons of continued pricing collusion with supposed competitor Odfjell. The analysis 'had been **requested by Stolt SA Chairman Jacob Stolt-Nielsen**,' the DOJ said in a footnote to its appeal." [Emphasis added.]

### Additional Scienter Allegations

81.     The facts alleged herein compel a strong inference that the Defendants made material false and misleading statements and omissions to the investing public; acted with scienter because the Defendants knew or recklessly disregarded that the public documents and statements issued or disseminated by them were materially false and misleading and omitted to state material facts necessary to make their statements not misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of §10(b) and Rule 10b-5 of the Exchange Act.

82.     By Defendants' own admission, through SNSA's June 4, 2003, June 16, 2004, and May 31, 2005 20-F filings, SNSA was aware of the anti-competitive activity conducted by SNTG (at the latest) as of 2002.

83.     Further, knowledge of the antitrust acts was not limited to officers and directors of SNTG. Rather, as detailed herein, O'Brien stated that he personally conveyed and discussed the issues concerning the anti-competitive business activities of SNTG with members of SNSA'S Board of Directors, including, but not limited to, the general counsel of SNSA.

84.     Finally, according the United States Justice Department, SNSA, including in particular Defendant Jacob Stolt-Nielsen himself, was not only aware of the antitrust activities performed by SNTG, the parent company was involved in orchestrating and/or determining whether to proceed with the anti-competitive business tactics *as early as April 2001*.

85.     Defendants had the motive and opportunity to perpetrate the fraudulent scheme and course of business described herein because: (A) Defendants had the motivation to misrepresent and conceal the facts about SNSA's antitrust violations to keep the Companies' earnings high enough to not breach key debt covenants; and (B) the Individual Defendants, who were the most senior officers and directors of SNSA, issued statements and press releases on behalf of SNSA and had the opportunity to commit the fraud alleged herein.

86.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public. The fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Companies, including the Individual Defendants.

87.     Finally, as a major division of SNSA, even absent proven knowledge and complicity on the part of officers and directors of SNSA, knowledge held by and maintained by SNTG is

ascribed to SNSA.  For example, several public documents, including court documents filed in connection with a lawsuit against Defendants by a former employee (O'Brien), state that Defendants Jacob Stolt-Nielsen and Niels G. Stolt-Nielsen served on the Board of Directors for both SNSA and SNTG.  Further, SNTG is a 100% owned subsidiary of SNSA.  Also, more than 50% of SNTG's shares are owned or controlled by Defendant Jacob Stolt-Nielsen and his family.  SNTG comprises of a large percentage of SNSA's revenues and profits.  As a major division of SNSA, and a vital facet of SNSA, the information and knowledge regarding SNTG and its business practices are inherently recognized by SNSA.  Further, SNSA's directors and officers were – and are – aware of the subsidiary's business affairs.

**Loss Causation/Economic Loss**

88.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of SNSA securities (ADRs and ordinary shares) and operated as a fraud or deceit on Class Period purchasers of SNSA securities by concealing that SNTG participated in antitrust activities.  Specifically, Defendants withheld information regarding the Companies' conspiracy with its competitors in violation of applicable regulations.  When Defendants' misrepresentations and fraudulent conduct were disclosed and became evident to the market, the price of SNSA securities fell sharply as the previously artificially inflated prices came out of SNSA's securities.  As a result of their purchases of SNSA securities during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages under the federal securities laws.

89.     By failing to disclose and making affirmative misrepresentations concerning the anti-competitive business tactics implemented by SNTG (under the auspices of SNSA), Defendants presented a misleading picture of SNSA's business and prospects.  Thus, instead of truthfully disclosing during the Class Period the true business model implemented and utilized by SNTG,

Defendants concealed and misrepresented the existence of the conspiracy with SNTG's competitors and the existence of improper antitrust activities.

90.    Defendants' false and misleading statements had the intended effect and caused SNSA securities to trade at artificially inflated levels throughout the Class Period.

