UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Joel Menkes, *et al*.,

       *Plaintiffs*,

       *v.*

Stolt-Nielsen S.A., *et al.*,

       *Defendants*.

Civ. Action No. 3:03 CV 409 (DJS)

March 20, 2006

**DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION TO DISMISS THE
SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

DEFENDANTS STOLT-NIELSEN S.A.,
STOLT-NIELSEN TRANSPORTATION
GROUP LTD., JACOB STOLT-NIELSEN,
NIELS G. STOLT-NIELSEN, SAMUEL
COOPERMAN AND REGINALD J.R. LEE

Michael P. Shea (#ct19598)
Jason S. Weathers (#ct24579)
Day, Berry & Howard LLP
City Place I
Hartford, Connecticut 06103-3499
Tel:  (860) 275-0356
Fax:  (860) 275-0343
Email: jsweathers@dbh.com

*Of Counsel*
J. Mark Gidley (#ct18450)
Christopher M. Curran (#ct22743)
Peter J. Carney (ct#24721)
Jaime M. Crowe (ct#25657)
WHITE & CASE LLP
701 Thirteenth Street, N.W.
Washington, DC 20005
Tel: (202) 626-3600
Fax: (202) 639-9355

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ......................................................................................... ii

I.    Plaintiffs Have Not Established A Reasonable And Strong Inference Of
      Fraudulent Intent ................................................................................................1

      A.    Plaintiffs' Claims Against SNTG And Its Employees Are Weaker Now
            Than In The Last Two Complaints ...........................................................4

      B.    Plaintiffs' Allegations Of Board Membership And Access To Information
            Are Insufficient To Allege Scienter .........................................................5

      C.    An Ambiguous Multi-Layered Hearsay Statement From An Obscure
            Trade Journal Does Not Raise A Reasonable And Strong Inference Of
            Fraudulent Intent .....................................................................................6

      D.    Stolt-Nielsen's Truthful Disclosure That It Initiated An Internal
            Investigation In 2002 Does Not Raise A Reasonable And Strong Inference
            Of Fraudulent Intent .................................................................................8

      E.    The Court Should Reject Plaintiffs' Invitation To Assume Facts And To
            Draw Adverse Inferences Based On The O'Brien Litigation ...............11

II.   Plaintiffs' Third Complaint Should Be Dismissed Because It Fails to Plead
      Material Misstatements With Particularity .......................................................13

III.  Defendants Had No Duty To Self-Report Allegedly Unlawful Conduct ..........18

IV.   As Before, The Complaint Fails To Properly Allege Controlling Person Liability ..........21

CONCLUSION ....................................................................................................22

## TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE**

*Acito v. IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir. 1995) ............................................................11

*Amalgamated Clothing and Textile Workers Union, AFL-CIO v. J.P. Stevens & Co., Inc.*, 475 F. Supp. 328 (S.D.N.Y. 1979)........................................................................................18, 19

*Ballan v. Wilfred Am. Educ. Corp.*, 720 F. Supp. 241 (E.D.N.Y. 1989) ......................................20

*Basic, Inc. v. Levinson*, 485 U.S. 224 (1988)................................................................................19

*Bolger v. First State Fin. Servs.*, 759 F. Supp. 182 (D.N.J. 1991) ...............................................19

*De Jesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65 (2d Cir. 1996)................................................3

*Endovasc Ltd. v. J.P. Turner & Co., LLC*, 2006 WL 558538 (2d Cir. 2006)..................................1

*Faulkner v. Verizon Commc'ns., Inc.*, 156 F. Supp. 2d 384 (S.D.N.Y. 2001) ...............................3

*Fellman v. Electro Optical Sys. Corp.*, 2000 WL 489713 (S.D.N.Y. 2000) ...........................17-18

*Frazier v. VitalWorks, Inc.*, 341 F. Supp. 2d 142 (D. Conn. 2004)................................................1

*Friedman v. Wheat First Sec. Inc.*, 64 F. Supp. 2d 338 (S.D.N.Y. 1999) ....................................21

*Gompper v. VISX, Inc.*, 298 F.3d 893 (9th Cir. 2002) ...................................................................3

*Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999).........................................................2

*Greenfield v. Prof'l Care, Inc.*, 677 F. Supp. 110 (E.D.N.Y. 1987)..............................................20

*Helwig v. Vencor, Inc.*, 251 F.3d 540 (6th Cir. 2001) ...................................................................2

*In re Alpharma, Inc. Sec. Litig.*, 372 F.3d 137 (3d Cir. 2004)....................................................2, 5

*In re Alstrom SA Sec. Litig.*, 406 F. Supp. 2d 433 (S.D.N.Y. 2005)............................................11

*In re Century Bus. Servs. Sec. Litig.*, 2002 WL 32254513 (N.D. Ohio 2002).............................17

*In re Dynex Capital, Inc. Sec. Litig.*, 2006 WL 314524 (S.D.N.Y. 2006)......................................5

*In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434 (S.D.N.Y. 2006) ....................................2

*In re Health Mgmt., Inc. Sec. Litig.*, 970 F. Supp. 192 (E.D.N.Y. 1997) ......................................6

*In re Keyspan Corp.*, 2003 WL 21981806 (E.D.N.Y. 2003) ............................................3

*In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668 (S.D.N.Y. 1990)........................................20

*In re Regeneron Pharm., Inc. Sec. Litig.*, 2005 WL 225288 (S.D.N.Y. 2005)................................2

*In re Sotheby's Holding, Inc. Sec. Litig.*, 2000 WL 1234601 (S.D.N.Y. 2000) ...........................20

*In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079 (9th Cir. 2002) ....................................................17

*Kalnit v. Eichler*, 85 F. Supp. 2d 232 (S.D.N.Y. 1999), *aff'd* 264 F.3d 131 (2d Cir. 2001) ........21

*Knorr-Bremse Systeme Fuer Nutzfahrzeuge GMBH v. Dana Corp.*, 383 F.3d 1337 (Fed. Cir. 2004) ........................................................................................................................................13

*Kushner v. Beverly Enters., Inc.*, 317 F.3d 820 (8th. Cir. 2003) ....................................................2

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005).........................................................14

*Leventhal v. Tow*, 48 F. Supp. 2d 104 (D. Conn 1999) ..................................................................14

*Moseley v. Secret Catalogue, Inc.*, 537 U.S. 418 (2003) ..............................................................13

*Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 209 (2d Cir. 1999) ....................................................13

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ..............................................................2, 11-12, 14

*Parker v. Prudential Ins. Co. of Am.*, 900 F.2d 772 (4th Cir. 1990) .............................................13

*Pirraglia v. Novell, Inc.*, 339 F.3d 1182 (10th Cir. 2003) ..............................................................3

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ............................................................................1

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801 (2d Cir. 1996)...........................................................................................................................2

*Shields v. Citytrust Bancorp*, 25 F.3d 1124 (2d Cir. 1994) ............................................................2

