Not Reported in F.Supp.2d                                                                                                          Page 1
Not Reported in F.Supp.2d, 2005 WL 225288 (S.D.N.Y.)
**(Cite as: 2005 WL 225288 (S.D.N.Y.))**

▶

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
In re: REGENERON PHARMACEUTICALS, INC.
SECURITIES LITIGATION
**No. 03 Civ.3111 RWS.**

Feb. 1, 2005.

Stull Stull & Brody, New York, NY, By: Jules Brody, Melissa Emert, for Plaintiffs, of counsel.

Milberg Weiss Bershad Hynes & Lerach, New York, NY, By: Richard Weiss, Guy Halfteck, for Plaintiffs, of counsel.

Mayer, Brown, Rowe & Maw, New York, NY, By: Dennis P. Orr, Joseph De Simone, Matthew D. Ingber, for Defendants, of counsel.

*OPINION*

SWEET, J.

**\*1** Defendants, Regeneron Pharmaceuticals, Inc. ("Regeneron" or the "Company"), Leonard S. Schleifer ("Dr.Schleifer"), George D. Yancopoulos ("Dr.Yancopoulos"), Hans-Peter Guler ("Dr.Guler"), Neil Stahl ("Dr.Stahl"), and Murray A. Goldberg ("Goldberg") (collectively the "Defendants") have moved to dismiss the consolidated amended class action complaint (the "Amended Complaint") pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6) and Section 21E(c)(1) of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). For the reasons set forth below, the motion is denied.

The Amended Complaint in 217 paragraphs drafted by skilled counsel alleges a securities fraud committed by the Defendants in connection with the fast-track development of AXOKINE, a drug to combat obesity. The instant motion, submitted by equally skilled and prominent defense counsel, has raised difficult issues of the application of the PSLRA and pleading requirements for a securities action. Given the complexities of the science involved, the process by which drugs are approved, and the operation of the securities market, it is difficult to define with precision the issues which must be resolved. The effort to do so follows.

*Prior Proceedings*

The complaint in this action was filed on May 2, 2003. On August 13, 2003, the present action was consolidated with 03 Civ. 3446(RWS), 03 Civ. 3704(RWS), 03 Civ. 3956(RWS), 03 Civ. 4006(RWS), 03 Civ. 4214(RWS), and 03 Civ. 4398(RWS). On September 9, 2003, Sarah and Joseph Katz, Teri D. Carroll, and Stanley D. Bazewicz were appointed lead plaintiffs pursuant to Section 21D(a)(3)(B) of the Securities Exchange Act of 1934 (the "Securities Exchange Act"). *See* 15 U.S.C. § 78u-4(a)(3)(B). A consolidated amended complaint ("the Amended Complaint") was filed on November 1, 2003. Defendants' motion to dismiss the Amended Complaint was filed on December 23, 2003. Oral arguments were heard on June 16, 2004, and the motion was considered fully submitted.

*The Parties*

Plaintiffs are a putative class of individuals who purchased Regeneron securities during the period March 10, 2000 through March 30, 2003 (the "Class Period"). (Compl.¶ 23.)

Regeneron is a biopharmaceutical company that was founded in 1988 "to develop and commercialize new therapeutic agents to treat unmet medical needs." (*Id.* ¶ 73.) With an initial focus on treating degenerative neurological conditions, Regeneron also has worked to develop drugs for use in the treatment of cancer, rheumatoid arthritis, asthma and obesity. (*Id.* ¶ 24.) AXOKINE is one of several such drug candidates currently under development by Regeneron. (*Id.* ¶ 69.)

The chairman of Regeneron's board of directors, Dr. P. Roy Vagelos ("Dr.Vagelos"), is the former chairman and chief executive officer of Merck & Co. (Orr Aff. Ex. 1 at 31.) Dr. Vagelos is not a defendant in this action.

Dr. Schleifer founded Regeneron in 1988 and has been its president and chief executive officer since its inception, and he served as chairman of its board of directors from 1990 to 1994. (Compl. ¶ 44; Orr. Aff. Ex. 1 at 31.) He is a licensed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                             Page 2
Not Reported in F.Supp.2d, 2005 WL 225288 (S.D.N.Y.)
**(Cite as: 2005 WL 225288 (S.D.N.Y.))**

physician certified in neurology by the American Board of Psychiatry and Neurology, and he formerly served as a clinical professor of neurology at Cornell University Medical School. (Orr. Aff. Ex. 1 at 31.)

**\*2** Dr. Yancopoulos is an executive vice president and chief scientific officer of Regeneron, president of Regeneron Research Laboratories, and a member of Regeneron's board of directors. (Compl. ¶ 45; Orr Aff. Ex. 1 at 32.) He is formerly Regeneron's vice president for discovery and a senior staff scientist. Dr. Yancopoulos received both a Ph.D in molecular biophysics and an M.D. from Columbia University, and he has been listed among the most highly cited scientists in biology and medicine. (Orr Aff. Ex. 1 at 32.)

Dr. Stahl is senior vice president for preclinical development and bimolecular science at Regeneron, and he is its former director of cytokines and signal transduction. (Compl. ¶ 47; Orr Aff. Ex. 1 at 32.) Dr. Stahl received his Ph.D. in biochemistry from Brandeis University. (Orr Aff. Ex. 1 at 32.)

Dr. Guler is Regeneron's vice president for clinical sciences. (Compl.¶ 46.) Prior to joining the Company, Dr. Guler was the senior director of clinical development at Chiron Corporation and associate director of drug development in the pharmaceuticals division of CIBA-GEIGY Corporation. (Orr Aff. Ex. 1 at 32.)

Goldberg is the senior vice president for finance and administration, chief financial officer, treasurer and assistant secretary of Regeneron. (Compl. ¶ 48; Orr Aff. Ex. 1 at 32.) Prior to joining Regeneron, Goldberg was a member of the board of directors, chief financial officer, vice president for finance, and treasurer of PharmaGenics, Inc. From 1988 until 1990, Goldberg was managing director of the structured finance group at the Chase Manhattan Bank, N.A. (Orr Aff. Ex. 1 at 32.) From 1973 until 1987, Goldberg held various management positions in finance and corporate development at American Cyanimid Company. (*Id.*)

*The FDA's Drug Candidate Review Process*

The development of any drug requires extensive Food and Drug Administration ("FDA") oversight. Once a drug candidate undergoes pre-clinical testing, the FDA must decide, based on an Investigational New Drug Application ("IND"), whether it is reasonably safe to test the drug candidate on humans. *See* 21 C.F .R. § 312.20. Assuming that human testing is approved, the FDA and a local institutional review board ("IRB") of physicians, scientists, and other persons who oversee clinical research must approve clinical trial protocols describing who may participate in the clinical trial, the schedule of tests and procedures, the dosages to be studied, the duration of the study, and the study's objectives. (Orr Aff. Ex. 2 at 1.) [FN1]

> FN1. In deciding this motion, it is proper to consider "documents attached as an exhibit [to the Complaint] or incorporated by reference, [citation omitted], and documents that are 'integral' to plaintiffs' claims, even if not explicitly incorporated by reference ." *Faulkner v. Verizon Communications, Inc., 189 F.Supp.2d 161, 168 (S.D.N.Y.2002).* It is also proper for the Court to "take judicial notice of pleadings in other lawsuits attached to the defendant's motion to dismiss, as a matter of public record, [citation omitted], as well as reports filed pursuant to Securities and Exchange Commission ("SEC") regulations as 'facts capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." ' *Id.* (quoting *Kramer v. Time Warner Inc., 937 F.2d 767, 773-74 (2d Cir.1991)*).

The clinical trials proceed in four phases. The principal purpose of the Phase I study is to evaluate the drug candidate's safety over a short period of time in a small group of subjects, typically in the range of 20 to 80 healthy volunteers. (*Id.* at 2.) If the Phase I study does not reveal unacceptable levels of toxicity and the design of the next phase is approved by the FDA and IRB, the Phase II study is undertaken. (*Id.*) The principal purposes of that study are to determine the optimum dose for the drug candidate and to obtain preliminary data on whether the drug candidate works in people with the particular disease or condition,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:03-cv-00409-DJS    Document 57-4    Filed 03/20/2006    Page 3 of 20

Not Reported in F.Supp.2d                                                                                                       Page 3
Not Reported in F.Supp.2d, 2005 WL 225288 (S.D.N.Y.)
**(Cite as: 2005 WL 225288 (S.D.N.Y.))**

based on a controlled study of short duration. *See* 21 C.F.R. § 312.21(2)(b). The typical number of subjects in a Phase II study ranges from a few dozen to several hundred. *Id.* The typical duration for a Phase II obesity study is three months. (Orr Aff. Ex. 3 at 3.)

**\*3** If, after examining the results of the Phase II test, the FDA approves the protocol for the next study, the applicant proceeds to the Phase III study. The purpose of the Phase III study is to gather more information about the safety and efficacy of the optimum dose or doses by studying different and larger populations over a substantially longer period of time. *See* 21 C.F.R. § 312.21(2)(c). The number of subjects in Phase III studies ranges from several hundred to several thousand. (Orr Aff. Ex. 2 at 2.) Phase III trial results are used as the basis for the FDA's decisions concerning approval of a drug candidate. Finally, Phase IV studies occur after a drug is approved by the FDA. They are designed to explore potential new uses for, and the long-term effects of, the approved drug. (*Id.*)

*The Development of AXOKINE And Regeneron's Disclosures*

Plaintiffs have alleged that the development of AXOKINE was critical to the overall performance and prospects of Regeneron and that AXOKINE was the Company's leading drug candidate during the Class Period. (*Id.* ¶ 177.) Plaintiffs have alleged that AXOKINE had the potential to "make or break" the Company, (*id.* ¶ 178), and that other products in development were secondary to AXOKINE. (*Id.* ¶ 179).

