As filed with the Securities and Exchange Commission on June 4, 2003

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

## FORM 20-F/A
### Amendment No. 1

☐ **REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR (g) OF THE SECURITIES EXCHANGE ACT OF 1934**

OR

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended November 30, 2002**

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

**Commission File Number 000-16977**

# STOLT-NIELSEN S.A.

(Exact name of Registrant as specified in its charter)

**LUXEMBOURG**

(Jurisdiction of incorporation or organization)

**c/o STOLT-NIELSEN LIMITED**
**Aldwych House**
**71-91 Aldwych**
**London WC2B 4HN, England**

(Address of principal executive offices)

**Securities registered or to be registered pursuant to Section 12(b) of the Act:**
None

**Securities registered or to be registered pursuant to Section 12(g) of the Act:**
Common Shares, no par value

**Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:**
None

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report:

Common Shares, no par value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  54,949,387*
Founder's Shares, no par value  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13,737,346**

---

\*    The number of outstanding Common Shares excludes 7,688,810 Common Shares owned by a subsidiary.

\*\*   The number of outstanding Founder's Shares excludes 1,922,203 Founder's Shares held by Stolt-Nielsen S.A.

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes ☒    No ☐

Indicate by check mark which financial statement item the registrant has elected to follow.

Item 17 ☐    Item 18 ☒

**EXPLANATORY NOTE**

Stolt-Nielsen S.A. hereby amends and restates in its entirety our Annual Report on Form 20-F filed on June 2, 2003 for our fiscal year ended November 30, 2002 as set forth in this Amendment No. 1 to Form 20-F/A. This amended Annual Report on Form 20-F/A corrects certain inadvertent errors. It also includes the following schedule and exhibit, which were available for inclusion in the Annual Report on Form 20-F and were intended to be included as part of the original filing, but were inadvertently omitted from our Annual Report on Form 20-F as filed on June 2, 2003 because of technical problems that were beyond our control:

- Schedule II—Valuation and Qualifying Accounts; and

- Exhibit 10.6. Certification by the Chief Executive Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, dated June 2, 2003.

## TABLE OF CONTENTS

Page

### PART I

| | | |
|---|---|---|
| **Item 1.** | Identity of Directors, Senior Management and Advisers | 4 |
| **Item 2.** | Offer Statistics and Expected Timetable | 4 |
| **Item 3.** | Key Information | 4 |
| | Selected Consolidated Financial Data | 4 |
| | Risk Factors | 4 |
| | Other Matters | 18 |
| **Item 4.** | Information on the Company | 19 |
| | History and Development of Stolt-Nielsen | 19 |
| | Business Overview | 22 |
| | Strategy and Competitive Strengths | 35 |
| | Regulation | 36 |
| | Competition | 41 |
| | Insurance | 42 |
| | Significant Subsidiaries | 43 |
| | Property, Plant, and Equipment | 44 |
| **Item 5.** | Operating and Financial Review and Prospects | 51 |
| | Operating Results | 52 |
| | Liquidity and Capital Resources | 52 |
| | Research and Development; Patents and Licenses | 52 |
| | Recent Developments | 54 |
| **Item 6.** | Directors, Senior Management, and Employees | 55 |
| | Directors and Senior Management | 55 |
| | Compensation | 58 |
| | Board Practices | 58 |
| | Employees | 59 |
| | Share Ownership | 59 |
| **Item 7.** | Major Shareholders and Related Party Transactions | 60 |
| | Major Shareholders | 60 |
| | Related Party Transactions | 62 |
| **Item 8.** | Financial Information | 63 |
| | Consolidated Statements and Other Financial Information | 63 |
| | Legal Proceedings | 63 |
| | Dividends | 67 |
| | Significant Changes | 67 |
| **Item 9.** | The Offer and Listing | 68 |
| | Stock Trading History | 68 |
| | Markets | 69 |
| **Item 10.** | Additional Information | 69 |
| | Organization and Register | 69 |
| | Articles of Incorporation | 69 |
| | Material Contracts | 74 |
| | Exchange Controls | 74 |

1

|  |  | Page |
|---|---|---|
|  | Taxation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 74 |
|  | Documents on Display . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 77 |
| **Item 11.** | Quantitative and Qualitative Disclosures about Market Risk . . . . . . . . . . . . . . . . . | 78 |
| **Item 12.** | Description of Securities Other than Equity Securities . . . . . . . . . . . . . . . . . . . . . . | 78 |

**PART II**

| **Item 13.** | Defaults, Dividend Arrearages and Delinquencies . . . . . . . . . . . . . . . . . . . . . . . . . . | 79 |
|---|---|---|
| **Item 14.** | Material Modifications to the Rights of Security Holders and Use of Proceeds . . . . . | 79 |
| **Item 15.** | Controls and Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 79 |
| **Item 16.** | [Reserved] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 79 |

**PART III**

| **Item 17.** | Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 80 |
|---|---|---|
| **Item 18.** | Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 80 |
|  | Consolidated Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 80 |
|  | Supplementary Schedules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 80 |
| **Item 19.** | Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 81 |

## INTRODUCTION

Stolt-Nielsen S.A. is a Luxembourg registered company. In this Report, the terms "we", "us", "our" and "Stolt-Nielsen", refer to Stolt-Nielsen S.A. and, unless the context otherwise requires, our consolidated subsidiaries. References in this Report to "SNTG" refer to Stolt-Nielsen Transportation Group Ltd., references to "SOSA" or "Stolt Offshore" refer to Stolt Offshore S.A., and references to "SSF" or "Stolt Sea Farm" refer to Stolt Sea Farm Holdings plc, each subsidiaries of Stolt-Nielsen.

References to our activities by years refer to the fiscal year ended November 30.

Our Common Shares are listed in Norway on the Oslo Stock Exchange under the ticker symbol "SNI" and trade in the form of American Depositary Shares (each ADS representing one Common Share) in the U.S. on the Nasdaq National Market ("Nasdaq") under the ticker symbol "SNSA".

On March 7, 2001, we reclassified our non-voting Class B Shares as Common Shares on a one-for-one basis; on that date, trading in the Class B Shares on Nasdaq and the Oslo Stock Exchange ceased. As a result, the Common Shares are our only publicly-traded security. References to Class B Shares means Class B Shares up until March 7, 2001, and thereafter means Common Shares. The reclassification did not change the underlying economic interests of existing shareholders nor the number of shares used for earnings per share purposes.

As of April 30, 2003 we had 54.9 million Common Shares (which excludes 7.7 million Treasury Common Shares) and 13.7 million Founder's Shares (which excludes 1.9 million Treasury Founder's Shares) issued and outstanding.

The Consolidated Financial Statements, including the notes thereto, included or incorporated in this Report (the "Consolidated Financial Statements") have been prepared in accordance with accounting principles generally accepted in the United States of America.

**SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS**

Certain statements made in this Report may include "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. These statements relate to our expectations, beliefs, intentions or strategies regarding the future. These statements may be identified by the use of words like "anticipate," "believe," "estimate," "expect," "intend," "may," "plan," "project," "will," "should," "seek," and similar expressions. In this Report, they include statements contained under "Item 3. Key Information—Risk Factors," "Item 4. Information on the Company," "Item 5. Operating and Financial Review and Prospects," "Item 8. Legal Proceedings" and "Item 11. Quantitative and Qualitative Disclosures about Market Risk."

The forward-looking statements that we make reflect our current views and assumptions with respect to future events and are subject to risks and uncertainties. Actual and future results and trends could differ materially from those set forth in such statements due to various factors, including those discussed in this Report under "Item 3. Key Information—Risk Factors," "Item 5. Operating and Financial Review and Prospects" and "Item 11. Quantitative and Qualitative Disclosures about Market Risk."

The following factors, and others which are discussed in our public filings and submissions with the U.S. Securities and Exchange Commission, including this Report on Form 20-F, are among those that may cause actual and future results and trends to differ materially from our forward-looking statements: (i) the level of our indebtedness, operating restrictions contained in our financing arrangements, our ability to comply with financial and other covenants in our financing agreements, our ability to refinance our indebtedness on acceptable terms as it comes due and the impact of floating interest rates on our debt service costs; (ii) our ability to deliver fixed-price projects in accordance with customer expectations and the parameters of our bids and avoid cost overruns; (iii) the outcome of pending and future legal proceedings involving governmental authorities and third parties, including antitrust proceedings, securities lawsuits, investigations regarding trading with embargoed countries and pending patent litigation; (iv) the impact of negative publicity; (v) environmental challenges facing our aquaculture business; (vi) changes in, or our failure to comply with, applicable laws and regulations, including our ability to receive or renew applicable permits or licenses; (vii) prevailing prices for our products and services; (viii) cost and availability of raw materials, including ship fuel and feed costs for fish; (ix) uncertainties inherent in operating internationally, including economic and political instability, boycotts or embargoes, labor unrest, changes in foreign governmental regulations, corruption and currency fluctuations; (x) general economic conditions and competition in the industries and markets in which we operate; (xi) the loss of, or deterioration of our relationship with, any significant customers; (xii) our ability to keep pace with technological changes; (xiii) operating hazards, including marine disasters, oil spills or leaks, environmental damage, death or property damage and business interruptions caused by weather, mechanical failures, war or other hostilities, piracy or hijackings, explosions, fires or human error; (xiv) adverse weather conditions and other natural conditions such as pollution and disease in the marine environment that may impact our aquaculture business; (xv) capital expenditures by oil and gas companies; (xvi) delays or cancellations of projects in our backlog; (xvii) oil and gas prices; (xviii) the effect of changes in accounting policies; and (xix) other factors which are described from time to time in our public filings with the U.S. Securities and Exchange Commission.

Many of these factors are beyond our ability to control or predict. Given these uncertainties, you should not place undue reliance on the forward-looking statements. We undertake no obligation to update publicly or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

PART I

**Item 1. Identity of Directors, Senior Management, and Advisers.**

Not applicable.

**Item 2. Offer Statistics and Expected Timetable.**

Not applicable.

**Item 3. Key Information.**

**Selected Consolidated Financial Data**

The information under the caption "Selected Consolidated Financial Data" on page 31 of our 2002 Annual Report filed with the Securities and Exchange Commission on Form 6-K on April 18, 2003 is incorporated herein by reference.

**Risk Factors**

You should carefully consider the following factors and the information contained in this Report, including the information incorporated by reference into this Report. The following is a summary of the risks applicable to our business operations that we consider to be material.

*Our level of debt and bank credit and financing agreements may constrain our operations.*

As of April 30, 2003, we had an aggregate of $1,747 million of debt outstanding on a consolidated basis, including an aggregate of $453.5 million of debt outstanding at our subsidiary, Stolt Offshore. We are party to material bank credit and other financing agreements which impose restrictions on our operations including the maintenance of defined financial ratios and restrictions on, dividend payments, purchases and redemptions of capital and investments and advances to non-consolidated joint ventures and other entities, if any. The degree to which we are leveraged may affect our ability to obtain additional financing in the future for working capital, capital expenditures, product and service development and general corporate purposes. It also constrains our ability to utilize cash flow from operations for these and other purposes other than debt service, and to overcome seasonal or other cyclical variations in our business. For example, we have invested $64 million and $200 million in each of 2002 and 2000, respectively into Stolt Offshore in the form of equity. These funds were necessary to maintain adequate funding for Stolt Offshore but could have been used for other corporate purposes. As our existing indebtedness becomes due, we may be required to refinance all or part of it or repay it by selling assets or through other means. We may not be able to refinance such debt on terms acceptable to us, if at all. If we were unable to refinance our debt, it is doubtful that we could repay it.

*Stolt Offshore is at risk of failing to satisfy the financial covenants contained in its primary credit facilities.*

Stolt Offshore's principal credit facilities are a $385 million secured multi-currency, five-year revolving credit facility and a $100 million secured multi-currency, four-year revolving credit facility. These facilities contain various financial covenants, including but not limited to, minimum consolidated tangible net worth, maximum consolidated debt to net worth and maximum consolidated debt to earnings before interest, taxation, depreciation and amortization (EBITDA). In early 2003 Stolt Offshore amended the financial covenants contained in its primary credit facilities to more appropriately reflect Stolt Offshore's financial prospects at that time. Based on those amendments, we expected that there would be a narrow margin of compliance with the financial covenants throughout the 2003 fiscal year. Since that time Stolt Offshore's new senior management team began a review of its major projects and identified substantially poorer than anticipated performance and cost overruns on three major projects and several smaller projects. As a result of these factors, Stolt Offshore expects to

4

incur significant losses. In light of this revised forecast, we are working closely with Stolt Offshore's main banks in seeking to amend Stolt Offshore's primary credit facilities to reflect Stolt Offshore's current financial position, including obtaining a waiver of certain financial covenant tests until November 30, 2003. As an interim step, Stolt Offshore's banks have agreed to a 30-day "standstill" through June 30, 2003 whereby they will take no actions on any potential noncompliance with the financial covenants while internal bank approvals are sought and documentation is completed. Without a waiver of certain financial covenants, Stolt Offshore would be out of compliance with its primary credit facilities. If we cannot reach final agreement with Stolt Offshore's bank lenders on the terms of amendments and/or waivers to Stolt Offshore's primary credit facilities, Stolt Offshore's noncompliance with its primary credit facilities could potentially lead to the credit facilities being repayable on demand. Stolt Offshore would not be able to repay these facilities on demand, unless an alternative financing source could be arranged.

Even if Stolt Offshore is able to amend its primary credit facilities to incorporate terms and conditions with which we believe Stolt Offshore can comply or obtain appropriate waivers, Stolt Offshore's ability to maintain compliance with such facilities will be subject to adverse changes in its financial condition, results of operations or cash flows, including many of the risk factors identified in this Report on Form 20-F. Any agreement that we reach with Stolt Offshore's lenders may provide only temporary relief from the current requirements of Stolt Offshore's primary credit facilities. Therefore, we are likely to require further amendments or waivers in the future, which may or may not be possible depending on Stolt Offshore's financial condition at such time.

Additionally, a default under Stolt Offshore's credit facilities could, in turn, result in a default under one of our bank credit or other financing agreements, as the majority of our credit facilities contain cross-default provisions. If a default were to extend beyond the applicable remedy or cure period under either Stolt Offshore's or our credit facilities, the financing agreement could become repayable on demand. It is unlikely that we could repay any such facility on demand without selling the assets securing such facility, unless an alternative financing source could be arranged.

*Our floating interest rate debt exposes us to the risk of fluctuations in interest rates.*

Approximately 41% of our consolidated long-term indebtedness at April 30, 2003 incurs interest at rates that fluctuate with the prevailing interest rates and, accordingly, increases in such rates will increase our interest cost if we do not hedge the impact of such interest rate movements.

*Unexpected costs may adversely affect the profitability of our fixed-price contracts.*

A significant proportion of our offshore services business is performed on a fixed-price or turnkey basis. In 2002, 2001 and 2000, approximately 88%, 72% and 74%, respectively, of Stolt Offshore's revenue was derived from fixed-price contracts. This, in turn, constituted approximately 44%, 34% and 32% of our consolidated revenues in each of those years, respectively. Long-term fixed-priced contracts are inherently risky because of the possibility that we might incur costs that we did not expect at the time of bidding, including the cost of satisfying post-completion warranty obligations. The net effect of significant revisions to contract estimates contributed $58.8 million to our net loss in 2002, decreased our net income by $2.4 million in 2001 and contributed $10.7 million to our net loss in 2000. In 2002, the net loss of $58.8 million included a $35.2 million of unanticipated costs for one of our accounts recorded on an engineering, procurement, installation and commission (referred to as "EPIC") project for the Burullus Gas Company in the Scarab/Saffron field off the coast of Egypt.

The cost and gross profit realized on such contracts can vary from those expected because of changes beyond our control, including but not limited to:

- unanticipated technical problems with the equipment we are supplying or developing which may require that we spend our own money to remedy the problem;

- unanticipated changes in the costs of components, materials or labor;

- unanticipated difficulties in obtaining required governmental permits or approvals;

- project modifications creating unanticipated costs and vessel scheduling difficulties;

- delays caused by local weather and soil conditions; and

- suppliers' or subcontractors' failure to perform as expected.

These risks are exacerbated if the duration of the project is long-term, because there is more time for and, therefore, an increased risk that the circumstances upon which we originally bid and developed a price will change in a manner that increases our costs. Our long-term projects often subject us to penalties if we cannot complete portions of the projects in accordance with agreed-upon time limits.

*We have experienced significant losses on several offshore services projects in Stolt Offshore's Southern Europe, Africa and Middle East (SEAME) region.*

Execution of offshore EPIC and pipelay projects in West Africa and Egypt has and will continue to put a strain on our consolidated financial condition and results of operations. These projects generally relate to the operations that we acquired in the ETPM acquisition. Certain projects within this region are making losses due to, among other things, costs that exceeded our estimates during the tendering process, project execution problems that have caused cost overruns and requirements that we use local subcontractors who, in some cases, have not performed as we expected. Additionally, in early 2003, Stolt Offshore's new senior management team began a review of its major projects and identified substantially poorer than anticipated performance and cost overruns on three major projects and several smaller projects. This has resulted in a significant decrease to the results of operations that we anticipated for Stolt Offshore for the 2003 fiscal year. We believe that we have identified the weaknesses that resulted in these problems and are taking action to remedy those that we can control or anticipate. If, however, we cannot successfully integrate the former ETPM operations and improve our ability to recover our costs with respect to projects in this region, we will continue to suffer losses on our projects. Stolt Offshore's SEAME region accounted for 49% of Stolt Offshore's revenues in 2002. Therefore, problems in West Africa and Egypt can have a significant negative impact on our consolidated financial condition and results of operations. Additionally, we have been unsuccessful collecting significant amounts owed to us by customers on projects in this region and many of the delays and cost overruns with respect to West African projects are the subject of variation orders being negotiated with the customers. If we are unable to resolve these negotiations on terms favorable to us, there will be an ongoing material negative impact on our financial condition, cash flows and results of operations. The financial impact of our inability to resolve these issues has contributed to Stolt Offshore's inability to maintain compliance with the financial covenants of its credit facilities. Even if Stolt Offshore is able to obtain waivers for, or renegotiate, its credit facilities, our inability to collect amounts owed to us or successfully negotiate change orders in our favor could make it more difficult for Stolt Offshore to comply with any revised financial covenants or present an obstacle to renegotiating Stolt Offshore's credit agreements. As discussed above, a default under a Stolt Offshore credit facility could, in turn, result in a default under a Stolt-Nielsen bank credit or financing agreement.

*The prices and volume for our bulk liquid transportation services and salmon and salmon trout products are sensitive to imbalances in the supply and demand for such services and products.*

Price is a primary factor in determining which supplier of transportation services is awarded a contract. Consequently, we may, from time to time, bid our ships at prices that do not reflect the relatively high fixed costs of our ships, depending on prevailing contractual rates, the contribution to fixed costs, and whether our revenue exceeds variable costs. Such competitive pricing conditions can

occur when the supply of transportation services ships is greater than the demand for such ships. Demand for our bulk liquid transportation services is affected by overall economic conditions and demand in the industries for the products we transport and store, including the chemical, lube oil, acid and food industries. The conditions in these industries often reflect the overall health of the markets in which we operate, location of the production of the products carried and stored in relation to location of demand, currency fluctuations, import/export tariffs and other trade restrictions and a general economic slowdown. Supply and demand imbalances are reflected in the "spot" prices for bulk liquid transportation services, which is the prevailing market rate for short-term transportation services at any given time in any particular region. In 2002, 8% of our consolidated revenues were derived from short-term parcel tanker services at prevailing "spot" prices. Therefore, supply and demand imbalances that affect spot prices can cause our revenues to fluctuate significantly from quarter to quarter.

Additionally, our fish farming business is still dependent predominantly on salmon and salmon trout products. Therefore, imbalances in the supply and demand for salmon and salmon trout products can lead to wide fluctuations in the prices for such products and therefore material variations in the results of our fish farming operations. Supply to the main markets can vary sharply, depending on the availability of capital to farmers, varying growing conditions, disease epidemics, and restrictions on farming capacity. Salmon prices generally have fallen significantly in most of SSF's major markets between 2000 and 2002. Consequently, SSF gross margins, which were 16% in 2000 fell to 6% in 2001 and 2% in 2002.

*We continue to face competition in our businesses which could have an adverse effect upon our operating results and financial condition.*

The parcel tanker, offshore oil and gas services and fish farming businesses are highly competitive. Contracts for our offshore oil and gas services and seafood products are generally awarded on a competitive bid basis. In the parcel tanker business contracts are often extended based on negotiated rates. Although customers normally consider, among other things, the availability and capability of equipment, quality of the products or services and the reputation and experience of the contractor, price is a primary factor in determining which contractor or supplier is awarded a contract. Several of our competitors and potential competitors are larger than we are and have greater financial and other resources than we have. This intense competition could result in pricing pressures, lower sales and reduced margins which would have an adverse effect upon our operating results, cash flows and financial condition.

*We are the subject of investigations by U.S. and European antitrust authorities for which we have been granted conditional immunity. We may suffer fines and other penalties if we cannot satisfy the conditions of our immunity or if other regulators bring legal proceedings against us.*

In 2002, we became aware of information that caused us to undertake an internal investigation regarding potential improper collusive behavior in our parcel tanker and intra-Europe inland barge operations. Consequently, we determined to voluntarily report conduct to the Antitrust Division of the U.S. Department of Justice and the Competition Directorate of the European Commission. On February 25, 2003, we announced that SNTG had been conditionally accepted into the Department of Justice's Corporate Leniency Program in connection with possible collusion in the parcel tanker industry. Pursuant to this program, SNTG and its directors and employees received amnesty from criminal antitrust prosecution and fines in the United States for anti-competitive conduct in the parcel tanker business, provided the stated conditions, including continued cooperation are met. We also announced that the European Commission had admitted SNTG into its Immunity Program with respect to deep-sea parcel tanker and intra-Europe inland barge operations. This program affords SNTG immunity from European Commission fines with respect to anti-competitive behavior, subject to SNTG fulfilling the conditions of the program, including continuing cooperation. Our ability to enforce the

agreements pursuant to which SNTG has been granted conditional amnesty and immunity has not been legally established. Consequently, SNTG's immunity and amnesty depends in large part on the Department of Justice's and European Commission's satisfaction with SNTG's efforts to cooperate and otherwise satisfy the conditions of the immunity and amnesty programs. It is possible that they could determine, because of new information or for other reasons, that SNTG has not fully complied with those conditions. If this were to happen, SNTG could be partly or fully removed from the immunity or amnesty programs, subject to criminal prosecution and, if SNTG were found guilty, incur significant fines and penalties. If any such proceedings were brought by the Department of Justice or European Commission, SNTG could incur significant additional defense costs and significant distraction of senior management from the operation of its business. Consequently, if SNTG cannot continue to avail itself of the immunity and amnesty programs, we could face a material adverse effect on our financial condition, cash flows and results of operations.

The activities that are the subject of the investigations involve jurisdictions other than the United States and Europe. Therefore, it is possible that regulatory authorities in other jurisdictions could commence investigations or legal proceedings with respect to the activities that are the subject of the investigations. We cannot determine whether or not any such proceedings may be brought or, if they are brought, the potential consequences of such proceedings. It is possible that the consequences of such proceedings, if brought, could have a material adverse effect on our financial condition, cash flows or results of operations.

*We may be subject to civil liabilities relating to the activities that are the subject of the antitrust investigations.*

We are named defendants in two civil antitrust lawsuits filed as putative class actions which appear to be based on media reports about the U.S. Department of Justice and European Commission investigations. Both actions are by former customers. The actions allege, among other things, violations of the Sherman Antitrust Act and state antitrust and unfair trade practices acts. The lawsuits seek to recover treble damages and costs, among other things, in unspecified amounts. Additionally, we are in ongoing discussions with several customers regarding the activities that are the subject of the Department of Justice and European Commission investigations. Some of these customers have requested mediation of their disputes with us or have threatened to commence litigation. It is possible that other legal proceedings, including arbitration or mediation, will be requested or commenced by our customers or former customers. We have also been named as a defendant, together with certain of our directors and senior executives (Jacob Stolt-Nielsen, Niels G. Stolt-Nielsen, Samuel Cooperman and Reginald J.R. Lee), in a putative civil class action for violations of U.S. securities laws. The securities litigation also appears to be based on media reports about the Department of Justice and European Commission investigations and alleges, among other things, that our failure to disclose such alleged antitrust violations, and other allegedly false and misleading statements, caused plaintiffs to pay inflated prices for our shares. The securities litigation seeks unspecified monetary damages, among other things. See "Item 8. Financial Information—Legal Proceedings."

We may be required to make payments in settlement or as a result of a final judgment to entities that have commenced or may commence proceedings against us in amounts that are not determinable. Additionally, we are incurring costs in connection with the pending proceedings, including the distraction of senior management from the operation of our businesses. Therefore, the pending civil claims against us and any future claims could have a material adverse impact on our financial condition, cash flows or results of operations. As of November 30, 2002 and February 28, 2003, we had not made any provision in our financial statements for any civil damages or penalties with respect to the claims against us.

*SNTG is the subject of a pending investigation by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") and may be subject to fines or other penalties as a result.*

OFAC is investigating past transactions of SNTG relating to Iran as possible violations of the International Emergency Economic Powers Act and the Iranian Transactions Regulations. SNTG is cooperating fully with OFAC's investigation. On April 3, 2002, OFAC issued a Cease and Desist Order covering payments by SNTG for incidental port expenses involving unlicensed shipments to, from or involving Iran. SNTG has fully complied with that Order. OFAC has not made any determination of whether or not a violation has occurred. If OFAC determines that a violation has occurred, it could impose a civil monetary or other penalties on SNTG. OFAC also could refer the matter to other federal law enforcement agencies for criminal investigation. We do not know whether or not the subject of OFAC's investigation of SNTG is included as part of the U.S. Attorney's investigation in Connecticut. Even if OFAC has referred this matter to the U.S. Department of Justice for criminal investigation, OFAC might also continue to pursue the matter as a civil penalty matter.

*Continuing negative publicity may adversely affect our business.*

We have been the subject of substantial negative publicity relating to the OFAC investigation, the U.S. Attorney investigation, the antitrust investigations and related civil litigation, including the employment litigation commenced by a former internal counsel. We may experience reluctance on the part of certain customers and suppliers to continue working with us on customary terms. The negative publicity, legal proceedings and resulting impact on our businesses could also have a negative impact on our ability to refinance our existing indebtedness when necessary. As a result of the antitrust investigations, the related litigation and negative publicity, members of senior management need to spend significant management time and effort dealing with investigations, litigation and customer relations issues rather than the operation of our businesses. Moreover, the negative publicity could encourage increased scrutiny from governmental regulatory authorities relevant to our various businesses or make us a more attractive subject for party claims and disputes. Whether or not warranted, such negative attention could require us to incur additional costs to respond to or settle such matters or have a negative impact on our share price. Therefore, continuing negative publicity could have a material adverse effect on our results of operations and liquidity and the market price of our publicly traded securities.

*Our business could suffer as a result of further adverse developments in our patent litigation with Coflexip S.A.*

We are subject to legal claims and investigations by customers, sub-contractors, employees, joint venture partners, government agencies and competitors. In particular, our competitor, Coflexip S.A. ("CSO") commenced legal proceedings through the UK High Court against three subsidiaries of Stolt Offshore S.A. claiming infringement of a certain patent held by CSO relating to flexible flowline laying technology in the UK. Judgement was given on January 22, 1999 and January 29, 1999. The disputed patent was held valid. We appealed and the Appeal Court maintained in July 2000 the validity of the patent and potentially broadened its application compared to the High Court decision. We applied for leave to appeal the Appeal Court decision to the House of Lords, which was denied. During 2001 after the Appeal Court decision became final, CSO submitted an amended claim to damages claiming lost profit on a total of 15 projects. In addition, there is a claim for alleged price depreciation on certain other projects. The total claim for lost profits was for approximately $89.0 million, up from approximately $14.0 million claimed after the High Court decision confirming the patent's validity, plus interest, legal costs and a royalty for each time that the flexible lay system tower on the Seaway Falcon was brought into UK waters. The increase came because several more projects potentially became relevant. The amount of the claim has not yet been considered by the Court and has thus so far not been upheld. We estimate that the total claim as submitted is in the order of $130.0 million at

9

November 2002, increasing at 8% simple interest per annum. In the alternative, CSO claims a reasonable royalty for each act of infringement, interest and legal costs. CSO has not quantified this claim, but it will be considerably less than the claim to lost profits. We, in consultation with our advisers, have assessed that the range of possible outcomes for the resolution of damages is $1.5 million to $130.0 million and have determined that there is no amount within the range that is a better estimate than any other amount. Consequently, in accordance with SFAS No. 5,"Accounting for Contingencies", as interpreted by FASB Interpretation No. 14 "Reasonable Estimation of the Amounts of a Loss", we have provided $1.5 million in the financial statements, being the lower amount of the range. The amount of damages is nevertheless uncertain and no assurance can be given that the provided amount is sufficient. If the amount we are ultimately determined to owe, if any, is substantially more than we have currently reserved or if we increase the amount of the reserve for this claim, it could have a material adverse effect on our results of operations.

*Environmental and consumer challenges facing the aquaculture industry may have an adverse effect on our fish farming business.*

The aquaculture industry has increasingly faced environmental and consumer challenges, drawing criticism regarding such issues as the effects of escaping fish on native fish populations, spread of disease and parasites such as sea lice, the impact of antibiotics given to farmed fish and synthetic pigments used in farmed salmon. These increasing environmental and consumer challenges could lead to potential litigation against us and more stringent government regulation of the aquaculture industry, each of which could require us to change our fish farming practices and incur additional costs. The additional costs could include the costs of compliance with governmental regulations, fines and penalties for non-compliance and the costs associated with challenging new governmental regulations or responding to litigation or other claims against our aquaculture business. Additionally, increasing environmental challenges could increase the costs of, or make it more difficult to obtain, insurance against the risks of environmental damage. It is possible that we will also be required to consent to injunctions against future conduct, lose the ability to conduct business with government agencies or suffer other penalties, which could have a material adverse effect on our fish farming business. Changes in the laws and regulations of the aquaculture industry, or our inability to renew necessary permits or licenses, can have a significant adverse effect on the production costs of fish as well as our ability to compete effectively in affected markets.

10

*Political or social instability in the developing countries in which we operate could increase our costs and reduce our future growth opportunities.*

A significant portion of our offshore services business involves projects in developing or less developed countries that are experiencing or may experience political or social instability. For the year ended November 30, 2002, approximately 28% of our consolidated net sales came from projects located in Angola, Nigeria, Egypt, Brazil and Indonesia. Even though it is one of the world's largest oil exporters, Nigeria, for example, has had a history of political instability and disorganized society with an internal infrastructure that is neither fully functional nor well maintained and parts of Nigeria regularly experience localized civil unrest and violence. Unanticipated political events or social disturbances in developing or less developed countries, including labor unrest, could cause cost overruns on projects for which we are not reimbursed or delays in execution of projects which lead to delayed revenues or potential contractual penalties. For example, in 2003 our Offshore Gas Gathering System ("OGGS") project in Nigeria has suffered disruption due to a labor strike at a subcontractor's yard and the hijacking of a chartered survey vessel. The extent to which the impact of these events will be borne by us is subject to negotiation with our customer. Additionally, to the extent a project is delayed or becomes more costly, there would be a negative impact on our financial condition, results of operations and cash flows. This, in turn, could have a negative impact on our compliance with the financial covenants contained in our credit facilities. Political or social instability could also inhibit offshore exploration or capital expenditures by our clients. It could also result in fewer new project tenders meeting our criteria thereby reducing growth opportunities for our business.

