1 of 1 DOCUMENT

In re Dynex Capital, Inc. Securities Litigation

05 Civ. 1897 (HB)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*2006 U.S. Dist. LEXIS 4988*

**February 10, 2006, Decided
February 10, 2006, Filed**

**COUNSEL:** [*1] For Teamsters Local 445 Freight Division Pension Fund, on its own behalf, Plaintiff: Christopher Lometti, Frank Rocco Schirripa, Joel P. Laitman, Schoengold & Sporn, P.C., New York, NY; Samuel P. Sporn, Schoengold, Sporn, Laitman & Lometti, P.C., New York, NY.

For Teamsters Local 445 Freight Division Pension Fund, on behalf of all others similarly situated, Plaintiff: Christopher Lometti, Frank Rocco Schirripa, Joel P. Laitman, Samuel P. Sporn, Schoengold & Sporn, P.C., New York, NY.

For Dynex Capital, Inc., Merit Securities Corporation, Stephen J. Benedetti, Thomas H. Potts, Defendants: Edward Joseph Fuhr, Eric Harrison Feiler, Monica Shelton Call, Terence James Rasmussen, Hunton & Williams, L.L.P.(Richmond VA),., Richmond, VA; Joseph John Saltarelli, Hunton & Williams, LLP(NYC), New York, NY U.S.A.

For Lehman Brothers, Inc., Greenwich Capital Markets, Inc., Defendants: James E. Brandt, Latham & Watkins LLP, New York, NY; Jeff G. Hammel, Latham and Watkins, New York, NY.

**JUDGES:** Harold Baer, U.S.D.J.

**OPINIONBY:** Harold Baer

**OPINION:**

### OPINION & ORDER

**Hon. Harold Baer, Jr., District Judge:**

Lead plaintiff Teamsters Local 445 Freight Divisions Pension Fund ("Local 445") brings this putative class action against defendants Merit Securities Corporation ("Merit"), Dynex Capital, Inc. ("Dynex," collectively the "corporate defendants" [*2] or "Dynex"), Thomas H. Potts ("Potts") and Stephen J. Benedetti ("Benedetti") for violations of *sections 10(b)* and *20(a)* of the Securities Exchange Act of 1934 (the "Exchange Act") in connection with the sale of asset-backed bonds. Defendants have moved to dismiss the complaint on the grounds that: 1) plaintiff's claims are barred by the statute of limitations; 2) plaintiff fails to plead fraud with the requisite particularity; 3) plaintiff fails to plead scienter; 4) plaintiff fails to plead loss causation; 5) certain of defendant's statements were forward-looking; and 6) plaintiff lacks standing to pursue claims based on classes of bonds that plaintiff itself did not actually purchase. For the following reasons, defendants' motions to dismiss is GRANTED in part and DENIED in part.

### I. BACKGROUND

Dynex is a financial services corporation principally engaged in "the consummation of public offerings of debt securities using mortgages as collateral." (Compl. P4). Merit is a wholly owned subsidiary of Dynex. (Compl. P21). Benedetti was, at all relevant times, the President and CEO of Merit. (Compl. P27). In addition, Benedetti served on the board of directors of Dynex, and [*3] held various senior management positions at Dynex throughout the class period. (Id.) Potts was President and Principal Executive Officer of Dynex from 1997 until June 2002 and served on Dynex's board of directors throughout the class period. (Compl. P28). In 1999, Merit issued two series of bonds, the "Series 12" bonds and the "Series 13" bonds, collateralized by pools of mobile home installment sales contracts. (Compl. P54). Local 445 purchased $450,000 par value Series 13 bonds for a total investment of $442,922. (Compl. P20). Dynex had originated the mobile home loans that served as collateral for the bonds between 1997 and 1999. (Compl. P55). Plaintiff alleges that, since Dynex "was a relatively 'late comer' to the mobile home loan business[,]" in order to obtain large volumes of loans, Dynex was forced to purchase loans from un-

creditworthy borrowers. (Id.) Plaintiff alleges that Dynex engaged in "the undisclosed practice of overtly marketing to mobile home dealers Dynex's willingness to buy 'bad paper' or uncreditworthy loans; purchasing these highly defective and impaired loans" and then using these loans as collateral for the bonds. (Compl. P5). Plaintiff alleges [*4] that the offering documents issued in 1999 in connection with the Series 12 and 13 bonds concealed "the true facts concerning how the collateral was originated." (Compl. P6). Plaintiff further alleges that, after the initial offering, defendants misrepresented the cause of the bond collateral's poor performance; misrepresented the reasons for restating its loan loss reserves; and concealed the loans' faulty underwriting. (Compl. PP7-10). On February 24, 2004, and May 13, 2004, Moody's downgraded the credit rating of the Series 13 and Series 12 bonds, respectively. (Compl. P13). These downgrades led to steep declines in the price of the bonds. (Compl. P2). Local 445 brings the instant action on behalf of all open market purchasers of Series 12 and 13 bonds between February 7, 2000 and May 13, 2004. (Compl. P35).

## II. DISCUSSION

When ruling on a motion to dismiss pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure*, the Court must construe all factual allegations in the complaint in favor of the non-moving party. See *Krimstock v. Kelly, 306 F.3d 40, 47-48 (2d Cir. 2002)*. The Court's consideration is normally [*5] limited to facts alleged in the complaint, documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken. See *Allen v. WestPoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991)*. A motion to dismiss should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Shakur v. Selsky, 391 F.3d 106, 112 (2d Cir. 2004)* (quoting *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957))*. When a complaint alleges fraud, "*Rule 9(b)* requires that allegations of fraud be pleaded with particularity." *Harsco Corp. v. Segui, 91 F.3d 337, 347 (2d Cir. 1996)*. This means that the complaint "must (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent. *Id*.

