UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| IRENE RUCKER and GUSTAV RUCKER, Individually and On Behalf of All Others Similarly Situated, | ) ) ) ) | Civil Action No. 3:03-cv-00409-DJS |
| | ) | CLASS ACTION |
| Plaintiffs, | ) ) | |
| | ) | MEMORANDUM OF LAW IN |
| vs. | ) ) | OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND CONSOLIDATED |
| | ) | AMENDED COMPLAINT |
| STOLT-NIELSEN S.A., JACOB STOLT-NIELSEN, NIELS G. STOLT-NIELSEN, SAMUEL COOPERMAN and REGINALD J.R. LEE, | ) ) ) ) | |
| | ) | |
| Defendants. | ) ) | |
| | ) | |

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................... iii

I.  PRELIMINARY STATEMENT ....................................................................... 1

II. STATEMENT OF FACTS ................................................................................ 4

III. ARGUMENT .................................................................................................. 10

    A.  Standards on a Motion to Dismiss .................................................... 10

    B.  The SAC Adequately Alleges Scienter .............................................. 11

        1.  Legal Standard ........................................................................ 11

        2.  The SAC Adequately Alleges Conscious Misbehavior and
            Recklessness Through Defendants' Knowledge of (and
            Participation in) SNTG's Anti-Competitive Activities ............ 12

        3.  Even Absent Direct Allegations of Awareness by SNSA,
            Possessed by SNTG, as a Wholly Owned Subsidiary and Major
            Component of SNSA, Is Imputed to SNSA Under the Concept of
            Corporate Scienter ................................................................... 15

    C.  SNTG, Cooperman and Lee Are Primarily Liable For SNSA's Materially
        False and Misleading Statements ...................................................... 17

        1.  SNTG, Cooperman and Lee Were a Knowing Source of SNSA's
            Materially False and Misleading Statements ........................... 17

        2.  SNTG, Cooperman and Lee Are Liable Under the Concept of
            Scheme Liability ..................................................................... 20

    D.  Defendants' Failure to Disclose the Anti-Competitive Activities and
         Antitrust Violations Violated Section 10(b) and Rule 10b-5 Thereunder ............ 22

        1.  Defendants' Positive Statements About SNSA's Business Affairs
            Created a Duty to Disclose the Bid Rigging Conspiracy ........... 22

        2.  Defendants' Alleged Omissions Were Material ........................ 26

    E.  The SAC More Than Adequately Meets the Reform Act's Particularity
        Requirements. .................................................................................. 28

    F.  Defendants' Statements are Not Protected As Forward Looking
        Statements ........................................................................................ 30

**Page**

    G.    Plaintiffs Have Stated a Claim for Control Person Liability Under Section 20(a) ................................................................................................................32

IV.    CONCLUSION................................................................................................................33

# TABLE OF AUTHORITIES

Page

## CASES

*Anixter v. Home-Stake Prod. Co.*,
   77 F.3d 1215 (10th Cir. 1996) ...................................................................................18

*Ballan v. Wilfred Am. Educ. Corp.*,
   720 F. Supp. 241 (E.D.N.Y. 1989) ............................................................................24

*Castellano v. Young & Rubicam, Inc.*,
   257 F.3d 171 (2d Cir. 2001)......................................................................................27

*Caterpillar v. Great Am. Ins. Co.*,
   62 F.3d 955 (7th Cir. 1995) ......................................................................................16

*City of Monroe Emples. Ret. Sys. v. Bridgestone Corp.*,
   399 F.3d 651 (6th Cir. 2005) ....................................................................................18

*Cooper v. Pickett*,
   137 F.3d 616 (9th Cir. 1997) ....................................................................................18

*Ernst & Ernst v. Hochfelder*,
   425 U.S. 185 (1976)..................................................................................................21

*Friedl v. City of New York*,
   210 F.3d 79 (2d Cir. 2000).........................................................................................29

*Ganino v. Citizens Utilities Co.*,
   228 F.3d 154 (2d Cir. 2000).................................................................................11, 27

*Goldman v. Belden*,
   754 F.2d 1059 (2d Cir. 1985)....................................................................................27

*Halperin v. eBanker USA.com, Inc.*,
   295 F.3d 352 (2d Cir. 2002)......................................................................................27

*Hamilton Chapter of Alpha Delta Phi Inc. v. Hamilton College*,
   128 F.3d 59 (2d Cir. 1997)........................................................................................10

*Hunt v. Alliance North Am. Gov't Income Trust, Inc.*,
   159 F.3d 723 (2d Cir. 1998)......................................................................................30

*In re Alstom SA Secs. Litig.*,
   No. 03 Civ. 6595 (VM), 2005 U.S. Dist. LEXIS 35641 (S.D.N.Y. 2005) ............17, 18, 19

**Page**

*In re Carter-Wallace Inc. Sec. Litig.*,
    220 F. 3d 36 (2d Cir. 2000).................................................................................12

*In re Credit Suisse First Boston Corp. v. ARM Fin. Group*,
    2001 U.S. Dist. LEXIS 3332 (S.D.N.Y. Mar. 27, 2001) ..................................31

*In re DaimlerChrysler AG Sec. Litig.*,
    197 F. Supp. 2d 42 (D. Del. 2002)....................................................................14

*In re Dynex Capital, Inc. Secs. Litig.*, 05 CV 1897 (HB), 2006 U.S. Dist.
    LEXIS 4988 (S.D.N.Y. Feb. 10, 2006)..............................................................15

*In re Global Crossing, Ltd. Sec. Litig.*,
    322 F. Supp. 2d 319 (S.D.N.Y. 2004)..................................................19, 20, 22

*In re IPO Sec. Litig.*,
    241 F. Supp. 2d 281 (S.D.N.Y. 2003).........................................................10, 22

*In re Initial Pub. Offering Sec. Litig.*,
    2004 U.S. Dist. LEXIS 20552 (S.D.N.Y.) Oct. 15, 2004)................................31

*In re Int'l Bus. Machines Corporate Sec. Litig.*,
    163 F.3d 102 (2d Cir. 1998)......................................................................26, 27, 31

*In re Kidder Peabody Sec. Litig.*,
    10 F. Supp. 2d 398 (S.D.N.Y. 1998)......................................................17, 18, 19

*In re LaBranche Sec. Litig.*,
    No. 03 Civ 8201 (RWS), 2005 U.S. Dist. LEXIS 32599
    (S.D.N.Y. Dec. 13, 2005) ..................................................................................19

*In re Lernout & Hauspie Sec. Litig.*,
    236 F. Supp. 2d 161 (D. Mass. 2003) ...............................................................22

*In re Mercator Software, Inc. Sec. Litig.*,
    161 F. Supp. 2d 143 (D. Conn. 2001)................................................................11

*In re MicroStrategy Inc. Sec. Litig.*,
    115 F. Supp. 2d 620 (E.D. Va. 2000) ................................................................11

*In re Motorola Secs. Litig.*,
    No. 03 C 287, 2004 U.S. Dist. LEXIS 19250 (N.D. Ill. Sept. 9, 2004)............16

**Page**

*In re NUI Sec. Litig.*,
    314 F. Supp. 2d 388 (D.N.J. 2004) ...................................................................16

*In re  Nortel Networks Corp. Sec. Litig.*,
    238 F. Supp. 2d 613 (S.D.N.Y. 2003)..................................................10, 11, 12

*In re Oxford Health Plans, Inc. Sec. Litig.*,
    187 F.R.D. 133 (S.D.N.Y. 1999) .....................................................................31

*In re Parmalat Sec. Litig.*,
    375 F. Supp. 2d 278 (S.D.N.Y. 2005).............................................................32

*In re Par Pharm., Inc. Sec. Litig.*,
    733 F. Supp. 668 (S.D.N.Y. 1990)...................................................................23

*In re Philip Servs., Corp. Sec. Litig.*,
    98 Civ. 0835, 2004 U.S. Dist. LEXIS 9261 (S.D.N.Y. May 24, 2004)............16

*In re Priceline.com Inc.*,
    342 F. Supp. 2d 33 (D. Conn. 2004)....................................................14, 27, 31

*In re Prudential Sec. Ltd. Pshps. Litig.*,
    930 F. Supp. 68 (S.D.N.Y. 1996).....................................................................31

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001)........................................................................11, 32

*In re Sirrom Capital Corp. Sec. Litig.*,
    84 F. Supp. 2d 933 (M.D. Tenn. 1999).............................................................23

*In re Sotheby's Holdings, Inc. Sec. Litig.*,
    No. 00 Civ. 1041 (DLC), 2000 U.S. Dist. LEXIS 12504
    (S.D.N.Y. Aug. 31, 2000)................................................................................23

*In re Van Der Moolen Holding N.V. Sec. Litig.*,
    No. 03 Civ. 8284 (RWS), 2005 U.S. Dist. LEXIS 32598
    (S.D.N.Y. Dec. 13, 2005) ................................................................................19

*In re Vivendi Universal, S.A. Sec. Litig.*,
    02 Civ. 5571, 2003 U.S. Dist. LEXIS 19431 (S.D.N.Y. Nov. 3, 2003) ...........30

*In re Warner Communications Sec. Litig.*,
    618 F. Supp. 735 (S.D.N.Y. 1985)...................................................................16

**Page**

*In re Worldcom, Inc. Secs. Litig.*,
    352 F. Supp. 2d 472 (S.D.N.Y. 2005)................................................................15

*Irvine v. Imclone Sys.*,
    2003 U.S. Dist. LEXIS 9342 (S.D.N.Y. June 3, 2003) ....................................30

*Irvine v. Imclone Sys. Inc.*,
    02-Civ.-109  2003 U.S. Dist. LEXIS 9342 (S.D.N.Y. June 4, 2003) ...............11

*Klein ex rel. IRA v. PDG Remediation*,
    937 F. Supp. 323 (S.D.N.Y. 1996)...................................................................26

*Kronfeld v. Trans World Airlines, Inc.*,
    832 F.2d 726 (2d Cir. 1987).............................................................................25

*McKesson HBOC, Inc. Sec. Litig.*,
    126 F. Supp. 2d 1248 (N.D. Cal. 2000) ...........................................................14

*Menkes v. Stolt-Nielsen S.A.*,
    No. 3:03CV409, 2005 U.S. Dist. LEXIS 28202 (D. Conn. Nov. 10, 2005).............*Passim*

*Nordstrom, Inc. v. Chubb & Son, Inc.*,
    54 F.3d 1424 (9th Cir. 1995) ............................................................................16

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)......................................................................10, 12

*Ottmann v. Hanger Orthopedic Group, Inc.*,
    353 F.3d 338 (4th Cir. 2003) ...........................................................................23

*Phelps v. Kapnolas*,
    308 F.3d 180 (2d Cir. 2002)..............................................................................11

