Not Reported in F.Supp. Page 1
Not Reported in F.Supp., 1998 WL 283286 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,235
**(Cite as: 1998 WL 283286 (S.D.N.Y.))**



**Motions, Pleadings and Filings**

United States District Court, S.D. New York.
In re HEALTH MANAGEMENT SYSTEMS, INC. SECURITIES LITIGATION
No. 97 CIV. 1865(HB).

June 1, 1998.

OPINION AND ORDER

BAER, District J.

**\*1** Defendants in this securities fraud class action move to dismiss the Consolidated Amended Complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and Section 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). For the reasons stated below, the defendants' motion is GRANTED, with leave to replead.

I. *Background*

Health Management Systems, Inc. ("HMS"), furnishes proprietary information, management and data processing services and software to hospitals and health care providers. HMS's main function is to benefit its health care clients by enhancing their revenue and accelerating cash flow, for example, by efficiently processing accounts receivable, reducing operating and administrative costs and improving decision-making capabilities. Compl. ¶ 66. In January 1992, HMS entered into a service agreement with HHL Financial Systems, Inc. ("HHL"), pursuant to which HMS was to provide HHL with revenue enhancing and support services. Compl. ¶ 74.

Plaintiff shareholders allege that they purchased HMS shares at artificially inflated prices as a result of materially false and misleading statements made by HMS and the individual defendants [FN1] regarding HMS's existing financial state and business relationships, particularly with certain of its substantial customers, in violation of Section 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. Plaintiffs sue on behalf of themselves and a class of other shareholders who purchased HMS stock between February 27, 1996 and February 25, 1997 (the "Class Period").

FN1. The individual defendants are present or former officers and/or directors of HMS and are as follows: Paul J. Kerz, President, Chief Executive Officer and Chairman of the Board of Directors; Donald J. Staffa, Senior Vice President of Operations; Laurence B. Simon, Senior Vice President of Development and Secretary; Phillip Siegel, Vice President and Chief Financial Officer; Russell L. Carson, HMS Director; Richard H. Stowe, HMS Director; Robert M. Holster, HMS Director; and John W. McIntyre, HMS Director. Compl. ¶¶ 38-45.

Specifically, plaintiffs allege that by the beginning of 1996, HMS's business began experiencing financial problems, due to increased competition and the emphasis on cost savings in managed care services. One of HMS's largest customers, HHL, allegedly began failing to make timely payments to HMS, and other customers also began deferring payments. Compl. ¶¶ 75-76. On February 27, 1996, the beginning of the Class Period, HMS announced its first quarter results in a press release, stating that they had a "solid quarter" and looked "forward to a fulfilling year ahead." Plaintiffs allege that these statements were false and misleading in light of HMS's problems with HHL and its other customers. Plaintiffs allege that defendants knew of HMS's financial problems because the individual defendants were officers and/or directors of HMS and especially because defendants Kerz, Carson, Stowe and Holster were also officers and/or directors of HHL. Compl. ¶¶ 77-78, 3.

On May 28, 1996, HMS issued a press release announcing positive second quarter results. Plaintiffs allege that this release was misleading because HMS failed to disclose its financial difficulties with its customers and that HMS and HHL had reached an agreement regarding the offsetting of HHL's receivables. Com pl. ¶¶ 80-83. Shortly thereafter, HMS disclosed the HHL receivables agreement in its Form 10-Q dated June 13, 1996. Plaintiffs allege that HMS nevertheless failed to disclose the full truth of the seriousness of the problem, *i.e.,* that HHL was on the verge of defaulting on its payments owed to HMS. Compl. ¶¶ 85-87.

**\*2** On August 21, 1996, HMS disclosed in a press release that it would take a third quarter charge of $5.51 million (32

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                               Page 2
Not Reported in F.Supp., 1998 WL 283286 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,235
**(Cite as: 1998 WL 283286 (S.D.N.Y.))**

cents per share), and that HMS had canceled a contract to manage the information processing business of HHL, after negotiating with HHL for several months. Plaintiffs allege that HMS nevertheless downplayed this by portraying the write-off as a positive, one-time charge that would not affect HMS's future performance. Compl. ¶¶ 89-91. When HMS announced its third quarter results on September 4, 1996 and released its 10-Q report for the period ended July 31, 1996, plaintiffs contend that HMS reinforced this false notion that the HHL situation was behind HMS. Compl. ¶¶ 101-02, 108-09. Plaintiffs also allege that defendants convinced securities analysts that its problems with HHL were in the past and that the write-off signaled a turnaround for HMS and would not negatively impact it. Compl. ¶¶ 93-99.

