## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOEL MENKES, Individually and on behalf of all others similarly situated, | : | |
| | : | |
| Plaintiffs, | : | No. 3:03CV409(DJS) |
| | : | |
| v. | : | |
| | : | |
| STOLT-NIELSEN S.A., JACOB STOLT-NIELSEN, NIELS G. STOLT-NIELSEN, SAMUEL COOPERMAN, and REGINALD JR. LEE, | : | |
| | : | |
| Defendants. | : | |

### MEMORANDUM OF DECISION

Lead plaintiffs, Irene Rucker and Gustav Rucker, bring this action on behalf of a putative class of purchasers of defendant Stolt-Nielsen S.A.'s ("SNSA") American Depository Receipts ("ADRs") for the period of May 31, 2000 through February 20, 2003 pursuant to Sections 10(b), 15 U.S.C. § 78j(b), and 20(a), 15 U.S.C. § 78t, of the Securities Exchange Act of 1934 ("the Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78a-78mm, and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, against Stolt-Nielsen S.A., Stolt-Nielsen Transportation Group, Jacob Stolt-Nielsen, Niels G. Stolt-Nielsen, Samuel Cooperman, and Reginald J.R. Lee. Defendants have filed a motion to dismiss (dkt. # 57) all counts of the Second Consolidated Amended Class Action Complaint. For the reasons set forth herein, defendants'

motion (dkt. # 57) is **DENIED.**

## I. BACKGROUND

Now pending before the court is a second motion to dismiss plaintiffs' complaint.  On November 10, 2005, this court granted defendants' motion to dismiss plaintiffs' previous complaint, and dismissed this case with prejudice.  Upon reconsideration, this court amended its judgment to a dismissal without prejudice to filing an amended complaint on or before March 1, 2006. Plaintiffs did file a Second Consolidated Amended Class Action Complaint (hereinafter "complaint" or cited as "Dkt. # 55, ¶ __") on March 1, 2006.  Defendants filed a motion to dismiss the complaint on March 20, 2006, and the motion has been fully briefed since April 25, 2006.

The following is an abridged version of facts alleged in the complaint, set forth in documents incorporated by reference into the complaint, or found in SNSA's public disclosure documents, or in other materials properly considered because plaintiffs have relied upon them in crafting their allegations.  See Rothman v. Gregor, 220 F.3d 81, 88-89 (2d Cir. 2000); In re Hunter Environmental Services, Inc. Securities Litigation, 921 F. Supp. 914, 917-18 (D. Conn. 1996).

Stolt-Nielsen S.A. ("SNSA") is a holding company that, through its subsidiaries, engages in, among other things, worldwide transportation, storage, and distribution of bulk

liquid chemicals and other similar materials.  Greenwich, Connecticut based Stolt-Nielsen Transportation Group, Inc. ("SNTG") is a subsidiary wholly owned by SNSA that engages in liquid chemical transportation on worldwide seaborne trade routes.  Jacob Stolt-Nielsen is the founder and current Chairman of SNSA, and Niels G. Stolt-Nielsen is the Chief Executive Officer of SNSA.  Samuel Cooperman has been the Chairman of SNTG and Reginald J.R. Lee has been SNTG's Chief Executive Officer during the time period relevant to plaintiffs' claims.

At issue in this case is SNTG's transportation of bulk liquid chemicals.  SNTG is one of the largest parcel tanker operators in the world, and several of SNTG's largest customers are among the world's major chemical companies.  Plaintiffs allege that, for the period of May 31, 2000[1] through February 20, 2003, SNTG engaged in a scheme to fix shipping rates, rig bids, and allocate customers.  According to plaintiffs, certain SNTG employees made agreements with major competitors to coordinate bidding and divide customer contracts between themselves.  SNTG employees allegedly met with competitors for this purpose on several different occasions, exchanged customer lists, and either purposefully did not bid on contracts to allow its competitors to gain the business or submitted artificially high bids to drive

---

[1] Plaintiffs also allege that SNTG may have begun its anti-competitive conduct as early as 1998.

the contract price upward for the benefit of other parties to
this anti-competitive arrangement.

