No. ____

# Supreme Court of the United States

STOLT-NIELSEN S.A. ,
STOLT-NIELSEN TRANSPORTATION GROUP LTD.,
AND RICHARD B. WINGFIELD,

*Petitioners*,

v.

UNITED STATES OF AMERICA,

*Respondent.*

**On Petition for a Writ of Certiorari to the
United States Court of Appeals
for the Third Circuit**

## PETITION FOR A WRIT OF CERTIORARI

ALLEN D. BLACK
   *Counsel of Record*
ROBERTA D. LIEBENBERG
GERARD A. DEVER
FINE, KAPLAN AND BLACK
1835 Market Street
Philadelphia, PA 19103
(215) 567-6565


*Counsel for Petitioner
Richard B. Wingfield*

CHRISTOPHER M. CURRAN
   *Counsel of Record*
J. MARK GIDLEY
PETER J. CARNEY
LUCIUS B. LAU
WHITE & CASE LLP
701 Thirteenth Street, N.W.
Washington, D.C. 20005
(202) 626-3600


*Counsel for Petitioners Stolt-
Nielsen S.A. and Stolt-Nielsen
Transportation Group Ltd.*

JULY 20, 2006

## QUESTION PRESENTED

Do the federal courts lack authority, under the Separation of Powers, to enjoin federal prosecutors from breaching a binding contractual obligation "not to bring any criminal prosecution" against a company and its executives?

ii

## PARTIES TO THE PROCEEDINGS BELOW

All the parties to the proceedings below are identified in the caption.

## RULE 29.6 STATEMENT

Pursuant to Rule 29.6 of this Court's rules, Petitioner Stolt-Nielsen Transportation Group Ltd. states that all of its stock is owned by its parent corporation, Petitioner Stolt-Nielsen S.A., a publicly held corporation. Petitioner Stolt-Nielsen S.A. states that it does not have any parent corporation and that no publicly held company owns more than 10% of its stock.

**TABLE OF CONTENTS**

**PAGE(S)**

QUESTION PRESENTED..................................................i

PARTIES TO THE PROCEEDING BELOW ...................ii

RULE 29.6 STATEMENT .................................................ii

TABLE OF AUTHORITIES...............................................v

OPINIONS BELOW .........................................................1

JURISDICTION ................................................................1

CONSTITUTIONAL PROVISIONS ..................................1

STATEMENT OF THE CASE ...........................................2

    1.  The Antitrust Division's Amnesty Program............2

    2.  The Amnesty Agreement Between The Antitrust Division And Stolt-Nielsen .....................................4

    3.  The Antitrust Division's Attempt To Indict Stolt-Nielsen And Wingfield Notwithstanding The Amnesty Agreement.........................................6

    4.  The District Court's Enforcement Of The Amnesty Agreement Through An Injunction Barring Indictments .................................................6

    5.  The Third Circuit's Holding That The District Court Lacked Authority To Enjoin The Indictments ..............................................................8

iv

**TABLE OF CONTENTS (cont'd)**

**PAGE(S)**

REASONS FOR GRANTING THE PETITION ............... 10

I.  THE DECISION OF THE THIRD CIRCUIT CREATES A CONFLICT IN THE CIRCUITS ON AN IMPORTANT CONSTITUTIONAL QUESTION OF JUDICIAL AUTHORITY UNDER THE SEPARATION OF POWERS. ...... 12

    A.  The Seventh Circuit Emphatically Endorses Pre-Indictment Determinations Of Alleged Breaches Of Non-Prosecution Agreements. ... 13

    B.  The Third Circuit Bars Pre-Indictment Determinations Of Alleged Breaches Of Non-Prosecution Agreements. ........................ 17

    C.  In This Modern Era Of Corporate Prosecutions, This Irreconcilable Conflict Between The Circuits Requires This Court's Resolution. ...................................................... 19

II.  THE THIRD CIRCUIT'S "CHILLING EFFECT" STANDARD MISAPPREHENDS THIS COURT'S PRECEDENTS AND ABDICATES JUDICIAL AUTHORITY. ........... 20

    A.  This Court's Precedents Do Not Confine Courts' Authority To Enjoin Prosecutions To Those Having A "Chilling Effect On Constitutional Rights." ..................................... 21

    B.  The U.S. Constitution Binds Prosecutors To Their Agreements With Defendants, Notwithstanding Prosecutorial Discretion. ...... 26

CONCLUSION ............................................................... 30

v
# TABLE OF AUTHORITIES

**CASES**                                                 **PAGE(S)**

*Am. Library Ass'n v. Barr,*
956 F.2d 1178 (D.C. Cir. 1992)......................................22

*Arthur Andersen LLP v. United States,*
544 U.S. 696 (2005) ....................................................19

*Bank of Nova Scotia  v. United States,*
487 U.S. 250 (1988) ................................................ 15-16

*Cavanaugh v. Looney,*
248 U.S. 453 (1919) ....................................................24

*Cleveland Bd. of Educ. v. Loudermill,*
470 U.S. 532 (1985) ....................................................14

*Cohen v. Beneficial Indus. Loan Corp.,*
337 U.S. 541 (1949) ....................................................18

*Dombrowski v. Pfister,*
380 U.S. 479 (1965) ............................................9, 21, 22

*eBay Inc. v. MercExchange, L.L.C.,*
126 S. Ct. 1837 (2006)...................................................24

*Heike v. United States,*
217 U.S. 423 (1910) ....................................................18

*Hynes v. Grimes Packing Co.,*
337 U.S. 86 (1949) ........................................9, 21, 23, 24

*In re Extradition of Drayer,*
190 F.3d 410 (6th Cir. 1999) ...........................................24

*In re Sawyer,*
124 U.S. 200 (1888) ....................................................24

*Midland Asphalt Corp. v. United States,*
489 U.S. 794 (1989) ....................................................18

vi

## TABLE OF AUTHORITIES (cont'd)

**CASES**                                                    **PAGE(S)**

*Parker v. Brown,*
   317 U.S. 341 (1943) .......................................................23

*Santobello v. New York,*
   404 U.S. 257 (1971) ..........................................21, 26, 27

*Smith v. Meese,*
   821 F.2d 1484 (11th Cir. 1987) ......................................29

*Truax v. Raich,*
   239 U.S. 33 (1915) .............................................21, 23, 24

*United States v. Alegria,*
   192 F.3d 179 (1st Cir. 1999)...........................................27

*United States v. Aleman,*
   286 F.3d 86 (2d Cir. 2002) .............................................26

*United States v. Ataya,*
   864 F.2d 1324 (7th Cir. 1988) ...........................13, 15, 16

*United States v. Bailey,*
   34 F.3d 683 (8th Cir. 1994) ............................................18

*United States v. Bielak,*
   660 F. Supp. 818 (N.D. Ind. 1987) ................................13

*United States v. Bird,*
   709 F.2d 388 (5th Cir. 1983) ..........................................18

*United States v. Carter,*
   454 F.2d 426 (4th Cir. 1972) ..........................................28

*United States v. Castaneda,*
   162 F.3d 832 (5th Cir. 1998) ..........................................26

*United States v. Doe,*
   170 F.3d 223 (1st Cir. 1999)...........................................27

vii

**TABLE OF AUTHORITIES (cont'd)**

**CASES**                                                          **PAGE(S)**

*United States v. Eliason,*
   3 F.3d 1149 (7th Cir. 1993) ............................................ 15

