# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JOEL MENKES, Individually      :
and on behalf of all           :
others similarly situated,     :
                               :
    Plaintiffs,              :
                               :
v.                             :        No. 3:03CV00409(DJS)
                               :
STOLT-NIELSEN S.A., JACOB      :
STOLT-NIELSEN, NIELS G.        :
STOLT-NIELSEN, SAMUEL          :
COOPERMAN, and REGINALD        :
J.R. LEE,                      :
                               :
    Defendants.              :

## MEMORANDUM OF DECISION AND ORDER

On March 1, 2006, Lead Plaintiffs Irene Rucker[1] and Gustav
Rucker filed a Second Consolidated Amended Class Action Complaint
("Complaint" or cited as "Dkt. # 55, ¶ __") on behalf of a putative
class of purchasers of Stolt-Nielsen S.A. securities against
Stolt-Nielsen S.A., Stolt-Nielsen Transportation Group, Jacob
Stolt-Nielsen, Niels G. Stolt-Nielsen, Samuel Cooperman, and
Reginald J.R. Lee (collectively "the Defendants"), alleging
violations of Sections 10(b), 15 U.S.C. § 78j(b) (2000), and 20(a),
15 U.S.C. § 78t (2000), of the Securities Exchange Act of 1934 (the
"Exchange Act"), as amended by the Private Securities Litigation
Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78a-78mm (2000), and Rule

---

[1] Irene Rucker has since passed away.

10b-5, 17 C.F.R. § 240.10b-5 (2000), promulgated thereunder.

On July 6, 2009, the parties jointly filed a Stipulation of Settlement ("Stipulation" or cited as "Dkt. # 113, ¶ __") in order to voluntarily resolve the claims of the putative class without resort to further litigation.  Now pending before the Court is Lead Plaintiff's motion for preliminary approval of the proposed settlement of this action pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.  For the reasons that hereafter follow, Lead Plaintiff's motion (Dkt. # 111) is GRANTED.

## I. FACTS

### A. Stolt-Nielsen

Stolt-Nielsen S.A. ("SNSA") is a Luxembourg holding corporation.  Through its subsidiaries, SNSA engages in worldwide transportation, storage, and distribution of bulk liquids.  During the time periods relevant to Lead Plaintiff's claims, Stolt-Nielsen Transportation Group, Inc. ("SNTG") was a wholly owned SNSA subsidiary based in Connecticut.  SNTG primarily engaged in transportation of bulk liquids on worldwide seaborne trade routes, and, with several major liquid chemical manufacturers among its clients, was one of the largest parcel tanker operators in the world. Jacob Stolt-Nielsen, SNSA's founder, served as Chairman of SNSA's Board of Directors and served on SNTG's Board of Directors.  Niels G. Stolt-Nielsen was SNSA's Chief Executive Officer and also served on SNTG's Board of Directors.  Samuel Cooperman served as Chairman

2

of SNTG's Board of Directors.  Reginald J.R. Lee was SNTG's Chief Executive Officer.

The securities at issue in Lead Plaintiff's Exchange Act claims are: (1) SNSA's American Depository Receipts ("ADR"),[2] which were traded on the NASDAQ National Market System during the period relevant to this action; and (2) SNSA's ordinary shares, which were traded on the Oslo Stock Exchange during the period relevant to this action.

### B. Antitrust Offenses

From 1998 to 2002, SNTG and two of its primary competitors, Norway-based Odfjell Seachem AS and Netherlands-based Jo Tankers B.V., agreed to allocate deep-sea trade routes and to refrain from competing for business from each others' customers on those routes. See United States v. Stolt-Nielsen S.A., 524 F. Supp. 2d 609, 611 (E. D. Pa. 2007).  These agreements were found to constitute per se violations of Section 1 of the Sherman Act, 15 U.S.C. § 1 (1994). Stolt-Nielsen, 524 F. Supp. 2d at 611.

In early 2002, Paul O'Brien, SNTG's Senior Vice-President and General Counsel, inadvertently discovered documents revealing the market allocation agreements between SNTG and its competitors of

---

[2] ADRs are "financial instruments that allow investors in the United States to purchase and sell stock in foreign corporations in a simpler and more secure manner than trading in the underlying security in a foreign market."  Pinker v. Roche Holdings Ltd., 292 F.3d 361, 365 (3rd Cir. 2002).  American Depository Receipts are "tradeable in the same manner as any other registered American security, may be listed on any of the major exchanges in the United States or traded over the counter, and are subject to the Securities Act and the Exchange Act." Id. at 367.

which he was apparently unaware.  United States v. Stolt-Nielsen

S.A., 524 F. Supp. 2d 609, 611 (E. D. Pa. 2007).  O'Brien first

reported his discovery and concerns for SNTG's compliance with

antitrust law to Cooperman, his superior at the time.  Id.  Shortly

thereafter, O'Brien resigned from his position and filed a

constructive-discharge lawsuit against SNTG and Cooperman, alleging

that SNTG had "failed to cease and rectify its allegedly ongoing

criminal conduct," and that he was "ethically and legally barred from

rendering legal services to, and remaining in, the management of

[SNTG] while the company's alleged illegal activities continued."

O'Brien v. Stolt-Nielsen Transp. Group Ltd., 48 Conn. Supp. 200, 201,

838 A.2d 1076, 1079 (Conn. Super. June 13, 2003).  As part of that

lawsuit, O'Brien sought a declaratory judgment "as to his rights to

reveal confidential client information and materials protected by

the attorney-client privilege . . . to law enforcement authorities."

Id.  In response, Cooperman and Lee "took action to terminate the

anticompetitive conduct that O'Brien reported."  Stolt-Nielsen, 524

F. Supp. 2d at 611.

On November 22, 2002, the Wall Street Journal published an

article describing O'Brien's constructive-discharge lawsuit which

prompted the Antitrust Division of the United States Department of

Justice ("the Division") to initiate an investigation of SNTG's

commercial activities.  United States v. Stolt-Nielsen S.A., 524 F.

Supp. 2d 609, 612 (E. D. Pa. 2007).  Upon learning of this

investigation, SNTG approached the Division regarding the possibility of admission into the Division's Corporate Leniency Program.  Id.[3]  SNTG ultimately entered into a Conditional Leniency Agreement with the Division on January 15, 2003.  Id. at 613.  As a result of the information furnished by SNTG under the Conditional Leniency Agreement, the Division successfully prosecuted SNTG's co-conspirators.  Id. at 614.[4]

### C. Securities Fraud

At issue in this litigation are a number of statements publicly disseminated by SNSA while SNTG actively engaged in the aforementioned unlawful market allocation scheme.  Specifically, on February 1, 2001, SNSA issued a press release announcing its fourth quarter financial results for Fiscal Year 2000 which contained the following statement, attributable to Niels G. Stolt-Nielsen:

> Income from operations for SNTG's tank container division increased to $19.9 million for the full year of 2000 from $17.8 million in 1999.  While pricing remains competitive in most markets, shipments in 2000 were up 11% from 1999 with similar growth anticipated in 2001.

(Dkt. # 55, ¶ 57.)  On March 28, 2001, SNSA issued a press release

---

[3] The Division's Corporate Leniency Program is "designed to provide an opportunity and incentive for companies to self-report activity that violates the criminal antitrust laws.  Under the Corporate Leniency Program, the first company to report its illegal antitrust activity to the Division is immunized from prosecution provided it meets the Program's conditions."  Stolt-Nielsen, 524 F. Supp. 2d at 611.

[4] Odfjell Seachem AS was fined and two of its executives served prison terms and were personally fined.  See Stolt-Nielsen, 524 F. Supp. 2d at 614.  Jo Tankers B.V. was fined and one of its executives served a prison term and was personally fined.  See id.

announcing its first quarter financial results for Fiscal Year 2001
which contained the following statement, attributable to Niels G.
Stolt-Nielsen:

> For SNTG's tank container operations, income from
> operations fell to $2.7 million in the first quarter of
> 2001, down from $4.9 million in the first quarter of last
> year.  While shipments were up 10% from the comparable
> quarter, pricing competition, weak utilization, and empty
> repositioning costs negatively impacted the results.  For
> the remainder of the year, we anticipate overall growth
> in the business to continue to be about 10% over last year
> and while we expect to continue to see strong price
> competition, margins should improve and by the latter half
> of the year be similar to the comparable quarters of last
> year.

(Dkt. # 55, ¶ 59.)  On October 26, 2001, SNSA filed an Annual Report
with the Securities Exchange Commission ("SEC") on Form 20-F/A[5] which
contained the following statement:

> Shipments in the year 2000 increased from the downturn
> encountered in 1999.  Increases were primarily the result
> of improved demand in three main operating regions of Asia
> Pacific, Europe, and the United States.  Shipment levels
> in 2001 continue to reflect improved demand particularly
> from the United States and Asia.

(Dkt. # 55, ¶ 61.)  On May 31, 2002, SNSA filed an Annual Report with
the SEC on Form 20-F which contained the following statement:

> The market for the integrated transportation and logistics
> services provided by SNTG is in its infancy.  In providing
> such services, SNTG competes primarily with a few other
> large terminal and transport companies who are developing
> such services . . . .  SNTG's tanker operations compete
> with operators based primarily in Europe and the Asia
> Pacific region . . . .  The competition in the tank

---

[5] Form 20-F/A is used by foreign private securities issuers to amend their
annual reports filed on Form 20-F under section 13(a) or 15(d) of the Exchange
Act.  See 17 C.F.R. § 249.220f (2000).

container market is fragmented, although the relative size
of the competition is increasing on a worldwide basis.
SNTG also competes, to a lesser extent, with tank container
leasing companies.

(Dkt. # 55, ¶ 63.)[6]  On March 27, 2002, SNSA issued a press release

announcing its first quarter financial results for Fiscal Year 2002

which contained the following statement, attributable to Niels G.

Stolt-Nielsen:

> Excluding the restructuring charges, [SNTG] reported
> results on par with the first quarter of last year . . .
> Income from operations for SNTG's parcel tanker division
> was $20.5 million in the first quarter of 2002 compared
> to $20.3 million in the first quarter of 2001.  Contracts
> of affreightment continue to be renewed at higher levels
> and SNTG recently renewed a multi-year contract for one
> of its largest customers.  We are anticipating a pickup
> in rates in the second half of the year and throughout 2003
> as the world economies continue their recovery . . . .
> SNTG's tank container operations income from operations
> improved to $4.7 million in the first quarter of 2002
> compared from $2.7 million in the first quarter of last
> year.  While shipments in the first quarter were similar
> to the comparable quarter last year, utilization rose to
> 71.1% compared to 67.7% last year.  For the remainder of
> the year we anticipate seeing continued pressure on
> pricing while utilization should be similar to what we saw
> in the first quarter.  We still see shipments for the year
> growing 5% compared to 2001.

(Dkt. # 55, ¶ 64.)  On June 26, 2002, SNSA issued a press release

announcing its second quarter financial results for Fiscal Year 2002

which contained the following statement, attributable to Niels G.

Stolt-Nielsen:

> While the results in the second quarter for [SNTG] were
> down compared to last year, our core contract business,

---

[6] This statement also appeared on SNSA's Form 20-F/A filed October 26, 2001.
(Dkt. # 55, ¶ 63.)