91.    As a direct result of Defendants' admissions and the public revelations regarding SNTG's anti-competitive actions and the corresponding investigation into antitrust activities in the tanker industry by the U.S. Department of Justice, the market realized that this revelation would have a significant detrimental impact on the Companies' business and their related profits.  As a result, on November 22, 2002, SNSA's ADR price dropped 15%, from $7.62 per share to $6.50 per share and the price of its ordinary shares dropped 16% from 53.5 NOK to 46 NOK.  Then, on February 20, 2002, SNSA's ADRs declined further, falling 16%, to close at $5.94 per share, and the price of SNSA ordinary shares declined 16% to 49.1 NOK, when the media revealed that the Companies' anti-competitive activities had been ongoing for years and that Defendants reaped enormous profits from the scheme.

92.    The 15% and 16% declines, respectively, in SNSA's ADRs price and the 16% and 16% declines, respectively in SNSA's ordinary shares, during the Class Period were a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of SNSA's securities price declines negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate SNSA's securities prices and the subsequent significant decline in the value of SNSA's securities when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

**No Statutory Safe Harbor**

93.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this complaint because none of the statements pleaded herein are "forward-looking statements" nor were they identified as "forward-looking statements" when made.  Nor did meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in any purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor does apply to any statements pleaded herein that are deemed to be forward-looking, Defendants are liable for those false forward-looking statements because at the time each of those statements were made the speaker actually knew those forward-looking statements were false and/or the statements were authorized and/or approved by an executive officer of the Company who actually knew that the statements were false when made.

**Presumption of Reliance:**
**Fraud on the Market Doctrine**

94.     At all relevant times, the market for SNSA's securities was an efficient market for the following reasons, among others:

(a)     SNSA's ADRs met the requirements for listing and were listed and actively traded on the NASDAQ and SNSA's ordinary shares were listed and actively traded on the Oslo Stock Exchange, highly efficient and automated markets;

(b)     As a regulated issuer, SNSA filed periodic public reports with the SEC and the NASD;

(c)     SNSA regularly talked to public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Several securities analysts employed by major brokerage firms regularly wrote reports about SNSA.  Those reports were distributed to the brokerage firms' sales force and customers.  Each of these reports was publicly available, entered the public marketplace, and misled the market.

95.     Consequently, the market for SNSA securities promptly digested current information regarding SNSA from all publicly-available sources and reflected such information in SNSA securities prices.  Under these circumstances, all purchasers of SNSA securities during the Class Period suffered similar injury through their purchase of SNSA securities at artificially-inflated prices.  A presumption of reliance applies.

## COUNT I

### For Violation of Section 10(b) of the
### Exchange Act and Rule 10b-5
### (Against All Defendants)

96.     Lead Plaintiffs repeat and reiterate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

97.     This Count is asserted against Defendants and is based upon Exchange Act §10(b), 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder.

98.     During the Class Period, the Individual Defendants directly engaged and carried out a common plan, scheme, and unlawful course of conduct, under which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Lead Plaintiffs and the other members of the Class, and made various deceptive and untrue statements of material facts and omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading to Lead Plaintiffs and the other members of the Class.

99.     The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, intended to induce throughout the Class Period, the Lead Plaintiffs and the other

members of the Class to purchase SNSA securities during the Class Period at artificially inflated prices.

100.    During the Class Period, Defendants, pursuant to said scheme, plan, and unlawful course of conduct, knowingly and/or recklessly issued, caused to be issued, participated in the issuance of, the preparation and issuance of deceptive and materially false and misleading statements to the investing public as particularized above.

101.    As a result of the Defendants' dissemination of and/or failure to correct the false and misleading statements set forth above, the market prices of SNSA's securities were artificially inflated during the Class Period.  Unaware of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by said Defendants, Lead Plaintiffs and the other members of the Class relied, to their detriment, on the integrity of the market prices of the securities in purchasing SNSA securities.  Had the Lead Plaintiffs and the other members of the Class known the truth, they would not have purchased these securities or would not have purchased them at the inflated prices that were paid.