*Stolt-Nielsen S.A. v. United States*, 352 F. Supp. 2d 553 (E.D. Pa. 2005)............................7-8, 11

*United States v. Matthews*, 787 F.2d 38 (2d Cir. 1986).........................................................18, 19

*W.R. Carney v. Cambridge Tech. Partners, Inc.*, 135 F. Supp. 2d 235 (D. Mass. 2001)...............6

## STATUTES

15 U.S.C. § 78u-4(b)(2) (1998) ................................................................................2
15 U.S.C. § 78u-4(b)(1)(B) (1998) ..........................................................................13
15 U.S.C. § 78u-5(c)(1)(A)(i) (1995) .......................................................................17
15 U.S.C. § 78u-5(c)(1)(B) (1995) ...........................................................................17
5 U.S.C. § 551 (1966) ...............................................................................................19

Federal Rules of Civil Procedure:
Rule 9(b) ...................................................................................................................13
Rule 10(c)....................................................................................................................3

## OTHER AUTHORITIES

Richard H. Porter, *Voluntary Disclosures to Federal Agencies – Their Impact on the Ability of Corporations to Protect from Discovery Materials Developed During the Course of Internal Investigations*, 39 Cath. U. L. Rev. 1007 (Summer 1990)...............................................9

Brad D. Brian & Barry F. McNeil, *Overview: Initiating an Internal Investigation and Assembling the Investigative Team,* Internal Corporate Investigations 2 (Brad D. Brian & Barry F. McNeil, eds., 2d ed. 2003) ...............................................................................................9

Dan K. Webb et al., Corporate Internal Investigations § 4.01 (2005) ...........................................10

Joel W. Sternman and Emily Eiselman, *Advising the Directors: Minimizing the Risk of Litigation Through Internal Investigations by Special Counsel*, C725 ALI-ABA 1 (1992)..........................10

This Court dismissed Plaintiffs' last amended complaint because Plaintiffs failed to adequately plead scienter. So, in moving for reconsideration of this Court's dismissal, Plaintiffs touted that they had discovered "new" evidence to support scienter. Now, having filed their third complaint in this matter, it is clear that aside from abandoning all claims relating to SNTG's alleged violations of U.S. embargo laws — the principal underlying violations alleged in the earlier complaints — Plaintiffs offer nothing to "fill [the] factual void" and to establish the necessary "clear link" between those with knowledge of misconduct and SNSA's management. Mem. of Decision at 27. If anything, Plaintiffs' allegations against Defendants are now even *less* specific than in their last two complaints. Oddly, as part of their effort to overcome their heavy pleading burden, Plaintiffs even rely on allegations that the federal judge in Stolt-Nielsen's case against the Department of Justice considered and rejected. Plaintiffs also have failed to state a claim against the Individual Defendants for securities fraud, either directly under Section 10(b) or indirectly as controlling persons under Section 20(a) of the Exchange Act. In the end, this Court's November 10, 2005 Order, the PSLRA and decisional law all compel the same result — dismissal with prejudice.[1]

## I. PLAINTIFFS HAVE NOT ESTABLISHED A REASONABLE AND STRONG INFERENCE OF FRAUDULENT INTENT

As this Court has acknowledged (Mem. of Decision at 10-11), Plaintiffs' action must be dismissed if Plaintiffs fail to allege the "strong inference" of fraudulent intent, or "scienter,"

---

[1] Certainly, by this stage dismissal with prejudice is appropriate. *See Endovasc Ltd. v. J.P. Turner & Co., LLC*, Nos. 04-2407-CV(L), 04-2591-CV (XAP), 04-2807-CV (XAP), 04-2723 CV (XAP), 2006 WL 558538 (2d Cir. March 8, 2006) (affirming dismissal with prejudice where plaintiffs' second amended complaint failed to plead securities fraud with the particularity required by the PSLRA and Rule 9(b)) (Exh. 1); *Rombach v. Chang*, 355 F.3d 164, 172, 177 (2d Cir. 2004) (affirming dismissal with prejudice where particularity requirement of Rule 9(b) was not met and scienter was not adequately alleged as required by the PSLRA); *In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 453 (S.D.N.Y. 2006) ("Having already been given the opportunity to replead, plaintiffs, who are represented by highly experienced counsel, have surely presented all relevant facts by now, and have twice failed to plead scienter. Accordingly, the Amended Complaint is dismissed with prejudice") (internal citations omitted); *Frazier v. VitalWorks, Inc.*, 341 F. Supp.2d 142, 163-64 (D. Conn. 2004) (dismissing with prejudice plaintiffs' securities complaint because complaint contained insufficient allegations of scienter).

mandated by the PSLRA's heightened pleading standards.  *See* 15 U.S.C. § 78u-4(b)(2)(1998).

Specifically, "[w]ith respect to scienter, under the PSLRA, and prior Second Circuit precedent, a

plaintiff must 'state facts with particularity that give rise to a strong inference of the required

state of mind.'"  Mem. of Decision at 11 (quoting *Novak v. Kasaks*, 216 F.3d 300, 312 (2d Cir.

2000)).  A plaintiff can establish such "strong inference" either:  "(a) by alleging facts to show

that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that

constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Shields v.

Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994); *see also* Mem. of Decision at 12

(same).  As before, "[p]laintiffs attempt to meet their pleading burden by way of the latter

method."  Mem. of Decision at 24.

Securities-fraud "[p]laintiffs do not, however, enjoy a license to base claims of fraud on

speculation and conclusory allegations."  *San Leandro Emergency Med.  Group Profit Sharing

Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 813 (2d Cir. 1996) (internal quotation omitted).

Moreover, as the court in *Kushner v. Beverly Enterprises, Inc.*, 317 F.3d 820, 827 (8th Cir. 2003)

declared:  "[I]nferences of scienter tested under the Reform Act will not survive a motion to

dismiss if they are only reasonable inferences — the inferences must be 'both ***reasonable and

strong***.'"  (emphasis added) (quoting *Helwig v. Vencor, Inc.*, 251 F.3d 540, 551 (6th Cir. 2001));

*see also In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 150 (3d Cir. 2004) (affirming dismissal of

securities complaint and holding that "inferences of scienter survive a motion to dismiss only if

they are both ***reasonable and strong*** inferences") (internal citations and quotations omitted)

(emphasis added); *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 195-96 (1st Cir. 1999) ("A mere

reasonable inference is insufficient to survive a motion to dismiss.");  *In re Regeneron Pharm.,

Inc. Sec. Litig.*, No. 03 Civ. 3111 RWS, 2005 WL 225288, at *24 (S.D.N.Y. Feb. 1, 2005)