AXOKINE is a modified form of a naturally occurring protein known as ciliary neurotrophic factor ("CNTF"). (Compl.¶ 72.) Regeneron initially tested CNTF as a potential treatment for Amyotrophic Lateral Sclerosis ("ALS" or "Lou Gehrig's Disease"). (*Id.* ¶ 28.) While testing CNTF in clinical trials, Regeneron discovered that reduced weight loss was a prominent side effect in ALS patients treated with CNTF. (Orr Aff. Ex. 6 at 3.) It was also noted that another side effect was that some patients treated with CNTF developed neutralizing antibodies. (*Id.*) At approximately the same time, it was noted that there was a strong similarity between the AXOKINE receptor and the receptor of a drug candidate in development called Leptin. (*Id.*) At the time, Leptin was considered to be a promising drug candidate for combatting obesity. (*Id.*) In 1997, Regeneron, in association with Procter & Gamble, commenced the development of AXOKINE for the treatment of, among other things, obesity and complications of obesity associated with Type II diabetes. (Compl.¶ 72.)

1. *The Phase I Study*

In early 1999, Regeneron filed an IND with the FDA, seeking approval to commence clinical trials of AXOKINE. (Orr Aff. Ex. 6 at 5.) With the FDA's approval, the Phase I study was conducted in 1999. (Orr Aff. Ex. 6 at 4.) In its Form 10-Q and in press releases, Regeneron disclosed that statistically significant weight loss had been observed in the Phase I study. (*Id.* Ex. 7 at 2). Regeneron also disclosed that 42% (8 out of 19 subjects) developed antibodies; however, no neutralizing antibodies were discovered using a cell-based neutralizing antibody assay. (*Id.* Ex. 8 at 4.) Regeneron further disclosed that "the single dose study demonstrated that AXOKINE is well tolerated at low doses," but at higher doses, "nausea, vomiting, and herpes cold sores were observed." (*Id.* Ex. 6 at 4.) As a result of these side effects, and as Regeneron disclosed, "as part of an internal review of drug development programs and budgets, Proctor & Gamble decided to return to Regeneron the product rights to AXOKINE." (*Id.*)

2. *The Phase II Study*

**\*4** In early 2000, Regeneron disclosed that it was seeking FDA approval to initiate a twelve-week, double-blind, placebo-controlled Phase II study of 170 patients, which was principally "designed to confirm the weight loss observed in the Phase I study ... and to determine the lowest effective well-tolerated dose" during a three-month trial. (Compl.¶ 98.) As a double-blind study, the protocol required that none of the Regeneron scientists, participating physicians, or patients knew which patients received different doses of AXOKINE or which patients received placebo. (Orr Aff. Ex. 8 at 3.) In its Form 10-Q disclosure filed March 31, 2000, Regeneron warned that antibodies could form and that if these antibodies were "neutralizing" antibodies, they could diminish or totally neutralize the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:03-cv-00409-DJS   Document 57-4   Filed 03/20/2006   Page 4 of 20

Not Reported in F.Supp.2d                                                                                                          Page 4
Not Reported in F.Supp.2d, 2005 WL 225288 (S.D.N.Y.)
**(Cite as: 2005 WL 225288 (S.D.N.Y.))**

effectiveness of AXOKINE. (*Id.* Ex. 10 at 19-20.) This warning appeared as a risk factor under the heading "Factors That May Affect Future Operating Results." *Id.* This warning was repeated as a risk factor in other Form 10-Q and 10-K disclosures filed during the Class Period.

Upon approval by the FDA, Regeneron initiated the Phase II study on March 28, 2000. (*Id.* Ex. 31 at 15.)

On November 28, 2000, Regeneron released the results of the Phase II testing (*Id.* Ex. 4 at 1). With respect to the efficacy of AXOKINE, Regeneron stated:
> Patients treated with AXOKINE showed medically meaningful and statistically significant weight loss compared to those receiving a placebo.... Patients who received the optimal dose of AXOKINE over the 12 week treatment period averaged 10 pounds more weight loss than patients on placebo....

(*Id.*)

According to Regeneron, the Phase II testing accomplished the dual goals of establishing an optimal dose for AXOKINE and demonstrating that this dose was well tolerated and produced medically significant weight loss. (*Id.* at 3.) Regeneron stated that additional safety and efficacy data would be collected in the Phase III testing. (*Id.*) Regeneron also noted that "[n]eutralizing antibodies, based on a laboratory test, were not dose-related and occurred in less than 10% of all patients receiving AXOKINE." (*Id.*) Regeneron stated that the drug's most common side effects were nausea, coughing, and skin irritation at the injection cite. (*Id.*)

In the January 2001 Form S-3, the Company stated that the Phase II trial was preliminary and that it might not be predictive of the results of later trials. (*Id.* Ex. 12 at 5.)

In its 2001 Form 10-K disclosure, filed in March 2001, Regeneron stated:
> During the conduct of clinical trials, patients report changes in their health, including illnesses, injuries and discomforts, to their study doctor. Often, it is not possible to determine whether or not these conditions are caused by the drug being studied. Various illnesses, injuries, and discomforts have been reported from time-to-time during the clinical trials of AXOKINE, our only product candidate that has completed Phase II trials. The most frequently reported conditions during the AXOKINE Phase II trial were injection site reactions, cough, and nausea or vomiting. During the Phase I study that was conducted in 1999, some subjects developed mouth sores, also known as cold sores, when AXOKINE was given in higher does than what is being studied in the Phase III program. These cold sores were thought to be caused by the reactivation of herpes simplex virus, or HSV. Recurrence of HSV was also reported in previous clinical studies of CNTF, AXOKINE's parent molecule. In the Phase I AXOKINE study, one patient who had evidence of previous exposure to HSV prior to treatment and had been previously diagnoses with Bell's palsy, had a recurrence of Bell's palsy approximately two weeks after the patient's last administration of AXOKINE. In the ongoing Phase III study of AXOKINE, one patient was reported to have been diagnosed with Guillain-Barre syndrome following an upper respiratory tract infection.

**\*5** Although AXOKINE was generally well tolerated in the completed Phase II trial, it is possible that as we test AXOKINE in a large and extended Phase III program, illnesses, injuries, and discomforts that were observed in the earlier trials, as well as conditions that did not occur or went undetected in these small trials, will be reported by patients. If additional clinical experience indicates that AXOKINE has many side effects or causes serious or life-threatening side effects, the development of AXOKINE may fail or be delayed, which would severely harm our business.

Many drug research and development programs never lead to the development of commercially successful products. Only a small minority of all research and development programs ultimately result in commercially successful drugs. We are attempting to develop drugs for human therapeutic uses, and our research and development activities may not be successful and none of our potential product candidates may ever complete clinical trials. Even if clinical trials demonstrate safety and efficacy of our product candidates and the necessary regulatory approvals are obtained, the commercial success of any of our product candidates will depend upon their acceptance by patients, the medical community, and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                    Page 5
Not Reported in F.Supp.2d, 2005 WL 225288 (S.D.N.Y.)
**(Cite as: 2005 WL 225288 (S.D.N.Y.))**

third-party payors and on our ability to successfully develop, manufacture, and market our product candidates. If our products are not successfully commercialized, we will not be able to recover the significant investment we have made in developing such products and our business would be severely harmed.

(*Id.* Ex. 13 at 27.)

*The Phase II Follow-Up Data*

The AXOKINE Phase II testing lasted 12 weeks. (*Id.* Ex. 15 at 1.) Regeneron followed up with its Phase II subjects at intervals of 24, 36 and 48 weeks. (*Id.* at 1-2.) There were no additional safety concerns observed in the subjects in the follow-up testing. (*Id.*) In addition, Regeneron tracked these patients to determine whether they suffered from "rebound" weight gain (*i.e.,* weight gained after the drug candidate is no longer administered). Evidence from the pre-clinical animal testing had suggested that patients treated with AXOKINE might potentially avoid rebound weight gain, a problem associated with many weight loss regimens. (*Id.* at 2.) Accordingly, Regeneron reported weight loss/gain data at intervals of 24, 36 and 48 weeks after the patients stopped using AXOKINE. (Compl.¶¶ 123-24.) At each of these intervals, Regeneron reported that patients treated with the optimal dose of AXOKINE reported, on average, sustained weight loss. (*See* Ex. 17 at 1; Ex. 15 at 1.)

In January 2003, the FDA granted "fast track" designation [FN2] to that component of the AXOKINE development program that "covers treatment of severely obese people who are unresponsive to, intolerant of, or unsuitable candidates for certain FDA approved medications for the long-term treatment of obesity." (Orr Aff. Ex. 18 at 1.)

> FN2. The FDA grants fast-track designation to therapeutic development programs that the agency determines have the potential to address an unmet medical need in treating serious or life-threatening disease conditions. (Orr Aff. Ex. 18 at 1.) Under the FDA Modernization Act of 1997, the FDA may take actions to expedite the development and review of an application for approval to market a therapeutic candidate that has been granted fast-track designation. (*Id.*)

*The Phase III Study*

**\*6** After consultation with the FDA and joint review of the Phase II data, Regeneron announced in July 2001 that it was initiating Phase III clinical trials. (*Id.* Ex. 19 at 1.) The double-blind, randomized, placebo-controlled Phase III study enrolled approximately 2,000 patients, roughly ten times the number previously studied in Phase II. Whereas the longest previous trial had only exposed patients to AXOKINE for twelve weeks, there was a twelve month treatment period in the Phase III study, allowing Regeneron to observe safety and efficacy issues in a trial of much longer duration. (Compl. ¶ 125; *Id.* Ex. 20 at 2.)