*Our method of accounting for our offshore services projects may result in the reduction or elimination of previously reported profit.*

Substantially all of our offshore services projects are accounted for on the "percentage-of-completion method," which is standard for our industry and in compliance with U.S. generally accepted accounting principles. In our offshore services projects, estimated contract revenues are accrued based on the ratio of costs incurred to the total estimated costs, taking into account the level of physical completion. Estimated contract losses are recognized in full when determined. Contract revenues and total cost estimates are reviewed and revised periodically as work progresses and as change orders are approved, and adjustments based on the percentage of completion are reflected in contract revenues in the reporting period when these estimates are revised. To the extent that adjustments result in a reduction or elimination of previously reported profits or contract revenues, we would recognize a charge against current earnings that may be significant depending on the size of the project or the adjustment.

*Our offshore services business is affected by expenditures by participants in the oil and gas industry.*

Demand for our offshore services depends on expenditures by participants in the oil and gas industry and particularly on capital expenditure budgets of the companies engaged in the exploration, development and production of offshore oil and gas. In particular, the oil and gas industry has been consolidating. There are fewer and larger oil and gas companies that control expenditures for the types of services and products that we and our competitors provide. Offshore oil and gas field capital expenditures are also influenced by many other factors beyond our control, including:

- prices of oil and gas and anticipated growth in world oil and gas demand;
- the discovery rate of new offshore oil and gas reserves;
- the economic feasibility of developing particular offshore oil and gas fields;
- the production from existing producing oil and gas fields;
- political and economic conditions in areas where offshore oil and gas exploration and development may occur;

11

- policies of governments regarding the exploration for, pricing and production and development of their oil and gas reserves; and

- the ability of oil and gas companies to access or generate capital and the cost of such capital.

*There might be delays or cancellation of projects included in our backlog.*

The dollar amount of our backlog does not necessarily indicate future earnings related to the performance of that work. Backlog refers to expected future revenues under signed contracts and letters of intent which management has determined are likely to be performed. During the course of a project, the backlog is adjusted to take account of alterations to the scope of work under approved variation orders and contract extensions. Although backlog represents only business that we consider to be firm, cancellations, delays or scope adjustments have occurred in the past and are likely to occur in the future. For example, one offshore construction project was recently cancelled due to an exploration and appraisal well was found to be dry. In this case, the customer paid our costs as incurred and a cancellation fee was negotiated but we lost our expected revenue stream. In another case, a construction project has been delayed for 12 months as the customer is awaiting planning permission for a gas treatment plant. In this instance, the backlog relating to the project reflects the expected delay in revenue from 2003 to 2004 and has been adjusted to include additional costs as negotiated with the customer. Due to factors outside our control, such as changes in project scope and schedule, we cannot predict with certainty when or if backlog will be performed.

*Price fluctuations in ship fuel and feed cost may impact our profitability.*

Ship fuel constitutes one of the major operating costs of our parcel tanker fleet and feed to fish accounts for approximately 50% of the total product cost of our fish farming products. Fluctuations in the price of ship fuel and fish feed can have a material impact on our results. Since 1987, the average annual cost of bunker fuel purchased by us has varied between approximately $76 and $144 per ton. In 2002, with an average cost of approximately $144 per ton, ship fuel constituted approximately 20% of total fleet operating costs. The cost in 2002 represented a $5 per ton, or 3.5% increase over the 2001 average. With respect to fish feed, prices can vary substantially because feed producers depend on the price and availability of raw materials such as fish meal and fish oil, which are scarce resources.

Although we seek to pass price fluctuations through to our customers, a significant portion is incurred solely by us and a rise in costs can negatively impact our results. For example, approximately 67% of our total parcel tanker revenues in 2002 were derived from long-term contracts of affreightment. About 42% of this revenue related to contracts of affreightment that were exposed to bunker fuel price fluctuations. The significance of these supply costs to our overall costs and the limitations on our ability to pass these costs on to our customers can cause fluctuations in the price of these materials to affect our profitability.

*We may be liable to third parties for the failure of our joint venture partners to fulfill their obligations.*

Under some of the joint venture agreements in our offshore service business, we and our partners are jointly and severally liable to the customer for the performance of the contract. If our joint venture partner in such arrangement fails to fulfill its obligations, we could have to carry the resultant liability toward the customer and would have to rely on our ability to obtain reimbursement from our joint venture partner. If our joint venture partner became insolvent or ceased operations, this might not be possible.

*Adverse weather and other natural conditions may impact our results.*

A substantial portion of our revenue from our offshore services business has been generated from work performed in the North Sea and North America. Adverse weather conditions during the winter months in these regions usually result in low levels of activity. Additionally, during other periods of the

year, we may encounter adverse weather conditions such as hurricanes or tropical storms in the Gulf of Mexico. During periods of curtailed activity due to adverse weather conditions, we continue to incur operating expenses, but our revenues from operations are delayed or reduced. As a result, full-year results are not likely to be a direct multiple of any particular quarter or combination of quarters.

Our fish farming operations may be adversely affected from time to time by climactic conditions, such as severe storms, flooding, dry spells and changes in water temperature or salinity, and may be adversely affected by natural or man-made calamities, such as oil spills. Because the growth rates of fish are dependent on weather conditions, unexpectedly hot or cold temperatures may adversely impact growth rates, harm the fish and lead to losses of fish. Bad weather may also delay harvest or result in the loss of equipment or fish. Storms and floods can also cause damage to facilities involving an interruption in the water supply or seaweed blockages, which may lead to a loss of fish.

Our fish farming operations also may be adversely affected by other natural conditions such as algae blooms (intensive and sudden blooms of algae that occur naturally in the marine environment), pollution, disease, parasites and natural predators, such as sea lions, seals and predatory birds. Although we use antibiotics and other chemical substances to control diseases and parasites and use farm management to control the impact of natural predators, if these precautions are not successful we could suffer losses to our fish stock, thereby reducing our revenues and resulting in possible losses. In certain instances, healthy fish may need to be culled, for example, under mandate from government authorities or voluntarily as part of an effort to control disease outbreak in the local farming area. Additionally, new diseases or parasites could emerge in a farming environment for which we do not currently have adequate countermeasures.

*Our international operations expose us to changes in foreign regulations and other risks inherent to international business, any of which could affect our operating results.*

Our operations in the emerging markets in South America, Asia-Pacific and Southern Europe/ Africa/Middle East regions present risks including:

- economic instability, which could make it difficult for us to anticipate future business conditions in these markets;

- political instability, which could discourage investment and complicate our dealings with governments;

- boycotts and embargoes that may be imposed by the international community on countries in which we operate;

- requirements imposed by local governments that we use local suppliers or subcontractors which may not be able to perform as required;

- labor unrest;

- disruptions due to civil war, election outcomes, shortages of commodities, power interruptions or inflation;

- the imposition of unexpected taxes or other payments on revenues; and

- the introduction of exchange controls and other restrictions by foreign governments.

*Our international operations expose us to the risk of fluctuations in currency exchange rates.*

Substantial portions of our revenue and expenses are denominated in currencies other than U.S. dollars. Consequently, exchange rate movements between the U.S. dollar and the Euro, the Norwegian kroner, the Canadian dollar, the Singapore dollar, the Japanese yen and other currencies can have a significant impact on our financial results. We do not attempt to hedge foreign earnings that are translated into dollars for reporting purposes. Foreign currency fluctuations have had and will continue to have an impact on reported financial results.

13

*We depend on certain significant customers and long-term contracts and the loss of one or more significant customers or the failure to replace or enter into new long-term contracts could adversely affect our operating results.*

In 2002, Shell accounted for 10% of our consolidated net operating revenue with TotalFinaElf and British Gas each accounting for 5% of our consolidated net operating revenue. In 2001, TotalFinaElf accounted for 11% of our consolidated net operating revenue, while Shell and British Gas accounted for 4% and 2%, respectively, of our consolidated net operating revenue. During 2002 and 2001, Stolt Offshore's ten largest customers accounted for 34% and 32%, respectively, of our consolidated net operating revenue, and over that period seven customers, including Shell, TotalFinaElf, British Gas, BP, Statoil, Petrobras and Norsk Hydro consistently numbered among Stolt Offshore's ten largest customers. Revenues from our largest customers are often related to specific long-term contracts that upon completion may not be replaced by contracts of equivalent size. In 2002 and 2001, approximately 44% and 34%, respectively, of our consolidated net operating revenue was derived from long-term contracts. Our inability to replace significant long-term projects on similar terms or the loss of any one or more of our significant customers or a substantial decrease in demand by our significant customers could result in a substantial loss of revenues which could have a material adverse effect on us.

*We could be adversely affected if we fail to keep pace with technological changes, and changes in technology could result in write-downs of assets.*

Our offshore services customers are constantly seeking to develop oil and gas fields in deeper waters. To meet our customers' needs, we must continuously develop new, and update existing, technology for the installation, repair and maintenance of offshore structures. In addition, rapid and frequent technology and market demand changes can often render existing technologies obsolete requiring substantial new capital expenditures and/or write-downs of assets. Our failure to anticipate or to respond adequately and timely to changing technology, market demands and/or customer requirements could adversely affect our business, particularly our offshore services business, and financial results.

*We are exposed to substantial hazards and risks that are inherent to the industries in which we operate, which may result in the loss of revenues, increased expenses, or for which the liabilities may potentially exceed our insurance coverage and contractual indemnity provisions.*

The operation of ocean-going ships and offshore services carry an inherent risk of personal injury or death, damage to or loss of property or business interruptions. These risks can arise from, for example: marine disasters, such as collisions or other problems involving our ships or other offshore equipment; oil spills or leaks involving offshore projects in which we participate; pollution caused by leaks or spills of chemicals or other products transported by our bulk liquid transportation business; injuries, death or property damage caused by mechanical failures involving our equipment or human error involving our employees; war or other hostilities affecting our operations; piracy or hijackings involving our ships or offshore oil and gas projects in which we participate; explosions and fires involving the chemical or other liquid products that we transport or our equipment; and other circumstances or events.

We insure for liability arising from our operations, including loss of or damage to third-party property, death or injury to employees or third parties and statutory workers compensation protection. There can be no assurance, however, that the amount of insurance we carry is sufficient to protect us fully in all events, that any particular claim will be paid or that we will be able to procure adequate insurance coverage at commercially reasonable rates in the future. A successful liability claim for which we are underinsured or uninsured could have a material adverse effect on us. Litigation arising from any such event may result in our being named a defendant in lawsuits asserting large claims. Any such event may result in loss of revenues, increased costs or future increased insurance costs.

While we currently insure our ships against property loss due to a catastrophic marine disaster, mechanical failure, or collision, the loss of any ship as a result of such an event could result in a substantial loss of revenues, increased costs, and other liabilities in excess of available insurance and could have a material adverse effect on our operating performance.

Stolt Offshore generally seeks to obtain indemnity agreements whenever possible from its customers requiring those customers to hold Stolt Offshore harmless in the event of structural damage, loss of production or liability for pollution that originates below the water surface. Such contractual indemnification, however, does not generally cover liability resulting from the gross negligence or willful misconduct of, or violation of law by Stolt Offshore's employees or subcontractors. Additionally, if Stolt Offshore suffers a loss for which it is entitled to indemnity, Stolt Offshore is dependent on its customer's ability to satisfy its indemnity obligation. If the customer cannot satisfy its obligation, Stolt Offshore could suffer losses.

*Our failure to comply with environmental and other regulations may result in significant fines, penalties, or the loss of revenue.*

We operate in a number of different jurisdictions and are subject to and affected by various types of governmental regulation and rules of industry associations related to the protection of the environment, including but not limited to national laws and regulations and international conventions relating to ship safety and design requirements, disposal of hazardous materials, discharge of oil or hazardous substances, food safety, marketing restrictions and various import and export requirements. Any changes in government regulation can have a significant impact on our production costs and on our ability to compete effectively in the regulated markets. While we maintain environmental damage and pollution insurance, more stringent environmental regulations may result in significant fines and penalties for non-compliance, increased costs for, or the lack of availability of, insurance against the risks of environmental damage or pollution. The U.S. Oil Pollution Act of 1990 ("OPA '90"), by imposing virtually unlimited liability upon ship owners, operators, and certain charterers for certain oil pollution accidents in the U.S., has made liability insurance more expensive and has also prompted insurers to consider reducing available liability coverage. While we maintain insurance, there can be no assurance that all risks are adequately insured against particularly in light of the virtually unlimited liability imposed by OPA '90, that any particular claim will be paid, or that we will be able to procure adequate insurance coverage at commercially reasonable rates in the future. Because we maintain mutual insurance, we are subject to funding requirements and coverage shortfalls in the event claims exceed available funds and reinsurance and to premium increases based on prior loss experience. Any such shortfalls could have a material adverse impact on us.

Our operations involve the use, storage and disposal of chemicals and other hazardous materials and wastes. We are subject to applicable federal, state, local and foreign health, safety and environmental laws relating to the protection of the environment, including those governing discharges of pollutants to air and water, the generation, management and disposal of hazardous materials and wastes and the cleanup of contaminated sites. In addition, some environmental laws, such as the U.S. Superfund law, similar state statutes and common laws, can impose liability for the entire cleanup of contaminated sites or for third-party claims for property damage and personal injury, regardless of whether the current owner or operator owned or operated the site at the time of the release of contaminants or the legality of the original disposal activities. In November 2001, SNTG sold its tank storage terminals in Perth Amboy, NJ and Chicago, IL. Under the terms of the sale agreement we have retained responsibility for certain environmental contingencies, should they arise during the covered period which generally ends two years after the closing date, in connection with these two sites. As of November 30, 2002, we have not been notified of any such contingencies having been incurred and we do not anticipate any such contingencies being incurred in the future.

15

*The U.S. Internal Revenue Service ("IRS") may rule that our shipping operations do not qualify for exemption from U.S. income taxes.*

Pursuant to the U.S. Internal Revenue Code (the "Code"), effective for our fiscal years beginning on or after December 1, 1987, U.S. source income from the international operation of ships is generally exempt from U.S. tax if the company operating the ships meets certain requirements. Among other things, to qualify for this exemption, the company operating the ship must be incorporated in a country which grants an equivalent exemption to U.S. citizens and corporations and whose shareholders meet certain residency requirements. The IRS has agreed that we qualify for this exemption for years up to and including fiscal 1992, but may review our qualifications for subsequent years. We believe that substantially all of SNTG's ship owning and ship operating subsidiaries meet the requirements to qualify for this exemption from U.S. taxation. For these reasons, no provision for U.S. income taxes has been made with respect to SNTG's U.S. source shipping income.

In August 2002, the Treasury Department published re-proposed regulations interpreting Code section 883, which superseded and replaced the regulations initially proposed in February 2000. At this time, it is unclear when re-proposed regulations will be finalized and whether they will be finalized in their present form. If published in their present form, however, the re-proposed regulations may adversely affect our ability to qualify for this exemption. Based upon information available at this time, we believe that the Company satisfies the requirements necessary to continue to qualify for the exemption under Code section 883 and, in addition, may qualify for a treaty exemption. However, if an equivalent exemption were not available, or if we did not qualify for a treaty exemption, we would be taxable on our U.S. source income from shipping activities in one of two ways. Generally, income subject to U.S. taxation would include 50% of the revenues derived from shipments between the U.S. and foreign ports. This would include our share of all such income from the Stolt Tankers Joint Service ("STJS"). Under the first method, if the company operating the ship has any such income which is "effectively connected" with a U.S. trade or business, such "effectively connected" U.S. source shipping income, net of applicable deductions, would be subject to U.S. taxation imposed at graduated rates up to 35%. In addition, this income, as determined after allowance for certain adjustments, may be further subject to the 30% "branch profits" tax on earnings effectively connected with such U.S. trade or business. Under the second method, any such income which is not "effectively connected" with a U.S. trade or business would be subject to taxation on a gross basis (without allowance for deductions) at a tax rate of 4%. The branch profits tax would not apply to income subject to the 4% tax.

*Our reputation and our ability to do business may be impaired by corrupt behavior by our employees or agents of us or our subsidiaries.*

We and our subsidiaries conduct business in countries known to experience governmental corruption. While we and our subsidiaries are committed to conducting business in a legal and ethical manner, there is a risk that our employees or agents may take actions that violate the U.S. Foreign Corrupt Practices Act, legislation promulgated pursuant to the 1997 OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, the International Emergency Economic Powers Act, the Trading With the Enemy Act, the Export Administration Act, including antiboycott laws, various economic sanctions regulations and export controls that restrict trade with certain designated countries and persons, or other applicable laws and regulations. Such violations could result in monetary or other penalties against us or our subsidiaries and could damage our reputation and, therefore, our ability to do business.

*We guarantee certain obligations of our subsidiaries.*

It is customary in the industries in which we operate to provide clients with bonding lines and performance guarantees supporting contracts executed by our subsidiaries. If our subsidiaries default on these performance obligations under the bonding lines, we will be obligated to reimburse customers or

pay damages to the client. In the aggregate, these agreements represent a material contingent liability. In addition, the liquidity of our businesses may be affected by the availability of these bonding lines.

*Our operating results, reported debt levels and financing availability may be impacted if we are unable to restructure our synthetic lease arrangements.*

In addition to our on-balance sheet borrowings and available credit facilities, and as part of the overall financing and liquidity strategy, we have sold twelve parcel tankers to a variable interest entity with 3% of contributed outside equity, which was established for the sole purpose of owning the ships. The ships are mortgaged by the variable interest entity as collateral for the related financing arrangement. The holders of the financing arrangement retain the risk and reward, in accordance with their respective ownership percentage. The ships were leased by the variable interest entity to one of our subsidiaries, for a maximum term of four and a half years. As of November 30, 2002, the remaining payments under the lease agreement were $89.3 million and are reflected as operating lease commitments in our Consolidated Financial Statements. Under new accounting rules that we will adopt beginning in our fourth quarter of 2003, we believe that we will be required to consolidate the entity in our financial statements as of the beginning of the fourth quarter of fiscal 2003. If we are unable to restructure these arrangements, the resulting accounting may increase our net property, plant and equipment and our total debt and decrease our operating profit. Such an increase in our total debt could negatively affect our compliance with the financial covenants of our bank debt or cause additional restrictions on the amount of funds available for us to borrow.

*The Stolt-Nielsen family exercises a controlling influence over matters requiring shareholder approval, which could prevent a change of control.*

As of April 30, 2003, the Stolt-Nielsen family, directly and indirectly, controlled approximately 60% of the outstanding shares of Stolt-Nielsen entitled to vote generally on matters brought to a vote of shareholders of Stolt-Nielsen. Refer also to "Item 7. Major Shareholders and Related Party Transactions — Major Shareholders" for further discussion.

The Stolt-Nielsen family currently exercises a controlling influence over our operations and has sufficient voting power to control the outcome of matters requiring shareholder approval including: the composition of our Board of Directors which has the authority to direct our business and to appoint and remove our officers; approving or rejecting a merger, consolidation or other business combination; raising future capital; and amending our Articles of Incorporation which govern the rights attached to our common shares. This control may also make it difficult to take control of Stolt-Nielsen without the approval of the Stolt-Nielsen family. Additionally, the interests of the Stolt-Nielsen family may conflict with those of other shareholders.

*Our Articles of Incorporation impose restrictions on the ownership of our securities.*

Our Articles of Incorporation state that no one U.S. person (defined to include any person who is a citizen or resident of the United States, a corporation organized under the laws of the United States and certain other entities and their affiliates and associates) may own, directly or indirectly, more than 9.9% of our total outstanding shares at any time. In addition, the Articles provide that all shareholders of any single country may not own, directly or indirectly, more than 49.9% of our outstanding shares, and no person may own, directly or indirectly, more than 20% of our outstanding shares unless a majority of our Board of Directors shall have authorized such shareholding in advance. The Board of Directors may take remedial action if it determines that we are threatened with "imminent and grave damage" (as defined in the Articles). We have been advised by our Luxembourg counsel, Elvinger, Hoss & Prussen, that there are no Luxembourg judicial interpretations of such phrase, but that situations involving hostile takeovers, adverse tax consequences to us or governmental sanctions are likely to be among the situations covered by that phrase. These defensive measures may have the effect of making more difficult a merger involving us, or a tender offer, open-market purchase program or

other purchase of our shares, in circumstances that could give shareholders the opportunity to realize a premium over the then prevailing market price for their shares.

*It may be difficult to enforce a U.S. judgment against us, our officers and our directors or to assert U.S. securities laws claims in Luxembourg or serve process on our officers or directors.*

We are a corporation organized under the laws of Luxembourg. Several of our directors and officers reside and maintain most of their assets outside the United States and it may not be possible to effect service of process within the United States on us or on such persons, or to enforce against us or them in U.S. courts judgments obtained in such courts based on the civil liability provisions of the U.S. federal securities laws. We have been advised by Elvinger, Hoss & Prussen, our Luxembourg counsel, that there is substantial doubt as to whether the courts of Luxembourg would (1) enforce judgments of U.S. courts obtained in actions against us or such directors and officers based on the civil liability provisions of the U.S. federal securities laws or (2) entertain original actions brought in Luxembourg against us or such directors and officers predicated solely upon the civil liability provisions of the U.S. federal securities laws. There is no treaty in effect between the United States and Luxembourg providing for such enforcement, and there are grounds upon which Luxembourg courts may choose not to enforce judgments of U.S. courts. Certain remedies available under the U.S. federal securities laws would not be enforced by Luxembourg courts as contrary to that nation's public policy.

**Other Matters**

Our consolidated financial statements for the years ended November 30, 2001 and 2000 included in this Form 20-F were audited by Arthur Andersen LLP ("Arthur Andersen"), which issued an audit report dated January 30, 2002 on these consolidated financial statements.

On July 24, 2002, the board of directors approved the audit committee's recommendation that Deloitte & Touche LLP be appointed as our independent public accountant. Arthur Andersen was terminated as our independent public accountant effective July 31, 2002. Pursuant to Luxembourg law requiring that the decision to appoint new auditors be subject to the approval of our shareholders, on October 17, 2002 at an extraordinary general meeting of shareholders, the shareholders approved the decision to appoint Deloitte & Touche LLP as our independent public accountant. Both the engagement partner and manager for our audit are no longer with Arthur Andersen and Arthur Andersen has ceased practicing before the Securities and Exchange Commission. As a result, we have been unable to obtain after reasonable efforts written consent of Arthur Andersen to the inclusion of its audit report in this Form 20-F.

Under these circumstances, Rule 437a under the Securities Act of 1933, as amended, permits us to file this Form 20-F, which is incorporated by reference into our previously filed registration statements, without a written consent from Arthur Andersen. Because Arthur Andersen has not consented to the inclusion of its audit report, investors may be limited in their ability to assert claims against Arthur Andersen under Section 11(a) of the Securities Act of 1933, as amended, for any untrue statement of a material fact, or omission of a material fact required to be stated, in the financial statements audited by Arthur Andersen. Therefore, investors may be limited in their ability to recover under the federal securities laws.

## Item 4. Information on the Company

## History and Development of Stolt-Nielsen

Stolt-Nielsen S.A. was incorporated in Luxembourg in 1974 as the holding company for all of the group's activities. Our registered office is located at 23, avenue Monterey, L-2086 Luxembourg and we are registered at the Companies' Register of the Luxembourg District Court under the designation "R.C. Luxembourg B.12.179". Our principal executive offices are c/o Stolt-Nielsen Limited, Aldwych House, 71-91 Aldwych, London WC2B 4HN, England; telephone number 44-207-611-8960; internet address www.stolt-nielsen.com. Our agent for U.S. federal securities law purposes is Stolt-Nielsen Inc., 8 Sound Shore Drive, P.O. Box 2300, Greenwich, Connecticut, U.S. 06836.

We have 91 offices and facilities, and employ approximately 13,000 persons worldwide as of November 30, 2002.

### *Recent Significant Developments*

#### *Stolt-Nielsen Transportation Group*

In 2002, we became aware of information that caused us to undertake an internal investigation regarding potential improper collusive behavior in our parcel tanker and intra-Europe inland barge operations. Consequently, we determined to voluntarily report conduct to the Antitrust Division of the U.S. Department of Justice and the Competition Directorate of the European Commission. On February 25, 2003, we announced that SNTG had been conditionally accepted into the Department of Justice's Corporate Leniency Program in connection with possible collusion in the parcel tanker industry. We also announced that the European Commission had admitted SNTG into its Immunity Program with respect to deep-sea parcel tanker and intra-Europe inland barge operations. Further details regarding these investigations and related legal proceedings are included in Item 3. "Risk Factors" and Item 8. "Legal Proceedings".

Additionally, on May 21, 2003 we announced that we were subject to an ongoing investigation by OFAC regarding past transactions relating to Iran. Further details regarding this investigation and related legal proceedings are included in Item 3. "Risk Factors" and Item 8. "Legal Proceedings".

#### *Stolt Offshore*

On December 3, 2002, SOSA made a capital contribution of $12.0 million in cash to the NKT Flexibles I/S joint venture. At the same date NKT Flexibles I/S repaid an outstanding loan for $12.0 million due to SOSA.

In the first quarter of the fiscal year 2003, one of SOSA's West African projects has suffered a disruption due to a strike at a subcontractor's yard and the hijacking of a chartered survey vessel. The extent to which the impact of these events will be borne by SOSA is currently under negotiation with the customer.

On February 28, 2003, SOSA made a drawdown of $48 million against the $50 million liquidity line provided by Stolt-Nielsen as discussed in Note 14 to our Consolidated Financial Statements. The $48 million drawdown was repaid within seven days.

On March 10, 2003 SOSA made the final payment to NKT Holding A/S of $13.5 million in respect of the settlement of the outstanding share price guarantee in respect of the remaining 879,121 Common Shares of Stolt Offshore owned by NKT Holdings A/S, which were issued as partial consideration in the acquisition of 49% of the NKT Flexibles I/S joint venture in December 1999.

On March 17, 2003, Tom Ehret joined Stolt Offshore as Chief Executive Officer. A new Chief Financial Officer, Stuart Jackson, joined Stolt Offshore in April, 2003.

19

In early 2003, Stolt Offshore's new senior management team began a review of its major projects and identified substantially poorer than anticipated performance and cost overruns on three major projects and several smaller projects. In addition, it is expected that activity levels will be slightly lower than previously anticipated. As a result of these factors, we expect to incur significant losses in the 2003 fiscal year. A substantial portion of these losses will be incurred in the second quarter of 2003. The specific reasons for the increased losses include:

- Burullus Scarab Saffron, the first deepwater project of its type in offshore Egypt which is now completed, where a further downgrade has been identified to provide for additional ship utilization days, poor performance of nominated sub-contractors and delays in claim resolution.

- OGGS, in the harsh operating environment of Nigeria and now 80% completed, where forecasted costs have increased mainly due to additional ship utilization days and higher than estimated local support costs in West Africa.

- Bonga, also offshore Nigeria, where the project is 50% complete, forecasted costs have increased due to higher project management and engineering, procurement and sub-contractor, and transport and logistics costs.

- On smaller projects, where provisions are likely to be made in respect of risk on collection of receivables, lower activity levels and lower ship utilization.

In early 2003 Stolt Offshore amended the financial covenants contained in its primary credit facilities to more appropriately reflect Stolt Offshore's financial prospects at that time. Based on those amendments, we expected that there would be a narrow margin of compliance with the financial covenants throughout the 2003 fiscal year. In light of the revised earnings expectations described above, we are working closely with Stolt Offshore's main banks in seeking to amend Stolt Offshore's primary credit facilities to reflect Stolt Offshore's current financial position, including obtaining a waiver of certain financial covenant tests until November 30, 2003. As an interim step, Stolt Offshore's banks have agreed to a 30-day "standstill" through June 30, 2003 whereby they will take no actions on any potential noncompliance with the financial covenants while internal bank approvals are sought and documentation is completed. Without a waiver of certain financial covenants, Stolt Offshore would be out of compliance with its primary credit facilities. If we cannot reach final agreement with Stolt Offshore's bank lenders on the terms of amendments and/or waivers to Stolt Offshore's primary credit facilities, Stolt Offshore's noncompliance with its primary credit facilities could potentially lead to the credit facilities being repayable on demand. Stolt Offshore would not be able to repay these facilities on demand, unless an alternative financing source could be arranged.

Additionally, a material default under Stolt Offshore's credit facilities could, in turn, result in a default under one of our bank credit or other financing agreements. If a default were to extend beyond the applicable remedy or cure period under either Stolt Offshore's or our credit facilities, the financing agreement could become repayable on demand. It is unlikely that we could repay any such facility on demand without selling the assets securing such facility, unless an alternative financing source could be arranged.

*Stolt Sea Farm*

Salmon prices in the first quarter of 2003 compared to the first quarter of 2002 were up 20% to 40%. Spot salmon prices in North America are relatively strong due in part to extreme weather in the Northeast and low volumes from Chile. However, pricing in Europe continues to remain depressed. The important Japanese market was negatively impacted by lower sales volume. The turbot operations in Iberia continue to perform well. At the start of the year we were anticipating only modest growth in Atlantic salmon supply over 2002, and hence we had hope of price improvements in the later part of 2003; however, the latest data indicate that supply growth may be larger than at first anticipated,

particularly in Europe, and so price increases may not materialize. In addition, the SARS outbreak in Asia has dampened demand in certain markets such as Hong Kong and Singapore.

*Optimum Logistics*

In April 2003, we sold substantially all of the assets of Optimum Logistics Ltd. ("OLL") to Elemica. Under the terms of the agreement, Elemica acquired the full technology platform and the ongoing business operations of OLL. SNTG will continue to be a customer of the Elemica network.

### Capital Expenditures

Capital asset expenditures by business over the last three years are summarized below. There were no significant divestitures during the three year period.

|  | 2002 | 2001 | 2000 |
|---|---|---|---|
|  | (In millions) | | |
| Stolt-Nielsen Transportation Group: | | | |
| Tankers | $ 17 | $ 43 | $150 |
| Tank Containers | 3 | 9 | 27 |
| Terminals | 19 | 58 | 29 |
| Total Stolt-Nielsen Transportation Group | 39 | 110 | 206 |
| Stolt Offshore | 55 | 63 | 62 |
| Stolt Sea Farm | 29 | 26 | 12 |
| Corporate and Other | — | 4 | 6 |
| Total Stolt-Nielsen | $123 | $203 | $286 |

In addition, the cash costs of acquisition of subsidiaries, net of cash acquired, amounted to $2 million (primarily for Stolt Sea Farm), $81 million (primarily for Stolt Sea Farm), and $120 million (primarily for Stolt Offshore) in 2002, 2001, and 2000, respectively. These exclude non-cash costs for acquisitions of $9 million and $265 million in 2001 and 2000, respectively.