"To state a cause of action under *section 10(b)* [of the Exchange Act] and Rule 10b-5 [of the Securities and Exchange Commission], [*6] a plaintiff must plead that the defendant made a false statement or omitted a material fact [in connection with the purchase or sale of securities], with scienter, and that plaintiff's reliance on defendant's action caused plaintiff injury." *Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2000)* (internal quotation omitted). "The requisite state of mind, or scienter, in an action under *section 10(b)* and Rule 10b-5[] that the plaintiff must allege is an intent to deceive, manipulate or defraud." Id. (internal quotation omitted). The Private Securities Litigation Reform Act of 1995 ("PSLRA") imposed heightened pleading requirements for securities fraud actions. Id. The PSLRA provides that:

> In any private action . . . in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

*15 U.S.C. § 78u-4(b)(2)*.

To establish fraudulent intent, a plaintiff may [*7] either allege facts showing "that defendants had both motive and opportunity to commit fraud" or allege "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit, 264 F.3d at 138* (internal quotation omitted). A plaintiff may establish the requisite strong inference of scienter by alleging that the defendants: "(1) benefited in a concrete and personal way from the purported fraud . . .; (2) engaged in deliberately illegal behavior . . .; (3) knew facts or had access to information suggesting that their public statements were not accurate . . .; or (4) failed to check information they had a duty to monitor." *Novak v. Kasaks, 216 F.3d 300, 311 (2d Cir. 2000)*.

### A. Misrepresentations and Omissions

Plaintiff alleges that the prospectuses issued in connection with the offerings of the Series 12 and 13 bonds contained various false and misleading statements. Specifically, plaintiff contends that the offering documents falsely represented the underwriting guidelines employed in originating the loans that served as collateral for the bonds. For example, the prospectuses stated that the underwriting guidelines [*8] would encompass the "creditworthiness of the Borrower" and "the Borrower's ability to make Monthly Payments." (Compl. P67). Further, the offering documents represented that the purpose of the underwriting guidelines was "to evaluate each prospective Borrower's credit standing and repayment ability and the value and adequacy of the related Mortgaged Premises as collateral." (Compl. P68). The offering documents went on to summarize the types of information utilized to deter-

Case 3:03-cv-00409-DJS   Document 57-7   Filed 03/20/2006   Page 3 of 11

Page 3
2006 U.S. Dist. LEXIS 4988, *8

mine a potential borrower's credit-worthiness, including credit history, income and employment status. (Compl. PP69-70). Plaintiff alleges that these statements were false because "the creditworthiness of the borrower as well as deficiencies in borrower documentation was systematically disregarded by Dynex regional and corporate officers in order to reach . . . loan volume amounts necessary to consummate" the bond offerings. (Compl. P71).

Plaintiff alleges that the misrepresentations continued after the offerings were consummated and throughout the class period. A representative sample of those allegations is as follows. In Dynex's 1999 Form 10-K, Dynex stated that it "historically utilized internally generated guidelines [*9] to underwrite loans for all product types and . . . performed the servicing function for loans on which the Company has credit exposure." (Compl. P74). Throughout the class period, in its SEC filings, Dynex represented that it was acting as "master servicer" of the mobile home loans by, *inter alia*, monitoring the submission of loan payments. (Compl. PP80-81). Plaintiff alleges that these representations are misleading because defendants recklessly disregarded underwriting criteria and servicing duties and that this recklessness lead to a material understatement of repossessions made in connection with the loans and the restatement of loan loss reserves. (Compl. PP75, 81).

In a letter to shareholders dated April 28, 2000, Potts stated that Dynex had decided to sell its manufactured housing lending business due to an inability to secure funding under reasonable terms. (Compl. P76). Plaintiff alleges that this statement was misleading because "Dynex failed to disclose that a material factor in the decision to sell the mobile home loan lending business was the poor underwriting and origination practices" that produced a defective loan portfolio. (Compl. P77). In another letter to [*10] shareholders, dated May 4, 2001, Potts stated that "manufactured housing loans are currently experiencing higher loss severities than previously anticipated due to the depressed state of the manufactured housing section." (Compl. P84). n1 In addition, the 2000 Form 10-K filed that same day stated that Dynex had:

> seen the loss severity on manufactured housing loans increase dramatically . . . as a result of the saturation in the market place with both new and used (repossessed) manufactured housing units. In addition, the Company has seen some increase in overall default rates on its manufactured housing loans. The Company anticipates that market conditions for manufactured housing loans will remain unfavorable through 2001.

(Compl. P86). n2 Plaintiff claims that this statement was misleading because defendants failed to disclose the true reasons for the decline of the mobile home loan portfolio, i.e., reckless loan origination and underwriting. (Compl. P87).

> n1 This sentiment was reiterated in another letter to shareholders from Potts dated April 8, 2002, in which Potts stated that Merit was "experiencing a high level of credit losses on the manufactured housing loan portfolio." (Compl. P92). Potts explained that "these losses are primarily related to the depressed market for repossessed manufactured homes, compounded by the exit from that market of several large lenders." (Id.)

[*11]

> n2 Merit's 2000 and 2001 Form 10-Ks contained similar statements. (Compl. PP88, 94).