*Picard Chem. Profit Sharing Plan v. Perrigo Co.*,
    940 F. Supp. 1101 (W.D. Mich. 1996) .............................................................18

*Pozniak v. Imperial Chemical Industries, PLC*,
    2004 WL 2186546 (S.D.N.Y. Sept. 28, 2004)..................................................25

*Rubinstein v. Collins*,
    20 F.3d 160 (5th Cir. 1994) ..............................................................................31

*SEC v. Texas Gulf Sulphur Co.*,
    401 F.2d 833 (2d Cir. 1968)..............................................................................23

**Page**

*SEC v. U.S. Envtl., Inc.*,
    155 F.3d 107 (2d Cir. 1998)........................................................................12

*SEC v. Zandford*,
    535 U.S. 813 (2002)..............................................................................22

*Schnall v. Annuity & Life Re (Holdings), Ltd.*,
    No. 02-CV-2133 (GLG), 2004 U.S. Dist. LEXIS 4643 (D. Conn. Mar. 9, 2004)............32

*Shapiro v. UJB Fin. Corp.*,
    964 F.2d 272 (3d Cir. 1992)........................................................................23

*Stolt Nielsen, S.A. v. United States*,
    2006 U.S. App. LEXIS 7203 (3d. Cir. March 23, 2006)......................................2

*Stolt-Nielsen S.A. v. United States of America*,
    352 F. Supp. 2d 553 (E.D. Pa. 2005) ........................................................8, 14

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
    250 F.3d 87 (2d Cir. 2001)........................................................................32

*TSC Indus. v. Northway, Inc.*,
    426 U.S. 438 (1976)..............................................................................25, 28

*United Paperworkers Int'l Union v. International Paper Co.*,
    801 F. Supp. 1134 (S.D.N.Y. 1992)............................................................23

**STATUTES**

15 U.S.C. §78j(b)..............................................................................................21

15 U.S.C. §78u-4(b)(2)......................................................................................11

15 U.S.C. §78u-5..............................................................................................30

17 C.F.R. §240.10b-5........................................................................................21

Lead Plaintiffs Irene Rucker and Gustav Rucker (the "Plaintiffs" or "Lead Plaintiffs") respectfully submit this Memorandum of Law in opposition to Defendants Stolt-Nielson S.A. ("SNSA"), Stolt-Nielson Transportation Group, Inc. ("SNTG") (collectively, "the Companies"), Jacob Stolt-Nielson, Niels G. Stolt-Nielson, Samuel Cooperman ("Cooperman") and Reginald J.R. Lee's ("Lee")[1] (collectively, the "Defendants") motion to dismiss the Second Consolidated Amended Complaint (the "SAC"), dated March 1, 2006.

## I.     PRELIMINARY STATEMENT

This is a federal securities fraud class action brought on behalf of the purchasers of American Depository Receipts ("ADRs") of SNSA between February 1, 2001 through February 20, 2003 (the "Class Period"), alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.  The Class also includes all U.S.-based purchasers of SNSA shares traded on the Oslo exchange during the Class Period.

This is the second time the parties have briefed pleading issues before the Court.  On November 10, 2005, the Court granted Defendants' motion to dismiss Plaintiffs' Amended Class Action Complaint[2] (the "AC") holding that the Lead Plaintiffs failed to sufficiently allege Defendants' scienter. *Menkes v. Stolt-Nielsen S.A.*, 2005 U.S. Dist. LEXIS 28208 (D. Conn. Nov. 10 2005) ("Order").  Shortly thereafter, Plaintiffs moved for reconsideration of the Order on a number of grounds.  The Court denied that motion but permitted Plaintiffs the opportunity to amend the AC.  On March 1, 2006, Plaintiffs filed the Second Amended Class Action Complaint.

---

[1] Jacob Stolt-Nielson, Niels G. Stolt-Nielson, Cooperman and Lee are collectively referred to as the "Individual Defendants".

[2] Plaintiffs' Amended Class Action Complaint was filed on September 8, 2003.

Plaintiffs respectfully submit that the SAC cures the pleading deficiencies cited by the Court in the Order. In the Order, the Court found that Defendants were under a duty to disclose that SNSA's core subsidiary, SNTG, was engaging in anti-competitive conduct in violation of United States antitrust laws and that certain of Defendants' statements were materially false and misleading for failing to disclose this activity. *Menkes*, 2005 U.S. Dist. LEXIS 28208 at *19. The Court, however, found that the AC failed to provide a link between SNTG's anti-competitive conduct and SNSA (or its officers) such that they knew or should have known of the improper conduct and, therefore, failed to adequately allege Defendants' scienter.[3]

The new allegations contained in the SAC strengthen Plaintiffs' scienter allegations and provide the missing "link" sought by the Court in the Order. The SAC alleges that SNSA management, in particular Jacob Stolt-Nielson, actually participated in the execution of the bid rigging conspiracy between SNTG and one of its competitors. As detailed herein, in April 2001, Jacob Stolt-Nielson requested for the preparation of a cost-benefit analysis regarding the pros and cons of conspiring with Odjfell versus competing with them.[4]

Furthermore, the SAC alleges numerous examples of the manner in which SNSA directors and officers knew or should have known about the anti-competitive activities conducted by SNTG at the time SNSA issued false and misleading statements to the public. Specifically, the SAC alleges

---

[3] The Court also held that the AC's allegations concerning Defendants' failure to disclose embargo violations was not actionable. After review of the Order, Plaintiffs decided to no longer pursue those claims in the interest of efficiency and judicial economy.

[4] This facsimile, in addition to other facts, appears to have caused the United States Department of Justice ("DOJ") to take the unprecedented step of revoking its corporate amnesty agreement with SNSA. The United States Court of Appeals for the Third Circuit recently vacated an injunction which barred the DOJ from indicting SNSA due to the amnesty agreement. The Third Circuit held that SNSA could assert the agreement as a defense to an indictment and the parties could then litigate the enforceability of the agreement. *Stolt Nielsen, S.A. v. United States,* 2006 U.S. App. LEXIS 7203 (3d Cir. March 23, 2006).

- 2 -

that the bid rigging conspiracy began as early as 1998 and that several employees of SNTG – including its former general counsel – informed senior management of *both* SNTG and SNSA of the anti-competitive activities carried out by SNTG.  In addition, SNSA has represented in its public filings that it was aware of SNTG's violations of antitrust laws at least as early as 2002.

The SAC also adds key background information about SNTG and SNSA and their U.S operations that further support a strong inference of scienter.  The SAC alleges that Jacob Stolt-Nielson and Niels G. Stolt-Nielson served on the Board of Directors for *both* SNTG and SNSA. These allegations are particularly significant as there is no dispute whatsoever that senior management and senior executives at SNTG participated in, or at least had direct knowledge of, SNTG's business affairs.  In addition, the SAC alleges that SNSA maintains its U.S. office in the same office space maintained by SNTG and that the companies share the same computer system and administrative staff.  In other words, SNSA and SNTG were very much operated as one entity despite their separate legal identities.

Clearly, the SAC's new scienter allegations, coupled with Plaintiffs' previous allegations, more than adequately allege that Defendants acted with a conscious disregard for the truth of their statements.  Defendants' scienter arguments are nothing more than improper factual disputation – they either ask the Court to not accept Plaintiffs' allegations as true or to adopt Defendants' interpretation of certain facts.   A fair reading of the SAC demonstrates that Plaintiffs have more than met their pleading burden and Defendants should have to wait until summary judgment to have their version of the facts heard by the Court.

Finally, it is respectfully submitted that no matter how the Court rules on the sufficiency of the SAC's new scienter allegations, the SAC states a claim against SNTG, Cooperman and Lee. SNTG, Cooperman and Lee can be held responsible for SNSA's materially false and misleading statements because they were a knowing source of the misrepresentations.  It should be noted that

- 3 -

the Court did recognize in the Order that the AC sufficiently alleged that knowledge of SNTG's anticompetitive conduct reached the "highest level of SNTG management in Cooperman."

For the reasons set forth herein, it is respectfully submitted that Defendants' motion to dismiss should be denied in all respects.

## II.    STATEMENT OF FACTS

Defendant SNSA is a holding company that, through its subsidiaries, engages in worldwide transportation, storage and distribution of, among other things, chemicals.  ¶2.[5]  SNSA conducts its business out of multiple offices, including one maintained in Norfolk, Connecticut.  ¶10.  One of SNSA's multiple subsidiaries is SNTG.  ¶2.  SNTG does an array of interrelated activities, which SNSA self-describes as "fully integrated."  For example, SNTG transports, stores and distributes bulk liquid chemicals, edible oils, acids and other specialty liquids.  ¶2.  SNTG carries its customers' products on worldwide seaborne trade routes for producers, refiners and distributors.  ¶2.  Several of SNTG's largest customers are among the world's major chemical companies.  ¶11.  SNTG's executive offices are located in Norfolk, Connecticut, at the same location as SNSA's Connecticut offices.  ¶11.

SNTG is a wholly-owned subsidiary of SNSA.  ¶11.  More than 50% of SNTG's shares are owned and operated by Defendant Jacob Stolt-Nielsen and his family.  ¶87.  In 2001, SNTG represented 39% of SNSA's net operating revenue, 94% of income from operations, and 50% of SNSA's total assets.  ¶11.  By 2004, SNTG represented about 62% of SNSA's net operating revenue and 73% of SNSA's total assets.  ¶11.

Defendant Jacob Stolt-Nielsen served as Chairman of SNSA since he founded the Company in 1959.  During the Class Period, Jacob Stolt-Nielsen served on the Board of Directors for *both*

---

[5] "¶__" refers to paragraphs of the SAC.

SNSA and SNTG.  ¶12.  Niels G. Stolt-Nielsen served as Chief Executive Officer ("CEO") of SNSA during the Class Period.  ¶13.  Niels G. Stolt-Nielsen served on the Board of Directors for *both* SNSA and SNTG.  ¶13.  Cooperman served as Chairman of SNTG during the Class Period.  ¶14. Lee served as SNTG's CEO during the Class Period. ¶15.

SNTG's major industry competitor was Odjfell ASA ("Odjfell").  ¶3.  The SAC alleges that, as early as 1998, SNTG and its competitors, including Odjfell, conspired to, among other things, rig bidding for international shipping contracts.  ¶¶3, 29.  SNTG and its competitors, in violation of antitrust and anti-competitive laws, schemed to fix shipping rates, rig bids and allocate customers. The scheme enabled SNTG – and, in turn, SNSA – to dominate international shipping trade and remain profitable. ¶29.  *The Wall Street Journal* provided a detailed account of the scheme between SNSA and Odjfell.  How Seagoing Chimical Haulers May Have Tried To Divide Market, *The Wall Street Journal*, February 20, 2003.  ¶30.