On November 15, 1996, HMS supposedly "shocked the market" when it announced its fourth quarter earnings were expected to be far less than market projections. HMS reported that these poor results were a result of problems with large clients, as well as the fact that the restructuring of HMS's relationship with HHL had consumed more management resources than anticipated. This news sent HMS's stock plummeting 34% that day. Compl. ¶¶ 112-115. Plaintiffs allege that even these disclosures were misleading and did not disclose the full extent of HMS's problems, *i.e.,* that it was "suffering increased competition, fee erosion and lower margins, all of which were contributing to reduced earnings...." *Id.* ¶ 115. Plaintiffs allege that the full extent of HMS's financial problems were finally revealed on February 25, 1997, the last day of the Class Period, when HMS announced its poor first quarter 1997 results and indicated that net income was down 50% from the prior year. In response to this announcement, HMS stock dropped 15% that day. Com pl. ¶¶ 119-20.

During the Class Period, some of the individual defendants sold their HMS stock, allegedly taking advantage of their concealment of prevailing problems at HMS. Specifically, the individual defendants, officers and/or directors of HMS, sold over $18,000,000 worth of their stock in total during the Class Period. Compl. ¶ 7.

II. *Discussion*

In order to state a claim for securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5, "a plaintiff must plead that the defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff injury." *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc., 75 F.3d 801, 808 (2d Cir.1996).* Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), these elements must be pled with a heightened degree of specificity. That law provides that any complaint alleging a violation of Section 10(b) must "specify each statement alleged to have been misleading, [and] the reasons or reasons why the statement is misleading" and must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *15 U.S.C. § 78u-4(b)(1)(B) and (b)(2).* I find that the plaintiffs' complaint fails to meet these stringent pleading requirements.

*A. Pleading on Information and Belief*

**\*3** All of the allegations in the complaint are prefaced by the phrase "upon information and belief," except those specifically pertaining to the named plaintiffs, their counsel and their own acts. In general, under *Rule 9(b) of the Federal Rules of Civil Procedure,* pleadings alleging fraud cannot be based on information and belief, except where matters are particularity within the adverse party's knowledge. The plaintiffs may invoke this exception only if they include "a statement of facts upon which [their] pleaded information and belief are founded." *Leslie v. Minson, 679 F.Supp. 280, 282 (S.D.N.Y.1988).* Moreover, the PSLRA provides that "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *15 U.S.C. § 78u-4(b)(1).* The complaint here is devoid of any such particularity.

Plaintiffs attempt to satisfy this pleading requirement in a single paragraph preceding paragraph 1 of their complaint, which states:

> Plaintiffs' information and belief is predicated upon, among other things, the investigation made by plaintiffs by and through their attorneys, which investigation included analyses of publicly available new articles, press releases, filings made by defendant Health Management Systems Inc.... with the Securities and Exchange Com-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:03-cv-00409-DJS    Document 62-2    Filed 04/25/2006    Page 3 of 6

Not Reported in F.Supp.                                                                                                    Page 3
Not Reported in F.Supp., 1998 WL 283286 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,235
**(Cite as: 1998 WL 283286 (S.D.N.Y.))**

mission ("SEC") and other matters of public record. The plaintiffs' allegations provide little, if any, specificity about the foundation for their attorneys' allegations. In particular, the above quoted paragraph is insufficient because it does not indicate what publicly available articles, releases and filings the plaintiffs relied on, nor does it indicate what "other matters" of public record plaintiffs reviewed. *See* Crystal v. Foy, 80 Civ. 446, 1981 WL 1648 (S.D.N.Y. June 30, 1981)(where complaint provided that the basis for plaintiff's information and belief were public filings, news articles, press releases, research reports, and other public sources of information, complaint was deficient, because it failed to delineate the specific documents, articles and reports relied upon by plaintiff); Branch v. Tower Air, Inc., 94 Civ. 649935, 1995 WL 649935 (S.D.N.Y. Nov.3, 1995)(paragraph listing source of plaintiff's information and belief was insufficient where it failed to particularize portions of prospectus relied on, or even the title and author of numerous articles and reports plaintiff alleges it relied on).