Plaintiffs claim that a number of statements made by
defendants during the class period were false or misleading
because of these undisclosed illegal activities.  Specifically,
plaintiffs claim that the following statements, disseminated by
SNSA or Jacob Stolt-Nielsen, were false or misleading in light of
SNTG's clandestine illegal conduct:

- "[i]ncome from operations for SNTG's tank container division
  increased to $19.9 million for the full year of 2000 from
  $17.8 million in 1999. **While pricing remains competitive in
  most markets**, shipments in 2000 were up 11% from 1999 with
  similar growth anticipated in 2001," (dkt. # 55, ¶ 57
  (February 1, 2001));

- "[f]or SNTG's tank container operations, income from
  operations fell to $2.7 million in the first quarter of
  2001, down from $4.9 million in the first quarter of last
  year. While shipments were up 10% from the comparable
  quarter, **pricing competition, weak utilization, and empty
  repositioning costs negatively impacted the results.** For the
  remainder of the year, we anticipate overall growth in the
  business to continue to be about 10% over last year and
  **while we expect to continue to see strong price competition**,
  margins should improve and by the latter half of the year be
  similar to the comparable quarters of last year," (id., ¶ 59
  (March 28, 2001));

- "[s]hipments in the year 2000 increased from the downturn
  encountered in 1999.  Increases were primarily the result of
  improved demand in three main operating regions of Asia
  Pacific, Europe and the United States.  Shipment levels in
  2001 continue to reflect improved demand particularly from
  the United States and Asia," (id., ¶ 61 (October 26, 2001));

- "[t]he market for the integrated transportation and
  logistics services provided by SNTG is in its infancy.  In
  providing such services, SNTG competes primarily with a few
  other terminal and transport companies who are developing

such services. . . .  SNTG's tanker operations compete with operators based primarily in Europe and the Asia Pacific region. . . .  The competition in the tank container market is fragmented, although the relative size of the competition is increasing on a worldwide basis.  SNTG also competes, to a lesser extent, with tank container leasing companies," (id., ¶ 63 (October 26, 2001 & May 31, 2002));

- "[e]xcluding the restructuring charges, the Stolt-Nielsen Transportation Group reported results on par with the first quarter of last year.  Income from operations for SNTG's parcel tanker division was $20.5 million in the first quarter of 2002 compared to $20.3 million in the first quarter of 2001. . . .  **Contracts of affreightment continue to be renewed at higher levels and SNTG recently renewed a multi-year contract for one of its largest customers.**  We are anticipating a pickup in rates in the second half of the year and throughout 2003 as the world economies continue their recovery[.] . . . SNTG's tank container operations income improved to $4.7 million in the first quarter of 2002 compared to $2.7 million in the first quarter of last year. While shipments in the first quarter were similar to the comparable quarter last year, utilization rose to 71.1% compared to 67.7% last year.  **For the remainder of the year we anticipate seeing continued pressure on pricing while utilization should be similar to what we saw in the first quarter.**  We still see shipments for the year growing 5% compared to 2001," (id., ¶ 64 (March 27, 2002));

- "[w]hile the results in the second quarter for the Stolt-Nielsen Transportation Group were down compared to last year, our core contract business, particularly for specialty chemicals, remains healthy.  We continue to see improvements in Stolt Offshore's results. . . .  SNTG's tank container division's income from operations improved significantly to $6.3 million in the second quarter of 2002 compared to $4.0 million in the same quarter of 2001.  Utilization in the second quarter compared to the same period last year rose 7.0% to 74.4%.  Shipments are up some 6% **although pricing continues to be tight,**" (id., ¶ 66 (June 26, 2002));

- "[t]he Stolt-Nielsen Transportation Group posted a solid quarter[.] . . .  SNTG's tank container division delivered another strong result with income from operations rising to $6.2 million from $5.6 million in the comparable quarter of 2001.  Year-to-date shipments are up some 10% compared to last year and utilization in the third quarter hit a record

level of 77.7% **although the business continues to see a tight pricing environment**," (id., ¶ 68 (October 8, 2002)).[2] Plaintiffs claim that defendants' failure to disclose Stolt's alleged anti-competitive conduct rendered these statements false or misleading.

## II. DISCUSSION

Plaintiffs set forth two counts in their complaint: (1) violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5 promulgated thereunder against all defendants; and (2) violation of 15 U.S.C. § 78t against the individual defendants.  Defendants seek dismissal of each count pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

### A. STANDARD

When considering a Rule 12(b)(6) motion to dismiss, the court accepts as true all factual allegations in the complaint and draws inferences from these allegations in the light most favorable to the plaintiff.  See Scheur v. Rhodes, 416 U.S. 232, 236 (1974); Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996).  Dismissal is warranted only if, under any set of facts that the plaintiff can prove consistent with the allegations, it is clear that no relief can be granted.  See Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984); Cooper v. Parsky, 140 F.3d 433, 440 (2d Cir. 1998).  "The issue on a motion to dismiss is not whether the

---

[2] All emphasis appears as it exists in the complaint.

plaintiff will prevail, but whether the plaintiff is entitled to offer evidence to support his or her claims." <u>United States v. Yale New Haven Hosp.</u>, 727 F. Supp. 784, 786 (D. Conn. 1990) (citing <u>Scheuer</u>, 416 U.S. at 232).  In its review of a motion to dismiss, the court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken." <u>Samuels v. Air Transport Local 504</u>, 992 F.2d 12, 15 (2d Cir. 1993).