*United States v. Hasting,*
   461 U.S. 499 (1983) ....................................................... 16

*United States v. Hernandez,*
   17 F.3d 78 (5th Cir. 1994) .............................................. 27

*United States v. Hogan,*
   862 F.2d 386 (1st Cir. 1988)........................................... 26

*United States v. Lezine,*
   166 F.3d 895 (7th Cir. 1999) ......................................... 27

*United States v. Lieber,*
   473 F. Supp. 884 (E.D.N.Y. 1979) ................................ 28

*United States v. Meyer,*
   157 F.3d 1067 (7th Cir. 1998) ...............................*passim*

*United States v. Minn. Mining & Mfg. Co.,*
   551 F.2d 1106 (8th Cir. 1977) ....................................... 29

*United States v. Paiva,*
   294 F. Supp. 742 (D.D.C. 1969)..................................... 28

*United States v. Smith,*
   976 F.2d 861 (4th Cir. 1992) ......................................... 27

*United States v. Verrusio,*
   803 F.2d 885 (7th Cir. 1986) ................................... 13, 15

*United States v. Watson,*
   988 F.2d 544 (5th Cir. 1993) ......................................... 27

*Wade v. United States,*
   504 U.S. 181 (1992) ....................................................... 27

viii

**TABLE OF AUTHORITIES (cont'd)**

**CASES**                                                 **PAGE(S)**

*Weinberger v. Romero-Barcelo,*
   456 U.S. 305 (1982) ......................................................24

*Younger v. Harris,*
   401 U.S. 37 (1971) ...................................................22, 25

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. III, § 1..........................................................1

U.S. Const. art. III, § 2, cl. 1................................................1

U.S. Const. amend. V ..........................................................2

**STATUTES AND RULES**

28 U.S.C. § 1254(1)...........................................................1

Sup. Ct. R. 29.6..................................................................ii

**ANTITRUST DIVISION MATERIALS**

Corporate Leniency Policy ..................................................2

Grand Jury Practice Manual, Ch. 5, Sec. J .........................3

Model Amnesty Agreement.................................................5

Speech by Assistant Attorney Gen. Antitrust
   Division Anne K. Bingaman (Aug. 10, 1993).................3

Speech by Assistant Attorney Gen. Antitrust
   Division Anne K. Bingaman (Oct. 21, 1993)..................3

Speech by Antitrust Division Director of
   Criminal Enforcement Scott D. Hammond,
   (Sept. 12, 2000) .........................................................2, 20

Speech by Antitrust Division Director of
   Criminal Enforcement Scott D. Hammond,
   (Nov. 21-22, 2000) ........................................... 2-3, 4, 29

ix

**TABLE OF AUTHORITIES (cont'd)**

**ANTITRUST DIVISION MATERIALS**          **PAGE(S)**

Speech by Antitrust Division Director of
  Criminal Enforcement Scott D. Hammond,
  (Mar. 8, 2001) .................................................................4

**OTHER**

Brief for United States as *Amicus Curiae* Supporting
  Petitioners, *F. Hoffman-La Roche Ltd. v.
  Empagran, S.A.*, 542 U.S. 155 (2004) (No. 03-724) ........4

Michael D. Monico & Barry A. Spevack, *Federal
  Criminal Practice: A Seventh Circuit Handbook*
  § 106 (2005) ................................................................13

Lynnley Browning, *U.S. Tactic on KPMG
  Questioned, Judge Criticizes Legal-Fee Cutoff*,
  N.Y. TIMES, June 28, 2006, at C1, C2. ...........................19

## PETITION FOR A WRIT OF CERTIORARI

Petitioners Stolt-Nielsen S.A., Stolt-Nielsen Transportation Group (collectively "Stolt-Nielsen"), and Richard B. Wingfield respectfully petition this Court for a writ of certiorari to review the judgment of the United States Court of Appeals for the Third Circuit.

## OPINIONS BELOW

The opinion of the court of appeals (Pet. App. 1a-21a), as amended (Pet. App. 22a-26a), is reported at 442 F.3d 177 (3d Cir. 2006). The opinion of the district court (together with findings of fact) (Pet. App. 34a-64a) is reported at 352 F. Supp. 2d 553 (E.D. Pa. 2005).

## JURISDICTION

The judgment of the court of appeals was entered on March 23, 2006 and amended on May 16, 2006. A timely petition for rehearing *en banc* was denied on June 20, 2006. The jurisdiction of this Court is authorized by 28 U.S.C. § 1254(1).

## CONSTITUTIONAL PROVISIONS

Article III, Section 1, of the United States Constitution provides in pertinent part: "The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."

Article III, Section 2, Clause 1, of the United States Constitution provides in pertinent part: "The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority; . . . to Controversies to which the United States shall be a Party . . . ."

2

The Fifth Amendment to the United States Constitution provides in pertinent part: "No person shall be . . . deprived of life, liberty, or property, without due process of law . . . ."

## STATEMENT OF THE CASE

This case raises an important constitutional question concerning the authority of federal courts to prevent prosecutors from breaching non-prosecution agreements. The Third Circuit held — in conflict with decisions in another circuit — that, under the Separation of Powers, the district court was powerless to enjoin an imminent federal prosecution in breach of a written Amnesty Agreement, even though the prosecutors had knowingly relinquished their prosecutorial discretion and even though the prosecution would violate the defendants' constitutional rights and cause irreparable injury. In reversing the district court's injunction and permitting an unlawful prosecution to proceed, the Third Circuit effectively abdicated judicial power vested in the federal courts by the United States Constitution.

### 1.    The Antitrust Division's Amnesty Program

The U.S. Department of Justice Antitrust Division has adopted a Corporate Leniency Policy (Pet. App. 72a-75a), under which companies are enticed to voluntarily self-report price-fixing activity in exchange for the Division's promise of "*not charging* such a firm criminally for the activity being reported." Pet. App. 72a (emphasis added). Given the benefit accorded, the Division commonly refers to its policy as an "amnesty" or "immunity" policy. *See, e.g.*, Pet. App. 72a ("The policy also is known as the corporate amnesty or corporate immunity policy."); 98a (Speech by Antitrust Division Director of Criminal Enforcement Scott D. Hammond, Sept. 12, 2000) ("our Corporate Leniency Program, or as it is also known, the Corporate Amnesty Program"); 117a n.1 (Speech by Director Hammond, Nov. 21-22, 2000) ("[C]orporate amnesty and corporate leniency

3

are used interchangeably to mean *a complete pass from criminal prosecution* and zero dollars in fines for the anticompetitive conduct.") (emphasis added).

The Antitrust Division, in its public pronouncements, has since the inception of the Amnesty Program in 1993 emphasized that a company with amnesty would not be indicted or otherwise prosecuted. *See, e.g.*, Pet. App. 88a (Speech by Assistant Attorney General Anne K. Bingaman, Aug. 10, 1993) (announcing adoption of current Corporate Amnesty Policy and equating amnesty to "*not seeking indictment of corporations*") (emphasis added); 94a (Speech by Assistant Attorney General Bingaman, Oct. 21, 1993) (same); 85a (Antitrust Division Grand Jury Practice Manual, Ch. 5 (Immunity), Sec. J (Corporate "Amnesty"), stating that according amnesty to a corporation "means not indicting such a firm").