> particularly for specialty chemicals, remains healthy.
> We continue to see improvements in Stolt Offshore's
> results. SNTG's tank container division's income from
> operations improved significantly to $6.3 million in the
> second quarter of 2002 compared to $4.0 million in the same
> quarter of 2001. Utilization in the second quarter
> compared to the same period last year rose 7.0% to 74.4%.
> Shipments are up some 6% <u>although pricing continues to be
> tight</u>.

(Dkt. # 55, ¶ 66.) On October 8, 2002, SNSA issued a press release

announcing its third quarter financial results for Fiscal Year 2002

which contained the following statement attributable to Niels G.

Stolt-Nielsen:

> [SNTG] posted a solid quarter . . . . SNTG's tank container
> division delivered another strong result with income from
> operations rising to $6.2 million from $5.6 million in the
> comparable quarter of 2001. Year-to-date shipments are
> up some 10% compared to last year and utilization in the
> third quarter hit a record level of 77.7% <u>although the
> business continues to see a tight pricing environment</u>.

(Dkt. # 55, ¶ 68.) Lead Plaintiff claims that these statements were

rendered false or misleading by Defendants' involvement in the

unlawful market allocation scheme. Specifically, Lead Plaintiff

claims that, at the time they were disseminated: (1) the statements

relating to "price" or "pricing" were false or misleading because

SNTG was "not competing on price with its competitors" (Dkt. # 55,

¶¶ 58, 60, 67, 69); (2) the statements relating to shipment increases

and contract renewals were false or misleading because they failed

to account for the unlawful market allocation scheme as a cause of

such shipment increases and contract renewals (Dkt. # 55, ¶¶ 62, 65);

and (3) the statements relating to the competitive nature of SNTG's

8

tank container operations or to competition in the market for integrated transportation and logistics were false or misleading because SNTG was involved in the unlawful market allocation scheme (Dkt. # 55, ¶¶ 60, 63).

Lead Plaintiff further claims that these statements artificially inflated the market prices for the SNSA securities at issue, and that those having purchased at such inflated prices suffered losses when the truth was publicly revealed. (Dkt. # 55, ¶ 88.)[7]  Accordingly, Lead Plaintiff seeks to recover these alleged losses on behalf of all persons similarly situated.

### D. Litigation

On June 19, 2006, this Court issued its Memorandum of Decision denying Defendants' motion to dismiss the Complaint. Menkes v. Stolt-Nielsen S.A. et al., No. 3:03CV409 (DJS), 2006 WL 1699603 (D. Conn. June 19, 2006).  On December 4, 2006, discovery was stayed pending resolution of criminal proceedings against Defendants in the United States District Court for the Eastern District of

---

[7] On November 22, 2002—the day the Wall Street Journal first reported that O'Brien had filed his constructive-discharge lawsuit and accused SNTG of engaging in unlawful conduct—the price of SNSA ADRs fell 14.7% from $7.62 per share to close at $6.50 per share, and the price of SNSA ordinary shares fell 14% from 53.5 NOK to 46 NOK.  (Dkt. # 55, ¶¶ 72, 91.)  On February 20, 2003, the Wall Street Journal published a cover story describing SNTG's involvement in the unlawful allocation scheme in greater detail.  (Dkt. # 55, ¶ 73.)  On that day, the price of SNSA ADRs fell 16.3% from $7.10 per share to close at $5.94 per share.  (Dkt. # 55, ¶ 73.)
    Lead Plaintiff further alleges that SNSA ordinary shares "declined 16% to 49.1NOK," but does not indicate the price of SNSA ordinary shares on the previous trading day to show the effect of the news revelation on their market price.  (Dkt. # 55, ¶ 91.)  (As compared to the 46 NOK closing price three months prior on November 22, 2002, the February 20, 2003 closing price of 49.1NOK represents a 6.7% appreciation in value.)

Pennsylvania.  (Dkt. # 77.)[8]  Subsequently, the parties actively sought to reach a compromise, and towards that end, engaged in mediation on May 6, 2008 before the Honorable Nicholas H. Politan, a retired United States District Judge for the District of New Jersey. Although the parties were unable to resolve their dispute at that mediation, their continued efforts ultimately proved successful when they reached an agreement-in-principle to settle the litigation in March 2009, the terms of which are set forth in the Stipulation.

Lead Plaintiff now moves for preliminary approval of the proposed settlement, which requires: (1) certification of a settlement class; (2) preliminary approval of the proposed settlement; (3) appointment of a Class Representative, of Class Counsel and of a Claims Administrator; and (4) approval of the proposed notice to the class.

## II. STANDARD

Federal Rule of Civil Procedure 23 imposes strict requirements as to whether an action may be maintained on behalf of a class.  Fed. R. Civ. P. 23(a)-(b).  Yet, courts have long favored the voluntary settlement of complex class action litigation, and putative class plaintiffs may pursue settlement negotiations without having first formally established that the action satisfies the certification requirements of Rule 23.  See McReynolds v. Richards-Cantave, 588

---

[8] See generally United States v. Stolt-Nielsen S.A., 524 F. Supp. 2d 609 (E. D. Pa. 2007); United States v. Stolt-Nielsen S.A., 524 F. Supp. 2d 586 (E. D. Pa. 2007).

F.3d 790, 803 (2d Cir. 2009); Wal-Mart Stores, Inc. v. VISA U.S.A.
Inc., 396 F.3d 96, 116 (2d Cir. 2005); In re Paine Webber Ltd. P'ships
Litig., 147 F.3d 132, 138 (2d Cir. 1998); Weinberger v. Kendrick,
698 F.2d 61, 72-73 (2d Cir. 1982).   Where pre-certification
negotiations successfully culminate in an agreement, plaintiffs
typically seek certification for the limited purpose of giving effect
to the settlement reached.   See Amchem Prods., Inc. v. Windsor, 521
U.S. 591, 618 (1997) ("Among current applications of Rule 23(b)(3),
the 'settlement only' class has become a stock device," (i.e.,
commonplace)).   These circumstances necessarily alter the character
of the Rule 23 inquiry.   See id. at 620 ("Confronted with a request
for settlement-only class certification, a district court need not
inquire whether the case, if tried, would present intractable
management problems . . . for the proposal is that there be no
trial.").   The prospect of settlement nullifies a defendant's
incentive in contesting the propriety of certification.   Cf. In re
Initial Public Offering Securities Litigation, 471 F.3d 24, 39 n.9
(2d Cir. 2006) (Normally, "[e]very class action defendant wants its
evidence disputing Rule 23 requirements considered in order to try
to fend off the enormous settlement pressure often arising from
certification.").   Thus, courts must ultimately consider motions
for 'settlement-only' certification without the benefit of
adversarial presentation on whether the action satisfies the
requirements of Rule 23.   See Amchem Prods., Inc. v. Windsor, 521

11

U.S. 591, 620 (1997).

Nonetheless, courts must perform a "rigorous analysis" to determine that "the requirements of Rule 23 [are] met, [and] not just supported by some evidence." In re Initial Public Offering Securities Litigation, 471 F.3d 24, 33 (2d Cir. 2006) (citing General Telephone Co. of the Southwest v. Falcon, 457 U.S. 147, 161 (1982)). In fact, to ensure that Rule 23 properly functions "to protect absentees by blocking unwarranted or overbroad class definitions," a motion for settlement-only certification demands the court's "undiluted, even heightened, attention." Amchem, 521 U.S. at 620. "Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold." Id. See D'Amato v. Deutsche Bank, 236 F.3d 78, 85 (2d Cir. 2001) ("When a settlement is negotiated prior to class certification . . . it is subject to a higher degree of scrutiny in assessing its fairness."); Plummer v. Chemical Bank, 668 F.2d 654, 657-58 (2d Cir. 1982) ("[I]f settlement has been negotiated before class action determination and the appointment of a class representative, the court must be doubly careful in evaluating the fairness of the settlement. . . . Because of the limited control exercisable by class members, class settlements are susceptible to abuse." (citations omitted)); Weinberger v. Kendrick, 698 F.2d 61, 72-73 (2d Cir. 1982). These dynamics frame the Court's

12

consideration of the motion at bar.

### III. DISCUSSION

### A. Class Certification

For the purposes of settlement only, Lead Plaintiff seeks certification of the class pursuant to Rules 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure.  As set forth in the Stipulation, the class is to include "all purchasers" of SNSA ADRs, and "all United States-located purchasers of [SNSA] ordinary shares traded on the Oslo Stock Exchange" during the relevant time periods. (Dkt. # 113, ¶ 1.3.)[9]

To certify a putative class, the Court must first determine whether the asserted claims meet the four threshold requirements of Rule 23(a) of the Federal Rules of Civil Procedure: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 613 (1997); Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., 546 F.3d 196, 201-02 (2d Cir. 2008).  In addition, "parties seeking class certification must show that the action is maintainable under Rule

_____

[9] To be excluded from the class are:

Defendants, members of the families of each of the Individual Defendants; any parent, subsidiary, affiliate, partner, officer, employee, executive or director of any Defendant during the Class Period; any entity in which any such excluded person has a controlling interest; and the legal representatives, heirs, successors, and assigns of any such excluded party[; and] any putative Class Members who timely and validly exclude themselves from the Class in accordance with the requirements set forth in the Notice.

(Dkt. # 113, ¶ 1.3.)

23(b)(1), (2), or (3)."  Amchem, 521 U.S. at 614.

Here, Lead Plaintiff seeks class certification pursuant to Rule 23(b)(3), which enables "vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all."  Id. at 617 (quotation marks omitted).  To qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the Rule 23(a) prerequisites: (1) predominance; and (2) superiority.  Fed. R. Civ. P. 23(b)(3).

Within the Second Circuit, a certifying court "must [have] receive[d] enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met."  In re Initial Public Offering Securities Litigation, 471 F.3d 24, 41 (2d Cir. 2006).  "[T]he preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements."  Bombardier, 546 F.3d at 202.  Cf. In re Flag Telecom Holdings, Ltd. Securities Litigation, 574 F.3d 29, 38-39 (2d Cir. 2009) (Concluding that district court abused its discretion by failing to find that all Rule 23 certification requirements were satisfied by a preponderance of the evidence).

### 1. Numerosity

Numerosity exists where the proposed class is "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1). "Impracticable" does not mean that joinder of all parties must be impossible, but "only that the difficulty or inconvenience of joining

14

all members of the class make use of the class action appropriate." Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC, 504 F.3d 229, 244-45 (2d Cir. 2007). Practicability generally "depends on all the circumstances surrounding a case." Robidoux v. Celani, 987 F.2d 931, 936 (2d Cir. 1993). Relevant factors include "judicial economy arising from the avoidance of a multiplicity of actions, geographic dispersion of class members, financial resources of class members, the ability of claimants to institute individual suits, and requests for prospective injunctive relief which would involve future class members." Id. Joinder is generally presumed to be impracticable when a putative class exceeds 40 members. Marisol A. v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997) (per curiam); Consolidated Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995); Fogarazzo v. Lehman Bros., Inc., 263 F.R.D. 90, 96 (S.D.N.Y. 2009). Further, "in securities class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." In re NYSE Specialists Securities Litigation, 260 F.R.D. 55, 70 (S.D.N.Y. 2009) (quotation marks omitted). See, e.g., Fogarazzo v. Lehman Bros., Inc., 263 F.R.D. 90, 101 (S.D.N.Y. 2009); In re Blech Securities Litigation, 187 F.R.D. 97, 103 (S.D.N.Y. 1999).