102.    Further, by reason of the foregoing, Defendants Cooperman, Lee and SNTG are primarily liable for the false and misleading statements issued by SNSA, the parent company, which were issued to the public based on affirmative steps and/or inaction on the part of the subsidiary, SNTG, in connection with the dissemination of misrepresentations or omissions made to purchasers of SNSA securities.  Moreover, SNTG, Cooperman and Lee knew that SNTG's anticompetitive conduct was occurring and that it was not being disclosed by SNSA in SNSA's public statements about SNTG and its business.  Finally, Defendants Cooperman, Lee and SNTG schemed with SNSA to mask and conceal the improper activities implemented by SNTG in connection with its antitrust measures.

103.     Lead Plaintiffs and the other members of the Class have suffered substantial damages as a result of the wrongs herein alleged in an amount to be proved at trial.

104.     By reason of the foregoing, Defendants directly violated section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they:

(A)     employed devices, schemes, and artifices to defraud;

(B)     made untrue statements of material facts or omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(C)     engaged in acts, practices, and a course of business which operated as a fraud and deceit upon plaintiff and the other members of the Class in connection with their purchases of SNSA securities during the Class Period, and

(D)     are liable to Lead Plaintiffs and the other members of the Class for damages which they have suffered in connection with their purchases of SNSA's Securities, during the Class Period.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

105.     Lead Plaintiff repeats and reiterates each and every allegation contained above in each of the foregoing as if fully set forth herein.

106.     The Individual Defendants acted as controlling persons of the Company within the meaning of section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and active participation in and/or awareness of the Company's day-to-day operations, and/or intimate knowledge of the Company's plans and implementation thereof, each had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected including the content and dissemination of the various statements that Lead Plaintiffs contend are false and misleading.  Each Individual Defendant was provided with or had unlimited access to copies of the Companies'

reports, press releases, public filings and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

107.    In particular, the Individual Defendants, had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

108.    By virtue of their positions as controlling persons, the Individual Defendants are liable under Exchange Act §20(a).  As a direct and proximate result of the wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

109.    Further, SNSA's SEC filings confirm that "[t]he Stolt-Nielsen family currently exercises a controlling influence over [the Companies'] operations[.]"

110.    Further, by reason of the foregoing, Defendants Cooperman and Lee are primarily liable for the false and misleading statements rendered by SNSA, the parent company, which were issued to the public based on affirmative steps and/or inaction on the part of the subsidiary, SNTG, in connection with the dissemination of misrepresentations or omissions made to shareholders. Defendants Cooperman and Lee likewise schemed with SNSA in an effort to conceal the anti-competitive measures from the public.

WHEREFORE, Lead Plaintiffs, on their own behalf and on behalf of the Class, pray for judgment as follows:

A.      Declaring this action to be a proper class action and certifying Lead Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding monetary compensatory damages in favor of Lead Plaintiffs and the other members of the Class against all of the Defendants primarily, and jointly and severally, for the damages sustained as a result of the wrongdoings of the Defendants, together with interest thereon;

C.     Awarding Lead Plaintiffs the fees and expenses incurred in this action, including reasonable allowance of fees for Lead Plaintiffs' attorneys, and experts;

D.     Awarding monetary damages against all of the Defendants, jointly and severally, in favor of the Lead Plaintiffs and the other members of the Class for all losses and damages suffered as a result of the wrongdoings alleged herein, including punitive damages where appropriate, together with interest thereon; and

E.     Granting Lead Plaintiffs such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Lead Plaintiffs hereby demand a trial by jury.

DATED: March 1, 2006                     SCOTT + SCOTT, LLC
                                          DAVID R. SCOTT (CT 16080)
                                          ERIN COMITE (CT 24886)


_____

                                          108 Norwich Avenue
                                          Colchester, CT  06415
                                          Telephone:  860/537-3818
                                          860/537-4432 (fax)

                                          *Liaison Counsel*

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
MARK S. REICH
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

*Lead Counsel for Plaintiffs and the Class*