(noting that inferences of scienter under the PSLRA must be "***reasonable and strong***") (emphasis added) (Exh. 2); *In re KeySpan Corp.*, No. 01 CV 5852 (ARR), 2003 WL 21981806, at *16 (E.D.N.Y. July 30, 2003) (recognizing that "[i]nferences of scienter must be ***reasonable and strong***") (emphasis added) (Exh. 3). In evaluating the latest complaint, the Court should also consider inferences against Plaintiffs: "Whether an inference is a strong one cannot be decided in a vacuum. In evaluating the strength of a plaintiff's inference of scienter, we may recognize the possibility of negative inferences that may be drawn against the plaintiff." *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1187 (10th Cir. 2003) (relying on *Gompper v. VISX, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002) (explaining that if the court did not consider negative inferences against plaintiff, it would "eviscerate the PSLRA's strong inference requirement by allowing plaintiffs to plead in a vacuum")).[2]

Consistent with these requirements, this Court dismissed Plaintiffs' last complaint because Plaintiffs did "not establish a ***clear link*** between those who were involved in the anti-competitive arrangements at SNTG and SNSA management." Mem. of Decision at 26 (emphasis added). As the Court elaborated:

> [T]he court cannot, without any information in the complaint as to the manner by which information flowed from SNTG to SNSA and how involved SNSA was in monitoring SNTG's activities from which the anti-competitive conduct originated complete the link from those with knowledge of the anti-competitive conduct to SNSA's management. Without facts such as these, the court can only assume, and not infer, that SNSA's management knew about the illegal activity. Because plaintiffs have not alleged scienter on the part of SNSA and Niels G. Stolt-Nielsen, defendants' motion must be granted with respect to plaintiffs' Section 10(b) claims.

---

[2] Additionally, in considering a motion to dismiss, "the court may consider those facts alleged in the complaint, documents attached as an exhibit thereto, or incorporated by reference, and documents that are integral to plaintiff's claims even if not explicitly incorporated by reference." *Faulkner v. Verizon Communications, Inc.*, 156 F. Supp. 2d 384, 391 (S.D.N.Y. 2001) (citing Fed. R. Civ. P. 10(c) and *De Jesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 69 (2d Cir. 1996)).

*Id.* at 27. Plaintiffs' third complaint changes none of this. Other than alleging a few isolated and ambiguous communications between SNTG and SNSA, Plaintiffs still do "not establish a clear link between those who were involved in the anti-competitive arrangements at SNTG and SNSA," and they still fail to detail "the manner by which information flowed from SNTG to SNSA and how involved SNSA was in monitoring SNTG's activities from which the anti-competitive conduct originated." If anything, Plaintiffs' allegations actually confirm that SNSA acted responsibly — not fraudulently — when it "became aware of information that caused [it] to undertake an internal investigation." Sec. Am. Compl. ¶ 50 (quoting Stolt-Nielsen S.A. Annual Report Form 20-F/A, filed June 4, 2003 (Exh. 4), at 10). Thus, in a vain effort to establish Defendants' scienter, Plaintiffs again raise the type of "speculation and conclusory allegations" that this Court earlier rejected and that the PSLRA has sought to eradicate. As a result, Plaintiffs' newest allegations still fail to establish a "reasonable and strong" inference of fraudulent intent.

### A.  PLAINTIFFS CLAIMS AGAINST SNTG AND ITS EMPLOYEES ARE WEAKER NOW THAN IN THE LAST TWO COMPLAINTS

Taking Plaintiffs' scienter allegations seriatim, Plaintiffs again allege that "Defendants SNTG, Cooperman and Lee were aware of and actively involved in SNTG's anticompetitive conduct." Sec. Am. Compl. ¶ 47. But Plaintiffs allegations of wrongdoing by SNTG and its employees are actually *weaker* now than in their last two complaints, especially given Plaintiffs' abandonment of the embargo claims. The allegations against these Defendants were insufficient to state a securities claim in Plaintiffs' last two complaints, and they are certainly insufficient now. Plaintiffs' much weaker allegations against SNTG and its employees still do "not establish a *clear link* between those who were involved in the anti-competitive arrangements at SNTG and SNSA management." Mem. of Decision at 27.

Moreover, in their prior complaints, Plaintiffs failed to allege any facts, much less particularized facts, that SNTG and Messrs. Cooperman and Lee had any involvement in or knowledge of alleged false statements made by or on behalf of SNSA. Given this "factual void," the Court dismissed the claims with respect to these Defendants, as well as Defendants Jacob and Niels G. Stolt-Nielsen. The new allegations in this third complaint do not correct this fundamental defect. Dismissal of Plaintiffs' third complaint with respect to SNTG and Messrs. Cooperman and Lee is thus required for this reason alone, along with the reasons set forth herein on behalf of all Defendants.

**B.     PLAINTIFFS ALLEGATIONS OF BOARD MEMBERSHIP AND ACCESS TO INFORMATION ARE INSUFFICIENT TO ALLEGE SCIENTER**

Plaintiffs next allege that Defendants Jacob Stolt-Nielsen and Niels G. Stolt-Nielsen "served on the Board of Directors of both SNSA and SNTG," that as directors of SNTG, they "had complete access to all of SNTG's operational and financial information," and that "SNTG and SNSA maintained offices in the same office space in Connecticut and the Companies utilized the same computer server during the Class Period." Sec. Am. Compl. ¶¶ 12, 13 and 48. Almost conceding the weakness of their case, Plaintiffs then assert: "[E]ven absent proven knowledge and complicity on the part of officers and directors of SNSA, knowledge held by and maintained by SNTG is ascribed to SNSA." Sec. Am. Compl. ¶ 87.

Of course, board membership and "access" to information are insufficient to establish scienter. *See, e.g.*, *Alpharma*, 372 F.3d at 149-150 (finding that plaintiffs failed to allege scienter against individual defendants, including members of the board who had access to information and worked in the same headquarters where a "whistleblower" had reported potential fraudulent activity by the company); *In re Dynex Capital, Inc. Sec. Litig.*, No. 05 Civ. 1897 (HB), 2006 WL 314524, at *9 (S.D.N.Y. Feb. 10, 2006) (in holding that Plaintiffs failed to plead scienter against

individual board members the court noted: "In broad terms, senior officers will always have 'access' to information indicative of malfeasance (if such information exists). The PSLRA demands more.") (Exh. 5); *W.R. Carney v. Cambridge Tech. Partners, Inc.*, 135 F. Supp. 2d 235, 255 (D. Mass. 2001) ("This kind of pleading, attributing knowledge to a defendant merely because of the defendant's status in a corporation, generally fails as a method of meeting the rigorous requirements for pleading scienter."); *In re Health Mgmt., Inc. Sec. Litig.*, 970 F. Supp. 192, 205 (E.D.N.Y. 1997) (explaining that if courts found scienter properly pleaded against directors by the virtue of their position and access to certain information, "the executives of virtually every corporation in the United States would be subject to fraud allegations."). Board membership and "access" to information hardly establishes "a clear link between those who were involved in the anti-competitive arrangements at SNTG and SNSA management," nor does it provide any detail regarding "the manner by which information flowed from SNTG to SNSA," or "how involved SNSA was in monitoring SNTG's activities from which the anti-competitive conduct originated . . . ." Mem. of Decision at 27.