On March 31, 2003, one day after the end of the Class Period, Regeneron issued a press release regarding the year-long Phase III study. (*Id.* Ex. 20 at 1.) Regeneron disclosed that the results of the initial Phase III trial were "preliminary" and that it "subsequently will discuss all of this data with regulatory authorities." (*Id.*) It stated that "at that time, [it would] be able to discuss [its] plans for further development of AXOKINE for treatment of obesity." (*Id.*)

Regeneron's March 21, 2003 press release further stated that patients treated with AXOKINE, when compared with placebo, achieved statistical significance with regard to both endpoints of the study. (*Id.*) First, a 25% of AXOKINE-treated patients lost at least 5% of their initial body weight while 17.6% of patients receiving placebo reported such weight loss. (*Id.*) Second, participants receiving AXOKINE experienced an average weight loss of 6.2 pounds while those receiving placebo experienced an average loss of 2.6 pounds. (*Id.*) Regeneron stated that "[a]lthough the results of this Phase III study were statistically significant, the overall magnitude of the weight loss was small." (*Id.* at 1.) Regeneron explained that AXOKINE-associated weight loss was limited, beginning after about three months of AXOKINE treatment, by the development of neutralizing antibodies in patients. (*Id.*)

According Dr. Louis Aronne, Director of the Comprehensive Weight Control Program at New York Presbyterian Hospital, who was quoted in the March 31, 2003 press release, the twelve-month study further revealed that in the 30% of AXOKINE-treated patients who were

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:03-cv-00409-DJS   Document 57-4   Filed 03/20/2006   Page 6 of 20

Not Reported in F.Supp.2d                                                                                                Page 6
Not Reported in F.Supp.2d, 2005 WL 225288 (S.D.N.Y.)
**(Cite as: 2005 WL 225288 (S.D.N.Y.))**

unaffected by neutralizing antibodies, weight loss was comparable to drugs available on the market. (*Id.* at 2.) Dr. Aronne nonetheless concluded that "AXOKINE [is] a potentially attractive candidate as part of an obesity regimen." (*Id.*)

*Events After The March 31, 2003 Announcement Of The Phase III Results*

On March 31, 2003, the date of the Regeneron Phase III press release, Regeneron's stock price dropped from $17.31 to $7.52, closing 56.6% below the closing price for March 28, 2003, the previous trading day. (Compl.¶ 163.)

By June 11, 2003, Regeneron's stock had returned to the March 28 closing price. (Orr Aff. Ex. 21 at 3.) The stock traded for as much as $22 per share in September 2003. (*Id.* at 1.) As of the time this motion was submitted, AXOKINE still had fast-track FDA status with respect to the clinical trials. On September 8, 2003, Regeneron announced that it had entered into a global agreement with Aventis Pharmaceuticals to jointly develop and commercialize Regeneron's Vascular Endothelial Growth Factor Trap, which is regarded as a promising anti-cancer therapy. (*Id.* Ex. 22 at 1.)

***7** On September 9, 2003, Regeneron announced that it was moving forward with the Phase III development program of AXOKINE for the treatment of obesity. (*Id.* Ex. 23 at 1.) Regeneron made this decision following a meeting with the FDA in which Regeneron reviewed the results of the initial Phase III trial announced on March 31, 2003. (*Id.*) It further stated that the remaining Phase III program was expected to consist of a one-year confirmatory pivotal trial similar to the initial trial, a separate one-year study in obese type 2 diabetic patients, and several smaller and shorter studies. (*Id.*) In total, approximately 2,300 additional people were expected to be enrolled in these future trials. (*Id.*) Dr. Yancopoulos stated:

> Based on our discussions with the FDA, we believe that AXOKINE has demonstrated a favorable risk-benefit profile in clinical trials performed to date[.] ... Our discussions also indicate that if the results of the remaining development program parallel the results we saw in our initial pivotal trial, we would have the basis for applying for approval of AXOKINE for the treatment of obesity.

*Id.* Regeneron's stock price closed at $21.75 on the day of this announcement. (*Id.* Ex. 21 at 1.)

*Regeneron's Disclosures Concerning The Development of PEGylated AXOKINE*

Regeneron sought to develop PEGylated AXOKINE, a more potent and longer-lasting version of AXOKINE that would allow for less frequent and lower dosing in patients. (Compl.¶ 78(a); Orr Aff. Ex. 5 at 3 .) PEGylation is the chemical process by which certain molecules (polyethylene glycol chains) are attached to protein drugs, in this case the original AXOKINE molecule. PEGylation reduces the immunogenicity of the drug, which causes formation of neutralizing antibodies thereby impairing the efficacy of the drug. (Compl.¶¶ 78-79.)

PEGylated AXOKINE was in the later stages of pre-clinical development in 2001 and entered into Phase I clinical trials in June 2002. (*Id.*) Regeneron disclosed that preliminary results of the Phase I trials demonstrated a long half-life potentially comparable with once per week dosing regimens. (*Id.* Ex. 9 at 2.) However, Regeneron also disclosed that in its current form, the molecule was not optimally absorbed into the blood stream and caused unacceptable injection site reactions. (*Id.*) Finally, it stated that "we are currently working to develop an improved form of PegAXOKINE." (*Id* .)

*The Amended Complaint*

The Amended Complaint contains two causes of action. The first cause of action asserts that all defendants violated Section 10(b) of the Securities Exchange Act, *see* 15 U.S.C. § 78(j)(b), and Rule 10b-5 promulgated thereunder. *See* 17 C.F.R. § 240.10b-5. The second cause of action asserts that the individual defendants violated Section 20(a) of the Exchange Act. *See* 15 U.S.C. § 78t(a).

Plaintiffs allege that Defendants made a variety of misrepresentations in publications including Regeneron's March 10, 2000 Registration Statement, its March 30, 2000 Prospectus, its November 28, 2000 press release, the June 2,

Not Reported in F.Supp.2d                                                                                                      Page 7
Not Reported in F.Supp.2d, 2005 WL 225288 (S.D.N.Y.)
**(Cite as: 2005 WL 225288 (S.D.N.Y.))**

2002 edition of *The New York Times,* its June 13, 2002 press release, its third quarter 2002 Form 10-Q disclosure, and its 2002 Form 10-K disclosure. As set forth in the Plaintiffs' opposition papers, the misstatements on which Plaintiffs allegedly relied can be grouped into five categories.

1. *Misstatements Concerning The Effectiveness Of AXOKINE*

**\*8** Defendants are alleged to have made misstatements concerning the effectiveness of AXOKINE. (*See, e.g.,* Compl. ¶¶ 102, 105, 107, 109, and 119.) Defendants' misrepresentations are alleged to include the following statements:

. "At the recommended dosages, Dr. Schleifer said, there are no side effects like nausea; people simply stop eating as much." (Compl. ¶ 128 (quoting William J. Holstein, *How a Side Effect Might Turn Into Success,* N.Y. Times, June 2, 2002, at C4).)

. "All AXOKINE-treated groups showed statistically significant weight loss compared to placebo ..." (*Id.* ¶ 107 (quoting November 28, 2000 press release (*see* Orr. Aff. Ex. 4 at 2).)

. "Patients treated with AXOKINE showed medically meaningful and statistically significant weight loss compared to those receiving a placebo ..." (*Id.* ¶ 105 (quoting November 28, 2000 press release (*see* Orr. Aff. Ex. 4 at 1).)

. "Pending confirmation of these results and obtaining further safety and efficacy data in additional clinical studies, AXOKINE appears to be one of the most promising potential treatments for obesity." (*Id.*)

. "Everyone at Regeneron is pleased with these results, which indicate that AXOKINE has the potential to help address a growing health crisis." (*Id.*)

Plaintiffs allege that Defendants' representations concerning the purported effectiveness of AXOKINE were materially false and misleading because Defendants failed to disclose to the investing public: (1) that formation of neutralizing antibodies in patients treated with AXOKINE defeated or severely impaired the drug's effectiveness; (2) that the occurrence of neutralizing antibodies posed a significant threat to obtaining FDA approval of AXOKINE as a diet drug and, as a consequence, to the drug's commercial prospects; and (3) that AXOKINE's efficacy in causing significant weight-loss in obese patients was limited. (*Id.* ¶¶ 106, 108.)

2. *Misstatements Concerning The Purported Lack Of Side-Effects*

Defendants are also alleged to have made false statements concerning AXOKINE's purported lack of side effects. (*See, e.g .,* id. ¶¶ 98, 105, 109, 119, 126, and 128.) For example, in the November 28, 2000 press release, Defendants are alleged to have made the following misrepresentations:

. "The drug was generally well tolerated and was not associated with any serious adverse events." (*Id.* ¶ 105; Orr Aff. Ex. 4 at 1.)

. "No serious adverse events associated with the drug were reported during the trial.... Neutralizing antibodies, based on a laboratory test, were not dose-related and occurred in less than 10% of all patients receiving AXOKINE." (*Id.* ¶ 109; Orr Aff. Ex. 4 at 2.)

. "We are pleased that the trial accomplished its major objectives. We demonstrated that this dose causes medically significant weight loss and is generally well-tolerated in a short-term study of 12 weeks." (*Id.* (quoting Dr. Guler).)

**\*9** Based on Defendants' alleged knowledge concerning serious side effects and the formation of neutralizing antibodies, Plaintiffs allege that these statements were materially false and misleading.

3. *Misstatements Concerning Regeneron's Reasons For Pursuing Development Of PEGylated AXOKINE*

Defendants are alleged to have misrepresented Regeneron's reasons for pursuing development of PEGylated AXOKINE. (*See, e.g., id.* ¶¶ 96, 100, 119, 126, 132, 133, and 136.) For example, Defendants' March 10, 2000 Registration Statement, which was signed by Defendants Dr. Schleifer and Goldberg, contains the following alleged misrepresentation:

> We are also developing a modified form of AXOKINE (pegylated) that in preclinical studies is substantially longer acting than unmodified AXOKINE. This may allow less frequent and lower dosing in patients.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                         Page 8
Not Reported in F.Supp.2d, 2005 WL 225288 (S.D.N.Y.)
**(Cite as: 2005 WL 225288 (S.D.N.Y.))**

(*Id.* ¶ 96.) This statement was repeated in a prospectus filed March 30, 2000. (*Id.* ¶ 100.) Defendants made similar representations in the following documents: the June 13, 2002 press release (*id.* ¶ 132); Regeneron's 2002 Third Quarter Form 10-Q disclosure (*id.* ¶ 133); and the Company's 2002 Form 10-K disclosure. (*Id.* ¶ 136).