Projected capital asset expenditures for 2003 amount to approximately $155 million comprised of $62 million for SNTG, $42 million for Stolt Sea Farm and $50 million for Stolt Offshore.

SSF commenced construction of the Cape Vilano turbot plant in Spain in 2002. The new plant will add capacity ultimately to harvest 1,000 metric tons of turbot per year. Turbot has provided SSF with consistently good operating margins and returns on capital in the last five years. The net cost of the project after regulatory grants is projected to be approximately $8.5 million, with approximately $1.5 million spent to date. Construction is expected to be complete in 2003 and the first harvests are expected in 2005.

### Asset Dispositions

In 2002, proceeds from sale of assets were $158 million, including $98 million for 12 chemical parcel tankers subsequently leased back, $30 million for tank containers also subsequently leased back, $24 million for Stolt Offshore, including the sale of Big Inch Marine Systems, Inc., and $6 million for other SNTG assets. In 2001, proceeds from the sale of assets were $77 million, including $70 million for the sale of tank storage terminals in Perth Amboy, NJ and Chicago, IL and $6 million for Stolt Offshore. In 2000, proceeds from the sale of assets were $72 million including $50 million for tank containers that were leased back and $19 million for Stolt Offshore.

**Business Overview**

*General*

We are a holding company which, through our subsidiaries, is engaged in: the worldwide transportation, storage, and distribution of bulk liquid chemicals, edible oils, acids, and other specialty liquids; offshore construction services including design, procurement, building, installation and servicing of a range of offshore surface and subsurface infrastructure for the global oil and gas industry; and aquaculture which is the production, marketing, and distribution of farmed fish. In 2002, we had two Internet-based businesses, one focused on bulk logistics, which was sold in April 2003, and the other on procurement for ship owners and operators.

***Description of Business Segments***

*Stolt-Nielsen Transportation Group*

The transportation business is carried out through Stolt-Nielsen Transportation Group Ltd., which represented approximately 34% of our 2002 net operating revenue, and approximately 48% of total assets as of November 30, 2002.

SNTG is engaged in the worldwide transportation, storage, and distribution of bulk liquid chemicals, edible oils, acids, and other specialty liquids. These products are carried on worldwide sea borne trade routes for the producers, refiners, and distributors of such products, as well as for trading, end-manufacturing, and industrial companies. Several of SNTG's largest customers are among the world's major chemical companies. Parcel tankers and tank containers carry similar products with parcel tankers typically used to transport cargo lots greater than 150 metric tons, while tank containers are typically more economical for the transportation of smaller cargo lots. SNTG's terminal operations facilitate the turnaround of its parcel tankers. The different operations of SNTG share many of the same customers and employ many of the same chemical handling and cleaning technologies. While the parcel tanker operations remain SNTG's single largest activity, the expansion of its tank container operations and storage and distribution services has increasingly enabled SNTG to provide integrated logistics solutions for its customers' transportation requirements. SNTG offers fully integrated transport and logistic services including intercontinental parcel tanker, coastal parcel tanker, river parcel tanker, tank container, rail, and storage.

*Parcel Tanker Operations*

SNTG has been a pioneer in the parcel tanker industry, an industry which derives its name from our first operating company, Parcel Tankers Inc. ("PTI"), which was incorporated in 1959. PTI subsequently changed its name to Stolt-Nielsen Transportation Group Ltd. SNTG is one of the largest operators of parcel tankers in the world. As of April 30, 2003, SNTG marketed a fleet of 126 parcel tankers, product tankers, and river tankers ranging in size from approximately 1,200 to 40,000 deadweight tons ("dwt") (of which 67 were over 10,000 dwt), and totaling approximately 2.1 million dwt. Of the 126 tankers, 63 ships provide intercontinental service, 26 ships provide regional service and 37 ships provide inland or river service.

The parcel tanker industry occupies a market niche in the worldwide tanker trade and represents only about 5% of the dwt of the international tanker fleet. Unlike crude oil tankers which, generally load a full cargo at one port for one customer and discharge at one destination, parcel tankers, as the name implies, carry many cargoes (as many as 58 parcels) for many customers on the same voyage and load and discharge cargo at many ports. A parcel tanker may carry a wide range of bulk liquids shipped in parcels of several hundred to several thousand tons each.

To facilitate handling of the diverse range of products carried by parcel tankers, the fleet is comprised of highly specialized ships. SNTG's sophisticated intercontinental parcel tankers typically

22

have 45 to 58 separate cargo tanks of varying sizes to permit the carriage of up to that number of fully segregated cargoes. The tanks are made of stainless steel or specially coated or lined steel to maintain the integrity of the variety of chemicals and other products carried and to facilitate cleaning. In addition, many tanks have independent heating and cooling systems to provide temperature control for each cargo. The level of sophistication of parcel tankers is reflected in newbuilding costs that are substantially higher than for equivalently-sized product tankers.

SNTG's parcel tanker fleet covers nearly all of the major international trade routes served by the industry. SNTG operates its ships on round-trip voyages with cargo carried on both outbound and inbound legs. These trade routes maximize utilization of ships seldom sailing without cargo.

SNTG operates its major intercontinental services through the Stolt Tankers Joint Service ("STJS" or "Joint Service"), an arrangement for the coordinated marketing, operation, and administration of the fleet of parcel tankers owned or chartered by the Joint Service participants in the deep sea intercontinental market. The Joint Service participants include affiliates and non-affiliates of Stolt-Nielsen. This fleet currently is comprised of 63 parcel tankers totaling approximately 1.8 million dwt. Of these, SNTG owns 41 ships and time-charters two ships for participation in the STJS.

The Joint Service operates seven ships owned by NYK Stolt Tankers, S.A. ("NYK Stolt", 50%-owned by Stolt-Nielsen), one ship owned by Barton Partner Limited, five ships owned by Bibby Pool Partner Limited and two ships owned by Unicorn Lines (Pty) Limited. The STJS currently has five additional tankers on time-charter.

Each ship in the STJS is assigned an earnings factor based upon its cargo carrying capacity and technical capabilities. The profitability of each ship is determined by its share of the STJS results, and not by the specific voyages performed. This enables the management of the STJS to schedule the fleet to optimize its total results.

Effective December 1, 2002, Stolt-Nielsen Transportation Group BV, a company incorporated in the Netherlands and wholly owned by us, commenced as agent for the STJS, entering into contracts with third parties on behalf of the STJS. Prior to this, Stolt Tankers Inc., a Liberian corporation and a wholly owned subsidiary, had been the agent for the STJS. The STJS ships are marketed by SNTG's professional chartering personnel worldwide using proprietary marketing and cargo tracking information systems as part of SNTG's worldwide network of chemical transportation and distribution services. Management believes that SNTG's ships operating in the STJS derive higher utilization, revenues, and profitability than competitors operating outside a similar pooling arrangement.

SNTG also operates tankers in six regional markets, three of which are in conjunction with joint venture partners. The Stolt NYK Asia Pacific Services Inc. ("SNAPS") joint venture operates between East Asia, Southeast Asia, and Australia. The Stolt NYK Australia Pty. Ltd. ("SNAPL") joint venture operates within the Australian coastal and trans-Tasman markets. Both the SNAPS and SNAPL tankers are marketed by SNTG's offices in these areas. The Stolt-Nielsen Inter-Europe Service ("SNIES") operates small tankers in European coastal waters. The Stolt-Nielsen Inland Tanker Service ("SNITS") currently operates 37 inland tankers on the River Rhine and the adjacent Rotterdam Antwerp waterways.

SNTG manages all of its owned ships and employs its own seafarers. For its shipowning activities SNTG has secured International Ship Management Association ("ISMA") Quality Assurance System certification, which includes International Standards Organization ("ISO") 9002 and International Safety Management ("ISM") certifications.

SNTG personnel coordinate most of the marketing and sales efforts directly with SNTG's parcel tanker customers. In some markets third-party brokers support this effort.

23

SNTG's tanker operations make extensive use of information systems for estimating voyages, scheduling cargo, stowing cargo, billing customers, tracking product handling and cleaning requirements, and managing ships. These systems not only control and track the status of each cargo movement but also keep the customer informed through system-generated estimated time of arrival notices. SNTG's Cargo STOW system has won a Windows World Open award for best Microsoft Windows system for distribution companies.

*Tank Container Operations*

The emergence of tank containers as a means of transporting bulk liquids such as chemicals and oils dates back to the early 1970s. Tank containers are stainless steel cylindrical tanks enclosed in rectangular steel frames, with the same outside dimensions as 20 foot dry box containers. They carry 17,000 to 24,000 liters of bulk liquids (16 to 20 tons, depending upon the specific gravity of the product). This compares to the smallest compartment in a parcel tanker which can carry approximately 100,000 liters of bulk liquid. Tank containers can be transported on container ships, rail cars, and trucks.

SNTG entered the tank container business in 1982 when it acquired United Tank Containers, which at the time operated about 400 tank containers. As the market grew, SNTG steadily expanded its tank container fleet through the purchase or lease of newly-manufactured tank containers and through acquisitions. SNTG specializes in making all transportation arrangements from origin to destination on behalf of the shipper, which is known as "door-to-door" shipping. SNTG is one of the largest operators in the door-to-door business, deploying approximately 13,428 tank containers in all major worldwide markets. In addition, approximately 1,958 tank containers are managed on behalf of customers.

There was an improvement in volume of container shipments in 2002. In 2002, SNTG shipped a total of 66,330 tank containers, an 11% increase from shipments of 59,762 tank containers in 2001. Shipments in 2001 reflected an increase of 2% from shipments of 58,624 tank containers in 2000. Shipments from North America and Europe were particularly strong in 2002 in comparison to 2001. Intra-Asian shipments were strong in both 2002 and 2001. We expect SNTG's total tank container shipments to grow 5% to 7% in 2003 as a result of continued strong markets and sales and marketing initiatives in North America, Europe and the Asia Pacific region. Total shipments increased in 2001 over 2000 but declines were experienced in Europe and Japan. As of April 30, 2003, SNTG controls a fleet of approximately 15,386 tank containers of which approximately 4,454 are owned and 10,932 that are leased or managed for customers.

All of SNTG's tank containers are built and maintained to the standards of the International Maritime Organization ("IMO"), the ISO, the U.S. Department of Transportation and other governmental and private organizations. SNTG requires that all of its tank containers be constructed according to, and have valid certificates in accordance with, the International Convention for Safe Containers ("CSC"). SNTG conducts periodic inspections in conformity with CSC and IMO testing requirements to ensure compliance with those safety and trading requirements.

SNTG's tank container operations requires its own infrastructure for tank cleaning and repair. In Europe and the U.S., third-party contractors primarily perform this work. In Rotterdam, Houston, and the Asia Pacific region, SNTG has established its own facilities to ensure high standards of quality, reduce costs, and increase market penetration. The facilities in Japan, China, Taiwan, and Korea are operated through joint ventures.

The business systems of SNTG's tank container operations have received ISO 9002 Certification. SNTG's Move/Quote System is used by the tank container personnel on a worldwide basis to schedule, track, trace and bill for tank container movements.

*Terminal Operations*

SNTG has interests in, investments in or alliances with ten bulk liquid storage terminals. SNTG's terminals offer storage services and distribution to inland waterways and land transportation for more efficient operation and better customer service. SNTG currently owns and operates two tank storage terminals in the U.S. and one in Brazil, with a combined capacity of approximately 3.4 million barrels of liquid storage. Each of these terminals serves as a hub for the regional storage and distribution of liquid chemicals, vegetable oils, and other products, providing storage and handling services to SNTG's parcel tankers and tank containers and for third parties.

SNTG has completed the first phase of the construction of a tank storage terminal located in Braithwaite, Louisiana with a storage capacity of approximately 0.8 million barrels of liquid storage and associated ship, rail and trucking facilities at a total cost of approximately $55 million. The Braithwaite terminal became operational in mid-2001. The terminal was 48% completed with a total of 405,000 barrels operational at the end of 2001, with the balance of 444,000 barrels completed during the first quarter of 2002. Construction of the second phase began in November 2002. An additional 7 tanks will be added with storage capacity of 290,000 barrels. The expected completion date is the third quarter of 2003.

SNTG's terminal operations also have interests in three ventures, with a combined storage capacity of 4.7 million barrels: (i) a 40% interest in Stolthaven Westport Sdn. Bhd., a joint venture with the Bolton Group in Malaysia; (ii) a 37% interest in Dovechem Stolthaven Ltd. (formerly Dovechem Terminal Holdings Ltd.), a publicly-traded company listed on the Singapore Stock Exchange, with terminals and drum manufacturing interests in China, Singapore, and Malaysia; and (iii) a 50% interest in Jeong-IL Stolthaven Ulsan Co. Ltd. which has a terminal facility in Ulsan, South Korea. SNTG also has an arrangement with subsidiaries of Vopak pursuant to which it has preferential berthing rights to two terminals located in Rotterdam, which is SNTG's parcel tanker operations' most frequently called port.

The following table contains information on SNTG's terminals as of April 30, 2003:

| Storage Location | % Holding | Year Acquired | Capacity (barrels) |
|---|---|---|---|
| Houston, Texas . . . . . . . . . . . . . . . . . . . . . | 100% | 1982 | 2,183,500 |
| Braithwaite, Louisiana . . . . . . . . . . . . . . . | 100% | 2001 | 849,000 |
| Santos, Brazil . . . . . . . . . . . . . . . . . . . . . | 100% | 1982 | 349,400 |
| Sub Total . . . . . . . . . . . . . . . . . . . . . . . | | | 3,381,900 |
| Joint Ventures | | | |
| Westport, Malaysia . . . . . . . . . . . . . . . . | 40% | 1998 | 417,000 |
| Kuantan, Malaysia . . . . . . . . . . . . . . . . | 10% | 1999 | 305,000 |
| Shenzen, China . . . . . . . . . . . . . . . . . . | 26% | 1998-2000 | 639,600 |
| Shanghai, China . . . . . . . . . . . . . . . . . . | 26% | 1998-2000 | 416,300 |
| Ulsan, South Korea . . . . . . . . . . . . . . . | 50% | 1999 | 2,881,600 |
| Sub Total . . . . . . . . . . . . . . . . . . . . . . . | | | 4,659,500 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . | | | 8,041,400 |

SNTG currently holds the ISO 9002 certification for its terminal business systems in Houston and Santos. SNTG implemented a Terminal Automation System for tracking customer contracts and tank inventory, as well as for producing customer bills and reports.

SNTG also operates a fleet of 357 leased railroad tank cars consisting of general-purpose low-pressure and specialized high-pressure tank cars.

*Stolt Offshore*

The offshore contracting business is carried out through Stolt Offshore (formerly named Stolt Comex Seaway S.A.), a subsidiary in which, as of April 30, 2003 we hold a 63.5% economic interest and a 69% voting interest.

A publicly-traded company since May 1993, Stolt Offshore was established through the merger of the businesses of two leading diving support services companies, Comex Services S.A. ("Comex") and Stolt-Nielsen Seaway A/S, which were acquired by Stolt-Nielsen in separate transactions in 1992. At the time of acquisition, Comex was a leading world-wide subsea services contractor, which pioneered deepwater saturation diving and subsea construction using both manned and unmanned techniques. Stolt-Nielsen Seaway A/S operated principally in the North Sea and pioneered the development and use of specially designed, technologically sophisticated diving support ships and remotely operated vehicles ("ROVs") to support operations in hostile deepwater environments.

In August 1998, Stolt Offshore acquired the Houston-based Ceanic Corporation ("Ceanic"), a publicly traded subsea contractor, for approximately $218.9 million. Ceanic provided a range of subsea services and products to the offshore oil and gas industry in the Gulf of Mexico and inland underwater services to domestic and governmental customers. With this acquisition Stolt Offshore took possession of a substantial fleet of ships mostly designed for shallow water work, ROVs and other related technologies.

The acquisition of Ceanic was strategically important for Stolt Offshore in that it provided access to the growing deepwater construction market in the Gulf of Mexico and the ability to build relationships with Houston-based oil and gas companies who conduct much of their world-wide business from Houston.

On December 7, 1999, Stolt Offshore completed a transaction to form a joint venture entity, NKT Flexibles I/S ("NKT"), a manufacturer of flexible flowlines and risers for the offshore oil and gas industry. NKT is owned 51% by NKT Holdings A/S and 49% by Stolt Offshore. The total consideration for the acquisition was $36.0 million funded partly by cash and partly by Class A shares of Stolt Offshore at a guaranteed value. The Class A shares of Stolt Offshore were subsequently converted to common shares of Stolt Offshore on a one-for-one basis. This acquisition secured the supply of flexible products for Stolt Offshore.

On December 16, 1999, Stolt Offshore acquired the French offshore construction and engineering company ETPM S.A. ("ETPM"), a wholly owned subsidiary of Groupe GTM S.A. ("GTM"). GTM has subsequently been acquired by Groupe Vinci S.A. ("Vinci"). The total consideration for this acquisition, including debt assumed, was approximately $350.0 million, funded partly by cash and partly by 6.1 million Class A shares of Stolt Offshore at a guaranteed value of $18.50 per share. The Class A shares of Stolt Offshore have subsequently been converted to common shares of Stolt Offshore on a one-for-one basis.

ETPM had a significant market position in West Africa, which is now one of the fastest growing markets for Stolt Offshore's services. ETPM also had significant engineering skills in offshore design of both subsea structures and of fixed and floating production platforms, in addition to a fleet of pipelay barges, which broaden Stolt Offshore's range of pipelay capabilities.

On July 18, 2001, Stolt Offshore acquired the Paris-based engineering company Ingerop Litwin from Vinci. On September 4, 2001, Stolt Offshore acquired a controlling interest in the Houston-based engineering company, Paragon Engineering Services, Inc. Stolt Offshore paid a total of $16.7 million of cash for these two companies, $4.3 million of which has been deferred until 2005. These acquisitions, by adding conceptual design and detailed engineering skills, have enabled Stolt Offshore to better undertake all of the engineering required for many of the large engineering, procurement, installation

26

and commissioning ("EPIC") type contracts that are expected to come into the market in the next few years.

Stolt Offshore provides services and products that add value for its customers at all phases of offshore oil and gas field exploration, development and production. Stolt Offshore surveys the seabed and provides other support services for drilling test holes during the exploration phase. When a field is being developed, Stolt Offshore applies its technical expertise and knowledge of regional conditions to offer conceptual and engineering designs for the field. Stolt Offshore also procures or fabricates and installs equipment used in field development. This equipment includes the above-water topsides and platforms used for processing recovered oil and gas, wellheads, pipelines and electrical and hydraulic cables, known as umbilicals, that are used to control subsea wells. The pipelines are used to transport oil and gas underwater and to the production and processing facilities at the surface. They may be steel pipe, referred to as rigid pipe, or of a bonded structure, referred to as flexible pipe, depending on technical requirements, and may be narrow (flowlines) or wide (trunklines) depending on production volumes and pressure. Stolt Offshore also combines its design and fabrication expertise to manage the building of floating facilities (known as FPSOs) that process, store and offload oil and which are used in very deep water where a platform or topside would be impractical. During the time that the field is producing oil or gas, Stolt Offshore inspects, maintains and repairs this equipment. Once the field has been depleted and is to be abandoned, Stolt Offshore provides field decommissioning services which include the removal of offshore structures and equipment.

Stolt Offshore is one of only a few companies that can offer a full range of offshore development and construction services on a global basis. Stolt Offshore's worldwide operations are managed through six regional offices. Stolt Offshore employs approximately 1400 engineering staff in project management and various engineering disciplines worldwide including about 140 conceptual and detailed design engineers. Stolt Offshore has operated in more than 73 countries and currently operates in over 21 countries.

Stolt Offshore has a world class fleet of highly specialized ships, barges and unmanned underwater remotely operated vehicles, or ROVs, deployed in the world's major offshore oil and gas exploration regions, including:

- 8 construction support ships;

- 4 flowline lay ships;

- 6 survey/inspection, repair and maintenance ships;

- 9 anchored construction and maintenance ships;

- 1 heavy lift ship (owned by a joint venture in which Stolt Offshore has a 49% interest);

- 7 pipelay barges;

- 4 tugs and other ships;

- 85 ROVs (6 of which are owned by a joint venture); and

- 6 hardsuits for manned dives.

Projects relating to the engineering and construction of new offshore oil and gas fields, which typically lasts more than one year, accounts for approximately 95% of Stolt Offshore's revenues while work related to the inspection, repair and maintenance of oil and gas fields throughout their time in production accounts for the remaining 5% of revenues.

27

Stolt Offshore's services cover all phases of offshore oil and gas operations, from exploration to decommissioning. Stolt Offshore offers its products and services through the following lines of business:

- *The Pipelay and Engineering, Procurement Installation and Commissioning (EPIC)* business line involves offshore fields where platforms are part of the infrastructure or where there is a large diameter pipeline or a major offshore element of pipeline work. These activities may include platform design and fabrication or tieback projects, which involve pipelaying or pipeline procurement to connect a new production well to an existing structure.

- *The Subsea Construction* business line involves projects where there may be one or more of the following elements: well control umbilical laying; burying rigid or flexible pipelines in the seabed to protect and insulate them (trenching); laying flexible pipelines; installing short pipes that connect other pipelines (jumpers); and/or hyperbaric welding (which is welding performed in a dry atmosphere in an underwater chamber).

- *The Deepwater Development* business line involves large or complex offshore projects where Stolt Offshore has some influence over the architecture of the oil or gas infrastructure and could include the design, manufacturing and installation of flowlines, production risers and other subsea structures.

- *The Floating Production* business line involves the design and management of the building of FPSOs for use in very deep water.

- *The Regional Services* business line handles local business projects including seabed survey and positioning for drill rig location or defining pipeline routes, engineering studies, drilling support, shallow water pipelay or inspection, repair and maintenance operations.

Stolt Offshore also provides field decommissioning services at the end of the working life of an offshore oilfield.

Stolt Offshore offers heavy lift floating crane services through a joint venture company, SHL. SHL charters the heavy lift barge *Stanislav Yudin* from a subsidiary of Lukoil, our joint venture partner in SHL. Stolt Offshore also manufactures flexible flowlines and dynamic flexible risers (which are flexible pipelines from the sea floor to the surface) through the joint venture company NKT, in which it has a 49% interest. The remainder of the joint ventures in which Stolt Offshore has interests have been formed either with a national oil company, such as Sonangol in Angola or on a project-specific basis to enhance the range of services provided to the customer. Stolt Offshore typically has interests ranging from 30% to 55% in these joint ventures.

*Stolt Sea Farm*

Our wholly-owned subsidiary, Stolt Sea Farm Holdings plc., along with its subsidiaries, produces, processes, and markets a variety of high quality seafood products, including Atlantic salmon, salmon trout, turbot, halibut, sturgeon (primarily for caviar), caviar, bluefin tuna, sole and tilapia. The predecessor of SSF was founded by Jacob Stolt-Nielsen in 1972 and acquired by us in late 1991.

SSF produces, processes, and markets a variety of high quality seafood with salmon production sites in Norway, North America, Chile and Scotland; salmon trout production sites in Norway and Chile; tilapia production sites in Canada; turbot production sites in Spain, Portugal, Norway, and France; halibut production sites in Norway; a tuna production site in Australia; and sturgeon and caviar production sites in the U.S. SSF has worldwide marketing operations with sales organizations covering North America, Europe, and Asia Pacific.

Aquaculture is the controlled breeding, growing and harvesting of seafood in a captive environment. We believe that the demand for farmed fish will increase in the long-term. We believe that this demand growth will be supported by a number of trends: individuals are increasingly seeking

healthier products like fish, and the supply of wild catch seems to have reached peak sustainable levels. From being primarily a salmon farming and sales company, SSF has diversified over the years into farming and selling other species, and has built a substantial seafood trading business in the Asia Pacific region. The following table illustrates the balance of these activities in terms of net operating revenue:

|  | 2002 | 2001 | 2000 |
| --- | --- | --- | --- |
|  | (U.S. dollars in millions) | | |
| Atlantic Salmon/Salmon Trout/Coho Farming and Sales: | | | |
| Americas | $139.7 | $130.0 | $146.7 |
| Norway | 66.8 | 76.9 | 77.5 |
| United Kingdom | 17.0 | 15.0 | 15.1 |
| Other Species Farming and Sales: | | | |
| Turbot | 22.4 | 20.8 | 19.2 |
| Tuna | 48.1 | 44.2 | — |
| Halibut | 1.5 | 1.9 | 2.5 |
| Sturgeon | 2.4 | 2.6 | 1.8 |
| Tilapia | 0.2 | 0.2 | 0.3 |
| Other | 0.4 | — | — |
| Sales and Marketing in Asia—Pacific | 188.8 | 113.8 | 91.9 |
| Inter-regional Elimination | (51.8) | (31.0) | (29.0) |
| Total Net Operating Revenue | $435.7 | $374.4 | $326.0 |

In SSF, the growth and harvesting of different fish species, and generations within those species, follow set patterns over the life cycle of the fish. The cycle starts with the build-up of inventory of the species, and ends as the inventory is harvested. These patterns are different for each species, and they do not all coincide. It is not always possible to discern seasonality overall, although there may be occasions when the coincidence of cycles of different species may result in a noticeable fluctuation in production. In northern hemisphere markets for salmon, demand tends to rise in holiday seasons, typically at the end of the year and during spring.

The world's main seafood markets are Asia, North America and Europe. Traditionally, there have been several middle-men between producers and consumers of fresh seafood. The majority of fish farmers do not have their own world wide sales and marketing organizations, and these companies will typically sell their fish to an exporter or a domestic wholesaler, which in turn will sell to importers, wholesalers and distributors, which in turn will sell to food service operators and retailers (restaurants and supermarkets). The overall trend in Europe, North America and Asia seems, with a varying degree of speed and concentration, to be moving toward a consolidation into fewer and larger vertically integrated fish farming companies selling increasing portions of their products directly to food service operators, restaurant chains and supermarket chains. These customers in turn, to an increasing degree, are demanding a higher degree of value added and consumer convenient products.

SSF and its competitors in the aquaculture industry in the last two years have shown some poor financial results, and this has resulted in several competitors coming under severe liquidity pressure. The main cause of the poor results has been the salmon farming sector, with the performance in farming of other species that SSF is involved in on an industrial scale, such as turbot and Southern bluefin tuna, holding up well. SSF's seafood trading activities in general have also held up well. The major factor causing problems for salmon aquaculture has been low prices to the farmers, caused by excessive increases in supply into the market coupled with a slowdown in the rate of increase in demand for the production. The slowdown in the U.S. was mainly due to post September 11, 2001 economic weakness and in Europe was mainly due to weak economies. In addition to weak pricing, the

29

industry in North America has suffered severely in 2002 from extraordinary mortalities, caused by viral and parasitic infections. There are signs that the liquidity problems in the industry, together with lost volumes following diseases, are causing slowdowns or even halts in the growth in supply of salmon, which should lead to an improvement in the demand/supply balance and prices. The salmon produced by the industry have become a commodity over recent years, and so it is anticipated the industry will always be susceptible to swings in production and prices. For this reason SSF has increased its focus on being a cost leading producer, and has reorganized its farming activities in Europe to achieve improved efficiencies. SSF has also reorganized its sales and marketing activities in both Europe and North America in an attempt to capture more of the margin in the supply chain for salmon through to the end consumers, and to increase the value added to the raw material farmed by SSF. We expect the benefits of these initiatives will be felt increasingly over time. SSF is also increasing its exposure in the profitable turbot activities by building a new state of the art facility in Spain to increase its turbot farming capacity by 40%, and continues its development of other non-salmon species which have good profit potential. The development of new species to profitable commercial levels takes time, but we believe that SSF is well placed to lead this process in the industry.

SSF's sales and distribution methods vary from market to market, depending on the nature of the product being sold and the structure of the market in question. Sales may be to wholesalers, distributors, processors, food service organizations or retailers. Most distribution is performed by third party suppliers on behalf of SSF.

In September 2000, SSF purchased Rokerij La Couronne NV, a smoker and processor of salmon and other seafood products.

In September 2000, SSF purchased the remaining 49% of Pacific Aqua Salmon Farmers Ltd. ("PASFL") that it did not own. PASFL is a producer of Atlantic salmon in British Columbia, and SSF acquired its initial 51% interest in the company when it acquired International Aqua Foods Ltd. ("IAF") in 1999. The seller of the 49% interest in PASFL was EWOS Canada Ltd., a subsidiary of Cermaq ASA. The agreement involved SSF acquiring the remaining 49% of the company, while Cermaq ASA acquired the assets and inventory owned by SSF at the Tofino, British Columbia sites.

The total consideration for the aforementioned SSF acquisitions in 2000 was approximately $9 million.

In December 2000, SSF purchased Australian Bluefin Pty Ltd., a company involved in the ranching of Southern Bluefin tuna.

In December 2000, SSF purchased the remaining 49% of Ocean Horizons SA ("OHSA") that it did not own. OHSA is a producer of Atlantic salmon in Chile, and SSF acquired its initial 51% interest in the company when it acquired IAF in 1999.

In February 2001, SSF purchased Harlosh Salmon Limited, a company that is involved in the farming of salmon in Scotland.

In July 2001, SSF purchased the 87.5% of Sociedad Pesquera Eicosal SA ("Eicosal") that it did not own. Eicosal is a producer of Atlantic salmon, salmon trout, and coho in Chile.

In July 2001, SSF purchased the 50% of Ferme Marine de l'Adour ("FMA") that it did not already own. FMA is a producer of turbot in France.

The total consideration for the five aforementioned SSF acquisitions in 2001 was approximately $80 million.

In December 2001, SSF purchased F&B Sales Ltd., a company based in Hong Kong and involved in the trading of seafood, for a total consideration, including debt assumed, of approximately $2 million.

30

*Optimum Logistics*

OLL was established in Bermuda on December 30, 1999. OLL offers an internet-based logistics system for global supply chain management for companies engaged in the bulk materials industries. OLL connects all participants in a producer's supply chain, such as carriers, terminal operators, receivers, surveyors, and freight forwarders. This system, TransLink ("TransLink"), enables OLL's customers to improve the efficiency of their entire supply chains.

OLL has focused its initial technological development and marketing efforts on the market for bulk marine transportation services of the chemicals industry. During 2000, efforts were directed toward the development of logistics products and pilot testing of these products with various chemical producers. In 2001, OLL focused on commercializing the existing technology by developing commercial relationships with a number of multinational chemical companies.

On February 28, 2001, we sold a 19 percent minority interest in OLL to Aspen Technology, Inc. ("Aspen"), a global provider of intelligent decision-support and e-business solutions for process industries.

In 2002, OLL nearly doubled its revenues and cut its costs by more than half as product development is largely complete. In October 2002, OLL finalized an agreement with Elemica, the leading chemical industry consortium. Elemica selected OLL to be its exclusive bulk marine and preferred container marine supply chain execution platform.