In its 2002 Form 10-K, Merit revised its loan loss reserves to include "a percentage of all loans with delinquencies greater than 30 days." (Compl. P100). Merit stated that the "increase in severe loan losses [was] a result of the saturation in the market place with both new and used (repossessed) manufactured housing units" and that "the Company [had] seen some increase in overall default rates. .." (Id.) Further, in its 2003 Form 10-K, Merit again revised its loan loss estimates to include a portion of "current loans." (Compl. P110). Merit stated that, "given . . . "new observable data" including default trends and market conditions, it was advisable to include some amount in its loss reserves to cover current loans. (Compl. P110).

In addition, on October 28, 2003, Dynex restated the cumulative repossession figures for the Series 13 bonds that it had been reporting monthly on its website. (Compl. P102-04). Specifically, Dynex reported that the total repossessions through September had been understated [*12] by approximately 34%. (Compl. P104). Finally, in its 2003 Form 10-K, Merit disclosed that it had identified an "internal control deficiency related to the recording of allowance for loan losses in excess of loan obligations" and that Merit was therefore restating its earnings for the first two quarters of 2003. (Compl. P112). In February, March and May 2004, the Series 12 and 13 bonds suffered severe credit downgrades by credit reporting services which in turn led to a steep drop in market price. (Compl. PP107-09, 114).

**B. Statute of Limitations**

An action "that involves a claim of fraud . . . in con-

Case 3:03-cv-00409-DJS   Document 57-7   Filed 03/20/2006   Page 4 of 11

Page 4
2006 U.S. Dist. LEXIS 4988, *12

travention of a regulatory requirement concerning the securities laws . . . may be brought no[] later than" two years after "the discovery of the facts constituting the violation" or five years after the violation itself, whichever is earlier. *28 U.S.C. § 1658(b)*; see also *Teamsters Local 445 Freight Division Pension Fund v. Bombardier, Inc., 05 Civ. 1898, 2005 U.S. Dist LEXIS 19506, *15-16 (S.D.N.Y. September 6, 2005)*.

Plaintiff's complaint was filed on February 7, 2005. Defendants argue that any claims based on statements or omissions [*13] contained in the bond offering documents, which were issued in 1999, are barred by the five year statute of repose. n3 In addition, defendants argue that the poor performance of the bond collateral, dramatic increases in Dynex and Merit's loss reserves, and news reports regarding risky underwriting practices in the manufactured housing loan industry created sufficient "storm warnings" to alert plaintiff to the nature of any alleged fraud prior to February 2003.

> n3 Indeed, defendants argue that plaintiff's are barred from relying on any alleged misrepresentations made before February 7, 2000.

### 1. Statute of Repose

The five year limitations period contained in *28 U.S.C. § 1658(b)* requires securities fraud claims to be brought within five years of the occurrence of the violation. In a case like this one, in which a series of fraudulent misrepresentations is alleged, this "period of repose begins when the last alleged misrepresentation was made." *Bombardier, 2005 U.S. Dist LEXIS 19506,* [*14] *19*. See also *Borden, Inc. v. Spoor Behrins Campbell & Young, Inc., 778 F. Supp. 695, 699 (S.D.N.Y. 1991)* (under previous statute of repose, plaintiff required to initiate suit within three years of most recent violation). n4 In Bombardier, a suit filed on the same day as this action, plaintiff alleged a similar scheme to defraud based on reckless underwriting practices. The Bombardier court reasoned that, "due to the continuation of material misrepresentations after February 7, 2000, the statute of repose does not bar plaintiff's claims." *Bombardier, 2005 U.S. Dist LEXIS 19506, *55*. Here, plaintiff alleges that the misrepresentations contained in the offering documents were followed by additional materially false statements regarding the same subject matter. Therefore, any claims arising from the 1999 offering documents are not barred by the five year limitations period.

> n4 In *Shalam v. KPMG, L.L.P., 2005 U.S. Dist. LEXIS 18989, 05 Civ. 3602, 2005 WL 2139928, *2 (S.D.N.Y. Sept. 6, 2005)*, I found that plaintiff's *section 10(b)* claims were barred by the five year statute of limitations because the sole relevant securities transaction had occurred more than five years before plaintiff filed suit. In Shalam, I noted that the five year limitations period ran from "'the date the parties . . . committed themselves to complete the . . . [securities] transaction[,]'" rather than from the occurrence of any subsequent fraudulent acts. Id. (quoting *Grondahl v. Merritt & Harris, Inc., 964 F.2d 1290, 1294 (2d Cir. 1992)*. However, in Shalam the plaintiff engaged in the sole relevant sale of securities more than five years before the complaint was filed, see *Shalam, 2005 U.S. Dist. LEXIS 18989, 2005 WL 2139928, * 2*. Here, plaintiff purchased the bonds at issue less than five years before filing suit. (Compl. PP20, 35).