With respect to the origin of the scheme, the February 20, 2003 article reported that SNSA and Odjfell began the bid rigging conspiracy as early as 1998 when the Asian economy experienced a slowdown, which resulted in a decrease in the production and shipments of chemicals.  ¶¶30, 31. The article reported that, at that time, a meeting was held between SNTG and SNSA representatives, at their Connecticut office, to address an agreement between SNTG and Odjfell regarding their customers.  According to the article, Andrew Pickering[6] described the customer-related agreement in the following manner:  "They had 'carved up the world'." ¶31.  The SAC alleges that Pickering's statement was reported to executives at both SNSA and SNTG, including Kenneth Bloom[7] and Cooperman.  ¶32.

---

[6] At that time, Pickering was the vice-president for SNTG's tanker trading. ¶31.

[7] At that time, Bloom was a vice-president or logistics with SNSA. ¶31.

Even after the Asian economy began to recover, the SAC alleges that SNTG and its competitors were forced to address the merger between Dow Chemical and Union Carbide. ¶34. SNTG and its competitors recognized that the merged entity would seek discounts in its chemical shipments due to the sheer volume generated by the combination the two companies. ¶34. SNTG and its competitors carried out a scheme which would enable them to maintain profit levels despite any efforts by Dow Carbine and Union Carbide to negotiate reduced rates. ¶¶34, 35.

According to the February 20, 2003 *The Wall Street Journal* article, in late 2001 through 2002, Richard B. Wingfield[8] worked with Odjfell to rig bidding on shipping contracts. ¶35. The article attributes quotes from Wingfield's journal notes, which described a February 28, 2001 meeting between representatives of both SNTG and SNSA and representatives of Odjfell. ¶36. The article further attributes quotes from a fax to Wingfield, dated April 10, 2001, which outlined the cost-benefit analysis between competing with Odjfell and conspiring with them. ¶37. ***The Complaint specifically alleges that the referenced fax was prepared by SNSA at the behest of Jacob Stolt-Nielsen.*** ¶¶37, 49. An article published in *Tradewinds*, dated May 27, 2005, reported that in connection with the U.S. Department of Justice's ("DOJ") investigation into SNSA, "Prosecutors cited an April 2001 internal memo written by SNTG's Bjorn Jansen to his superior, Richard Wingfield, detailing the pros and cons of continued pricing collusion with supposed competitor Odfjell. The analysis 'had been ***requested by Stolt SA Chairman Jacob Stolt-Nielsen***,' the DOJ said in a footnote to its appeal." [Emphasis Added.] ¶80. The Complaint alleges that based on the April 2001 internal memorandum, SNSA, including Defendant Jacob Stolt-Nielsen himself, was not only aware of SNTG's anti-competitive activities, the parent company was involved in the decision to accomplish the conspiracy. ¶¶37, 49, 80, 84.

---

[8] At that time, Wingfield was the managing director of SNTG's tanker trading division. ¶34.

By January 24, 2002, the Complaint alleges, Wingfield informed the SNTG management board that the Dow contracts "were all but locked up" and, according to the February 20, 2003 *The Wall Street Journal* article, Wingfield attributed the securing of the contracts to the conspiracy between SNSA and Odjfell.  ¶38.

The SAC further alleges that less than two weeks after Wingfield's announcement regarding the Dow contracts, Paul O'Brien[9] advised Cooperman to: (1) suspend Wingfield for his involvement in conspiring with Odjfell; (2) investigate SNSA's illegal and anti-competitive practices; and (3) bring an end to SNSA's and SNTG's antitrust violations.  ¶40.  After Cooperman refused to comply with O'Brien's recommendations, the SAC alleges, on March 1, 2002, O'Brien resigned from the Companies.  ¶40.

O'Brien later filed suit against the Companies, alleging that he had to resign in order to avoid any participation in the illegal or criminal activities conducted by the Companies.[10]  ¶¶40, 51.  The publicly available documents[11] from O'Brien's lawsuit state that O'Brien expressed concern regarding the anti-competitive behavior conducted by SNTG directly to the attention of the highest authorities in both SNSA and SNTG, including Defendants Jacob Stolt-Nielsen and Niels G. Stolt-Nielsen, as well as Alan Windsor.[12]  ¶¶51-52.  According to the SAC, twelve days after O'Brien's resignation, SNSA scheduled a meeting for Wingfield "to present an antitrust update" to its directors.  ¶41.

---

[9] At that time, O'Brien was general counsel of SNTG.

[10] *See Paul O'Brien v. Stolt-Nielsen, etal,* 02-cv-190051-S (filed Jun. 19, 2002).

[11] Although a large portion of the documents filed in O'Brien's wrongful termination suit have been redacted at the request of SNSA and SNTG, the unredacted language of the pleadings, motion practice and supporting affidavits supply ample statements regarding the information conveyed by O'Brien to various officers and directors with both SNTG and SNSA. ¶¶52-56.

[12] At that time, Windsor was general counsel of SNSA.

On June 24, 2003 the United States government filed a criminal complaint against Wingfield. ¶¶42, 79. An affidavit of John W. Sharp ("Sharp"), special agent with the Federal Bureau of Investigation ("FBI"), accompanied the complaint against Wingfield and outlined background and facts concerning Wingfield's actions. ¶¶42, 79. Sharp attested that Wingfield entered into conspiratorial agreements with SNTG's competitors as early as March 2001 and continued as late as October 2002. ¶42.

In October 2003, in connection with the same investigation by the DOJ, Odjfell – as well as its chairman and vice president – plead guilty to participating in the antitrust and anti-competitive activities. ¶44. Odjfell was ordered to pay a $42.5 million fine in connection with the plea agreement. ¶44.

*The Wall Street Journal* later reported, in an article dated October 6, 2004, that the bid rigging conspiracy between SNTG and Odjfell did not cease upon the DOJ's investigation. ¶45. The article conveyed that high ranking SNSA executives met with Odjfell representatives to provide assurances that the arrangement – the scheme – between the companies would continue. ¶45. The DOJ became aware of the continued relationship between the companies and sought to revoke their amnesty agreement with SNTG. ¶45. SNSA brought suit against the DOJ in the District Court of Pennsylvania seeking an order that the DOJ could not revoke the amnesty agreement. ¶45. The District Court denied the DOJ's revocation of the agreement.[13] ¶45. (Since the filing of the SAC,

---

[13] Defendants misleadingly attempt to utilize the court's findings of facts in *Stolt-Nielsen S.A. v. United States of America*, 352 F. Supp. 2d 553 (E.D. Pa. 2005) to support their position that SNSA was unaware of SNTG's antitrust activity in April 2001. Defendants blatantly misrepresent the Court's findings as its own when, in fact, the court merely conveyed that that the statements were the belief of John M. Nannes ("Nannes"). For example, the court stated: "Nannes believed that the [April 2001] fax was evidence of conscious parallelism, not of a Sherman Act violation. Tr. 4/13/04 at 163-64." 352 F. Supp. 2d at 564. Defendants claim that the court (Judge Savage) found the statement credible. Defendants Memorandum of Law in Support of Motion to Dismiss Second

the Third Circuit reversed the District Court's decision and remanded the case to the District Court to dismiss SNSA's complaint.)

**The Truth is Revealed to the Public**

On November 22, 2002, *The Wall Street Journal* reported that O'Brien accused SNTG of performing anti-competitive activities. ¶72. In reaction to this report, SNSA's stock price fell from $7.62 per share to $6.50 per share. ¶72. Next, on February 20, 2003, *The Wall Street Journal* published an article detailing the conspiracy conducted by the Companies and the manner in which the scheme had been carried out "for years". ¶73. SNSA's stock price again tumbled in reaction to the revelation of negative news regarding SNTG's business practices. ¶73. SNSA's stock price fell from $7.10 per share on February 19, 2003 to $5.94 per share on February 20, 2003, with over thirteen times the trading volume on the day *The Wall Street Journal* article was published versus the previous day. ¶73.

On February 21, 2003, *The Wall Street Journal* added to its story regarding the Companies' anti-competitive activities by reporting that the DOJ launched a criminal investigation into allegations of price fixing between SNSA and Odjfell. The February 21, 2003 article added that Richard Fisher, SNSA's former sole American director, had resigned due to concerns about the way SNSA handled O'Brien's allegations and the DOJ's probe. ¶75. The article stated that the government probe began as early as late-2001. The article further stated that, in early 2002, SNSA's

---

Consolidated Amended Complaint at 7 ("Def. Mem. at __"). The court made no such finding. The court simply relayed that the statement was Nannes' belief.

Also, Defendants stated that "Judge Savage found convincing that as of December 2002, Stolt-Nielsen's outside counsel was still unsure whether SNTG had engaged in any anticompetitive activity." *See* Def. Mem. at 8. Plaintiffs do not dispute – nor care – when ***Nannes*** became sure of the anti-competitive activity. The issue before this Court is when ***Defendants*** were aware of the activity. Quite simply, the SAC alleges that Defendants engaged in, or at a minimum had knowledge of, a bid rigging scheme between SNTG and its competitors as early as May 24, 2000. ¶¶3, 29, 42.

outside lawyers in Britain informed the company that its business practices may be in violation of antitrust laws.  ¶74.  This article, the Complaint alleges, clearly evinces that SNSA officers and directors were well-aware of the business practices implemented by SNTG and its competitors and had knowledge of the allegations of anti-competitive activities during the Class Period.  ¶¶74-75.

On February 21, 2003, SNSA issued a press release announcing that the DOJ granted SNTG conditional amnesty for its alleged violation of antitrust laws.  ¶76.  The press release acknowledged that in the course of an investigation of SNTG, SNSA became aware of possible collusive behavior in its subsidiary's business affairs.  ¶76.  SNSA reiterated its statement regarding its internal investigation in SNSA's June 4, 2003, June 16, 2004 and May 31, 2005 20-F statements, stating that in the course of an investigation conducted by SNSA in 2002, the company "became aware of information that caused us to undertake an investigation regarding potential improper collusive behavior in our parcel tanker and intra-Europe inland barge operations."  ¶76.