Indeed, a paragraph similar to the one at issue here, was rejected as insufficiently specific in a recent case in this District, Novak v. Kasaks, 997 F.Supp. 425, 1998 WL 107033 (S.D.N.Y. March 10, 1998). In *Novak,* the plaintiffs based their allegations on an investigation of counsel, which included a "review of [defendant's] SEC filings, securities analysts reports and advisories about the Company, press releases issued by the Company, media reports about the Company and discussions with consultants." *Id.* at *7. The court held that this paragraph failed to provide the required facts underlying the plaintiffs' allegations. *Id.* Similarly, here, none of the information specified in plaintiffs' introductory paragraph sufficiently delineates the source of the plaintiffs' allegations.

*B. Fraud*

***4** Even if plaintiffs had sufficiently identified the source of their allegations, they have failed to plead the elements of fraud with particularity. As discussed above, under the PSLRA, plaintiffs are required to specify each statement alleged to have been misleading, and the reasons why the statement is misleading. 15 U.S.C. § 78u-4(b)(1)(B). Plaintiffs sufficiently identify the statements alleged to have been misleading. However, I find they have failed to plead with sufficient particularity the reasons why these statements are false or misleading.

The essence of the plaintiffs' complaint is that defendants made statements about the company's financial situation, but failed to disclose the financial difficulties that the company was having, including difficulties with several customers, decreasing margins and slowing or reversing revenue growth. Indeed, the complaint is replete with allegations that certain press releases and public filings were misleading because they failed to reveal that HMS was having problems receiving payments from unspecified customers, including HHL, and that HMS was suffering from "increased competition," lower margins, decreased profitability and "fee erosion." *E.g.,* Compl. ¶¶ 78, 82, 86, 100, 111, 115. These general, conclusory allegations are wholly insufficient under Rule 9(b), let alone the PSLRA. *See* Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 115 (2d Cir.1982). These allegations do not specify the customers involved, the nature of the customer's supposed payment problems, the nature or genesis of the alleged "increased competition," or the extent of the alleged lower margins or decreased profitability. *See, e.g.,* Roots Partnership v. Lands' End, Inc., 965 F.2d 1411, 1418-19 (7th Cir.1992)(complaint was insufficient where it failed to particularize alleged operational problems of "slackening demand, obsolete inventory, low-margin liquidations, and declining profit margins"); Tuchman v. DSC Comms. Corp., 818 F.Supp. 971, 977 (N.D.Tex.1993)(dismissing complaint because it referred to problems of increased competition and customer defections but did not specify the nature of the competition or of the customer defections, such as how many and which customers defected), *aff'd,* 14 F.3d 1601 (5th Cir.1994).

Plaintiffs' attempts to be more specific also fail. For example, plaintiffs point to several statements in press releases on February 27, 1996 and on May 28, 1996, indicating that the company had a solid quarter and looked forward to a fulfilling year. Compl. ¶¶ 77, 80. Plaintiffs allege that these statements were misleading because HMS failed to state that it was experiencing requests for contract and contract payment deferrals. HMS also allegedly failed to disclose its problems with HHL, and that HHL "had stopped making payment to [HMS] at least as early as December 1995."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 4
Not Reported in F.Supp., 1998 WL 283286 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,235
**(Cite as: 1998 WL 283286 (S.D.N.Y.))**

Compl. ¶¶ 78, 82. As with the allegations of unnamed customer problems, plaintiffs' allegations regarding requests for contract deferrals are insufficient as they do not specify who requested the deferrals, when they were requested, the amounts at issue or any other facts sufficient to show the purportedly omitted information was material. *See, e.g.,* Tuchman, 818 F.Supp. at 977. The allegation that HHL had stopped making payments in December 1995 is similarly devoid of sufficient factual support.

**\*5** Plaintiffs also argue that the May 28th press release was misleading because it stated that HMS had consistent operating margins, while HMS was actually experiencing decreased operating margins. However, the conclusory allegation that the opposite of a statement in a press release is true, without further factual elaboration, is insufficient. Leonard v. NetFRAME Sys., Inc., No. C-95-0238, 1995 WL 798923, \*6 (N.D.Cal. Aug.8, 1995). Plaintiffs further allege that this release was misleading because it failed to mention an agreement reached between HMS and HHL regarding the offsetting of HHL's receivables. This agreement was subsequently disclosed in HMS's June 13, 1996 form 10-Q. The mere allegation that statements in one report should have been made earlier does not make out a claim of securities fraud. Acito v. IMCERA Group, 47 F.3d 47, 53 (2d Cir.1995); In re Glenayre Technologies, Inc. Securities Litigation, 982 F.Supp. 294, 297 (S.D.N.Y.1997).