## B. SECTION 10(b) CLAIM

Plaintiffs allege that defendants engaged in fraudulent conduct that affected the purchase or sale of SNSA's ADRs. Specifically, plaintiffs claim that defendants had a duty to disclose to the investing public the nature and scope of their anti-competitive agreements with other parcel tanker companies, and that defendants acted with scienter.

Although the parties invite this court to do so, this court will not revisit its prior holdings in the absence of new allegations addressed thereto.  Specifically, the court adheres to the following holdings: defendants' statements regarding competition in the marketplace, including each of the statements set forth in the previous section of this memorandum, could be materially false or misleading; defendants had a duty to disclose information regarding their anti-competitive conduct as a result

of their own public statements set forth herein referencing
competition in the marketplace; and plaintiffs's allegations
regarding the integration of SNTG's parcel tanker and tank
container operations are sufficient to link the anti-competitive
conduct with defendants' statements.[3]  With respect to the new
allegations, the court holds as follows.

1. SCIENTER

In order to successfully plead scienter under the PSLRA, and
prior Second Circuit precedent, a plaintiff must "state facts
with particularity that give rise to a strong inference of the
required state of mind."  Novak v. Kasaks, 216 F.3d 300, 312 (2d
Cir. 2000); see 15 U.S.C. § 78u-4(b)(2) ("In any private action
arising under this chapter in which the plaintiff may recover
money damages only on proof that the defendant acted with a
particular state of mind, the complaint shall, with respect to
each act or omission alleged to violate this chapter, state with
particularity facts giving rise to a strong inference that the
defendant acted with the required state of mind.").  The Court of
Appeals for the Second Circuit has "recognized two distinct ways
in which a plaintiff may plead scienter without direct knowledge
of the defendant's state of mind.  The first approach is to
allege facts establishing a motive to commit fraud and an

_____

[3] The court, however, elaborates upon its conclusions
herein.  See infra, § II.B.3.

-8-

opportunity to do so.  The second approach is to allege facts constituting circumstantial evidence of either reckless or conscious behavior."  In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 268-69 (2d Cir. 1993).  In order to successfully meet this standard, plaintiffs must "allege facts that give rise to a strong inference of fraudulent intent."  Shields v. Citytrust Bancorp., Inc., 25 F.3d 1124, 1128 (2d Cir. 1994).  "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  Id.

Plaintiffs attempt to meet their pleading burden by way of the latter method.  "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation."  Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000).  Mindful of the admonition that "there are limits to the scope of liability for failure to adequately monitor the allegedly fraudulent behavior of others," id. at 309, plaintiffs attempt to establish the sufficiency of their allegations against

-9-

SNSA as follows.

First, plaintiffs emphasize SNTG's relationship to SNSA. Plaintiffs allege that SNTG's operations were critical to SNSA's financial health, such that SNTG's business "represented 39% of SNSA's net operating revenue, 94% of income from operations, and 50% of SNSA's total assets" in 2001, and that SNTG "represented about 62% of SNSA's net operating revenue and 73% of SNSA's total assets" in 2004.  (Dkt. # 55, ¶ 11.)  Plaintiffs also contend that Cooperman, who served as SNTG's chairman, and was in a position to relay this knowledge to SNSA, was warned of and must have been aware of SNTG's anti-competitive conduct.  Also, plaintiffs state that Niels Stolt-Nielsen, SNSA's CEO, and Jacob Stolt-Nielsen, SNSA's founder and Chairman of the Board, served on SNTG's Board of Directors during the class period, and therefore had first-hand knowledge of SNTG's operations.

Second, plaintiffs allege that SNSA employees were or should have been aware of SNTG's anti-competitive conduct.  Plaintiffs allege that, in 1998, SNTG's "vice-president for SNTG's tanker trading," Andrew Pickering, stated, in a meeting between SNSA and SNTG employees, that "Odfjell and Stolt had reached an agreement that certain customers belonged to Stolt and others to Odfjell. They had 'carved up the world.'"  (Dkt. # 55, ¶ 31.)  They further allege that Kenneth Bloom, a SNSA "vice-president for logistics," "expressed his concerns [about Pickering's statement]

to Cooperman, then SNTG's Chairman."  (Id. ¶ 34).