The Division in its public pronouncements also has expressly recognized that it purposefully relinquishes its prosecutorial discretion through the Amnesty Program:

> [F]or an Amnesty Program to work, an antitrust authority must do more than just publicize its policies and educate the public. It has to be willing to make the ultimate sacrifice for transparency — *the abdication of prosecutorial discretion.*

> Our Amnesty Program by its nature is transparent because we have eliminated, to a great extent, the exercise of prosecutorial discretion in its application.

Pet. App. 126a (emphasis added).

Under the Amnesty Program, amnesty is available only to the first conspirator to report the antitrust conspiracy. Pet. App. 73a. As the Antitrust Division puts it: "The catch is that it is only available to the first one in the door. If you are second, even if only by a matter of a few hours, which has

4

happened on a number of occasions, the second firm and all of its culpable executives will be subject to full prosecution. This 'winner-take-all' approach sets up a race . . . ." Pet. App. 135a-36a (Speech by Antitrust Division Director of Criminal Enforcement Scott D. Hammond, Mar. 8, 2001).

Over the past decade, the Division's Amnesty Program has been a resounding success, leading to the disclosure of numerous cartels and the criminal conviction of numerous corporations and executives. As the United States described in a recent *amicus curiae* brief to this Court, it is precisely because of the Antitrust Division's avowed promise not to prosecute that the Amnesty Program is so attractive to un-indicted companies and is by far the Antitrust Division's most effective tool in "cracking" anti-competitive cartels: *"The program has been responsible for cracking more international cartels than all of the Division's search warrants, secret audio or videotapes, and FBI interrogations combined.* Since 1997, cooperation from amnesty applications has resulted in scores of criminal convictions and more than $1.5 billion in criminal fines." Brief for the United States as *Amicus Curiae* Supporting Petitioners, *F. Hoffman-La Roche Ltd. v. Empagran, S.A.*, 542 U.S. 155 (2004), *available at* 2004 WL 234125, at *20 (emphasis added); *see also, e.g.*, Pet. App. 117a (Speech by Director Hammond, Nov. 21-22, 2000) ("[O]ver the last five years, the results have been staggering. There has been more than a ten-fold increase in amnesty applications . . . .").

## 2. The Amnesty Agreement Between The Antitrust Division And Stolt-Nielsen

Enticed by the promised benefits of amnesty, during late 2002 and early 2003 Stolt-Nielsen sought and received admission into the Antitrust Division's amnesty program. Stolt-Nielsen and the Antitrust Division entered into a letter

5

agreement dated January 15, 2003 (the "Amnesty Agreement") setting forth the terms and conditions of the company's amnesty. Pet. App. 65a-71a. The letter was signed by the Deputy Assistant Attorney General responsible for criminal prosecutions, and countersigned by counsel for Stolt-Nielsen and by the CEO of Stolt-Nielsen's transportation unit. Pet. App. 71a. The Amnesty Agreement is based on, and materially identical to, the Antitrust Division's model amnesty agreement. Pet. App. 76a-81a.

In the Amnesty Agreement, Stolt-Nielsen agreed to voluntarily incriminate itself and others in an antitrust conspiracy in the parcel-tanker shipping industry. Pet. App. 66a-67a. In return, the Antitrust Division agreed "*not to bring any criminal prosecution* against [Stolt-Nielsen] for any act or offense it may have committed prior to the date of this letter [January 15, 2003] in connection with the anticompetitive activity being reported." Pet. App. 68a (emphasis added). The Antitrust Division also agreed that cooperating directors, officers and employees of Stolt-Nielsen "*shall not be prosecuted criminally* by the Antitrust Division for any act or offense committed prior to the date of this letter [January 15, 2003] in connection with the anticompetitive activity being reported." Pet. App. 69a (emphasis added).

After entering into the Amnesty Agreement, Stolt-Nielsen's counsel promptly provided the Antitrust Division with "smoking gun" documents and other information establishing the existence of a hard-core customer-allocation conspiracy. Stolt-Nielsen's counsel obtained the crucial "smoking gun" documents — actual lists used by Stolt-Nielsen and its main competitor, Odfjell Seachem AS, to allocate customers — from Stolt-Nielsen executive Richard B. Wingfield, a petitioner here.

The Antitrust Division subsequently used the evidence obtained from Stolt-Nielsen and Wingfield to successfully

6

prosecute Stolt-Nielsen's co-conspirators.    To date, two
corporate co-conspirators have pleaded guilty and paid fines
totaling $62 million, and top executives at these companies
have also pleaded guilty, paid additional fines, and served
time in federal prison.

### 3. The Antitrust Division's Attempt To Indict Stolt-Nielsen And Wingfield Notwithstanding The Amnesty Agreement

Despite Stolt-Nielsen's voluntary delivery of the evidence
leading to these successful prosecutions, the Antitrust
Division threatened to prosecute Stolt-Nielsen and at least
one of its executives, Wingfield, for their part in the
conspiracy Stolt-Nielsen reported. Pet. App. 64a (¶ 89).  As
the purported justification for its unilateral abrogation of the
grant of amnesty under the Amnesty Agreement, the Division
asserted that Stolt-Nielsen and Wingfield had breached
certain representations or conditions under the Agreement.
Pet. App. 42a-43a, 48a, 63a (¶ 80), 64a (¶¶ 87-89).

On June 24, 2003, Wingfield was arrested and charged
pursuant to a complaint with participating in a customer
allocation conspiracy between March 2001 and October 2002,
a time period specifically covered by the Amnesty
Agreement. Pet. App. 8a, 63a-64a (¶ 86).  The conspiracy
alleged is the very same conspiracy Stolt-Nielsen voluntarily
reported to the Division, with Wingfield's critical assistance.
While arrested and charged, Wingfield has not yet been
indicted. Pet. App. 8a-9a n.1.

### 4. The District Court's Enforcement Of The Amnesty Agreement Through An Injunction Barring Indictments

Stolt-Nielsen commenced a civil action in the district
court to enforce the Antitrust Division's obligations under the
Amnesty Agreement through injunctive or declaratory relief.

7

Pet. App. 9a. Wingfield commenced his own similar action, and the two were consolidated. Pet. App. 9a. The Antitrust Division thereafter agreed to refrain from seeking an indictment until the district court resolved Stolt-Nielsen's claims. Pet. App. 9a.

The district court held a two-day hearing in which it heard testimony from two live witnesses (i.e., the Stolt-Nielsen and Antitrust Division counsel who negotiated and signed the Amnesty Agreement) and considered numerous exhibits and extensive argument. On January 14, 2005, the district court issued a memorandum opinion, detailed findings of fact, and a judgment in favor of Stolt-Nielsen and Wingfield. Pet. App. 34a-64a. Finding that Stolt-Nielsen and Wingfield had not breached the Amnesty Agreement, the district court enforced the Amnesty Agreement by enjoining the Division from indicting or otherwise prosecuting Stolt-Nielsen and Wingfield for their roles in the anticompetitive activity prior to January 15, 2003. Pet. App. 51a.

In its opinion, the district court expressly considered the appropriateness of ruling upon such an issue prior to an indictment being brought. The district court concluded that it was appropriate to rule upon the issue prior to an indictment because, otherwise, "if an indictment were later determined to have been wrongfully secured, it would be too late to prevent the irreparable consequences." Pet. App. 45a. The district court added:

> Our decision is guided by the Seventh Circuit which observed that "[t]he preferred procedure, absent exigent circumstances, would be for the government to seek relief from its obligations under the immunity agreement prior to indictment." [*United States v. Meyer*, 157 F.3d 1067, 1077 (7th Cir. 1998).] The court reasoned that the burden on the government to obtain a pre-indictment judicial determination is

8

> minimal because the government must eventually obtain one. *Id.* Resolving the issue of whether SNTG was in material breach of the agreement and whether DOJ is bound by the agreement now at the pre-indictment stage ensures that SNTG is afforded the requisite due process without imposing an undue burden on the government.