    Here, the proposed claims administrator has received "1,208

separate names" listed on SNSA's transfer records as purchasers of
SNSA ADRs or ordinary shares during the class period.  (Declaration
of Ellen Gusikoff Stewart in Support of Lead Plaintiff's Motion for
Preliminary Approval of Settlement (Dkt. # 125, ¶ 5)).  This
persuades the Court that, by a preponderance of the evidence, the
numerosity requirement is met.

### 2. Commonality

Commonality exists where there are "questions of law or fact
common to the class."  Fed. R. Civ. P. 23(a)(2).  This is not a
demanding standard, as it "is established so long as the plaintiffs
can identify some unifying thread among the [class] members' claims."
Haddock v. Nationwide Financial Services, Inc., 262 F.R.D. 97, 116
(D. Conn. 2009) (quotation marks omitted).  As do the Rule 23(a)
requirements of typicality and adequacy-of-representation, the
commonality requirement "serve[s] as [a] guidepost[ ] for
determining whether . . . maintenance of a class action is economical
and whether the named plaintiff's claim and the class claims are so
interrelated that the interests of the class members will be fairly
and adequately protected in their absence."  Amchem Prods., Inc. v.
Windsor, 521 U.S. 591, 626 n.20 (1997) (quotation marks omitted).

Here, Lead Plaintiff offers no specific evidence to support his
claim that the commonality requirement is met.  Nonetheless, the
Court is satisfied that commonality exists because identical
questions of both law and fact would be raised by the claims of each

16

class member if these were to be asserted individually.  To prevail on their securities fraud claims under Section 10(b) and Rule 10b-5, each class member, proceeding independently, would have to prove that: (1) Defendants made materially false statements or omitted materials facts; (2) the statements or omissions were made in connection with the purchase or sale of securities; (3) the statements or omissions were made with scienter; (4) the purchaser relied on the statements or omissions (i.e., "transaction causation"); (5) the purchaser suffered economic loss; and (6) the statements or omissions caused that loss (i.e., "loss causation"). See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008); Securities and Exchange Commission v. DiBella, 587 F.3d 553, 563 (2d Cir. 2009); ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 197 (2d Cir. 2009).

Here, the questions of whether Defendants' statements or omissions were material, whether they were made in connection with the purchase or sale of securities, and whether they were made with scienter, are necessarily common to each class member given that Defendants' conduct alone is relevant to their proof.  Similarly, the question of whether the class members commonly suffered economic losses is necessarily resolved by the proposed class definition, which specifically excludes any person who did not hold SNSA securities on at least one of the two days when their market prices

fell.   Further, the question of loss causation is common to all class members.   Without more, "an inflated purchase price will not itself constitute or proximately cause the relevant economic loss."   Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 342 (2005).   Rather, establishing loss causation requires proof "'that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.'"   In re Flag Telecom Holdings, Ltd. Securities Litigation, 574 F.3d 29, 35 (2d Cir. 2009) (quoting Lentell v. Merrill Lynch & Co., 396 F.3d 161, 173 (2d Cir. 2005)).   The Second Circuit has identified "two requirements necessary to establish loss causation: (1) the loss must be foreseeable, and (2) the loss must have been caused by the materialization of the concealed risk."   Id. at 40.   To establish that the loss was foreseeable, a plaintiff must prove that the risk of loss was "'within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor.'"   Id. (quoting Lentell, 396 F.3d at 173).   Here, each class member, proceeding independently, would similarly have to prove that the defendants' allegedly false or misleading statements had concealed a risk of loss in the value of their SNSA holdings that materialized when SNTG's involvement in the unlawful market allocation scheme was revealed.

Finally, to prevail on their control person claim under Section 20(a), each class member, proceeding independently, would have to

prove: (1) a primary violation by a controlled person; (2) Defendants' control of the primary violator; and (3) that Defendants were, in some meaningful sense, culpable participants in the controlled person's violation.  See ATSI Communications, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 108 (2d Cir. 2007).  Here, each class member's control person claim should be identical given that Defendants' conduct alone is relevant to satisfying the applicable standard, and given that each class member's claim arises from the same statements made by Defendants.

Since IPO, district courts within the Second Circuit have continued to find commonality satisfied on the ground that each member of a putative securities fraud class, proceeding individually, would have to prove the same elements to prevail.  See, e.g., In re Initial Public Offering Securities Litigation, 243 F.R.D. 79, 85 (S.D.N.Y. 2007) ("The commonality requirement has been applied permissively in securities fraud litigation.  In general, where putative class members have been injured by similar material misrepresentations and omissions, the commonality requirement is satisfied."); In re Vivendi Universal, S.A. Securities Litigation, 242 F.R.D. 76, 84 (S.D.N.Y. 2007) (similar).  Accordingly, the existence of substantial questions of law and fact with respect to the claims of all putative class members in this action persuades the Court that, by a preponderance of the evidence, the commonality requirement is met.

### 3. Typicality

Typicality exists where "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "To establish typicality under Rule 23(a)(3), the party seeking certification must show that each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." In re Flag Telecom Holdings, Ltd. Securities Litigation, 574 F.3d 29, 35 (2d Cir. 2009) (quotation marks omitted). Thus, "[w]hen it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." Robidoux v. Celani, 987 F.2d 931, 936-37 (2d Cir. 1993).

Here, the typicality requirement is met. The claims of each class member are likely to vary depending on the dates of purchase and sale, and on the effect of the alleged misstatements that were disseminated on those dates, but such minor distinctions will not preclude the propriety of class adjudication. See In re Flag Telecom Holdings, Ltd. Securities Litigation, 574 F.3d 29, 37 (2d Cir. 2009) (Reliance of class members on differing misstatements exposing only some to an affirmative defense of negative causation would not always preclude the certification of a single class). As alleged, each

20

class member's claim arises from the same general course of events, and each class member would present similar legal arguments to prove the defendants' liability.  These factors persuade the Court that, by a preponderance of the evidence, the typicality requirement is met.

### 4. Adequacy of Representation

The adequacy of representation requirement demands that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  The requirement is satisfied where: (1) the proposed class representative's interests are to vigorously pursue the claims of the class and are not antagonistic to the interests of other class members; and (2) the proposed class counsel are qualified, experienced and able to conduct the litigation.  Flag, 574 F.3d at 35; Denney v. Deutsche Bank AG, 443 F.3d 253, 268 (2d Cir. 2006).  The inquiry focuses "on uncovering 'conflicts of interest between named parties and the class they seek to represent.'"  Flag, 574 F.3d at 35 (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625 (1997)).  To defeat a motion for certification, any such conflicts "must be fundamental."  In re Flag Telecom Holdings, Ltd. Securities Litigation, 574 F.3d 29, 35 (2d Cir. 2009).  See, e.g., Baffa v. Donaldson, Lufkin & Jenrette Securities Corp., 222 F.3d 52, 60 (2d Cir. 2000) ("While it is settled that the mere existence of individualized factual questions with respect to the class representative's claim will not

bar class certification, class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." (quotation marks omitted)); Maywalt v. Parker & Parsley Petroleum Co., 67 F.3d 1072, 1077-78 (2d Cir. 1995) (Class certification may properly be denied where the class representatives have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys.) (quotation marks omitted).  Finally, where settlement is contemplated, "[a]dequacy must be determined independently of the general fairness review of the settlement; the fact that the settlement may have overall benefits for all class members is not the 'focus' in 'the determination whether proposed classes are sufficiently cohesive to warrant adjudication.'" Denney v. Deutsche Bank AG, 443 F.3d 253, 268 (2d Cir. 2006) (quoting Ortiz v. Fibreboard Corp., 527 U.S. 815, 858 (1999)).

Here, the adequacy of representation requirement is met. Through prior efforts in this litigation, Lead Plaintiff and his predecessors have sufficiently demonstrated that their interests are to vigorously pursue the claims on behalf of the class.  Lead Plaintiff represents that he has no conflicts with potential class members, and there otherwise is no indication that fundamental conflict might exist precluding certification.  The claims of anticipated class members are expected to be homogeneous in nature,

22

and nothing suggests the possible existence of subgroups with interests sufficiently adverse to warrant the creation of subclasses.  See, generally Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625-27 (1997).  Furthermore, Lead Plaintiff represents that, in accordance with the PSLRA, he "will not seek any recovery from the Settlement Fund over and above his pro rata share, as calculated by the Plan of Allocation."  (Dkt. # 125 ¶ 6.)[10]  Finally, Lead Plaintiff has satisfactorily demonstrated that proposed class counsel is sufficiently qualified and experienced to effectively represent the proposed class.  (See Plaintiff's Memorandum of Law In Support of Motion for Preliminary Approval of Settlement (Dkt. # 112-1.))  These factors persuade the Court that, by a preponderance of the evidence, the adequacy of representation requirement is met.

### 5. Ascertainability

Beyond the foregoing, a distinct "implied requirement of ascertainability" must be satisfied for certification of class actions pursuant to Rule 23.  In re Initial Public Offering Securities Litigation, 471 F.3d 24, 30, 44-45 (2d Cir. 2006).  See, e.g., Spagnola v. Chubb Corp., 264 F.R.D. 76, 97 (S.D.N.Y. 2010); Fogarazzo v. Lehman Bros., Inc., 263 F.R.D. 90, 97 (S.D.N.Y. 2009); Casale v. Kelly, 257 F.R.D. 396, 406 (S.D.N.Y. 2009); Jermyn v. Best

---

[10] The PSLRA provides that "[t]he share of any final judgment or of any settlement that is awarded to a representative party serving on behalf of a class shall be equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class."  15 U.S.C. § 78u-4(a)(4).

Buy Stores, L.P., 256 F.R.D. 418, 432 (S.D.N.Y. 2009); Cortigiano
v. Oceanview Manor Home For Adults, 227 F.R.D. 194, 207 (E.D.N.Y.
2005).  To satisfy the ascertainability requirement, "[c]lass
membership must be readily identifiable such that a court can
determine who is in the class and bound by its ruling without having
to engage in numerous fact-intensive inquiries." Spagnola, 264
F.R.D. at 97.  Class membership "must be ascertainable 'at some point
in the case,' but not necessarily prior to class certification."
IPO, 471 F.3d at 45 (quoting In re Methyl Tertiary Butyl Ether
Products Liability Litigation, 209 F.R.D. 323, 337 (S.D.N.Y. 2002)).
Class membership is readily identifiable where it "can be ascertained
by reference to objective criteria." Spagnola, 264 F.R.D. at 97
(quotation marks omitted).  Such criteria must be "sufficiently
definite so that it is administratively feasible for the Court to
determine whether a particular individual is a member." Jermyn, 256
F.R.D. at 432 (quotation marks omitted).  Thus, the need for numerous
individualized determinations or insufficiently precise criteria in
defining class membership can preclude the propriety of class
certification.  In re Initial Public Offering Securities
Litigation, 471 F.3d 24, 45 (2d Cir. 2006).  See, e.g., Harris v.
Initial Sec., Inc., No. 05 Civ. 3873, 2007 WL 703868, at *3 n.4
(S.D.N.Y. Mar. 7, 2007) (class defined as "dark-skinned" employees
deemed unascertainable "because there is no objective criteria to
which the Court could refer to determine whether someone is

sufficiently 'dark-skinned' to be a class member.").