### C.   AN AMBIGUOUS MULTI-LAYERED HEARSAY STATEMENT FROM AN OBSCURE TRADE JOURNAL DOES NOT RAISE A REASONABLE AND STRONG INFERENCE OF FRAUDULENT INTENT

In a desperate effort to salvage their case, Plaintiffs now cite to a short (less than a page long) article appearing in the May 27, 2005 issue of *Tradewinds*, an obscure trade journal. Sec. Am. Compl. ¶ 49. Based on this obscure article, Plaintiffs now assert that "it is reasonable to infer that Defendant Jacob Stolt-Nielsen knew of SNTG's anticompetitive activities prior to requesting that an analysis of that activity be prepared." *Id.* But the *Tradewinds* article upon which Plaintiffs now base their scienter claim is hardly the stuff of which "reasonable and strong" inferences are made. Referencing *Tradewinds*, all Plaintiffs do is report that in the appeal papers that DOJ filed with the Third Circuit, DOJ — in a footnote — "cited an April

2001 internal memo written by SNTG's Bjorn Jansen to his superior, Richard Wingfield, detailing the pros and cons of continued pricing collusion with supposed competitor Odfjell." Sec. Am. Compl. ¶ 49 (quoting *Tradewinds*).  Plaintiffs then repeat *Tradewinds*' report that DOJ — the losing party in Stolt-Nielsen's case against it — asserted that the "analysis 'had been requested by Stolt SA Chairman Jacob Stolt-Nielsen.'"  *Id.*  (quoting *Tradewinds*) (emphasis omitted).  Unable to find reasonable and strong evidence to support Jacob Stolt-Nielsen's alleged scienter, Plaintiffs thus offer a contorted multi-layered hearsay statement — (i) an obscure article, (ii) describing the footnote of a losing litigant , (iii) describing a Bjorn Jansen statement, (iv) describing Mr. Jansen's alleged conversation with Reginald Lee, (v) describing his alleged conversation with Richard Wingfield, (vi) reporting on an alleged conversation with Jacob Stolt-Nielsen.

Rather than evidence Jacob Stolt-Nielsen's fraudulent intent, Plaintiffs' uncritical reliance on *Tradewinds* actually underscores the fundamental weakness of their case.  In fact, Plaintiffs' claim is sorely lacking in specifics.  They provide no detail regarding Mr. Stolt-Nielsen's alleged request.  They provide no detail regarding the circumstances surrounding the alleged request.  Plaintiffs do not even allege that Mr. Stolt-Nielsen actually received the "analysis" that is supposed to reflect antitrust conduct.

Not surprisingly, the federal judge who presided over Stolt-Nielsen's action against DOJ in *Stolt-Nielsen S.A. v. United States*, 352 F. Supp. 2d 553 (E.D. Pa. 2005) (the subject of the Third Circuit appeal) considered and rejected the suggestion, advanced by Plaintiffs here, that SNSA became aware of antitrust conduct in April 2001.  Instead, Judge Savage found credible the November 2002 view of Stolt-Nielsen's outside counsel that the April 2001 fax reflected "evidence of conscious parallelism, not of a Sherman Act violation."  *Stolt-Nielsen,* 352 F. Supp.

2d at 564.  Moreover, Judge Savage also found:  "Competitors in the [parcel tanker] industry sometimes have legal joint ventures."  *Id.* at 564.  Despite his consideration of the April 2001 fax, Judge Savage noted that Stolt-Nielsen had not concluded that anticompetitive activities had occurred until **after** Stolt-Nielsen commenced its investigation in November 2002.  *Id.* at 565. Judge Savage found convincing that as of December 2002, Stolt-Nielsen's outside counsel was still unsure whether SNTG had engaged in any anticompetitive conduct.  *Id*. at 566; *see also Id*. at 567 (recognizing that the Amnesty Agreement between Stolt-Nielsen and DOJ  did not even specify a date of discovery for the illegal conduct).  In light of this, Plaintiffs' reliance on the discredited assertion appearing in an obscure *Tradewinds* article is hardly sufficient to raise a "reasonable and strong" inference of Jacob Stolt-Nielsen's fraudulent intent.

### D. STOLT-NIELSEN'S TRUTHFUL DISCLOSURE THAT IT INITIATED AN INTERNAL INVESTIGATION IN 2002 DOES NOT RAISE A REASONABLE AND STRONG INFERENCE OF FRAUDULENT INTENT

Next, Plaintiffs allege — as they first did in their reconsideration papers — that based upon Stolt-Nielsen's SEC filings on June 4, 2003 (and thereafter), Stolt-Nielsen disclosed that "[i]n 2002, [it] became aware of information that caused [it] to undertake an internal investigation regarding potential improper collusive behavior in [its] parcel tanker and intra-Europe inland barge operations."  Sec. Am. Compl. ¶ 50.  In their reconsideration papers, Plaintiffs argued that this demonstrated that SNSA "learned of SNTG's anti-competitive conduct in 2002."  Recons. Mem. at 1.  In fact, Plaintiffs' desperate argument is specious — and certainly raises no "reasonable and strong" inference of fraudulent intent.  As Defendants explained in opposing reconsideration:  "There is a big difference between becoming aware of **information** sufficient to undertake an investigation and 'learn[ing] of **anticompetitive conduct**.'"  Opp'n Recons. Mot. at 5 (emphasis added) (quoting Plaintiffs' Recons. Mem. at 1).  In their reply brief, Plaintiffs — who then had the last word — misquoted Defendants' argument to contend:

8

"Defendants argue that there is a 'big difference' between 'becoming aware of anti-competitive activities' and 'learning of anticompetitive activities.'"[3]   Recons. Mem. at 3.   Plaintiffs essentially ignored Defendants' argument by miscasting it.   Defendants, of course, never represented that Stolt-Nielsen "bec[ame] aware of anti-competitive activities" at the time SNSA initiated its investigation.  In fact, Plaintiffs' allegation does **not** establish that SNSA learned of anticompetitive conduct in 2002, nor do Plaintiffs identify which SNSA statements were made misleading by the initiation of an investigation in 2002.

It is not uncommon for a publicly traded company to conduct an internal investigation when it obtains some information that causes it to question whether the company has been involved in legal wrongdoing.  *See* Brad D. Brian & Barry F. McNeil, *Overview:  Initiating an Internal Investigation and Assembling the Investigative Team*, in Internal Corporate Investigations 2 (Brad D. Brian & Barry F. McNeil, eds., 2d ed. 2003) ("In the wake of highly publicized corporate shake-ups, internal investigations have gained national prominence and have established themselves as an important tool of management. An internal investigation is often the **first step** employed by senior management to uncover wrongdoing and rid the corporation of the wrongdoers.") (emphasis added); Richard H. Porter, *Voluntary Disclosures to Federal Agencies – Their Impact on the Ability of Corporations to Protect from Discovery Materials Developed During the Course of Internal Investigations*, 39 Cath. U. L. Rev. 1007, 1007 (Summer 1990) ("In many American corporations, internal investigations are becoming commonplace.  Responsible corporate executives are recognizing that internal investigations are an essential element in a program of responsible self-governance.").