Plaintiffs allege that, in truth, Defendants were seeking, by PEGylation, to suppress the immunogenicity of AXOKINE, thereby preventing the formation of neutralizing antibodies. (Compl.¶¶ 78-79.) In addition, Plaintiffs allege that the PEGylated version of AXOKINE constitutes an entirely new drug candidate that would require initiation and completion of costly clinical trials in order to obtain separate FDA approval. (*Id.* ¶ 79.) Plaintiffs alleged that by concealing the true purpose of PEGylation, Defendants misled investors as to the degree of neutralizing antibody formation and thus falsely reassured investors that AXOKINE does not trigger formation of neutralizing antibodies. (*Id.* ¶¶ 97, 137.)

4. *Misstatements Concerning Defendants' Alleged Understanding Of The Mechanism By Which AXOKINE Purportedly Caused Weight Loss*

Plaintiffs allege that the November 28, 2000 press release contained the following misrepresentations concerning the mechanism by which AXOKINE purportedly caused weight loss:

. "Both the site and mechanism of action of AXOKINE are similar to those of leptin, a natural hormone regulator of body weight that is released by fat cells." (*Id.* ¶ 113; Orr Aff. Ex. 4 at 3.)

. "Using animal models of diet-induced obesity, Regeneron scientists deciphered the mechanism by which CNTF induced weight loss...." (*Id.* ¶ 116; Orr Aff. Ex. 4 at 4.)

Plaintiffs allege that, in fact, Defendants did not have an adequate understanding of the mechanism of action underlying AXOKINE, or its parent molecule CNTF. (*Id.* ¶ 114.) In particular, Plaintiffs allege that Defendants did not possess an understanding whether and how AXOKINE affects the regulation of body weight. (*Id* ). Plaintiffs allege that by falsely assuring investors that Defendants had an understanding of how AXOKINE works, Defendants artificially boosted investors' confidence in Defendants' ability to address problems encountered in the development of the drug. (*Id.* ¶¶ 144-150, 210.)

5. *Misstatements Concerning The Size Of The Market For AXOKINE*

**\*10** Plaintiffs allege that Defendants made misrepresentations concerning the size of the market for AXOKINE. For example, plaintiffs allege that Dr. Schleifer made the following misstatements, which were published in the June 2, 2002 edition of *The New York Times:*

. " 'In terms of the number of people affected, obesity 'could be the largest market in the pharmaceutical industry." ' (*Id.* ¶ 128 (quoting William J. Holstein, *How a Side Effect Might Turn Into Success,* N.Y. Times, June 2, 2002, at C4).)

. " 'Certainly, some people will say that the chance of building another giant rarely happens.... Out of thousands of budding biotechnology companies, only a relative handful have clearly succeeded.... We expect to be bigger than them ... I absolutely, fervently believe that." ' (*Id.*)

The Amended Complaint alleges that in light of AXOKINE's serious side-effects and the formation of neutralizing antibodies, the market for AXOKINE, as compared to other already-available diet drugs, was severely limited. (*Id.* ¶ 130.) In addition, the Amended Complaint alleges that AXOKINE's marketability was further impaired by the fact that it is administered by injection rather than orally. (*Id.*)

*Sales Of Stock By The Defendants*

It is alleged that the individual Defendants sold from their personal holdings nearly 400,000 shares of Regeneron stock for almost $7.5 million. (*Id.* ¶ 196.) It is alleged that Dr. Schleifer sold almost 77,000 shares for over $1.6 million; Goldberg sold almost 57,000 shares for $1.5 million; Dr. Yancopoulos sold 186,000 shares for $3.5 million; Dr. Guler sold 10,000 shares for about $213,000; and Dr. Stahl sold more than 30,000 shares for $558,000. (*Id.* ¶¶ 188-198, 191, 192, 195.) The following chart provides a summary of the alleged trading activity by individual Defendants during

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 9
Not Reported in F.Supp.2d, 2005 WL 225288 (S.D.N.Y.)
**(Cite as: 2005 WL 225288 (S.D.N.Y.))**

the class period. [FN3] (*See id.* ¶¶ 191-96.)

> FN3. According to the Defendants, Dr. Vagelos, the chairman of Regeneron's board of directors, purchased 75,000 shares on the open market during the Class Period for approximately $1,560,100, and increased his holdings substantially in the Class Period. (*See* Defs.' Mem. Supp. Mot. Dismiss at 33.)

```
Defendant        Number of Shares    Number
of Shares            Total         Percentage
                    Owned at        Owned
at End of        Increase in       Increase
                 Beginning of
Class Period         Share           in
Total
                                 Class Period
Ownership        Ownership
Schleifer            2,158,340
2,519,105          360,765           16.7
Yancopoulos          513,000
703,539            190,539           37.1
Goldberg             105,400
171,425             66,025           62.6
Stahl                111,359
179,580             68,211           61.2
Guler                 24,000
80,057              56,057          233.5
```

It is alleged that during the Class Period, the Individual Defendants caused Regeneron to offer more than $443 million of its own securities to the public (*See id.* ¶ 182.) These offerings were as follows:
  . In a March 2000 public offering, Regeneron issued 2,600,000 shares of common stock at $29.75 a share, thereby raising $77,350,000. (*Id.* ¶ 183.)
  . In a March 2001 public offering, Regeneron issued 6,630,000 shares of common stock at $25.00 a share, thereby raising another $165,750. (*Id.* ¶¶ 184, 185.)
  . In an October 2001 private placement, Regeneron sold 200,000 5.5% convertible debt notes at a fixed price of $1,000 a note, thereby raising $200,000,000. (*Id.* ¶ 186.)

*Discussion*

A. *Applicable Legal Standards*

**\*11** Plaintiffs have alleged that Defendants' conduct gives rise to liability pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act.

To state a cause of action under Section 10(b) and Rule 10b-5 promulgated thereunder, plaintiffs must plead that each defendant "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *In re Livent, Inc. Sec. Litig.,* 78 F.Supp.2d 194, 213 (S.D.N.Y.1999).

Section 20(a) imposes joint and several liability on any person who "controls any person liable under any provision of this title or of any rule or regulation thereunder." 15 U.S.C. § 78t(a). In order to state a claim based on control person liability under Section 20(a), a plaintiff must allege "(1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) 'that the controlling person was in some meaningful sense a culpable participant' [FN4] in the primary violation." *Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir.1998) (quoting *SEC v. First Jersey Securities, Inc.,* 101 F.3d 1450, 1472 (2d Cir.1996)); *Deutsche Telekom AG Sec. Litig.,* No. 00 Civ. 9475(SHS), 2002 WL 244597 at \*7 (S.D.N.Y. Feb. 20, 2002) (applying "culpable participation" requirement at pleading stage); *In re Emex Corp. Sec. Litig.,* No. 01 civ. 4886(SWK), 2002 WL 31093612 at \*9 (S.D.N.Y. Sept. 18, 2002) (same).

> FN4. The culpable participation element is subject to the PSLRA's heightened pleading requirements, and requires particularized allegations that defendants acted with scienter. *See, e.g., Deutsche Telekom,* 2002 WL 244597 at \*7; *In re Emex Corp. Sec. Litig.,* No. 01 Civ. 4886(SWK), 2002 WL 31093612 at \*10 (S.D.N.Y. Sept. 18, 2002).

Defendants have moved for dismissal of the Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 10
Not Reported in F.Supp.2d, 2005 WL 225288 (S.D.N.Y.)
**(Cite as: 2005 WL 225288 (S.D.N.Y.))**

In considering a motion to dismiss pursuant to Rule 12(b)(6), the Court construes the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir.2002) (citing Gregory v. Daly, 243 F.3d 687, 691 (2d Cir.2001)). However, "mere conclusions of law or unwarranted deductions" need not be accepted. First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 771 (2d Cir.1994). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir.1995) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). In other words, " 'the office of a motion to dismiss is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.' " Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York, 375 F.3d 168, 176 (2d Cir.2004) (quoting Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir.1980)). Dismissal is only appropriate when "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." Sweet v. Sheahan, 235 F.3d 80, 83 (2d Cir.2000); accord Eternity Global Master Fund, 375 F.3d at 176-77.

*12 Securities fraud actions are subject to the pleading requirements of the PSLRA and Rule 9(b), which requires plaintiffs to identify "with particularity" the circumstances constituting the alleged fraud. Fed.R.Civ.P. 9(b). To satisfy Rule 9(b), the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir.1993); see also In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 69-70 (2d Cir.2001); Stevelman v. Alias Research Inc., 174 F.3d 79, 84 (2d Cir.1999); Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir.2000).

Rule 8's general pleading requirement and Rule 9(b)'s particularity requirement must be read together. See Ouaknine v. MacFarlane, 897 F.2d 75, 79 (2d Cir.1990) ("Rule 9(b) ... must be read together with Rule 8(a) which requires only a 'short and plain statement' of the claims for relief."); Credit & Fin. Corp. v. Warner & Swasey Co., 638 F.2d 563, 566 (2d Cir.1981) (same); In re Initial Pub. Offering Sec. Litig. ("IPO"), 241 F.Supp.2d 281, 327 (S.D.N.Y.2003). These two rules have been read together to mean that a plaintiff need not plead evidentiary details. See, e.g., id. The Second Circuit has stated that it does "not require the pleading of detailed evidentiary matter in securities litigation." Scholastic, 252 F.3d 63, 72. [FN5] Courts of this district have stated that "the application of Rule 9(b) ... must not abrogate the concept of notice pleading." IPO, 241 F.Supp.2d at 327 n. 46.