In April 2003, the we sold substantially all of the assets of OLL to Elemica. Under the terms of the agreement, Elemica aquired the full technology platform and the ongoing business operations of OLL.

*SeaSupplier*

In early 2000, we established Prime Supplier Ltd., now renamed SeaSupplier Ltd. ("SSL"), which offers an Internet-based total marine procurement system, which makes available products and services needed for marine operations. The system enables ship operators to electronically select, purchase and arrange delivery for all the ship's needs for consumables, spare parts and other services. SSL employs a proprietary supplier and price database to intelligently manage the procurement process, including transportation.

During 2000, SSL did not generate revenues and incurred operating losses and negative operating cash flow. SSL relied on equity and debt financing from us to fund its operations.

In May 2001, SSL acquired the business of OneSea.com Inc., through the sale of a 3% minority interest in SSL to the shareholders of OneSea.com Inc. resulting in the name change to SSL. We maintain a controlling interest of 97% ownership in SSL, which has offices in London, Oslo, Houston, Singapore, Piraeus, and Bermuda.

During 2001 and 2002 SSL incurred operating losses and negative operating cash flow. SSL began to generate internal revenue during the second half of 2001. SSL relied on equity and debt financing from us to fund its operations. The operating expenses were largely associated with software development and employee salaries and benefits.

In October 2001, SSL signed a contract with Seabulk International, and this was followed by contracts with Royal Caribbean Cruise Lines and Teekay Shipping Ltd., both in January 2002. In May 2002, SSL signed a global e-procurement contract with Tokyo based Nippon Yusen Kabushiki Kaisha (NYK Line). SSL started generating external revenue in the first quarter of 2002 and is currently negotiating several new contracts.

31

*Financial Summary of Businesses*

The following table sets out the net operating revenue, income from operations and identifiable assets for each of our businesses for the year ended November 30, 2002:

| | Net Operating Revenue | | Income (Loss) From Operations | Identifiable Assets | |
|---|---|---|---|---|---|
| | | | ($ in Millions) | | |
| Stolt-Nielsen Transportation Group: | | | | | |
| Tankers | $ 692 | 24% | $ 83 | $1,436 | 38% |
| Tank Containers | 228 | 8 | 19 | 118 | 3 |
| Terminals | 58 | 2 | 19 | 274 | 7 |
| Subtotal | 978 | 34 | 121 | 1,828 | 48 |
| Stolt Offshore | 1,437 | 51 | (124) | 1,459 | 39 |
| Stolt Sea Farm | 436 | 15 | (28) | 495 | 13 |
| Corporate and Other | 2 | —* | (18) | 5 | —* |
| Total | $2,853 | 100% | $ (49) | $3,787 | 100% |

---

\* Represents less than 1%.

*Geographic Distribution*

The following table sets out net operating revenue by geographic area for our reportable segments. SNTG net operating revenue is allocated on the basis of the country or region in which the cargo is loaded. Tankers and Tank Containers operate in a significant number of countries. Revenues from specific foreign countries which contribute over 10% of total net operating revenue are disclosed separately. Stolt Offshore net operating revenue is primarily allocated based on the geographic

distribution of its activities. SEAME represents Southern Europe, Africa and the Middle East. SSF net operating revenue is primarily allocated on the basis of the country in which the sale is generated.

| | For the years ended November 30, | | |
|---|---|---|---|
| | 2002 | 2001 | 2000 |
| | ($ in Millions) | | |
| **Net operating revenue:** | | | |
| **Stolt-Nielsen Transportation Group:** | | | |
| Tankers: | | | |
| United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 248 | $ 245 | $ 278 |
| South America . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 70 | 74 | 58 |
| Netherlands . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 39 | 48 | 47 |
| Other Europe . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 116 | 135 | 105 |
| Malaysia . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 68 | 68 | 54 |
| Other Asia . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 109 | 148 | 118 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 97 | 100 | 85 |
| Less commissions, sublet costs, transshipment and barging expenses . . . . . . . | (55) | (63) | (53) |
| | 692 | 755 | 692 |
| | | | |
| Tank Containers: | | | |
| United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 72 | 68 | 80 |
| South America . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9 | 9 | 9 |
| France . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 22 | 22 | 23 |
| Other Europe . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 63 | 54 | 55 |
| Japan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14 | 12 | 16 |
| Other Asia . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 39 | 38 | 39 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9 | 11 | 2 |
| | 228 | 214 | 224 |
| | | | |
| Terminals: | | | |
| United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 49 | 71 | 52 |
| Brazil . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9 | 8 | 7 |
| | 58 | 79 | 59 |
| Total Stolt-Nielsen Transportation Group . . . . . . . . . . . . . . . . . . . . . . | 978 | 1,048 | 975 |
| **Stolt Offshore:** | | | |
| Asia Pacific . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 26 | 39 | 40 |
| North America . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 190 | 277 | 122 |
| Norway . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 106 | 111 | 199 |
| SEAME . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 703 | 520 | 445 |
| South America . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 52 | 50 | 53 |
| United Kingdom . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 230 | 215 | 124 |
| Other Corporate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 130 | 44 | — |
| Total Stolt Offshore . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,437 | 1,256 | 983 |

|  | For the years ended November 30, | | |
|---|---|---|---|
|  | 2002 | 2001 | 2000 |
|  | ($ in Millions) | | |
| **Stolt Sea Farm:** | | | |
| United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 97 | 99 | 123 |
| Canada . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12 | 18 | 17 |
| Chile . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8 | 7 | 1 |
| United Kingdom . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 17 | 19 | 21 |
| Norway . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14 | 19 | 8 |
| Spain . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15 | 14 | 11 |
| Japan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 184 | 138 | 70 |
| Others, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 89 | 60 | 75 |
| Total Stolt Sea Farm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 436 | 374 | 326 |
| **Corporate and Other** | 2 | — | — |
| Total Stolt-Nielsen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $2,853 | $2,678 | $2,284 |

*Seasonality*

SNTG's markets can be impacted by a variety of seasonal factors including unpredictable weather patterns that can disrupt ship operations, increased consumption of oil in the northern hemisphere in the winter months which increases activity in the clean petroleum market, and summer and holiday periods which can result in decreased market activity.

Over the past three years, a substantial proportion of Stolt Offshore's revenue has been generated from work performed in the North Sea and North America. Adverse weather conditions during the winter months in these regions usually result in low levels of activity, although this is less apparent than in the past due to technological advances. As a result, full-year results are not likely to be a direct multiple of any particular quarter or combination of quarters. Additionally, during certain periods of the year, we may be affected by delays caused by adverse weather conditions such as hurricanes or tropical storms in the Gulf of Mexico. During periods of curtailed activity due to adverse weather conditions, we continue to incur operating expenses, but our revenues from operations are delayed or reduced.

The growth rate of certain of Stolt Sea Farm's species, including salmon and salmon trout, is impacted by weather conditions. Excessively cold winters will slow fish eating patterns and thus growth rates. Warmer weather conditions may lead to algae blooms which are harmful for living marine organisms including farmed salmon and salmon trout. The demand for our salmon products, particularly in the Northern hemisphere, is also seasonal with peak demand periods around major holidays, typically at the end of the year and the spring, and the summer grilling season. The bluefin tuna business is a seasonal business which the majority of the harvest and sales typically occurs in our third quarter.

*Raw Materials*

The primary raw material used in SNTG's operations is ship bunker fuel which is subject to volatility primarily due to the fluctuating price of oil. The market for ship bunker fuel is competitive and we source from a number of different suppliers.

We generally do not manufacture the components used in the offshore services that Stolt Offshore provides, but rather supply, assemble and install equipment manufactured by others. Assembly work is performed at our onshore fabrication yards located in Lobito (Angola), Warri (Nigeria), Louisiana

(USA) and Macae City (Brazil). We coordinate our procurement and supply activities on a regional basis with group level management overseeing the procurement and supply function for all of our operations.

The majority of raw materials that Stolt Offshore uses have not been subject to significant price volatility; however, suppliers occasionally levy surcharges on materials to reflect the escalation of fuel prices. We do not believe that long-term contracts for the supply of materials are appropriate as there is often a long lead time from the bid to contract award date, which can expose us to price fluctuations in materials. We may be exposed to increased prices for raw materials on individual contracts. We actively challenge suppliers to offer competitive prices on materials by inviting bids for supply contracts and introducing new suppliers. Over the last year, Stolt Offshore's results have not been significantly affected by increased prices for raw materials.

Feed for fish accounts for approximately 50% of SSF's production cost. Fluctuations in the price could have an impact on SSF's profitability. Although there are a limited number of fish feed suppliers, pricing of fish feed is generally competitive. Natural limitations in the resources of the sea could potentially lead to a shortage of fish feed.

**Strategy and Competitive Strengths**

*Stolt-Nielsen Transportation Group*

SNTG's strategy is to provide a global network to service our customers' every bulk liquid logistic need from door to door throughout the world and to be the low cost provider of such services.

The demand for bulk liquid transportation services varies with patterns of industrial growth and world trade. Historically, such demand has grown at a greater rate than world trade, which itself has grown faster than industrial production.

In 1994, SNTG embarked on a new-building program to construct 25 new parcel tankers (of which one ship was cancelled) designed to meet increasing demand for its transportation services and replace the first generation of purpose-built parcel tankers built in the early to mid-1970s. The last ship in this new-building program was delivered in December 2001. The new ships generally have greater capacity than the units they have replaced and introduce a series of features to increase operational efficiency, reduce operating costs, and be environmentally safer than previous generations of parcel tankers.

SNTG's tank container operations provide transportation services for many of the same type of bulk liquids that are carried in parcel tankers, although tank containers transport smaller lots. A major trend in the tank container market is the conversion from transportation of liquids in drums to tank containers. As tank containers can be reused, the transportation of liquids in tank containers provides a cleaner, safer, and more economical means of transportation than by drums, which typically must be disposed of after only a few uses. It is SNTG's intention to continue to expand its presence in this market in response to the needs of its customers, and to continue to provide an important link in SNTG's transportation service chain. By using tank containers, SNTG is able to offer door-to-door, just-in-time deliveries. In developing countries in the Asia Pacific region where there is little existing support infrastructure for tank containers, SNTG has also been a pioneer in developing cleaning and maintenance facilities for tank containers.

SNTG's terminal operations support its parcel tanker operations by enabling quicker turnaround of the tankers when in port. They also provide hubs for servicing SNTG's customers by integrating storage with sea and land transportation by parcel tanker, barge, rail, and road. It is SNTG's strategy to take advantage of existing infrastructure and to make selective investments to increase the capacity of its existing terminal facilities, as well as to look for new opportunities on a worldwide basis to expand its network of services and improve operational efficiency through faster parcel tanker turnaround and the integration of transportation services.

### Stolt Offshore

Stolt Offshore's goal is to enhance its position as a full-service offshore contractor providing a full range of global offshore development and construction service to its customers.

Stolt Offshore has historically had a strong position in the North Sea and Brazil since offshore oil exploration started there in the early 1970s. In 1998, Stolt Offshore embarked on a strategy to address changing market dynamics by expanding its service offering and strengthening its market position in the high growth markets of West Africa and the Gulf of Mexico. In 1998, Stolt Offshore acquired Ceanic Corporation which gave it a strong presence in the Gulf of Mexico market and the ability to build relationships with Houston-based oil and gas companies. In 1999, Stolt Offshore purchased ETPM S.A., which significantly enhanced its presence in the West African market, and Stolt Offshore acquired a 49% interest in the NKT Flexibles I/S joint venture, which secures its supply of flexible flowlines. In 2001, Stolt Offshore acquired Ingerop Litwin, now called Paragon Litwin, and a controlling interest in Paragon Engineering Services to strengthen its engineering capabilities. Stolt Offshore now has the necessary engineering, construction and technological assets to undertake all aspects of EPIC projects for virtually any new offshore oil and gas field in each of the major offshore markets.

### Stolt Sea Farm

SSF's mission is to position itself as a world leading seafood company by the development of new species and new farming technologies; by adding value to its products through further processing into convenient "ready-to-eat" products; and by building a global sales network, close to customers, making *Sterling* and *Prodemar* branded seafood products conveniently available to the consumer. SSF emphasizes scale as well as decentralized farming operations, the importance of being fully integrated along the value chain, and the importance of having both a strong local presence in all the major markets and a production platform in all four major production regions. SSF focuses on spearheading research and development and taking a position with branded seafood products in several new species.

### Regulation

Our businesses are subject to international conventions and U.S. and other governmental regulations which strictly regulate various aspects of our operations. In addition, we are required by various governmental and other regulatory agencies to obtain certain permits, licenses, and certificates with respect to our equipment and operations. The kinds of permits, licenses and certificates required in our operations depend upon a number of factors. We believe that we have or can readily obtain all permits, licenses, and certificates necessary to conduct our operations. Some countries require that we enter into a joint venture or similar business arrangement with local individuals or businesses in order to conduct business. We have entered into such arrangements where necessary.

Compliance with current health, environmental, safety and other laws and regulations is an ordinary part of our businesses. These laws change frequently and, as an ordinary part of our business, we incur costs to maintain compliance with such laws. Although these costs have not had a material impact on our financial condition or results of operations in recent years, there can be no assurance that it will not have such an impact in the future. Moreover, although it is our objective to maintain compliance with all such laws and regulations applicable to it, there can be no assurance that we will avoid material costs, liabilities and penalties imposed as a result of governmental regulation in the future.

### Stolt-Nielsen Transportation Group

SNTG is subject to the international and national conventions and regulations which cover ocean shipping generally and the transport of chemicals and oil in bulk specifically. The major international conventions applicable to SNTG's operations include the International Convention on the Safety of

36

Life at Sea; the International Convention for the Prevention of Pollution from Ships, 1973, as modified by the Protocol of 1978, as amended; the International Convention on the Standards of Training, Certification and Watchkeeping of Seafarers; and the Convention on Civil Liability for Oil Pollution Damage. Applicable national regulations for SNTG's operations in U.S. waters include the Port and Tanker Safety Act, the Hazardous Materials Transportation Act, the Clean Air Act, the Clean Water Act, the U.S. Oil Pollution Act of 1990 ("OPA '90), and the U.S. Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") (see specific discussion on OPA '90 and CERCLA below).

In addition, specifically to protect the purity of fats and vegetable oils, SNTG complies with the latest cargo rules established by the National Institute of Oilseed Products in the U.S. and the Federation of Oils, Seeds, and Fats Associations in Europe. SNTG's Dedicated Vegetable Oil Service has been developed as a direct result of these rules.

SNTG's river parcel tanker activities are governed by the European Agreement on Regulations for the Carriage of Dangerous Substances on the Rhine and other applicable standards for service on the Rhine River in Europe and by the U.S. Coast Guard safety and pollution prevention regulations.

As a foreign-owned corporation, SNTG is prohibited by U.S. Federal law from owning more than a 25% interest in ships operating in the U.S. coastal market and in the U.S. inland waterway system.

In addition to many of the regulations governing the parcel tanker operations, SNTG's tank container operations are subject to the International Convention for Safe Containers which establishes guidelines for the construction of tank containers; the International Maritime Dangerous Goods Code which regulates the construction and periodic testing of equipment used to transport hazardous packaged liquids; and regulations of other comparable national authorities regarding the use of containers on rail cars and the transport of hazardous materials by rail or road.

Additional regulations specific to SNTG's terminal operations in the U.S. are the Resource Conservation and Recovery Act regarding the reporting, recordkeeping, and handling of hazardous waste and the Occupational Safety and Health Act regulating the working conditions at U.S. terminals as well as other business facilities. Terminals located outside of the U.S. are governed by the comparable national and local governmental agencies.

*U.S. Oil Pollution Act of 1990 and Comprehensive Environmental Response, Compensation and Liability Act*

OPA '90 sets out various requirements applicable to shipowners and ship operators in U.S. waters including, among other things, standards and requirements covering the construction of ships carrying oil and oil products (as defined in the Act), stringent financial responsibility requirements and expanded contingency planning requirements. OPA '90 also increases shipowners' and ship operators' potential liability for damages and cleanup and removal costs for pollution accidents in U.S. waters. Ship and facility owners and operators are "responsible parties" and are jointly, severally and strictly liable (unless the spill results solely from the act or omission of a third party, an act of God or an act of war) for all oil spill containment and cleanup costs and other damages arising from oil spills from their ships or facilities. These other damages are defined broadly to include: (i) natural resources damages and the costs of assessment thereof; (ii) real and personal property damages; (iii) net loss to a government entity of taxes, royalties, rents, fees, and other lost revenues; (iv) lost profits or impairment of earning capacity due to property or natural resources damage; (v) net cost of public services necessitated by a spill response, such as protection from fire, safety, or health hazards; and (vi) loss of subsistence use of natural resources.

With limited exceptions, OPA '90 requires that all new ships ordered after June 30, 1990, or delivered after January 1, 1994, must be built with double hulls to be allowed to call at U.S. ports. There is a timetable for retrofitting existing ships with double hulls or taking them out of service,

depending upon the year the ship was built, its gross tonnage, and whether the ship already has a double bottom or double sides. Since January 1, 1995, double bottom ships of greater than 5,000 gross tons and more than 45 years of age have been required to be retrofitted with double hulls. The age requirement is reduced annually so that by 2005, and until 2015, no such ships may exceed 30 years of age without retrofitting. To operate in U.S. waters after 2015, ships must have both a double bottom and double sides.

Double bottom installation has become standard on most parcel tankers and chemical tankers since the IMO regulations for the carriage of hazardous products in bulk became effective. All of SNTG's parcel tankers already have double bottoms. It is SNTG's intention that all tankers ordered in the future will comply with the double hull requirements identified above.

The liability provisions of OPA '90 are applicable to "oil" as defined in the Act. For this purpose, "oil" means oil of any kind or in any form, including, but not limited to, petroleum, fuel oil, sludge, oil refuse, and oil mixed with wastes other than dredged spoil, but does not include any substance which is specifically listed or designated as a "hazardous substance" under CERCLA. Some of the chemicals carried on SNTG's ships are covered by the provisions of CERCLA. SNTG's ships frequently carry some parcel cargoes of lubricating oils and additives and the ships' engines are powered by fuel oil. In addition, cargoes of "clean petroleum products," which are generally covered by the provisions of OPA '90, are occasionally carried on SNTG's ships. Animal fat and vegetable oils as well as other non-petroleum oils are included within the OPA '90 definition of "oil".

In compliance with OPA '90 requirements, SNTG has obtained Certificates of Financial Responsibility for all of its ships which call on U.S. ports.

The effect of the liability provisions of OPA '90 and CERCLA on the shipping industry has not yet been fully determined. OPA '90 increased the limit on shipowners' and ship operators' liability for tankers over 3,000 gross tons to the greater of $1,200 per gross ton or $10 million for damages, cleanup, and removal costs. Owners and operators of onshore facilities, including oil terminals, are liable for removal costs and damages up to a limit of $62 million. However, OPA '90 provides for unlimited liability if the spill was proximately caused by: (i) gross negligence or willful misconduct; (ii) violation of an applicable federal safety, construction or operating regulation by the responsible party, its agents or employees or any person acting pursuant to a contractual relationship with it; or (iii) if the owner or operator fails to report the spill, provide reasonable cooperation in connection with a removal order or, without sufficient cause, to obey an order issued by an authority under a removal regulation. For owners and operators of ships carrying hazardous substances as cargo, the liability provisions under CERCLA are $300 per gross ton or $5 million, whichever is greater. Facility owners and operators are liable for the total of all response costs plus $50 million for damages as defined under CERCLA. The CERCLA damages provisions are broadly similar to those of OPA '90. CERCLA also contains provisions similar to OPA '90 for breaking liability limits. CERCLA contains various reporting provisions, some of which are more detailed than OPA '90. Furthermore, both OPA '90 and CERCLA provide that individual U.S. states may issue their own pollution prevention laws and regulations, which laws and regulations may impose greater liabilities than set out in, and which may differ significantly from, OPA '90 or CERCLA. Many states have, in fact, enacted such provisions which provide for virtually unlimited liability for pollution accidents occurring in their waters.

OPA '90 also sets out contingency plan requirements with respect to cleanup and removal of the substances covered by its provisions. OPA '90 also requires expenditure to meet specific response standards for equipment to be kept on board ships. The contingency plan requirements also apply to marine transportation-related facilities, including Coast Guard-regulated onshore oil terminals, tank trucks, and railroad tank cars.

OPA '90 has made liability insurance more expensive for shipowners and ship operators and has also caused insurers to consider reducing available liability coverage, although this has not yet occurred. See "Insurance" in this Item 4.

### Stolt Offshore

Stolt Offshore's business is subject to international conventions and governmental regulations that strictly regulate various aspects of its operations. The maritime laws and the diving, health and safety regulations of the jurisdictions in which Stolt Offshore operates govern its operations in these areas. In the North Sea, these regulations include established working hours and a specified working environment for divers, as well as standards for diving procedures, equipment and diver health. The North Sea standards are among the most stringent in the world. In the absence of any specific regulation in other geographic regions, Stolt Offshore closely follows the standards set by the International Marine Contractor Association.

Stolt Offshore's operations in the United Kingdom are subject to a variety of worker and European community safety laws. The Health and Safety at Work Act of 1974, and regulations made thereunder, mandate general requirements for safe workplaces for all employees. Similar regulations apply in Norway, France and other European countries in which it operates.

In the United States, Stolt Offshore is subject to the jurisdiction of the U.S. Coast Guard, the National Transportation Safety Board and the U.S. Customs Service, as well as private industry organizations such as the American Bureau of Shipping. The Coast Guard and the National Transportation Safety Board set safety standards and are authorized to investigate vessel accidents and recommend improved safety standards. The Customs Service is authorized to inspect vessels at will. The exploration and development of oil and gas properties located on the Outer Continental Shelf of the United States is regulated by the Minerals Management Service. Stolt Offshore's U.S. operations are also affected by numerous federal, state, and local laws and regulations relating to safety and health of employees, protection of the environment including the Occupational Safety & Health Act of 1970, the Resource Conservation & Recovery Act of 1976, the Outer Continental Shelf Lands Act of 1953, the Federal Water Pollution Control Act of 1972, and OPA '90.

The International Maritime Organization recently made the regulations of the International Safety Management (ISM) Code mandatory. The ISM Code provides an international standard for the safe management and operation of ships, pollution prevention and certain crew and vessel certifications which is effective, unless extended by governmental authorities, on July 1, 2002. Stolt Offshore believes that it is currently in compliance with these standards to the extent such standards are applicable to its operations.

In addition, Stolt Offshore is required by various governmental and other regulatory agencies to obtain certain permits, licenses and certificates with respect to its equipment and operations. The kind of permits, licenses and certificates required in Stolt Offshore's operations depend upon a number of factors but are normally of a type required of all operators in a given jurisdiction. We believe that Stolt Offshore has or can readily obtain all permits, licenses and certificates necessary to conduct its operations. Some countries require that Stolt Offshore enter into a joint venture or similar business arrangements with local individuals or businesses in order to conduct business in such countries.

Stolt Offshore's operations are affected from time to time and to varying degrees by political developments and federal and local laws and regulations. In particular, oil and gas production, operations and economics are affected by price control, tax and other laws relating to the petroleum industry, by changes in such laws and by constantly changing administrative regulations. Such developments directly or indirectly may affect Stolt Offshore's operations and those of its customers.

The hull and machinery (including diving equipment) of most of our ships must be "classed" by a classification society authorized by its country of registry. The classification society certifies that the

ship is safe and seaworthy in accordance with the classification rules as well as with applicable rules and regulations of the country of registry of the ship and the international conventions of which that country is a member. Certain of our ships are not required to be classed, but do comply with applicable regulations.

Each classed ship is inspected by a surveyor of the classification society. A visual inspection is carried out annually to ascertain the general condition of the ship or relevant items. Intermediate surveys are carried out at the second or third annual survey. This survey includes a visual inspection of the hull structure, machinery and electrical installations and equipment. Renewal surveys which involve a major inspection of the hull structure, machinery installations and equipment are carried out at five-year intervals. A classed ship is also required to be drydocked every 30 to 36 months for inspection of the underwater parts of the ship. As a general policy, we drydock out classed ships every second year during the winter off-season. Should any defect be found, the classification society surveyor will issue its report as to appropriate repairs which must be made by the ship owner within the time limit prescribed. Insurance underwriters make it a condition of insurance coverage that a classed ship be "in class." All of our major classed ships currently meet that condition.

Our U.S. flagged ships that are inspected by the U.S. Coast Guard but not classed are drydocked twice during each five-year cycle. The intermediate drydocking is due between the end of the second and third years of the cycle. Our U.S. flagged Load Line only ships, as well as the un-classed Panama and Honduras flagged ships, are drydocked according to the same schedule for condition surveys as required by the respective national Load Line regulations. The annual topside safety and equipment surveys are very similar to and parallel the traditional class surveys.

*Stolt Sea Farm*

SSF is subject to the laws and regulations of the individual countries, including Norway, the U.K., Canada, the U.S., Chile, Spain, Portugal, France, Belgium and Australia, in which its operations are situated which strictly regulate various aspects of its operations. The hatcheries, the ongrowing sites, and the slaughteries are regulated by state environmental laws and laws regarding treatment of, and protection from, fish diseases and pollution. International conventions and treaties regulate the importation of SSF's products in various markets around the world.

In 1996, the Norwegian government imposed feed quotas and production regulations on Norwegian fish farmers in an attempt to reduce the supply of Norwegian farmed salmon, and hence the amount of Norwegian farmed salmon available for sale in the EU market. In order to avoid further threats of duties against Norwegian salmon, the Norwegian government, in July 1997, reached an agreement with the EU (the "EU Agreement") for a five year period to regulate supplies of Norwegian salmon into the EU market. This agreement, among other things, restricted the increase in supply of Norwegian salmon into the EU market to 10% per year; required the average sales price to be at or above an agreed minimum price; and increased the export levy payable by Norwegian producers. The Norwegian government still maintains the feed quota and production regulations that it introduced in 1996. The quotas and regulations have had an adverse effect on the cost structure of the Norwegian operation, as they have limited the capacity utilization of farmed concessions. However, the Norwegian government has permitted annual increases of varying amounts (ranging from 2% to 10%) in the feed quotas, which progressively reduce the negative impact of the feed quota regime. The EU Agreement expired in 2002, but was extended by mutual agreement while further discussions were held as to what, if anything, should take the place of that agreement. On May 26, 2003 the EU announced that the agreement would be terminated with effect from May 31, 2003.

In Chile, in 1998, following a formal complaint by certain U.S. salmon farmers, the U.S. Department of Commerce ("DOC") instigated an anti-dumping review against the Chilean salmon farming industry that sold their products into the U.S. market. 15 of the largest producers were investigated, including our Eicosal subsidiary. Eicosal initially received a 10.69% duty. Since 1998, the

large producers, including Eicosal, have been subject to annual reviews for dumping behavior, and in the three subsequent annual reviews Eicosal was found to be de minimis and therefore pays zero duty. SSF's Ocean Horizons business in Chile, which was not one of the large producers in Chile, was subjected to a dumping duty of the average industry rate of 4.7%. As Eicosal received a third consecutive clean dumping review in respect of the period ending June 30, 2001, it should have been eligible for revocation of the anti-dumping charges. However, as a result of the acquisition by SSF of the Eicosal business in July 2001, the DOC declined to revoke the charges. The reason given was that the potential collapsing of Eicosal and Ocean Horizons after they became jointly owned by SSF may lead to future dumping. SSF is appealing this ruling on the basis that the acquisition of Eicosal by SSF took place after the end of the third review period and so is not relevant. The outcome of the appeal will probably not be known until 2004. If the appeal is successful, SSF will not have to pay duties. If it is not successful, SSF will have to continue to complete annual reviews and file again for revocation in future years. In the meantime, SSF has informed the DOC that it declines to take part in the fourth review covering the year ended June 30, 2002, on the basis that SSF believes that revocation was unfairly and mistakenly withheld and that the DOC's timetable and demands for additional information for the fourth review have placed an impossible burden on SSF. It is not yet known what the outcome of this will be, but it is likely that the DOC will impose some sort of duty on SSF which could be recovered by SSF if its stance is vindicated. On April 29, 2003 the major U.S. farmed salmon producers, representing 85% of the total U.S. Atlantic salmon production, filed a request with the DOC for a changed circumstances review of the duty on the basis of having no interest in its continuance. The remaining U.S. companies are expected to join the request. If the DOC accepts the request, then the DOC may cease the anti-dumping review of the Chilean salmon farming industry, including the investigation of Eicosal. There can be no assurance, however, as to how the DOC will respond to this request.

All species of sturgeon have now been added to Appendix II of the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"). As a result, all international trade of sturgeon and caviar is now regulated, and all exports require proper documentation. While this does not affect the sale of SSF California's products within the U.S., it does mean that exports from the U.S. require proper license documentation. We have been working with the U.S. government to obtain the necessary documents and now have the procedures in place to allow export.

### Competition

#### *Stolt-Nielsen Transportation Group*

Price is a primary factor in determining which supplier of transportation services is awarded a contract, although quality and availability of service are also considered. SNTG is able to offer parcel tanker and tank container services on a worldwide basis. SNTG's tanker operations compete with operators based primarily in Europe and the Asia Pacific region. The parcel tanker market can be divided into two segments, deep-sea and regional, which depend on the routes and ships employed. Major competitors include Odfjell, Jo Tankers and Tokyo Marine. SNTG's tank container operations compete primarily with European-based tank container operators. The competition in the tank container market is fragmented, although the relative size of the competition is increasing on a worldwide basis. Major competitors include Hoyer-Odfjell and VOTG. SNTG also competes, to a lesser extent, with tank container leasing companies and with container shipping lines, which operate tank containers. SNTG's terminal operations compete with other international terminal networks as well as local independent terminal companies, with geographic location being a key competitive factor. In the ports where SNTG has storage facilities, SNTG either maintains a significant presence or occupies a niche in terms of products handled.

*Stolt Offshore*

The offshore contracting business is highly competitive. The consolidation in the offshore oil and gas services industry in the last few years has resulted in fewer but more substantial competitors. Although Stolt Offshore believes customers consider, among other things, the availability and technical capabilities of equipment and personnel, efficiency, condition of equipment, safety record, and reputation, price competition is the primary factor in determining which qualified contractor with available equipment will be awarded a contract. Stolt Offshore's ships are specialized and have few alternative uses and, because of their nature and the environment in which they work, have relatively high maintenance costs whether or not operating. Because these costs are essentially fixed, and in order to avoid additional expenses associated with temporarily idling its ships, Stolt Offshore may from time-to-time be required to bid its ships in projects at lower margins depending on the prevailing contractual rates in a given region.