[*15]

### 2. Inquiry Notice

The two year limitations period for securities fraud claims "begins to run when the plaintiff obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge." *Shah v. Meeker, 04 Civ. 5965, F.3d , 2006 U.S. App. LEXIS 1379, 2006 WL 147503, *4 (2d Cir. 2006)* (internal quotation omitted). "Information contained in articles in the financial press may trigger the duty to investigate. . . . [That] duty arises when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded." *Id. 2006 U.S. App. LEXIS 1379, [WL] at *5* (internal quotation omitted). "A plaintiff in a securities fraud case is charged with knowledge of publicly available news articles and analysts' reports to the extent that they constitute storm warnings sufficient to trigger inquiry notice." *Fogarazzo v. Lehman Brothers, Inc., 341 F. Supp. 2d 274, 298 (S.D.N.Y. 2004)* (internal quotation omitted). When a duty of inquiry has arisen, "knowledge will be imputed to the investor who does not make such an inquiry." *Dodds v. Cigna Securities, Inc., 12 F.3d 346, 350 (2d Cir. 1993)*. [*16]

"To be placed on inquiry notice, plaintiffs need not be able to learn the precise details of the fraud, but they must be capable of perceiving the general fraudulent scheme based on the information available to them." *Fogarazzo, 341 F. Supp. 2d at 298* (internal quotation omitted). However, "available information must establish 'a probability, not a possibility' of fraud to trigger inquiry notice." Id. (quoting *Newman v. Warnaco Group, Inc., 335 F.3d 187, 194 (2d Cir. 2003))*. Therefore, "in the context of dismissal, defendants bear a heavy burden in establish-

Case 3:03-cv-00409-DJS    Document 57-7    Filed 03/20/2006    Page 5 of 11

Page 5
2006 U.S. Dist. LEXIS 4988, *16

ing that the plaintiff was on inquiry notice as a matter of law. Inquiry notice exists only when uncontroverted evidence irrefutably demonstrates when plaintiff discovered or should have discovered the fraudulent conduct." *Fogarazzo, 341 F. Supp. 2d at 298* (internal quotation omitted).

Defendants argue that plaintiff should have been alerted to any alleged fraud prior to February 2003. Specifically, defendants cite the following indicators, each of which was disclosed publicly prior to 2003: 1) drastic increases in loan delinquency rates; 2) increases in "loss severities" [*17] on defaulting loans; 3) increases in loan loss reserves; and 4) steep increases in total losses on the bond collateral. In addition, defendants cite numerous media reports describing problems in the manufactured housing industry. Some of these articles reference loose underwriting practices as a factor contributing to the industry's decline. (See, e.g., Declaration of Joseph Saltarelli, dated July 15, 2005 ("Saltarelli Dec."), Exs. 23, 24; Declaration of Terence Rasmussen, dated August 30, 2005 ("Rasmussen Dec."), Exs. 32 – 37).

The mounting losses on the bond collateral, while indicative of poor performance, did not suffice to place investors on notice of fraud. See *Bombardier, 2005 U.S. Dist LEXIS 19506, *39* ("A reasonable investor, upon reading these reports, would surely have concluded that the [bonds] and collateral were performing poorly, but poor performance alone is not an indication of securities fraud.") Indeed, plaintiff alleges that, at the time, defendants attributed this poor performance to market conditions. (See, e.g., Compl. PP84, 86, 100). The statute of limitations period "is triggered only by data that relates *directly* to the misrepresentations [*18] and omissions" of which plaintiff complains. *Lentell v. Merrill Lynch & Co., 396 F.3d 161, 169 (2d Cir. 2005)*. These indicators would not have apprised a reasonable investor of massive fraud in the origination and servicing of the bond collateral. If anything, they portend a decline in the value of the bonds that could be attributed to any number of factors. n5

> n5 *L.C. Capital Partners, L.P. v. Frontier Ins. Group, Inc., 318 F.3d 148 (2d Cir. 2003)*, upon which defendants rely, is not to the contrary. In L.C. Capital, the Second Circuit found that various "storm warnings," including three substantial reserve charges taken within four years, gave rise to a duty of inquiry. *Id. at 155*. However, in that case "the focus of the alleged fraud . . . [was] the inadequacy of reserve levels attributable to inadequate internal controls." Id. (internal quotation omitted). Here, the focus of the alleged fraud is defendants' underwriting practices, not the adequacy of loan loss reserves.

[*19]

In addition, the various media reports cited by defendants did not give rise to a duty to inquire. Only three of the trade reports actually mentioned Dynex at all. A June 21, 1999 article in Mortgage–Backed Securities Letter noted that Dynex was selling its manufactured housing loan origination business, but did not link the sale directly to any overly aggressive lending practices by Dynex. (See Rasmussen Dec., Ex. 31). A report in Asset–Backed Alert, dated March 26, 2001 noted that the industry "continued to struggle" but that underwriting practices had improved. (Rasmussen Dec., Ex. 44). In reference to Dynex, that article stated only that "Origen Financial . . . formerly known as Dynex financial . . .[was] on the verge of pricing a manufactured–housing deal totaling $163.4 million . . ." (Id.) Finally, a May 2, 2002 Fitch report examined several major players in the industry, and discussed problems with underwriting standards, but mentioned Dynex only in a chart listing all industry lenders. (Rasmussen Dec., Ex. 33).

While the analyst reports demonstrate that there was information available to the public regarding the manufactured housing industry's loose underwriting [*20] standards, there was little (if any) information in the public domain to tie these practices to Dynex. Further, "aggressive underwriting . . . does not amount to routine disregard for all underwriting guidelines. . ." *Bombardier, 2005 U.S. Dist LEXIS 19506, *40* (finding that rating agency and analyst reports that linked defendants to poor underwriting practices did not put plaintiff on inquiry notice of fraud). Thus, these reports did not "sufficiently describe the actual scheme that is the basis for plaintiff's claims" to place plaintiff on inquiry notice. Id.

### C. Scienter

Defendants argue that plaintiff has failed to adequately plead scienter. Principally, defendants argue that: 1) plaintiff's allegations of scienter are overly generalized and consist solely of "boilerplate" assertions; 2) plaintiff's theory of motive defies economic reason; 3) plaintiff fails to allege that either of the individual defendants, or any other identified executive who issued public statements, had access to any information indicative of the alleged fraud; and 4) plaintiff fails to adequately identify various unnamed sources referenced in the complaint.