## III.  ARGUMENT

### A.    Standards on a Motion to Dismiss

A motion to dismiss imposes a heavy burden on the movant, as the defendants must demonstrate that the plaintiffs either failed to state claims as a matter of law under Rule 12(b)(6) or that the plaintiffs have failed to properly plead those claims under the Federal Rules of Civil Procedure or the Private Securities Litigation Reform Act ("PSLRA").  *See In re IPO Sec. Litig.*, 241 F. Supp. 2d 281, 321-31 (S.D.N.Y. 2003).   In reviewing the complaint, the Court draws all reasonable inferences in Plaintiffs' favor and accepts as true the factual allegations in the Complaint. *See Novak v. Kasaks*, 216 F.3d 300, 305 (2d Cir. 2000); *Hamilton Chapter of Alpha Delta Phi Inc. v. Hamilton College*, 128 F.3d 59, 63 (2d Cir. 1997) ("[T]he court must accept as true all the factual allegations in the complaint and must draw all reasonable inferences in favor of the plaintiff."); *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 621 (S.D.N.Y. 2003).  Since the Court is merely reviewing the complaint, the issue "is not whether a plaintiff is likely to ultimately prevail,

but whether the claimant is entitled to offer evidence to support the claims." *Phelps v. Kapnolas*, 308 F.3d 180, 184-185 (2d Cir. 2002). The purpose of a pleading is to state a claim and provide adequate notice of that claim. In essence, "[a] pleading is not a trial and plaintiffs are not required to marshal their evidence and sustain a verdict at this stage." *Nortel*, 238 F. Supp. 2d at 621; *see also In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001). Furthermore, all allegations must be read in their totality, not in isolation. *See In re Mercator Software, Inc. Sec. Litig.*, 161 F. Supp. 2d 143, 150 (D. Conn. 2001).

### B.    The SAC Adequately Alleges Scienter

#### 1.    Legal Standard

The PSLRA dictates that a complaint alleging violations of Section 10(b) of the Exchange Act must state "facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2). Under the Second Circuit's standard, a plaintiff may establish a "strong inference" of scienter by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 170 (2d Cir. 2000); *see also Irvine v. Imclone Sys. Inc.*, 02-Civ.-109 (RO), 2003 U.S. Dist. LEXIS 9342, at *6-7 (S.D.N.Y. June 4, 2003).

In consideration of whether the allegations of the SAC give rise to a strong inference of scienter, the Court should not consider the SAC's allegations in isolation, but rather in their entirety. *See Mercator*, 161 F. Supp. 2d at 150 (holding that when determining whether scienter has been sufficiently pleaded the complaint's allegations should be "read in their totality"); *see also In re MicroStrategy Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 631 (E.D. Va. 2000) (same). The Second Circuit does not require "'great specificity' provided the plaintiff alleges enough facts to support 'a strong inference of fraudulent intent.'" *Ganino*, 228 F.3d at 169.

2.    **The SAC Adequately Alleges Conscious Misbehavior and Recklessness Through Defendants' Knowledge of (and Participation in) SNTG's Anti-Competitive Activities**

In order "to survive dismissal under the 'conscious misbehavior' theory, [Plaintiffs] must show that they alleged reckless conduct by the [Defendants], which is at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Nortel*, 238 F. Supp. 2d at 631 (*quoting In re Carter-Wallace Inc. Sec. Litig.*, 220 F. 3d 36, 39 (2d Cir. 2000)). Moreover, "securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Novak*, 216 F.3d at 308; *see also SEC v. U.S. Envtl., Inc.*, 155 F.3d 107, 111 (2d Cir. 1998) ("It is well-settled that knowledge of the proscribed activity is sufficient scienter under §10(b)."). In essence, a plaintiff may sufficiently plead scienter under the conscious misbehavior or recklessness prong by "specifically alleg[ing] defendants' knowledge of facts or access to information contradicting their public statements." *Novak*, 216 F.3d at 308.

Here, this Court has already analyzed the issue of scienter as applied to the actionable statements (and similar thereto) alleged in the SAC. *Menkes*, 2005 U.S. Dist. LEXIS 28208, at *31-*36. In deciding Defendants' motion to dismiss filed in connection with the AC, this Court acknowledged that "each statement was spoken by SNSA or by SNSA's agent on behalf of SNSA, while SNTG employees actually engaged in the anti-competitive activity. Plaintiffs must therefore allege that SNSA offered these potentially false and misleading statements with scienter." *Id.* at *31. In its scienter analysis, this Court sought allegations that SNSA management participated or had

knowledge of the anti-competitive activities performed by SNTG. To the disappointment of Plaintiffs, this Court reasoned:

> As currently constituted, the complaint does not establish a clear link between those who were involved in the anti-competitive arrangements at SNTG and SNSA management. Although they do allege that word of anti-competitive activities reached the highest level of SNTG management in Cooperman, plaintiffs do not allege any facts supporting the conclusion that Cooperman relayed this information to SNSA management.

*Id.* at *35. Ultimately, this Court concluded that it could "only assume, and not infer, that SNSA's management knew about the illegal activity." *Id.* at *36.

Now, in the SAC, Plaintiffs have alleged a clear link between those involved in the anti-competitive activities at SNTG and SNSA management. ¶¶12, 13, 31, 32, 36, 39, 40, 42, 48, 50-52, 54 and 55. In fact, the SAC pleads more than a link, but alleged that SNSA management was involved in the decision to conspire with (or, at least, continue to conspire with) Odjfell in the bid rigging scheme with SNTG. ¶¶36, 37, 42 and 49. Now, this Court need not make any assumptions about what information SNSA management had regarding the anti-competitive activity at the time SNSA issued the false and misleading statements.

The SAC pleads numerous allegations that, at a minimum, infer that Defendants SNSA, Jacob Stolt-Nielsen and Niels G. Stolt-Nielson had knowledge of SNTG's anti-competitive activity (and, even more, participated in carrying out the conspiracy between SNTG and its competitors). For example, The SAC further alleges that Pickering advised members of both SNSA and SNTG of SNTG's conspiracy with Odjfell. ¶¶31-32. Jacob Stolt-Nielsen and Niels G. Stolt-Nielsen each served on the Board of Directors for both SNSA and SNTG. ¶¶12, 13, 48. Defendants do not deny that SNTG and its executives had knowledge of SNTG anti-competitive activities. In this regard, Jacob Stolt-Nielsen and Niels G. Stolt-Nielsen inherently had knowledge of SNTG's business affairs. This fact, coupled with the fact that they were members of the SNSA board, infers that

Defendants SNSA, Jacob Stolt-Nielson and Niels G. Stolt-Nielson were well aware of bid rigging conspiracy performed by SNTG and its competitors.

Next, the SAC alleges that O'Brien informed members of SNTG, "as well as high level executives at SNSA," about SNTG's anti-competitive activities. ¶¶51-52. Also, while SNSA's own statements acknowledge that they were aware of the activity at least as early as 2002[14] (¶¶38, 40, 42, 50, 54, 74, 76, and 82), there is strong indication that SNSA knew about the scheme well before then (¶¶31, 49, 50, 80, and 84). In fact, according to DOJ investigations, Jacob Stolt-Nielson not only knew about the anti-competitive activity, as early as April 2001, but he participated in orchestrating the continued conspiracy with SNTG's competitor Odjfell.[15] ¶78.

---

[14] Defendants purport that the investigation conducted by SNSA in 2002 does not infer fraudulent intent on the part of Defendants. Def. Mem. at 8-11. In doing so, Defendants spend pages arguing that SNSA acted responsibly by initiating the investigation. Plaintiffs do not allege that an investigation should not have been conducted. Rather, the allegations regarding SNSA's investigation in 2002 simply refutes the position taken by Defendants until now; namely, that SNSA and its executives were unaware of any wrongdoing by SNTG during the Class Period. *See* Defendants' Motion to Dismiss Plaintiffs' Amended Class Action Complaint, at 9-12; Defendants' Opposition to Plaintiffs' Motion for Reconsideration, at 11-14. Clearly, Defendants were aware of SNTG's wrondoing prior to February 20, 2003.

Defendants further argue that "[a]s Stolt-Nielsen's case against DOJ established it was not until November 2002 that Stolt-Nielson [SNSA] commenced its investigation" (Def. Mem. at 11) and that no misleading statements are alleged after that date. Defendants' argument overlooks the numerous other allegations imputing knowledge to SNSA and its executives to dates as far back as early 2002 (¶¶38, 40, 42, 50, 54, 74, 76, and 82), April 2001 (¶¶49, 50, 80, and 84) and even 1998 (¶31). In fact, the Pennsylvania District Court (which Defendants repeatedly cite to and rely upon in their memorandum of law (Def. Mem. at 7-8, 11)) issued a finding of fact that the bid rigging conspiracy began well in advance of the Class Period. The court specifically found: "Beginning in August 1998 and continuing into 2002, SNTG had express agreements with Odfjell and Jo Tankers to allocate customers by not bidding on each other's selected shipping routes." 352 F. Supp. 2d at 564.

[15] In support of one of several bases for scienter, Plaintiffs cite to a May 27, 2005 article published in Tradewinds. ¶80. The article reiterated the allegation that Jacob Stolt-Nielsen was not only aware of the anti-competitive activity performed by SNTG, but he requested a study – a cost-benefit analysis – between conducting business through the bid rigging scheme with Odjfell or conducting business without violating antitrust laws. *Id.* Defendants argue that Plaintiffs use of the article in the Complaint, as a basis for evincing scienter, is improper. Def. Mem. at 6-7. Defendants' argument ignores the basic tenet that a Plaintiff may rely on media articles to plead a case. *In re*

The SAC, therefore, has undoubtedly provided this Court with the necessary "link" it sought between the antitrust activities conducted by SNTG and knowledge of those activities by SNSA and its executives. As the only remaining genuine issue of law concerning Plaintiffs' Complaint (following this Courts' grant for leave to replead), this Court should sustain the SAC and reject Defendants' motion to dismiss in its entirety.

>    **3.    Even Absent Direct Allegations of Awareness by SNSA, Possessed by SNTG, as a Wholly Owned Subsidiary and Major Component of SNSA, Is Imputed to SNSA Under the Concept of Corporate Scienter**

Corporate scienter is a viable legal theory that has been adopted by Second Circuit courts. *See In re Dynex Capital, Inc. Secs. Litig.*, 05CV1897 (HB), 2006 U.S. Dist. LEXIS 4988 (S.D.N.Y. Feb. 10, 2006) (stating that a plaintiff may allege scienter on the part of a corporate defendant without pleading scienter against any particular employees of the corporation). In order "[t]o carry their burden of showing that a corporate defendant acted with scienter, plaintiffs in securities fraud cases need not prove that any one individual employee of a corporate defendant also acted with scienter; Proof of a corporation's collective knowledge and intent is sufficient." *In re Worldcom, Inc. Secs. Litig.*, 352 F. Supp. 2d 472, 497 (S.D.N.Y. 2005).

---

*DaimlerChrysler AG Sec. Litig.*, 197 F. Supp. 2d 42, 80 (D. Del. 2002); *McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248 (N.D. Cal. 2000).