Plaintiffs also allege that the earnings results that were stated in the May 28 press release, and in HMS's June 13, 1996 Form 10-Q, materially overstated HMS's earnings because HMS did not write-off receivables from HHL, or at least establish an appropriate reserve. Compl. ¶¶ 84, 87. The conclusory allegation that earnings are overstated or that accounting entries are improper is insufficient. *See* Decker, 681 F.2d at 116 (allegation that defendant did not write down value of certain facilities was insufficient); Shushany v. Allwaste, Inc., 992 F.2d 517, 522 (5th Cir.1993)(complaint failed to explain how allegedly faulty adjustments affected company's financial statements, or whether they were material).

Plaintiffs also allege that the August 21, 1996 press release was false in its statement that "[w]e do not expect future operating results to suffer as a consequence of this HHL write-off" and that the write-off was a "one-time charge." Compl. ¶ 91. Plaintiffs allege only in a conclusory fashion that defendants "failed to explain that the write-off was not the end of the HHL situation and the Company would sustain additional costs in winding down the HHL business." Compl. ¶ 100. Aside from the fact that HMS did end up spending more on the HMS situation than anticipated, the complaint wholly fails to specify how the statements in the August 21st release were false at the time they were made. Such allegations of fraud by hindsight are not actionable under the securities laws. *See* Acito, 47 F.3d at 53; Crystal v. Foy, 562 F.Supp. 422, 429 (S.D.N.Y.1983); Grossman v. Texas Commerce Bancshares, Inc., 87 Civ. 6295, 1995 WL 552744 (S.D.N.Y. Sept.15, 1995). Finally, the allegation that HMS's announcement on November 15, 1996 that its earnings were down was misleading because defendants "still failed to disclose that the Company was suffering increased competition, fee erosion and lower margins, all of which were contributing to reduced earnings even below the announced readjusted expectations" (Compl.¶ 115) is wholly insufficient, as discussed above. [FN2]

> FN2. Moreover, plaintiffs have failed to plead facts attributing certain securities analyst's statements to the defendants. Defendants cannot be held liable for reports prepared by analysts unless plaintiffs plead sufficient facts supporting a conclusion that defendants adopted, endorsed, or sufficiently entangled themselves with the analysts statements. *See* Elkind v. Liggett & Myers Inc., 635 F.2d 156, 163 (2d Cir.1980) To adequately plead "entanglement" plaintiffs must specify what information was supplied to the analyst, who supplied it and how defendants may have controlled the contents of the report. Pilarczyk v. Morrison Knudsen Corp., 965 F.Supp. 311, 320 (N.D.N.Y.1997). The complaint alleges that a report published by the firm of Robinson-Humphrey Co. is attributable to defendants because it was written by a former CFO of HMS and because the information is of sufficient detail that it could only have come from defendants. Compl. ¶ 96. I find that these allegations do not sufficiently plead with particularity that defendants so thoroughly "entangled" themselves

Not Reported in F.Supp. Page 5
Not Reported in F.Supp., 1998 WL 283286 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,235
**(Cite as: 1998 WL 283286 (S.D.N.Y.))**

with such report as to render them liable for such reports. *See, e.g.,* Leonard, 1995 WL 798923 at *7.

*C. Scienter*

***6** Although the above alone requires dismissal of the plaintiffs' complaint, I also find that plaintiffs have failed to plead with sufficient particularity facts that raise a strong inference of scienter. Under the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The PSLRA has been interpreted to have strengthened the already stringent pleading requirements under Rule 9(b). *Novak,* 1998 WL 107033 at *5. In order to satisfy this pleading requirement, a plaintiff must now plead specific facts that create a strong inference of either knowing misrepresentation or conscious recklessness. *In re Glenayre Techs.,* 982 F.Supp. at 298. Moreover, under the PSLRA, a showing of motive and opportunity, without more, no longer suffices to raise a strong inference of scienter, although such facts can nevertheless be relevant to the scienter analysis. *In re Glenayre Techs.,* 982 F.Supp. at 298; *In re Baesa Sec. Litig.,* 969 F.Supp. 238, 242 (S.D.N.Y.1997).