Plaintiffs allege that the primary perpetrator of the alleged anti-competitive conduct was Richard Wingfield, SNTG's Managing Director of its Tanker Trading Division, and that SNSA was aware of Wingfield's illegal activities.  According to plaintiffs, during late 2000 through 2001, Wingfield met with Odfjell, which was one of SNTG's primary competitors in the parcel tanker business, to agree on pricing and allocate contracts and routes.  Plaintiffs also allege that Wingfield discussed agreement about shipping rates with Tokyo Marine. Plaintiffs contend that Wingfield shared information about his anti-competitive activity as follows: a May 24, 2000 e-mail to "colleagues in Greenwich,"  regarding Tokyo Marine's desire to "cooperate on rates," (dkt. # 55, ¶ 37(a)); an April 10, 2001 fax to Wingfield setting forth  "a cost-benefit analysis prepared by Stolt regarding the profitability of conspiring with Odfjell versus 'going to war' with Odfjell," (id., ¶ 37(c)); and a January 24, 2002 announcement to "the SNTG management board," that "the Dow contracts were all but locked up" as a result of SNTG's illegal conspiracy with Odfjell, (id., ¶ 38).  Plaintiffs allege that, according to the Department of Justice, the April 10, 2001 fax was prepared in response to a request from Jacob Stolt-Nielsen for "an analysis of the pros and cons of continued pricing collusion with Odfjell."  (Dkt. # 55, ¶ 49.)

-11-

Plaintiffs allege that, after Wingfield's January 24, 2002 announcement regarding the Dow contracts in which he referenced help from Odfjell, SNSA was put on notice of the possibility that SNTG was violating the antitrust laws.  Plaintiffs allege that "SNSA officials discussed with SNSA's attorneys in London the Companies' European shipping efforts," and that "[t]hose attorneys worried that the Companies were breaking Europe's antitrust laws."  (Dkt. # 55, ¶ 39.)  Plaintiffs allege that Paul O'Brien, SNTG's general counsel, was aware of Wingfield's activities, that O'Brien asked Cooperman to suspend Wingfield and investigate his anti-competitive activities in February of 2002, that Cooperman declined to do so, and that O'Brien resigned in protest on March 1, 2002.  According to plaintiffs, O'Brien also voiced his concerns to "the highest authorities in both SNTG and SNSA," (dkt. # 55, ¶ 52), including "Alan Winsor, general counsel of SNSA."  (id., ¶ 54).

Finally, plaintiffs allege that SNSA offered the following statements in several public filings:

> [i]n 2002, we became aware of information that caused us to undertake an internal investigation regarding potential improper collusive behavior in our parcel tanker and intra-Europe inland barge operations. Consequently, we decided to voluntarily report conduct to the Antitrust Division of the U.S. Department of Justice (the "DOJ" or "Antitrust Division") and the Competition Directorate of the European Commission ("EC").

(Dkt. # 55, ¶ 76.)

Based upon the foregoing, plaintiffs have met the applicable standard for pleading scienter by proving sufficient detail to permit a strong inference that defendants engaged in conscious misbehavior.  They have alleged that, in early 2002, O'Brien communicated concerns about anti-competitive conduct to SNSA management and SNSA's general counsel, and that he resigned after raising his concerns.  They also allege that Jacob Stolt-Nielsen commissioned a study regarding the advantages of anti-competitive arrangements with Odfjell.  These specific allegations, combined with the facts that SNTG's operations were critical to SNSA's financial well-being, that Jacob Stolt-Nielsen and Niels Stolt-Nielsen were STNG board members, that Cooperman was aware of potentially anti-competitive conduct within SNTG as far back as 1998, and that Wingfield's January 24, 2002 comments prompted questions from both O'Brien and SNSA's London counsel provide the framework from which plaintiffs may prove that defendants made the statements set forth in the complaint with conscious disregard for the truth.

## 2. LIABILITY OF COOPERMAN AND LEE

Defendants argue that plaintiffs "have pleaded no independent basis for holding Messrs. Cooperman and Lee personally liable for any alleged violations of Section 10(b) and Rule 10b-5."  (Dkt. # 57 at 21.)  Plaintiffs contend that both Cooperman and Lee, as well as SNTG, are primarily liable for

-13-

violating Section 10(b) and Rule 10b-5 because they were responsible for withholding the information omitted from SNSA's public statements even though they did not directly communicate the false or misleading statements to the public.