Pet. App. 45a-46a (footnote omitted).

In agreeing to refrain from bringing an indictment until the district court had resolved Stolt-Nielsen's and Wingfield's claims, the Division here essentially acquiesced in what the Seventh Circuit termed "[t]he preferred procedure."

### 5. The Third Circuit's Holding That The District Court Lacked Authority To Enjoin The Indictments

On the Antitrust Division's appeal, a two-judge panel of the Third Circuit reversed, *solely* on the legal basis that the district court did not have "authority" to enjoin the Executive Branch from filing an indictment under the circumstances of this case. The panel remanded with instructions that the district court dismiss the complaints with prejudice. Petitions for rehearing *en banc* were denied (but not before the panel made substantial modifications to the analysis in its opinion). Pet. App. 30a-31a, 22a-25a.

At the very outset of its opinion, the panel acknowledged: "This case raises a significant constitutional question of first impression in this Circuit: whether federal courts have authority, consistent with the separation of powers, to enjoin the executive branch from filing an indictment." Pet. App. 4a. On this critical question of judicial "authority" under the Constitution, the panel began by acknowledging decisions of this Court finding that federal courts do have authority to enjoin federal prosecutions in certain circumstances. Pet.

9

App. 23a (citing, *inter alia*, *Dombrowski v. Pfister*, 380 U.S. 479 (1965), and *Hynes v. Grimes Packing Co*., 337 U.S. 86 (1949)).    The panel, however, read those decisions as supporting authority to enjoin prosecutions only "to avoid a chilling effect on constitutional rights." Pet. App. 12a (as amended by Pet. App. 23a).    The panel concluded that the authority of federal courts to enjoin prosecutions does not extend to circumstances in which a non-prosecution agreement is about to be breached.

The panel acknowledged the district court's reliance upon the Seventh Circuit decision in *Meyer*, and also acknowledged the declaration in *Meyer* that a pre-indictment determination of immunity under a non-prosecution agreement was not only authorized, but was "the preferred procedure, absent exigent circumstances."    Pet. App. 13a. The panel even stated that it had "no quarrel" with the Seventh Circuit's observation that "in many circumstances" a pre-indictment determination of the parties' obligations under an immunity agreement "might be useful." Pet. App. 14a (as amended by Pet. App. 24a).   Nevertheless, the panel declined to follow the Seventh Circuit, characterizing *Meyer*'s preferred procedure as "*dicta*" given that the Seventh Circuit determined that the agreement in that case entitled the defendant only to a judicial determination prior to conviction rather than prior to indictment.

The panel went on to treat the Amnesty Agreement here as a protection against conviction rather than against indictment and trial. Pet. App. 14a-21a.  In support of this treatment, the panel relied heavily upon cases denying an interlocutory appeal upon the denial of a post-indictment motion to dismiss based on an assertion of statutory or contractual immunity. Pet. App. 14a-15a, 19a-20a.   The panel viewed these cases as "instructive because they reinforce the narrowness of a defendant's ability to challenge

10

the Government's decision to pursue a prosecution." Pet. App. 18a.

While the panel acknowledged that its interpretation of non-prosecution agreements "may seem counterintuitive" (Pet. App. 17a), the panel did not attempt to reconcile this interpretation with the substantial and undisputed evidence here that the Antitrust Division enticed Stolt-Nielsen into the amnesty program and the Amnesty Agreement with the explicit promise that Stolt-Nielsen would be free from criminal prosecution, including indictment. Nor did the panel attempt to reconcile its interpretation with the substantial and undisputed evidence that the Division had purposefully elected to exercise and relinquish its prosecutorial discretion in the amnesty program and the Amnesty Agreement.

The panel also asserted that "simply being indicted and forced to stand trial is not generally an injury for constitutional purposes." Pet. App. 15a. The panel added: "[T]he District Court's finding that Stolt-Nielsen and Wingfield would be irreparably harmed by an indictment does not bring this case within the ambit of the cases in which injunctions against indictment and trial have been approved." Pet. App. 16a n.5.

## REASONS FOR GRANTING THE PETITION

In holding that federal courts lack authority to enjoin prosecutors from breaching non-prosecution agreements, the Third Circuit decision creates an irreconcilable conflict with the Seventh Circuit on an important constitutional question under the Separation of Powers. Furthermore, contrary to the Third Circuit's suggestion, the Seventh Circuit's recognition of pre-indictment judicial authority cannot be dismissed as mere *dicta* in a single case, because the Seventh Circuit has repeatedly and emphatically instructed district courts and prosecutors in that circuit to conduct pre-indictment judicial proceedings, and these courts and prosecutors have heeded

11

the instruction to such an extent that such proceedings are the accepted practice within the Seventh Circuit.

The conflict created here is starkly illustrated by the proceedings in this very case, where the district court followed the Seventh Circuit rule in issuing an injunction only to have the Third Circuit reverse by adopting the new Third Circuit rule.  As the Third Circuit decision was made purely as a matter of constitutional law, the conflict is squarely and discretely presented by this petition.  Unless this Court resolves the conflict, disparate results, prosecutorial overreaching, and cynical forum-shopping are sure to ensue.  These problems will recur not only in the important context of the Antitrust Division's Amnesty Program, but in any situation where prosecutors choose to enter into an agreement not to indict.

Finally, beyond the conflict on this important constitutional issue under the Separation of Powers, this petition raises other important issues central to this modern era in which corporations and their executives frequently find themselves in the cross-hairs of prosecutors.  The Third Circuit blithely disregarded an express, bargained-for contractual promise not to prosecute, on the grounds that "simply being indicted" is unworthy of judicial protection.  Such a conclusion not only re-writes the parties' bargain and ignores the due process interests created by the prosecutors' contractual promise, but is decidedly out of date in an era in which a "simple indictment" can cause irreparable or even ruinous injury to a corporation and its varied constituents.  In fact, avoiding such potential ruin was an essential part of the enticement the Antitrust Division offered in order to obtain valuable evidence from Stolt-Nielsen here.

12

## I. THE DECISION OF THE THIRD CIRCUIT CREATES A CONFLICT IN THE CIRCUITS ON AN IMPORTANT CONSTITUTIONAL QUESTION OF JUDICIAL AUTHORITY UNDER THE SEPARATION OF POWERS.

The decision by the Third Circuit here creates a conflict with the Seventh Circuit as to whether federal courts have the authority to prevent federal prosecutors from breaching non-prosecution agreements. Under the Third Circuit rule, federal courts are categorically powerless to consider prior to indictment whether a threatened prosecution would violate a non-prosecution agreement. Under the Seventh Circuit rule, in contrast, federal courts not only have the authority to determine whether a threatened prosecution would violate a non-prosecution agreement, but such a pre-indictment determination is emphatically endorsed as the "preferred procedure." Indeed, the Seventh Circuit has indicated that it views pre-indictment consideration as *required* in certain circumstances (i.e., where, as here, a defendant is promised not to be indicted).