Here, the ascertainability requirement is met.  The proposed class is defined as all purchasers of SNSA ADRs and all United States-based purchasers of SNSA ordinary shares traded on the Oslo Stock Exchange during the relevant class periods.  Lead Plaintiff proposes to rely on SNSA's transfer records as the principal means of identification of all class members.  (Dkt. # 112, p. 11.)  With respect to purchasers of SNSA ordinary shares, Lead Plaintiff further proposes specific procedures designed to ascertain the applicability of the "United States-based" restriction on class membership and to resolve ambiguities.  (See Affidavit of Lara McDermott (Dkt. # 127, ¶ 7-12.))  In aggregate, these measures persuade the Court that, by a preponderance of the evidence, the ascertainability requirement is met.

### 6. Predominance

Predominance exists where "questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  To satisfy predominance, "a plaintiff must show that those issues in the proposed action that are subject to generalized proof outweigh those issues that are subject to individualized proof."  In re Salomon Analyst Metromedia Litigation, 544 F.3d 474, 480 (2d Cir. 2008) (quotation marks omitted).  Predominance is "a more demanding criterion than the commonality inquiry under Rule 23(a)."  Moore v.

PaineWebber, Inc., 306 F.3d 1247, 1252 (2d Cir. 2002) (citing Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623-24 (1997)).  The inquiry "tests whether a proposed class is sufficiently cohesive to warrant adjudication by representation."  Salomon Analyst, 544 F.3d at 480 (quotation marks omitted).[11]

Here, as noted above with respect to commonality, several questions are shared by the members of the proposed class, including: (1) whether the defendants made materially false statements or omitted materials facts; (2) whether the statements or omissions were made in connection with the purchase or sale of securities; (3) whether the statements or omissions were made with scienter; and (4) whether the class members suffered economic loss.  Conversely, the claims of each class member, if asserted individually, would require individualized proof to show: (1) the extent of actual losses individually incurred; and (2) individual reliance on the defendants' statements or omissions (i.e., transaction causation).

The need to prove actual losses individually incurred by each class member does not defeat predominance because differences in the amount and recoverability of individual damages do not necessarily make class actions unmanageable.  See McLaughlin v. American Tobacco Co., 522 F.3d 215, 231 (2d Cir. 2008) (citing 6 Alba Conte & Herbert

_____

[11] If predominance exists "with respect to the Section 10(b) claim—i.e., the 'primary violation'—the predominance requirement will also be met with respect to the Section 20(a) claim, as the issue of control is susceptible to generalized proof."  In re SCOR Holding (Switzerland) AG Litigation, 537 F. Supp. 2d 556, 572 n.21 (S.D.N.Y. 2008).

B. Newberg, <u>Newberg on Class Actions</u> § 18:27 (4th ed. 2002)); <u>In re</u>
<u>Visa Check/MasterMoney Antitrust Litigation</u>, 280 F.3d 124, 140 (2d
Cir. 2001); Fed. R. Civ. P. 23 advisory committee's note ("[A] fraud
perpetrated on numerous persons by the use of similar
misrepresentations may be an appealing situation for a class action,
and it may remain so despite the need, if liability is found, for
separate determination of the damages suffered by individuals within
the class.").

    In contrast, the need to "establish[] reliance individually by
members of the class . . . defeat[s] the requirement of Rule 23 that
common questions of law or fact predominate over questions affecting
only individual members."   <u>In re Initial Public Offering Securities</u>
<u>Litigation</u>, 471 F.3d 24, 42 (2d Cir. 2006).   <u>See</u> Fed. R. Civ. P. 23
advisory committee's note ("[A]lthough having some common core, a
fraud case may be unsuited for treatment as a class action if there
was material variation in the representations made or in the kinds
or degrees of reliance by the persons to whom they were addressed.").
<u>See, e.g.</u>, <u>Teamsters Local 445 Freight Div. Pension Fund v.</u>
<u>Bombardier, Inc.</u>, No. 05 Civ. 1898, 2006 WL 2161887, at *1 (S.D.N.Y.
Aug.1, 2006) (If plaintiff cannot establish that it "relied on
defendants' misrepresentations, the requirement that common issues
predominate over individual issues will not be satisfied, and class
certification must be denied.") <u>aff'd</u>, 546 F.3d 196 (2d Cir. 2008).
But a plaintiff may overcome this obstacle by invoking the

fraud-on-the-market doctrine, under which reliance is presumed if it can be shown that false or misleading material statements were publicly made concerning a security traded in an efficient market. In re Salomon Analyst Metromedia Litigation, 544 F.3d 474, 478 (2d Cir. 2008).[12]  The fraud-on-the-market doctrine rests on the premise that an efficient securities market "transmits information to the investor in the processed form of a market price."  Basic Inc. v. Levinson, 485 U.S. 224, 244 (1988).  Given that the market price of a security is deemed to reflect related public statements, "it can be assumed that an investor who buys or sells stock at the market price relies upon the statement."  Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 159 (2008) (citing Basic, 485 U.S. at 247).  See Hevesi v. Citigroup Inc., 366 F.3d 70, 77 (2d Cir. 2004) (The fraud-on-the-market doctrine "creates a rebuttable presumption that (1) misrepresentations by an issuer affect the price of securities traded in an open market, and (2) investors rely on the market price of securities as an accurate measure of their intrinsic value.").  Thus, "where a defendant has (1) publicly made (2) a material misrepresentation (3) about stock traded on an impersonal, well-developed (i.e., efficient) market, investors' reliance on

---

[12] Although inapplicable here, a rebuttable presumption of reliance can also be invoked "if there is an omission of a material fact by one with a duty to disclose," in which case "the investor to whom the duty was owed need not provide specific proof of reliance."  Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 159 (2008) (citing Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153-54 (1972)).

those misrepresentations may be presumed." In re Salomon Analyst Metromedia Litigation, 544 F.3d 474, 481 (2d Cir. 2008) (citing Basic, 485 U.S. at 248 n.27). Additionally, in considering the applicability of the fraud-on-the-market presumption, the Second Circuit has observed that Basic "requires that the plaintiff 'traded the shares between the time the misrepresentations were made and the time the truth was revealed.'" Id. at 481 n.4 (quoting Basic, 485 U.S. at 248 n.27). In other words, transactions initiated before misrepresentation or after corrective disclosure cannot be presumed to have occurred in reliance upon information transmitted to investors in the processed form of a market price. See, e.g., Karvaly v. eBay, Inc., 245 F.R.D. 71, 80 n.17 (E.D.N.Y. 2007) (observing that there is "no legitimate reason for extending the class definition to include" transactions occurring prior to defendant's misrepresentations); Debora v. WPP Group PLC, No. 91 Civ. 1775 (KTD), 1994 WL 177291, at *3 (S.D.N.Y. May 05, 1994) (plaintiff having purchased securities after corrective disclosures could not have relied on the issuer's misrepresentations).

    Here, the alleged misrepresentations appeared either as part of a press release or financial report filed with the SEC, and were thus publicly made. The alleged misrepresentations were also material. In the securities fraud context, "[t]he materiality of a misstatement depends on whether 'there is a substantial likelihood that a reasonable shareholder would consider it important in deciding

how to act.'"  ECA, Local 134 IBEW Joint Pension Trust of Chicago
v. JP Morgan Chase Co., 553 F.3d 187, 197 (2d Cir. 2009) (quoting
Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988).  A misstatement
is material where there is "'a substantial likelihood that the
disclosure of the omitted fact would have been viewed by the
reasonable investor as having significantly altered the "total mix"
of information made available.'"  Basic, 485 U.S. at 231-32 (quoting
TSC Industries, Inc., v. Northway, Inc., 426 U.S. 438, 449 (1976)).
See In re Salomon Analyst Metromedia Litigation, 544 F.3d 474, 482
(2d Cir. 2008) ("'The touchstone of the inquiry is . . . whether
defendants' representations or omissions, considered together and
in context, would affect the total mix of information and thereby
mislead a reasonable investor regarding the nature of the securities
offered.'" (quoting Halperin v. eBanker USA.com, Inc., 295 F.3d 352,
357 (2d Cir. 2002)).  Here, Defendants' misrepresentations
concealed STNG's involvement in an unlawful market allocation scheme
which exposed SNSA to criminal and civil liability and likely
distorted SNSA's financial performance disclosures.[13]  Any

---

[13] When evaluating the materiality of alleged misstatements in securities
fraud cases, the Second Circuit occasionally looks to SEC Staff Accounting Bulletin
No. 99, 64 Fed. Reg. 45150, 45150-52 (Aug. 19, 1999) ("SAB No. 99"), which is deemed
persuasive authority on the matter, and "consider[s] the factors it sets forth
in determining whether the misstatement significantly altered the 'total mix' of
information available to investors."  ECA, Local 134 IBEW Joint Pension Trust of
Chicago v. JP Morgan Chase Co., 553 F.3d 187, 197-98 (2d Cir. 2009).  See Ganino
v. Citizens Utils. Co., 228 F.3d 154, 163 (2d Cir. 2000).
        SAB No. 99 explains that "[t]he omission or misstatement of an item in a
financial report is material if, in the light of surrounding circumstances, the
magnitude of the item is such that it is probable that the judgment of a reasonable
person relying upon the report would have been changed or influenced by the

reasonable investor having contemplated a transaction involving SNSA securities would most certainly have considered this information to be important.  Defendants' misrepresentations therefore sufficiently affected the total mix of information upon which the decision to buy or sell SNSA securities would have rested to support the conclusion that they were material.

Further, Lead Plaintiff has satisfied his burden of proof with respect to the efficiency of the markets in which the securities at issue were traded.  Although the Second Circuit has not explicitly adopted a test for market efficiency, it has noted that the inquiry set forth in Cammer v. Bloom, 711 F. Supp. 1264 (D.N.J. 1989) has "been routinely applied by district courts considering the efficiency of equity markets."  Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc., 546 F.3d 196, 204 n.11, 210-11 (2d Cir. 2008).  See, e.g., In re American Intern. Group, Inc. Securities Litigation, 265 F.R.D. 157, 175-81 (S.D.N.Y. 2010); In re Initial Public Offering Securities Litigation, 260 F.R.D. 81, 94-95

---

inclusion or correction of the item."  64 Fed. Reg. at 45151.  But a misstatement's "magnitude by itself, without regard to the nature of the item and the circumstances in which the judgment has to be made, will not generally be a sufficient basis for a materiality judgment."  Id. at 45152.

SAB No. 99 further provides a non-exhaustive list of qualitative factors which can "render material a quantitatively small misstatement [in] a financial statement."  Id.  As relevant here, these include: (1) "[w]hether the misstatement masks a change in earnings or other trends"; (2) "[w]hether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability"; (3) "[w]hether the misstatement involves concealment of an unlawful transaction"; and (4) management's expectation "that a known misstatement may result in a significant positive or negative market reaction."  Id.  Here, each of these factors applies and supports the conclusion that even quantitatively small distortions in SNSA's financial disclosures during the relevant period were material.