---

[3] This was not the first time Plaintiffs have misquoted information to support their case.  *See* Reply Mem. to Mot. to Dismiss at 8 (noting how Plaintiffs had "spliced two separate statements, from different parts of a press release, to craft one convenient quote"); *id.* at 9 (describing another effort by Plaintiffs to mischaracterize Stolt-Nielsen's public statements).

Simply put, the fact that a company has launched an investigation does **not** mean that it has found credible evidence of wrongdoing.   *See* Dan K. Webb et al., Corporate Internal Investigations § 4.01 (2005) ("[T]o fulfill its obligations and act in the company's best interests, management will often have to conduct an investigation or risk facing allegations that it breached its duties."); Joel W. Sternman and Emily Eiselman, *Advising the Directors: Minimizing the Risk of Litigation Through Internal Investigations by Special Counsel*, C735 ALI-ABA 1, 8 (1992). (explaining that internal investigations are often commenced "for the purpose of protecting . . . the corporation's interests," and allow directors "obtain the information and professional advice on which to base sound, reasoned judgments, in accordance with their duty of due care."). Otherwise the purpose of an internal investigation — to ascertain whether wrongdoing has occurred — would be pointless.  Indeed, it would be reckless for a company and its directors to publicly announce that it has engaged in wrongdoing without first conducting a thorough investigation to determine whether a suspicion or allegation of illegality has merit.  Almost certainly, share values would fall and governmental entities would initiate lengthy and expensive investigations — further undermining share values — based upon evidence that ultimately may be inconclusive, unsubstantiated or simply wrong.  (Were that to happen, these same Plaintiffs' attorneys might then file a derivative action alleging that the directors breached their duties of care and loyalty).[4]

Stolt-Nielsen's disclosure actually undercuts Plaintiffs' contention that Defendants acted with fraudulent intent.   By launching an investigation as soon as it "became aware of information" in 2002, Defendants discharged their duties diligently and responsibly.  Plaintiffs

---

[4] Interestingly, in November 2002, Plaintiffs Irene and Gustav Rucker bought 1,000 shares of SNSA stock at $8.07. Since then, SNSA's stock price has more than quadrupled, closing at $32.81 as of March 17, 2006.  Assuming Plaintiffs still own SNSA stock, the value of Plaintiffs' investment has grown from $8,070 to $32,810.

really are arguing that because Stolt-Nielsen's investigation ultimately uncovered evidence of anticompetitive conduct, Stolt-Nielsen should have disclosed its involvement in such conduct in 2002, when it initiated the investigation. Courts, however, have expressly rejected the type of "fraud by hindsight" allegation that Plaintiffs advance here. *See In re Alstrom SA Sec. Litig.*, 406 F. Supp. 2d 433, 447 (S.D.N.Y. 2005) ("[T]he court has refused to allow plaintiffs to proceed with allegations of 'fraud by hindsight'") (quoting *Novak*, 216 F.3d at 309) (citing *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 53 (2d Cir. 1995) for the proposition that "allegations that defendants should have anticipated future events and made earlier disclosures did not suffice to make out a claim of fraud"). As in those cases, this Court must reject Plaintiffs' argument of "fraud by hindsight" here.

Finally, Plaintiffs allege **no** misstatements resulting from Stolt-Nielsen's acquisition of information in 2002 that led it to "undertake an internal investigation." As Stolt-Nielsen's case against DOJ established, it was not until November 22, 2002 that Stolt-Nielsen commenced its investigation. *Stolt-Nielsen*, 352 F. Supp. 2d at 564. Plaintiffs, however, allege **no** misleading statements occurring **after** the initiation of the Stolt-Nielsen investigation. In fact, the last allegedly misleading statement, according to Plaintiffs, was Stolt-Nielsen's October 8, 2002 press release — a press release that pre-dated the commencement of Stolt-Nielsen's November 2002 investigation.

### E. THE COURT SHOULD REJECT PLAINTIFFS' INVITATION TO ASSUME FACTS AND DRAW ADVERSE INFERENCES BASED ON THE O'BRIEN LITIGATION

Lastly, Plaintiffs now claim that based on their "review of the pleadings from O'Brien's wrongful termination lawsuit it is reasonable to strongly **infer** that O'Brien told both Defendant Jacob Stolt-Nielsen and Niels G. Stolt-Nielsen of his **concerns** regarding SNTG's anticompetitive behavior in or around February 2002 — aside from telling Defendants

11

Cooperman, Lee and others." Sec. Am. Compl. ¶ 51 (emphasis added). Plaintiffs' allegations in paragraphs 51-56 of their third complaint amount to nothing more than conjecture and speculation. Of course, "concerns" do not equal "knowledge" that is imputable to Defendants. Unable to actually allege that former General Counsel O'Brien had evidence of antitrust wrongdoing that he communicated to Messrs. Stolt-Nielsen, Plaintiffs expressly urge the Court to "infer" (i.e., *assume*) facts. But while the securities laws allow courts to infer *intent* based upon properly pleaded *facts*, the securities laws do *not* allow courts to fill a complaint's factual void by inferring the underlying *facts* — as Plaintiffs seem to misapprehend. *See* Mem. of Decision at 11 (quoting *Novak*, 216 F.3d at 312 and declaring that "under the PSLRA, and prior Second Circuit precedent, a plaintiff must '*state facts with particularity* that give rise to a strong inference of the required state of mind.'").

In paragraphs 51-56, Plaintiffs fail to allege *anything* to establish that Mr. O'Brien *in fact* notified Messrs. Stolt-Nielsen about alleged antitrust violations — much less the substance of what Mr. O'Brien allegedly told Messrs. Stolt-Nielsen. The closest Plaintiffs come to alleging that Mr. O'Brien notified Messrs. Stolt-Nielsen of SNTG's alleged collusive activities is paragraph 55:

> A substantial portion of the affidavits submitted by O'Brien in support of his claims against his former employer have been redacted at the request of the Companies. The unredacted portions of his affidavits, however, indicate that O'Brien held meetings with directors and officers of both SNTG and SNSA, including Defendants Jacob and Niels G. Stolt-Nielson [sic], at the Connecticut offices of SNTG and SNSA.

From these meetings, Plaintiffs want the Court to *assume* that Mr. O'Brien informed Messrs. Stolt-Nielsen of alleged antitrust concerns. Of course, the fact that then-General Counsel O'Brien "held meetings" with Messrs. Stolt-Nielsen does not at all establish that Mr. O'Brien communicated antitrust "concerns" to Messrs. Stolt-Nielsen.