> FN5. See also Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1225 (1st Cir.1996) (stating that "in determining the adequacy of a complaint under [Rule 9(b)], we cannot hold plaintiffs to a standard that would effectively require them, pre-discovery, to plead evidence").

The PSLRA's particularity requirements are similar to those imposed by Rule 9(b). See, e.g., Rombach v. Chang, 355 F.3d 164, 170 (2d Cir.2004). The PSLRA provides that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1) ("paragraph (b)(1)"). The PSLRA, like Rule 9(b), serves the purpose of putting the defendant on notice of the specific misstatements and omissions that are at issue. See, e.g., IPO, 241 F.Supp.2d at 354.

Notwithstanding use of the word "all" in paragraph (b)(1)'s final clause, the Second Circuit has held that to satisfy the PSLRA's particularity requirement concerning allegations based on information and belief, a plaintiff need only plead sufficient facts to support a reasonable belief as to the misleading nature of the statement or omission. Novak, 216 F.3d at 313-14 & n. 1 (stating that "[its] reading of [paragraph (b)(1) ] focuses on whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission.") [FN6]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:03-cv-00409-DJS    Document 57-4    Filed 03/20/2006    Page 11 of 20

Not Reported in F.Supp.2d                                                                                                                Page 11
Not Reported in F.Supp.2d, 2005 WL 225288 (S.D.N.Y.)
**(Cite as: 2005 WL 225288 (S.D.N.Y.))**

FN6. In support of its departure from the plaint language of paragraph (b)(1), the *Novak* court observed that a strict textual construction would lead to absurd results:

Reading "all" literally would produce illogical results that Congress cannot have intended. Contrary to the clearly expressed purpose of the PSLRA, it would allow complaints to survive dismissal where "all" the facts supporting the plaintiff's information and belief were pled, but those facts were patently insufficient to support that belief. Equally peculiarly, it would require dismissal where the complaint pled facts fully sufficient to support a convincing inference if any known facts were omitted.

*Novak,* 216 F.3d at 314 n. 1.

*Dismissal Is Not Warranted Pursuant To Either The PSLRA Safe Harbor Provision or the Common Law "Bespeaks Caution" Doctrine*

**\*13** Defendants argue that the statement at issue are not actionable pursuant to the PSLRA's safer harbor provision and/or the common law "bespeaks caution" doctrine.

A. *The PSLRA Safe Harbor Provision*

The PSLRA provides a safe harbor for certain forward-looking statements made by an issuer of securities. *See* 15 U.S.C. § 78u-5(c) (stating that under specified circumstances "in any private action arising under [15 USC §§ 78a *et seq.*] that is based on an untrue statement of material fact or omission of a material fact necessary to make the statement not misleading, a person shall not be liable with respect to any forward-looking statement"). To be entitled to this safe harbor protection, a forward-looking statement must be "[1] identified as a forward-looking statement, and [2] ... accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement [.]" 15 U.S.C. § 78u-5(c)(1)(A)(i). Representations of historical or current fact do not qualify for the PSLRA's safe harbor. *See In re Complete Mgmt. Sec. Litig.,* 153 F.Supp.2d 314, 340 (S.D.N.Y.2001).

The Defendants' statements that Plaintiffs allege are false and misleading involve representations of present or historical facts concerning, among other things, the effectiveness, safety, and tolerability of AXOKINE. The Defendants' representations concerning the following were not forward-looking: (1) the reasons Regeneron embarked on the development of PEGylated-AXOKINE (*see* Compl. ¶¶ 96, 100, 119, 126, 132, 133, 136); (2) the efficacy of AXOKINE (*see* Compl. ¶¶ 102, 105, 107, 119, 125); (3) the tolerability of AXOKINE and its lack of association with any serious adverse effects (*see* Compl. ¶¶ 105, 109, 119, 126); and (4) Regeneron's understanding of the mechanism by which AXOKINE worked. (*See* Compl. ¶ 116).

Statements that might arguably have some forward-looking aspect are unprotected by the PSLRA safe harbor provision to the extent that they are premised on representations of present fact. *See, e.g., In re Nortel Networks Corp. Sec. Litig.,* 238 F.Supp.2d 613, 629 (S.D.N.Y.2003) (stating that "even when an allegedly false statement has both a forward-looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply") (internal quotations omitted); *Manavazian v. ATEC Group, Inc.,* 160 F.Supp.2d 468, 481 (E.D.N.Y.2001) (same).

In addition, the safe harbor provision does not protect a statement made with "actual knowledge" that it was false and misleading. 15 U.S.C. § 78u-5(c)(1)(B). Plaintiffs have alleged that Defendants acted with such knowledge.

Based on the foregoing, it is determined that the PSLRA's safe harbor provision does not apply to the statements at issue.

B. *The "Bespeaks Caution" Doctrine*

**\*14** In the context of Section 10(b) and Rule 10b-5, an alleged misstatement or omission is material if there is a substantial likelihood that the disclosure of the omitted fact would be viewed by the reasonable investor as having significantly altered the "total mix" of information made available. *Halperin v. eBanker USA.Com, Inc.,* 295 F.3d 352, 357 (2d Cir.2002).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 12
Not Reported in F.Supp.2d, 2005 WL 225288 (S.D.N.Y.)
**(Cite as: 2005 WL 225288 (S.D.N.Y.))**

Under the "bespeaks caution" doctrine, certain alleged misrepresentations made in connection with the purchase or sale of a security are deemed immaterial as a matter of law because it cannot be said that a reasonable investor would consider them important in light of adequate cautionary language that is set forth in the applicable disclosure documents. *Halperin,* 295 F.2d at 357 (dismissing Rule 10b-5 claims pursuant to bespeaks caution doctrine); *Olkey v. Hyperion 1999 Term Trust,* 98 F.3d 2, 5 (2d Cir.1996) (same); *In re Duane Reade, Inc. Sec. Litig.,* No. 02 Civ. 6478(NRB), 2003 WL 22801416 at *5 (S.D.N.Y. Nov. 25, 2003) (same).

Pursuant to the bespeaks caution doctrine, when cautionary language is present, courts analyze the allegedly fraudulent materials in their entirety to determine whether a reasonable investor would have been misled. *Halperin,* 295 F.3d at 357. As the Second Circuit has explained, "[t]he touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." *Id.* The "total mix" of information includes "information already in the public domain and facts known or reasonably available to the shareholders." *Rodman v. Grant Found.,* 608 F.2d 64, 70 (2d Cir.1979). Courts have applied the bespeaks caution doctrine to dismiss securities fraud claims against pharmaceutical and biotechnology companies. *See, e.g., In re Syntex Corp. Sec. Litig.,* 95 F.3d 922, 929-30 (9th Cir.1996); *Schwartz v. Novo Industri A/S,* 658 F.Supp. 795, 798 (S.D.N.Y.1987); *Asher v. Baxter Int'l, Inc.,* No. 02 C 5608, 2003 WL 21825498 at *17 (N.D.Ill. July 24, 2003).

From the beginning of Regeneron's testing of AXOKINE, before the Class Period and even prior to the Phase I testing, Regeneron made certain disclosures concerning the tendency of neutralizing antibodies to form when AXOKINE was administered to some subjects. The Form 10-K disclosure for 1998 states:

> Previous clinical studies of ciliary neurotrophic factor ("CNTF"), the parent molecule of AXOKINE, resulted in the creation of antibodies and adverse events (side effects) in patients, including weight loss, cough, nausea, and malaise. While certain aspects of the development of AXOKINE by the Company and Proctor & Gamble have focused on attempting to avoid or minimize antibody production or adverse events, no assurance may be given that these problems will be avoided or minimized or that they will not lead to the failure, delay, or additional difficulty in conducting AXOKINE clinical trials.

**\*15** (Orr Aff. Ex. 27 at 21.)

The Form 10-K for 1999 states:
> The Company also plans to collect additional data in the study about the relationship of AXOKINE and the reactivation of HSV, about the effect of AXOKINE on pulse rate, and about the possible development of neutralizing antibodies when AXOKINE is administered for a longer time.
>
> No assurances can be made regarding the timing or the final result of the Phase II study or the timing or result of any further clinical trial of AXOKINE. Previous clinical studies of CNTF, the parent molecule of AXOKINE, in addition to weight loss, resulted in the creation of neutralizing antibodies and adverse events (side effects) in patients, including cough, nausea, malaise, and increased herpes simplex cold sores. While certain aspects of the development of AXOKINE have focused on attempting to avoid or minimize antibody production or adverse events, no assurance may be given that these problems will be avoided or minimized or that they will not lead to the failure, delay, or additional difficulty in conducting AXOKINE clinical trials.

(*Id.* Ex. 6 at 5.)

Similar disclosures mentioning neutralizing antibodies appeared in Regeneron's quarterly SEC disclosure documents prior to the Class Period. (*See id.* Ex. 28 at 10 (March 1999 Form 10-Q)); Ex. 29 at 11 (June 1999 Form 10-Q at 13); and Ex. 30 at 11 (Sept.1999 Form 10-Q).) The reference to neutralizing antibodies was repeated in Regeneron's SEC filings during the Class Period. (*See id.* Ex. 5 at 22 (2000 Form 10-K); Ex. 10 at 13 (March 2000 Form 10-Q); Ex. 31 at 15 (June 2000 Form 10-Q); and Ex. 32 at 16 (Sept.2000 Form 10-Q).) In addition, the Form 10-Q disclosures contain statements that "we have no

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

information that these antibodies are neutralizing antibodies." (*See, e.g., id.* Ex. 10 at 20 (March 2000 Form 10-Q).)