Stolt Offshore believes that it is one of only four companies capable of providing a wide range of offshore services on a worldwide basis in the major offshore oil and gas producing regions. Competition in most of the range of services that Stolt Offshore offers to its customers is limited to three main competitors, Technip-Coflexip, Subsea7, and Saipem S.p.A. Stolt Offshore is subject to intense competition from these offshore contractors. In North America, J. Ray McDermott Inc., Global Industries Inc., Cal Dive International, Torch Offshore Inc. and Horizon Offshore Contractors Inc. also provide similar services to those that Stolt Offshore provides. Additionally, these services are provided by J. Ray McDermott Inc. in Asia Pacific and the Middle East and by Global Industries Inc. in Asia Pacific and West Africa. However, Stolt Offshore believes that these companies are not capable of operating in all the major oil and gas producing regions worldwide. Stolt Offshore also competes with Allseas Marine Contractors and Heerema who operate in the worldwide market, providing trunkline and rigid pipelay services and heavy lifting services, respectively. Stolt Offshore also faces substantial competition from smaller regional competitors and less integrated providers of offshore services.

*Stolt Sea Farm*

SSF competes with other producers of farmed seafood and with suppliers of wild catch and other species of fish. SSF's major competitors include Nutreco, Pan Fish, Fjord Seafood, Aqua Chile and Cermaq. The North American Atlantic salmon activities compete primarily with North American and Chilean producers in the North American market. Norwegian and Scottish Atlantic salmon activities compete primarily with other Norwegian, U.K., Irish and Faeroese producers of Atlantic salmon in the European market. For both regions, competition is based on quality, price, and delivery capability. In Asia, SSF competes with importers and producers of farmed and wild fish. The turbot production in Spain, Portugal and France competes primarily in the Mediterranean area with other Spanish and French producers of turbot and with suppliers of wild turbot.

Of the main competitors in the industry, SSF is one of three currently with a presence in all the major farming regions (Norway, Chile, Canada/U.S. and the U.K). Two other major competitors farm in three of the big four regions. SSF is the only producer with an in-market sales organization in all main markets. SSF's position in the industry is strengthened by the fact that SSF has further diversified into farming species other than salmon. SSF has also been developing a concept of sales of higher value added products deeper in the market, through processing and sales units situated in the U.S. market and known as seafood centers. The first of these was opened in 1997 in Los Angeles, CA and a second was opened in Stratford, CT in 2001.

**Insurance**

We maintain insurance against physical loss and damage to our assets as well as coverage against liabilities to third parties we may incur in the course of our operations. Assets are insured at replacement cost, market value, or assessed earning power. The owned fleet of SNTG and Stolt

Offshore is currently covered by hull and machinery insurance in the aggregate amount of $3.94 billion. Marine liabilities, which may be incurred through the operation of SNTG's and Stolt Offshore's ships, are insured under marine protection and indemnity insurance policies. The policies have a limit of approximately $4.25 billion per incident except for marine oil pollution which is limited to $1 billion per occurrence. Non-marine liabilities are insured up to $200 million. We believe our insurance coverage to be in such form, against such risks, for such amounts and subject to such deductibles as are prudent and normal to those industries in which we operate.

**Significant Subsidiaries**

As of April 30, 2003, our significant subsidiaries are as follows:

| Name of Company | Country of Incorporation | % Shareholding(1) |
|---|---|---|
| Stolt-Nielsen Transportation Group Ltd. | Liberia | 100 |
| Stolt-Nielsen Transportation Group Ltd. | Bermuda | 100 |
| Stolt-Nielsen Transportation Group Inc. | USA | 100 |
| Stolt-Nielsen Transportation Group B.V. | Netherlands | 100 |
| Stolt-Nielsen Transportation Group AG | Switzerland | 100 |
| Stolt-Nielsen Transportation Group Pte. Ltd. | Singapore | 100 |
| Stolt Tankers Inc. | Liberia | 100 |
| Stolt General Product Tankers Inc. | Liberia | 100 |
| Anthony Radcliffe Steamship Company Limited | England | 100 |
| Stolt-Nielsen Inter European Service B.V. | Netherlands | 100 |
| Stolt-Nielsen Inter Asia Service Inc. | Liberia | 100 |
| Stolt-Nielsen Inland Tanker Service B.V. | Netherlands | 100 |
| Stolt-Nielsen Indian Ocean and Middle East Service Ltd. | Bermuda | 100 |
| Stolthaven New Orleans L.L.C. | USA | 100 |
| Stolthaven Houston Inc. | USA | 100 |
| Stolthaven (Santos) Ltda. | Brazil | 100 |
| Stolt Tank Containers Leasing Ltd. | Bermuda | 100 |
| Stolt-Nielsen Transportation Group Limited | England | 100 |
| Stolt-Nielsen Transportation Group SAS | France | 100 |
| Stolt Container Terminal Pte. Ltd. | Singapore | 100 |
| Stolt Container Terminal Co. Ltd. | Taiwan | 90 |
| Stolt Sea Farm Holdings plc | England | 100 |
| Stolt Sea Farm A/S | Norway | 100 |
| Stolt Sea Farm Inc. | USA | 100 |
| Stolt Sea Farm Ltd. | Scotland | 100 |
| Stolt Sea Farm S.A. | Spain | 100 |
| Stolt Sea Farm Inc. | Canada | 100 |
| Stolt Offshore S.A.(2) | Luxembourg | 63 |
| Stolt Offshore B.V.(2) | Netherlands | 63 |
| Stolt Offshore S.A.(2) | France | 63 |
| Stolt Offshore Inc.(2) | USA | 63 |
| Stolt Comex Seaway Holdings Inc.(2) | USA | 63 |
| Stolt Offshore A/S(2) | Norway | 63 |
| Stolt Offshore Limited(2) | United Kingdom | 63 |
| Stolt Offshore Services S.A.(2) | France | 63 |
| Stolt Offshore M.S. Limited(2) | Bermuda | 63 |
| ETPM DeepSea Limited(2) | United Kingdom | 63 |
| SeaSupplier Ltd. | Bermuda | 97 |

(1) Unless otherwise indicated, the percentage of voting rights is the same as the percentage of shareholding.

(2) The percentage of voting rights in these companies is 69%.

**Property, Plant and Equipment**

*Stolt-Nielsen Transportation Group*

The following table describes the parcel tankers that are operated by SNTG, both within and outside STJS. It also includes ships that are leased or time-chartered. (See notes to table below pertaining to ownership and registry.)

### Parcel Tankers Operated by Stolt Tankers Joint Service
### as of April 30, 2003

| | Year Built | DWT (Metric Tons) | Ownership(1) | Registry |
|---|---|---|---|---|
| **STOLT INNOVATION CLASS** | | | | |
| Stolt Capability . . . . . . . . . . . . . . . . . . . . . . . . . . | 1998 | 37,000 | NYK Stolt | Liberian |
| Stolt Efficiency . . . . . . . . . . . . . . . . . . . . . . . . . . | 1998 | 37,000 | SNTG BV | Cayman |
| Stolt Inspiration . . . . . . . . . . . . . . . . . . . . . . . . . . | 1997 | 37,000 | SNTG BV | Cayman |
| Stolt Creativity . . . . . . . . . . . . . . . . . . . . . . . . . . | 1997 | 37,000 | SNTG BV | Cayman |
| Stolt Invention . . . . . . . . . . . . . . . . . . . . . . . . . . | 1997 | 37,000 | NYK Stolt | Liberian |
| Stolt Confidence . . . . . . . . . . . . . . . . . . . . . . . . . . | 1996 | 37,000 | SNTG BV | Cayman |
| Stolt Innovation . . . . . . . . . . . . . . . . . . . . . . . . . . | 1996 | 37,000 | SNTG BV | Cayman |
| Stolt Concept . . . . . . . . . . . . . . . . . . . . . . . . . . | 1999 | 37,000 | SNTG BV | Cayman |
| Stolt Effort . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1999 | 37,000 | SNTG BV | Cayman |
| **STOLT ACHIEVEMENT CLASS** | | | | |
| Stolt Achievement . . . . . . . . . . . . . . . . . . . . . . . . | 1999 | 37,000 | SNTG BV | Cayman |
| Stolt Perseverance . . . . . . . . . . . . . . . . . . . . . . . . | 2001 | 37,000 | SNTG BV | Cayman |
| **STOLT HELLULAND CLASS** | | | | |
| Stolt Vinland . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1992 | 29,999 | SNTG BV | Liberian |
| Stolt Vestland . . . . . . . . . . . . . . . . . . . . . . . . . . | 1992 | 29,999 | SNTG BV | Liberian |
| Stolt Helluland . . . . . . . . . . . . . . . . . . . . . . . . . . | 1991 | 29,999 | SNTG BV | Liberian |
| Stolt Markland . . . . . . . . . . . . . . . . . . . . . . . . . . | 1991 | 29,999 | SNTG BV | Liberian |
| **STOLT SAPPHIRE CLASS** | | | | |
| Stolt Jade . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1986 | 38,746 | SNTG BV | Cayman |
| Stolt Aquamarine . . . . . . . . . . . . . . . . . . . . . . . . | 1986 | 38,746 | SNTG BV | Cayman |
| Stolt Topaz . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1986 | 38,720 | SNTG BV | Cayman |
| Stolt Emerald . . . . . . . . . . . . . . . . . . . . . . . . . . | 1986 | 38,720 | SNTG BV | Cayman |
| Stolt Sapphire . . . . . . . . . . . . . . . . . . . . . . . . . . | 1986 | 38,746 | NYK Stolt | Liberian |
| **STOLT FALCON CLASS** | | | | |
| Stolt Eagle . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1980 | 37,082 | TSI | Liberian |
| Stolt Condor . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1979 | 37,200 | TSI | Liberian |
| Stolt Heron . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1979 | 37,075 | TSI | Liberian |
| Stolt Hawk . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1978 | 37,080 | TSI | Liberian |
| Stolt Osprey . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1978 | 37,080 | TSI | Liberian |
| Stolt Falcon . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1978 | 37,200 | TSI | Liberian |
| **STOLT PRIDE CLASS** | | | | |
| Stolt Excellence . . . . . . . . . . . . . . . . . . . . . . . . . | 1979 | 32,093 | TSI | Liberian |
| Stolt Loyalty . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1978 | 32,091 | TSI | Liberian |
| Stolt Tenacity . . . . . . . . . . . . . . . . . . . . . . . . . . | 1978 | 32,093 | TSI | Liberian |
| Stolt Integrity . . . . . . . . . . . . . . . . . . . . . . . . . . | 1977 | 32,057 | TSI | Liberian |
| Stolt Sincerity . . . . . . . . . . . . . . . . . . . . . . . . . . | 1976 | 31,942 | TSI | Liberian |
| Stolt Pride . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1976 | 31,942 | TSI | Liberian |

| | Year Built | DWT (Metric Tons) | Ownership(1) | Registry |
|---|---|---|---|---|
| **STOLT AVANCE CLASS** | | | | |
| Stolt Avenir . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1978 | 23,275 | SNTG BV | Liberian |
| Stolt Avance . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1977 | 23,648 | SNTG BV | Liberian |
| **STOLT SEA CLASS** | | | | |
| Stolt Sea . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1999 | 22,500 | SNTG BV | Cayman |
| Stolt Sun . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2000 | 22,210 | SNTG BV | Cayman |
| Stolt Span . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1999 | 22,460 | NYK Stolt | Liberian |
| Stolt Surf . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2000 | 22,460 | SNTG BV | Cayman |
| Stolt Stream . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2000 | 22,917 | SNTG BV | Cayman |
| Stolt Spray . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2000 | 22,460 | SNTG BV | Cayman |
| **SUPERFLEX CLASS** | | | | |
| Stolt Guardian . . . . . . . . . . . . . . . . . . . . . . . . . | 1983 | 39,726 | SNTG BV | Liberian |
| Hyde Park . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1982 | 39,015 | T/C by SNTG BV | Liberian |
| Stolt Protector . . . . . . . . . . . . . . . . . . . . . . . . . . | 1983 | 39,782 | SNTG BV | Liberian |
| Kenwood Park . . . . . . . . . . . . . . . . . . . . . . . . . . | 1982 | 39,015 | T/C by SNTG BV | Liberian |
| **STOLT ASPIRATION CLASS** | | | | |
| Stolt Aspiration . . . . . . . . . . . . . . . . . . . . . . . . . | 1987 | 12,219 | NYK Stolt | Liberian |
| Stolt Alliance . . . . . . . . . . . . . . . . . . . . . . . . . . | 1985 | 12,674 | NYK Stolt | Liberian |
| Stolt Taurus . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1985 | 12,749 | SNTG BV | Liberian |
| Stolt Titan . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1985 | 12,691 | SNTG BV | Liberian |
| Stolt Durham . . . . . . . . . . . . . . . . . . . . . . . . . . | 1995 | 12,458 | Bibby | Cayman |
| Stolt Devon . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1985 | 12,721 | Bibby | Panamanian |
| Stolt Cornwall . . . . . . . . . . . . . . . . . . . . . . . . . . | 1985 | 12,749 | Bibby | Bahamas |
| Stolt Accord . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1982 | 12,467 | NYK Stolt | Liberian |
| **TROJAN CLASS** | | | | |
| Stolt Trojan . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1996 | 15,313 | Barton | Panamanian |
| **TRIUMPH CLASS** | | | | |
| Stolt Kent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1998 | 19,300 | Bibby | Isle of Man |
| Stolt Dorset . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1997 | 19,299 | Bibby | Panamanian |
| **NTOMBI CLASS** | | | | |
| Stolt Ntaba . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1991 | 13,946 | Unicorn | Panamanian |
| Stolt Ntombi . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1990 | 13,947 | Unicorn | Panamanian |
| **OTHER PARCEL TANKERS** | | | | |
| Stolt Hikawa . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1992 | 8,080 | SNTG BV | Liberian |
| Montana Blue . . . . . . . . . . . . . . . . . . . . . . . . . . | 1991 | 40,153 | B/B by SNTG BV | Liberian |
| Montana Star . . . . . . . . . . . . . . . . . . . . . . . . . . | 1992 | 40,160 | B/B by SNTG BV | Liberian |
| Montana Sun . . . . . . . . . . . . . . . . . . . . . . . . . . | 1994 | 40,160 | B/B by SNTG BV | Liberian |
| Stolt Nanami . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2003 | 19,500 | T/C by SNTG BV | Panamanian |
| Valerie . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2003 | 19,981 | T/C by SNTG BV | Gibraltar |
| **TOTAL IN STJS** | | | | |
| (63 ships) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 1,825,644 | | |

45

**Parcel Tankers Outside the Stolt Tankers Joint Service**
**Operated and/or Controlled by Stolt Affiliates**
**as of April 30, 2003**

| | YEAR BUILT | DWT (Metric Tons) | Ownership(1) | Registry |
|---|---|---|---|---|
| **STOLT-NIELSEN INTER EUROPE SERVICE** | | | | |
| Stolt Shearwater | 1998 | 5,498 | SNTG BV | Cayman |
| Stolt Kittiwake | 1993 | 4,729 | SNTG BV | Cayman |
| Stolt Guillemot | 1993 | 4,709 | SNTG BV | Cayman |
| Stolt Cormorant | 1999 | 5,498 | SNTG BV | Cayman |
| Stolt Kestrel | 1992 | 5,758 | SNTG BV | Cayman |
| Stolt Petrel | 1992 | 4,794 | SNTG BV | Cayman |
| Stolt Tern | 1991 | 4,794 | SNTG BV | Cayman |
| Stolt Dipper | 1992 | 4,794 | SNTG BV | Cayman |
| Stolt Kite | 1992 | 4,794 | SNTG BV | Cayman |
| Stolt Puffin | 1993 | 5,758 | SNTG BV | Cayman |
| Stolt Fulmar | 2000 | 5,498 | SNTG BV | Cayman |
| Stolt Egret | 1992 | 5,758 | SNTG BV | Cayman |
| Marinor | 1992 | 7,950 | T/C by SNTG BV | Panamanian |
| **STOLT-NIELSEN INTER ASIA SERVICE** | | | | |
| Stolt Avocet | 1992 | 5,758 | SNTG BV | Cayman |
| Stolt Distributor | 2002 | 3,992 | T/C by SNTG BV | Panamanian |
| **STOLT BOTANY TANKER SERVICES** | | | | |
| Botany Triton | 1991 | 8,080 | Barton | Liberian |
| **STOLT NYK ASIA PACIFIC SERVICE** | | | | |
| Stolt Suisen | 1998 | 11,537 | NSSH | Liberian |
| Stolt Botan | 1998 | 11,553 | NSSH | Liberian |
| Stolt Kikyo | 1998 | 11,545 | NSSH | Liberian |
| Stolt Azami | 1997 | 11,564 | NSSH | Liberian |
| Stolt Ayame | 1991 | 9,070 | NSSH | Liberian |
| Stolt Azalea | 1988 | 7,582 | NSSH | Liberian |
| Stolt Lily | 1988 | 7,593 | NSSH | Liberian |
| Stolt Magnolia | 1985 | 7,132 | NSSH | Panamanian |
| Perla | 1994 | 10,332 | T/C by NSSH | Singaporean |
| **STOLT NYK AUSTRALIA PTE LTD** | | | | |
| Stolt Australia | 1986 | 9,940 | SNAPL | Australian |
| **STOLT-NIELSEN INLAND TANKER SERVICE** | | | | |
| Alliantie | 1999 | 1,600 | T/C by SNTG BV | Dutch |
| Pax Montana | 1998 | 2,408 | T/C by SNTG BV | Dutch |
| Stolt Emden | 1980/1998 | 1,388 | SNTG BV | German |
| Stolt Madrid | 1994 | 1,560 | SNTG BV | Swiss |
| Stolt Oslo | 1994 | 1,556 | SNTG BV | Swiss |
| Stolt Prag | 1994 | 1,202 | SNTG BV | Dutch |
| Stolt Waal | 1993 | 2,095 | SNTG BV | Dutch |
| Stolt Somtrans | 1993 | 2,408 | T/C by SNTG BV | Dutch |
| Columbia | 1993 | 1,605 | T/C by SNTG BV | Dutch |
| Stolt Rom | 1993 | 2,156 | SNTG BV | Swiss |
| Stolt Wien | 1993 | 2,157 | SNTG BV | Swiss |
| Stolt Mosel | 1992 | 2,133 | SNTG BV | Dutch |
| Stolt Main | 1992 | 2,124 | SNTG BV | Dutch |
| Stolt Neckar | 1992 | 2,095 | SNTG BV | Dutch |

46

| | YEAR BUILT | DWT (Metric Tons) | Ownership(1) | Registry |
|---|---|---|---|---|
| Stolt Maas . . . . . . . . . . . . . . . . . . . . . . . . . . | 1992 | 2,096 | SNTG BV | Dutch |
| Challenger . . . . . . . . . . . . . . . . . . . . . . . . . | 1992 | 1,605 | T/C by SNTG BV | Dutch |
| Oranje Nassau . . . . . . . . . . . . . . . . . . . . . . . . | 1992 | 2,408 | T/C by SNTG BV | Dutch |
| Stolt Basel . . . . . . . . . . . . . . . . . . . . . . . . | 1992 | 2,404 | SNTG BV | Dutch |
| Stolt Lausanne . . . . . . . . . . . . . . . . . . . . . . | 1992 | 2,359 | SNTG BV | Swiss |
| Diersbuettel/Somtrans 8 . . . . . . . . . . . . . . . . . | 1992 | 2,103 | T/C by SNTG BV | Swiss |
| Stolt Tolerantie . . . . . . . . . . . . . . . . . . . . . | 1999 | 1,500 | T/C by SNTG BV | Dutch |
| Enterprise . . . . . . . . . . . . . . . . . . . . . . . . . . | 1991 | 1,608 | T/C by SNTG BV | Dutch |
| Turbulentie . . . . . . . . . . . . . . . . . . . . . . . . . . | 1986/1990 | 1,777 | T/C by SNTG BV | Dutch |
| Stolt Koeln . . . . . . . . . . . . . . . . . . . . . . . . . . | 1989 | 1,701 | SNTG BV | German |
| Stolt Berlin . . . . . . . . . . . . . . . . . . . . . . . . . | 1987 | 3,199 | SNTG BV | Swiss |
| Reesenbuettel/Somstrans 6 . . . . . . . . . . . . . . . | 1987 | 3,153 | T/C by SNTG BV | Swiss |
| Stolt London . . . . . . . . . . . . . . . . . . . . . . . . . | 1985 | 1,335 | SNTG BV | Dutch |
| Brunsbuettel/Somtrans 7 . . . . . . . . . . . . . . . . . | 1985 | 3,000 | T/C by SNTG BV | Dutch |
| Tesa . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1984 | 1,600 | T/C by SNTG BV | Dutch |
| Stolt Hoechst . . . . . . . . . . . . . . . . . . . . . . . | 1980 | 1,366 | SNTG BV | Swiss |
| Thystaad . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2000 | 2,500 | T/C by SNTG BV | Belgian |
| Tim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2000 | 2,452 | T/C by SNTG BV | Dutch |
| Pegasus . . . . . . . . . . . . . . . . . . . . . . . . . . | 1999 | 2,494 | T/C by SNTG BV | Belgian |
| Stolt Merlux . . . . . . . . . . . . . . . . . . . . . . . . | 2002 | 2,001 | T/C by SNTG BV | Dutch |
| Stolt Texas . . . . . . . . . . . . . . . . . . . . . . . . . | 2002 | 3,198 | T/C by SNTG BV | Dutch |
| Paris . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1991 | 2,103 | T/C by SNTG BV | German |
| Werverwind . . . . . . . . . . . . . . . . . . . . . . . . . . | 1988/2003 | 1,689 | T/C by SNTG BV | Dutch |

Total Outside STJS
(63 ships) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .                    262,148

GRAND TOTAL
(126 ships) . . . . . . . . . . . . . . . . . . . . . . . . . . . .                    2,087,792

Notes:

"SNTG BV" means Stolt-Nielsen Transportation Group B.V.

"NYK Stolt" means NYK Stolt Tankers, S.A., which is 50% owned by us.

"B/B" means bare boat chartered.

"T/C" means Time-Chartered.

"Barton" means Barton Partner Limited.

"Bibby" means Bibby Pool Partner Limited.

"Unicorn" means Unicorn Lines (Pty) Limited.

"NSSH" means NYK Stolt Shipholding Inc., which is 50% owned by us.

"SNAPL" means Stolt NYK Australia Pty. Ltd., which is 50% owned by us.

"TSI" means Twelve Ships Inc., to which 12 ships were sold to a third party and leased back to us.

(1)  Certain of our parcel tankers are subject to ship mortgages. Certain of our debt is secured by
     mortgages on vessels, tank containers, terminals and seafood facilities with a net book value of
     $1.6 billion as of November 30, 2002.

*Stolt Offshore*

Stolt Offshore operates one of the world's most advanced fleets of subsea construction support and flowline lay ships from which the majority of Stolt Offshore's subsea activities are performed. Stolt Offshore owns or charters a fleet consisting of eight construction support ships, four flowline lay ships, six survey/inspection, repair and maintenance ships, nine anchored construction and maintenance ships, one heavy lift ship, seven pipelay barges, four tugs and other ships, 85 ROVs (six of which are owned by a joint venture) and 6 hardsuits.

The following table describes our major assets as of March 31, 2003:

| Name | Capabilities | Year built/ Major upgrade | ROVs | Length overall (meters) | Owned/ Chartered |
|---|---|---|---|---|---|
| **Construction Support Ships** | | | | | |
| *Seaway Harrier* . . . . . . . . | Subsea construction | 1985 | 1 | 84 | Owned(1) |
| *Seaway Hawk* . . . . . . . . . | Subsea construction | 1978 | — | 93 | Owned |
| *Seaway Osprey* . . . . . . . . | Flexible flowline and umbilical lay, accepts coiled tubing, straightener for tubing, stern roller | 1984/1992/1996 | 2 | 102 | Owned(1) |
| *Seaway Eagle* . . . . . . . . . | Flexible flowline lay, multi-purpose subsea construction | 1997 | 2 | 140 | Owned(1) |
| *Seaway Legend* . . . . . . . . | ROV and hardsuit diving support, subsea construction | 1985/1998 | 2 | 73 | Owned |
| *Discovery* . . . . . . . . . . . . | Flexible flowline lay, subsea construction | 1990 | 1 | 120 | Chartered(2) |
| *Seaway Kingfisher* . . . . . . | Diverless inspection, repair and maintenance | 1990/1998 | 2 | 90 | Chartered(3) |
| *Seaway Explorer* . . . . . . . | Trenching ship | 1984 | — | 80 | Owned(1) |
| **Flowline Lay Ships** | | | | | |
| *Seaway Condor* . . . . . . . | Flexible flowline and umbilical lay, module handling system, trenching | 1982/1994/1999/2002 | 2 | 141 | Owned(1) |
| *Seaway Falcon* . . . . . . . . | Rigid and flexible flowline and umbilical lay | 1976/1995/1997 | 2 | 162 | Owned(1) |
| *Seaway Polaris* . . . . . . . . | Deepwater derrick/ pipelay barge | 1979/1991/1996/1999/2002 | — | 137 | Owned(1) |
| *Seaway Kestrel* . . . . . . . . | Rigid reel lay ship | 1976/1991/1995 | — | 99 | Owned(1) |
| **Survey / IRM Ships** | | | | | |
| *Seaway Defender* . . . . . . | ROV and hardsuit diving support, subsea construction | 1976 | 1 | 67 | Owned |

48

| Name | Capabilities | Year built/ Major upgrade | ROVs | Length overall (meters) | Owned/ Chartered |
|------|-------------|---------------------------|------|-------------------------|------------------|
| *Seaway Pioneer* . . . . . . . | ROV and hardsuit diving support, subsea construction | 1966/1996 | 1 | 64 | Owned |
| *Seaway Invincible* . . . . . . | ROV support, subsea construction | 1971 | — | 71 | Owned |
| *Seaway Rover* . . . . . . . . . | ROV support, subsea construction | 1966/1972/1983/1991 | — | 71 | Owned |
| *Elang Laut* . . . . . . . . . . | Multi-role shallow seismic/multibeam survey and geotechnical service ship | 1978 | — | 35 | Owned |
| *Far Saga* . . . . . . . . . . . . | ROV support, subsea construction | 2001 | 2 | 89 | Chartered(4) |
| **Anchored Construction & Maintenance Ships** | | | | | |
| *American Pride* . . . . . . . | Four-point anchor system | 1977/1992 | — | 59 | Owned |
| *American Constitution* . . . | Four-point anchor system, saturation diving, moonpool | 1974 | — | 64 | Owned |
| *American Eagle* . . . . . . . | Four-point anchor system | 1976 | — | 50 | Owned |
| *American Independence* . . | Four-point anchor system | 1970 | — | 52 | Owned |
| *American Star* . . . . . . . . | Four-point anchor system, saturation diving | 1967/1998 | — | 53 | Owned |
| *American Triumph* . . . . . | Four-point anchor system | 1965/1997 | — | 53 | Owned |
| *American Victory* . . . . . . | Four-point anchor system | 1976/1997 | — | 50 | Owned |
| *American Liberty* . . . . . . | Four-point anchor system | 1974 | — | 33 | Owned |
| *American Diver* . . . . . . . | Diving support | 1964 | — | 33 | Owned |
| **Heavy Lift Ships and Barges** | | | | | |
| *Stanislav Yudin* . . . . . . . . | Heavy lift, 2,500-ton crane | 1985 | — | 183 | Chartered(5) |
| *Annette* . . . . . . . . . . . . . | Pipelay barge, marine construction | 1972/1989/1997 | — | 61 | Owned |
| *Arwana* . . . . . . . . . . . . . | Pipelay barge | 1998 | — | 70 | Owned |
| *Jasamarine V (ex Sin Thai Hin IV)* . . . . . . . . . . . | Flat top barge fitted out for inshore diving/ construction | 1978 | — | 55 | Owned |
| *Seaway Orion* . . . . . . . . . | Pipelay barge | 1977/1984/1997 | — | 85 | Owned |
| *DLB 801* . . . . . . . . . . . . | Derrick lay barge | 1978/1980/1989 | — | 107 | Owned(1) |

49

| Name | Capabilities | Year built/ Major upgrade | ROVs | Length overall (meters) | Owned/ Chartered |
|---|---|---|---|---|---|
| *LB 200* . . . . . . . . . . . . . | Pipelay barge | 1975/1996 | — | 168 | Owned(1) |
| *CBL 103* . . . . . . . . . . . . | Seagoing barge | 1975/1985/1996 | — | 91 | Owned |
| **Tugs and Other** | | | | | |
| *Golek* . . . . . . . . . . . . . . | Transport barge | 1983/1992 | — | 46 | Owned |
| *Polka* . . . . . . . . . . . . . . | River tug and anchor handler | 1971 | — | 12 | Owned |
| *Seaway Sabiá* . . . . . . . . | Anchor Mooring support | 2002 | — | 37 | Owned |
| *DLB 1* . . . . . . . . . . . . . | Barge | 1956 | — | 91 | Owned |

(1)  Subject to mortgage under our current credit facilities.

(2)  Chartered from Friary Ocean Surveyor NV through September 2002, with options to extend through 2011 and with options to purchase.

(3)  Chartered from Kingfisher DA in which we have a 50% ownership, for five years starting in 1998, with 10 one-year options to extend through December 2013 and with options to purchase.

(4)  Chartered from Farstad Supply AS for five years beginning in 2002 with three one-year options to extend.

(5)  Chartered to SHL by a subsidiary of the ship's owner, Lukoil, through October 2004.

The environmental regulations which affect the utilization of the above assets are described in the section on "Governmental Regulation."