The majority of the [*21] allegations in plaintiff's complaint that are relevant to scienter are directed against the "defendants" or "Dynex" in general. Plaintiff alleges that Dynex "systematically disregarded 'borrower cred-

itworthiness[,]'" and that Dynex "recklessly disregarded 'red flags' of uncreditworthy paper[.]" (Compl. P10). (See also Compl. P12 ("Dynex . . . knew, or recklessly disregarded . . . [that] . . . material defects . . . in the underwriting and origination of the Bond collateral . . . undermined the quality of the . . . collateral). n6 The principal sources of these allegations are identified as "former Dynex employees who worked at Dynex's centralized collection center [in] Forth Worth, Texas . . in the areas of collection and repossession" as well as former employees "who worked in regional sales offices engaged primarily in the origination and underwriting of . . . loans. . ." (Compl. P15).

> n6 See also Compl. P115 ("Defendants' recklessness an/or actual knowledge . . . is reflected in the following facts alleged herein: [1] the systematic disregard for creditworthiness . . . was a 'top down' policy since . . . the Underwriting Guidelines were typically waived on the regional branch and corporate levels . . .; [2] Dynex artificially . . . reported delinquencies through . . . 1999 . . .; [3] defendants knew[] or recklessly disregarded[] that 65%–70% of its mobile home collateral were Buy For loans . . .; [4] by . . . February 7, 2000, Dynex had had substantial collection experience with the mobile home loans . . . and thus had actual knowledge of [*inter alia*] high delinquencies and loss severities . . .; [5] . . . defendants knew the true causes for the poor performance of the collateral . . .[was] Dynex's reckless underwriting and origination practices . . .; [6] the . . . 'erroneous' reporting of cumulative repossessions [was] indicative of defendants' intentional and/or reckless disregard of 'Master Servicers' duties . . .; [and 7] the . . . 'deficiencies in internal controls' [in] assessing and determining the loan loss provision . . . reflected defendants intentional and/or reckless disregard of Master Servicer functions. . ."); Compl. P62 ("Dynex knew, or recklessly disregarded, that it bought Buy For loans. . . . Dynex also knew of its Buy For loans because collectors at its Texas offices reported this condition."); P64 ("Dynex . . . directed that the reported delinquencies be falsified."); P78 ("Dynex monitored the performance of the Bond collateral because it had the potential to directly impact Dynex's reported profits.").

[*22]

More specifically, plaintiff alleges that "Dynex salespeople were directed to tell mobile home dealers . . . that Dynex would purchase their far from creditworthy paper. . ." (Compl. P10). Plaintiff asserts that "officers reporting to [defendant] Potts and [to] regional officers systematically waived" underwriting standards. . . (Id.) Plaintiff alleges that Dynex "established underwriting guidelines, but then gave the branch managers and regional managers . . . wide latitude to waive those guidelines. n7 Such waivers were reportedly used to achieve [high] volume loan quotas." (Compl. P60) Plaintiff claims that "many regions, particularly the Texas region, led by Regional Vice President[] John Whitehead, 'miraculously' achieved enormous loan volume quotas on the last few days of each quarter." (Compl. P59). "The sales force was directed to tell mobile home dealers that Dynex was willing to 'buy deep'—meaning Dynex would purchase the dealer's less than creditworthy loans if Dynex would be able to purchase the other 'good paper.'" (Compl. P56). n8

> n7 According to plaintiff, "branch managers and Vice Presidents had the power to waive underwriting guidelines for loans up to $85,000 . . . .[while loans] in excess of $85,000 were approved by . . . corporate headquarters." (Compl. P56).

[*23]

> n8 See also Compl. P63 ("Despite internal 'red flags' on applications [sent] to Dynex by . . . non-reputable dealers, the underwriters knowingly approved the loans [although] a first payment default was [imminent].")

With respect to the individual defendants, plaintiff alleges that "Benedetti, as a result of his various senior positions, was well aware of the data derived from the collections operations . . . which reflected the high percentage of [Buy For] n9 loans, first payment default delinquencies and failed . . . repossessions. . ." (Compl. P27). n10 Plaintiff claims that, "as a result, Benedetti knew, or recklessly disregarded, that the true reason for the poor performance of the Bond collateral was due, in material part, to the manner in which the collateral was originated." (Id.) n11 Plaintiff also claims that "Potts knew[] or recklessly disregarded[] that he and the senior officers reporting to him at . . . corporate headquarters were directly involved in the approval of mobile home loans . . . which failed to satisfy internal underwriting standards and guidelines. [*24] . ." (Compl. P28). Plaintiff further alleges that, "because of [their] positions with [Dynex]," both Potts and Benedetti "had access to . . . adverse undisclosed information about [the] underwriting and origination of [Dynex's] bond collateral . . . and [nonetheless] caused, allowed and permitted" the various misrepresentations and omissions alleged in the complaint. (Compl. P29). n12

> n9 "Buy For" loans are loans in which the mobile home owner and occupant were not the same as the

Case 3:03-cv-00409-DJS   Document 57-7   Filed 03/20/2006   Page 7 of 11

Page 7
2006 U.S. Dist. LEXIS 4988, *24

borrower. (Compl. P10).

n10 Plaintiff also claims that Potts had access to the same collections data. (Compl. P28).

n11 Plaintiff also asserts that Benedetti "knew, or recklessly disregarded [that] one of the material undisclosed reasons for the sale of Dynex['s] mobile home loan origination business in 1999 included the poor quality of the collateral which had been originated by Dynex." (Compl. P27). Plaintiff makes this same assertion against Potts. (Compl. P28).

n12 Plaintiff further alleges that both individual defendants, "by virtue of their high-level positions with the company, directly participated in the management of the company [and were] directly involved in the day-to-day operations of the company. . ." (Compl. P30).