Defendants' argument further ignores the basic tenet that the allegations of the Complaint must be taken as true. *See In re Priceline.com Inc.*, 342 F. Supp. 2d 33, 49 (D. Conn. 2004). In this regard, the Complaint provides multiple allegations stating that SNSA management, including Jacob Stolt-Nielsen, had knowledge of SNTG's anti-competitive activities and/or participated in the execution of the scheme with SNTG's competitors during the Class Period. For example, O'Brien stated that he personally conveyed issues regarding the anti-competitive activities to members of SNSA's Board of Directors, including SNSA's general counsel. ¶¶51, 83. Also, DOJ documents, according to the Complaint, provide evidence that Jacob Stolt-Nielsen not only knew about the anti-competitive activities, but was personally involved in the decision to proceed with the bid rigging conspiracy. ¶¶49, 84. Further, SNSA's own 20-F statements acknowledge that SNSA was aware of the anti-competitive conduct at least as early as 2002. ¶50. Additional allegations assert that SNSA was aware of the conduct well before 2002. ¶¶49, 50, 84.

The SAC alleged (and this Court recognized) that Plaintiffs' adequately alleged knowledge of SNTG's anti-competitive activities on the part of senior officials at SNTG.  ¶¶47-56; *Menkes*, 2005 U.S. Dist. LEXIS 28208, at *33.  The SAC further alleged (and this Court likewise recognized) the significance of SNTG's operations to SNSA.  ¶¶11, 87; *Menkes*, 2005 U.S. Dist. LEXIS 28208, at *35.

The knowledge held by individuals that are critical to a company can be imputed to the company itself.  *See In re NUI Sec. Litig.*, 314 F. Supp. 2d 388, 410-413 (D.N.J. 2004) (finding collective scienter on the part of corporate defendant where the complaint alleged that the company's assistant general counsel was advised of improper bad debt procedures); *Caterpillar v. Great Am. Ins. Co.*, 62 F.3d 955, 962 (7th Cir. 1995) (concluding that a corporation may be liable for actions by senior management personnel that are "intrinsically corporate and bear the imprimatur of the corporation itself").  Here, SNTG's involvement in the antitrust activity and/or the knowledge held by senior management at SNTG regarding the bid rigging conspiracy between SNTG and its competitors should impute knowledge of the conduct to SNSA.

Even assuming that SNTG is ultimately found not liable, SNSA may be held primarily liable in lieu of the subsidiary.  A case could hinge on the collective scienter of employees as well as defenses that are available to individuals and not available to the corporation.  *See Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1435 (9th Cir. 1995) (noting that "collective scienter could be a basis for liability"); *In re Warner Communications Sec. Litig.*, 618 F. Supp. 735, 752 (S.D.N.Y. 1985) (noting that corporate scienter differs from individual scienter and that "the requisite degree of scienter is likely to be easier to attribute to [corporate defendants] than to the individual defendants"); *see also In re Motorola Secs. Litig.*, No. 03 C 287, 2004 U.S. Dist. LEXIS 18250 (N.D. Ill. Sept. 9, 2004) (finding corporate scienter, and not individual scienter, based on an inference of what the corporation knew or should have known); *In re Philip Servs., Corp. Sec. Litig.*,

98 Civ. 0835 (MBM), 2004 U.S. Dist. LEXIS 9261 (S.D.N.Y. May 24, 2004) (concentrating on the firm's collective state of mind, not that of individual partners or employees, in the context of securities fraud).

Based on the theory of corporate scienter, the knowledge maintained by SNTG and its management should be imputed to SNSA. Therefore, irrespective of this Court's determination with respect to liability on the part of SNTG and its executives, this Court should find SNSA primarily liable.

    **C.**    **SNTG, Cooperman and Lee Are Primarily Liable For SNSA's Materially False and Misleading Statements**

        **1.**    **SNTG, Cooperman and Lee Were a Knowing Source of SNSA's Materially False and Misleading Statements**

Primary liability for the issuance of materially false and misleading statements is not restricted to those who participate in the fraud or scheme to defraud. *See In re Alstom SA Secs. Litig.*, No. 03 Civ. 6595 (VM) 2005 U.S. Dist. LEXIS 35641, (S.D.N.Y. 2005). Based upon this concept, SNTG, Cooperman and Lee should be held liable for SNSA's materially false and misleading statements and disclosures made by SNSA. Cooperman and Lee – and SNTG as a whole – were directly responsible for the misrepresentations or omissions, using SNSA as a conduit for conveying materially false information to investors. *See In re Kidder Peabody Sec. Litig.*, 10 F. Supp. 2d 398, 402 (S.D.N.Y. 1998).

In *Kidder*, the complaint alleged that General Electric Company ("GE") made false and misleading statements regarding its revenue, which specifically originated from false profits derived from its wholly-owned subsidiary Kidder, Peabody & Co. ("Kidder"). There, the complaint alleged that Kidder should be held responsible for the statements made by GE. The Court explained that "if plaintiffs can show that defendants were the original and knowing source of a misrepresentation and that defendants knew or should have known that that misrepresentation would be communicated to investors, primary liability should attach." *Kidder*, 10 F. Supp. 2d at 407.

Here, SNTG is undeniably the original and knowing source of the false and misleading statements involving its business operations. In this regard, despite the fact that SNTG, Cooperman and Lee did not directly communicate the false and misleading statements to the public, SNTG, Cooperman and Lee should nevertheless be held primarily liable for Plaintiffs' securities claim. In general, a party can held responsible for materially false and misleading statements made to the public even without communicating directly with investors. *See City of Monroe Emples. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 686, n.29 (6th Cir. 2005) ("The requirement that the plaintiff allege that the defendant made a misrepresentation does not mean that the plaintiff must allege that the defendant communicated that misrepresentation directly to the plaintiff."); *Cooper v. Pickett*, 137 F.3d 616, 624 (9th Cir. 1997) (stating that a party "cannot escape liability simply because it carried out its alleged fraud through the public statements of third parties"); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1226 (10th Cir. 1996) (noting that "there is no requirement that the alleged violator directly communicate misrepresentations to plaintiffs for primary liability to attach").[16]

In *Kidder*, the court reasoned that, as a subsidiary of GE, it is sensible "to infer that Kidder knew this information would reach securities analysts, GE stockholders and others in the investment community." *Kidder*, 10 F. Supp. 2d at 407; *See also In re Alstom*, 2005 U.S. Dist. LEXIS 35641, *73-*74 (holding that the subsidiary may be held liable where the complaint sufficiently alleged that the subsidiary was "the 'original and knowing' source of the alleged misrepresentations, and, because investors could – at least constructively – attribute this information to the subsidiary"). Here, SNTG, Cooperman and Lee knew that SNTG's anti-competitive actions would be omitted

---

[16]   A defendant that used or allowed another party to covey the message containing misstatements may be liable as a primary violator. *See*, for example, *Picard Chem. Profit Sharing Plan v. Perrigo Co.*, 940 F. Supp. 1101 (W.D. Mich. 1996) ("In such circumstances, it was the defendant's original statement which misled investors–the person who communicated the statement to investors served as a mere conduit for [the] defendant's statement.").

from SNSA's statements and disclosures. SNTG, Cooperman and Lee thereby effectuated the issuance of false and misleading statements about SNSA and its subsidiaries. In *Kidder*, the Court specifically stated:

> [H]olding a subsidiary immune from liability for statements communicated by its parent under these facts would lead to an anomalous result. A subsidiary could freely disseminate false information to the market through its parent, but investors relying on that information to their detriment would be left with no remedy: an action could not be brought against the subsidiary, and the parent would escape liability because it lacked scienter. This "would lead to a result 'so bizarre' that Congress could not have intended it." This is precisely the situation facing plaintiffs in this case, where the lawsuit against GE was dismissed because plaintiffs' allegations against GE failed to establish scienter.

[Citations omitted.] *Id.*

SNTG, Cooperman and Lee can be held responsible for the misrepresentations in SNSA's statements even where the statements were not ascribed them. *See In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 333 (S.D.N.Y. 2004) (stating that "a plaintiff may state a claim for primary liability under section 10(b) for a false statement (or omission), even where the statement is not publicly attributed to the defendant"); *see also In re LaBranche Sec. Litig.*, No. 03 Civ. 8201 (RWS), 2005 U.S. Dist. LEXIS 32599 (S.D.N.Y. Dec. 13, 2005); *In re Van Der Moolen Holding N.V. Sec. Litig.*, No. 03 Civ. 8284 (RWS), 2005 U.S. Dist. LEXIS 32598 (S.D.N.Y. Dec. 13, 2005).

In *LaBranche*, the court concluded that the subsidiary company may be held primarily liable for the statements disseminated by its parent company. *LaBranche*, 2005 U.S. Dist. LEXIS 32599, *44-47. When LaBranche & Co. reported its subsidiary's (LaBranche LLC) principal trading revenues, the court found that LaBranche & Co. was a "mere" conduit through which the information was disseminated. *Id.* Here, SNSA was likewise a "mere" conduit for SNTG, Cooperman and Lee to disseminate information regarding SNTG's operations, revenues and business affair. Defendants do not – and cannot – dispute that Defendants SNTG, Cooperman and Lee had actual and constructive knowledge of the anticompetitive activities conducted by SNTG.

Essentially, these Defendants used SNSA as a conduit to misrepresent the public about SNTG's business operations and anti-competitive acts.

Additionally, even where the parent corporation does not explicitly identify its subsidiary as the source of information, a misrepresentation can be attributed to the subsidiary. *Global Crossing*, 322 F. Supp. 2d at 333, n. 14; *LaBranche*, 2005 U.S. Dist. LEXIS 32599; *Van Der Moolen*, 2005 U.S. Dist. LEXIS 32598. Specifically, in *Van Der Moolen*, the court noted that the subsidiary corporation need not even participate in the drafting, producing, reviewing and/or disseminating of the alleged misstatements. The Court expressly stated that the defendant "need not directly communicate the misrepresentation to plaintiffs in order to be held liable under section 10(b)." 2005 U.S. Dist. LEXIS 32598, *37.

Akin to the manner in which the recent Second Circuit District Court decisions found primary liability against subsidiary companies and their executives, this Court should sustain the allegations for primary liability against SNTG, Cooperman and Lee.

### 2.     SNTG, Cooperman and Lee Are Liable Under the Concept of Scheme Liability

The SAC clearly alleges that SNSA and SNTG schemed to conceal the anti-competitive measures conducted by SNTG and the manner in which SNTG addressed competition concerns by conspiring with its competitors. In this regard, Defendants should be held liable for the executing the scheme that resulted in the fraud on investors.

The language of §10(b) of the 1934 Act, entitled "Employment of manipulative and deceptive devices," expressly states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a)     To employ any device, scheme, or artifice to defraud,

   (b)    To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

   (c)    To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

15 U.S.C. §78j(b). Rule 10b-5 promulgated by the SEC flows directly from the language of §10(b) itself and provides:

   §240.10b-5 Employment of manipulative and deceptive devices

   It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

   (a)    To employ any device, scheme, or artifice to defraud,

   (b)    To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

   (c)    To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. §240.10b-5.