Plaintiffs argue that they have plead a strong inference that defendants knew the various press releases and securities filings were materially false and misleading at the time they were made based on membership by four of the individual defendants, Kerz, Carson, Stowe and Holster, on the boards of both HMS and HHL. I find that the fact that four of the individual defendants were on the boards of HMS and HHL is insufficient to establish actual intent or conscious recklessness. Plaintiffs' theory is essentially that these four defendants must have known the true seriousness of the problems at HHL and that they must have communicated this information to the other individual defendants. This allegation fails to explain with sufficient particularity how it is the individual defendants supposedly had knowledge of the true seriousness of HHL's financial condition, or of the other problems HMS was allegedly having with its customers. Indeed, courts have routinely rejected the attempt to plead scienter based on allegations that because of defendants' board membership and/or their executive managerial positions, they had access to information concerning the company's adverse financial outlook. *See, e.g., Melder v. Morris,* 27 F.3d 1097, 1103 (5th Cir.1994); *Glickman v. Alexander & Alexander Svcs., Inc.,* 93 Civ. 7594, 1996 WL 88570 at *14 (S.D.N.Y.Febr.29, 1996); *Grossman,* 1995 WL 552744 at *13.

Plaintiffs also argue that they have plead motive and opportunity based on suspicious insider selling activity by the individual defendants. Unusual insider trading activity during the class period may permit an inference of scienter; however, plaintiffs bear the burden of showing that any such sales are in fact unusual. *Acito,* 47 F.3d at 54; *In re Glenayre,* 982 F.Supp. at 299. Plaintiffs argue that since defendants Simon, McIntyre, Krez, Carson, Staffa, Stowe and Holster sold on average in excess of 20% of their holdings during the Class period, this constitutes a strong inference of suspicious trading. [FN3] However, defendant Siegel, the Chief Financial Officer of HMS sold no HMS shares during the Class Period and actually purchased shares during that period and defendant Holster also purchased shares during the Class Period. The fact that these defendants did not sell their shares undermines plaintiff's claim that defendants delayed notifying the public so that they could sell their stock at a huge profit. *Acito,* 57 F.3d at 54; *In re Glenayre,* 982 F.Supp. at 299. Moreover, the timing of the individual defendants' sales is not suspicious. There was no one particular event or events that triggered substantial sales by the individual defendants. Indeed, very few shares were sold after the May 28, 1996 press release, which plaintiffs claim artificially inflated HMS's share price; only defendants Simon and McIntyre sold any shares shortly after May 26. In addition, after the November 15, 1996 announcement which caused HMS's share price to plummet, both Kerz and Staff sold significant amounts of their shares. [FN4] Therefore, I find that plaintiffs have failed to meet the PSLRA's pleading requirements regarding scienter. [FN5]

> FN3. Defendants sales during the Class Period were: Kerz, 3.06%, Holster, 5.62%, Carson, 14.02%, Staffa, 22.94%, Simon 23.53%, Stowe 24.92%, and McIntyre 81.9%. While defendant McIntyre's sales were quite high during the Class Period, this was most likely on account of the fact that he resigned as an HMS director prior to Janu-

Case 3:03-cv-00409-DJS    Document 62-2    Filed 04/25/2006    Page 6 of 6

Not Reported in F.Supp.                                                                        Page 6
Not Reported in F.Supp., 1998 WL 283286 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,235
**(Cite as: 1998 WL 283286 (S.D.N.Y.))**

ary 1997 and was divesting himself of his shares. I note that absent his sales, the average sales of the individual defendants drops significantly, to about 15%.

FN4. Plaintiffs' argument that HMS's acquisition of Quality Standards in Medicine using supposedly artificially inflated company stock as currency in negotiations also fails to establish motive. Desire to consummate corporate transaction does not constitute a motive for securities fraud. *See e.g.,* San Leandro, 75 F.3d at 814; *Melder,* 27 F.3d at 1102.

FN5. Plaintiffs allege that the individual defendants are liable as control persons under Section 20(a) of the Exchange Act. Since plaintiffs have failed to sufficiently plead their 10(b) claim, this claim must also be dismissed. Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc., 32 F.3d 697, 704 (2d Cir.1994).

*D. Individual Defendants*

**\*7** Outside director defendants Carson, Stowe, and Holster argue that the complaint should be dismissed against them because it fails to specify any false or misleading statements made by them. Defendant Phillip Siegel argues that the complaint should be dismissed against him because the facts alleged in the complaint negate any showing of scienter on his part. In light of the dismissal of the complaint with leave to replead, the court reserves judgment on these aspects of defendants' motions. Plaintiffs are encouraged, however, to address these concerns if they choose to replead.

IV. *Conclusion*

For the foregoing reasons, the motion to dismiss is GRANTED, with leave to replead within 30 days of the date of this opinion.

SO ORDERED.

Not Reported in F.Supp., 1998 WL 283286 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,235

**Motions, Pleadings and Filings** (Back to top)

• 1:97cv01865 (Docket) (Mar. 17, 1997)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.