Cooperman and Lee were corporate officers of SNTG, and were not part of SNSA's management, which was the source of the false or misleading statements alleged in the complaint.  There is no secondary liability for violating Section 10(b), such as by aiding and abetting the person primarily liable for violating Section 10(b).  See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 191 (1994); Shapiro v. Cantor, 123 F.3d 717, 720 (2d Cir. 1997) ("A claim under § 10(b) must allege a defendant has made a material misstatement or omission indicating an intent to deceive or defraud in connection with the purchase or sale of a security."). The Court of Appeals for the Second Circuit has further held that "a secondary actor cannot incur primary liability under the Act for a statement not attributed to that actor at the time of its dissemination. . . .  Thus, the misrepresentation must be attributed to that specific actor at the time of public dissemination, that is, in advance of the investment decision." Wright v. Ernst & Young LLP, 152 F.3d 169, 175 (2d Cir. 1998).

Despite the apparent bright-line rule regarding primary liability, however, there have been circumstances where courts

bound to follow the foregoing decisions have permitted claims
against persons who did not actually utter the false or
misleading statements but nevertheless may be deemed to have
caused the statements to be uttered.  In In re Sholastic Corp.
Securities Litigation, 252 F.3d 63 (2d Cir. 2001), the Court of
Appeals for the Second Circuit rejected a defendant's argument
that the statements alleged in the complaint attributed to the
corporate defendant "have not been properly made attributable to
him." Id. at 75.  In rejecting the defendant's argument, the
court found that plaintiffs had alleged that the defendant "was
involved in the drafting, producing, or reviewing and/or
disseminating of the false and misleading statements issued by"
the corporation; "had access to internal corporate documents and
reports relating to" the subject matter of the statements; and
helped prepare the corporation's analysis of sales data.  Id. at
76.  The Court of Appeals therefore held that a corporate insider
could be liable for misstatements attributed to the corporation
and not the insider himself, a holding noted and followed in
several reported decisions by district courts within the Second
Circuit.  See, e.g., In re Alstom SA Sec. Lit., 406 F. Supp. 2d
433, 466-67 (S.D.N.Y. 2005); In re LaBranche Sec. Lit., 405 F.
Supp. 2d 333, 351-52 (S.D.N.Y. 2005); Seippel v. Sidley, Austin,
Brown & Wood, LLP, 399 F. Supp. 2d 283, 295 (S.D.N.Y. 2005); In
re Global Crossing, Ltd. Sec. Lit., 322 F. Supp. 2d 319, 332-33

(S.D.N.Y. 2004).

SNTG, Cooperman, and Lee can be held primarily liable for violating Section 10(b).  Their conduct goes well beyond simply enabling or turning a blind eye to SNSA's fraud and rises to the level of active participation in the dissemination of false or misleading information.  Plaintiffs allege that Cooperman and Lee had knowledge of SNTG's anti-competitive conduct alleged in the complaint as early as 1998, and that O'Brien specifically relayed his concerns about Wingfield to them before he resigned.  Plaintiffs also allege that Cooperman and Lee were in a position to disclose the anti-competitive conduct to SNSA and render SNSA's statements regarding SNTG's activities complete and truthful, but, at best, they failed to do so, or at worst, they conspired with SNSA to "mask and conceal the improper activities implemented by SNTG in connection with its antitrust measures."  (Dkt. # 55, ¶ 102.)  In either instance, SNTG, Cooperman and Lee could be held responsible for the false or misleading statements attributed to SNSA because SNSA was either a mere conduit for SNTG, through Cooperman and Lee, to perpetrate a fraud or was a co-conspirator.  As one court has aptly stated, "[t]o hold otherwise would enable parent companies to create subsidiaries under which all of its business would be conducted and then to shield the subsidiaries from Section 10(b) liability by disseminating the subsidiary's false information."  In re

-16-

LaBranche Sec. Lit., 405 F. Supp. 2d at 352.  These allegations form a sufficient basis to hold SNTG, Cooperman, and Lee primarily liable for violating Section 10(b).