Here, the district court expressly followed the Seventh Circuit rule by considering, prior to the threatened indictment of Petitioners, whether the Antitrust Division would be breaching the Amnesty Agreement in bringing the indictment. The district court found that the Division would be breaching the Amnesty Agreement, and enjoined the Division from doing so. In reversing, the Third Circuit declined to follow the Seventh Circuit rule, mistakenly considering it to be mere "*dicta.*" In fact, the Seventh Circuit, in exercise of its supervisory powers, has consistently directed the courts and prosecutors in its jurisdiction to conduct pre-indictment proceedings to address alleged breaches of non-prosecution agreements (except in exigent circumstances). This case thus presents a bona fide and irreconcilable conflict between the

13

circuits on an important constitutional question under the Separation of Powers.

### A. The Seventh Circuit Emphatically Endorses Pre-Indictment Determinations Of Alleged Breaches Of Non-Prosecution Agreements.

The Seventh Circuit has over the course of the last two decades repeatedly endorsed pre-indictment judicial proceedings over an alleged breach of a non-prosecution agreement as the "preferred procedure." *United States v. Meyer*, 157 F.3d 1067, 1077 (7th Cir. 1998); *see also United States v. Ataya*, 864 F.2d 1324, 1330 n.9 (7th Cir. 1988) ("We now state our unqualified belief that such a [pre-indictment] procedure is most proper."); *United States v. Verrusio*, 803 F.2d 885, 889 (7th Cir. 1986) (describing pre-indictment determinations as the "better procedure").

Indeed, such pre-indictment proceedings are enshrined as accepted procedure in the Seventh Circuit. *E.g.*, *Verrusio*, 803 F.3d at 889-90 n.3 (7th Cir. 1986) ("We further note that a number of plea agreements that have appeared before this court expressly provide a particular procedure that the government must follow if it seeks to reindict the defendant. For example, one such agreement calls for the government to offer the defendant an opportunity to correct any breach on his part before the government can reindict him."); *United States v. Bielak*, 660 F. Supp. 818, 820 (N.D. Ind. 1987) (describing the pre-indictment determination that occurred in the case as the "proper procedure" in the Seventh Circuit); Michael D. Monico & Barry A. Spevack, *Federal Criminal Practice: A Seventh Circuit Handbook* § 107 (2005) ("[T]he favored procedure in these circumstances is for the government to secure a judicial determination that the defendant breached the immunity agreement pre-indictment.") (citing *Meyer*, 157 F.3d at 1077).

14

In the most recent Seventh Circuit case on the issue, *Meyer*, a defendant entered an immunity agreement with the Government in exchange for cooperation. Because the defendant already had been indicted, the agreement provided for dismissal of the indictment. Subsequently, the Government asserted that the defendant had breached the agreement, and the Government re-indicted him. Asserting the immunity agreement, the defendant moved to dismiss the indictment, and the district court denied his motion, finding that he had breached the agreement. On appeal after his conviction, the defendant argued that due process required a *pre*-indictment determination of whether he had breached his immunity agreement.

The Seventh Circuit reasoned that a "fundamental requirement of the due process clause is that an individual receive notice and the opportunity for a hearing before he is deprived of a significant property interest." *Meyer*, 157 F.3d at 1076 (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (holding that a pre-deprivation hearing is the "root requirement" of due process)).

The Seventh Circuit specified that:

With respect to immunity agreements, due process "requires prosecutors to scrupulously adhere to commitments made to suspects in which they induce the suspects to surrender their constitutional rights in exchange for the suspects giving evidence that the government needs against others which simultaneously implicates themselves." . . .

*Absent exigent circumstances, an individual is entitled to a judicial determination of his breach*

15

> *before being deprived of his interest in the*
> *enforcement of an immunity agreement.*

*Meyer*, 157 F.3d at 1076 (quoting *United States v. Eliason*, 3 F.3d 1149, 1153 (7th Cir. 1993), and citing *Verrusio*, 803 F.2d at 888 (7th Cir. 1986)) (emphasis added).

The Seventh Circuit proceeded to hold that the relevant defendant in that case, Hoff, was not entitled to a pre-indictment determination and that a post-indictment, pretrial determination sufficed where he already had been under indictment when he entered the agreement and, therefore, the agreement protected him from the "risk of conviction" rather than indictment. *Meyer*, 157 F.3d at 1077; *see also id.* ("Hoff's agreement provided that, in exchange for Hoff's performance, the government would dismiss the charge currently pending against him . . . .").

Critically, the Seventh Circuit emphasized that although a post-indictment determination was sufficient for that particular defendant on those facts, the court was reiterating a rule in favor of pre-indictment determinations:

> [W]e again stress that, in cases such as these, the *preferred procedure*, absent exigent circumstances, would be for the government to seek relief from its obligations under the immunity agreement *prior to indictment*. Since the government is required to obtain a judicial determination of a defendant's breach prior to trial, it is but a *de minimis* inconvenience for the government to secure that determination pre-indictment.

*Meyer*, 157 F.3d at 1077 (citing *Ataya*, 864 F.2d at 1330 n.9 (7th Cir. 1988)). The Seventh Circuit plainly was repeating an instruction, pursuant to its supervisory powers, to the district courts and federal prosecutors within its jurisdiction. *See generally Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988) ("In the exercise of its supervisory authority,

16

a federal court 'may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress.'") (quoting *United States v. Hasting*, 461 U.S. 499, 505 (1983)).

The Seventh Circuit expounded the salutary effects of its rule: "A pre-indictment hearing would *curtail prosecutorial overreaching in drafting ambiguous immunity agreements* and, in cases in which the defendant had fulfilled his obligations under the agreement, would help to prevent the government from using the threat of criminal prosecution 'to achieve by coercion what it could not achieve through voluntary negotiation.'" *Meyer*, 157 F.3d at 1077 (quoting *Ataya*, 864 F.2d at 1330 n.9 (7th Cir. 1988)) (emphasis added).

Thus, in *Meyer*, the Seventh Circuit explained its rule that "an individual is entitled to a judicial determination of his breach before being deprived of his interest in the enforcement of an immunity agreement." 157 F.3d at 1076. An un-indicted corporation that is enticed into self-reporting illegal conduct under an Amnesty Agreement in which the Government promises "not to bring any criminal prosecution" against the corporation or its executives plainly possesses the interest the Seventh Circuit crafted its rule to protect — particularly where the Government repeatedly publicizes "amnesty" as meaning "not seeking indictment of corporations," Pet. App. 88a, 94a.

Furthermore, the Seventh Circuit's rule necessarily recognizes federal courts' authority to enforce the outcomes of their pre-indictment determinations — a result at loggerheads with the Third Circuit's holding in this case that the district court "lacked authority" to enforce its pre-indictment determination of the enforceability of the Amnesty Agreement. Pet. App. 21a.

17

**B. The Third Circuit Bars Pre-Indictment Determinations Of Alleged Breaches Of Non-Prosecution Agreements.**

In this case, the district court relied on *Meyer* to hold that, given the Antitrust Division's promise "not to bring any criminal prosecution against [Stolt-Nielsen]," the requisite judicial determination whether the Amnesty Agreement had been breached had to occur *pre*-indictment.  Pet. App. 45a (citing *Meyer*, 157 F.3d at 1077).