(S.D.N.Y. 2009); <u>Fogarazzo v. Lehman Bros., Inc.</u>, 263 F.R.D. 90, 102 n.83 (S.D.N.Y. 2009).  <u>Cammer</u> identifies five factors that can be considered to ascertain whether a security is traded in an efficient market: (1) the security's average weekly trading volume;[14] (2) the number of analysts who follow the security;[15] (3) the extent which market makers and arbitrageurs trade the security;[16] (4) the issuer's eligibility to file SEC registration Form S-3;[17] and (5) evidence of

---

[14] High weekly trading volume suggests efficiency "because it implies significant investor interest in the company.  Such interest, in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information."  <u>Cammer</u>, 711 F. Supp. at 1286. "Turnover measured by average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; one percent would justify a substantial presumption."  <u>Id.</u> at 1293 (citations omitted).

[15] "The more securities analysts who follow and report on a company's stock, the greater the likelihood that information disseminated by a corporation is being relied upon by the stock trading public."  <u>Krogman v. Sterritt</u>, 202 F.R.D. 467, 475 (N. D. Tex. 2001).  Thus, "the existence of a number of financial analysts who report on a security supports a finding of market efficiency because it permits an inference that financial statements relating to a security are 'closely reviewed by investment professionals, who . . . in turn make buy/sell recommendations to client investors.'"  <u>Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.</u>, 546 F.3d 196, 205 (2d Cir. 2008) (quoting <u>Cammer</u>, 711 F. Supp. at 1286).

[16] Market makers and arbitrageurs "'react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level.'"  <u>Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.</u>, 546 F.3d 196, 206 (2d Cir. 2008) (quoting <u>Cammer</u>, 711 F. Supp. at 1286-87).  Their capacity "to seek out new information and evaluate its effects on the price of securities distinguishes them from ordinary investors, who lack the time, resources or expertise to evaluate all the information concerning a security. . . . In an efficient market, then, an ordinary investor who becomes aware of publicly available information cannot make money by trading on it because the information will already have been incorporated into the market by arbitrageurs."  <u>In re PolyMedica Corp. Securities Litigation</u>, 432 F.3d 1, 9 (1st Cir. 2005) (citation and quotation marks omitted).

[17] The SEC permits the filing of an S-3 Registration Statement only where "the stock is already traded on an open and efficient market, such that further disclosure is unnecessary."  <u>Krogman</u>, 202 F.R.D. at 476.  "To be eligible to use Form S-3 in connection with an equity offering, an issuer must, among other things, have been filing reports under the Exchange Act for at least thirty-six months and either have out-standing $150 million of voting stock held by nonaffiliates or $100 million of such stock outstanding coupled with an annual trading volume

a causal relationship between unexpected corporate events or financial releases and the security's price.[18]  711 F. Supp. 1264, 1286-87 (D.N.J. 1989).  Three additional factors identified in Krogman v. Sterritt have also subsequently been considered as part of the Cammer analysis, namely: (1) the security's market capitalization;[19] (2) the security's bid-ask spread;[20] and (3) the proportion of the security's trading volume attributable to insiders.[21]  202 F.R.D. 467, 478 (N. D. Tex. 2001) (quotation marks omitted).  Together, these factors seek to evaluate the "two core requirements for an efficient market: 'large numbers of rational and

---

of three million shares per year." Cammer, 711 F. Supp. at 1271 n.5 (citation omitted).  Form S-3 is thus "'predicated on the Commission's belief that the market operates efficiently for these companies, i.e., that the disclosure in Exchange Act reports and other communications by the registrant, such as press releases, has already been disseminated and accounted for by the market place.'" Id. at 1284 (quoting SEC Securities Act Release No. 6235, 45 Fed. Reg. 63,693 (Sept. 25, 1980)).

[18] "[I]n an efficient market, a stock's price remains relatively stable in the absence of news, and changes very rapidly as the market receives new and unexpected information." Krogman, 202 F.R.D. at 477.  Therefore, evidence of a causal relationship between unexpected corporate events or financial releases and the security's price is "the essence of an efficient market and the foundation for the fraud on the market theory." Cammer, 711 F. Supp. at 1287.

[19] "Market capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations." Krogman, 202 F.R.D. at 478.

[20] A large bid-ask spread, i.e., the difference between the price at which purchasers are willing to buy and the price at which sellers are willing to sell, "is indicative of an inefficient market, because it suggests that the stock is too expensive to trade." Krogman, 202 F.R.D. at 478.

[21] The greater the proportion of the security's trading volume is attributable to insiders (i.e., the lower the "float"), the less likely it is that the security's price accurately reflects all available public information because insiders are more likely to have access to private information relating to the security. Krogman, 202 F.R.D. at 478.

intelligent investors,' and 'important current information' that is 'almost freely available to all participants.'"  In re Initial Public Offering Securities Litigation, 260 F.R.D. 81, 94 (S.D.N.Y. 2009) (quoting Paolo Cioppa, The Efficient Capital Market Hypothesis Revisited: Implications of the Economic Model for the United States Regulator, 5 Global Jurist Advances 1, 5-6 (2005)).  In Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc., the Second Circuit affirmed a district court's application of the Cammer factors as an "analytical tool" to determine whether the securities there at issue were traded in an efficient market.  546 F.3d 196, 210 (2d Cir. 2008).  In so doing, the Second Circuit emphasized the critical importance of "[e]vidence that unexpected corporate events or financial releases cause an immediate response in the price of a security," and observed that "[w]ithout the demonstration of such a causal relationship, it is difficult to presume that the market will integrate the release of material information about a security into its price."  Id. at 207.  The Second Circuit further specified the type of evidence contemplated, explaining that "[a]n event study that correlates the disclosures of unanticipated, material information about a security with corresponding fluctuations in price has been considered prima facie evidence of the existence of such a causal relationship."  Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc., 546 F.3d 196, 207-08 (2d Cir. 2008) (citing In re Xcelera.com Securities Litigation, 430 F.3d 503, 512-14

(1st Cir. 2005)).  The Court also noted that such evidence "may be rejected . . . if it is methodologically unsound or unreliable."  Id. at 208 n.15 (citing Bell v. Ascendant Solutions, Inc., 422 F.3d 307, 316 (5th Cir. 2005)).

Here, SNSA's ADRs were listed on NASDAQ, and SNSA's ordinary shares were listed on the Oslo Stock Exchange during the relevant time periods.  Listing on these exchanges, without more, is not necessarily dispositive of market efficiency,[22] but Lead Plaintiff's analysis of the Cammer factors sufficiently demonstrates market efficiency for the specific securities at issue.

[22] In Ascendant Solutions, the Fifth Circuit rejected an argument that market efficiency was established by the fact that, among other things, the security there at issue had been listed on NASDAQ from November 1999 to May 2001, observing that "the mere fact that a stock trades on a national exchange does not necessarily indicate that the market for that particular security is efficient."  422 F.3d at 313.  The Fifth Circuit further noted that "'some companies listed on national stock exchanges are relatively unknown and trade there only because they met the eligibility requirements.  While the location of where a stock trades might be relevant, it is not dispositive of whether the current price reflects all available information.'"  Id. at 313-14 (quoting Cammer v. Bloom, 711 F. Supp. 1264, 1281 (D.N.J. 1989)).  Thus, listing on a particular exchange is not dispositive of market efficiency because "a market can be open and developed for some securities and not for others."  Id. at 315.  See Cammer, 711 F. Supp. at 1281 ("It would be illogical to apply a presumption of reliance merely because a security is traded within a certain 'whole market' without considering the trading characteristics of the individual stock itself.").  See, e.g., Blatt v. Muse Technologies, Inc., Nos. Civ.A. 01-11010-DPW, Civ.A. 01-12173-DPW , 2002 WL 31107537, at *13 (D. Mass. Aug. 27, 2002) (concluding that "a particularized inquiry remains necessary" despite stock being traded on the NASDAQ during class period).  But see In re Initial Public Offering Securities Litigation, 243 F.R.D. 79, 91 (S.D.N.Y. 2007) (characterizing NASDAQ as an efficient market).

Similarly, courts routinely rely on the Cammer factors to assess market efficiency for securities listed on foreign stock exchanges.  See, e.g., In re SCOR Holding (Switzerland) AG Litigation, 537 F. Supp. 2d 556, 572-79 (S.D.N.Y. 2008) (concluding that plaintiffs failed to establish market efficiency for securities traded on the SWX Swiss Exchange or in the form of American Depository Shares on the New York Stock Exchange); In re Alstom SA Securities Litigation, 253 F.R.D. 266, 279-80 (S.D.N.Y. 2008) (securities actively traded on Euronext (formed from the merger of the Amsterdam Stock Exchange, the Brussels Stock Exchange, and the Paris Bourse), London Stock Exchange, and New York Stock Exchange); In re Parmalat Sec. Litig., 375 F. Supp. 2d 278, 303-05 (S.D.N.Y. 2005) (securities actively traded on the Luxembourg, Milan and Uruguayan stock exchanges, and in the over-the-counter market in the United States).

Specifically, with respect to weekly trading volume, Lead Plaintiff

explains that

> [d]uring the Class Period, SNSA ADRs had a reported trading
> volume of more than 20 million shares with a dollar trading
> volume exceeding $280 million. Average reported daily
> trading volume for the SNSA ADRs during the Class Period
> was more than 40,000 shares with an average daily dollar
> volume of more than $550,000. In addition, from May 24,
> 2000 through February 20, 2003, SNSA ordinary shares had
> a reported trading volume of more than 36 million shares
> with a dollar trading volume exceeding $510 million.
> Average reported daily trading volume for the SNSA
> ordinary shares during the Class Period exceeded 50,000
> shares with an average daily dollar volume of more than
> $770,000. This demonstrates that there were a
> substantial number of willing buyers and sellers who
> traded SNSA shares on a daily basis during the Class
> Period, thereby providing liquidity for the stock.

(Declaration of Bjorn I. Steinholt, CFA (Dkt. # 126, ¶ 14.))  With

respect to analyst coverage, Lead Plaintiff explains that

> [d]uring the Class Period, several analysts provided
> research coverage on SNSA, including: Jarle Sjo at First
> Securities ASA, Per Didrik Leivdal at Pareto Securities
> ASA, James Winchester at Lazard Freres & Co., Henrik With
> at ABN AMRO, Bjorn Knutsen at Nordea Equity Research, Greg
> Ward at Credit Suisse and Stephen Gengaro at ING Barings.
> In addition, SNSA held periodic analyst conference calls
> where both buy side and sell side analysts could ask
> questions regarding the Company's performance. These
> analyst conference calls were also made available on
> Bloomberg for other analysts and investors to listen to.
> Bloomberg provides the investment industry with financial
> news and data, including software tools to analyze and
> trade on the financial news and data. During the Class
> Period, Bloomberg disseminated more than 280 stories
> relating to SNSA to the investment community.