Portions of pleadings in the O'Brien litigation have been redacted because they reflect privileged communications between then-General Counsel O'Brien and Stolt-Nielsen officials. Plaintiffs really are asking this Court to assume facts and draw adverse inferences against Defendants based upon Stolt-Nielsen's assertion of the attorney-client privilege in the O'Brien litigation. Courts, however, soundly have rejected efforts to draw adverse inferences based upon the assertion of the attorney-client privilege. *See, e.g.*, *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GMBH v. Dana Corp.*, 383 F.3d 1337, 1344 (Fed. Cir. 2004) ("Although the duty to respect the law is undiminished, no adverse inference shall arise from invocation of the attorney-client and/or work product privilege."); *Nabisco, Inc. v. PF Brands, Inc*., 191 F.3d 209, 226 (2d Cir. 1999) ("We believe the district court erred in drawing an adverse inference against [defendant] by reason of its invocation of the attorney-client privilege."), *overruled on other grounds*, *Moseley v. Secret Catalogue, Inc*., 537 U.S. 418 (2003); *Parker v. Prudential Ins. Co. of Am*., 900 F.2d 772, 775 (4th Cir. 1990) ("The [attorney-client] privilege was created to protect the right to effective counsel. . . . To protect that interest, a client asserting the privilege should not face a negative inference about the substance of the information sought."). As in those cases, the Court should reject Plaintiffs' invitation to draw adverse inferences against Defendants based upon Stolt-Nielsen's assertion of the attorney-client privilege.

## II.    PLAINTIFFS' THIRD COMPLAINT SHOULD BE DISMISSED BECAUSE IT FAILS TO PLEAD MATERIAL MISSTATEMENTS WITH PARTICULARITY

The PSLRA imposes a heightened pleading standard on Plaintiffs, requiring them to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading," and to the extent a claim is based on information or belief, "to state with particularity all facts on which the belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). Rule 9(b) of the Federal Rules of Civil Procedure also provides that "[i]n all averments of fraud or

mistake" — as in this case — "the circumstances constituting fraud or mistake shall be stated with particularity."  Moreover, as the Court explained in its Memorandum of Decision (at 11) dismissing Plaintiffs' second complaint:  "With respect to scienter, under the PSLRA, and prior Second Circuit precedent, a plaintiff must 'state facts with ***particularity*** that give rise to a strong inference of the required state of mind.'"  (quoting *Novak*, 216 F.3d at 312) (emphasis added); *see also Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 168 (2d Cir. 2005) (affirming dismissal of securities complaint and recognizing that Rule 9(b)'s "strict pleading requirements" apply "***assiduously*** to securities fraud") (emphasis added); *Leventhal v. Tow*, 48 F. Supp. 2d 104, 112 (D. Conn. 1999) ("The PSLRA, therefore, heightened the requirements for pleading scienter . . . Plaintiffs must state with particularity facts giving rise to a strong inference that the defendants acted with the requisite state of mind.") (internal quotations omitted).

In the last motion to dismiss, Defendants expressly warned Plaintiffs that their complaint failed the particularity requirements of the PSLRA and Rule 9(b) because — as now — their complaint alleged antitrust violations in Stolt-Nielsen's parcel tanker operations, while alleging misstatements relating to Stolt-Nielsen's separate tank container operations.  Mem. in Support of Mot. to Dismiss at 12-16; Reply Mem. at 8-10.  Because this Court dismissed Plaintiffs' second complaint based upon Plaintiffs' failure to properly plead scienter, the Court's ruling did not hinge on the particularity issue.

When confronted with this deficiency last time, Plaintiffs blithely asserted — ***without support*** — that their second complaint did not "purport to limit its allegations of antitrust and embargo violations to just the parcel tanker operations of SNTG."  Opp'n Mem. at 22.  Plaintiffs ignored that ***they*** bore the burden of properly pleading facts "with particularity" (especially in the securities context).  Contending — ***again without support*** — that one "cannot ***assume*** that

14

misconduct at SNTG was confined to the parcel tanker operations," *id.* (emphasis added), Plaintiffs were really asking the Court to "assume that misconduct at SNTG was [not] confined to the parcel tanker operations" — something Rule 9(b) and the PSLRA absolutely prohibit.

Last time, Plaintiffs also claimed — with practically no analysis — that Stolt-Nielsen's parcel tanker and tank container operations were "fully integrated." *Id.* As noted in Defendants' earlier reply brief, Plaintiffs advanced this point by misrepresenting Stolt-Nielsen's public filing. Stolt-Nielsen did not — as Plaintiffs asserted — describe its parcel tanker and tank container operations as being "fully integrated." Rather, the statement Plaintiffs referenced merely noted that Stolt-Nielsen's ***services*** were "fully integrated." Reply Mem. at 9. In fact, Stolt-Nielsen's SEC filings make clear that its tank container operations are "organized as a separate line of business from our parcel tanker business." *See, e.g.*, SNSA Form 20-F filed May 31, 2005 (Exh. 6), at 15. They are separate divisions. They utilize entirely different and distinct vessels. They serve different markets. They have separate employees. *See, e.g.*, SNSA Form 20-F filed October 26, 2001 (Exh. 7), at 4-6 (describing the market for parcel tankers, including vessels utilized and customers served); *id.* 6-7 (describing the market for tank containers, including vessels utilized and customers served); *id.*, at 7 ("Tank containers are fully intermodal and are transported on container ships, rail cars, and trucks **owned by others**.") (emphasis added). Throughout its SEC filings — including in the presentation of detailed financial data — Stolt-Nielsen's parcel tanker and tank container operations are always treated separately.[5]

---

[5] We note that last time, the Court found certain statements to be actionable — paragraphs 66, 68,74 and 76 of the prior complaint (now pleaded as paragraphs 63, 64, 66 and 68 of the third complaint) — but for Plaintiffs' failure to allege a sufficient link between the misconduct and SNSA's awareness of the misconduct. These statements, as explained in the text, relate to "tank containers" — not the "parcel tanker" business relevant to this case. We believe that this aspect of the Court's ruling may have relied on Plaintiff's mistaken and unsupported claim that the parcel tanker and tank container operations were "fully integrated." In now urging that Plaintiffs have failed to allege materially false statements because they do not relate to the "parcel tanker" business, we respectfully ask the Court to reconsider that portion of its earlier decision which found certain statements regarding the "tank container" business to be actionable in this lawsuit.