The November 28, 2000 press release stated in pertinent part:

> Regeneron Pharmaceuticals, Inc .... today announced results of a Phase II dose-ranging trial to study the safety and efficacy of AXOKINE(R) in severely obese patients. Patients treated with AXOKINE showed medically meaningful and statistically significant weight loss compared to those receiving a placebo in a dose-dependent manner.... Patients who received the optimal dose of AXOKINE over the 12 week treatment period averaged 10 pounds more weight loss than patients on placebo ... and continued to lose weight over the entire treatment period. Moreover, 46% of these treated patients loss at least 10 pounds, compared with just 5% of those on placebo. The drug was generally well tolerated and was not associated with any serious adverse events.
>
> "Everyone at Regeneron is pleased with these results, which indicate that AXOKINE has the potential to help address a growing health crisis. Millions of people in the United States suffer from obesity, and the problem is especially serious for the approximately 12 million people with clinically severe obesity. The prevalence and severity of obesity has risen sharply in recent years in many developed nations, and that trend shows no signs of easing," said Leonard S. Schleifer, M.D., Ph.D., President and Chief Executive Officer of Regeneron. "Subject to discussions with regulatory authorities, we plan on initiating Phase III testing on AXOKINE as quickly as possible to gather information about the safety and efficacy of the drug in larger numbers of patients over longer periods of time."
>
> **\*16** "Pending confirmation of these results and obtaining further safety and efficacy data in additional clinical studies, AXOKINE appears to be one of the most promising potential treatments for obesity. Weight loss in this trial was at a medically desirable rate," said Steven B. Heymsfield, M.D., Deputy Director of the New York Obesity Research Center, Professor of Medicine at Columbia University's College of Physicians and Surgeons, and an investigator in the Phase II clinical study. "Physicians and patients desperately need new treatment approaches for obesity, which substantially increases the risk of morbidity and mortality from Type 2 diabetes, hypertension, coronary heart disease, stroke, gallbladder disease, certain cancers, and many other medical conditions."
>
> * * *
>
> Safety and Tolerability
>
> No serious adverse events associated with the drug were reported during the trial. The most common side effect was dose-dependent injection site reactions (skin redness), which occurred in all patient groups, including placebo, and were generally mild. Other side effects associated with the drug included cough, which was notable only in the highest dose group, and nausea, which occurred most frequently in the highest dose group. There was no increase compared to placebo in the incidence of herpes simplex virus infections in patients taking AXOKINE. Neutralizing antibodies, based on a laboratory test, were not dose-related and occurred in less than 10% of all patients receiving AXOKINE. Further evidence of the tolerability of the drug was demonstrated by the ratio of patients in each dose group completing the full 12 weeks of treatment: placebo, 61%; 0.3 mcg/kg, 74%; 1.0 mcg/kg, 70%, and 2.0 mcg/kg. 58%.
>
> Hans-Peter Guler, M.D., Regeneron's Vice President of Clinical Sciences, stated: "We are pleased that the trial accomplished its major objectives. We established an optimal dose of AXOKINE of 1 mcg/kg and demonstrated that this does causes medically significant weight loss and is generally well-tolerated in a short-term study of 12 weeks. We look forward to gathering further safety and efficacy data for AXOKINE in the Phase III clinical trial that we plan to initiate in 2001."
>
> AXOKINE: Scientific rationale in Obesity
>
> AXOKINE is a genetically re-engineered version of a naturally occurring human protein known as ciliary neurotrophic factor (CNTF). Preclinical studies have shown that injected AXOKINE travels through the bloodstream to reach a critical area of the brain, known as the hypothalamus, that regulates body weight. AXOKINE binds to specific receptors and activates key signaling pathways in the hypothalamus that suppress appetite and reduce body weight. Both the site and mechanism of

Not Reported in F.Supp.2d                                                                                                Page 14
Not Reported in F.Supp.2d, 2005 WL 225288 (S.D.N.Y.)
**(Cite as: 2005 WL 225288 (S.D.N.Y.))**

action of AXOKINE are similar to those of leptin, a natural hormone regulator of body weight that is released by fat cells. However, in animal models of the most common form of obesity (diet-induced obesity), animals are resistant to administration of leptin, while AXOKINE is able to cause substantial weight loss.

**\*17** In animal studies, AXOKINE caused weight loss, produced selective loss of fat (as opposed to lean body mass), and had beneficial effects on obesity-associated co-morbidities such as diabetes. In addition, unlike forced dieting, cessation of AXOKINE treatment did not lead to an immediate rebound in weight.

"It's very satisfying that animal models of diet-induced obesity seem to have correctly predicted AXOKINE's ability to cause weight loss in common human obesity," commented George D. Yancopoulos, M.D., Ph.D., the Chief Scientific Officer and Senior Vice President of Research at Regeneron.

(*Id.* Ex. 4 at 1, 3-4.) After the Phase II results were obtained, Regeneron also stated:

. [I]t is possible that as we test AXOKINE in a large and extended Phase III trial, side effects that were observed in the earlier clinical trials, as well as side effects that did not occur or went undetected in the completed small clinical studies, will become apparent, which will delay or prohibit the future development or commercialization of AXOKINE. (*Id.* Ex. 12 at 5 (January 25, 2002 Form S-3 Registration Statement).)

. There is substantial competition in the discovery and development of treatments for obesity, as well as established, cost-effective, and emerging prescription and over-the-counter treatments for this condition. For example, Hoffmann-LaRoche and Abbott Laboratories already market well-established drugs for the treatment of obesity and Amgen, Sanofi-Synthelabo and a number of other pharmaceutical companies are developing new potential therapeutics.... Some of these medicines or therapeutic candidates may offer competitive advantages over AXOKINE. For example, AXOKINE currently is available only in injectable form, while the currently marketed drugs for the treatment of obesity ... are delivered in pill (or oral dosage) forms, which generally are favored by people over injectable medicines. Therefore, even if AXOKINE is approved for sale, the fact that it must be delivered by injection may severely limit its market acceptance among patients and physicians. (*Id.* Ex. 9 at 13-14 (2002 Form 10- K); *see also* Ex. 5 at 11 (2000 Form 10-K); Ex. 13 at 11 (2001 Form 10-K) .)

. Only a small minority of all research and development programs ultimately result in commercially successful drugs. We are attempting to develop drugs for human therapeutic uses, and our research and development activities may not be successful and none of our potential product candidates may ever complete clinical trials. Even if clinical trials demonstrate safety and efficacy of our product candidates and necessary regulatory approvals are obtained, the commercial success of any of our product candidates will depend upon their acceptance by patients, the medical community, and third-party payors and our ability to successfully develop, manufacture, and market our product candidates. (*Id.* Ex. 5 at 23 (2000 Form 10-K).) [FN7]

> FN7. A similar caveat was included in other mandatory SEC disclosures made during the Class Period. (*See, e.g.* Ex. 13 at 27 (2001 Form 10-K); Ex. 9 at 31 (2002 Form 10-K).)

**\*18** Each of Regeneron's annual reports during the Class Period began with a warning in italics, stating, among other things, that "a potential investor should specifically consider the various factors identified under the Caption 'Factors that May Affect Future Operating Results." ' In this caption, Regeneron made the following disclosure:

In addition to the safety, efficacy, manufacturing and regulatory hurdles faced by Regeneron's drug candidates, the administration of recombinant proteins frequently causes an immune response, resulting in the creation of antibodies against the therapeutic protein. The antibodies can have no effect or can totally neutralize the effectiveness of the protein.... In some cases, the antibody can cross react with the patient's own proteins, resulting in an "auto-immune type" disease. Whether antibodies will be created can often not be predicted from preclinical experiments and their appearance is often delayed, so that there can be no assurance that neutralizing antibodies will not be created at a later date--in some cases even after

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:03-cv-00409-DJS   Document 57-4   Filed 03/20/2006   Page 15 of 20

Not Reported in F.Supp.2d                                                                                                      Page 15
Not Reported in F.Supp.2d, 2005 WL 225288 (S.D.N.Y.)
**(Cite as: 2005 WL 225288 (S.D.N.Y.))**

pivotal clinical trials have been successfully completed. Patients who have been treated with AXOKINE ... have developed antibodies....

(*Id.* Ex. 10 at 19 (March 2000 Form 10-Q).) Defendants point out that this warning regarding neutralizing antibodies was repeated at least 13 times in SEC disclosure documents during the three-year Class Period. It was included in both Form 10-Q [FN8] and Form 10-K [FN9] statements filed during this period.

> FN8. *See id.* Ex. 31 at 23 (June 2000 Form 10-Q); Ex. 32 at 26 (Sept.2000 Form 10-Q); Ex. 33 at 21 (March 2001 Form 10-Q); Ex. 34 at 23 (June 2001 Form 10-Q); Ex. 35 (Sept.2001 Form 10-Q) at 26; Ex. 36 at 19 (March 2002 Form 10-Q); Ex. 37 at 24 (June 2002 Form 10-Q); Ex. 38 at 25- 26 (Sept.2002 Form 10-Q); Ex. 39 at 25 (March 2003 10-Q).

> FN9. *See id.* Ex. 5 at 22 (2000 Form 10-K); Ex. 13 at 25 (2001 Form 10-K); Ex. 9 at 29 (2002 Form 10-K).

Defendants' press releases during the Class Period also contained a generic disclaimer concerning hypothetical future risks:

> This news release discusses historical information and include forward-looking statements about Regeneron and about its products, programs, finances, and business, all of which involve a number of risks and uncertainties, such as risks associated with preclinical and clinical development of drugs and biologics, determinations by regulatory and administrative governmental authorities, competitive factors, technological developments, the availability and cost of capital, the costs of developing, producing, and selling products, the potential for any collaboration agreement to be cancelled or to terminate without any product success, and other material risks.