### *Other Properties*

In addition to owned or leased office space, we own or hold under long-term leases the following real property in connection with SNTG:

| | Owned | Leased | Debt Outstanding (as of 4/30/03) |
|---|---|---|---|
| | (acres) | | (in thousands) |
| Houston bulk liquid storage terminal . . . . . . . . . . . . . . . . . . . . . . . . | 246 | — | $75,600 |
| New Orleans bulk liquid storage terminal . . . . . . . . . . . . . . . . . . . . . | 118 | — | — |
| Santos bulk liquid storage terminal . . . . . . . . . . . . . . . . . . . . . . . . . . | 28 | — | — |
| Singapore tank container depot . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 4 | — |
| Rotterdam pier . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 3 | — |

*Stolt Offshore*

Stolt Offshore owns or holds under long-term leases, as of March 31, 2003, real estate property as described below:

| Location | Function | Office Space | Work or Storage Space or Land | Status |
|---|---|---|---|---|
| | | (square meters) | (square meters) | |
| Aberdeen, Scotland . . . . . . . | Offices, workshop and storage | 8,949 | 95,351 | Owned/Leased |
| Ardersier, Scotland . . . . . . . | Storage | — | 42,694 | Owned |
| Baku, Azerbaijan . . . . . . . . . | Offices | 66 | — | Leased |
| Bergen, Norway . . . . . . . . . . | Offices | 100 | — | Leased |
| Cairo, Egypt . . . . . . . . . . . | Offices | 250 | — | Leased |
| Dhahran, Saudi Arabia . . . . | Offices and storage | 330 | 750 | Leased |
| East Kalimantan, Indonesia . | Workshop and storage | — | 190,267 | Leased |
| Houston, Texas . . . . . . . . . . | Offices, workshop and storage | 4,830 | 9,467 | Leased |
| Houston, Texas . . . . . . . . . . | Offices, workshop and storage | 10,105 | 25,738 | Leased |
| Jakarta, Indonesia . . . . . . . . | Offices and storage | 915 | 601 | Leased |
| Kristiansund, Norway . . . . . . | Offices and storage | 120 | 800 | Leased |
| Lagos, Nigeria . . . . . . . . . . . | Offices | 200 | — | Leased |
| Lobito, Angola . . . . . . . . . . | Offices, fabrication and storage | 5,945 | 554,431 | Leased |
| Luanda, Angola . . . . . . . . . . | Offices and storage | 53 | 690 | Leased |
| Macae City, Brazil . . . . . . . . | Offices, workshop, fabrication and storage | 1,286 | 21,651 | Owned/Leased |
| Nanterre, France . . . . . . . . . | Offices | 22,364 | — | Leased |
| New Orleans, Louisiana . . . . | Offices, workshop and fabrication | 347 | 52,609 | Owned/Leased |
| Perth, Australia . . . . . . . . . . | Offices and storage | 440 | 1,750 | Leased |
| Port Gentil, Gabon . . . . . . . | Offices and storage | 305 | 5,070 | Owned/Leased |
| Port of Fourchon, Louisiana . | Offices and workshop | 52 | 39,256 | Leased |
| Port of Iberia, Louisiana . . . | Offices and workshop | 1,999 | 97,373 | Owned/Leased |
| Rio de Janeiro, Brazil . . . . . | Offices | 295 | — | Owned |
| Rotterdam, The Netherlands . | Storage | — | 4,200 | Leased |
| Rueil, France . . . . . . . . . . . | Offices | 5,235 | — | Leased |
| Sharjah, United Arab Emirates . . . . . . . . . . . . . | Offices | 1,570 | — | Leased |
| Singapore . . . . . . . . . . . . . . | Offices, workshop and storage | 928 | 4,606 | Leased |
| Stavanger, Norway . . . . . . . . | Offices | 7,721 | 562 | Leased |
| Sunbury, England . . . . . . . . | Principal executive offices | 765 | — | Leased |
| Tananger, Norway . . . . . . . . | Offices and storage | 250 | 26,000 | Leased |
| Tchengue, Gabon . . . . . . . . . | Offices and storage | 1,486 | 60,000 | Leased |
| Tehran, Iran . . . . . . . . . . . . | Offices | 200 | — | Leased |
| Warri, Nigeria . . . . . . . . . . . | Offices, fabrication and storage | 1,765 | 222,582 | Leased |

During 2003, Stolt Offshore plans for its North America region's headquarters to move to new, leased office premises in Houston.

**Item 5. Operating and Financial Review and Prospects.**

51

**Operating Results**

The information included under the caption "Management's Discussion and Analysis" on pages 17 through 30 of our 2002 Annual Report filed with the Securities and Exchange Commission on Form 6-K on April 18, 2003 is incorporated herein by reference. Refer also to "Recent Developments" below.

*Inflation*

Our business transactions in high-inflation countries are almost entirely denominated in stable currencies, such as the U.S. dollar and inflation therefore does not materially affect our consolidated financial results.

*Currency Fluctuations*

Our reporting currency is the U.S. Dollar. The U.S. Dollar is the functional currency of our most significant businesses. Our exposure to currency rate fluctuations affects both our operating costs and net investments in foreign subsidiaries. We do not use derivative instruments to hedge the value of investments in foreign subsidiaries. The net translation adjustments arising on the above currency exposures were $37.9 million gain, $8.6 million gain and $48.6 million loss for the years 2002, 2001, and 2000 respectively. These are recorded in Other Comprehensive Income in the Consolidated Statement of Shareholder's Equity.

We are also exposed to fluctuations in a number of currencies principally resulting from operating expenditures. Our currency exposure policy prescribes the range of allowable hedging activity. We are currently using forward exchange contracts to hedge these currency exposures. Our major foreign currency exposures are to the Euro, Norwegian Kroner, British Pound, Canadian Dollar, Japanese Yen and Singapore Dollar. These exposures are managed by entering into derivative instruments pursuant to our policies. Designation is performed on a specific exposure basis to support hedge accounting. The changes in the fair value of these derivative instruments are offset in part or in whole by corresponding changes in the fair value of the underlying exposures being hedged.

All of our derivative instruments are over-the-counter instruments entered into with major financial credit institutions to hedge our committed exposures. Our derivative instruments are primarily standard foreign exchange forward contracts, which subject us to a minimum level of exposure risk and have various maturities not to exceed 60 months. We do not consider that we have a material exposure to credit risk from third parties failing to perform according to the terms of derivative instruments. Further details are included in Note 24 to our Consolidated Financial Statements.

**Liquidity and Capital Resources**

The information included under the caption "Management's Discussion and Analysis" on pages 17 through 30 of our 2002 Annual Report filed with the Securities and Exchange Commission on Form 6-K on April 18, 2003 is incorporated herein by reference. Refer also to "Recent Developments" below.

**Research and Development; Patents and Licenses**

*Stolt-Nielsen Transportation Group*

SNTG does not have significant expenditures for research and development.

*Stolt Offshore*

Stolt Offshore has a long history of innovation and the development of new technologies that have contributed significantly to the evolution of the offshore oil and gas industry. Particular strengths include its construction techniques, which include but are not limited to: deepwater pipeline laying and umbilicals installation, deep water river technology, subsea construction equipment, remote intervention technologies and automated welding systems. Stolt Offshore's expenditures on research and development were less than $1 million in each of 2002, 2001 and 2000.

Two of Stolt Offshore's notable developments have recently been successfully applied to great effect on deep water projects in West Africa. These include the riser bundle tower technology and the automatic bolted flange connection system known as MATIS™.

In deepwater field developments, it is critical to keep the hydrocarbon fluids sufficiently warm to prevent the blockage of flowlines and risers caused by the formation of for example wax, with the riser being the most critical area. The riser bundle tower technology that Stolt Offshore developed and introduced on the Girassol Project in Angola has proven to be an excellent solution to these difficult flow assurance issues. A number of riser pipes can be bundled together in one riser tower and then surrounded in foam to provide the necessary insulation. The towers, which are built onshore and then towed to the field for upending and installation are connected to the production ship using a series of short flexible pipes.

The introduction of standard flange connectors for deep water applications is now a reality owing to the introduction of the MATIS™ remote tooling system. MATIS™ has been one of Stolt Offshore's long term research and development projects, which has now been successfully introduced to the market place. The system has now been used to remotely connect in excess of 70 flanges as part of the operation to link together the subsea flowline and riser systems at the Girassol Field at water depths of around 1,500 meters. Standard flanges have a considerable cost advantage over the proprietary remote connectors normally used for deep water applications, as well as a track record of successful subsea applications throughout the world.

Stolt Offshore has a current active research and development program based upon a combination of internally directed development projects and participation in external joint industry projects. The Group Technical Division (GTD), whose resources are split evenly between Stolt Offshore's facilities in Aberdeen and Paris, manages the research and development program centrally. The research and development work is mainly performed internally. Where a particular technical expertise is not internally available Stolt Offshore forms strategic alliances with specific specialist companies in the area of interest. Projects currently in progress include the development of ultra deep water handling systems aimed at meeting the challenges of future field developments with water depths in excess of 2,000 meters. In these conditions, conventional systems based upon steel wire rope become limiting due to the weight of the wire rope. Developments are currently in progress to investigate ways in which lightweight synthetic fiber ropes can be used to replace steel wire for these applications. Other development areas include the further development of the riser tower technology to improve on the initial design from both a technical and cost efficiency point of view, and the development of inflatable buoyancy units for subsea applications. Stolt Offshore also performs research and development work directly with its customers; one example is the ongoing development work to investigate ways of removing large North Sea steel structures. In this particular project Stolt Offshore is working together with a group of major North Sea operations to develop tools and techniques to remove these large structures using remote technology.

Ongoing development activities are also related to the improvement of Stolt Offshore's major assets such as ships and equipment. Stolt Offshore has recently begun to investigate ways in which the transit speed of key ships within its fleet can be improved. The transit speed can have a significant commercial impact, as the ship is effectively idle during the transit period. Projects are also in progress

in the area of deep water pipelay. These range from improvements implemented to increase the capacity of existing equipment such as the J Lay Tower onboard the *Seaway Polaris*, to the development of next generation of deep water pipelay systems.

Stolt Offshore's Technical Department performs continuous medium-to long-range research into new technical solutions to industry related processes.

In addition Stolt Offshore's development activities are also related to customer and project-specific development efforts. Within these areas Stolt Offshore undertakes to tailor systems and equipment to the needs of a customer in connection with specific orders or projects. Stolt Offshore's customers pay for order-related developments as part of the contract price. They are accounted for as cost of sales until the relevant project is completed, after which the expenditure is capitalized if Stolt Offshore retains the asset in question and it is recognized as having extended useful life.

*Stolt Sea Farm*

SSF aims to be at the forefront of the development of new species and technology in the aquaculture industry. Expenditures in research and development include: farming methods, disease control, new equipment, breeding programs, and new species such as halibut and sole.

**Recent Developments**

In early 2003, Stolt Offshore's new senior management team began a review of its major projects and identified substantially poorer than anticipated performance and cost overruns on three major projects and several smaller projects. In addition, it is expected that activity levels will be slightly lower than previously anticipated. As a result of these factors, we expect to incur a loss in the 2003 fiscal year. A substantial portion of these losses will be incurred in the second quarter of 2003. The specific reasons for the increased losses include:

- Burullus Scarab Saffron, the first deepwater project of its type offshore Egypt which is now completed, where a further downgrade has been identified to provide for additional ship utilization days, poor performance of nominated sub-contractors and delays in claim resolution.

- OGGS, in the harsh operating environment of Nigeria and now 80% completed, where forecasted costs have increased mainly due to additional ship utilization days and higher than estimated local support costs in West Africa.

- Bonga, also offshore Nigeria, where the project is 50% complete, forecasted costs have increased due to higher project management and engineering, procurement and sub-contractor, and transport and logistics costs.

- On smaller projects, where provisions are likely to be made in respect of risk on collection of receivables, lower activity levels and lower ship utilization.

In early 2003 Stolt Offshore amended the financial covenants contained in its primary credit facilities to more appropriately reflect Stolt Offshore's financial prospects at that time. Based on those amendments, we expected that there would be a narrow margin of compliance with the financial covenants throughout the 2003 fiscal year. In light of the revised earnings expectations described above, we are working closely with Stolt Offshore's main banks in seeking to amend Stolt Offshore's primary credit facilities to reflect Stolt Offshore's current financial position, including obtaining a waiver of certain financial covenant tests until November 30, 2003. As an interim step, Stolt Offshore's banks have agreed to a 30-day "standstill" through June 30, 2003 whereby they will take no actions on any potential noncompliance with the financial covenants while internal bank approvals are sought and documentation is completed. Without a waiver of certin financial covenants, Stolt Offshore would be out of compliance with its primary credit facilities. If we cannot reach final agreement with Stolt

Offshore's bank lenders on the terms of amendments and/or waivers to Stolt Offshore's primary credit facilities, Stolt Offshore's noncompliance with its primary credit facilities could potentially lead to the credit facilities being repayable on demand. Stolt Offshore would not be able to repay these facilities on demand, unless an alternative financing source could be arranged.

Additionally, a material default under Stolt Offshore's credit facilities could, in turn, result in a default under one of our bank credit or other financing agreements. If a default were to extend beyond the applicable remedy or cure period under either Stolt Offshore's or our credit facilities, the financing agreement could become repayable on demand. It is unlikely that we could repay any such facility on demand without selling the assets securing such facility, unless an alternative financing source could be arranged.

## Item 6. Directors, Senior Management and Employees.

### Directors and Senior Management

We are a Luxembourg holding company with only three officers of SNSA. The following is a list of our Directors and persons employed by our subsidiaries who perform the indicated executive and administrative functions for the combined business of our subsidiaries:

| Name | Age* | Position |
|------|------|----------|
| Jacob Stolt-Nielsen | 71 | Chairman of the Board |
| Niels G. Stolt-Nielsen | 38 | Director and Chief Executive Officer, Stolt-Nielsen S.A. |
| Kinichi Hirayama | 60 | Director |
| Erling C. Hjort | 66 | Director |
| Christer Olsson | 57 | Director |
| Jacob B. Stolt-Nielsen | 40 | Director and Chief Executive Officer, SeaSupplier |
| Christen Sveaas | 46 | Director |
| Christopher J. Wright | 68 | Director |
| Jan Chr. Engelhardtsen | 51 | Chief Financial Officer, Stolt-Nielsen S.A. |
| John Wakely | 55 | Executive Vice President, Stolt-Nielsen S.A. |
| Samuel Cooperman | 57 | Chairman, Stolt-Nielsen Transportation Group, SeaSupplier and Optimum Logistics |
| Reginald J.R. Lee | 59 | Chief Executive Officer, Stolt-Nielsen Transportation Group |
| Tom Ehret | 51 | Chief Executive Officer, Stolt Offshore |
| James S. Lorentzen | 46 | Chief Executive Officer, Stolt Sea Farm |
| Andrew LeSueur | 36 | Chief Executive Officer, Optimum Logistics |

\*    As of April 30, 2003.

Under the terms of our Articles of Incorporation, our Directors may be elected for terms of up to six years, and serve until their successors are elected. It has been our practice to elect Directors for one-year terms. Under the Articles of Incorporation, the Board may consist of not fewer than three nor more than nine Directors at any one time. Our Board of Directors currently consists of eight members.

Mr. Jacob Stolt-Nielsen has served as our Chairman of the Board since he founded Stolt-Nielsen in 1959. He also serves as Chairman of the Board of Directors of Stolt Offshore S.A. He held the position of Chief Executive Officer of Stolt-Nielsen S.A. from 1959 until 2000. He was trained as a shipbroker and worked in that capacity in London and New York prior to founding the Company. He holds a degree from Handelsgymnasium, Haugesund, Norway. He is a Norwegian citizen.

Mr. Niels G. Stolt-Nielsen has served as a Director since 1996 and as Chief Executive Officer since 2000. He serves as a Director of Stolt Offshore S.A and served as Interim Chief Executive Officer, Stolt Offshore S.A. from September 2002 until March 2003. He has served as Chairman, Stolt Sea

Farm since January 2003 and held the position of Chief Executive Officer, Stolt Sea Farm from 1996 until September 2001. In 1994 he opened and organized our representative office in Shanghai. He joined us in 1990 in Greenwich, CT, working first as a shipbroker and then as a round voyage manager. Mr. Stolt-Nielsen graduated from Hofstra University in 1990 with a BS degree in Business and Finance. Mr. Niels G. Stolt-Nielsen is a son of Mr. Jacob Stolt-Nielsen. He is a Norwegian citizen.

Mr. Hirayama has served as a Director since 2000. Mr. Hirayama is presently Chairman and Chief Executive Officer of Nippon Yusen Kaisha ("NYK") Line (North America) Inc. and Senior Managing Director of NYK Line. He joined NYK Line in 1965 and has worked in both Japan and the U.S.A. in various positions within NYK. He is a graduate of Keio University where he majored in Economics. He is a Japanese citizen.

Mr. Hjort has served as a Director since 1995. He is a graduate of the Faculty of Law at the University of Oslo. In 1964 he joined the Norwegian law firm, Wikborg, Rein & Co. in Oslo, where he was admitted to the bar in the same year. In 1970 he was admitted to the bar of the Norwegian Supreme Court and in 1993 he became the Senior Partner in Wikborg, Rein & Co. He is a Norwegian citizen.

Mr. Olsson has served as a Director since 1993. He is President and CEO of Wallenius Lines AB and Chairman of WalleniusWilhelmsen Lines A/S. He also serves as Chairman of UECC and the Swedish Club, Vice Chairman of Gorthon Lines AB and a Director of B&N AB, Atlantic Container Line AB and the Swedish Shipowners Association. He received his BLL degree from Stockholm University. He is a Swedish citizen.

Mr. Jacob B. Stolt-Nielsen has served as a Director since 1995. In 2000, he founded and currently serves as Chief Executive Officer of SeaSupplier Ltd. From 1992 until 2000 he held the position of President, Stolthaven Terminals, with responsibility for our global tank storage business. He joined us in 1987 and served in various positions in Oslo; Singapore; Greenwich, CT; Houston, TX; and London. Mr. Stolt-Nielsen graduated from Babson College in 1987 with a BS degree in Finance and Entrepreneurial studies. Mr. Jacob B. Stolt-Nielsen is a son of Mr. Jacob Stolt-Nielsen. He is a Norwegian citizen.

Mr. Sveaas has served as a Director since May 2002. He is a private investor and chairs his own investment company, Kistefos AS, which has investments in shipping, offshore services, real estate and venture capital. He is a director of Orkla ASA and HemoCue AB, and is a senior advisor to the international investment firm EQT Scandinavia and EQT Northern Europe Limited. He is also a member of the Board of Representatives of Storebrand ASA, and Member of the Dean's Council, John F. Kennedy School of Government, Harvard University. He has a Lic.Oec. HSG-degree from the University of St. Gall, Switzerland. He is a Norwegian citizen.

Mr. Wright has served as a Director since May 2002. He served as our President and Chief Operating Officer from 1986 to December 2001. He was employed by British Petroleum plc ("BP") from 1958 until the time he joined the Company. He held a variety of positions at BP working in Scandinavia, Asia, the U.S.A. and London. Mr. Wright holds a Masters degree in History from Cambridge University. He is a British citizen.

Mr. Engelhardtsen has served as Chief Financial Officer since 1991. He served as Interim Chief Financial Officer, Stolt Offshore S.A. from September 2002 until March 2003. He served as President and General Manager of Stolt-Nielsen Singapore Pte. Ltd. from 1988 through 1991. He has been associated with Stolt-Nielsen since 1974. Mr. Engelhardtsen holds an M.B.A. from the Sloan School at the Massachusetts Institute of Technology, as well as undergraduate degrees in Business Administration and Finance. He is a Norwegian citizen.

Mr. Wakely has served as Executive Vice President since January 2002 responsible for tax planning, internal audits and legal. He joined Stolt-Nielsen in 1988 and held various positions in the

56

controllership, internal auditing and tax planning areas. He was employed by BP prior to his employment with Stolt-Nielsen. Mr. Wakely is a member of the Chartered Institute of Management Accountants. He is a British citizen.

Mr. Lee has served as Chief Executive Officer, Stolt-Nielsen Transportation Group since 2000. Previously, he served as Managing Director of Stolt Tank Containers. He joined Stolt-Nielsen in 1981. He is a British citizen.

Mr. Ehret was appointed Chief Executive Officer of Stolt Offshore in March 2003. He joined Comex, a predecessor to Stolt Offshore, in 1975 and held design engineering and project management positions based in Paris, London and Houston. In 1978 he joined the FMC Corporation, where he became a member of the Executive Committee of FMC Europe. In 1982 he returned to Comex as a member of the Comex Group Executive committee and Managing Director of Comex Houlder Diving. In 1989 Mr. Ehret became Chief Executive Officer at Stena Offshore. Between 1989 and 2002 he held a number of key senior management positions within the Coflexip Stena Offshore and Technip-Coflexip Groups and was ultimately Vice Chairman of the Management Board of the Technip-Coflexip Group and President of its Offshore Branch. Mr. Ehret holds a masters degree in Mechanical Engineering at Ecole des Arts et Metiers, Paris. He is a French citizen.

Mr. Stove Lorentzen has served as Chief Executive Officer, Stolt Sea Farm since September 2001. He has previously worked for Stolt-Nielsen in a number of marketing and management posts in the tanker and terminal divisions of the Stolt-Nielsen Transportation Group. Most recently he has held senior management positions with Belships in both Oslo and Singapore. Mr. Stove Lorentzen has a business studies degree from HEC in Lausanne and an M.B.A. from IMI in Geneva. He is a Norwegian citizen.

Mr. LeSueur served as Chief Executive Officer, Optimum Logistics Ltd. from August 2002 until April 2003. He joined Optimum Logistics in 2001 as Chief Operating Officer. Previously he was Vice President of Strategic Services and General Manager at ICG Commerce Inc. and a Principal with A.T. Kearney, Inc. He also held various international sales positions with Westvaco Corporation. Mr. LeSueur holds B.A. in International Relations from Brown University and an M.B.A. from Harvard University School of Business Administration. He is a U.S. citizen.

Mr. Cooperman serves as Chairman of Stolt-Nielsen Transportation Group Ltd., SeaSupplier Ltd., and Optimum Logistics Ltd. (until April 2003, when Optimum Logistics was sold to Elemica). Previously, he served as Chief Executive Officer, Optimum Logistics, Chief Executive Officer, Stolt-Nielsen Transportation Group and Chief Executive Officer of Stolt Parcel Tankers Inc. He joined Stolt-Nielsen in 1974. Mr. Cooperman received B.S. and M.S. degrees in Electrical Engineering from Columbia University and the University of Pennsylvania, respectively, and an M.B.A. from Temple University. He is a U.S. citizen.

Jacob B. Stolt-Nielsen and Niels G. Stolt-Nielsen are the sons of Jacob Stolt-Nielsen.

Bernard Vossier served as Chief Executive Officer, Stolt Offshore from May 1995 until October 2002. He has been a Director of Stolt Offshore since 2000. Previously he served as Chief Operating Officer of that business from December 1994 to May 1995. He joined Comex in 1974.

Richard Fisher served as a Director from May 2002 until December 2002 when he resigned.

Under a Shareholders' Agreement between NYK and an entity controlled by the Stolt-Nielsen family, during the term of such agreement and for so long as NYK shall own at least 5,500,000 Common Shares, (or the equivalent thereof after any stock split or recapitalization), such entity shall support NYK's nomination of one person to our Board of Directors.

**Compensation**

As described above, SNSA has only three officers, but certain persons employed by our subsidiaries perform executive and administrative functions for the combined business of our subsidiaries. The aggregate annual compensation paid to the nine members of senior management, excluding non-executive directors, performing such executive functions for us for the fiscal year ended November 30, 2002 (including employee performance incentive awards and certain benefits) was $4,020,800. In addition, $145,300 was contributed on behalf of such directors and members of senior management to defined contribution pension plans maintained by us and our subsidiaries. The Directors and members of senior management also received stock option awards in 2002 for 120,000 Common Shares with an exercise price of $5.90 and expiring in December 2012. During 2002, our executive directors received no compensation for their services as such, but received reimbursement of their out-of-pocket expenses. The non-executive directors, with the exception of NYK's nominated director, received an aggregate fee of $221,400 plus expenses for serving on the Board and Committees.

*Employee Performance Incentive Plan*

We have employee performance incentive plans which are based in part on the net profits earned by each of our individual businesses (after specified adjustments) and in part on performance in meeting individual performance objectives. SNTG's and SSF's Plans are administered by a Compensation Committee appointed by our Board of Directors. The Stolt Offshore Plan is administered by a Compensation Committee appointed by Stolt Offshore's Board of Directors. For the fiscal year ended November 30, 2002, the SNTG, SOSA and SSF programs paid $4.9 million, $2.8 million and $0.5 million, respectively, of which $210,000 was paid to those officers performing executive and administrative functions.

**Board Practices**

The standing committees of the Board of Directors consist of an Audit Committee and a Compensation Committee.

*Audit Committee*

The Audit Committee, formed in 1988, meets regularly to review our audit practices and procedures, scope and adequacy of internal controls and related matters, our financial statements and to advise the Board on such matters. The Audit Committee recommends to the Board of Directors the annual appointment of auditors, the scope of audit and other assignments to be performed by the auditors and the fees relating thereto. The Audit Committee also meets periodically with representatives of our auditors, to review the scope of our auditors' engagement with respect to the audit of our financial statements and to review the recommendations arising therefrom. The current members of the Audit Committee are Messrs. Hjort (Chairman), Olsson and Sveaas. Mr. Carroll N. Bjornson, a former Director of Stolt-Nielsen who retired from the Board in 2002, was also a member of the Audit Committee in 2001 and early 2002.

*Compensation Committee*

The Compensation Committee, formed in 1988, reviews and approves salaries for our executive officers, salary parameters for all other staff, employee performance awards (if any, pursuant to our Employee Performance Incentive Plan) and stock option awards under our stock option plans. The current members of the Compensation Committee are Messrs. Jacob Stolt-Nielsen (Chairman), Niels G. Stolt-Nielsen, Olsson and Wright. Mr. Carroll N. Bjornson, a former Director of Stolt-Nielsen who retired from the Board in 2002, was also a member of the Compensation Committee in 2001 and early 2002.

*Service Contracts*

No Director has a service contract that provides for benefits upon termination.

**Employees**

The average number of persons employed during the three years ended November 30, 2002 are as follows:

| | Average number of employees | | |
|---|---|---|---|
| | Years ended November 30, | | |
| | 2002 | 2001 | 2000 |
| Transportation[a] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,144 | 4,298 | 4,305 |
| Offshore Construction[b] . . . . . . . . . . . . . . . . . . . . . . . . | 6,666 | 6,553 | 4,770 |
| Seafood . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,332 | 1,736 | 1,149 |
| All Other[c] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 67 | 67 | 44 |
| | 13,209 | 12,654 | 10,268 |

---

[a] Corporate service employees are included within Transportation and related costs are allocated to the other business units based on services provided.

[b] As of the year ended November 30, 2002 the total number of employees was approximately 6,666 comprised of 3,927 permanent employees and 2,739 temporary employees.

[c] All Other includes the employees of Optimum Logistics Ltd. and SeaSupplier Ltd.

*Unions*

Twelve SNTG-owned ships are manned by Filipino officers and crew, eleven by Latvian officers and crew and four by Russian officers and crew. Various SNTG-owned ships are also manned by Polish officers. SNTG maintains its own crewing office and training center in Manila to provide Filipino officers and crew members for its fleet, all of whom belong to the Associated Marine Officers' and Seamen's Union of the Philippines. SNTG owns 49% of its crewing agent in Latvia to provide Latvian officers and crew members who belong to the Latvian Seafarers' Union of Merchant Fleet Riga, and those from Russia belong to the Seafarers' Union of Russia. All such unions are affiliated with the International Transport Workers Federation in London. The collective bargaining agreements remain in full force and effect as of April 30, 2003. Hourly employees at certain of SNTG's terminals are also covered by union contracts. A significant number of Stolt Offshore's employees are represented by labor unions. As part of normal business, a number of union agreements come up for annual renegotiation in 2003. We have not experienced any significant work stoppages and consider our relations with our unionized employees and their unions to be good.

**Share Ownership**

Each of our Directors and executive officers, on an individual basis, and all Directors and executive officers as a group beneficially owns less than one percent of the Common Shares outstanding as of April 30, 2003. After consideration of Common Shares receivable upon exercise of employee stock options exercisable within 60 days after April 30, 2003, that are deemed to be beneficially owned at said date, each of our directors and executive officers would directly own less than one percent of Common Shares on an individual basis. All Directors and executive officers as a group (15 persons) would directly own 1.8% of our Common Shares outstanding.

Reference is made to "Item 7. Major Shareholders and Related Party Transactions" for a discussion of Common Shares owned by Fiducia Ltd., which is owned by trusts of which members of the Stolt-Nielsen family are beneficiaries. Total shares owned by Fiducia Ltd. and Jacob Stolt-Nielsen,

Jacob B. Stolt-Nielsen and Niels G. Stolt-Nielsen represent 49.6% of the Common Shares outstanding as of April 30, 2003.

Our 1987 Stock Option Plan (the "1987 Plan") covers 2,660,000 Common Shares and our 1997 Stock Option Plan (the "1997 Plan") covers 5,180,000 Common Shares. No further grants will be issued under the 1987 Plan. Options granted under the 1987 Plan, and those which have been or may be granted under the 1997 Plan are exercisable for periods of up to ten years. The options granted under the 1987 Plan and the 1997 Plan are or will be at an exercise price not less than the fair market value per share at the time the option was or is granted. The 1987 Plan and the 1997 Plan are administered by a Compensation Committee appointed by our Board of Directors. The Compensation Committee awards options based on the grantee's position in Stolt-Nielsen, degree of responsibility, seniority, contribution to Stolt-Nielsen and such other factors as it deems relevant under the circumstances.

In March 2001, we completed a share reclassification whereby our outstanding non-voting Class B Shares were reclassified as Common Shares on a one-for-one basis. All Class B Shares issued in connection with the exercise of options will immediately convert to Common Shares upon issuance.

As of April 30, 2003, options for 4,020,183 Common Shares were outstanding under the 1987 and 1997 Plans. Of this total, options for 1,098,950 Common Shares were outstanding in accordance with their stated terms to our Directors and executive officers. Each of our Directors or executive officers hold options exercisable for shares representing less than 1% of our outstanding Common Shares. The options are exercisable at the respective prices set out below and expire on the dates indicated:

| Exercise Price | Number of Common Shares | Expiration Date |
| --- | --- | --- |
| $ 0.0 | 262,754 | August 2003-December 2005 |
| 17.50 | 4,000 | August 2003 |
| 15.75 | 123,500 | December 2003 |
| 19.75 | 163,800 | December 2004 |
| 25.38 | 3,000 | June 2005 |
| 28.63 | 228,850 | December 2005 |
| 16.88 | 4,250 | September 2006 |
| 17.13 | 148,863 | December 2006 |
| 17.50 | 148,976 | December 2006 |
| 22.50 | 2,500 | August 2007 |
| 22.13 | 2,500 | August 2007 |
| 20.13 | 356,350 | December 2007 |
| 9.88 | 353,450 | December 2008 |
| 11.94 | 2,100 | April 2009 |
| 14.63 | 412,425 | December 2009 |
| 20.50 | 2,600 | October 2010 |
| 17.73 | 5,000 | December 2010 |
| 14.75 | 506,975 | December 2010 |
| 13.10 | 589,350 | December 2011 |
| 5.90 | 698,940 | December 2012 |
| | 4,020,183 | |

## Item 7. Major Shareholders and Related Party Transactions.

### Major Shareholders

We are not, directly or indirectly, owned by another corporation or by any government. There are no arrangements known to us, the operation of which may at a subsequent date result in a change in control of Stolt-Nielsen.

Set out below is information concerning the share ownership of all persons who owned beneficially 5% or more of our Common Shares and Founder's Shares as of April 30, 2003:

| Name of Beneficial Owner or Identity of Group | Number of Common Shares | Percentage of Class | Number of Founder's Shares | Percentage of Class | Number of Voting Securities | Percentage of Voting Securities |
|---|---|---|---|---|---|---|
| Fiducia Ltd., which is owned by Trusts of which the Stolt-Nielsen Family (including Niels G. Stolt-Nielsen and Jacob B. Stolt-Nielsen) are Beneficiaries . . | 27,253,129(a) | 49.6% | — | — | 27,253,129 | 39.7% |
| Jacob Stolt-Nielsen . . . . . . . . . . . . | — | — | 13,737,346 | 87.7% | 13,737,346 | 20.0% |
| Nippon Yusen Kaisha Ltd. ("NYK") . . . . . . . . . . . . . . . . . . | 5,500,000 | 10.0% | — | — | 5,500,000 | 8.0% |
| Odin Forvaltning AS ("Odin") . . . . | 4,226,780 | 7.7% | — | — | 4,226,780 | 6.2% |

(a) Includes aggregate of 247,974 Common Shares owned by Jacob Stolt-Nielsen and members of his immediate family, including Jacob B. Stolt-Nielsen and Niels G. Stolt-Nielsen.