[*25]

As set forth above, plaintiff "must allege facts that give rise to a strong inference of fraudulent intent." *Novak, 216 F.3d at 307*. "The requisite strong inference of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." I*d*. (internal quotation omitted). "Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged. Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged." *Shields v. CityTrust Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir. 1994)*. Motive requires specific allegations that indicate "that defendants benefited in some concrete and personal way from the purported fraud." *Novak, 216 F.3d at 307-08*.

To state a claim based on recklessness, plaintiff must "specifically allege[] defendant's knowledge of facts or access to information contradicting [defendant's] public statements." *Id. at 308.* [*26] However, where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Id. at 309*. Plaintiff may not "plead scienter based on speculation and conclusory allegations lacking a factual foundation." *Faulkner v. Verizon Communications, Inc., 189 F. Supp. 2d 161, 170 (S.D.N.Y. 2002)*.

### 1. Individual Defendants

It is often difficult to determine whether a plaintiff has plead the requisite inference of scienter because the circumstances that give rise to PSLRA claims vary widely. However, one necessary ingredient is that the allegations leveled against a particular individual must demonstrate that his or her culpability is based upon more than that person's mere position in the corporate hierarchy. See *In re Health Mgmt. Sys., Sec. Litig., 1998 U.S. Dist. LEXIS 8061, 97 Civ. 1865, 1998 WL 283286, *6 (S.D.N.Y. June 1, 1998)* (Baer, J.) ("courts have routinely rejected . . . attempts to plead scienter based on allegations that because of defendants' board membership and/or their executive managerial positions, they had access to information concerning the [*27] company's adverse financial outlook"). See also *In re Federated Dep't Stores, Inc., 2004 U.S. Dist. LEXIS 3769, 00 Civ. 6362, 2004 WL 444559, *6 (S.D.N.Y. March 11, 2004)* ("If accepted, this argument would apply to all corporate directors and officers.").

That ingredient is missing here. In essence, plaintiffs allege that both Potts and Benedetti were involved in the day to day operations of the company, and therefore "knew [of] or recklessly disregarded" the alleged fraud at Dynex and that their public statements were false. Plaintiff also asserts that Potts "knew or recklessly disregarded" that Potts himself or other (unidentified) officers reporting to him were involved in the approval of loans that failed to satisfy internal underwriting guidelines.

Plaintiff, however, does not allege facts that demonstrate that either Potts or Benedetti "benefited in some concrete and personal way from the purported fraud." *Novak, 216 F.3d at 307-08* (plaintiff can not "proceed based on motives possessed by virtually all corporate insiders"). "When, as here, there is no evidence of motive . . . circumstantial evidence of conscious misbehavior or recklessness must be [*28] correspondingly greater . . ." *Federated, 2004 U.S. Dist. LEXIS 3769, 2004 WL 444559, *6*. To show recklessness, plaintiff must "specifically identify . . . reports or statements [that contained] information" that contradicted [defendants'] public statements. *Novak, 216 F.3d at 309*. Plaintiff may not rely on conclusory allegations that lack a specific factual foundation. See *Shields, 25 F.3d at 1129*.

While plaintiff has aptly described a pattern of reckless corporate behavior, plaintiff has failed to link that behavior to any culpable individuals. Or put another way, with respect to the individual defendants, plaintiff's complaint fails the "where's the beef" test. If plaintiff's allegations against Potts and Benedetti suffice to demonstrate scienter, senior officers of any corporation in which a pattern of wrongdoing is alleged would be liable for securities fraud. In broad terms, senior officers will always have "access" to information indicative of malfeasance (if such information exists). The PSLRA demands more. Plaintiff has not alleged that Potts or Benedetti saw or had access to specific reports or statements that indicated malfeasance, or that contradicted [*29] their public statements. Nor

Case 3:03-cv-00409-DJS   Document 57-7   Filed 03/20/2006   Page 8 of 11

Page 8
2006 U.S. Dist. LEXIS 4988, *29

has plaintiff alleged that Potts or Benedetti directly supervised or knew of any identified individual(s) who were engaged in specific wrongdoing. Therefore, plaintiff has failed to adequately plead scienter with respect to Potts and Benedetti. n13

> n13 While the Bombardier court found that plaintiff therein had sufficiently plead scienter with respect to certain individual defendants, the plaintiff in *Bombardier* made specific allegations not present here. Specifically, plaintiff in Bombardier alleged that a certain senior manager, who was ultimately terminated, had directed employees to disregard stated underwriting guidelines. *Bombardier, 2005 U.S. Dist. LEXIS 19506, *60*. Further, in Bombardier, one of the individual defendants had directly supervised that senior manager. *Id. at 63-64*.

### 2. Corporate Defendants

A plaintiff may, and in this case has, alleged scienter on the part of a corporate defendant without pleading scienter against [*30] any particular employees of the corporation. See *In re Worldcom, 352 F. Supp. 2d 472, 497 (S.D.N.Y. 2005)* (to show that a corporate defendant acted with scienter, "plaintiffs in securities fraud cases need not prove that any one individual employee . . . also acted with scienter"). Here, the requisite inference of fraudulent intent arises from allegations that show the corporate defendant had the motive and opportunity to commit fraud, or acted recklessly. See, e.g., *In re Oxford Health Plans, Inc. Sec. Litig., 51 F. Supp. 2d 290, 294 (S.D.N.Y. 1999)*.