       In addition to forbidding "any untrue statement of a material fact," Rule 10b-5 also forbids the employment of a scheme. Scheme liability is further endorsed by the text of §10(b), which prohibits of "any manipulative or deceptive device or contrivance", thereby encompassing any "scheme to defraud." In *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976), the United States Supreme Court defined the term "device" as "[t]hat which is devised, or formed by design; a contrivance; an invention; project; scheme; often, a scheme to deceive; a stratagem; an artifice" and defined the term "contrivance" to mean "a scheme, plan, or artifice." *Id*. at 199 n. 20 (quoting *Webster's International Dictionary* (2d ed. 1934)). Indeed, the term "scheme" is unmistakably incorporated by the broad language of §10(b).

Courts have endorsed the broad language of Rule 10(b) and §10b-5 and the understanding that a party to a fraudulent scheme should be held primarily liable for the fraud.  *See Global Crossing,* 322 F. Supp. 2d at 335 (holding accountants liable for the fraudulent scheme behind the false and misleading statements by defendant corporation, on the basis that liability may "be assigned based on the use of a manipulative or deceptive device or participation in a scheme to defraud"); *Initial Pub. Offering*, 241 F. Supp. 2d at 385; *see also SEC v. Zandford*, 535 U.S. 813, 817-818 (2002) (reaffirmed the broad reading of the language under Section 10(b)); *see also In re Lernout & Hauspie Sec. Litig.*, 236 F. Supp. 2d 161 (D. Mass. 2003) (finding adequate reliance by plaintiff on the secondary actors' actions by considering the alleged scheme as a whole rather than viewing the conduct and misrepresentations separately from one another).

The allegations of the SAC articulate knowledge and participation of the bid rigging conspiracy – the scheme – on the part of both SNSA and SNTG.  The Companies engaged in anti-competitive activities and then mislead investors by issuing statements regarding SNTG's operations without disclosing its specific business affairs.  This Court should, therefore, find Defendants liable under the theory of scheme liability.

> **D.     Defendants' Failure to Disclose the Anti-Competitive Activities and Antitrust Violations Violated Section 10(b) and Rule 10b-5 Thereunder**
>
> **1.     Defendants' Positive Statements About SNSA's Business Affairs Created a Duty to Disclose the Bid Rigging Conspiracy**

As detailed in the SAC, SNTG entered into a conspiracy with its competitors.  The scheme between SNTG and Odjfell, for example, facilitated the companies to split customers' business at a rate set by SNTG and its competitor.  The bid rigging scheme enabled SNTG – and, in turn, SNSA – to maintain revenues and profits that it would not have otherwise been able to attain.

At the same time, SNSA issued repeated positive statements regarding SNTG's business model and operations.  Defendants' statements specifically concerning competition, pricing and

- 22 -

customer contracts created a duty to disclose material facts regarding their business affairs and, most notably, that the success of SNTG was largely attributable to anti-competitive activities through a conspiracy entered into between SNTG and its competitors. *See SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 962 (2d Cir. 1968) (holding that where a defendant voluntarily chooses to make a statement that is reasonably calculated to influence the investing public, defendant has a duty to disclose sufficient information so that the statement is not "so incomplete as to mislead."); *In re Sotheby's Holdings, Inc. Sec. Litig.*, No. 00 Civ. 1041 (DLC), 2000 U.S. Dist. LEXIS 12504 (S.D.N.Y. Aug. 31, 2000) (denying motion to dismiss and holding that failure to disclose illegal antitrust activities rendered statements about earnings and business developments materially false and misleading); *In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 675 (S.D.N.Y. 1990) ("*Par Pharm.*") (finding that failure to disclose bribery scheme with the FDA in order to receive expedited review of company's drug applications properly stated a claim under Section 10(b) and Rule 10b-5).[17]

This Court has already held, directly with respect to SNSA's statements concerning, for example, competition, customer contracts, market pressure and pricing environment, that the *Sotheby's* and *Par Pharm.* decisions apply. *See Menkes v. Stolt-Nielsen S.A.*, No. 3:03CV409, 2005 U.S. Dist. LEXIS 28202, *16-17, 22, 24 (D. Conn. Nov. 10, 2005) (Order) (holding that statements

---

[17] *See also Ottmann v. Hanger Orthopedic Group, Inc.,* 353 F.3d 338, 352 (4th Cir. 2003) (finding that defendants' positive statements about the integration of two businesses created a duty to disclose that the combined company was experiencing a loss of referral business); *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992) (holding that where a bank characterizes its management practices as "conservative" and "cautious," the bank puts the issue of management practices "in play" and is bound to speak truthfully about the practices.). *In re Sirrom Capital Corp. Sec. Litig.*, 84 F. Supp. 2d 933, 942 (M.D. Tenn. 1999) (holding that where the company chose to make affirmative statements concerning its financial viability, thereby putting such statements "in play", the company was bound to be forthcoming and truthful to shareholders and prospective investors); *see also United Paperworkers Int'l Union v. International Paper Co.*, 801 F. Supp. 1134, 1143 (S.D.N.Y. 1992) (Where "the company chose to offer specific representations about its environmental record and policies, it was obligated to portray that record fairly.").

about SNSA's financial performance were rendered materially false and misleading by failing to disclose that the results were achieved as a result of price-fixing and anti-competitive conduct).

This Court further relied on *Ballan v. Wilfred Am. Educ. Corp.*, 720 F. Supp. 241 (E.D.N.Y. 1989), where the court denied defendants motion to dismiss the securities fraud claims on the basis that the school had the duty to disclose the degree of the school's manipulation of the federal education loan system. In *Ballan*, the court found that the school had a duty to disclose the magnitude of the misconduct as the school had minimized the potential consequences of the pending investigation in its public statements. *Id.* at 249-250.

In deciding the motion to dismiss in relation to the AC, this Court found that "[c]ertain statements set forth in the complaint obligate [SNSA] to disclose its alleged uncharged anti-competitive activity because disclosure of this conduct was necessary to prevent misleading the public." *Menkes,* 2005 U.S. Dist. LEXIS 28208, *20. This Court explained that:

> [e]ach of these statements directly references the uncharged anti-competitive conduct alleged in the complaint by stating that 'SNTG's tanker operations compete with operators based primarily in Europe and the Asia Pacific region,' (dkt. # 28 ¶66[18]), touting the fact that SNTG 'recently renewed a multi-year contract for one of its largest customers,' which plaintiffs allege was the direct result of a conspiracy with Odfjell (id. ¶68[19]), and describing the pricing environment in the market as 'tight' (id. ¶74[20]) and subject to continued 'pressure' (id. ¶68[21]).

*Id.* at *24. These alleged statements have not changed from the AC to the SAC. This Court should, therefore, reiterate its determination that Defendants had a duty to disclose these statements for the same reasons it found a duty to disclose before.

---

[18] ¶66 of the AC is alleged as ¶63 of the SAC.

[19] ¶68 of the AC is alleged as ¶64 of the SAC.

[20] ¶74 of the AC is alleged as ¶66 of the SAC.

[21] ¶76 of the AC is alleged as ¶68 of the SAC.

Similarly, the SAC alleges three additional statements in which Defendants maintain that "pricing remains competitive" (¶57), Defendants address "pricing competition" and "overall business growth" (¶59), and Defendants comment about "demand" in the Asian Pacific, Europe and United States regions (¶61). These statements, akin to the four previously sustained statements, obligate Stolt to disclose its anti-competitive activity. The statements in ¶¶57, 59 and 61 directly reference the anti-competitive activities alleged in the SAC and by issuing these statements, Defendants created a duty to disclose the true nature of their business affairs – the conspiracy with SNTG's competitors.

Indeed, while Rule 10b-5 does not require companies "to disclose every controversial or questionable aspect of the business model," *Pozniak v. Imperial Chemical Industries, PLC*, 2004 WL 2186546 at *7 (S.D.N.Y. Sept. 28, 2004), it does require companies to disclose information, such as has been alleged here, that "a reasonable shareholder would consider [] important in deciding" whether or not to purchase SNSA stock, *Kronfeld v. Trans World Airlines, Inc.*, 832 F.2d 726, 731 (2d Cir. 1987) (quoting *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)), cert. denied, 485 U.S. 1007 (1988), and which "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." 832 F.2d at 731 n.11 (*quoting TSC Indus.*, 426 U.S. at 449).

The statements alleged in the SAC were materially false and misleading because they misrepresented and failed to disclose the true and complete facts regarding SNTG's business affairs – that SNTG maintained its customer base through anti-competitive activities. This Court should, therefore, (once again) determine that Defendants had a duty to disclose the bid rigging scheme and antitrust activities.

## 2.     Defendants' Alleged Omissions Were Material

The SAC alleges that, during the Class Period, Defendants failed to disclose that SNTG had entered into a bid rigging conspiracy with its competitors and was engaged in anti-competitive activity.  In doing so, Defendants likewise failed to disclose that SNTG was in control of the competition for business by SNTG and that revenues that would not have otherwise been gained by the Companies were a direct result of the anti-competitive activity.  This omitted information was material and therefore should have been disclosed.

Indeed, where "a large source" of a company's income is attributable to a source, any information pertaining to that source would be material and would influence an investors' decision to purchase the company's stock.  Here, SNTG has consistently represented a substantial portion of SNSA's net operating revenue and a majority of SNSA's total assets.  For example, in *Klein ex rel. IRA v. PDG Remediation*, 937 F. Supp. 323, 327 (S.D.N.Y. 1996), the court found that investors would have wanted to know about potential problems with a program which represented "a large source of [the company's] income."  The court specifically stated:

> On the record before it, the Court can certainly see how a fact finder could determine that the reimbursement program was a large source of PDG's income and therefore the existence of governmental reports that the reimbursement may be modified in any way is extremely important to the average, or other type of, investor's decision to purchase the PDG stock.

*Klein*, 937 F. Supp. at 327.  Accordingly, information that relates to a source of a substantial portion of SNSA's overall revenues is certainly material and warrants disclosure.  *Id.*

As a general standard, as this Court observed, "in order for an omission to be actionable, the omission must be material."  *Menkes*, 2005 U.S. Dist. LEXIS 28208, at *17.  As applied to the facts at issue, this Court stated that "[a] statement is material only if there is a 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'"  *Id.*; *quoting In re Int'l Bus. Machines Corporate Sec. Litig.*, 163 F.3d 102, 106-7 (2d Cir. 1998).  This Court further noted that

material facts will encompass those that may impact or effect the future of the company and that may influence investors' decision to trade the company's securities. *Id.*; *see also Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 180 (2d Cir. 2001). According to this Court's own analysis, a complaint that alleges a statement or omission that an investor would consider significant in deciding investment strategies is deemed to have satisfied the materiality requirement of Rule 10b-5. *Id.*; *see also Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 161 (2d Cir. 2000).[22] "Because materiality is a mixed question of law and fact, judgment as a matter of law may not be granted on the ground that alleged omissions are immaterial unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Priceline.com Inc.*, 342 F. Supp. 2d at 47.