### 3. MATERIALITY

As previously referenced herein, defendants urge the court to reconsider its ruling that plaintiffs' complaint meets the standard set forth in Rule 9 of the Federal Rules of Civil Procedure.  Defendants argue that the statements alleged in the complaint to be false or misleading reference SNTG's tank container operations, which they allege are part of a line of business distinct from its parcel tanker operations.  Defendants further assert that the complaint alleges that any illegal anti-competitive activities took place within the parcel tanker line of business only, and that plaintiffs' failure to link SNTG's illegal conduct within the parcel tanker line of business with statements referencing the tank container line of business renders the complaint insufficient pursuant to Rule 9.

Plaintiffs' complaint meets the applicable standard.  Plaintiffs' complaint alleges pervasive anti-competitive activity within SNTG over a period of four years, and that SNSA attempted to deceive the investing public by stating that any business success was achieved in a competitive environment, when in fact it was not.  Plaintiffs also allege that SNTG used many means to provide services to their customers, including parcel tankers and

tank containers, and that the statements set forth in the complaint could have misled a reasonable investor into believing that SNTG's success was achieved in a competitive environment for all services it offers.  These allegations are particular to the degree required by applicable law because the complaint identifies "the statements plaintiff asserts were fraudulent and why, in plaintiff's view, they were fraudulent, [and] specif[ies] who made them, and where and when they were made."  In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 69-70 (2d Cir. 2001).

Defendants' arguments, although framed within the context of Rule 9, are tantamount to an attack on the materiality of the statements rather than an attack on the sufficiency of the pleading.  The dispositive issue, therefore, is whether the false or misleading statements are material.  "A statement is material only if there is a 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'"  In re International Business Machines Corporate Securities Litigation, 163 F.3d 102, 106-7 (2d Cir. 1998) (quoting Basic Inc. v. Levinson, 485 U.S. 224, 231- 32 (1988)).  "Material facts include those that 'affect the probable future of the company and [that] may affect the desire of investors to buy, sell, or hold the company's securities.'" Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 180 (2d Cir.

-18-

2001) (quoting  SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 849 (2d Cir. 1968)).  "At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions."  Ganino v. Citizens Utilities Co., 228 F.3d 154, 161 (2d Cir. 2000).  Because materiality is a mixed question of law and fact, judgment as a matter of law "may not be granted on the ground that alleged omissions are immaterial 'unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'"  Castellano, 257 F.3d at 180 (quoting Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985)); Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 357 (2d Cir. 2002) ("Recognizing that the materiality of an omission is a mixed question of law and fact, courts often will not dismiss a securities fraud complaint at the pleading stage of the proceedings, unless reasonable minds could not differ on the importance of the omission."); Ganino, 228 F.3d at 162.  At this juncture, the court cannot conclude that the statements are not actionable as a matter of law; plaintiffs may be able to prove that an investor would have considered the information misstated or withheld to be significant.  Therefore, this court adheres to its prior holding rejecting defendants' Rule 9 challenge to the complaint.

-19-

### 4. SCHEME LIABILITY

Plaintiffs have raised a claim under Rule 10b-5(a) and (c) against the defendants for employing a scheme in connection with the purchase or sale of securities.  Although the court is reluctant to invite a third round of motions addressed to the pleadings, it is obliged to do so under the circumstances with respect to plaintiffs' claim of scheme liability.  Plaintiffs raise this claim, which is entirely distinct from their other claim under Rule 10b-5(b), in three pages of their opposition memorandum, and defendants briefly address this claim in their reply memorandum.  The basis for scheme liability is also not immediately apparent from the complaint.  The court cannot render an informed decision on the record as it currently stands. Ordinarily defendants, as the movants, would bear the consequences of a scant record, but the state of the record is understandable given the complexity of this case, the paramount importance of other issues raised in this motion, and the manner in which the claim was raised. On the other hand, plaintiffs have not made the particulars of their claim immediately apparent from the complaint.  As such, the court will provide another opportunity for defendants to address plaintiffs' scheme liability claim in another motion if they wish to do so.  Any additional motion practice will not delay discovery.

-20-

### III. CONCLUSION

For the reasons set forth herein, defendants' motion to dismiss (dkt. # 57) is **DENIED.**  With respect to plaintiffs' scheme liability claim, defendants' motion is **DENIED without prejudice**; defendants may file another motion addressing this claim on or before **August 11, 2006.**  The parties shall meet and confer as contemplated by Rule 26(f) of the Federal Rules of Civil Procedure, and shall submit a proposed discovery plan on or before **August 11, 2006.**  The stay of this litigation shall remain in effect until further order from this court.

So ordered this 19th day of June, 2006.

**/s/DJS**

_____
**DOMINIC J. SQUATRITO**
**UNITED STATES DISTRICT JUDGE**