The district court proceeded to enjoin the Antitrust Division from bringing an indictment against Petitioners, based on the court's pre-indictment finding that Petitioners had *not* breached the Amnesty Agreement.  Pet. App. 49a. The Third Circuit reversed solely on the question of the district court's authority to have issued the injunction: "[W]e conclude that that District Court lacked authority to employ the extraordinary remedy of enjoining the Government's indictments of Stolt-Nielsen and Wingfield." Pet. App. 21a.

The Third Circuit never reached the merits of whether Petitioners had breached or complied with the Amnesty Agreement.  (Thus, no factual issues obscure the legal issue presented here.)  Instead, the reversal turned entirely on the timing of the district court's decision (i.e., pre-indictment). Indeed, the Third Circuit invited Petitioners to invoke the Amnesty Agreement post-indictment:  "Stolt-Nielsen and Wingfield may interpose the Agreement (as a defense to conviction) in a pre-trial motion." Pet. App. 19a.

The Third Circuit based its rule against pre-indictment determinations on the Separation of Powers, and allowed only a narrow exception that the court held did not apply to this case:  "Separation-of-power concerns thus counsel against using the extraordinary remedy of enjoining the Government from filing the indictments. *Although courts have carved out a narrow exception to this rule in those cases in which the*

18

*very act of filing an indictment may chill constitutional rights, this case does not implicate that concern.*" Pet. App. 20a & 24a (amended opinion) (emphasis added).

As additional support for barring pre-indictment determinations, the Third Circuit misplaced reliance upon three cases denying interlocutory appeals from post-indictment motions to dismiss that had asserted a right not to be prosecuted. Pet. App. 14a-15a (citing *Heike v. United States*, 217 U.S. 423, 431 (1910); *United States v. Bailey*, 34 F.3d 683, 690-91 (8th Cir. 1994); *United States v. Bird*, 709 F.2d 388, 392 (5th Cir. 1983)). While not apparent from the Third Circuit's decision, the relevance of those cases is confined to the special circumstances of the "collateral order" doctrine of *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949), and the federal interest in strictly limiting interlocutory appeals in pending criminal cases. *See Heike*, 217 U.S. at 433 ("[T]he effect of the immunity statute in question is *not to change the system of appellate procedure* in the Federal courts, and give a right of review before final judgment in a criminal case . . . .") (emphasis added); *Bailey*, 34 F.3d at 691 ("[W]e hesitate to create a new collateral order exception *sua sponte* in light of the Supreme Court's clear intent to limit use of the exception."); *Bird*, 709 F.2d at 392 (same). *See generally Midland Asphalt Corp. v. United States*, 489 U.S. 794, 799, 801 (1989) ("We have interpreted the collateral order exception 'with the utmost strictness' in criminal cases"; "A right not to be tried in the sense relevant to the *Cohen* exception rests upon explicit statutory or constitutional guarantee that trial will not occur . . . .").

The Third Circuit thus bars pre-indictment determinations of the type that have been repeatedly endorsed as the "preferred procedure" in the Seventh Circuit. *Meyer*, 157 F.3d at 1077. Parties holding agreements not to indict have fundamentally different rights in the Seventh Circuit than in the Third. Unquestionably, the Seventh Circuit would have

19

reached the *opposite outcome* in this case — i.e., it would have affirmed the authority of the district court to enjoin the Antitrust Division — and that is the *touchstone for genuine conflict*.

### C. In This Modern Era Of Corporate Prosecutions, This Irreconcilable Conflict Between The Circuits Requires This Court's Resolution.

In cases like this one, where the putative defendant is enticed by a promise of amnesty for a corporation and its directors, officers, and employees, Pet. App. 67a-69a, and the Government repeatedly and publicly describes "amnesty" as "not seeking indictment," *e.g.*, Pet. App. 85a, 94a, the putative defendant has a bargained-for interest in avoiding not only conviction, but indictment. In the Seventh Circuit, that type of interest can be protected by a pre-indictment determination of whether the non-prosecution agreement is enforceable or has been breached. In the Third Circuit, by contrast, the putative defendant must first be subjected to indictment and only subsequently learn through a post-indictment motion to dismiss whether the non-prosecution agreement is enforceable. By then, of course, the defendant will have suffered through the very experience it contracted to avoid — without any hope of ever being made whole.

In the modern era, indictment alone can destroy an individual's livelihood or company's business, while the ultimate determination of criminal liability can be far less important — as exemplified by Arthur Andersen's abrupt ruin despite the ultimate reversal of conviction by this Court. *See Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005). Indeed, today's headlines are rife with other illustrations of the potential for an indictment to ruin a profitable enterprise: "An indictment is often a death knell for a company, as it was for KPMG's rival, Arthur Andersen." Lynnley Browning, *U.S. Tactic On KPMG Questioned, Judge Criticizes Legal-Fee Cutoff,* N.Y. TIMES, June 28, 2006, C1, C2.

20

This potential for financial ruin is particularly true in antitrust cases. The past two decades have seen a marked escalation of corporate antitrust fines. Fines of $500 million have been obtained, through guilty pleas, using evidence secured through the Amnesty Program. Pet. App. 101a. Antitrust Division officials boast that by preying on companies' fears of devastating fines the Division drives companies into the Amnesty Program. *E.g.*, Pet. App. 103a (Speech by Antitrust Division Director of Criminal Enforcement Scott D. Hammond, Sept. 12, 2000) ("When we revised our Amnesty Program, we sweetened the carrot by increasing the opportunities and incentives for companies to self report and cooperate. At the same time, our recent record of successful prosecutions and heavy sentences has sharpened the stick for companies who risk the alternative path.").

Given that reality, a conflict in the circuits over whether courts have the authority to determine the enforceability of non-prosecution agreements prior to indictment is intolerable, particularly for multi-circuit actors, like Petitioners, who potentially are subject to prosecution in either the Third or Seventh Circuits. Undoubtedly, this circuit conflict will encourage prosecutors to forum shop in favor of the Third Circuit when possible. Furthermore, the conflict here is fully developed, devoid of any necessity to resolve factual issues, and ripe for this Court's resolution.

## II. THE THIRD CIRCUIT'S "CHILLING EFFECT" STANDARD MISAPPREHENDS THIS COURT'S PRECEDENTS AND ABDICATES JUDICIAL AUTHORITY.

In holding that federal courts have authority to enjoin federal prosecutions only where the prosecutions have a "chilling effect" on the exercise of constitutional rights, the Third Circuit erred in at least two fundamental respects. First, the "chilling effect" standard misapprehends this Court's precedents on when courts can enjoin prosecutions.

21

Second, and more fundamentally, the Third Circuit derived its "chilling effect" standard from the entirely wrong source of law to determine whether courts have the authority to adjudicate the enforceability of non-prosecution agreements pre-indictment. While the Third Circuit looked to this Court's general precedents on enjoining prosecutions, the dispositive body of law is *Santobello v. New York*, 404 U.S. 257 (1971), and its progeny governing the enforceability of agreements between prosecutors and defendants under the Due Process Clause.

### A. This Court's Precedents Do Not Confine Courts' Authority To Enjoin Prosecutions To Those Having A "Chilling Effect On Constitutional Rights."

The Third Circuit relied on three of this Court's precedents as support for its holding that courts are authorized to enjoin prosecutions only "to avoid a chilling effect on constitutional rights." Pet. App. 12a (as amended by Pet. App. 23a) (citing *Dombrowski v. Pfister*, 380 U.S. 479, 486-87 (1965); *Hynes v. Grimes Packing Co.*, 337 U.S. 86, 98-99 (1949); *Truax v. Raich*, 239 U.S. 33, 38-39 (1915)). These precedents, either individually or collectively, do not support such a standard.