(Dkt. # 126, ¶ 15.)  With respect to market makers and arbitrageurs,

Lead Plaintiff has "identified at least two dozen market makers for

the SNSA ADRs during the Class Period, including: Lazard Freres and

Co., Jeffries & Co,, Knight Equity Markets, Schwab Capital Markets and Archipelago Securities." (Dkt. # 126, ¶ 16.)  Lead Plaintiff has also "examined available information on institutional ownership of SNSA ADRs.  It showed that reporting institutions owned from 2.5 million to 6.6 million SNSA ADRs during the Class Period." (Dkt. # 126, ¶ 17.)

With respect to SNSA's eligibility to file SEC registration Form S-3, Lead Plaintiff notes that "SNSA had been an SEC reporting company for more than one year prior to 2001, [and] had a market capitalization of several hundred million dollars throughout the entire Class Period." (Dkt. # 126, ¶ 18.)

With respect to whether a causal relationship existed between the disclosure of unanticipated material information and market price, Lead Plaintiff has performed an event study which concludes that the price declines of SNSA's securities in the period immediately following the two fraud-related disclosures here at issue were "highly statistically significant at the 99% level of confidence." (Dkt. # 126, ¶ 20-22.)

In sum, the Court is satisfied that, by a preponderance of the evidence, the markets for the securities here at issue were efficient.

Finally, however, one of the Stipulation's proposed Class Periods appears inconsistent with Lead Plaintiff's attempt to invoke the fraud-on-the-market doctrine to satisfy the transaction

causation requirement.  Specifically, for purchasers of SNSA ADRs, the Stipulation defines the Class Period as the interval beginning February 1, 2001—the date of the earliest SNSA press release containing one of the allegedly false or misleading statements upon which Plaintiffs' claims are based—and ending February 20, 2003, inclusive—the date of publication for the second Wall Street Journal report describing SNTG's involvement in the unlawful market allocation scheme.  (Dkt. # 113, ¶ 1.4.)  In contrast, with respect to United States-located purchasers of SNSA ordinary shares traded on the Oslo Stock Exchange, the Stipulation defines the Class Period as the interval beginning May 24, 2000—the date of an early e-mail message between STNG executives suggesting the existence of anticompetitive conduct (Dkt. # 55, ¶ 37(a))—and also ending February 20, 2003 (Dkt. # 113, ¶ 1.4).

This second starting date of May 24, 2000 is problematic.  The earliest SNSA press release containing one of the allegedly false or misleading statements upon which Plaintiffs' claims are based was issued on February 1, 2001.  Accordingly, February 1, 2001 represents the earliest date upon which the Defendants' alleged fraudulent statements could have operated to affect the market price for SNSA securities, ultimately leading to the price declines underlying this litigation.  It thus follows that no market purchases of SNSA securities occurring prior to February 1, 2001 could have been adversely affected or influenced by the allegedly

fraudulent statements at issue in this case.

To overcome this difficulty, certification of the class must be limited to the interval beginning February 1, 2001 and ending February 20, 2003 with respect to United States-located purchasers of SNSA ordinary shares traded on the Oslo Stock Exchange.  See In re Salomon Analyst Metromedia Litigation, 544 F.3d 474, 481 n.4 (2d Cir. 2008) (acknowledging a district court's restriction of class period to the interval beginning on the date of the first alleged misrepresentation, and ending on the date the alleged misrepresentation was corrected).  See, e.g., Jermyn v. Best Buy Stores, L.P., 256 F.R.D. 418, 430-31 (S.D.N.Y. 2009) (exercising discretion to create shorter subclass to exclude time-barred claims); In re Veeco Instruments, Inc., Securities Litigation, 235 F.R.D. 220, 241 (S.D.N.Y. 2006) (limiting class period to interval beginning on the date of the first actionable misrepresentation, and ending on the date the corrective disclosure).  Only within this interval may Lead Plaintiff invoke the fraud-on-the-market doctrine to satisfy the transaction causation requirement.  The Court thus concludes that, with respect to this interval only, questions of law or fact common to class members predominate over any questions only affecting individual members.

### 7. Superiority

Superiority exists where "a class action is superior to other available methods for fairly and efficiently adjudicating the

controversy." Fed. R. Civ. P. 23(b)(3).  Together with predominance, the superiority requirement "ensures that the class will be certified only when it would 'achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'"  Cordes & Co. Financial Services, Inc. v. A.G. Edwards & Sons, Inc., 502 F.3d 91, 104 (2d Cir. 2007) (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 615 (1997)).  To evaluate the fairness and efficiency of a proposed class action, courts must consider: (1) "the class members' interests in individually controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) "the likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3).

Here, the superiority requirement is met.  The claims of each individual class member are likely too small to warrant the costs of litigating individually, and it is therefore in the interest of all class members to proceed as a class.  "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights."  Amchem Prods.,

Inc. v. Windsor, 521 U.S. 591, 617 (1997)(quotation marks omitted).
Accordingly, class treatment is often deemed superior in "negative
value" cases, i.e., where each individual class member's interest
in the litigation is less than the anticipated cost of litigating
individually.  Spagnola v. Chubb Corp., 264 F.R.D. 76, 99 (S.D.N.Y.
2010).  See, e.g., Charrons v. Pinnacle Group NY LLC, ___ F. R. D.
____, 2010 WL 1752501, at *22 (S.D.N.Y. Apr. 27, 2010) (superiority
satisfied where individual claims of proposed class members appeared
too small to warrant individual adjudication); In re Currency
Conversion Fee Antitrust Litigation, 264 F.R.D. 100, 117 (S.D.N.Y.
2010)(similar); Fogarazzo v. Lehman Bros., Inc., 263 F.R.D. 90, 110
(S.D.N.Y. 2009) (similar); In re Initial Public Offering Securities
Litigation, 243 F.R.D. 79 (S.D.N.Y. 2007) (similar).  Cf. Kottler
v. Deutsche Bank AG, No. 05 Civ. 7773, 2010 WL 1221809, at *5 (S.D.N.Y.
Mar. 29, 2010) (superiority not satisfied where class members were
high net-worth investors with large claims, capable of litigating
individually).

Further, the Court is unaware of any existing parallel
litigation which might counsel against certification of the class.
See, e.g., Kottler, 2010 WL 1221809, at *5 (superiority not satisfied
where 25 proposed class members had already filed individual lawsuits
and where others had reached settlement without litigation).

Finally, the Court does not foresee any management-related
difficulties that might be sufficiently acute to bar certification.

41

Courts occasionally observe that "'[t]he greater the number of individual issues, the less likely that superiority can be established.'" Cohn v. Massachusetts Mut. Life Co., 189 F.R.D. 209, 219 (D. Conn. 1999)(quoting Castano v. American Tobacco Company, 84 F.3d 734, 745 n.19 (5th Cir. 1996)). See, e.g., Spagnola v. Chubb Corp., 264 F.R.D. 76, 99 (S.D.N.Y. 2010) (superiority not satisfied because of "the need for mini-trials on the resolution of each class member's claims and the applicability of affirmative defenses"). Conversely, the "failure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule." In re Visa Check/MasterMoney Antitrust Litigation, 280 F.3d 124, 140 (2d Cir. 2001) (quotation marks omitted). See, e.g., Charrons v. Pinnacle Group NY LLC, ___ F. R. D. _____, 2010 WL 1752501, at *22 (S.D.N.Y. Apr. 27, 2010) (adjudicating liability elements of common claims where individual class members sought varying damages deemed "the most efficient way to proceed."); In re American Intern. Group, Inc. Securities Litigation, 265 F.R.D. 157, 188 (S.D.N.Y. 2010) (anticipated management difficulties in class action involving more than two million class members deemed "necessary evils in avoiding the undoubtedly much larger difficulties that would arise from resolving the controversy through thousands of smaller suits."); In re Currency Conversion Fee Antitrust Litigation, 264 F.R.D. 100, 117 (S.D.N.Y. 2010) (anticipated management difficulties outweighed by

42

desirability of "[s]treamlining the litigation in one forum [to] simplify the process and avoid inconsistency," and "conservation of judicial resources."); Fogarazzo v. Lehman Bros., Inc., 263 F.R.D. 90, 110 (S.D.N.Y. 2009) (similar).  Here, management concerns are further minimized by the fact that the parties contemplate no further litigation of their substantive claims.  In aggregate, these factors persuade the Court that, by a preponderance of the evidence, the superiority requirement is met.

In accordance with the foregoing, the proposed class meets the requirements of Rules 23(a) and Rule 23(b)(3), and as such is certified subject to the above stated limitation with respect to the Class Period.

### B. Proposed Settlement

Federal Rule of Civil Procedure 23(e) requires court approval of any settlement that effects the dismissal of a class action. Final approval of a proposed settlement may only be granted "after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).  See, e.g., McReynolds v. Richards-Cantave, 588 F.3d 790, 803 (2d Cir. 2009); Central States Se. and Sw. Areas Health and Welfare Fund v. Merck-Medco Managed Care, L.L.C., 504 F.3d 229, 247 (2d Cir. 2007).  Determining whether a settlement is fair, reasonable, and adequate requires consideration of the "'negotiating process leading up to the settlement, i.e., procedural fairness, as well as the settlement's substantive terms,

43

i.e., substantive fairness.'"  McReynolds, 588 F.3d at 803-04

(quoting D'Amato v. Deutsche Bank, 236 F.3d 78, 85 (2d Cir. 2001)).

With respect to procedural fairness, the reviewing court must "ensure

that the settlement resulted from arm's-length negotiations and that

plaintiffs' counsel . . . possessed the necessary experience and

ability, and have engaged in the discovery, necessary to effective

representation of the class's interests."  Id. at 804 (quotation

marks omitted).  Under such circumstances, the Second Circuit has

recognized a presumption of fairness, reasonableness, and adequacy

as to proposed settlements.  See id. at 803; Wal-Mart Stores, Inc.

v. Visa U.S.A., Inc., 396 F.3d 96, 116 (2d Cir. 2005).  With respect

to substantive fairness, the reviewing court must consider nine

factors, namely:

> (1) the complexity, expense and likely duration of the
> litigation; (2) the reaction of the class to the
> settlement; (3) the stage of the proceedings and the amount
> of discovery completed; (4) the risks of establishing
> liability; (5) the risks of establishing damages; (6) the
> risks of maintaining the class action through the trial;
> (7) the ability of the defendants to withstand a greater
> judgment; (8) the range of reasonableness of the
> settlement fund in light of the best possible recovery;
> (9) the range of reasonableness of the settlement fund to
> a possible recovery in light of all the attendant risks
> of litigation.

City of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d Cir. 1974)

(internal citations omitted), abrogated on other grounds by

Goldberger v. Integrated Res., Inc., 209 F.3d 43 (2d Cir. 2000).  See

McReynolds v. Richards-Cantave, 588 F.3d 790, 804 (2d Cir. 2009);

Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 117 (2d Cir.
2005).