Despite Defendants' early warning — first raised in October 2003 — Plaintiffs **again** have alleged an antitrust conspiracy affecting Stolt-Nielsen's parcel tanker operations, while alleging misstatements relating to Stolt-Nielsen's separate tank container operations. Specifically, while Plaintiffs allege antitrust violations in **parcel tankers**:

- Paragraphs 57 and 58 allege material misstatements based on a February 1, 2001 SNSA press release describing "[i]ncome from operations for SNTG's **tank container** division;"[6]

- Paragraphs 59 and 60 allege material misstatements based on a March 28, 2001 SNSA press release discussing the financial performance of "SNTG's **tank container** operations;"

- Paragraphs 61 and 62 allege material misstatements based on SNSA's Form 20-F/A filed October 26, 2001, because — in the section of the filing describing **tank container** operations (not the separate section of the filing describing parcel tanker operations) — SNSA reported that "[s]hipments in the year 2000 increased . . . primarily the result of improved demand;"

- Paragraphs 64 and 65 allege material misstatements based on statements attributed to Niels G. Stolt-Nielsen (from an unidentified source)[7] describing "SNTG's **tank container** operations income;"

- Paragraphs 66 and 67 allege material misstatements based on a June 26, 2002 SNSA press release describing "Stolt-Offshore's results" — yet another separate SNTG operating unit — and "SNTG's **tank container** division's income;" and

- Paragraphs 68 and 69 allege material misstatements based on an October 8, 2002, SNSA press release noting that "SNTG's **tank container** division delivered another strong result . . ."[8]

---

[6] Indeed, this paragraph also fails to state a claim because the **earliest** Plaintiffs allege that Defendants knew of wrongdoing at SNTG was April 2001 — after the February 1, 2001 press release. *See* Sec. Am. Compl. ¶ 49.

[7] Independently, Plaintiffs' failure to identify the source of the alleged misstatement runs afoul of the particularity requirements of the PSLRA and Rule 9(b). *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993) ("Specifically, the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state **where and when the statements were made**, and (4) explain why the statements were fraudulent.") (emphasis added).

[8] Indeed, the only allegedly misleading statement that **remotely** relates to parcel tanker operations — discussed in paragraph 63 (reporting on Stolt-Nielsen's October 26, 2001 Form 20-F/A) — is extremely general and does not even mention **parcel tankers** specifically. It does, however, mention competition in **tank containers**. This broad and muted statement, however, is hardly sufficient to carry Plaintiffs' case.

Having been put on notice of this fundamental deficiency early on, Plaintiffs' failure to correct it now is unforgivable — and completely fatal to their case.  As the Court noted in its Order dismissing Plaintiffs' second complaint:  "Courts that have determined that corporations had a duty to disclose uncharged illegal conduct in order to prevent other statements from misleading the public have required a ***connection*** between the illegal conduct and the statements beyond the simple fact that a criminal conviction would have an adverse impact upon the corporation's operations in general or bottom line."  Mem. of Decision at 15-16 (emphasis added) (citing cases).  Plaintiffs have failed to heed the Court's advice, as their latest complaint still utterly fails to establish any "connection between the illegal conduct" involving ***parcel tankers*** "and the statements" regarding ***tank containers***.  Under the circumstances, Plaintiffs "fall short of the requirements of Rule 9(b) and the PSLRA, because they fail to draw any nexus between the allegedly fraudulent statements and the facts on which the fraud allegation is based." *In re Century Bus. Servs. Sec. Litig.*, No. 1:99CV02200, 2002 WL 32254513, at *15 (N.D. Ohio June 27, 2002) (Exh. 8).  Stolt-Nielsen's statements regarding tank containers were not made misleading by virtue of an alleged conspiracy relating to parcel tankers — and Plaintiffs have failed to allege otherwise.  Plaintiffs' latest complaint is as absurd as one alleging an antitrust conspiracy affecting gold, and then pointing to statements about diamonds to allege a violation of federal securities laws.[9]

---

[9] Even if the statements referenced in ¶¶ 59-60 and 64-65 did relate to the correct operational unit, they are non-actionable forward-looking statements.  First, these statements are not actionable because they were "accompanied by meaningful cautionary statements," 15 U.S.C. § 78u-5(c)(1)(A)(i).  Both the press release from March 28, 2001, referenced in ¶¶ 59-60,  and the press release from March 27, 2002, referenced in ¶¶ 64-65, contained identical cautionary language, explaining that the "press release contain[ed] forward-looking statements" and that "[a]ctual future results and trends could differ materially from those set forth in such statements due to various factors."  Second, Stolt-Nielsen used appropriate terms — such as "anticipate" or "expect" — to convey that these statements were merely predictions.  *See In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1091 (9th Cir. 2002) (noting that financial forecasts are "unquestionably forward-looking statements").  Third, Plaintiffs have not alleged with particularity any "actual knowledge" of any particular executive that these statements were "false or misleading" when made.  15 U.S.C. § 78u-5(c)(1)(B); *see also Fellman v. Electro Optical Sys. Corp.*, No. 98 Civ. 6403 (LBS),

## III.    DEFENDANTS HAD NO DUTY TO SELF-REPORT ALLEGEDLY UNLAWFUL CONDUCT

As detailed in Defendants' earlier memorandum in support of their motion to dismiss, and the reply memorandum that followed, Defendants had no legal duty to self-report antitrust wrongdoing. Mem. in Support of Mot. to Dismiss at 1-8 (citing cases, SEC Regulation S-K and policy reasons compelling dismissal of Plaintiffs' case); Reply at 1-4 (same). In dismissing Plaintiffs' second complaint, the Court agreed in part, declaring:

> Neither Regulation S-K nor the SEC's instructions for completing Form 20-F mandates the disclosure of conduct at issue in this case. To construe the disclosure requirements cited by plaintiffs to compel disclosure of Stolt's alleged criminal conduct would eviscerate the well-established principle that Rule 10-b generally does not "require management to accuse itself of antisocial or illegal policies."

Mem. of Decision at 21 (quoting *Amalgamated Clothing and Textile Workers Union, AFL-CIO v. J.P. Stevens & Co., Inc.*, 475 F. Supp. 328, 331 (S.D.N.Y 1979)). As the Court explained, "[t]here is simply no authority supporting plaintiffs' broad reading of Regulation S-K;" consequently, "a much more specific and decisive statement from the SEC is necessary to overcome the proposition, emphatically stated by the Court of Appeals for the Second Circuit in *Matthews*, that Rule 10b-5 does not mandate the disclosure of uncharged criminal conduct." *Id.* at 22 (referencing *United States v. Matthews*, 787 F.2d 38 (2d Cir. 1986)). The Court, however, then seemed to undercut its sound holding by nonetheless finding that "[c]ertain statements set forth in the complaint obligate Stolt to disclose its alleged uncharged anti-competitive activity because disclosure of this conduct was necessary to prevent misleading the investing public." Mem. of Decision at 17. Respectfully, Defendants ask the Court to reconsider the latter-

---

2000 WL 489713, at *4 (S.D.N.Y. Apr. 25, 2000) (concluding that "[a]lthough Plaintiffs allege in a general manner that [defendant] had actual knowledge of the falsity… they allege no specific facts from which such actual knowledge can be inferred") (Exh. 10).

referenced part of its ruling, and — consistent with Regulation S-K and Second Circuit law — to hold that Defendants had no duty to self-report antitrust violations.