(*See id.* Ex. 4 at 5; Ex. 7; Ex. 15; Ex. 16; Ex. 17; Ex. 18; Ex. 22; Ex. 23.) Regeneron's SEC filings contained, in substance, the same language. (*See id.* Ex. 5 at 21-22 (2000 Form 10-K); Ex. 6 at 27 (1999 10-K); Ex. 9 at 28- 29 (2002 Form 10-K); Ex. 10 at 19 (March 31, 2000 Form 10-Q); Ex. 13 at 25 (2001 Form 10-K).)

None of the above-described caveats refer to any of the specific problems concerning AXOKINE that are detailed in the Amended Complaint and that Regeneron allegedly knew to exist at the time that the statements at issue were made. A warning that fails to disclose specific known facts is insufficiently precise and will not insulate Defendants' statements from liability pursuant to the bespeaks caution doctrine. *See, e.g. In re American Express Co. Sec. Litig.,* No. 02 Civ. 5533(WHP), 2004 WL 632750 at *12 (S.D.N.Y. Mar. 31, 2004).

**\*19** Moreover, discussing hypothetical risks that might occur in the future does not adequately disclose actual problems that already have materialized. *See In re Prudential Sec. Ltd. P'ships Litig.,* 930 F.Supp. 68, 72 (S.D.N.Y.1996) (stating that "[[t]he doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away"); *see also Credit Suisse First Boston Corp. v. ARM Fin. Group, Inc.,* No. 99 Civ. 12046(WHP), 2001 WL 300733 at *8 (S.D.N.Y. Mar. 27, 2001) (stating that "warnings of specific risks ... do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described").

Based on the foregoing, it is determined that the bespeaks caution doctrine does not render the statements at issue immaterial as a matter of law.

*The Amended Complaint Adequately Alleges That Defendants Made False And Misleading Statements*

The misrepresentations alleged in the Amended Complaint are adequately described as to their content, maker and date, and, as indicated, are based upon SEC filings, annual reports to shareholders, press releases put out by Regeneron, published interviews, and interviews with knowledgeable confidential sources (all of whom were former Regeneron employees or otherwise involved in the AXOKINE program during the Class Period). (Compl. ¶¶ 1-22 .) Furthermore, Plaintiffs' allegations provide ample details describing the duration and nature of the confidential sources' employment by Regeneron and their involvement in its affairs and, in

Not Reported in F.Supp.2d                                                                                              Page 16
Not Reported in F.Supp.2d, 2005 WL 225288 (S.D.N.Y.)
**(Cite as: 2005 WL 225288 (S.D.N.Y.))**

particular, the AXOKINE project. (*Id.*)

For example, CS-14, a program director at Regeneron, reported that the issue of neutralizing antibodies was something that was always in the background and that one could not have been unaware of it, and that Defendants' attention was focused on the antibody problem in light of the threat it posed to the success of AXOKINE. (*Id.* ¶ 175(b),(c).) CS-14 stated that there were significant concerns as to whether AXOKINE would work and would be effective and that the dose of AXOKINE had been reduced because it was highly toxic. (*Id.* ¶ 154.) CS-14 also stated that the Defendants were aware that AXOKINE would compete with the diet drugs Meridia and Xenical, and it was no more effective and offered no advantage over these drugs and was less marketable because it required injection. (*Id.* ¶ 156(c).)

According to CS-14, Defendants were aware of the problems associated with neutralizing antibodies due to their prior experience with CNTF, AXOKINE's predecessor. (*Id.* ¶ 175(b).) According to CS-14, CNTF also was subject to the formation of neutralizing antibodies. (*Id.* ¶¶ 170, 175.)

CS-6, who during the Class Period held a position that involved direct knowledge of the Clinical Protocols and preparation of FDA submissions (including the Pharmacology/Toxicology portions of the submissions), [FN10] is alleged to have stated that, by late February or early March 2001 (two years before the end of the Class Period), Dr. Stahl was very focused on the neutralizing antibodies problem; that Defendants understood the problem and knew what the problem meant; and that Defendants did not want to document the existence of that problem and did not want to disclose it to the investing public. (*Id.* ¶ 141(c).) CS-6 also is alleged to have stated that Regeneron's senior officers wanted to make that data look as good as it could, (*id.* ¶ 141(b)), that Defendants had no clue as to where the AXOKINE development program was going and why it was going there, that the program was just "patchwork," and "there was no rationale at all." (*Id.* ¶ 146.)

> FN10. These portions of the FDA submissions discuss, among other things, antibody formation.

**\*20** CS-6 also reported that the issue of neutralizing antibodies was frequently discussed. CS-6 recalls Defendants frequently referring to 66% when discussing the neutralizing antibodies problem of AXOKINE. It was CS-6's understanding that 66% of the patients treated with AXOKINE developed neutralizing antibodies. (*Id.* ¶¶ 111, 141(d).) CS-6 and CS-6's supervisor shared the concern that AXOKINE was causing an immune response. (*Id.* ¶ 141(e).)

CS-5, a research associate for Regeneron, stated that Defendants maintained high levels of secrecy regarding the AXOKINE project, thereby reflecting the seriousness of the concerns associated with AXOKINE. (*Id.* ¶ 176.)

According to CS-7, and as corroborated by CS-6, CS-17, CS-19 and CS-20, immunoassay sampling (blood sampling) was run on a regular basis on patients in the various AXOKINE clinical trials. The blood samples were sent back to Regeneron where the immunoassays were performed. Dr. Stahl, who was in charge of the AXOKINE program and was responsible for this particular data, had access to this data. CS-7 noted that Dr. Stahl was able to know without un-blinding the data that the antibody levels were far beyond the statistical levels disclosed after Phase II clinical trial. (*Id.* ¶¶ 147, 141(f) .) CS-19, a statistician at Regeneron for more than ten years, corroborated the information provided by CS-17.

*The Amended Complaint Adequately Alleged That The Statements At Issue Were Material*

With respect to Plaintiff's allegations concerning the materiality of the statements at issue, it should be noted that materiality issues are rarely appropriate for resolution on a motion to dismiss. *See Basic Inc. v. Levinson,* 485 U.S. 224, 239 (1988); *Weiner v. Quaker Oats Co.,* 129 F.3d 310, 317 (3d Cir.1997) (stating that " '[m]ateriality is a mixed question of law and fact, and the delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts are peculiarly for the trier of fact." ') (quoting *Shapiro v. UJB Financial Corp.,* 964 F.2d 272, 281 n. 11 (3d Cir.1992); *see also In re Twinlab Corp. Sec. Litig.,* 103 F.Supp.2d 193, 201 (E.D.N.Y.2000) (stating that "[b]ecause materiality is generally a question of fact, it is unlikely that a cause of action turning on materiality would

Not Reported in F.Supp.2d                                                                                                              Page 17
Not Reported in F.Supp.2d, 2005 WL 225288 (S.D.N.Y.)
**(Cite as: 2005 WL 225288 (S.D.N.Y.))**

be dismissed as a matter of law") (quoting *Feiner v. SS & C Techs.,* 11 F.Supp.2d 204, 208 (D.Conn.1998)). "The determination [of materiality] requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 450 (1976).

Given the fact-intensive nature of the materiality inquiry, " 'a complaint may not properly be dismissed ... on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." ' *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 162 (2d Cir.2000) (quoting *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir1985)). *See also Simon DeBartolo Group, L.P. v. Richard E. Jacobs Group, Inc.,* 186 F.3d 157, 172 (2d Cir.1999) (stating that " '[o]nly if no reasonable juror could determine that the undisclosed [information] would have assumed actual significance in the deliberations of the reasonable [investor] should materiality be determined as a matter of law." ') (quoting *Press v. Chemical Inv. Servs. Corp.,* 166 F.3d 529, 538 (2d Cir.1999)).

***21** As stated above, a misrepresentation or omission is material if there is " 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." ' *Basic,* 485 U.S. at 231-32 (quoting *TSC Indus.,* 426 U.S. at 449). "At the pleading stage, a plaintiff satisfies the materiality requirement ... by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino,* 228 F.3d at 161. "Material facts include those 'that affect the probable future of the company and [that] may affect the desire of investors to buy, sell or hold the company's securities." ' *Castellano v. Young & Rubicam, Inc.,* 257 F.3d 171, 180 (2d Cir.2001) (quoting *S.E.C. v. Texas Gulf Sulphur Co.* 401 F.2d 833, 849 (2d Cir.1968)). To satisfy the materiality requirement, "information need not be such that a reasonable investor would necessarily change his investment decision based on

the information, as long as a reasonable investor would have viewed it as significantly altering the 'total mix' of information available." *SEC v. Mayhew,* 121 F.3d 44, 52 (2d Cir.1997); *see also Ganino,* 228 F.3d at 162. Material facts include any fact that " 'in reasonable and objective contemplation *might* affect the value of the corporation's stock or securities." ' *Mayhew,* 121 F.3d at 52 (quoting *Texas Gulf Sulpher,* 401 F.2d at 849) (emphasis in original).

In the context of a drug development program, courts have noted that "[s]tatements regarding the overall efficacy of the drug ... cannot be simply dismissed as immaterial...." *In re Viropharma, Inc., Sec. Litig.,* No. CIV. A. 02-1627, 2003 WL 1824914 at *6 (E.D.Pa. Apr. 3, 2003). "[I]t would be a sad day when [a] court could determine that misstatements about whether a company's primary product worked did not alter the 'total mix' of information available in the market." *Id.*

Based on the foregoing, it is determined that Plaintiffs have alleged the existence of false and misleading statements of material fact concerning the effectiveness, safety, tolerability, and commercial viability of AXOKINE. The success of AXOKINE was critical to the Company. This was evidenced, among other things (1) by the numerous press releases in which Defendants discussed AXOKINE (Compl.¶¶ 98, 102, 105, 107, 109, 113, 116, 123, 124, 125, 131, 132); and (2) analysts' reports that considered AXOKINE and its prospects crucial for Regeneron. (*Id.* ¶¶ 104, 118, 134, 135). The materiality of the statements at issue is underscored by the fact that the price of Regeneron's common stock plummeted almost 57% the day the negative news was released. (*Id.* ¶¶ 35-36.)