As of April 30, 2003, there were 15,659,549 Founder's Shares issued of which 13,737,346 were owned by Mr. Stolt-Nielsen and 1,922,203 were held by us as Treasury Shares. As a result of the ownership of the Founder's Shares, and his beneficial ownership of Common Shares noted above, Mr. Stolt-Nielsen and his family control 59.7% of our outstanding voting securities.

As of April 30, 2003, Stolt-Nielsen Transportation Group Ltd. owned 7,688,810 Common Shares. Under applicable provisions of the Luxembourg Company Law, these shares remain issued but are not entitled to vote. In computing earnings per Common Share, these shares are not considered part of outstanding shares. The cost of these shares is being accounted for similar to treasury stock, as a deduction from shareholders' equity.

As a result of the March 7, 2001 share reclassification, there has been a significant change in the percentage of voting securities held by the major shareholders listed in the above table during the past three years. Fiducia Ltd.'s (including Common Shares and Founders' Shares owned by the Stolt-Nielsen family) percentage of voting securities has ranged from 89.1% to 59.7%, NYK's percentage of voting securities has ranged from 8.1% to 10.0% and Odin's percentage of voting securities has ranged from 0% to 6.2% over the past three years. For a further discussion see "Item 10. Additional Information — Voting Rights."

As of March 20, 2003, the record date for the Annual General Meeting, all of our 62,638,197 Common Shares were registered in the Verdipapirsentralen ("VPS") in the names of 920 shareholders. Excluding Treasury Common Shares held by Stolt-Nielsen Transportation Group Ltd., outstanding Common Shares registered in the name of Fiducia Ltd. and NYK and outstanding Common Shares registered in the name of Citibank N.A. as depositary for the ADSs, it is estimated that the free float of Common Shares on the Oslo Stock Exchange is 16,790,510. As of March 20, 2003, the record date for Annual General Meeting, there was a total of 37,231,815 ADSs registered in the names of 106 shareholders. Of the ADSs, 83,331 ADSs were registered in the names of 76 shareholders having U.S. addresses (although some of such ADSs may be held on behalf of non-U.S. persons). Based on communications with banks and securities dealers who hold our ADSs in street name for individuals, we estimate the number of beneficial owners of ADSs is approximately 1,800. Excluding outstanding ADSs registered in the name of Fiducia Ltd. and NYK and Treasury ADSs registered in the name of the Stolt-Nielsen Transportation Group Ltd., it is estimated that the free float of ADSs on Nasdaq is 5,405,748.

**Related Party Transactions**

*Share Ownership*

As of April 30, 2003, SNTG owned 41,686,988 of the common shares of Stolt Offshore and all 34,000,000 of Stolt Offshore's Class B shares. This ownership represents an economic interest in Stolt Offshore of approximately 63.5% and a voting interest of approximately 69%. As of April 30, 2003, the Stolt-Nielsen family, directly and indirectly through Fiducia Ltd., controlled approximately 59.7% of our outstanding shares entitled to vote generally on matters brought to a vote of our shareholders.

*Arrangements and Transactions with Stolt Offshore*

We and Stolt Offshore have developed a number of arrangements and engage in various transactions as affiliated companies. We believe that these arrangements and transactions, taken as a whole, are based on arm's length principles to accommodate our respective interests in a manner that is fair and beneficial to both parties. However, because of the scope of the various relationships between us and Stolt Offshore (and our respective subsidiaries), we cannot assure you that each of the agreements and transactions, if considered separately, has been or will be effected on terms no less favorable to us than could have been obtained from unaffiliated third parties.

All material arrangements with Stolt Offshore are reviewed by the audit committee of our Board of Directors consisting of directors who are not employees or officers of either Stolt-Nielsen or Stolt Offshore and who are not related to the Stolt-Nielsen family. Existing material arrangements include agreements with an affiliate of us under which the affiliate provides certain management, administrative, accounting, financial and other services to us. From time to time we or our affiliates may provide for or guarantee some of Stolt Offshore's financing, and Stolt Offshore's continued access to such financing would depend on a number of factors, including compliance by us or our affiliates with covenants in our financing arrangements.

Pursuant to a corporate services agreement, we supply through our subsidiaries, financial, risk management, public relations and other services to Stolt Offshore for an annual fee based on costs incurred in rendering those services. The fee is subject to negotiation and agreement between us and Stolt Offshore on an annual basis. The fees for 2002, 2001 and 2000 were approximately $3.2 million, $3.7 million and $3.3 million, respectively. The services agreement is automatically renewed for additional one-year terms unless we and Stolt Offshore are unable to agree on the annual fees payable. The services agreement may also be terminated by either party on the occurrence of certain events, including the other party's:

- failure to pay amounts due under the services agreement within 15 days after notice;

- breach of any material obligation under the services agreement and failure to cure any breach within 30 days after notice; and

- bankruptcy or related proceedings.

**Purchases of Stolt Offshore Common Shares**

In May 2002, we advanced $64.0 million to Stolt Offshore in order to assist Stolt Offshore to repurchase the 6,142,857 Common Shares previously issued to Vinci and to settle the share price guarantee. Stolt Offshore subsequently issued 6,392,478 Common Shares to us during 2002 for $38.4 million, which was used to partially repay the debt due to us. In November 2002, Stolt Offshore issued 6,019,287 Common Shares to us for proceeds of $25.6 million to repay the remaining outstanding portion of the $64.0 million loan.

*Liquidity Line to Stolt Offshore*

Stolt Offshore has obtained a commitment from us to provide a subordinated credit line of $50 million which is currently available until November 28, 2003 and which is excluded in the calculation of covenants for Stolt Offshore's financing arrangements. On February 28, 2003, Stolt Offshore made a drawdown of $48 million against this $50 million liquidity line provided by us. The $48 million drawdown was repaid within seven days.

*Stolt Tankers Joint Service*

SNTG operates its major intercontinental services through the STJS, an arrangement for the coordinated marketing, operation and administration of the fleet of parcel tankers owned or chartered by the Joint Service participants in the deep sea intercontinental market. For further discussion of the STJS, see "Item 4. Information on the Company — Business Overview."

## Item 8. Financial Information.

### Consolidated Statements and Other Financial Information

The information included under the captions "Independent Auditors' Report," "Report of Independent Public Accountants," "Consolidated Financial Statements" and "Notes to Consolidated Financial Statements" on pages 32 through 62 of our 2002 Annual Report filed with the Securities and Exchange Commission on Form 6-K on April 18, 2003 and as amended on June 2, 2003 is incorporated herein by reference.

### Legal Proceedings

*Stolt-Nielsen S.A. and Stolt-Nielsen Transportation Group*

*Antitrust Investigations*

In 2002, we became aware of information that caused us to undertake an internal investigation regarding potential improper collusive behavior in our parcel tanker and intra-Europe inland barge operations. As a consequence of the internal investigation, we determined to voluntarily report certain conduct to the Antitrust Division of the U.S. Department of Justice (the "DOJ") and the Competition Directorate of the European Commission (the "EC"). On February 25, 2003, we announced that SNTG had been conditionally accepted into the DOJ's Corporate Leniency Program in connection with possible collusion in the parcel tanker industry. Pursuant to such program, SNTG and its directors and employees will receive amnesty from criminal antitrust prosecution and fines in the United States for anti-competitive conduct in the parcel tanker business, provided the stated conditions, including continued cooperation, are met. We also announced that the EC had admitted SNTG into its Immunity Program with respect to deep-sea parcel tanker and intra-Europe inland barge operations. Acceptance into the EC program affords SNTG immunity from EC fines with respect to anti-competitive behavior, subject to the SNTG fulfilling the conditions of the program, including continued cooperation. We are committed to cooperating fully with the DOJ and the EC with respect to such programs. In light of SNTG's admission into the government antitrust programs, no provision for any fines related to the DOJ or EC investigations has been made in our consolidated financial statements. However, our ability to enforce the agreements pursuant to which SNTG has been granted conditional amnesty and immunity has not been legally established. Consequently, SNTG's immunity and amnesty depends in large part on the Department of Justice's and European Commission's satisfaction with SNTG's efforts to cooperate and otherwise satisfy the conditions of the immunity and amnesty programs. It is possible that they could determine, because of new information or for other reasons, that SNTG has not fully complied with those conditions. If this were to happen, SNTG could be partly or fully removed from the immunity or amnesty program, subject to criminal prosecution and, if it were found guilty,

significant fines and penalties. If any such proceedings were brought by the Department of Justice or European Commission, SNTG could incur significant additional defense costs and significant distraction of senior management from the operation of its business. Consequently, if SNTG cannot continue to avail itself of the immunity and amnesty programs, we could face a material adverse effect on our financial condition, cash flows and results of operations.

*Potential Investigation by the U.S. Attorney's Office in Connecticut*

We are aware that an article in the May 20, 2003 edition of *The Wall Street Journal* reported a probe of SNTG by the U.S. Attorney's Office in Connecticut. We have contacted the U.S. Attorney's Office and we are committed to cooperating fully in any probe. We understand that the probe is in the most preliminary of phases. If an investigation proceeds, SNTG could be subject to criminal prosecution and, if it were found guilty, significant fines and penalties. In connection with an investigation and any potential criminal proceedings we could incur significant additional defense costs and significant distraction of senior management from the operation of its business. Consequently, we could face a material adverse effect on our financial condition, cash flows and results of operations.

*Office of Foreign Assets Control Investigations*

OFAC has initiated investigations of certain payments by SNTG of incidental port expenses to entities in Iran and Sudan as possible violations of the International Emergency Economic Powers Act, the Iranian Transactions Regulations and the Sudanese Sanctions Regulations. We are cooperating fully with OFAC in these investigations, have implemented internal Company policies and procedures, which are designed to ensure full compliance with U.S. sanctions regulations, and have ceased all tanker trade with all OFAC-restricted countries. With respect to OFAC's Iran investigation, on April 3, 2002 OFAC issued a Cease and Desist Order to SNTG covering payments by SNTG for incidental port expenses involving unlicensed shipments to, from or involving Iran. SNTG has fully complied with that Order. OFAC's investigation with respect to Iran is currently pending and OFAC has not made any determination of whether a violation has occurred as a result of SNTG's payments of incidental port expenses to entities in Iran. If OFAC determines that an apparent violation has occurred, SNTG could seek to settle the matter with OFAC or OFAC could impose a civil monetary or other penalties on SNTG. OFAC also could refer the matter to other federal law enforcement agencies for criminal investigation. At this time, we do not know whether the subject of OFAC's investigation of SNTG is included as part of the U.S. Attorney's probe in Connecticut. Even if OFAC has referred this matter to the Department of Justice for criminal investigation, OFAC might also continue to pursue the matter as a civil penalty matter. With respect to OFAC's Sudan investigation, on March 20, 2003 SNTG settled the matter with OFAC for a payment of US $95,000 and without any determination by OFAC that SNTG's payments of incidental port expenses to entities in the Sudan violated U.S. sanctions regulations.

*Paul E. O'Brien*

In June 2002 a former general counsel of SNTG, Paul E. O'Brien, filed an action in Superior Court in Connecticut alleging that he had been constructively discharged. Mr. O'Brien had resigned in March 2002 and his complaint seeks, among other things, compensatory damages for lost future income as well as punitive damages in unspecified amounts. Mr. O'Brien seeks to make public privileged and confidential attorney-client information regarding legal advice on compliance with U.S. and international laws and regulations and to disclose ethically protected client confidences. We have formally moved to strike each count of the complaint. We intend to vigorously defend ourselves against this lawsuit and have not made any provision for any liability related to the action in the consolidated financial statements.

*Civil Antitrust Actions*

In March 2003 a former customer of SNTG, JLM Industries, Inc. ("JLM"), filed a putative civil class action against SNTG and several other parcel tanker companies in the U.S. District Court for the District of Connecticut. The suit alleges violations of the Sherman Antitrust Act and state antitrust and unfair trade practices acts and seeks treble damages in an unspecified amount. We have formally moved to seek dismissal of the action based on SNTG's agreement with JLM to arbitrate disputes. Another defendant has similarly moved to compel arbitration. We intend to vigorously defend ourselves against the JLM action and have not made any provision for any liability related to the JLM action in the consolidated financial statements.

In April 2003 a former customer of SNTG, Nizhnekamskneftekhim USA, Inc. ("Nizh"), filed a putative civil class action against SNTG and several other parcel tanker companies in the U.S. District Court for the Southern District of Texas. The suit alleges violations of Section 1 of the Sherman Antitrust Act and Section 4 of the Clayton Antitrust Act and seeks treble damages in an unspecified amount. As in the JLM action described above, SNTG has agreements with Nizh to arbitrate disputes. We intend to vigorously defend ourselves against the Nizh action and have not made any provision for any liability related to the Nizh action or such unasserted possible claims in the consolidated financial statements.

*Securities Action*

In March 2003 an individual claiming to have purchased Stolt-Nielsen S.A. American Depositary Shares, Joel Menkes, filed a putative civil securities class action in the U.S. District Court for the District of Connecticut against us and certain of our directors and officers. The complaint claims that our failure to disclose such alleged collusive behavior, coupled with allegedly "false and misleading" statements, caused plaintiff to pay inflated prices for our securities. We intend to vigorously defend itself against this lawsuit and have not made any provision for any liability related to the action in the consolidated financial statements.

### Stolt Offshore

CSO commenced legal proceedings through the U.K. High Court against three subsidiaries of SOSA claiming infringement of a certain patent held by CSO relating to flexible flowline laying technology in the U.K. Judgement was given on January 22, 1999 and January 29, 1999. The disputed patent was held valid. SOSA appealed and the Appeal Court maintained in July 2000 the validity of the patent and potentially broadened its application compared to the High Court decision. SOSA applied for leave to appeal the Appeal Court decision to the House of Lords, which was denied.

During 2001 after the Appeal Court decision became final, CSO submitted an amended claim to damages claiming lost profit on a total of 15 projects. In addition, there is a claim for alleged price depreciation on certain other projects.The total claim for lost profits was for approximately $89 million, up from approximately $14.0 million claimed after the High Court decision confirming the patent's validity, plus interest, legal costs and a royalty for each time that the flexible lay system tower on the *Seaway Falcon* was brought into U.K. waters. The increase came because several more projects potentially became relevant. The amount of the claim has not yet been considered by the Court and has thus so far not been upheld. SOSA estimates that the total claim as submitted is in the order of $130 million at November 30, 2002, increasing at 8% simple interest per annum.

In the alternative, CSO claims a reasonable royalty for each act of infringement, interest and legal costs. CSO has not quantified this claim, but it will be considerably less than the claim to lost profits.

SOSA, in consultation with its advisers, has assessed that the range of possible outcomes for the resolution of damages is $1.5 million to $130 million and has determined that there is no amount

within the range that is a better estimate than any other amount. Consequently, in accordance with SFAS No. 5, "Accounting for Contingencies," as interpreted by FASB Interpretation No. 14, "Reasonable Estimation of the Amount of a Loss", SOSA has provided $1.5 million in the financial statements, being the lower amount of the range. The amount of damages is nevertheless uncertain and no assurance can be given that the provided amount is sufficient.

On April 15, 2003, the U.K. High Court, in an action between Rockwater Ltd. (part of the Halliburton Group) and CSO, held that the same patent, the subject of the proceedings against SOSA, was invalid. SOSA is considering its position in the light of this recent judgement.

On December 6, 2002, SOSA settled a long-standing dispute with the owners of the *Toisa Puma* vessel for $7.3 million, including interest of $1.0 million. The nature of the dispute was the cancellation of a charter of the vessel in 1999. SOSA had expected that the settlement would be made in the range of $2 million to $8 million. The cost of the final settlement was included in SOSA's 2002 results.

*Stolt Sea Farm*

SSF has not received any notice of violation from any federal, state or local permitting agency. However, USPIRG and two individual plaintiffs, represented by the National Environmental Law Center, have brought a civil action under the citizen suit provisions of the federal Clean Water Act, against SSF alleging that SSF is operating without a required Maine Pollutant Discharge Elimination System ("MPDES") permit. USPIRG also sued two other major Maine aquaculture companies on identical grounds. USPIRG claims that SSF is required to have a MPDES permit in order to authorize the routine conduct of fish farming operations, and was required to obtain the MPDES permit prior to commencing sea farm operations. USPIRG seeks an injunction ordering SSF to cease operations at its Maine salmon farms in violation of the Clean Water Act, to remediate any harm caused by the alleged violations, and to pay civil penalties for each violation occurring from April 25, 1995 to the present, and to pay plaintiffs' reasonable attorneys fees and costs.

On June 16, 2002, the United States District Court of the District of Maine issued a decision on the parties' cross motions for summary judgment. The Court found that SSF had violated the Clean Water Act by operating sea farms in Maine waters without obtaining MPDES permits, and entered Summary Judgment for the plaintiffs on liability issues, rejecting SSF's legal and equitable defenses on the liability issues. A hearing on civil penalties and injunctive relief was concluded in October 2002 and on May 28, 2003, the Court issued its ruling. The Court ordered SSF to pay $50,000 in damages: to fallow its sites for 24 months following the completion of the normal grow-out and to harvest the fish currently on the sites; not to restock any sites until an MPDES permit is issued; only to stock one year class of fish on any site; not to use any non-North American strains of fish; and to pay reasonable plaintiff attorney's fees.

The Maine Department of Environmental Protection recently announced that the Maine Board of Environmental Protection will consider a draft general Maine NPDES permit for salmon sea farm operations for approval on June 19, 2003.

66

In April 2003 two lawsuits were filed against SSF pertaining to its operations in the Broughton Archipelago, British Columbia. Both are brought in the name of aboriginal organizations. The one filed in the Federal Court of Canada seeks to set aside the decision of the Minister of Fisheries and Oceans to permit the relocation of an aquaculture site from Eden Island to Humphrey Rock. The other, filed in the Supreme Court of British Columbia, seeks damages, and other relief arising from the stocking of aquaculture facilities in territory claim to be subject to aboriginal title of the plaintiffs. In this action the Plaintiffs have given notice of an intention to apply for an interlocutory injunction to restrain the continuance of aquaculture operations pending resolution of the dispute. The federal and provincial governments and Heritage Salmon Ltd. are co-defendants in the suit along with SSF. Both actions are being vigorously defended by all named defendants, and we have not made any provision for any liability related to these actions in our Consolidated Financial Statements.

*General*

We are a party to various other legal proceedings arising in the ordinary course of business. We believe that none of the matters covered by such legal proceedings will have a material adverse effect on our business or financial condition.

The ultimate outcome of governmental and third party legal proceedings are inherently difficult to predict. It is reasonably possible that actual expenses and liabilities could be incurred in connection with both asserted and unasserted claims in a range of amounts that cannot reasonably be estimated. It is possible that such expenses and liabilities could have a material adverse affect on our financial condition, cash flows or results of operations in a particular reporting period.

**Dividends**

Cash dividends are normally paid twice per year in U.S. dollars.

The following table shows the total dividend payments per Common Share, Class B Share, and Founder's Share made during the fiscal years indicated.

| Class of Stock | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| Common . . . . . . . . . . . . . . . . . . . . . . . | $0.500 | $0.375 | $0.250 | $0.250 | $0.250 |
| Class B* . . . . . . . . . . . . . . . . . . . . . . | $0.500 | $0.375 | $0.250 | $0.125 | $    — |
| Founder's . . . . . . . . . . . . . . . . . . . . . . | $0.005 | $0.005 | $0.005 | $0.005 | $0.005 |

\*    In March 2001 all Class B Shares were reclassified as Common Shares on a one-for-one basis.

The 2002 figures represent the interim and final dividend for 2001. An interim dividend for 2002 of $0.125 per Common Share and $0.005 per Founder's Share was declared on November 14, 2002 and paid on December 18, 2002. The shareholders at our Annual General Meeting, held on May 8, 2003, approved a final dividend for 2002 of $0.125 per Common Share which was paid on May 28, 2003 to shareholders of record as of May 14, 2003.

**Significant Changes**

Except as described in Note 26 to the Consolidated Financial Statements, in "Item 4. Information on the Company—Recent Significant Developments", "Item 5. Recent Developments" and "Item 8. Financial Information—Legal Proceedings" of this Report, there have been no significant changes since November 30, 2002.

## Item 9. The Offer and Listing.

### Stock Trading History

The following table sets out the range of high and low closing prices for our publicly traded shares for the periods indicated.

### Common Shares (Nasdaq)

| Quarterly for the two years ended November 30, 2002 and for the two quarters ended May 31, 2003 | Qtr. 1 | Qtr. 2 | Qtr. 3 | Qtr. 4 |
|---|---|---|---|---|
| 2003 | | | | |
| High | $ 8.98 | $ 8.20 | — | — |
| Low | $ 5.20 | $ 5.72 | — | — |
| 2002 | | | | |
| High | $15.74 | $16.97 | $16.98 | $12.10 |
| Low | $12.28 | $14.26 | $11.44 | $ 6.21 |
| 2001 | | | | |
| High | $18.00 | $20.27 | $20.45 | $14.55 |
| Low | $15.75 | $14.94 | $14.45 | $10.50 |

| Annually for the five years ended November 30, | 2002 | 2001 | 2000 | 1999 | 1998 |
|---|---|---|---|---|---|
| High | $16.98 | $20.45 | $22.00 | $16.75 | $22.38 |
| Low | $ 6.21 | $10.50 | $11.75 | $ 9.00 | $10.38 |

### Common Shares (Oslo Stock Exchange) (Norwegian Kroner)

| Quarterly for the two years ended November 30, 2002 and for the two quarters ended May 31, 2003 | Qtr. 1 | Qtr. 2 | Qtr. 3 | Qtr. 4 |
|---|---|---|---|---|
| 2003 | | | | |
| High | 64.50 | 55.00 | — | — |
| Low | 39.20 | 42.00 | — | — |
| 2002 | | | | |
| High | 142.00 | 152.00 | 130.00 | 92.00 |
| Low | 112.00 | 126.00 | 84.50 | 47.00 |
| 2001 | | | | |
| High | 166.50 | 185.50 | 189.00 | 130.00 |
| Low | 130.00 | 136.00 | 128.00 | 93.00 |

| Annually for the five years ended November 30, | 2002 | 2001 | 2000 | 1999 | 1998 |
|---|---|---|---|---|---|
| High | 152.00 | 189.00 | 225.00 | 148.00 | 170.00 |
| Low | 47.00 | 93.00 | 120.00 | 73.00 | 75.00 |

68

| Monthly | Nasdaq ADS (U.S. Dollars) | | Oslo Stock Exchange (Norwegian Kroner) | |
|---|---|---|---|---|
| | High | Low | High | Low |
| 2002 | | | | |
| November ............................. | $8.13 | $6.21 | 61.00 | 48.50 |
| December ............................. | $6.70 | $5.90 | 52.00 | 43.50 |
| 2003 | | | | |
| January ............................... | $8.98 | $6.25 | 64.50 | 44.50 |
| February .............................. | $7.60 | $5.20 | 56.00 | 39.20 |
| March ................................. | $6.45 | $5.90 | 47.50 | 43.00 |
| April .................................. | $6.89 | $5.72 | 50.00 | 42.00 |
| May .................................. | $8.20 | $6.90 | 55.00 | 47.50 |

---

\*    On March 7, 2001 we completed a share reclassification in which the then outstanding Class B Shares were converted to Common Shares on a one-for-one basis; on that date, trading in the Class B Shares on Nasdaq and the Oslo Stock Exchange ceased. Our Common Shares are currently listed in Norway on the Oslo Stock Exchange (under the ticker symbol SNI) and trade as American Depositary Shares ("ADSs"), each of which represents one Common Share, in the United States on Nasdaq (under the ticker symbol SNSA).

**Markets**

Our Common Shares are currently listed in Norway on the Oslo Stock Exchange (under the ticker symbol SNI) and trade as ADSs, each of which represents one Common Share, in the United States on the Nasdaq National Market (under the ticker symbol SNSA). On March 7, 2001, we completed a share reclassification. The objective of the reclassification was to create a simplified and more transparent share capital structure that gives all shareholders a vote on all matters, and results in only one class of publicly traded shares. The reclassification reclassified our outstanding non-voting Class B Shares (previously listed on the Oslo Stock Exchange under the ticker symbol SNIB and traded as ADSs on the Nasdaq National Market under ticker symbol STLBY) as voting Common Shares on a one-for-one basis. Prior to the share reclassification, our Common Shares were only listed on the Nasdaq National Market (under the ticker symbol STLTF).

**Item 10. Additional Information**

**Organization and Register**

We are a "Société Anonyme Holding" organized in the Grand Duchy of Luxembourg under the Company Law of 1915, as amended ("Luxembourg Company Law"). We were incorporated in Luxembourg in 1974 as the holding company for all of the group's activities.

Our registered office is located at 23, avenue Monterey, L-2086 Luxembourg and we are registered in the Companies' Register of the Luxembourg District Court under the designation "R.C. Luxembourg B.12.179".

**Articles of Incorporation**

*Set forth below is a description of the material provisions of our Articles of Incorporation and the Luxembourg Company Law. The following summary is qualified by reference to the Articles of Incorporation and applicable Luxembourg law. The full text of the Articles of Incorporation is available at our registered office.*

*Objects and Purposes*

Article Three of our Articles of Incorporation sets forth our object as a holding company, namely participation in any manner in all commercial, industrial, financial and other enterprises of Luxembourg or foreign nationality through the acquisition by participation, subscription, purchase, option or by any other means of all shares, stocks, debentures, bonds or securities; the acquisition of patents and licenses which we will administer and exploit; we may lend or borrow with or without security, provided that any money so borrowed may only be used for the purposes of Stolt-Nielsen, or companies which are subsidiaries of or associated with or affiliated with Stolt-Nielsen; and in general to undertake any operations directly or indirectly connected with such objects as permitted by the Luxembourg Holding Company Law of 1929.

*Directors*

The Board of Directors is comprised of at least three and not more than nine members, elected by a simple majority of our outstanding shares represented at a general meeting of shareholders, for a period not exceeding six years and until their successors are elected. It is our customary practice that Directors are elected for terms of one year at the Annual General Meeting of Shareholders held each year in Luxembourg.

Our Articles of Incorporation do not mandate the retirement of Directors under an age limit requirement.

Our Articles of Incorporation do not require Directors to be shareholders in Stolt-Nielsen.

Under Luxembourg law and our Articles of Incorporation, the members of the Board of Directors owe a duty of loyalty and care to Stolt-Nielsen. They must exercise the standard of care of a prudent and diligent business person and bear the burden of proving they did so if their actions are contested.

Our Articles of Incorporation provide that no transaction between Stolt-Nielsen and another party in which a Director serves as a director, officer or employee, will be invalidated solely for that reason. The Articles of Incorporation also provide that any Director who has a personal interest in a transaction must disclose such interest, must abstain from voting on such transaction and may not be counted for purposes of determining whether a quorum is present at the meeting. Such Director's interest in any such transaction shall be reported at the next meeting of shareholders.

*Authorized Shares*

Our authorized share capital consists of:

- 120,000,000 Common Shares, no par value

- 30,000,000 Founder's Shares, no par value

Under the Luxembourg Company Law, Founder's Shares are not considered as representing capital of our company.

Pursuant to our Articles of Incorporation, and as required by Luxembourg law as presently in effect, authorized capital will automatically be reduced to the amount represented by outstanding shares on the fifth anniversary date of the publication of the most recent amendment of the Articles of Incorporation revising our authorized capital. Amendments increasing and amending our authorized capital were approved at an Extraordinary General Meeting held on March 6, 2001, and publication of such amendment in the *Official Gazette* took place on October 29, 2001. From time to time we take such steps as are required to continue the authorized capital in effect.

The Board of Directors is authorized to issue additional Common Shares and Founder's Shares, from time to time, up to the maximum authorized number. The Articles of Incorporation require all

shares to be issued in registered form. All shares, when issued, are fully paid and non-assessable. All shares are freely transferable by the holder thereof.

As a general rule, shareholders are entitled to preemptive rights under Luxembourg law in respect of the issuance of shares of the same class of shares for cash, unless the Articles of Incorporation provide otherwise. Our Articles of Incorporation authorize the Board of Directors to deny shareholders' preemptive rights for a period of five years, and our Board of Directors has done so, with respect to all authorized but unissued Common Shares. Upon the expiration of authorized but unissued shares as described above, the suppression of preemptive rights will also terminate and shareholders will be entitled to preemptive rights once again unless the Board recommends denying further such rights and such recommendation is approved by the shareholders. As a result, based on publication of the amendment to our Articles of Incorporation in October 2001, Common Shares will not be entitled to preemptive rights for a period of at least five years ending October 2006.

Our Articles of Incorporation contain an anti-dilution provision which maintains the level of Founder's Shares at 20% of all outstanding voting shares (Common Shares and Founder's Shares). In the event of a stock dividend, recapitalization or other issuance of our Common Shares, additional Founder's Shares are distributed to the then holder(s) of such Founder's Shares on a proportionate basis so as to maintain the 20% level at all times.

In addition to our authorized Common Shares and Founder's Shares set forth above, an additional 1,500,000 Class B Shares, no par value, have been authorized for the sole purpose of options granted under our existing stock option plans, and may not be used for any other purpose. The rights, preferences and priorities of such Class B Shares are set forth in the Articles of Incorporation. All such Class B Shares convert to Common Shares immediately upon issuance. Such authorized Class B Shares and all of the rights relating thereto shall expire, without further action, on December 31, 2010.

*Voting Rights*

Except for matters where applicable law requires the approval of both classes of shares voting as separate classes, Common Shares and Founder's Shares vote as a single class on all matters submitted to a vote of the shareholders, with each share entitled to one vote. Under Luxembourg law, shareholder action can generally be taken by a simple majority of Common Shares and Founder's Shares present or represented at a meeting, without regard to any minimum quorum requirements. Three exceptions to the law are (i) to amend the Articles of Incorporation which requires (x) a two-thirds vote of those Common Shares and Founder's Shares present or represented, and (y) when the meeting is first convened, a quorum of 50% of the outstanding shares entitled to vote, (ii) to change the country of incorporation of Stolt-Nielsen to a country other than Luxembourg or to increase the contribution of the shareholders, which require the affirmative vote of 100% of the Common Shares and Founder's Shares, and (iii) any action for which the Articles of Incorporation require more than a majority vote or a quorum. Luxembourg law further provides that a two-thirds majority vote of those shares present or represented and when the meeting is first convened, a quorum of 50% of such shares, of the outstanding Common Shares and Founder's Shares, each voting and counted for quorum purposes as a separate class, is required to authorize any amendment to the Articles of Incorporation in respect of a recapitalization, reclassification and similar transactions affecting the relative rights, preferences and priorities of the Common Shares and Founder's Shares if such class of shares is adversely affected.