In sum, plaintiff alleges that Dynex systematically disregarded various indicia of borrowers' creditworthiness in order to quickly consummate large volumes of loans, and ignored signs that the bond collateral was defective after the loans were originated. Specifically, plaintiff asserts, *inter alia*, that Dynex "typically" and "systematically" waived internal underwriting guidelines at regional and corporate levels (compl. PP10,115); Dynex "knew or recklessly disregarded that 65%-70% of its . . . collateral were Buy For loans" (id.); "Dynex . . . directed that . . . reported delinquencies be falsified" [*31] (compl. P64); Dynex underwriters approved loans despite an imminent likelihood of default, (compl. P63); Dynex salespeople purchased uncreditworthy paper (compl. PP10, 56); and that "many regions, particularly the Texas region" achieved very high loan volume quotas at the end of each quarter. (Compl. P59).

These allegations are sufficient to infer that officers and employees of the corporate defendants had the motive and opportunity to commit fraud. Plaintiff has alleged that Dynex entered the manufactured housing mortgage market with the intention of quickly consummating large volumes of loans and bundling those loans into asset-backed bonds. In order to consummate the loans, plaintiff alleges that Dynex disregarded its own underwriting guidelines and acquired loans with very high risk of default. Defendants counter that this scheme would "defy economic reason." Defendants argue that, since Dynex retained a significant interest in the bonds, Dynex itself stood to loose money if the bond collateral proved defective. However, plaintiff need not allege a foolproof scheme to raise the requisite inference of scienter. It is sufficient for plaintiff to plead facts showing that the corporate [*32] defendants sought to make short term profits at the expense of unsuspecting investors. The argument that Dynex stood to lose if the scheme collapsed is creative, but unavailing, since in any case plaintiff's allegations demonstrate recklessness. Plaintiff has alleged that Dynex systematically originated defective loans, despite clear signs that borrowers were not creditworthy. These allegations constitute "strong circumstantial evidence of . . . recklessness." *Novak, 216 F.3d at 307*. Therefore, plaintiff has adequately plead scienter with respect to Dynex and Merit.

### D. Particularity

"*Rule 9(b)* requires that allegations of fraud be pleaded with particularity."*Harsco Corp. v. Segui, 91 F.3d 337, 347 (2d Cir. 1996)*. This means that the complaint "must (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent. *Id*. In addition, the PSLRA requires that plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement [*33] is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . .[to] state with particularity all facts on which that belief is formed." *15 U.S.C. § 78u-4(b)(1)*.

Defendants argue that plaintiff has failed to adequately identify any actionable misrepresentations because defendants did not purport to adhere to rigid underwriting guidelines. In addition, defendants assert that plaintiff should be required to plead the quantity of bad loans Dynex acquired with greater specificity. Both arguments are unavailing.

The alleged misrepresentations and omissions set forth in the complaint, and summarized in detail in section II A, *supra*, demonstrate that Dynex, through its public statements, endeavored to ensure the investing public

Case 3:03-cv-00409-DJS   Document 57-7   Filed 03/20/2006   Page 9 of 11

Page 9
2006 U.S. Dist. LEXIS 4988, *33

that it utilized adequate underwriting guidelines. (See, e.g., compl. P74 (Dynex stated that it "historically utilized internally generated underwriting guidelines. . .")). Plaintiff also identifies statements in which Dynex attributed the poor performance of the bond collateral to "market conditions." (See, e.g., compl. PP86, 92, 100). Plaintiff alleges that these statements [*34] were misleading because Dynex did not in fact utilize reasonable underwriting guidelines and failed to disclose that this lapse rendered the bond collateral defective. These allegations are sufficiently particular. There is no requirement that plaintiff allege the exact number of bad loans that Dynex acquired. It is sufficient that plaintiff allege that the disregard for underwriting standards was systematic and material. Plaintiff has cleared that hurdle.

### E. Loss Causation

To plead loss causation, plaintiff must allege that defendants' "misrepresentation or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell, 396 F.3d at 173*. An allegation that plaintiff purchased securities at an artificially inflated price does not suffice. Rather, plaintiff must provide "some indication" of the causal connection between defendants' alleged misrepresentations and plaintiff's loss. See *Dura Pharmaceuticals, Inc. v. Broudo, 161 L. Ed. 2d 577, 125 S. Ct. 1627, 1634 (2005)*. See also In re Public Offering Sec. Litig., MDL No. 1554, 2005 WL 1529659, * 6 (S.D.N.Y. June 28, 2005) [*35] ("Where the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss, it is the materialization of the undisclosed condition or event that causes the loss.").

Defendants argue that plaintiff fails to plead loss causation because: 1) plaintiff's loss was allegedly caused by bond credit downgrades rather than by the disclosure of previously withheld information; 2) the credit downgrades did not have an immediate affect on bond prices; and 3) any misrepresentations concerning Dynex's loss reserves were immaterial and could not have affected the price of the bonds.