Based upon this reasoning, this Court previously concluded that the omissions alleged by Plaintiffs in ¶¶63, 64, 66 and 68 of the Complaint were material. *Menkes*, 2005 U.S. Dist. LEXIS 28208, at *17-*19. Specifically, this Court determined that:

> [t]he allegations of Stolt's [SNSA's] agreement to rig bids and fix prices are, as set forth in the complaint, sweeping in their scope, and the potential sanctions therefor could significantly impact Stolt's [SNSA's] future operations and earnings. There is a 'substantial likelihood that a reasonable shareholder' would consider this information important in deciding whether to conduct a transaction involving Stolt's

---

[22] This Court further commented:

> Because materiality is a mixed question of law and fact, judgment as a matter of law "may not be granted on the ground that alleged omissions are immaterial 'unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *Castellano*, 257 F.3d at 180 (quoting Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985)); *see also, Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) ("Recognizing that the materiality of an omission is a mixed question of law and fact, courts often will not dismiss a securities fraud complaint at the pleading stage of the proceedings, unless reasonable minds could not differ on the importance of the omission."); *Ganino*, 228 F.3d at 162.

*Menkes*, 2005 U.S. Dist. LEXIS 28208, at *18.

ADRs. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S. Ct. 2126, 48
L. Ed. 2d 757 (1976).

*Id.* at *18-*19.  By the same token, this Court should likewise conclude that ¶¶57, 59 and 61 are
material.

### E.     The SAC More Than Adequately Meets the Reform Act's Particularity Requirements.

The level of particularity in which the SAC has been plead has not decreased from the
manner in which the AC was plead.  In this regard, this Court should simply echo its analysis
regarding whether Plaintiffs complied with Rule 9 of the Federal Rules of Civil Procedure and
conclude that the SAC has been plead with adequate particularity for this stage of the litigation.
*Menkes*, 2005 U.S. Dist. LEXIS 28208, at *15; U.S.C. § 78u-4(b)(1)(B).

Defendants state that they "expressly warned" that the AC lacked particularity where certain
statements failed to make specific differentiations between Defendants' business operations –
SNTG's parcel tankers operations versus SNTG's tank container operations.  Def. Mem. at 14.
Plaintiffs countered – and this Court agreed – that debating trivial nuances regarding SNSA's or
SNTG's business operations is inappropriate in the context of a motion dismiss.  *Menkes*, 2005 U.S.
Dist. LEXIS 28208, at *14; Plaintiffs' Opposition to Defendants' Motion to Dismiss Plaintiffs'
Amended Class Action Complaint, pps. 20-23. Just as this Court previously rejected Defendants'
argument in relation to Defendant's motion to dismiss the AC as premature, this Court should reject
Defendants' identical argument in relation to the SAC here as well.

Defendants, quite noticeably, do not argue that SNTG did not conduct anti-competitive
activities through its parcel tanker operations or its tank container operations.  Rather, Defendants
purport a slew of factual details regarding SNTG's organization, including vessel utilization,
customer base, business model, etc.  Def. Mem. at 15.  Defendants' representations regarding
SNTG's business, however, do not alter the SAC's particularized allegations.  Defendants'
representations merely raise disputed factual issues.  As this Court already concluded, Defendants'

- 28 -

contentions are "more properly reserved for the time when presentation of evidence is appropriate" – *i.e.*, at summary judgment. *Menkes*, 2005 U.S. Dist. LEXIS 28208, at *15; *see also Friedl v. City of New York,* 210 F.3d 79, 83-84 (2d Cir. 2000).

Notwithstanding the factual nature of Defendants' argument, Plaintiffs maintain that the distinction drawn by Defendants (concerning SNTG's tank and parcel tanker operations) remains murky. For example, SNSA's 20-F statements consistently contain the following language in the description of SNTG's business segments: "SNTG offers fully integrated transport and logistic services including intercontinental parcel tanker, coastal parcel tanker, river parcel tanker, tank container, rail, and storage." *See, for example*, SNSA 20-F Statement, fiscal year 2002, pg. 22[23]; SNSA 20-F Statement, fiscal year 2001, pg. 15.[24]  Through this statement, SNSA does not characterize – to their shareholders, their customers and the public – the distinction regarding SNTG's business operations that it now represents to this Court. Clearly, Defendants do not wish for their shareholders to draw a distinction between SNTG's tank container and parcel tanker operations.[25]  In this regard, how can Defendants now demand that Plaintiffs be required to make allegations regarding SNTG with any greater particularity?

---

[23] This document is attached as Exhibit 4 to Defendants' motion to dismiss the SAC.

[24] This document is attached as Exhibit 6 to Defendants' motion to dismiss the SAC.

[25] Defendants themselves have difficulty parsing the distinction between SNTG's tank container and parcel tanker operations. Def. Mem. at 16.  In footnote 8 of Defendants' memorandum of law, Defendants concede that ¶63 of the Complaint relates, albeit remotely, to SNTG's parcel tanker operations despite the fact that the statement does not mention parcel container directly.  Still, according to Defendants, the statement mentions only SNTG's tank container operations.

Clearly, even Defendants cannot unequivocally draw a line between the supposedly separate divisions in the context of their own statements.  Still, despite the blurred differential between the two operations, Defendants ask this Court to make a legal determination of the fact-sensitive information.

Plaintiffs' SAC, akin to their AC, has been plead with adequate particularity.[26]  In this regard, this Court should reject Defendants' unsupported, rehashed argument.

### F.    Defendants' Statements Are Not Protected As Forward Looking Statements

Defendants argue that certain of their Class Period statements are non-actionable forward-looking statements as they were accompanied by cautionary statements and utilized terms such as "anticipate" or "expect".  Def. Mem. at 17, n. 9.  In order to qualify as a forward-looking statement entitled to safe-harbor protection, however, a statement must be identified as such, and be "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" in the forward-looking statement.  15 U.S.C. §78u-5; *see also Imclone Sys.*, 2003 U.S. Dist. LEXIS 9342, at *4; *In re Vivendi Universal, S.A. Sec. Litig.*, 2003 U.S. Dist. LEXIS 19431, at * 183 (S.D.N.Y. Nov. 3, 2003) (holding that cautionary language must "render reliance on the misrepresentation unreasonable").

Furthermore, as the Second Circuit has made clear, the cautionary language, "must relate *directly* to that by which plaintiffs claim to have been misled." *Hunt v. Alliance North Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 729 (2d Cir. 1998) (Emphasis added); *see also Irvine*, 2003 U.S. Dist. LEXIS 9342, at *4.  Furthermore, if a party is aware of a particular problem worthy of disclosure, the party may not rely on general disclaimers to avoid liability.

---

[26] The only contention that Defendants make even remotely related to the issue of particularity is buried in a footnote. Def. Mem. at 16, n. 7.  There, Defendants argue that ¶64 of the Complaint lacks particularity as Plaintiffs failed to "state where and when the statements were made". *Id.*  The referenced statement, however, clearly states that "[o]n March 27, 2002, SNSA announced...".  Further, it is quite disingenuous for Defendants' to demand particularity as to "where" the statement was made when the statement was derived from an SNSA press release (See Exhibit A attached hereto), which declares to have been issued from London, England.

Defendants contend that the general, standard-form language contained in their statements render the statements non-actionable.  Def. Mem. at 17, n. 9.  As the SAC alleged, however, these blanket warnings were not meaningful and did not advise investors of the true risks and uncertainties facing the Company.  ¶93.  None of these purported "warnings" ever warned about bid rigging conspiracies or schemes, anti-competitive activities, violations of antitrust law, or even a threat to SNTG's customer base due to the nature of its business affairs.  Indeed, Defendants' basic "disclosure" did not "relate directly" – or even indirectly – to the risks associated with conducting business through bid rigging schemes and the risks associated with violating antitrust laws.  *See In re Priceline.com Inc.*, 342 F. Supp. 2d at 49; *see also In re Initial Pub. Offering Sec. Litig.*, 2004 U.S. Dist. LEXIS 20552; *46 (S.D.N.Y. Oct. 15, 2004) (finding that generalized disclosures of amorphous risks will not shield defendants from liability as the cautionary language must be "too prominent and specific to be disregarded" and the disclosures must "warn investors of exactly the risk that plaintiffs claim was not disclosed"); *Rubinstein v. Collins*, 20 F.3d 160, 171 (5th Cir. 1994) ("The inclusion of general cautionary language regarding a prediction would not excuse the alleged failure to reveal known material, adverse facts."); *see also In re Credit Suisse First Boston Corp. v. ARM Fin. Group*, 2001 U.S. Dist. LEXIS 3332, *23 (S.D.N.Y. Mar. 27, 2001) ("warnings of specific risks . . . do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described").  These so-called "risks" were, in actuality, strategically planned and executed schemes by the Companies and thus safe harbor protection does not apply.  *See In re Prudential Sec. Ltd. Pshps. Litig.*, 930 F. Supp. 68,  72 (S.D.N.Y. 1996) ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.").

Moreover, opinions and projections are actionable where, as here, "the speaker does not genuinely or reasonably believe them." *In re IBM Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998). Additionally, opinions may be actionable if they are made without any basis "or if the speakers were aware of any facts undermining the accuracy of these statements." *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 141 (S.D.N.Y. 1999). Here, Defendants were in possession of adverse information regarding the illegal basis of the Company's customer growth and revenue generation. Accordingly, since the statements made by Defendants' during the Class Period were made while Defendants had knowledge of "facts undermining the accuracy of those statements," those statements are actionable.

### G.   Plaintiffs Have Stated a Claim for Control Person Liability Under Section 20(a)

To state a claim under Section 20(a), a plaintiff must plead: (1) a primary violation by a controlled person; and (2) control of the primary violator by the defendant. *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 310 (S.D.N.Y. 2005). Here, by unmistakably alleging an overall primary violation of the Exchange Act, the claims against the Individual Defendants should likewise be sustained.

Also, Defendants concede that Cooperman and Lee are control persons as that term is defined by Section 20(a) of the Exchange Act. Def. Mem. at 21; *See Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001) (control person liability is sufficiently plead where the complaint alleges that defendant was an officer of the company and that he had primary responsibility for the dealings of the company); *Schnall v. Annuity & Life Re (Holdings), Ltd.*, No. 02-CV-2133 (GLG), 2004 U.S. Dist. LEXIS 4643, at *28 (D. Conn. Mar. 9, 2004) ("If Plaintiffs have adequately pleaded a Section 10(b) claim, the first or primary violation element of a Section 20(a) claim is sufficiently pled." *citing Scholastic*, 252 F.3d at 77-78).