In *Dombrowski*, this Court addressed an injunctive action against the threatened criminal enforcement of a subversive activities law. A three-judge district court dismissed the action on abstention grounds and the Court reversed, noting in broad terms that an injunction was appropriate because the threatened prosecution chilled First Amendment rights:

> A criminal prosecution under a statute regulating expression usually involves imponderables and contingencies that themselves may inhibit the full exercise of First Amendment freedoms. . . . The assumption that defense of a criminal prosecution will

22

generally assure ample vindication of constitutional rights is unfounded in such cases. . . . [W]e have not thought that the improbability of successful prosecution makes the case different. The *chilling effect upon the exercise of First Amendment rights* may derive from the fact of the prosecution, unaffected by the prospects of its success or failure.

*Dombrowski*, 380 U.S. at 486-87 (emphasis added).

Soon after *Dombrowski*, this Court clarified in *Younger v. Harris*, 401 U.S. 37 (1971), that *Dombrowski* does *not* stand for the proposition that First Amendment rights are elevated to dispositive significance above traditional bases for equitable relief when federal courts entertain injunctions of criminal prosecutions: "We recognize that there are some statements in the *Dombrowski* opinion that would seem to support this argument. But, as we have already seen, such statements were unnecessary to the decision of that case, because the Court found that the plaintiffs had alleged *a basis for equitable relief under the long-established standards.*" 401 U.S. at 50 (emphasis added); *see, e.g., Am. Library Ass'n v. Barr*, 956 F.2d 1178, 1188 (D.C. Cir. 1992) (noting "the Supreme Court's later restrictions of the broad implications of *Dombrowski*, notably in *Younger v. Harris*").

Nonetheless, in this case, the Third Circuit block-quotes the language above from *Dombrowski* and, in the panel's original opinion, expressly misreads *Dombrowski* as confining to the First Amendment context the authority of federal courts to enjoin criminal prosecutions. *See* Pet. App. 13a ("The question thus becomes whether, in those cases not concerning *First Amendment rights*, the authority to enforce cooperation or immunity agreements may be exercised pre-indictment in the form of an injunction.") (original opinion) (italics added).

23

Subsequently, "in response to a meritorious argument raised in Stolt-Nielsen's petition [for rehearing *en banc*]," Pet. App. 28a, the panel amended its opinion by removing the First Amendment limitation and announcing its current "chilling effect on constitutional rights" standard. Pet. App. 24a (amended opinion). In further response to Petitioners' arguments in their petitions for rehearing, the panel added its current citations to *Hynes* and *Truax*, (Pet. App. 12a (as amended by Pet. App. 23a)), which Petitioners had noted were ignored by the panel despite having been discussed prominently in Petitioners' merits briefs.

In *Hynes*, salmon canners sought an injunction of a threatened criminal prosecution under a Department of Interior regulation prohibiting fishing in certain coastal waters without obtaining a license and obeying certain restrictions of a local Native American tribe. 337 U.S. at 97-101. The canners argued that they could not challenge the regulation "in an ordinary criminal proceeding" without risking the seizure of their fishing equipment and other harmful penalties under the regulation. *Id.* at 99.

This Court affirmed the injunction of the prosecution, holding: "While ordinarily criminal prosecutions will not be restrained even under an invalid statute, a civil action will lie in exceptional circumstances that make an *injunction necessary to effectually protect property rights*." *Id.* at 98-99 (emphasis added). The Court added: "the '*danger of irreparable loss is both great and immediate*' and properly calls forth the jurisdiction of the court of equity." *Id.* at 100 (quoting *Parker v. Brown*, 317 U.S. 341, 349 (1943)) (emphasis added).

This Court reasoned similarly in *Truax*. In that case, an alien sought an injunction against the criminal prosecution of his employer under Arizona's law prohibiting the employment of aliens. 239 U.S. at 36. Threatened with imminent prosecution under the act, the employer had, in

24

turn, threatened to fire the alien. The Court held: "[W]hile a court of equity, generally speaking, has 'no jurisdiction over the prosecution, the punishment, or the pardon of crimes or misdemeanors,' a distinction obtains, and equitable jurisdiction exists to restrain criminal prosecutions under unconstitutional enactments, *when the prevention of such prosecutions is essential to the safeguarding of rights of property.*" *Id.* at 37-38 (emphasis added) (quoting *In re Sawyer*, 124 U.S. 200, 210 (1888)).

Thus, as a first principle, courts' injunctive powers lie foremost for the protection of property rights. For a more recent case affirming the vitality of this first principle, see, for example, *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("An injunction should issue only where the intervention of a court of equity 'is essential to effectually to *protect property rights* against injuries otherwise irremediable.'") (quoting *Cavanaugh v. Looney*, 248 U.S. 453, 456 (1919)) (emphasis added). Notably, just this Term, the Court relied on *Weinberger* for the appropriate standard for permanent injunctive relief. *eBay Inc. v. MercExchange, L.L.C.*, 126 S. Ct. 1837, 1839 (2006).

*Hynes* and *Truax* exemplify that this first principle applies with equal force when the subject of the injunctive action is a threatened criminal prosecution. Yet, despite adding citations to *Hynes* and *Truax* to its amended opinion, the Third Circuit ignored entirely the holdings in those cases regarding property rights. Indeed, despite Petitioners' vigorous advocacy of the point, *the term "property rights" does not even appear in the Third Circuit's opinion.* Oddly, the Third Circuit viewed Petitioners' constitutionally protected property rights in the Amnesty Agreement as unworthy of protection because an indictment would have *destroyed* those rights rather than merely *chilled* them.

Thus, the Third Circuit misapprehended the law by ignoring the core injunctive function of protecting property

25

rights and, moreover, by holding that a "chilling effect on constitutional rights" is a prerequisite to enjoining a prosecution. That misapprehension of the law follows directly from the Third Circuit's reliance on the First Amendment statements in *Dombrowksi* that this Court clarified in *Younger v. Harris*. Indeed, the Third Circuit's "chilling effect" standard is plainly a remnant of its original, but subsequently amended First Amendment-only standard. *See* Pet. App. 28a.

Furthermore, the Third Circuit's misapprehension of the law was outcome-determinative in this case because the court foreclosed Petitioners' ability to obtain injunctive relief due to the purported absence of a "chilling effect": "Although courts have carved out a narrow exception to this rule in those cases in which the very act of filing an indictment may chill constitutional rights, this case does not implicate that concern." Pet. App. 20a (as amended by Pet. App. 24a).

Likewise, the Third Circuit ignored Petitioners' property rights in the Amnesty Agreement despite the court's view that Petitioners had demonstrated a danger of irreparable harm from the Antitrust Division's threatened indictment and revocation of the Amnesty Agreement:

> We note that the District Court's finding that Stolt-Nielsen and Wingfield would be irreparably harmed by an indictment does not bring this case within the ambit of the cases in which injunctions against indictment and trial have been approved.

Pet. App. 16a n.5.

The Third Circuit thus announced a clean, stark, and *incorrect rule of law* limiting federal courts' authority to enjoin federal prosecutions to circumstances involving a "chilling effect on constitutional rights."