Preliminary approval of a class action settlement, in contrast
to final approval, "is at most a determination that there is what
might be termed 'probable cause' to submit the proposal to class
members and hold a full-scale hearing as to its fairness." In re
Traffic Executive Association-Eastern Railroads, 627 F.2d 631, 634
(2d Cir. 1980). As such, it "is appropriate where it is the result
of serious, informed, and non-collusive negotiations, where there
are no grounds to doubt its fairness and no other obvious deficiencies
. . . , and where the settlement appears to fall within the range
of possible approval." Reade-Alvarez v. Eltman, Eltman & Cooper,
P.C., 237 F.R.D. 26, 33 (E.D.N.Y. 2006). See, e.g., Authors Guild
v. Google. Inc., No. 05 Civ. 8136, 2009 WL 4434586, at *1 (S.D.N.Y.
Dec. 1, 2009); Chin v. RCN Corp., No. 08 Civ. 7349, 2010 WL 1257586,
at *2 (S.D.N.Y. Mar. 12, 2010).

Here, the proposed settlement falls within the range of possible
approval. As set forth in the Stipulation, Defendants have agreed
to pay $2 million into an escrow account (the "Settlement Fund") for
the benefit of the class in exchange for the release of all Released
Claims against any of the Released Parties.[23] (Dkt. # 113, ¶¶ 2.2.

---

[23] "Released Claims" is defined as

any and all claims, debts, demands, rights or causes of action or
liabilities of any nature or description whatsoever (including, but
not limited to, claims for damages, interest, attorneys' fees, expert

or consulting fees, and any other costs, expenses, or liability whatsoever), whether based on federal, state, local, statutory or common law or any other law, rule or regulation, whether fixed or contingent, accrued or unaccrued, liquidated or unliquidated, at law or in equity, matured or unmatured, whether class or individual in nature, including both known claims and Unknown Claims . . . , that have been or could have been asserted in any forum by Lead Plaintiff or the Class Members or any of them or the heirs, successors, and assigns of any of them, against any of the Released Parties, which arise out of, are based on, or relate in any way, directly or indirectly, to any of the allegations, acts, transactions, facts, events, matters or occurrences, representations or omissions involved, asserted, set forth, referred to or that could have been asserted in the Litigation and arise out of, are based on, or relate in any way to the purchase of [SNSA] securities by any Class Member during the Class Period, including, but not limited to, any derivative claims that could have been asserted relating to the Released Claims.

(Dkt. # 113, ¶ 1.17.)  "Unknown Claims" is defined as

any and all Released Claims which the Lead Plaintiff or any Class Member does not know or suspect to exist in his, her or its favor at the time of the release of the Released Parties, and any Released Defendants' Claims which any Defendant does not know or suspect to exist in his, her or its favor, which if known by him, her or it might have affected his, her or its decision(s) with respect to the Settlement.  With respect to any and all Released Claims and Released Defendants' Claims, the Settling Parties stipulate and agree that upon the Effective Date, the Lead Plaintiff and Defendants shall expressly waive, and each Class Member shall be deemed to have waived, and by operation of the Order and Final Judgment shall have expressly waived, any and all provisions, rights and benefits conferred by any law of any state or territory of the United States, or principle of common law, which is similar, comparable, or equivalent to California Civil Code § 1542, which provides: 'A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.'  Lead Plaintiff and the Class Members may hereafter discover facts in addition to or different from those which he, she or it now knows or believes to be true with respect to the subject matter of the Released Claims, but the Lead Plaintiff shall expressly waive, and each Class Member, upon the Effective Date, shall be deemed to have, and by operation of the Order and Final Judgment shall have, fully, finally, and forever settled and released any and all Released Claims, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, which now exist, or heretofore have existed, upon any theory of law or equity now existing or coming into existence in the future, including, but not limited to, breach of any duty, law or rule, without regard to the subsequent discovery or existence of such different or additional facts.  Defendants may hereafter discover facts in addition to or different from those which they know or believe to be true with respect to the subject matter of the Released Defendants' Claims, but Defendants shall expressly waive, and by operation of the Order and

3.1.)  Lead Plaintiff estimates that this sum represents $0.12 per

share of SNSA ADRs before deduction of attorneys' fees and expenses.

(Notice of Proposed Settlement of Class Action ("Notice") (Dkt. #

---

Final Judgment shall have fully, finally, and forever settled and
released any and all Released Defendants' Claims, known or unknown,
suspected or unsuspected, contingent or non-contingent, whether or
not concealed or hidden, which now exist, or heretofore have existed,
upon any theory of law or equity now existing or coming into existence
in the future, including, but not limited to, breach of any duty, law
or rule, without regard to the subsequent discovery or existence of
such different or additional facts.  Lead Plaintiff and Defendants
acknowledge, and the Class Members by operation of law shall be deemed
by operation of the Order and Final Judgment to have acknowledged,
that the inclusion of "Unknown Claims" in the definition of Released
Claims and Released Defendants' Claims was separately bargained for
and was a key element of the Settlement.

(Dkt. # 113, ¶ 1.23.)  "Released Defendants' Claims" is defined as

any and all claims, rights or causes of action or liabilities
whatsoever, whether based on federal, state, local, statutory or
common law or any other law, rule or regulation, including both known
claims and Unknown Claims . . . , that have been or could have been
asserted in the Litigation or any forum by the Defendants, or the
heirs, successors and assigns of any of them against the Lead
Plaintiff, any of the Class Members or their attorneys, which arise
out of or relate in any way to the institution, prosecution or
settlement of the Litigation, excluding any claims for breaches of
this Stipulation.

(Dkt. # 113, ¶ 1.18.)  Although these definitions sweep broadly, the parties'
authority to release is necessarily limited to claims that "arise[ ] out of the
'identical factual predicate' as the settled conduct."  Wal-Mart Stores, Inc. v.
Visa U.S.A., Inc., 396 F.3d 96, 107 (2d Cir. 2005) (quoting TBK Partners, Ltd.
v. Western Union Corp., 675 F.2d 456, 460 (2d Cir. 1982)).  Finally, "Released
Parties" is defined as

each and all of the Defendants, their respective past or present
advisors, affiliates, agents, assigns, attorneys, banks or investment
banks, co-insurers, consultants, directors, divisions, present and
former employees, heirs, insurers, investment advisors, members,
officers, parents, predecessors, principals, reinsurers,
representatives, stockholders, spouses, subsidiaries, successors,
related or affiliated entities, any entity in which any Defendant has
a controlling interest, any member of an Individual Defendant's
immediate family, or any trust of which any Defendant is the settlor
or which is for the benefit of any Individual Defendant and/or
member(s) of his family.

(Dkt. # 113, ¶ 1.19.)

113-2, p. 4.))  Lead Plaintiff further estimates that this sum represents approximately eight percent of the maximum recoverable damages for all Class Members.  (Dkt. # 112, p. 10.)

"Securities class actions are generally complex and expensive to prosecute."  In re Gilat Satellite Networks, Ltd., No. CV-02-1510, 2007 WL 1191048, at *10 (E.D.N.Y. Apr. 19, 2007).  See Strougo v. Bassini, 258 F. Supp. 2d 254, 258 (S.D.N.Y. 2003) (it is "beyond cavil that continued litigation in this multi-district securities class action would be complex, lengthy, and expensive, with no guarantee of recovery by the class members." (quotation marks omitted)).  Here, in light of the considerable risks involved in establishing liability, the anticipated costs involved, and the uncertainty of securing any recovery through further litigation, the proposed Settlement Fund amount and its relationship to Lead Plaintiff's estimated maximum recoverable damages weigh in favor of approving the settlement.

Further, the proposed settlement does not appear to be collusive.  The negotiations leading to settlement appear to have been comprehensive, and the Stipulation forecloses any unduly preferential treatment to class representatives.  Specifically, the Stipulation provides that after accounting for: (1) the costs of notice and administration of settlement;[24] (2) the attorneys' fees

_____

[24] The Stipulation provides that Lead Counsel, as Escrow Agent, may allocate up to $200,000 of the Settlement Fund to a distinct Notice and Administration Fund, and without seeking further approval from the court, may draw from the Notice and

and expenses to be awarded by this Court;[25] and (3) taxes on the income earned by the Settlement Fund and tax expenses, the balance of the Settlement Fund (the "Net Settlement Fund") is to be distributed to all Authorized Claimants[26] in accordance with the proposed Plan of Allocation,[27] and no portion is to be returned to Defendants. (Dkt. # 113, ¶¶ 3.2, 3.6, 5.2, 6, 7.1, 7.12.)[28]  In turn, the Plan of

---

Administration Fund to pay the costs of notice and administration of the settlement. (Dkt. # 113, ¶ 5.2.)  The tasks involved, including mailing the notice to the class, publishing the summary notice, reviewing claims, compiling a distribution schedule, and mailing distribution checks, are to be performed by the Claims Administrator under Lead Counsel's supervision and subject to the court's authority. (Dkt. # 112, p. 12; Dkt. # 113 ¶ 5.1.)

[25] According to the proposed Notice, Lead Plaintiff's counsel, if appointed as Class Counsel, intends to move for an award attorneys' fees not to exceed 33-1/3 percent of the Settlement Fund, and reimbursement of expenses not to exceed $100,000 as incurred in connection with the prosecution of this action, plus interest on both fees and expenses at the same rate as that earned by the Settlement Fund. (Dkt. # 113-2, pp. 3, 15.)

[26] "Authorized Claimant" is defined as "any Class Member whose claim for recovery has been allowed" in accordance with the terms of the Stipulation. (Dkt. # 113, ¶ 1.1.)

[27] The proposed Plan of Allocation is set forth as part of the proposed Notice to the class, but the Stipulation notes that this particular version of the Plan "is not a necessary term of this Stipulation and it is not a condition of this Stipulation that the Plan of Allocation be approved." (Dkt. # 113, ¶ 7.3.)

[28] The Settlement will only effectively release the claims of the class after: (1) the court preliminarily approves the Settlement; (2) the class is notified in accordance with the approved method; (3) a Settlement Hearing is held during which class members are given an opportunity to object to the Settlement, the Plan of Allocation, or proposed counsel fees and expenses; (4) the court finally approves the Settlement as fair, reasonable, and adequate in accordance with Rule 23; and (5) all appeals have been exhausted and the opportunity for further review has expired. (Dkt. # 113, ¶¶ 1.6, 4.2, 11.1.)  Meanwhile, the parties agree that Defendants shall retain an option to terminate the settlement, which may be exercised only if

> the aggregate number of shares of [SNSA] securities purchased during the Class Period by Class Members who would otherwise be entitled to participate as members of the Class, but who timely and validly request exclusion, equals or exceeds a certain percentage of the total number of shares of [SNSA] securities traded during the Class Period, as set forth in a Supplemental Agreement between Defendants and Lead Plaintiff.

Allocation provides that the Claim Administrator will first determine a "Recognized Claim" for each Authorized Claimant based on the dates on which their affected securities were purchased and sold, adjusted in accordance with the PSLRA's 90-day "lookback" limitation.  (Dkt. # 113-2, pp. 21-29.)[29]  If all Recognized Claims can be borne by the Net Settlement Fund, each Authorized Claimant will receive an amount equal to their Recognized Claim.  (Dkt. # 113-2, p. 21.)  Otherwise, each Authorized Claimant will receive a share of the Net Settlement Fund corresponding to the percentage of all Recognized Claims represented by their Recognized Claim.  (Dkt. # 113-2, p. 21.)

In sum, the Court at this stage finds no obvious deficiencies or significant grounds to doubt the settlement's fairness, and concludes that the settlement lies within the range of possible approval.  Accordingly, preliminary approval is granted.