As the Court has acknowledged, Rule 10b-5 — and the Second Circuit — do "***not*** mandate the disclosure of uncharged criminal conduct." Mem. of Decision at 22. Indeed, in holding that "[s]ilence, absent a duty to disclose" (*Basic, Inc. v. Levinson*, 485 U.S. 224, 239 n. 17 (1988)) is not actionable under Rule 10b-5, the Second Circuit has expressly deferred to the SEC to determine the scope of a defendant's disclosure obligations, declaring:   "We take cognizance of [the SEC's] 'expert view' as disclosed in the Commission's Rules, knowing that it was arrived at in general compliance with the provisions of the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, and only after every feasible effort has been made to secure the views of persons to be affected."  *Matthews*, 787 F.2d at 47.  Because, as this Court has recognized, SEC Regulation S-K does not impose upon companies a duty to self-report wrongdoing, Plaintiffs claims — which are based upon the misguided contention that such duty exists — should be dismissed.   As the Court in *Amalgamated Clothing*, 475 F. Supp. at 332 — a case cited with approval by this Court in its earlier ruling (Mem. of Decision at 14, 21) — explained succinctly:

> [Regulation S-K] does not require disclosure of illegal intentions or even of crimes committed which have not been the subject of legal proceedings.  This is not because shareholders would not be interested in such information; rather it is a realistic recognition . . . ***In my view a requirement that illegal intentions be disclosed would make a silly, unworkable rule.***  It would not promote increased disclosure, but would serve only to support vexatious litigation and abusive discovery.

(Emphasis added); *see also Bolger v. First State Financial Servs.*, 759 F. Supp. 182, 194 (D.N.J. 1991) (declaring that "Regulation S-K requires disclosure only of non-routine pending litigation," and that "companies have no duty to disclose legal theories as to how a given transaction violated the law").

19

The cases upon which the Court relied to find that Defendants had a duty to disclose are quite different from the case at hand. First, the court in *In re Sotheby's Holding, Inc. Securities Litigation*, No. 00 Civ. 1041 (DLC), 2000 WL 1234601, at *4 (S.D.N.Y. Aug. 31, 2000) (Exh. 9) denied the motion to dismiss because defendant touted the intensity of competition in the primary auction business — the correct market sector for that case. As discussed above, however, Plaintiffs have utterly failed to identify statements in which Defendants touted intense competition in ***parcel tankers*** — the correct market sector for this case. Second, the court in *In re Par Pharmaceutical, Inc. Securities Litigation*, 733 F. Supp. 668, 672-74 (S.D.N.Y. 1990) denied a motion to dismiss based on Plaintiffs' allegation that defendant failed promptly to notify the investing public that it was under investigation for bribery, and because once the investigation was made public, the defendant expressly denied the allegations. Third, in *Ballan v. Wilfred American Education Corp.*, 720 F. Supp. 241, 244 (E.D.N.Y. 1989), defendants also failed to "disclose the [government] investigations in any documents likely to be received by shareholders or the investing public," and defendants sought "to conceal the [government] investigations and to mislead shareholders or the investing public . . ." Finally, in *Greenfield v. Professional Care, Inc.*, 677 F. Supp. 110, 112-13 (E.D.N.Y. 1987), defendants failed to disclose a state investigation into Medicaid fraud. Thus, all the cases except *Sotheby's* concerned defendants' failure to promptly report government investigations — something not alleged here. Under the circumstances — and in light of the Court's recognition that SEC regulations and Second Circuit law do not require Defendants to disclose antitrust wrongdoing — the Court should dismiss Plaintiffs' third complaint in its entirety.

## IV. AS BEFORE, THE COMPLAINT FAILS TO PROPERLY ALLEGE CONTROLLING PERSON LIABILITY

Finally, Plaintiffs again allege that the "Individual Defendants" — Defendants Jacob Stolt-Nielsen, Niels G. Stolt-Nielsen, Samuel Cooperman and Reginald J.R. Lee — should face both primary liability for direct violations of Section 10(b) and Rule 10b-5, and secondary liability as "controlling persons" for violations of Section 20(a) of the Exchange Act. Sec. Am. Compl. ¶¶ 96-110. As before, because Plaintiffs have failed to establish any liability under Section 10(b), and Plaintiffs' Section 20(a) claims derive from the Section 10(b) claims, the Complaint must be dismissed as to the Section 20(a) claims as well. *See* Mem. of Decision at 28 ("[B]ecause plaintiffs' Section 20(a) claims are derived from their Section 10(b) claims, which fail as a matter of law, these claims also fail as a matter of law."); *Kalnit v. Eichler*, 85 F. Supp. 2d 232, 246 (S.D.N.Y. 1999), *aff'd* 264 F.3d 131 (2d Cir. 2001) (dismissing Section 20(a) claims because complaint failed to adequately plead a primary violation under Section 10(b) or Rule 10b-5)); *Friedman v. Wheat First Sec. Inc.*, 64 F. Supp. 2d 338, 347 (S.D.N.Y. 1999) (same).

With respect to Messrs. Cooperman and Lee, who were officers only of SNTG, Plaintiffs have not — and cannot — plead "controlling person" liability under Section 20(a) based upon the alleged misstatements of officers of SNTG's parent company, SNSA, which form the basis of Plaintiffs' complaint. Likewise, Plaintiffs have pleaded no independent basis for holding Messrs. Cooperman and Lee personally liable for any alleged violations of Section 10(b) and Rule 10b-5. Indeed, Plaintiffs have failed to plead that Messrs. Cooperman or Lee made any misstatements themselves or that they somehow caused or authorized the alleged misstatements attributed to SNSA.

## CONCLUSION

For the foregoing reasons, the Court should grant the Defendants' Motion to Dismiss the Second Consolidated Amended Class Action Complaint and dismiss the Complaint with prejudice in its entirety as to all Defendants.

DEFENDANTS STOLT-NIELSEN S.A.,
STOLT-NIELSEN TRANSPORTATION
GROUP LTD., JACOB STOLT-NIELSEN,
NIELS G. STOLT-NIELSEN, SAMUEL
COOPERMAN AND REGINALD J.R. LEE


By:    /s/ Jason S. Weathers
       Michael P. Shea (#ct19598)
       Jason S. Weathers (#ct24579)
       Day, Berry & Howard LLP
       City Place I
       Hartford, Connecticut 06103-3499
       Tel:  (860) 275-0356
       Fax:  (860) 275-0343
       Email: jsweathers@dbh.com

       *Of Counsel*
       J. Mark Gidley (#ct18450)
       Christopher M. Curran (#ct22743)
       Peter J. Carney (ct#24721)
       Jaime M. Crowe (ct#25657)
       WHITE & CASE LLP
       701 Thirteenth Street, N.W.
       Washington, DC 20005
       Tel: (202) 626-3600
       Fax: (202) 639-9355

## CERTIFICATION

I hereby certify that on March 20, 2006, a copy of foregoing Memorandum in Support of Motion To Dismiss The Second Consolidated Amended Class Action Complaint was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

By:     /s/ Jason S. Weathers
        Jason S. Weathers (#ct24579)
        Day, Berry & Howard LLP
        City Place I
        Hartford, Connecticut 06103-3499
        Tel:  (860) 275-0356
        Fax:  (860) 275-0343
        Email: jsweathers@dbh.com