*The Amended Complaint Adequately Alleges Scienter*

To satisfy Rule 10b-5's scienter requirement, plaintiffs must allege facts showing: (1) that defendants had motive and opportunity to commit fraud or (2) that there is strong circumstantial evidence of conscious misbehavior or recklessness. *Kalnit v. Eichler,* 264 F.3d 131, 138-39 (2d Cir.2001).

***22** With respect to motive, Plaintiffs allege that Defendants "benefitted personally and directly from the artificial

Case 3:03-cv-00409-DJS    Document 57-4    Filed 03/20/2006    Page 18 of 20

Not Reported in F.Supp.2d                                                                           Page 18
Not Reported in F.Supp.2d, 2005 WL 225288 (S.D.N.Y.)
**(Cite as: 2005 WL 225288 (S.D.N.Y.))**

inflation of the price of Regeneron stock by selling substantial amounts of their personal holdings in Regeneron." (Compl.¶ 188). However, the mere allegation of insider sales during the Class Period does not, without more, properly allege motive. Instead, Plaintiffs must further allege adequately that the insider sales were "unusual." See Acito v. IMCERA Group, 47 F.3d 47, 54 (2d Cir.1995); In re Hudson Techs., Inc. Sec. Litig., No. 98 Civ 1616(JGK), 1999 WL 767418 at *9 (S.D.N.Y. Sept. 28, 1999). "Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." Scholastic, 252 F.3d 63, 74-75 (2d Cir.2001).

Here, although the Plaintiffs allege the total number of shares purportedly sold by Defendants during the Class Period, the Amended Complaint fails to allege (i) the ratio of shares sold to shares held by the Defendants during the Class Period, (ii) the percentage increase in Defendants' ownership of Regeneron shares during the Class Period; and (iii) the amount of profit from the Defendants' sales. Based on Defendants' calculations, Plaintiffs have alleged that Defendants sold 9% of their owned or acquired shares during the Class Period. (*See* Compl. ¶ 196; *compare* Orr Aff. Ex. 41 at 1 and Ex. 42 at 2). [FN11] The percentage of shares sold is sufficient to rebut Plaintiffs' allegations of scienter based on motive. See Acito, 47 F.3d at 54 (stock sales that amounted to less than eleven percent of holdings failed to qualify as "unusual"); In re KeySpan Corp. Sec. Litig., No. 01 CV 5852(ARR), 2003 WL 1702279 at *19 (E.D.N.Y. March 21, 2003) (finding that sales amounting to 20% of total holdings were not unusual).

> FN11. This percentage is calculated using the methodology employed by the Second Circuit in Acito, 47 F.3d at 54. Even if Defendants exclude the vested options awarded in 2000 and 2001 that were generally "out-of-the-money" during the Class Period (*i.e.,* when the exercise price of the options exceeded the market price of the stock), Defendants sold 10% of their holdings.

Moreover, as set forth above, each of the five individual defendants increased their ownership of Regeneron shares during the Class Period. Furthermore, although Dr. Vagelos, chairman of Regeneron's board, is not a defendant in this action, it is nonetheless significant that he apparently acquired additional Regeneron shares during the Class Period: SEC filings show that he purchased 75,000 shares on the open market during the Class Period at a total cost of approximately $1,560,100. (Orr.Aff.Ex. 43.) All told, Dr. Vagelos apparently increased his holdings from 1,299,272 shares at the beginning of the Class Period to 1,602,600 at the end of the Class Period. (*Id.* Ex. 41 at 1; Ex. 42 at 2.)

It is well settled that such an action--*i.e.,* the purchase of additional company shares during the class period--is inconsistent with an intent to commit fraud. *See, e.g., In re Symbol Techs. Class Action Litig.,* 950 F.Supp. 1237, 1245 (E.D .N.Y.1997) (stating that "[p]laintiffs do not allege a motive to commit fraud. This is not surprising, since the company and defendant Amato, as well as two high-ranking financial officers, purchased shares of Symbol stock during the class period."); *In re First Union Corp. Sec. Litig.,* 128 F.Supp.2d 871, 889 (W.D.N.C.2001) (stating that "[Defendant's] net holdings of First Union Stock actually increased ... during the 'Class Period'--a fact that Plaintiffs omit because it is wholly inconsistent with their contention that he knew undisclosed negative information about the Company").

**\*23** Regeneron's two equity offerings and one convertible debt offering during the Class Period also fail to establish motive. Plaintiffs cannot plead motive by alleging "an abstract desire to enable the company to continue to enjoy a high stock price and thereby ease the difficulties of raising additional capital." *Salinger v. Projectavision, Inc.,* 934 F.Supp. 1402, 1414 (S.D.N .Y.1996). For example, in *Glickman v. Alexander & Alexander Servs., Inc.,* No. 93 Civ. 7594(LAP), 1996 WL 88570 at *9 (S.D.N.Y. Feb. 29, 1996), plaintiffs alleged that a private placement during the class period of 2.3 million shares of preferred stock, yielding net proceeds of $110.9 million, demonstrated defendants' motive to commit fraud. The court disagreed, holding that the alleged fraud was not "necessary to realize important corporate goals. In this case, plaintiff has pleaded no facts to show that the acquisition and placement were of any importance ... or to show that the underlying fraud was

Case 3:03-cv-00409-DJS   Document 57-4   Filed 03/20/2006   Page 19 of 20

Not Reported in F.Supp.2d                                                                                              Page 19
Not Reported in F.Supp.2d, 2005 WL 225288 (S.D.N.Y.)
**(Cite as: 2005 WL 225288 (S.D.N.Y.))**

in any way necessary to [the] transaction." *Id.* at *12.

Here the Plaintiffs allege, without providing any nexus between the alleged fraud and the alleged transactions, that "the Individual Defendants caused Defendant Regeneron to issue more than $443 million, in total, of its own securities in two equity offerings and one convertible debt offering ..." (Compl.¶ 182.) Such allegations amount to no more than an allegation of "a generic motive of increasing capital," which is insufficient as a matter of law. *Glickman,* 1996 WL 88570 at *11; *see also San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies, Inc.,* 75 F.3d 801, 814 (2d Cir.1996) (stating that allegations concerning a company's desire to maintain a high bond or credit rating does not qualify as sufficient motive for fraud); *Emex Corp.,* 2002 WL 31093612 at *6 (stating that allegations that defendants made misstatements to increase company's share price in advance of a rights offering and a proposed sale of common stock to the public were insufficient to establish motive to commit fraud).

However, the Plaintiffs also allege scienter based upon the conscious recklessness of the Defendants. (*See* Compl. ¶¶ 167-180.) Such allegations of conscious recklessness satisfy Plaintiffs' pleading obligation with respect to scienter. *See, e.g., Kalnit,* 264 F.3d at 138-39. The common theory of these allegations is that AXOKINE was the "make-or-break" product that Regeneron sought to develop; that the market for a drug reducing obesity was extensive; that the existence of neutralizing antibodies threatened the success of the clinical trials; and their from their experience with CNTF, the clinical trials, and their day-by-day supervision of the AXOKINE development program, the Defendants knew the extent of the development of neutralizing antibodies. This knowledge was the alleged reason for the development of the PEGylation program, and such true reason for the PEGylation program was concealed. These allegations sufficiently allege conscious recklessness.

*\*24 The key allegation is that the Defendants knew of the existence of the antibody problem, rather than being aware of the possibility of the problem. In this connection, the Plaintiffs rely heavily on the confidential sources referred to prominently in the Amended Complaint. (Compl.¶¶ 2-22.)

The PSLRA requires that plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). [FN12] Although the inference of scienter must be reasonable and strong, it need not be irrefutable. As stated in *Aldridge v. A.T. Cross Corp.,* 284 F.3d 72, 83 (1st Cir.2002), "Plaintiffs need not foreclose all other characterizations of fact, as the task of weighing contrary accounts is reserved for the fact finder. [Citation omitted]. The plaintiff must show that his characterization of the events and circumstances as showing scienter is highly likely." *Id.*

> FN12. Fed.R.Civ.P. 9(b) provides that "malice, intent, knowledge, and other condition of mind of a person may be averred generally."

In determining whether a strong inference of scienter has been pleaded, the Court must read the complaint "*in toto* and most favorably to plaintiff." *In re Complete Mgmt. Sec. Litig.,* 153 F.Supp.2d 314, 333 (S.D.N.Y.2001); *see also Rothman v. Gregor,* 220 F.3d 81, 94 (2d Cir.2000) (stating that the alleged conduct "in combination with the other allegations of the complaint, reinforces the adequacy of the complaint's allegation of scienter").

Based on the foregoing, it is determined that the Plaintiffs have properly alleged scienter.

*The Amended Complaint Adequately Alleges Control*

Plaintiffs' allegations concerning the Individual Defendants' direct involvement in the day-to-day management of the Company and their responsibility for its statements to the public go well beyond what suffices to plead Section 20(a) liability. *See, e.g. IPO,* 241 F.Supp.2d at 394-95; *Emex Corp.,* 2002 WL 31093612 at *9 (stating that "[a]t the motion to dismiss stage, plaintiffs need only plead facts supporting a reasonable inference of control").

Based on the foregoing discussion, control person liability has been adequately alleged.

*Conclusion*

Based on the foregoing discussion, Plaintiff's motion to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                    Page 20
Not Reported in F.Supp.2d, 2005 WL 225288 (S.D.N.Y.)
**(Cite as: 2005 WL 225288 (S.D.N.Y.))**

dismiss the amended complaint is hereby denied.

It is so ordered.

Not Reported in F.Supp.2d, 2005 WL 225288 (S.D.N.Y.)

    **Motions, Pleadings and Filings (Back to top)**

• 1:03cv03111 (Docket) (May. 02, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.