*Shareholder Meetings and Notice Thereof*

Under the Articles of Incorporation, we are required to hold a general meeting of shareholders each year in Luxembourg. The meeting is normally convened in April. In addition, the Board may call any number of extraordinary general meetings, which may be held in Luxembourg or elsewhere,

although any extraordinary general meeting convened to amend the Articles of Incorporation will be held in Luxembourg. The Board of Directors is further obliged to call a general meeting of shareholders to be held within thirty days after receipt of a written demand by shareholders representing at least one-fifth of the outstanding shares entitled to vote.

The Articles of Incorporation require notice of any general meeting to be sent by first class mail, postage prepaid, to all shareholders at least twenty days prior to such meeting. Shareholders may be represented by written proxy, provided the written proxy is deposited with us at our registered office in Luxembourg, or with any of our Directors, at least five days before the meeting.

### Dividends

Under the Articles, holders of Common Shares and Founder's Shares participate in annual dividends, if any are declared, in the following order of priority:

- $0.005 per share to Founder's Shares and Common Shares equally;

- thereafter, all further amounts are payable to Common Shares only.

Interim dividends can be declared up to three times in any fiscal year by the Board of Directors. Interim dividends can be paid, but only after the prior year's financial statements have been approved by the shareholders at a general meeting, and any such interim dividend must be approved by our independent auditors. Final dividends are declared once a year at the annual general meeting of the shareholders. Interim and final dividends on Common Shares and Founder's Shares can be paid out of earnings, retained and current, as well as paid-in surplus.

Luxembourg law authorizes the payment of stock dividends if sufficient surplus exists to provide for the related increase in stated capital or the par value of the shares issued in connection with any stock dividend. Luxembourg law requires that 5% of our unconsolidated net profits each year be allocated to a legal reserve before declaration of dividends. This requirement continues until the reserve is 10% of our stated capital, as represented by the Common Shares, after which no further allocations are required until further issuance of shares.

The legal reserve may also be satisfied by allocation of the required amount at the time of issuance of shares or by a transfer from paid-in surplus. The legal reserve is not available for dividends. The legal reserve for all of our existing Common Shares has heretofore been satisfied and appropriate allocations will be made to the legal reserve account at the time of each new issuance of Common Shares.

### Liquidation Preference

Under the Articles, in the event of a liquidation, all of our debts and obligations must first be paid, and thereafter all of our remaining assets are paid to the holders of Common Shares and Founder's Shares in the following order of priority:

- Common Shares ratably to the extent of the stated value thereof (e.g. $1.00 per share);

- Common Shares and Founder's Shares participate equally up to $0.05 per share; and

- thereafter, Common Shares are entitled to all remaining assets.

### Equal Treatment Provision

If we merge, consolidate or enter into any similar transaction with another entity or such other entity will remain the survivor, the Common Shares held by holders other than holder(s) of Founder's Shares shall be entitled to receive consideration which is no less per share than the consideration per share received by the holder(s) of Founder's Shares, the latter per share amount to be determined by

72

dividing the aggregate of all consideration received by such holder(s) for all shares owned by them, including Founder's Shares, by the total number of Common Shares which they own.

*Restrictions on Shareholders*

Our Articles of Incorporation provide that in recognition of the fact that certain shareholdings may threaten us with "imminent and grave damage", which term includes adverse tax consequences, a hostile takeover attempt or adverse governmental sanctions,

  (i) no U.S. Person (as defined in the Articles) shall own, directly or indirectly, more than 9.9% of our outstanding shares,

  (ii) all shareholders who are U.S. Persons may not own, directly or indirectly, more than 49.9% of our outstanding shares (including for these purposes the shares of U.S. Persons who were shareholders as of August 31, 1987),

  (iii) all shareholders of any single country may not own, directly or indirectly, more than 49.9% of our outstanding shares, and

  (iv) no person may own, directly or indirectly, more than 20% of our outstanding shares unless a majority of the Board shall have authorized such shareholding in advance.

The Articles provide that the foregoing restrictions, except as specified in (iii) above, shall not apply to any person who was a shareholder as of August 31, 1987, or certain Affiliates or Associates (as such terms are defined in the Articles) of such person.

In addition to the restrictions on shareholders described above, the Board is authorized to restrict, reduce or prevent the ownership of our shares if it appears to the Board that such ownership may threaten us with "imminent and grave damage". Luxembourg Company Law does not provide a specific definition of imminent and grave damage, but instead leaves the interpretation of the phrase within the Board's discretion. We have been advised by our Luxembourg counsel, Elvinger, Hoss & Prussen, that there are no Luxembourg judicial interpretations of the phrase, but that situations involving hostile takeovers, adverse tax consequences to Stolt-Nielsen or governmental sanctions are likely to be among the situations covered by such phrase.

In order to enforce the foregoing restrictions, the Articles empower the Board to take certain remedial action including causing us: (i) to decline to register any prohibited transfer; (ii) to decline to recognize any vote of a shareholder precluded from holding shares; (iii) to require any shareholder on our Register of Shareholders or any prospective shareholder to provide information to determine whether such person is precluded from holding shares; and (iv) upon the issuance of a notice, to require the sale of shares to us at the lesser of (A) the amount paid for the shares if acquired within the twelve months immediately preceding the date of the notice, and (B) the last quoted price for the shares on the day immediately preceding the day on which the notice is served (provided that the Board may in its discretion pay the amount calculated under (B) in situations where (A) would otherwise apply and result in a lower purchase price, if the Board determines it equitable after taking into account specified factors) and to remove the name of any shareholder from the Register of Shareholders immediately after the close of business on the day the notice is issued and payment is made available.

Our form of share certificate requires a certification to be made upon the transfer of ownership regarding the citizenship of the transferee. The certification is intended to assist us in enforcing the restrictions described above.

*Change in Control*

Except as described above, there are no provisions in our Articles of Incorporation that would have the effect of delaying, deferring or preventing a change in control of Stolt-Nielsen and that would only operate with respect to a merger, acquisition or corporate restructure involving us or any of our subsidiaries.

*Non-Luxembourg Shareholders*

There are no limitations under Luxembourg law on the rights of non-residents to hold or vote our shares.

**Material Contracts**

See Note 14 to our Consolidated Financial Statements and "Item 7. Related Party Transactions."

**Exchange Controls**

We have been advised by Elvinger, Hoss & Prussen, our Luxembourg counsel, that at the present time there are no exchange controls in existence in Luxembourg which would restrict the export or import of capital, including but not limited to, foreign exchange controls, or affect our ability to make payments of dividends, interest or other payments to non-resident holders of Common Shares.

**Taxation**

*Luxembourg Taxation*

The following is intended only as a general summary of material tax considerations affecting dividend payments by us relevant to prospective investors in Stolt-Nielsen. It does not constitute and should not be construed to constitute legal or tax advice to any such investor. Prospective investors are therefore urged to consult their own tax advisers with respect to their particular circumstances. Double taxation treaties may contain rules affecting the description in this summary.

*Stolt-Nielsen*

We are a holding company under the law of July 31, 1929 of Luxembourg and are eligible for the following taxation provided for by the decree of December 17, 1938. An annual tax on all amounts paid by us on interest payments made on bonds or debentures issued by us would be levied at the rate of 3% on such interest payments. We have not and do not contemplate issuing bonds or debentures so that this tax on interest is unlikely to become relevant. Additionally an annual tax on all amounts paid by us as dividends and non-resident Directors' fees will be computed on the following basis:

   (i) 3% of the first EUR 2,400,000 or the equivalent thereof;

  (ii) 1.8% of the next EUR 1,200,000; and

 (iii) 0.1% of any balance;

with a minimum annual tax of EUR 48,000. These taxes are paid by us.

Subject to the foregoing, we, as a Luxembourg holding company, are not liable under present Luxembourg law for any income tax, withholding tax, capital gains tax, estate or inheritance tax, or any other tax (except for a contribution tax of 1% on issues of share capital), calculated by references to our capital, assets or income.

74

*Shareholders*

Under present Luxembourg law, so long as we maintain our status as a holding company, no income tax, withholding tax, capital gains tax, estate or inheritance tax is payable in Luxembourg by shareholders in respect of our common shares, except for shareholders domiciled, resident (or, in certain circumstances, formerly resident) or having a permanent establishment in Luxembourg.

Shareholders domiciled or resident in Luxembourg (except holding companies) or who have a permanent establishment in Luxembourg with whom the holding of our common shares is effectively connected, have to include the dividend received in their taxable income during the relevant period.

Physical persons domiciled or resident in Luxembourg are not subject to taxation of capital gains unless the disposal of our common shares preceded the acquisition or the disposal occurs within 6 months following the acquisition of our common shares. Physical persons domiciled or resident in Luxembourg who own more than 10% (the limit being 25% for those participations which had been acquired prior to fiscal year 2002 and disposed of at the latest during fiscal year 2007) of the issued common shares are liable to taxation on capital gains even after the 6 months holding and physical persons who were formerly residents or domiciled in Luxembourg will remain so liable during a period of 5 years after they have given up their domicile or residence in Luxembourg or their holding has been reduced below 10% (the limit being 25% for those participations which had been acquired prior to fiscal year 2002 and disposed of at the latest during fiscal year 2007) provided they had their domicile or residence in Luxembourg for more than 15 years.

Income and capital gains on common shares which are included in the assets of a trade or business of a physical person domiciled or resident in Luxembourg or in the permanent establishment in Luxembourg of a non-resident and income and capital gains on common shares which are held by Luxembourg corporations (other than holding companies) will be included in the taxable income of the relevant taxpayers.

There is no Luxembourg transfer duty or stamp tax applicable on sales acquisitions of the common shares.

### U.S. Federal Income Taxation

The following is a summary of the principal U.S. federal income tax consequences that may be relevant with respect to the acquisition, ownership and disposition of Common Shares or ADSs. This summary addresses only the U.S. federal income tax considerations of holders that will hold Common Shares or ADSs as capital assets. This summary does not address tax considerations applicable to holders that may be subject to special tax rules, such as financial institutions, insurance companies, real estate investment trusts, regulated investment companies, grantor trusts, dealers or traders in securities or currencies, tax-exempt entities, persons that received Common Shares or ADSs as compensation for the performance of services, persons that will hold Common Shares or ADSs as part of a "hedging" or "conversion" transaction or as a position in a "straddle" for U.S. federal income tax purposes, persons that have a "functional currency" other than the U.S. dollar or holders that own (or are deemed to own) 10% or more (by voting power or value) of our stock. Moreover, this summary does not address the U.S. federal estate and gift or alternative minimum tax consequences of the acquisition, ownership and disposition of Common Shares or ADSs. This summary (i) is based on the Internal Revenue Code of 1986, as amended (the "Code"), U.S. Treasury Regulations and judicial and administrative interpretations thereof, in each case as in effect and available on the date of this Report. All of the foregoing are subject to change, which change could apply retroactively and could affect the tax consequences described below.

The U.S. Treasury Department has expressed concern that depositaries for American depositary receipts, or other intermediaries between the holders of shares of an issuer and the issuer, may be

taking actions that are inconsistent with the claiming of U.S. foreign tax credits by U.S. holders of such receipts or shares. Accordingly, the analysis regarding the availability of a U.S. foreign tax credit for Luxembourg taxes and sourcing rules described below could be affected by future actions that may be taken by the U.S. Treasury Department.

For purposes of this summary, a "U.S. Holder" is a beneficial owner of Common Shares or ADSs that, for U.S. federal income tax purposes, is: (i) a citizen or resident of the U.S., (ii) a partnership or corporation created or organized in or under the laws of the U.S. or any state thereof (including the District of Columbia), (iii) an estate the income of which is subject to U.S. federal income taxation regardless of its source or (iv) a trust if such trust validly elects to be treated as a U.S. person for U.S. federal income tax purposes or if (x) a court within the U.S. is able to exercise primary supervision over its administration and (y) one or more U.S. persons have the authority to control all of the substantial decisions of such trust. A "Non-U.S. Holder" is a beneficial owner (or, in the case of a partnership, a holder) of Common Shares or ADSs that is not a U.S. Holder.

Each holder is urged to consult its own tax advisor with respect to the U.S. federal, state, local and foreign tax consequences of acquiring, owning or disposing of Common Shares.

*Ownership of ADSs in General*

For U.S. federal income tax purposes, a holder of ADSs generally will be treated as the owner of the Common Shares represented by such ADSs.

*Foreign Personal Holding Company Status*

Stolt-Nielsen is a "foreign personal holding company" for U.S. federal income tax purposes. As a result, U.S. Holders would be subject to U.S. federal income tax on their share of any undistributed foreign personal holding company income (generally, taxable income calculated as if we were a U.S. corporation, subject to adjustments for any dividends paid and certain other items) received by us but not actually distributed to shareholders. To the extent that a U.S. Holder were required to include amounts in income under this rule, such amounts would be added to the tax basis of the Common Shares or ADSs held by such U.S. Holder. We have made distributions in an amount sufficient to eliminate undistributed foreign personal holding company income in the past and, subject to compliance with certain financing covenants limiting its ability to pay dividends, we intend to distribute all such income it may receive in the future.

*Distributions*

Subject to the discussion above under "Foreign Personal Holding Company Status", the gross amount of any distribution by Stolt-Nielsen of cash or property (other than certain distributions, if any, of Common Shares distributed pro rata to all shareholders of Stolt-Nielsen, including holders of ADSs) with respect to Common Shares or ADSs will be includible in income by a U.S. Holder as dividend income to the extent such distributions are paid out of the current or accumulated earnings and profits of Stolt-Nielsen as determined under U.S. federal income tax principles. Such dividends will not be eligible for the dividends received deduction generally allowed to corporate U.S. Holders. Subject to the discussion above under "Foreign Personal Holding Company Status", to the extent, if any, that the amount of any distribution by Stolt-Nielsen exceeds our current and accumulated earnings and profits as determined under U.S. federal income tax principles, it will be treated first as a tax-free return of the U.S. Holder's adjusted tax basis in the Common Shares or ADSs and thereafter as capital gain.

Dividends received by a U.S. Holder with respect to Common Shares or ADSs will be treated as foreign source income, which may be relevant in calculating such holder's foreign tax credit limitation. The limitation on foreign taxes eligible for credit is calculated separately with respect to specific classes

of income. For this purpose, dividends distributed by Stolt-Nielsen generally will constitute "passive income", or, in the case of certain U.S. Holders, "financial services income".

Subject to the discussion below under "Backup Withholding Tax and Information Reporting Requirements," a Non-U.S. Holder of Common Shares or ADSs generally will not be subject to U.S. federal income or withholding tax on dividends received on Common Shares or ADSs, unless such income is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the U.S.

*Sale or Exchange of Common Shares or ADSs*

A U.S. Holder generally will recognize gain or loss on the sale or exchange of Common Shares or ADSs equal to the difference between the amount realized on such sale or exchange and the U.S. Holder's adjusted tax basis in the Common Shares or ADSs. Such gain or loss will be capital gain or loss. In the case of a noncorporate U.S. Holder, the maximum marginal U.S. federal income tax rate applicable to such gain will be lower than the maximum marginal U.S. federal income tax rate applicable to ordinary income if such U.S. Holder's holding period for such Common Shares or ADSs exceeds one year and will be further reduced if such holding period exceeds five years. Gain or loss, if any, recognized by a U.S. Holder generally will be treated as U.S. source income or loss for U.S. foreign tax credit purposes. The deductibility of capital losses is subject to limitations.

Subject to the discussion below under "Backup Withholding Tax and Information Reporting Requirements," a Non-U.S. Holder of Common Shares or ADSs generally will not be subject to U.S. federal income or withholding tax on any gain realized on the sale or exchange of such Common Shares or ADSs unless (i) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the U.S. or (ii) in the case of any gain realized by an individual Non-U.S. Holder, such holder is present in the U.S. for 183 days or more in the taxable year of such sale or exchange and certain other conditions are met.

*Backup Withholding Tax and Information Reporting Requirements*

U.S. backup withholding tax and information reporting requirements generally apply to certain payments to certain noncorporate holders of stock. Information reporting generally will apply to payments of dividends on, and to proceeds from the sale or redemption of, Common Shares or ADSs made within the U.S. to a holder of Common Shares or ADSs (other than an "exempt recipient", including a corporation, a payee that is not a U.S. person that provides an appropriate certification and certain other persons). A payor will be required to withhold 31% of any payments of dividends on, or the proceeds from the sale or redemption of, Common Shares or ADSs within the U.S. to a holder (other than an "exempt recipient") if such holder fails to furnish its correct taxpayer identification number or otherwise fails to comply with, or establish an exemption from, such backup withholding tax requirements.

THE ABOVE SUMMARY IS NOT INTENDED TO CONSTITUTE A COMPLETE ANALYSIS OF ALL TAX CONSEQUENCES RELATING TO ACQUISITION, OWNERSHIP AND DISPOSITION OF COMMON SHARES OR ADSs. PROSPECTIVE PURCHASERS AND HOLDERS OF COMMON SHARES OR ADSs ARE URGED TO CONSULT THEIR OWN TAX ADVISORS CONCERNING THE TAX CONSEQUENCES OF THEIR PARTICULAR SITUATIONS.

**Documents on Display**

We are subject to the informational requirements of the Securities Exchange Act of 1934 applicable to foreign private issuers and, in accordance with these requirements, we file reports with the Securities and Exchange Commission. As a foreign private issuer, we are exempt from the rules

under the Exchange Act relating to the furnishing and content of proxy statements, and our officers, directors and principal shareholders are exempt from the reporting and short-swing profit recovery provisions contained in Section 16 of the Exchange Act. In addition, we are not required under the Exchange Act to file periodic reports and financial statements with the Commission as frequently or as promptly as U.S. companies whose securities are registered under the Exchange Act.

You may read and copy any documents that we file with the Commission, including this Report and the related exhibits, without charge at the Commission's public reference room at 450 Fifth Street, N.W., Washington D.C. 20549. You may also obtain copies of the documents at prescribed rates by writing to the public reference room of the Commission at 450 Fifth Street, N.W., Washington D.C. 20549. Please call the Commission at 1-800-SEC-0330 for further information on the pubic reference room. In addition, this Report and the related exhibits are publicly available through the website maintained by the Commission at www.sec.gov.

**Item 11. Quantitative and Qualitative Disclosures about Market Risk**

The information included under the caption "Management's Discussion and Analysis—Market Risk" on pages 26 and 27 of our 2002 Annual Report filed with the Securities and Exchange Commission on Form 6-K on April 18, 2003 is incorporated herein by reference.

**Item 12. Description of Securities Other than Equity Securities.**

Not applicable.

PART II

**Item 13. Defaults, Dividend Arrearages and Delinquencies.**

None.

**Item 14. Material Modifications to the Rights of Security Holders and Use of Proceeds.**

None.

**Item 15. Controls and Procedures**

*Evaluation of Disclosure Controls and Procedures*

Disclosure controls and procedures are defined by Rules 13a-14(c) and 15d-14(c) of the Exchange Act of 1934, as amended, as controls and other procedures that are designed to ensure that information required to be disclosed by us in reports filed with the Securities and Exchange Commission ("SEC") under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the required time periods. Within 90 days prior to the filing date of this Report (the "Evaluation Date"), we conducted an evaluation, under the supervision and with the participation of management, including the Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures. Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective. The evaluation disclosed, however, that procedures of Stolt Offshore for estimating the costs required to complete lump sum EPIC projects were not followed in respect of certain projects in the SEAME Region. Unless such estimation procedures are followed on an ongoing basis, material revisions to results are more likely. Stolt Offshore has instigated a program of remedial measures which is further discussed under changes in internal controls below. Disclosure controls and procedures, no matter how well designed and implemented, can provide only reasonable assurance of achieving the stated objectives and our senior management was necessarily required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures. The design of any system of controls and procedures is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated objectives under all potential future conditions.

*Changes in Internal Controls*

We maintain a system of internal accounting controls that are designed to provide reasonable assurance that our books and records accurately reflect our transactions and that our established policies and procedures are followed. Subsequent to the Evaluation Date, there have been no significant changes (including corrective actions with regard to significant deficiencies or material weaknesses) in our internal controls or in other factors that could significantly affect our internal controls other than implementation of the remedial measures to correct the deficiency at Stolt Offshore identified above which include the following:

- Upgrade of project management systems
- Increase in the number of qualified cost control personnel
- Replacement of under-performing project managers
- Closer supervision by the product line management
- More frequent project reporting

Our senior management is continuing to evaluate our costing procedures and expects that there will be further actions taken to address the weaknesses that have been identified.

**Item 16. [Reserved]**

## PART III

**Item 17. Financial Statements.**

We have elected to provide financial statements for the fiscal year ended November 30, 2002 and the related information pursuant to Item 18.

**Item 18. Financial Statements.**

### Consolidated Financial Statements

Independent Auditors' Report

Report of Independent Public Accountants

Consolidated Statements of Operations for the years ended November 30, 2002, 2001 and 2000

Consolidated Balance Sheets as of November 30, 2002 and 2001

Consolidated Statements of Shareholders' Equity for the years ended November 30, 2002, 2001 and 2000

Consolidated Statements of Cash Flows for the years ended November 30, 2002, 2001 and 2000

Notes to Consolidated Financial Statements

Our Consolidated Financial Statements and related notes referred to above and the report of Deloitte & Touche LLP, our independent auditors, attached as an exhibit to this Report, are incorporated herein by reference to our Consolidated Financial Statements filed with the Commission on Form 6-K on June 2, 2003.

### Supplementary Schedules

Independent Auditors' Report on Schedule

Report of Independent Public Accountants on Schedules

Schedule II-Valuation and Qualifying Accounts

**Item 19. Exhibits.**

| Exhibit Number | Description |
| --- | --- |
| 1.1 | Amended and Restated Articles of Incorporation. Incorporated by reference to Stolt-Nielsen's Annual Report on Form 20-F for the fiscal year ended November 30, 2000, filed with the Securities and Exchange Commission on May 30, 2001. |
| 2.1 | Deposit Agreement among Stolt-Nielsen S.A., Citibank, N.A., as Depositary and the holders and beneficial owners of American Depositary Receipts. Incorporated by reference to Stolt-Nielsen's Registration Statement on Form F-6 filed with the Securities and Exchange Commission on December 21, 1995. |
| 2.2 | Form of American Depositary Receipt (included in Exhibit 2.1). |
| 2.3 | Stolt-Nielsen S.A. hereby agrees to furnish copies of instruments defining the rights of holders of long-term debt of Stolt-Nielsen S.A. and its consolidated subsidiaries to the Securities and Exchange Commission upon request. |
| 4.1 | Stolt Tankers Joint Service Agreement, as restated effective November 12, 1997 (the "Joint Service Agreement"), among Stolt Tankers Inc., Stolt Parcel Tankers, Inc., NYK Stolt Tankers, S.A., Rederi AB Sunship, Barton Partner Limited, Bibby Pool Partner Limited and Unicorn Lines (Pty) Ltd. |
| 4.2 | Addendum to the Joint Service Agreement, dated March 2, 2000, between Stolt Tankers Inc. and Stolt Parcel Tankers Inc., Barton Partner Limited, Bibby Pool Partner Limited, Unicorn Tankers (International) Limited, Rederi AB Sunship and NYK Stolt Tankers S.A. |
| 4.3 | Novation Agreement, dated November 22, 2002, among Stolt Tankers Inc., Stolt-Nielsen Transportation Group Ltd., Barton Partner Limited, Bibby Pool Partner Limited, Unicorn Tankers (International) Limited, NYK Stolt Tankers S.A. and Stolt-Nielsen Transportation Group B.V. |
| 4.4 | Addendum to the Joint Service Agreement, dated December 10, 2002, between Stolt-Nielsen Transportation Group B.V. and Stolt-Nielsen Transportation Group B.V., Barton Partner Limited, Bibby Pool Partner Limited, Unicorn Tankers (International Limited) and NYK Stolt Tankers S.A. |
| 8.1 | Significant subsidiaries as of the end of the year covered by this Report. See "Significant Subsidiaries" under "Item 4. Information on the Company." |
| 10.1 | Consent of Deloitte & Touche LLP, Independent Auditors. |
| 10.2 | Consent of Elvinger, Hoss & Prussen. |
| 10.3 | Stolt-Nielsen 2002 Annual Report, pages 17 through 31. |
| 10.4 | Stolt-Nielsen Consolidated Financial Statements for year ended November 30, 2002. |
| 10.5 | Financial Data Schedule. |
| 10.6 | Certification of the Chief Executive Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act Of 2002, dated June 2, 2003.*† |
| 10.7 | Certification of the Chief Executive Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, dated June 4, 2003.* |
| 10.8 | Certification of the Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act Of 2002, dated June 4, 2003.* |

---

\*    This document is being furnished in accordance with SEC Release Nos. 33-8212 and 34-47551.

†    This exhibit was inadvertently omitted from Stolt-Nielsen's Annual Report on Form 20-F as filed with the Securities and Exchange Commission on June 2, 2003. See "Explanatory Note."

**SIGNATURES**

The registrant hereby certifies that it meets all of the requirements for filing on Form 20-F/A and that it has duly caused and authorized the undersigned to sign this annual report on its behalf.

STOLT-NIELSEN S.A.

By: /s/ NIELS G. STOLT-NIELSEN
      Name: Niels G. Stolt-Nielsen
      Title: Chief Executive Officer

By: /s/ JAN CHR. ENGELHARDTSEN
      Name: Jan Chr. Engelhardtsen
      Title: Chief Financial Officer

Date: June 4, 2003

**Certifications**

I, Niels G. Stolt-Nielsen, certify that:

1. I have reviewed this annual report on Form 20-F of Stolt-Nielsen S.A.;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and have:

   a. designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

   b. evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

   c. presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

   a. all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

   b. any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6. The registrant's other certifying officer and I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

Date: June 4, 2003

/s/  NIELS G. STOLT-NIELSEN
_____
Niels G. Stolt-Nielsen
*Chief Executive Officer*, Stolt-Nielsen S.A.

I, Jan Chr. Engelhardtsen, certify that:

1. I have reviewed this annual report on Form 20-F of Stolt-Nielsen S.A.;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and have:

   a. designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

   b. evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

   c. presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

   a. all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

   b. any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6. The registrant's other certifying officer and I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

Date: June 4, 2003

/s/ JAN CHR. ENGELHARDTSEN
Jan Chr. Engelhardtsen
*Chief Financial Officer*, Stolt-Nielsen S.A.

### INDEX TO REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS
### AND SUPPLEMENTARY SCHEDULE

Independent Auditors' Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   F-2

Report of Independent Public Accountants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   F-3

Schedule II—Valuation and Qualifying Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   S-1

**INDEPENDENT AUDITORS' REPORT**

To the Board of Directors and Stockholders of
Stolt-Nielsen S.A.:

We have audited the consolidated financial statements of Stolt-Nielsen S.A. and subsidiaries as of November 30, 2002, and for the year then ended, included in the Company's 2002 Annual Report to Shareholders incorporated by reference in this Form 20-F/A, and have issued our report thereon dated April 1, 2003 which report expresses an unqualified opinion and includes an explanatory paragraph concerning the application of procedures relating to certain disclosures and reclassifications of financial statement amounts related to the 2001 and 2000 consolidated financial statements that were audited by other auditors who have ceased operations; such financial statements and report are included in your 2002 Annual Report to Shareholders and are incorporated herein by reference. Our audit also included the 2002 financial statement schedule of Stolt-Nielsen S.A. and subsidiaries. This financial statement schedule is the responsibility of the Company's management. Our responsibility is to express an opinion based on our audit. In our opinion, the 2002 financial statement schedule, when considered in relation to the 2002 basic financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein. The financial statement schedules for the years ended November 30, 2001 and 2000 were audited by other procedures who have ceased operations. Those auditors expressed an opinion, in their report dated January 30, 2002, that such 2001 and 2000 financial statement schedules, when considered in relation to the 2001 and 2000 basic financial statements taken as a whole (prior to the disclosures and reclassifications referred to above), presented fairly, in all material respects, the information set forth therein.

/s/ DELOITTE & TOUCHE LLP

New York, New York
April 1, 2003

## REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS

To STOLT-NIELSEN S.A.

We have audited in accordance with auditing standards generally accepted in the United States, the consolidated financial statements included in Stolt-Nielsen S.A.'s Annual Report to Shareholders incorporated by reference in this Form 20-F, and have issued our report thereon dated January 30, 2002. Our audits were made for the purpose of forming an opinion on those statements taken as a whole. The schedule listed in the Index on page F-1 is the responsibility of the Company's management and is presented for purposes of complying with the Securities and Exchange Commission's rules and is not part of the basic consolidated financial statements. This schedule has been subjected to the auditing procedures applied in the audits of the basic consolidated financial statements and, in our opinion, fairly states in all material respects the financial data required to be set forth therein in relation to the basic consolidated financial statements taken as a whole.

/s/ ARTHUR ANDERSEN LLP*

New York, New York
January 30, 2002

---

* This audit report is a copy of the previously issued report of Arthur Andersen LLP covering 2001, 2000 and 1999. The predecessor auditors, Arthur Andersen LLP, have not reissued their report.

F-3

SCHEDULE II

**STOLT-NIELSEN S.A. AND SUBSIDIARIES**

**VALUATION AND QUALIFYING ACCOUNTS**

**(amounts in thousands)**

| | Balance at Beginning of Period | Charged to Costs and Expenses | Write Offs Against the Reserve | Other Add (Deduct)(a) | Balance at End of Period |
|---|---|---|---|---|---|
| **For the year ended** | | | | | |
| November 30, 2000: | | | | | |
| Allowance for doubtful accounts . . . . . . . | $10,713 | $ 3,081 | $(1,121) | $ (218) | $12,455 |
| Other(b) . . . . . . . . . . . . . . . . . . . . . . . . | 41,583 | 18,719 | (5,000) | 1,628 | 56,930 |
| **For the year ended** | | | | | |
| November 30, 2001: | | | | | |
| Allowance for doubtful accounts . . . . . . . | $12,455 | $ 5,477 | $(3,379) | $ 621 | $15,174 |
| Other(b) . . . . . . . . . . . . . . . . . . . . . . . . | 56,930 | 5,130 | (4,393) | (2,771) | 54,896 |
| **For the year ended** | | | | | |
| November 30, 2002: | | | | | |
| Allowance for doubtful accounts . . . . . . . | $15,174 | $ 5,012 | $(7,601) | $ 921 | $13,506 |
| Other(b) . . . . . . . . . . . . . . . . . . . . . . . . | 54,896 | 10,524 | (14,762) | 3,570 | 54,228 |

(a) Includes the effect of exchange rate changes on beginning balances of valuation and qualifying accounts, except as otherwise noted.

(b) The "Other" designation in the above Valuation and Qualifying Accounts schedule comprises a number of provisions for legal claims, tax risks and other contingencies arising in the normal course of business. The various liability and accrual accounts included in the "Other" category have been determined in accordance with the guidance provided by Statement of Financial Accounting Standards No. 5, "Accounting for Contingencies".