Plaintiff has alleged that, on October 28, 2003, Dynex drastically restated the cumulative repossession data for the Series 13 bond collateral. (See Compl. P104). Following this disclosure, Moody's initiated a credit review of the bonds. (Compl. PP105-06). On February 24, 2004, Moody's "issued massive downgrades" of the Series 13 bonds, noting "*inter alia*, . . . worsening 'cumulative repossession rates.'" (Compl. P107). In March 2004, Fitch downgraded the Series 12 bonds, noting "*inter alia*, 'relaxed credit standard[s]. . .'" (Compl. P109). On May 11, 2004, the next [*36] day that the Series 13 bonds were priced on the Bloomberg trading system, the Series 13 bonds suffered severe price decreases. (Compl. P108). The Series 12 bonds also dropped steeply between March and May 2004. (Compl. P114). n14

> n14 There is some inconsistency in the complaint regarding the date that Fitch downgraded the Series 12 bonds. Paragraph 109 refers to a downgrade on March 29, 2004. Paragraph 114 refers to a May 10, 2004 downgrade, but the chart accompanying paragraph 114 references a downgrade on March 10, 2004. I assume that the reference to a May downgrade is scrivener's error, and that the Fitch downgrade(s) actually occurred in March 2004.

This series of events is sufficient to allege loss causation. Plaintiff alleges that defendants misrepresented the quality of the bond collateral, this "concealed risk materialized when the collateral pool experienced high . . . repossessions[,]" and credit rating agencies downgraded the bonds. *Bombardier, 2005 U.S. Dist. LEXIS 19506*, * [*37] 57-58 (finding plaintiff adequately plead loss causation on facts almost identical to those alleged herein). These allegations suffice to plead a causal relationship between defendants' alleged misrepresentations and plaintiff's eventual loss.

Defendants' assertion that the bonds did not trade in an efficient market because the bond prices did not react immediately to the credit downgrades is belied by plaintiff's allegation that the Series 13 bonds dropped precipitously on the first day they were priced on Bloomberg following the credit downgrade. Furthermore, the efficiency of a market is a question of fact, and plaintiff has adequately alleged that these bonds traded in an efficient market. (See Compl. PP42-44 (alleging that a liquid market for the bonds existed at all relevant times and the bonds were traded by at least 12 broker-dealers).

Finally, defendants are incorrect that any misrepresentations concerning Dynex's loss reserves could not have affected the price of the bonds. Dynex's loss reserves were based, in part, on the performance of the bond collateral. The quality of the collateral impacted the price of the bonds. (See Compl. PP78, 82). Thus, there was a link [*38] between the loss reserves and the value of the bonds.

In sum, plaintiff has adequately plead loss causation.

### F. Forward Looking Statements

Defendants assert that Dynex's statements regarding loss reserves were forward looking and are therefore protected by the PSLRA's "safe harbor" provision. See *15 U.S.C. § 78u-5(c)*. n15 "However, it is well recognized

that even when an allegedly false statement 'has both a forward-looking aspect and an aspect that encompasses a representation of present fact,' the safe harbor provision of the PSLRA does not apply." *In re Nortel Networks Corp. Sec. Litig., 238 F. Supp. 2d 613, 629 (S.D.N.Y. 2003).* Here, plaintiff has alleged that defendants understated loss reserves by, *inter alia*, failing to include some provision for "current" (not delinquent) loans. Thus, plaintiff alleges that the reserve understatement concealed present facts concerning the impaired nature of the bond collateral. Therefore, plaintiff has adequately alleged that the reserve provisions encompassed a representation of present fact. See *Schnall v. Annuity & Life Re (Holdings) Ltd., 02 Civ. 2133, 2004 U.S. Dist. LEXIS 2859,* [*39] *\*25 (D. Conn. Feb. 22, 2004)* ("Statements regarding loss reserves are not projections, they are directed to the then-present state of the Company's financial condition.") (internal quotation omitted).

> n15 The safe harbor provision states that forward looking statements will not give rise to liability under the PSLRA if that statement was accompanied by cautionary language or was made without actual knowledge of its falsity. See *15 U.S.C. § 78u-5(c)*.

### G. Standing

Defendants assert that, because plaintiff only purchased class M1 and M2 Series 13 bonds, plaintiff lacks standing to represent purchasers of other classes of Series 13 bonds, as well as purchasers of Series 12 bonds. However, plaintiff alleges that defendants made the exact same misrepresentations with respect to both series of bonds and that the bond collateral suffered from the same defects. (See, e.g., compl. PP67-70). A "plaintiff has standing to represent a class of all purchasers who relied on the same [*40] repeated, material misstatements and thus suffered the same injury." n16 *Bombardier, 2005 U.S. Dist. LEXIS 19506, \*35*. (finding plaintiff had standing to represent purchasers of different series and classes of bonds). Therefore, plaintiff has standing to proceed on behalf of purchasers of Series 12 and Series 13 bonds.

> n16 To the extent that differences in the pools of collateral that secured various classes of bonds affected the bondholders' alleged injury, certification of subclasses may ultimately prove necessary.

### III. CONCLUSION

For the reasons set forth above, the motion to dismiss is GRANTED with respect to the individual defendants, with leave to replead within 30 days of the date of this Order. The motion to dismiss the corporate defendants is DENIED. The Clerk of the Court is hereby directed to close this motion and remove it from my docket.

**SO ORDERED.**

**February 10, 2006**
**New York, New York**

/s/ Harold Baer, Jr.

**U.S.D.J.**

```
                                                                     108RZX
**********  Print Completed  **********

Time of Request: March 20, 2006   10:03 PM EST

Print Number:   1821:89733302
Number of Lines: 509
Number of Pages: 10




















Send To:   DEMPSEY, J.J.
           WHITE & CASE LLP
           601 13TH ST NW
           STE 600
           WASHINGTON, DC 20005-3807
```