**IV.     CONCLUSION**

        For the reasons set forth herein, Defendants' motion to dismiss should be denied in its

entirety.

DATED:  April 11, 2006                          LERACH COUGHLIN STOIA GELLER
                                                  RUDMAN & ROBBINS LLP
                                                SAMUEL H. RUDMAN
                                                MARK S. REICH


                                                _____/s/ Mark S. Reich_____
                                                        MARK S. REICH

                                                58 South Service Road, Suite 200
                                                Melville, NY  11747
                                                Telephone:  631/367-7100
                                                631/367-1173 (fax)

                                                Lead Counsel for Plaintiffs

                                                SCOTT + SCOTT, LLC
                                                DAVID R. SCOTT (CT 16080)
                                                108 Norwich Avenue
                                                Colchester, CT  06415
                                                Telephone:  860/537-3818
                                                860/537-4432 (fax)

                                                Liaison Counsel

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 11, 2006, I electronically filed the foregoing with the Clerk of

the Court using the CM/ECF system which will send notification of such filing to the e-mail

addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

mailed the foregoing document or paper *via* the United States Postal Service to the non-CM/ECF

participants indicated on the attached Manual Notice List.

                              LERACH COUGHLIN STOIA GELLER
                                RUDMAN & ROBBINS LLP


                              _____
                                      s/ Mark S. Reich
                                    MARK S. REICH

                              58 South Service Road, Suite 200
                              Melville, NY  11747
                              Telephone:  631/367-7100
                              631/367-1173 (fax)
                              E-mail:  MReich@lerachlaw.com

# Mailing Information for a Case 3:03-cv-00409-DJS

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Peter J. Carney**
  pcarney@whitecase.com

- **Erin Green Comite**
  ecomite@scott-scott.com cmcgowan@scott-scott.com

- **Jaime M. Crowe**
  jcrowe@whitecase.com

- **Christopher M. Curran**
  ccurran@whitecase.com

- **J. Mark Gidley**
  mgidley@whitecase.com

- **Donna Nelson Heller**
  dheller@fdh.com

- **Patrick J. McHugh**
  pmchugh@fdh.com

- **Mark S. Reich**
  MReich@lerachlaw.com

- **Samuel H. Rudman**
  SRudman@lerachlaw.com

- **David Randell Scott**
  drscott@scott-scott.com cmcgowan@scott-scott.com

- **Michael P. Shea**
  mpshea@dbh.com kpbrooks@dbh.com

- **Jason S. Weathers**
  jsweathers@dbh.com jhinds@dbh.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`

# EXHIBIT A



ABOUT HUGIN        CONTACT        CAREERS        HELP

.com          My!HUGIN | Companies | Annual Reports | Search | General press releases



1:31PM 2002.03.27  (GMT+1)

## Stolt-Nielsen S.A. Reports First Quarter Results

**London, England - March 27, 2002**

Stolt-Nielsen S.A. (Nasdaq: SNSA; Oslo Stock Exchange: SNI) today reported results for the first quarter ended February 28, 2002. Net loss for the latest quarter was $3.7 million, or $0.07 per share, on net operating revenue of $611.2 million, compared to a net loss of $8.2 million, or $0.15 per share, on net operating revenue of $542.0 million for the first quarter of 2001. Adjusted for a non-recurring item of $5.4 million of SNTG restructuring charges in the first quarter of 2002, net income was $1.7 million or $0.03 per share. The basic weighted average number of shares outstanding for the quarter was 54.9 million compared with 54.9 million for the same period in 2001.

Commenting on the results, Niels G. Stolt-Nielsen, Chief Executive Officer of Stolt-Nielsen S.A. said "Excluding the restructuring charges, the Stolt-Nielsen Transportation Group reported results on par with the first quarter of last year. Stolt Offshore reported greatly improved results in what traditionally is a weak quarter. Stolt Sea Farm again reported weak results due to low salmon prices, however, there are signs that salmon prices have begun to rebound.

"Before $5.5 million of restructuring charges, the Stolt-Nielsen Transportation Group Ltd. (SNTG) reported income from operations of $28.9 million in the first quarter of 2002 compared to $29.2 million in the first quarter of 2001. The slight decline is entirely due to the loss of income following the sale of the Chicago, IL and Perth Amboy, NJ terminal facilities at the very end of 2001. SNTG anticipates recognizing an additional $5 million of one-off restructuring costs through out the remainder of the year, although it is also anticipated that cost savings from the program will offset most of this.

"The Stolt Tankers Joint Service Sailed-in Index in the first quarter of 2002 was 5% higher than in the comparable quarter of 2001 but 5% lower compared to the fourth quarter of 2001. Income from operations for SNTG's parcel tanker division was $20.5 million in the first quarter of 2002 compared to $20.3 million in the first quarter of 2001. Contract volumes remained relatively steady compared to the first and fourth quarter of 2001, but spot volumes were off, particularly in the commodity chemical and clean petroleum product markets. In recent months, SNTG redelivered eight simpler time-chartered ships. Contracts of affreightment continue to be renewed at higher levels and SNTG recently renewed a multi-year contract for one of its largest customers. We are anticipating a pickup in rates in the second half of the year and through out 2003 as the world economies continue their recovery.

"SNTG's tank container operations income from operations improved to $4.7 million in the first quarter of 2002 compared from $2.7 million in the first quarter of last year. While shipments in the first quarter were similar to the comparable quarter last year, utilization rose to 71.1% compared to 67.7% last year. For the remainder of the year we anticipate seeing continued pressure on pricing while utilization should be similar to what we saw in the first quarter. We still see shipments for the year growing 5% compared to 2001.

"SNTG's terminal division income from operations was $3.6 million during the first quarter of 2002 compared to $6.2 million in the first quarter of 2001. The lower 2002 result was due to the loss of income from the two terminals sold, partially offset by a contribution from the new Braithwaite, LA terminal, which opened in the latter half of

2001. During the quarter, we added another 180,000 barrels of capacity in Braithwaite. Reflecting the sale of the two terminals, for the year we continue to anticipate 2002 revenue to be about $15 million lower than 2001, but income from operations and EBITDA to be only slightly off from 2001 results.

"Before minority interests, Stolt Offshore S.A. (SOSA) reported a net profit of $0.2 million compared to a net loss of $15.5 million in the first quarter of 2001. The results reflect good project performance particularly on Girassol and Gulfstream. We have settled some of the previously reported variation orders on the Girassol project, but some significant claims remain under review. Our order backlog now stands at $1.6 billion of which $903 million is for 2002. This compares with a backlog of $1.5 billion at this time last year of which $786 million was for 2001. The level of bids outstanding now stands at $3.7 billion, which is the same as at this time last year. The outlook continues to be good as we expect our market to grow to $10.2 billion this year from $6.8 billion in 2001. In West Africa we have a record backlog and expect to see rapid market growth in this region. Uncertainties remain on the activity level in the spot market in the Gulf of Mexico and the North Sea regions in the second half of the year. The pace of project awards was slow during the first quarter but we expect a number of large projects to both come into the market and be awarded in the next six months.

"Stolt Sea Farm Holdings plc's (SSF) reported a loss from operations in the first quarter of 2002 of $5.6 million compared to income from operations of $2.9 million in the first quarter of 2001. While production volumes in the first quarter compared to 2001 were up some 10% in North America and 30% in Europe, and sales volumes were up over 50% in the fast growing Asia Pacific region, salmon prices were again weaker. In the first quarter we saw signs that salmon prices had begun to stabilize and even improve toward the latter part of the quarter and into March. While this may be a typical seasonal run up to Easter and may not be sustainable near-term, we continue to anticipate stronger pricing towards the latter half of the year as there are signs that production increases are now moderating, and the supply/demand balance will improve. SSF's turbot operations in Iberia posted another strong result.

"During and subsequent to the quarter both Optimum Logistics Ltd. (OLL) and SeaSupplier Ltd. (SSL) announced several contracts. In addition, OLL, as a result of completing most of its technology development and a cost reduction effort, reduced its loss from operations to $2.7 million in the first quarter of 2002 from $4.7 million in the comparable quarter of 2001.

"We maintain our overall guidance of $0.85 to $1.15 earnings per share for the full year. For the second quarter, we expect earnings per share to between $0.05 and $0.15," Mr. Stolt-Nielsen concluded.

Stolt-Nielsen S.A. is one of the world's leading providers of transportation services for bulk liquid chemicals, edible oils, acids, and other specialty liquids. The Company, through its parcel tanker, tank container, terminal, rail and barge services, provides integrated transportation for its customers. The Company also owns 53 percent of Stolt Offshore S.A. (Nasdaq: SOSA; Oslo Stock Exchange: STO), which is among the largest subsea services contractors in the world. Stolt Offshore specializes in providing engineering, flowline and pipeline lay, construction, inspection, and maintenance services to the offshore oil and gas industry. Stolt Sea Farm, wholly-owned by the Company, produces and markets high quality Atlantic salmon, salmon trout, turbot, halibut, sturgeon, caviar, Bluefin tuna, and tilapia.

This news release contains forward-looking statements as defined in the U.S. Private Securities Litigation Reform Act of 1995. Actual future results and trends could differ materially from those set forth in such statements due to various factors. Additional information concerning these factors is contained from time to time in the Company's U.S. SEC filings, including but not limited to the Company's report on Form 20-F/A for the year ended November 30, 2000. Copies of these filings may be obtained by contacting the Company or the U.S. SEC.

Conference Call Details
Date & Time March 27, 2002 10 am EST (3pm GMT)
Phone +1 212 346 6460

PostView Facility Available directly after the conference until 5:00 pm EST on Thursday, March 28, 2002
Phone +1 800 633 8284 (in U.S.) +1 858 812 6440 (outside U.S.)
Reservation Number 20464325

Live Webcast conference call is available via the company's Internet site www.stolt-nielsen.com commencing on Wednesday, March 27th 2002 at 10:00 am EST (3:00 pm GMT). A playback of the conference call commences on Wednesday, March 27th 2002 after 12:00 noon EST (5:00pm GMT).

end text
tables follow

SNSA 1Q02 Results

*Contact:*
*Richard M. Lemanski*
*USA 1 203 625 3604*
*rlemanski@stolt.com*

*Valerie Lyon*
*UK 44 20 7611 8904*
*vlyon@stolt.com*

Stolt-Nielsen S.A.                                    HUGIN Online

---

**Notify a collegue or friend about this press release:**

E-mail address: _____     Your name: _____     [Send]