26

**B.  The U.S. Constitution Binds Prosecutors To Their Agreements With Defendants, Notwithstanding Prosecutorial Discretion.**

This Court held in *Santobello v. New York*, 404 U.S. 257, 262 (1971), that due process binds prosecutors to the terms of agreements bargained with defendants: "[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." This Court thereby made clear that prosecutors' promises are worthy of the highest constitutional protections by federal courts. *E.g.*, *United States v. Aleman*, 286 F.3d 86, 90 (2d Cir. 2002) ("[D]ue process not only requires that the government adhere to the terms of any plea bargain or immunity agreement it makes, but also requires [the court] to construe agreements strictly against the government in recognition of its superior bargaining power . . . .") (citation and internal quotation marks omitted); *United States v. Hogan*, 862 F.2d 386, 388 (1st Cir. 1988) ("*Santobello* and its progeny proscribe not only explicit repudiation of the government's assurances, but must in the interests of fairness be read to forbid end-runs around them.") (citation and internal quotation marks omitted).

Courts uniformly apply *Santobello*'s directive beyond plea agreements to immunity, cooperation, and other non-prosecution agreements. *E.g.*, Pet. App. 13a ("It is also well established that the Government must adhere strictly to the terms of agreements with defendants — including plea, cooperation, and immunity agreements . . . .") (citing *Santobello*); *In re Extradition of Drayer*, 190 F.3d 410, 412 (6th Cir. 1999) ("[*Santobello*'s] logic has been extended to immunity agreements and to cooperation agreements[.]"); *United States v. Castaneda*, 162 F.3d 832, 835 (5th Cir. 1998) ("Nonprosecution agreements, like plea bargains, are contractual in nature, and are therefore interpreted in

27

accordance with general principles of contract law."); *United States v. Smith*, 976 F.2d 861, 863 (4th Cir. 1992) ("In interpreting immunity agreements, as with plea agreements, we must be mindful of the fact that the defendant's underlying contract right is constitutionally based and therefore reflects concerns that differ fundamentally from and run wider than those of commercial contract law.") (citation and internal quotation marks omitted).

A necessary corollary to *Santobello*'s directive is that in reaching binding agreements with defendants, prosecutors bargain away Executive Branch discretion. *E.g., Wade v. United States*, 504 U.S. 181, 185 (1992) (noting that, under *Santobello*, a prosecutor's discretion would have been "superseded" by a plea agreement) (citing *Santobello*, 404 U.S. at 262-63); *United States v. Alegria*, 192 F.3d 179, 182 (1st Cir. 1999) ("As a general rule, nothing precludes a prosecutor from bargaining away something over which he has discretion in return for promises extracted from a criminal defendant."); *United States v. Doe*, 170 F.3d 223, 226, (1st Cir. 1999) ("The government can, under *Santobello*, limit itself by contract . . . ."); *United States v. Lezine*, 166 F.3d 895, 901 (7th Cir. 1999) ("[T]he Government limits its discretion when it enters into a plea agreement . . . ."); *United States v. Hernandez*, 17 F.3d 78, 82 (5th Cir. 1994) (holding that "discretion . . . can be bargained away by the government in a plea agreement"); *United States v. Watson*, 988 F.2d 544, 552 (5th Cir. 1993) ("Implicit in [*Santobello*'s] holding is the fact that the government may bargain away its discretion.").

Because such agreements result from prosecutors sacrificing prosecutorial discretion in exchange for prosecutorial objectives, the Separation of Powers does *not* impede courts' ability to enforce such agreements. *E.g., Santobello*, 404 U.S. at 262-63 (holding that defendant who had "'bargained' and negotiated for a particular plea" was entitled to a judicial order for "specific performance of the

28

agreement"); *United States v. Carter*, 454 F.2d 426, 427-28 (4th Cir. 1972) ("If, after having utilized its discretion to strike bargains with potential defendants, the Government seeks to avoid those arrangements by using the courts, its decision so to do will come under scrutiny.") (quoting *United States v. Paiva*, 294 F. Supp. 742, 747 (D.D.C. 1969)) (internal quotation marks omitted); *United States v. Lieber*, 473 F. Supp. 884, 895 (E.D.N.Y. 1979) ("Ordering specific performance of the [plea] agreement does not constitute an interference with the functioning of the executive branch, any more than would ordering specific performance of a Government procurement contract. . . . It would be difficult to imagine a situation in which the court could justify, in a vacuum, an order that the executive branch purchase those goods. Yet, it is just as certain that if the executive did enter into such a contract and then breached it, the court could order its performance.").

Furthermore, there is nothing talismanic about the Government's power to bring indictments that prevents the Government from bargaining away that discretion. In an early corporate amnesty case, the Eighth Circuit held that federal prosecutors "breached" a non-prosecution agreement simply by bringing an indictment:

> Here, the Government urged corporations to voluntarily come forth and admit to and document illegal campaign contributions with the promise that such voluntary action might mitigate their criminal liability. 3M officials accepted this governmental overture and proceeded to fully divulge the nature and extent of their illegal activity. As we have indicated, the agreement between 3M and the Government contained a promise that the Government would forego future criminal prosecution of 3M and its officials for all matters arising out of the illegal political contribution scheme. This was not a

29

traditional plea bargain arrangement in which the trial judge was a participant. Rather, it was a prosecutorial agreement, the inviolability of which rested completely in the province of the government prosecutors, who have the sole power and responsibility to institute criminal proceedings. *The Government breached this promise by returning the present indictment against defendants.*

*United States v. Minn. Mining & Mfg. Co.*, 551 F.2d 1106, 1111-12 (8th Cir. 1977) (citation omitted) (emphasis added).

The Eleventh Circuit, too, has recognized that federal courts have the authority — indeed, the duty — to review the decisions of prosecutors that impact constitutional rights, despite prosecutors' invocation of the Separation of Powers doctrine. *Smith v. Meese*, 821 F.2d 1484, 1492 (11th Cir. 1987) ("The [federal prosecutor] defendants cannot cloak constitutional violations under the guise of prosecutorial discretion and expect the federal courts simply to look the other way.").

Here, not only did the Antitrust Division bargain away its prosecutorial discretion in the Amnesty Agreement, but the Division expressly touted its Amnesty Program as a purposeful relinquishment of its prosecutorial discretion. Pet. App. 126a (Speech by Antitrust Division Director of Criminal Enforcement Scott D. Hammond, Nov. 21-22, 2000) ("Our Amnesty Program by its nature is transparent because we have eliminated to a great extent, the exercise of prosecutorial discretion in its application."). Under these circumstances, the Division should not be heard to argue that its contractual promises are unenforceable under the Separation of Powers.

30

## CONCLUSION

For the foregoing reasons, the petition for a writ of certiorari should be granted.

Respectfully submitted,

ALLEN D. BLACK
  *Counsel of Record*
ROBERTA D. LIEBENBERG
GERARD A. DEVER
FINE, KAPLAN AND BLACK
1835 Market Street
Philadelphia, PA 19103
(215) 567-6565

CHRISTOPHER M. CURRAN
  *Counsel of Record*
J. MARK GIDLEY
PETER J. CARNEY
LUCIUS B. LAU
WHITE & CASE LLP
701 Thirteenth Street, N.W.
Washington, D.C. 20005
(202) 626-3600

*Counsel for Petitioner*
*Richard B. Wingfield*

*Counsel for Petitioners Stolt-*
*Nielsen S.A. and Stolt-Nielsen*
*Transportation Group Ltd.*

July 20, 2006