---

(Dkt. # 113, ¶ 10.1.)  Defendants must give Lead Counsel advance notice of their intent to exercise this option to terminate.  (Dkt. # 113, ¶ 10.2.)  Upon such notice, Lead Counsel "may review the validity of any Class Member's request for exclusion and may attempt to cause retraction or withdrawal of any request for exclusion" in order to reduce the percentage of affected securities to a level falling below the threshold set forth in the "Supplemental Agreement."  (Dkt. # 113, ¶ 10.3.)  Lead Plaintiff's success in causing sufficient retractions of requests for exclusion automatically nullifies Defendants' right to exercise their option to terminate.  (Dkt. # 113, ¶ 10.3.)

[29] In securities class actions, the PSLRA limits damages to the purchase price of the security, reduced by its mean trading price for the 90-day period subsequent to the corrective disclosure (the "lookback" period).  See 15 U.S.C. § 78u-4(e).  When the subject security is sold before expiration of the lookback period, damages may not exceed the difference between the purchase price and the mean trading price during the interval beginning at the date of the corrective disclosure and ending at the date of sale.  See id.

## C. Appointment of Class Representative, Class Counsel, and Claims Administrator

With Defendants' consent, Lead Plaintiff seeks appointment as Class Representative, and Lead Counsel's appointment as Class Counsel.  (Dkt. # 113, p. 4.)  The parties propose Gilardi & Co. LLC as Claims Administrator.  (Dkt. # 112, p. 6.)

To appoint Lead Plaintiff as Class Representative, a court must "find, by a preponderance of the evidence, that he is both an adequate and typical representative of the class . . . ."  In re Flag Telecom Holdings, Ltd. Securities Litigation, 574 F.3d 29, 40 (2d Cir. 2009). Here, the Court has made such findings as discussed under A-3 (Typicality) and A-4 (Adequacy of Representation), above. Accordingly, the Court appoints Lead Plaintiff as Class Representative.

Federal Rule of Civil Procedure 23(g)(1)(A) sets out the factors a court must consider in appointing Class Counsel, namely: (1) "the work counsel has done in identifying or investigating potential claims in the action;" (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;" (3) "counsel's knowledge of the applicable law;" and (4) "the resources that counsel will commit to representing the class."  Fed. R. Civ. P. 23(g)(1)(A).  Further, a court may "consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class."  Fed. R. Civ.

P. 23(g)(1)(B).

Here, the Court is satisfied that Lead Counsel has performed adequately in litigating and settling this case, and is sufficiently qualified and experienced to effectively represent the proposed class. (See Dkt. # 112-1.) Accordingly, the Court appoints Lead Counsel as Class Counsel.

Finally, the proposed Claims Administrator has submitted a detailed declaration describing the claim processing procedures that it will implement to effectuate the settlement, as well as its relevant experience and qualifications. (See Dkt. # 127-2.) Accordingly, the Court appoints Gilardi & Co. LLC as Claims Administrator.

### D. Proposed Notice

Lead Plaintiff seeks approval of its proposed notice to the class. Under Federal Rule of Civil Procedure 23(c)(2)(B), a "court must direct to class members the best notice that is practicable under the circumstances . . . ."[30]

With respect to substance, this requires that the notice clearly

---

[30] In the simultaneous certification and settlement context, notice to class members seems mandated by both Rules 23(c)(2)(B) and 23(e)(1). Rule 23(e)(1), which states that "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal," appears to require somewhat less than Rule 23(c)(2)(B), which states that "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. Thus, in the simultaneous certification and settlement context, as here, a single notice suffices if it constitutes the best notice that is practicable under the circumstances in accordance with Rule 23(c)(2)(B). See Manual for Complex Litigation, Fourth, § 21.311 (2004) ("If a class is certified and settled simultaneously, a single notice is generally used.").

and concisely state in plain, easily understood language: (1) the nature of the action; (2) the definition of the class certified; (3) the class claims, issues, or defenses; (4) that a class member may enter an appearance through an attorney if the member so desires; (5) that the Court will exclude from the class any member who requests exclusion; (6) the time and manner for requesting exclusion; and (7) the binding effect of a class judgment on class members.  Fed. R. Civ. P. 23(c)(2)(B).  Where a proposed or final settlement agreement is published or otherwise disseminated to the class, the PSLRA further requires: (1) a statement of plaintiff recovery;[31] (2) a statement of potential outcome of the case;[32] (3) a statement of attorneys' fees and costs sought;[33] (4) identification of lawyers' representatives;[34] (5) the reasons for settlement; and (6) a cover page summarizing the information contained in the foregoing

[31] Specifically, the "amount of the settlement proposed to be distributed to the parties to the action, determined in the aggregate and on an average per share basis." 15 U.S.C. § 78u-4(a)(7)(A).

[32] Specifically, a "statement concerning the average amount of such potential damages per share," or "[i]f the parties do not agree on the average amount of damages per share that would be recoverable if the plaintiff prevailed on each claim alleged under this chapter, a statement from each settling party concerning the issue or issues on which the parties disagree." 15 U.S.C. § 78u-4(a)(7)(B).

[33] Specifically, a statement indicating which parties or counsel intend to apply to the court for an award of attorneys' fees or costs from any fund established as part of the settlement, as well as "the amount of fees and costs that will be sought (including the amount of such fees and costs determined on an average per share basis), and a brief explanation supporting the fees and costs sought."  15 U.S.C. § 78u-4(a)(7)(C).

[34] Specifically, "[t]he name, telephone number, and address of one or more representatives of counsel for the plaintiff class who will be reasonably available to answer questions from class members concerning any matter contained in any notice of settlement published or otherwise disseminated to the class." 15 U.S.C. § 78u-4(a)(7)(D).

statements.   15 U.S.C. § 78u-4(a)(7).

With respect to method, Rule 23(c)(2)(B) requires "individual notice to all members who can be identified through reasonable effort."  See Eisen v. Carlisle and Jacquelin, 417 U.S. 156, 176 (1974) ("[I]ndividual notice to identifiable class members is not a discretionary consideration to be waived in a particular case.   It is, rather, an unambiguous requirement of Rule 23.").

Finally, in order to comport with due process, the notice "must be of such nature as reasonably to convey the required information . . . and it must afford a reasonable time for those interested to make their appearance."  McReynolds v. Richards-Cantave, 588 F.3d 790, 804 (2d Cir. 2009) (quotation marks omitted).  See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 114 (2d Cir. 2005) (A "settlement notice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." (quotation marks omitted)).   Proper notice under the foregoing rules allows class members to meaningfully evaluate their participation in a proposed settlement by, for instance, comparing the recovery per share under the settlement with the potential damages per share if the class prevailed at trial.   See In re Independent Energy Holdings PLC Securities Litigation, 302 F. Supp. 2d 180, 184 (S.D.N.Y. 2003) ("One of the concerns Congress had in enacting the PSLRA was to ensure that class members received sufficient, comprehensible notice so

they could evaluate proposed settlements intelligently.").

Here, the Court has reviewed the proposed Notice (Dkt. # 113-2) and is satisfied that all foregoing requirements are met.  Lead Plaintiff proposes to send this Notice and a Proof of Claim and Release form (Dkt. # 113-3) by first-class mail to each Class Member identified from SNSA's transfer records as purchasers of its securities during the Class Period.  (Dkt. # 112, p. 11.)  Lead Plaintiff further proposes to cause Summary Notice (Dkt. # 113-4) to be published once in the national edition of Investor's Business Daily (Dkt. # 112, p. 11) and to be posted on either the PR Newswire or the Business Wire (Dkt. # 125, ¶ 7).  The proposed Notice and Summary Notice both indicate that the Claims Administrator will also maintain a toll-free telephone service and website which will serve to provide further information on the settlement and assistance to potential class members without charge, including copies of the Stipulation and Proof of Claim and Release form.  (Dkt. # 113-2, p. 12; Dkt. # 113-4, p. 3.)  The Court finds these notice methods adequate.  Accordingly, the proposed notice to the class is approved provided that, prior to its dispatch, appropriate adjustments are made to the Notice, Proof of Claim and Release form, and Summary Notice in order to accurately reflect the Class Period parameters as certified herein.

## IV. CONCLUSION

For the foregoing reasons, Lead Plaintiff's motion (Dkt. # 111)

is GRANTED as modified herein.   To effectuate settlement, the Court orders the following:

**Within 20 days from the date of this order**, Defendants shall provide the Claims Administrator with a list of all known purchasers of SNSA ADRs or ordinary shares during the Class Period in a form acceptable to the Claims Administrator.

**Within 45 days from the date of this order**, the Claims Administrator shall: (A) cause the Notice and Proof of Claim and Release form to be mailed to each class member; (B) cause the Summary Notice to be published once in the national edition of Investor's Business Daily and over the BusinessWire or PR Newswire; and (C) make available the toll-free telephone service and website described in the Notice and Summary Notice.   Proof of compliance with the foregoing shall be served on Defendants' counsel and filed with the Court no later than 10 days prior to the Settlement Hearing.

**On December 15, 2010, at 3:00 P.M.** in Courtroom 2 of the United States District Court for the District of Connecticut, 450 Main Street, Hartford, Connecticut 06103, the Court shall conduct a Settlement Hearing in order to determine: (1) whether the proposed Settlement is fair, reasonable, and adequate and should be finally approved; (2) whether to approve the Plan of Allocation; (3) whether to approve Class Counsel's application for attorney's fees and costs; and (4) whether the action should be dismissed with prejudice.   The Court may adjourn the Settlement Hearing without notice to members

of the Class, and reserves the right to finally approve the proposed Settlement without further notice to members of the Class.

**No later than 15 days before the Settlement Hearing**, Plaintiffs shall file a motion for final approval of the settlement and supporting briefs.

**No later than 15 days before the Settlement Hearing**, Class Counsel shall file their application for attorney's fees and costs along with supporting brief in accordance with Fed. R. Civ. P. 23(h).

All Class Members have the right, pursuant to Rule 23(c)(2), to opt-out of the Action by filing a valid request for exclusion from the class with the Claims Administrator at the address included in the Notice **no later than 30 days before the Settlement Hearing**, unless otherwise accepted by the Court.  Class Members who validly request exclusion shall not be entitled to any payment, and shall have no standing to object to the Settlement.  All Class Members who do not request exclusion shall be bound by all determinations and judgments in this action.

Any Class member who does not timely or validly request exclusion from the Class and who has timely filed a notice of intention to appear may appear in person or by counsel at the Settlement Hearing and be heard in opposition to the fairness, reasonableness and adequacy of the Settlement, Plan of Allocation, or Class Counsel's application for attorney's fees and costs.  All wishing to be so heard shall file a notice of their intention to appear

with the Clerk of the Court, and serve the same on Class Counsel and counsel for Defendants, **no later than 30 days before the Settlement Hearing**, unless otherwise excused by the Court.  Such notice must include proof of class membership, explanation for the opposition, and supporting documents.  Class Members who do not object to the Settlement need not appear or take any other action to indicate approval.

SO ORDERED this 10th day of September, 2010.


_____**/s/DJS**_____
                 **DOMINIC J. SQUATRITO**
           **UNITED STATES DISTRICT JUDGE**